ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
– and –
SPENCER A. BURKHOLZ (147029)
DANIELLE S. MYERS (259916)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
danim@rgrdlaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UA LOCAL 38 DEFINED CONTRIBUTION PENSION PLAN, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SEAGATE TECHNOLOGY HOLDINGS PLC, WILLIAM D. MOSLEY, and GIANLUCA ROMANO,<br><br>Defendants. | Case No. 3:23-cv-03431<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff UA Local 38 Defined Contribution Pension Plan ("plaintiff"), on behalf of itself and all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings, press releases, earnings presentations, conference call transcripts, and other information prepared for investors by Seagate Technology Holdings plc ("Seagate" or the "Company"), as well as media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a securities class action on behalf of all purchasers of Seagate common stock between September 15, 2020 and October 25, 2022, inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against Seagate and certain of the Company's current and former senior executives under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

**JURISDICTION AND VENUE**

2. Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

3. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), because the Company conducts business in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements into this District. Defendant Seagate maintains principal product development facilities in this District.

4. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

5. Plaintiff UA Local 38 Defined Contribution Pension Plan, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased Seagate common stock during the Class Period and has been damaged thereby.

6. Defendant Seagate Technology Holdings plc is an Irish corporation with its principal product development facilities in Fremont, California. The Company's common stock is listed on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "STX." As of April 24, 2023, there were more than 207 million shares of Seagate stock issued and outstanding held by thousands of record holders.

7. Defendant William D. Mosley ("Mosley") served as the Chief Executive Officer ("CEO") of Seagate and a member of the Company's Board of Directors (the "Board") at all relevant times. As CEO, defendant Mosley spoke on Seagate's behalf in releases, conference calls and SEC filings. Pursuant to §906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, defendant Mosley certified the Company's Forms 10-Q filed with the SEC on October 29, 2020, January 28, 2021, April 29, 2021, October 28, 2021, January 27, 2022, and April 28, 2022.

8. Defendant Gianluca Romano ("Romano") served as the Chief Financial Officer ("CFO") of Seagate at all relevant times. As CFO during the Class Period, defendant Romano spoke on Seagate's behalf in releases, conference calls, and SEC filings. Pursuant to §906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, defendant Romano certified the Company's Forms 10-Q filed with the SEC on October 29, 2020, January 28, 2021, April 29, 2021, October 28, 2021, January 27, 2022, and April 28, 2022.

9. Defendants referenced above in ¶¶7-8 are sometimes referred to herein as the "Individual Defendants." During the Class Period, the Individual Defendants ran the Company as hands-on managers, overseeing Seagate's operations, business practices, and finances, and made

the materially false and misleading statements described herein. The Individual Defendants had intimate knowledge about core aspects of Seagate's financial and business operations, including the Company's proprietary technologies and business relationships. They were also intimately involved in deciding which disclosures would be made by the Company.

**BACKGROUND**

10. Seagate is a leading global supplier of data storage products, including hard disk drives ("HDDs"). In its fiscal year 2021, Seagate reported $10.7 billion of revenue and $1.3 billion of net profit. By geographic region, roughly half of Seagate's sales were to customers in the Asia Pacific region. By distribution channel, roughly 70% of Seagate's sales were to original equipment manufacturers ("OEMs") with the remainder going to distributors and retailers. The Company has increased its market share in recent years, and controlled more than 40% of the world market for HDDs at the start of the Class Period. Seagate's main competitors are other manufacturers of data storage solutions, including Micron Technology, Inc., SK hynix Inc., Toshiba Corporation, and Western Digital Corporation.

11. By the start of the Class Period, Huawei Technologies Co. Ltd. ("Huawei"), a Chinese multinational technology corporation headquartered in Shenzhen, China, had emerged as a significant global purchaser of data storage products, including HDDs, produced by Seagate and other U.S.-based suppliers including Western Digital. Huawei utilized the HDDs in the PC and server products it manufactured and sold to consumers, as well as in its own data centers, servers, and other bulk-data storage applications. At the start of the Class Period, Huawei was estimated to spend around $800 million annually on HDDs.

12. On May 16, 2019, Huawei and certain of its non-U.S. affiliates were added to the U.S. Department of Commerce Bureau of Industry and Security's ("BIS") Export Administration Regulations ("EAR") Entity List ("Entity List"). The EAR Entity List is a list of names of certain foreign persons – including businesses, research institutions, government and private organizations, individuals, and other types of legal persons – that are subject to specific license requirements for the export, re-export, and/or transfer (in-country) of specified items. The Entity List designation was based on a determination made by multiple U.S. government agencies "***that***

***there is reasonable cause to believe that Huawei has been involved in activities contrary to the national security or foreign policy interests of the United States*.**" Specifically, the End-User Review Committee, composed of representatives of the U.S. Departments of Commerce, State, Defense, and Energy, determined that the listings were necessary to protect U.S. national security or foreign policy.

13. Then, on August 17, 2020, the BIS imposed export controls over certain foreign-produced items "to better address the continuing threat to U.S. national security and U.S. foreign policy interests posed by Huawei and its non-U.S. affiliates." Specifically, effective August 17, 2020, the BIS implemented the foreign direct product ("FDP") rule, imposing license requirements on certain foreign-produced items when (i) there is knowledge that a listed Huawei entity is a party to the transaction and (ii) the foreign-produced item is produced by an overseas plant or major component of a plant that is itself a direct product of U.S.-origin technology or software subject to the EAR and specified in certain Export Control Classification Numbers. The BIS explained that the FDP rule "narrowly and strategically target[ed] Huawei's acquisition of semiconductors that are the direct product of certain U.S. software and technology." The BIS reference to "certain U.S. software and technology" covered not only the end products (*e.g.*, HDDs) but also any equipment that was "involved in any essential 'production' or 'development' . . . including product engineering, manufacture, integration, assembly (mounting), inspection, testing and quality assurance" of such products.

14. Seagate's HDD manufacturing sites in China, Northern Ireland, Malaysia, Singapore, Thailand, and the United States used equipment, including testing equipment, subject to the EAR and the FDP rule. For example, Seagate used a fully automated laser-based surface inspection system manufactured by a third party to detect and classify critical defects on HDDs' substrates and media such as micro pits, bumps, and particles. At all relevant times, Seagate's equipment was subject to the EAR and was the direct product of U.S.-origin ECCN 3E991 technology.

15. Shortly after the new BIS export rules were put in place, Seagate's competitors, including two of the three companies capable of making HDDs, promptly – and publicly – stated

that they had ceased sales to Huawei. Several other suppliers of semiconductors used by the top global producers of HDDs also suspended sales directly to Huawei after the rules went into effect.

16. Unbeknownst to investors, Seagate capitalized on the lack of competition and expanded its relationship with Huawei. By late 2020, Seagate had become Huawei's sole source provider of the HDDs and entered a three-year Strategic Cooperation Agreement. The agreement named Seagate as "Huawei's strategic supplier," granting Seagate "priority basis over other Huawei suppliers." The undisclosed increase in sales to Huawei allowed defendants to report strong revenue growth in Seagate's HDD business during the Class Period. In total, between August 2020 and September 2021, Seagate transacted with Huawei on 429 occasions, shipping more than 7.4 million HDDs in violation of the BIS export rules, and generating more than $1.1 billion in revenue.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD**

17. The Class Period begins on September 15, 2020. One day prior, September 14, 2020, after the market closed, defendants spoke at Deutsche Bank's 2020 Technology Conference investor conference. During the conference, defendant Romano was asked about how the new Huawei export restrictions would impact the Company. The CFO responded as follows: "I don't see any particular restriction for us in terms of being able to continue to ship to Huawei or any other customers in China. So we don't think we need to have a specific license."

18. On October 22, 2020, Seagate issued a release providing the Company's financial and operational results for the quarter ended October 2, 2020 ("Q1 2021"). The release stated that Seagate had achieved total revenue of $2.31 billion during the quarter. That same day, Seagate held an earnings call with analysts and investors to discuss the Company's Q1 2021 results, hosted by defendants Mosley and Romano. During the earnings call, an analyst asked: "First question is – relates to Huawei. I just want to confirm that, can you talk about whether you are continuing to ship to Huawei? And what is included in your December quarter guidance? It looks like your competitor may have stopped shipping maybe back in middle of September. And do you think

you're seeing some benefits of that in your December quarter?" Instead of disclosing an accurate picture of its ongoing relationship with Huawei, defendant Mosley stated:

> [W]e don't talk about individual customers. I think if I go back 5 or 6 quarters now, we've been talking about how demand has been fairly disrupted, particularly in China. And there's a lot of reasons for pulling in or pushing out demand, different projects that people are doing, financial planning that they might be doing.
>
> * * *
>
> We're a global tech company. We have a broad network of suppliers and customers. We continually monitor and remain in compliance with all the rules and regulations around.

19. On October 29, 2020, Seagate filed with the SEC its quarterly results for Q1 2021 on Form 10-Q, which was signed by defendants Mosley and Romano, who also filed certifications attesting to the Form 10-Q's accuracy and completeness. The Form 10-Q incorporated the risk disclosures from the Company's August 7, 2020 Form 10-K concerning compliance with U.S. export rules, which stated in pertinent part as follows:

> ***Our business is subject to various laws, regulations and governmental policies that may cause us to incur significant expense***.
>
> Our business is subject to regulation under a wide variety of U.S. federal and state and non-U.S. laws, regulations and policies. . . .
>
> In addition, regulation or government scrutiny may impact the requirements for marketing our products and slow our ability to introduce new products, resulting in an adverse impact on our business. Although we have implemented policies and procedures designed to ensure compliance, there can be no assurance that our employees, contractors or agents will not violate these or other applicable laws, rules and regulations to which we are and may be subject. Violations of these laws and regulations could lead to significant penalties, restraints on our export or import privileges, monetary fines, government investigations, disruption of our operating activities, damage to our reputation and corporate brand, criminal proceedings and regulatory or other actions that could materially adversely affect our results of operations. The political and media scrutiny surrounding a governmental investigation for the violation of such laws, even if an investigation does not result in a finding of violation, could cause us significant expense and collateral consequences, including reputational harm, that could have an adverse impact on our business, results of operations and financial condition.

20. On January 21, 2021, Seagate issued a release providing the Company's financial and operational results for the quarter ended January 1, 2021 ("Q2 2021"). The release stated that Seagate had achieved total revenue of $2.62 billion during the quarter, an increase of 13% over the previous quarter and exceeding the high end of the Company's revenue guidance range. That

same day, Seagate held an earnings call with analysts and investors to discuss the Company's Q2 2021 results, hosted by defendants Mosley and Romano. During the earnings call, an analyst again asked about Huawei: "I know I asked this question last quarter on Huawei. But given the current restrictions on the shipment to Huawei, does that change the way you think about the total addressable market for this calendar year for nearline drives?" In response, defendant Mosley stated:

> Yes. So like I said last time, we don't comment on any specific customers. I think that the market demand globally will not change on how it's ultimately serviced. So if that answers your question. So the net demand for data storage products is out there, and it will get serviced by one customer or another, by one supply chain or another, and these are very, very complex supply chains.

21. On January 28, 2021, Seagate filed with the SEC its quarterly results for Q2 2021 on Form 10-Q, which was signed by defendants Mosley and Romano, who also filed certifications attesting to the Form 10-Q's accuracy and completeness. The Form 10-Q incorporated the risk disclosures concerning compliance with U.S. export rules, described above at ¶19.

22. On April 22, 2021, Seagate issued a release providing the Company's financial and operational results for the quarter ended April 2, 2021 ("Q3 2021"). The release stated that Seagate had achieved total revenue of $2.73 billion during the quarter, an increase of 4% over the previous quarter and exceeding the mid-point of the Company's revenue guidance range. That same day, Seagate held an earnings call with analysts and investors to discuss the Company's Q3 2021 results, hosted by defendants Mosley and Romano.

23. On April 29, 2021, Seagate filed with the SEC its quarterly results for Q3 2021 on Form 10-Q, which was signed by defendants Mosley and Romano, who also filed certifications attesting to the Form 10-Q's accuracy and completeness. The Form 10-Q incorporated the risk disclosures concerning compliance with U.S. export rules, described above at ¶19.

24. On July 21, 2021, Seagate issued a release providing the Company's financial and operational results for the quarter ended July 2, 2021 ("Q4 2021"). The release stated that Seagate had achieved total revenue of $3.01 billion during the quarter, an increase of 10% over the previous quarter and 20% over the same quarter in the previous year. That same day, Seagate held an

earnings call with analysts and investors to discuss the Company's Q4 2021 results, hosted by defendants Mosley and Romano.

25. On August 6, 2021, Seagate filed with the SEC its annual results for FY 2021 on Form 10-K, which was signed by defendants Mosley and Romano, who also filed certifications attesting to the Form 10-K's accuracy and completeness. The Form 10-K contained risk disclosures concerning compliance with U.S. export rules, stating in pertinent part as follows:

***Legal, Regulatory and Compliance Risks***

- Our business is subject to various laws, regulations, governmental policies, litigation, governmental investigations or governmental proceedings that may cause us to incur significant expense or adversely impact our results or operations and financial condition.
- Some of our products and services are subject to export control laws and other laws affecting the countries in which our products and services may be sold, distributed, or delivered, and any changes to or violation of these laws could have a material adverse effect on our business, results of operations, financial condition and cash flows.

26. On October 22, 2021, Seagate issued a release providing the Company's financial and operational results for the quarter ended October 1, 2021 ("Q1 2022"). The release stated that Seagate had achieved total revenue of $3.12 billion during the quarter, an increase of 3% over the previous quarter. That same day, Seagate held an earnings call with analysts and investors to discuss the Company's Q1 2022 results, hosted by defendants Mosley and Romano.

27. On October 28, 2021, Seagate filed with the SEC its quarterly results for Q1 2022 on Form 10-Q, which was signed by defendants Mosley and Romano, who also filed certifications attesting to the Form 10-Q's accuracy and completeness. The Form 10-Q incorporated the risk disclosures from the August 6, 2021 Form 10-K concerning compliance with U.S. export rules, described, above at ¶25.

28. On January 27, 2022, Seagate filed with the SEC its quarterly results for Q2 2022 on Form 10-Q, which was signed by defendants Mosley and Romano, who also filed certifications attesting to the Form 10-Q's accuracy and completeness. The Form 10-Q incorporated the risk disclosures from the August 6, 2021 Form 10-K concerning compliance with U.S. export rules, described, above at ¶25.

29. On April 28, 2022, Seagate filed with the SEC its quarterly results for Q3 2022 on Form 10-Q, which was signed by defendants Mosley and Romano, who also filed certifications attesting to the Form 10-Q's accuracy and completeness. The Form 10-Q incorporated the risk disclosures from the August 6, 2021 Form 10-K concerning compliance with U.S. export rules, described, above at ¶25.

30. On August 5, 2022, Seagate filed with the SEC its annual results for FY 2022 on Form 10-K, which was signed by defendants Mosley and Romano, who also filed certifications attesting to the Form 10-K's accuracy and completeness. The Form 10-K contained risk disclosures concerning compliance with U.S. export rules, stating in pertinent part as follows:

> **LEGAL, REGULATORY AND COMPLIANCE RISKS**
>
> * * *
>
> ***Some of our products and services are subject to export control laws and other laws affecting the countries in which our products and services may be sold, distributed, or delivered, and any changes to or violation of these laws could have a material adverse effect on our business, results of operations, financial condition and cash flows***.
>
> Due to the global nature of our business, we are subject to import and export restrictions and regulations, including the Export Administration Regulations administered by the U.S. Commerce Department's Bureau of Industry and Security ("BIS") and the trade and economic sanctions regulations administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"). We incorporate encryption technology into certain of our products and solutions. These encryption products and the underlying technology may be exported outside of the United States only with export authorizations, including by license, a license exception or other appropriate government authorizations, including the filing of an encryption registration. The U.S., through the BIS and OFAC, places restrictions on the sale or export of certain products and services to certain countries, persons and entities, as well as for certain end-uses, such as military, military-intelligence and weapons of mass destruction end-uses. The U.S. government also imposes sanctions through executive orders restricting U.S. companies from conducting business activities with specified individuals and companies. Although we have controls and procedures to ensure compliance with all applicable regulations and orders, we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers. Additionally, we cannot ensure that our interpretation of relevant restrictions and regulations will be accepted in all cases by relevant regulatory and enforcement authorities.
>
> Violators of any U.S. export control and sanctions laws may be subject to significant penalties, which may include monetary fines, criminal proceedings against them and their officers and employees, a denial of export privileges, and suspension or debarment from selling products to the U.S. government. Moreover, the sanctions imposed by the U.S. government could be expanded in the future.

> Our products could be shipped to those targets or for restricted end-uses by third parties, including potentially our channel partners, despite our precautions. In addition, if our partners fail to obtain appropriate import, export or re-export licenses or permits, we may also be adversely affected, through reputational harm as well as other negative consequences including government investigations and penalties. A significant portion of our sales are to customers which are located in geographies that have been the focus of recent changes in U.S. policies. Any further limitation that impedes our ability to export or sell our products and services could materially adversely affect our business, results of operations and financial condition.

31. The statements referenced in ¶¶17-30 above were materially false and/or misleading when made because they failed to disclose the following facts pertaining to Seagate's business, operations, and financial condition, which were known to or recklessly disregarded by defendants:

(a) the nature and magnitude of Seagate's HDD sales to Huawei, including that Seagate experienced a significant acceleration in sales to Huawei immediately after the BIS rules went into effect and Seagate's competitors stopped selling to Huawei; and

(b) that the underlying details of Seagate's HDD manufacturing process, including the use of covered U.S. software and technology in "essential 'production'" processes, rendered its sales to Huawei in violation of the BIS export rules.

32. In addition, as a result of ¶31(a)-(b) above, Seagate was in blatant violation of the BIS export rules which resulted in an ongoing investigation by the U.S. Department of Commerce and exposed the Company to hundreds of millions of dollars in fines and penalties.

33. Then, on October 26, 2022, Seagate issued a Form 8-K disclosing that it had received a Proposed Charging Letter from the BIS. The Form 8-K stated:

> On August 29, 2022, Seagate Technology Holdings plc ("Seagate" or the "Company") received a proposed charging letter ("PCL") from the U.S. Commerce Department's Bureau of Industry and Security ("BIS"), alleging violations of the U.S. Export Administration Regulations ("EAR"). The PCL alleges Seagate acted in violation of the EAR by providing Seagate hard disk drives ("HDDs") to a customer and its affiliates listed on the BIS Entity List between August 2020 and September 2021. . . .
>
> The matters raised by the PCL remain unresolved at this time, and there can be no assurance as to the timing or terms of any final outcome. Seagate is unable at this time to estimate the range of loss and/or penalty, if any, although it is possible that the outcome could have a material impact on our business, results of operations, financial condition, and cash flows.

34. Analysts reacted negatively to the BIS news and commented on the potential for a material monetary fine to resolve the matter. For example, a Credit Suisse analyst stated: "We see this as an additional overhang until resolved." Following this news, the price of Seagate common stock fell by nearly 8% to close at $53.39 on October 26, 2022, on unusually heavy trading volume. Over the following three trading days, Seagate's stock price continued to drift lower, falling an additional nearly 7% to close at $49.66 on October 31, 2022.

35. Following the end of the Class Period the anticipated penalties stemming from Seagate's conduct, as outlined the BIS Proposed Charging Letter, were confirmed. On April 19, 2023, the BIS issued a press release stating:

> BIS issued an order today against Seagate imposing an administrative penalty of $300 million, mandatory multi-year audit requirement, and a five-year suspended Denial Order. As part of the BIS settlement, Seagate admitted to the conduct set forth in the Proposed Charging Letter . . . .

36. As a result of defendants' wrongful acts and omissions, and the decline in the price of Seagate common stock as detailed herein, plaintiff and other members of the Class (as defined below) have suffered significant losses and damages.

**ADDITIONAL SCIENTER ALLEGATIONS**

37. As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading.

38. The Individual Defendants, because of their positions with Seagate, controlled the contents of Seagate's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the

defendants are responsible for the accuracy of Seagate's corporate statements and are, therefore, responsible and liable for the representations contained therein.

**APPLICATION OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET AND *AFFILIATED UTE***

39. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's common stock traded in an efficient market;

(d) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e) plaintiff and other members of the Class purchased Seagate common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

40. At all relevant times, the market for Seagate common stock was efficient for the following reasons, among others:

(a) Seagate common stock met the requirements for listing and was listed and actively traded on the Nasdaq, a highly efficient market;

(b) as a regulated issuer, Seagate filed periodic public reports with the SEC; and

(c) Seagate regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

41. As a result of the foregoing, the market for Seagate common stock promptly digested current information regarding Seagate from publicly available sources and reflected such information in the price of Seagate common stock. Under these circumstances, all purchasers of

Seagate common stock during the Class Period suffered similar injury through their purchases of Seagate common stock at artificially inflated prices, and a presumption of reliance applies.

42. A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in significant part, on defendants' material omissions. Because this action involves defendants' failure to disclose material adverse information regarding Seagate's business, operations, and risks, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

**LOSS CAUSATION/ECONOMIC LOSS**

43. During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Seagate common stock and operated as a fraud or deceit on Class Period purchasers of Seagate common stock by misrepresenting the value of the Company's business and prospects by concealing the significant defects in its underwriting and due diligence practices and deficiencies in its commercial credit portfolio and related securitized assets. As defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of the Company's stock fell precipitously as the prior artificial inflation came out of the stock's price. As a result of their purchases of Seagate common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**CLASS ACTION ALLEGATIONS**

44. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Seagate during the Class Period (the "Class"). Excluded from the Class are defendants and members of their immediate families, the officers and directors of the Company, at all relevant times, and members of their immediate families, the legal representatives, heirs, successors, or

assigns of any of the foregoing, and any entity in which defendants have or had a controlling interest.

45. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Seagate common stock was actively traded on the Nasdaq. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class because there were more than 207 million shares of Seagate stock issued and outstanding as of April 24, 2023. Record owners and other members of the Class may be identified from records maintained by Seagate or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

46. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

47. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

48. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the defendants violated the Exchange Act as alleged herein; and

(b) to what extent the members of the Class have sustained damages and the proper measure of damages.

49. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

50. Plaintiff incorporates ¶¶1-49 by reference.

51. Defendants are liable for making false statements and failing to disclose adverse facts known to them about Seagate. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on those who transacted in Seagate common stock during the Class Period was a success, as it: (i) deceived the investing public regarding Seagate's business and financial condition; (ii) artificially inflated the price of Seagate common stock; and (iii) caused plaintiff and other members of the Class to transact in Seagate common stock at inflated prices.

52. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Seagate common stock during the Class Period.

54. Defendants, individually and together, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Seagate's business, operations, and financial condition as specified herein.

55. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Seagate common stock. Plaintiff and the Class

would not have purchased Seagate common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

**COUNT II**

**For Violation of §20(a) of the Exchange Act Against All Defendants**

56. Plaintiff incorporates ¶¶1-55 by reference.

57. The Individual Defendants acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act:

(a) By reason of their positions as executive officers and/or directors, their participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading;

(b) The Individual Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by plaintiff to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected; and

(c) Because of their positions as CEO and CFO, the Individual Defendants directly participated in the Company's management and were directly involved in Seagate's day-to-day operations. The Individual Defendants also controlled the contents of Seagate's quarterly reports and other public filings, press releases, conference calls, and presentations to securities analysts and the investing public. The Individual Defendants prepared, reviewed, and/or were provided with copies of the Company's reports, press releases, and presentation materials alleged to be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected and failed to do so.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Declaring that defendants violated the Exchange Act, as alleged herein;

C. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 10, 2023

ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS

s/ Shawn A. Williams
SHAWN A. WILLIAMS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
SPENCER A. BURKHOLZ
DANIELLE S. MYERS
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

UA Local 38 Defined Contribution Pension Plan ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*In re SelectQuote, Inc. Sec. Litig.*, No. 1:21-cv-06903 (S.D.N.Y.)

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6th day of June, 2023.

UA Local 38 Defined Contribution Pension Plan

By: [signature]
Maria C. Rivera, Administrator

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 03/19/2021 | 366 | $75.45 |
| 04/07/2021 | 154 | $79.04 |
| 07/21/2021 | 185 | $83.35 |
| 09/13/2021 | 5 | $83.65 |
| 05/04/2022 | 48 | $84.07 |
| 07/06/2022 | 209 | $71.11 |

Prices listed are rounded up to two decimal places.