**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
CAITLIN C. BOZMAN (Bar No. 343721)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

-and-

SALVATORE GRAZIANO (admitted pro hac vice)
(salvatore@blbglaw.com)
HANNAH ROSS (admitted pro hac vice)
(hannah@blbglaw.com)
ABE ALEXANDER (admitted pro hac vice)
(abe.alexander@blbglaw.com)
AASIYA F. M. GLOVER (admitted pro hac vice)
(aasiya.glover@blbglaw.com)
SARAH SCHMIDT (pro hac vice forthcoming)
(sarah.schmidt@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400

*Counsel for Co-Lead Plaintiffs Public Employees' Retirement System of Mississippi and Arkansas Public Employees' Retirement System and Co-Lead Counsel for the Class*

[Additional counsel appear on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| *In re Seagate Technology Holdings plc Securities Litigation* | Case No. 3:23-cv-03431-VC |
| | **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| | CLASS ACTION |
| | DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   PARTIES ........................................................................................................... 6

    A.   Lead Plaintiffs .......................................................................................... 6

    B.   Defendants ............................................................................................... 7

III.  JURISDICTION ................................................................................................ 7

IV.   SUMMARY OF THE FRAUD ......................................................................... 8

    A.   Seagate's HDD Business Was The Driver Of The Company's Financial
    Performance And The Focus Of Investor Attention And Concern During
    The Class Period .................................................................................... 8

    B.   In August 2020, The U.S. Department of Commerce Imposed Broad
    Export Restrictions That Raised Investor Concern About Seagate's All-
    Important HDD Revenue ...................................................................... 10

        1.   Background On BIS And Export Restrictions Aimed At
        Safeguarding Against The Threat Posed By Huawei To U.S.
        National Security ......................................................................... 10

        2.   In August 2020, BIS Promulgated Expanded Export Restrictions
        Aimed At Huawei ....................................................................... 13

    C.   Throughout The Class Period, Defendants Reassured Investors That
    Seagate Was Compliant With The FDPR And Downplayed The
    Company's Reliance On HDD Sales To Huawei ................................. 14

    D.   In Truth, Seagate Used The FDPR To Secure An Illicit Monopoly Over
    Lucrative HDD Sales To Huawei, While Concealing The Company's
    Regulatory Violations And Its Reliance On Illegal Sales From Investors .......... 19

        1.   As The Company Has Admitted, Seagate Used Advanced U.S.-
        Origin Technologies To Manufacture Its HDDs, Triggering The
        FDPR's Prohibition on Sales To Huawei ................................. 20

        2.   Seagate Secretly Ramped Up Its Sales To Huawei, Despite Clear
        Warnings That Those Sales Were Illegal .................................. 23

        3.   In January 2021, A Supplier Sent Seagate An "FDPR Rule
        Notification Letter," Clearly Warning That The Company's HDD
        Manufacturing Technologies Triggered FDPR Licensing

Requirements, But Seagate Responded By Further Accelerating Illegal HDD Sales to Huawei ................................................... 27

4.    Seagate Stonewalled A Congressional Investigation Into Its HDD Sales, While It Once Again Accelerated Shipments To Huawei By Secretly Extending The Customer Massive Amounts Of Credit ............. 29

E.    The Truth Emerges ......................................................................... 33

1.    On March 8, 2022, The Collapse of Seagate's Illegal Monopoly Caused The Company To Revise Earnings Guidance Significantly Downward, Leading To A Sharp Decline In Seagate's Stock Price ........ 33

2.    On July 21, 2022, Seagate Reported A Significant Revenue Miss And Further Reduced Revenue Guidance, As The Company's Financial Performance Continued To Assimilate The Loss Of Its Illegal Monopoly Over Huawei Sales ...................................................... 35

3.    On October 26, 2022, Seagate Reported That It Had Received A Charging Letter From BIS Alleging That The Company Had Violated U.S. Export Restrictions ................................................... 36

4.    On April 19, 2023, The Company Admitted That It Had Sold Over $1.1 Billion Worth Of HDDs To Huawei In Violation U.S. Export Restrictions And Had Been Hit With A $300 Million Penalty – The Largest In BIS History ........................................................... 38

V.    ADDITIONAL ALLEGATIONS OF SCIENTER ......................................................... 40

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ......................................................................................... 47

A.    Defendants' Materially False And Misleading Statements Concerning Seagate's Compliance With The FDPR .................................................... 48

1.    False And Misleading Statements During The First Fiscal Quarter of 2021 (Ended October 2, 2020) ............................................... 48

2.    False And Misleading Statements During The Second Fiscal Quarter of 2021 (Ended January 1, 2021) ............................................... 49

3.    False And Misleading Statements During The Third Fiscal Quarter of 2021 (Ended April 2, 2021) ................................................... 51

4.    False And Misleading Statements During The Fourth Fiscal Quarter of 2021 (Ended July 2, 2021) .................................................... 53

5.    False And Misleading Statements During The First Fiscal Quarter of 2022 (Ended October 1, 2021) .............................................. 56

6.      False And Misleading Statements During The Second Fiscal Quarter of 2022 (Ended December 31, 2021)............................................ 57

7.      False And Misleading Statements During The Third Fiscal Quarter of 2022 (Ended April 1, 2022)................................................................ 60

8.      False And Misleading Statements During The Fourth Fiscal Quarter (Ended July 1, 2022)................................................................ 62

9.      False And Misleading Statements During The First Fiscal Quarter of 2023 (Ended September 30, 2022) .......................................... 64

10.      False And Misleading Statements During The Second Fiscal Quarter of 2023 (Ended December 30, 2022).......................................... 65

11.      False And Misleading Statements During The Third Fiscal Quarter of 2023 (Ended March 31, 2023) ........................................... 68

B.      Defendants' Materially False And Misleading Statements Downplaying Seagate's Reliance On HDD Sales To Huawei ....................................... 69

     1.      False And Misleading Statements During The First Fiscal Quarter of 2021 (Ended October 2, 2020) .......................................... 69

     2.      False And Misleading Statements During The Second Fiscal Quarter of 2021 (Ended January 1, 2021)................................................... 70

     3.      False And Misleading Statements During The Third Fiscal Quarter of 2021 (Ended April 2, 2021)................................................................ 71

C.      Defendants' Materially False And Misleading Statements Concerning The Drivers Of Seagate's Financial Performance....................................... 72

     1.      False And Misleading Statements During The Second Fiscal Quarter of 2021 (Ended January 1, 2021)................................................... 72

     2.      False And Misleading Statements During The Third Fiscal Quarter of 2021 (Ended April 2, 2021)................................................................ 73

     3.      False And Misleading Statements During The Fourth Fiscal Quarter of 2021 (Ended July 2, 2021) .......................................... 74

     4.      False And Misleading Statements During The First Fiscal Quarter of 2022 (Ended October 1, 2021) .......................................... 76

     5.      False And Misleading Statements During The Second Fiscal Quarter of 2022 (Ended December 31, 2021)............................................ 77

     6.      False And Misleading Statements During The Third Fiscal Quarter of 2022 (Ended April 1, 2021)................................................................ 78

7.    False And Misleading Statements During The Fourth Fiscal Quarter of 2022 (Ended June 30, 2022)......................................... 79

8.    False And Misleading Statements During The First Fiscal Quarter of 2023 (Ended September 30, 2022) ....................................... 80

9.    False And Misleading Statements During The Second Fiscal Quarter of 2023 (Ended December 30, 2022).......................................... 81

10.    False And Misleading Statements During The Third Fiscal Quarter of 2023 (Ended March 31, 2023) .............................................. 81

VII.    LOSS CAUSATION.................................................................. 82

VIII.    CLASS ACTION ALLEGATIONS ......................................... 85

IX.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT............................. 87

COUNT I for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against All Defendants) ........................................................... 87

COUNT II for Violations of Section 20(a) of the Exchange Act (Against Defendants Mosley and Romano)................................................................ 89

X.    PRAYER FOR RELIEF ................................................................ 90

Lead Plaintiffs Public Employees' Retirement System of Mississippi, Arkansas Public Employees Retirement System, Universal-Investment-Gesellschaft mbH, Universal-Investment-Luxembourg S.A., and UI BVK Kapitalverwaltungsgesellschaft mbH (collectively, "Lead Plaintiffs"), by and through their undersigned counsel ("Lead Counsel"), bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, against Defendants Seagate Technology Holdings plc, William D. Mosley, and Gianluca Romano (collectively, the "Defendants"), on behalf of themselves and all other similarly situated persons who purchased or otherwise acquired the common stock of Seagate Technology Holdings plc ("Seagate" or the "Company") between September 14, 2020, and April 19, 2023, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Lead Plaintiffs' information and belief are based upon Lead Counsel's investigation, which included review and analysis of, among other things: (1) Seagate's public filings with the SEC; (2) Defendants' additional public statements, including those made in press releases, at investor conferences, and on earnings calls; (3) research reports by securities and financial analysts concerning Seagate; (4) economic analyses of securities movement and pricing data; and (5) publicly available information regarding Seagate, including the April 19, 2023 Order ("BIS Settlement") issued by the U.S. Department of Commerce's Bureau of Industry and Security ("BIS"), in which "Seagate admits committing the alleged conduct" described therein.  Lead Counsel's investigation into the factual allegations contained in this Complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control.  Lead Plaintiffs believe that substantial additional evidentiary support for the allegations set forth in this Complaint exists and would be uncovered through a reasonable opportunity for further investigation or discovery.

## I.    INTRODUCTION

1.    This case arises from materially false and misleading statements and omissions made to investors by Seagate and certain of its senior executives concealing the Company's illegal

mass export of over $1.1 billion worth of advanced hard disk drive ("HDD") technology to Huawei, the largest supplier of telecommunications equipment in the world and a Chinese Communist Party proxy, in violation of the most serious U.S. export control laws and in flagrant disregard of U.S. national security interests.  In August 2020, the U.S. Department of Commerce ("DOC") prohibited the unlicensed export to Huawei of any item incorporating, or using at "**any** stage" of its production, specified U.S. technologies (the "Foreign Direct Product Rule" or "FDPR").  The DOC enacted this rule in order "to better address the continuing threat to U.S. national security" posed by Huawei, citing, among other things, a federal criminal indictment alleging that Huawei had "knowingly and willfully" conspired with the Iranian government to repeatedly ship U.S. goods and technology to Iran in violation of U.S. sanctions.  And for years, news media, academics, and industry experts have reported that Huawei actively aids the Chinese government's military espionage efforts and that the extensive financial support it receives from the Chinese Communist Party allows the telecommunications giant to undercut competitors and destabilize global markets.

2.    While Seagate's competitors all announced they would cease shipping HDDs to Huawei, Defendants assured worried investors that Seagate would not have to follow suit. Defendants told investors, "*[We] don't see any particular restriction* for us in term[s] of being able to continue to ship to Huawei," and when repeatedly pressed by securities analysts about the legality of its Huawei sales and the Company's compliance with the FDPR, stated, "[T]he truth is *we comply with all the rules and regulations*."[1]  To further assuage investor concerns, Defendants downplayed Seagate's reliance on Huawei sales in connection with the Company's financial performance.  For instance, when analysts asked about the magnitude of Huawei's revenue contribution, Defendants responded, "*I don't think it's material*."  And when Seagate reported unusually strong revenue during the Class Period, Defendants attributed those results to a host of legitimate business factors, including a supposed resurgence of "broad-based" demand as the COVID-19 pandemic waned.

---

[1] Unless otherwise noted, all emphasis is added.

3.      These statements were materially false and misleading.  In truth, and as Seagate has since admitted, the Company illegally sold over $1.1 billion in HDDs to Huawei in violation of the FDPR during the Class Period.  While the FDPR proscribed the unlicensed export of an item to Huawei if *any* specified U.S. *technology* is used at "*any* stage" of the item's production, unbeknownst to investors, and as Seagate has further admitted, the Company used *multiple* specified U.S. origin technologies – technologies the Company admitted were "essential" to its manufacturing processes and "major component[s]" of its HDD factories – at *multiple* stages of the HDD production process to manufacture *multiple* core components of its HDDs.  Moreover, before and throughout the Class Period, Seagate received repeated warnings, including from suppliers, competitors, and its lawyers, that the Company's HDD sales to Huawei violated the FDPR and were therefore illegal.  Indeed, in January 2021, shortly after the start of the Class Period, a supplier of two of the key technologies that Seagate used to manufacture its HDDs sent the Company an "FDPR rule notification" letter, clearly warning that the use of those technologies at any stage of the manufacturing process triggered FDPR proscriptions on export to Huawei.

4.      Nevertheless, even as its competitors suspended all HDD shipments to Huawei, Seagate secretly doubled and tripled down on its HDD sales to the Chinese telecommunications giant.  Facing significant economic pressure exerted by the COVID-19 pandemic and the Company's massive debt load, Seagate used the enactment of the FDPR as an opportunity, albeit an illegal one, to obtain a lucrative monopoly over HDD sales to Huawei and keep the Company's revenue stable during a period of extreme economic volatility.  Again, unbeknownst to investors, Seagate vastly *expanded* its commercial relationship with Huawei through sweeping agreements, signed by the Company's senior management, as part of which the Company agreed to sell Huawei no less than 7.4 million HDDs (worth over $1 billion) and "regard Huawei as a strategic customer," including by agreeing to maintain a team specially dedicated to servicing it.  Moreover, Seagate extended more than $1 billion in credit to Huawei in order to facilitate the swift placement of multiple high-volume orders.  Internally, Seagate personnel acknowledged that the Company's lines of credit to Huawei were among its single largest exposures.

5.      Far from having a "not material" impact on Seagate's financial performance as Defendants falsely claimed, Seagate's illegal HDD sales to Huawei over the Class Period boosted the Company's reported revenue by at least 10% and its critical HDD revenue by as much 15%. Throughout the Class Period, Seagate's illegal HDD sales repeatedly allowed the Company to meet or exceed revenue guidance, thereby inflating Seagate's stock price and causing it to ***more than double*** over the Class Period.  Moreover, Seagate's monopoly on HDD sales to Huawei also inflated the Company's credit rating – an important metric for Seagate given the significant debt load that the Company carried.  Defendants' misstatements, including their misstatements attributing the Company's impressive revenue results to a host of legitimate business factors, concealed these highly material facts from investors.

6.      In May of 2021, as Seagate continued to dramatically accelerate the pace and volume of its HDD sales to Huawei, the U.S. Senate Commerce Committee began quietly investigating HDD manufacturers' compliance with restrictions on exports to Huawei.  Tellingly, Seagate was alone among its competitors in stonewalling the Committee.  Seagate not only refused to provide information concerning its relationship with Huawei, but it also declined to share its interpretation of the FDPR with Committee staff, making clear that Seagate had no plausible interpretation of the FDPR that would support the Company's continued HDD sales to Huawei. Only when faced with the threat of adverse action by the Committee did the Company finally relent and agree to meet with Committee staff.  Significantly, at the same time, and just as Congress was beginning to closely scrutinize Seagate's FDPR compliance, the Company abruptly suspended all shipments to Huawei, notwithstanding the significant commercial partnership it had forged with the Company through multiple secret agreements.

7.      Following the collapse of its lucrative monopoly, Seagate's revenue began to seriously suffer, revealing the truth about the Company's reliance on illegal HDD sales to Huawei. First, on March 8, 2022, Seagate was forced to revise its earnings guidance significantly downward due to "disruption in the Chinese market" for HDDs.  Then, on July 21, 2022, as the Company's performance continued to reflect the loss of its illegal stream of HDD revenue, Seagate reported

revenue significantly below estimates and further reduced forward guidance because of lagging HDD demand in Asia.  Seagate's stock price declined significantly in response to this news, falling by $9.52 per share, or 9.5%, on March 8, and $6.78 per share, or 8.1%, on July 22.  Defendants, however, continued to conceal the truth from investors, blaming the Company's poor revenue performance on secular and "transitory" headwinds, including "impacts from COVID lockdowns in Asia, non-HDD component shortages, and global inflationary pressures."

8.     Then, on On October 26, 2022, Seagate disclosed that, two months earlier, it had received a proposed charging letter from BIS alleging that the Company had violated the FDPR (the "Proposed Charging Letter").  The Company also disclosed a further 26% decline in HDD sales due to falling demand in China.  In response, Seagate common stock declined by $4.61 per share, or nearly 8%.  In order to stem the decline and assuage investor concern, Defendants again issued misleading statements denying any wrongdoing and affirming the Company's compliance with applicable laws.

9.     Finally, on April 19, 2023, the market learned the full scope and magnitude of Seagate's illegal HDD sales, when Seagate and BIS announced a settlement of the Proposed Charging Letter, and the Company **admitted** that, contrary to its repeated statements that it "complied with all relevant export control laws and regulations," Seagate had illegally sold more than $1.1 billion in HDDs to Huawei in violation of the FDPR.  Seagate further admitted that it had received direct warnings that these sales were illegal, including the "FDPR rule notification letter" from its key supplier, but that the Company's senior management had nevertheless ramped up the Company's exposure to these illegal transactions through sweeping commercial agreements and massive extensions of credit to Huawei.  As a result of Seagate's admitted illegal conduct, BIS had imposed a $300 million civil penalty, ***the largest standalone civil penalty in the agency's history***.  In response to this news, Seagate stock declined by $5.78, or more than 9%.

10.    In all, Defendants' misstatements concealing Seagate's reliance on illicit sales of HDDs to Huawei caused massive losses to investors, with Seagate shares falling nearly 43% from

$100.09 at the close of trading on March 7, 2022, to $57.08 at the close of trading on April 20, 2023.

## II.    PARTIES

### A.    Lead Plaintiffs

11.    Lead Plaintiff Public Employees' Retirement System of Mississippi ("MissPERS") is a pension fund established for the benefit of the current and retired public employees of the State of Mississippi.  MissPERS is responsible for the retirement income of employees of the State, including current and retired employees of the State's public-school districts, municipalities, counties, community colleges, state universities, libraries, and water districts.  MissPERS provides benefits to over 75,000 retirees, manages over $28 billion in assets for its beneficiaries, and is responsible for providing retirement benefits to more than 250,000 current public employees.  As set forth in the Declaration filed at Exhibit A, MissPERS purchased Seagate common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the securities laws alleged in this Complaint.

12.    Lead Plaintiff Arkansas Public Employees Retirement System ("APERS") was established in 1957 for the purpose of providing retirement benefits for qualified employees of the State of Arkansas and subsequently expanded to include the employees of counties, municipalities, and other political subdivisions.  APERS manages over $10 billion in assets for the benefit of its approximately 84,000 active and retired members.  As set forth in the Declaration filed at Exhibit B, APERS purchased Seagate common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the securities laws alleged in this Complaint.

13.    Lead Plaintiffs Universal-Investment-Gesellschaft mbH ("Universal-Investment"), Universal-Investment-Luxembourg S.A. ("Universal Luxembourg"), and UI BVK Kapitalverwaltungsgesellschaft mbH ("UI BVK") are members of the Universal Investment Group.  Universal-Investment and UI BVK are investment companies based in Frankfurt am Main, Germany, and Universal Luxembourg is an investment company based in Grevenmacher, Luxembourg.  They collectively administer fund assets of approximately 1,000 billion Euros.  As

set forth in the Declaration filed at ECF No. 24-1, Universal-Investment's funds, Universal Luxembourg's fund, and UI BVK's fund purchased Seagate common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the securities laws alleged in this Complaint.

**B.    Defendants**

14.    Defendant Seagate is a data storage company incorporated in Ireland, with its operational headquarters and principal place of business in Fremont, California.  Seagate common stock trades on the NASDAQ stock exchange under the ticker symbol "STX."  As of August 10, 2020, approximately one month prior to the start of the Class Period, Seagate had more than 257 million shares of common stock outstanding.

15.    Defendant William D. Mosley ("Mosley") is, and was at all relevant times, Seagate's Chief Executive Officer ("CEO") and was a Director of the Company throughout the Class Period.  Prior to his role as CEO, Mosley served as President and COO of Seagate.  Mosley has a technical background, served as Seagate's President of Operations and Technology, held several R&D leadership roles at the Company, and holds a PhD in Physics from the University of California, Davis, focusing on solid state physics.

16.    Defendant Gianluca Romano ("Romano") is, and was at all relevant times, the Chief Financial Officer ("CFO") of Seagate and was a Director of the Company throughout the Class Period.

**III.    JURISDICTION**

17.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 (17 C.F.R. § 240.10b-5), promulgated under the Exchange Act.

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  At all relevant times Seagate had its principal executive

offices located in this District and conducts substantial business here. In addition, many of the acts alleged herein occurred in this District.

20.    In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone and internet communications, and the facilities of the national securities exchanges and markets.

## IV.    SUMMARY OF THE FRAUD

### A.    Seagate's HDD Business Drove The Company's Financial Performance And Attracted Investor Attention And Concern During The Class Period

21.    Seagate is a provider of data storage technology and, as the Company's SEC filings state, its "principal products" are hard disk drives, or "HDDs." HDDs are sophisticated devices that store digitally encoded data on rapidly rotating disks with magnetic surfaces. HDDs are the primary medium for mass data storage in the world, the markets for which range from businesses that manage their own enterprise data storage solutions to "hyper scale" data centers and cloud storage providers. Analysts estimated that by 2020, the HDD market was worth more than $35 billion and projected that the market would grow to more than $80 billion by the end of the decade.

22.    Prior to, and throughout, the Class Period, HDDs comprised the core of Seagate's business, and the Company relied heavily on sales of these products to ensure its financial health. By the start of the Class Period, Seagate derived 92% of its revenue from HDD sales, with approximately two-thirds of that revenue coming from sales of mass storage drives. Seagate was also a market leader in HDDs. The Company's share of the HDD market was roughly 40% at the start of the Class Period; its primary competitors were Western Digital, with 40% of the market, and Toshiba, with roughly 20%.

23.    Accordingly, investors and analysts were intensely focused on the health and success of Seagate's HDD business and viewed that business as the core investment thesis in the Company's stock. Northland analysts, for instance, characterized Seagate as "a pure-play HDD supplier." Seagate itself explained that its "focus [is] for sure on the hard disk space."

24.    In the months leading up to the Class Period, however, the COVID-19 pandemic significantly disrupted both the supply and demand sides of the HDD business.  As Defendant Mosley explained on the Company's July 2020 earnings call, the COVID-19 pandemic led to a "deteriorating demand environment," as Seagate's revenue slumped by 15% from pre-pandemic levels of $2.7 billion to $2.3 billion at the start of the Class Period.  Moreover, severe supply chain disruptions significantly increased costs and resulted in factory underutilization, thus shrinking Seagate's margins and earnings.  As Seagate explained in a July 2020 earnings release, "continued economic uncertainty and COVID-19 related disruptions impacted demand in other key end markets . . . and also impacted profitability as we incurred higher logistics and labor costs which together weighed on our fourth quarter results."[2]  Likewise, Mosley explained at a September 8, 2020 investor conference, "I think COVID has changed everything.  So, we obviously took some cost increases as a function of that and the demand picture has been fairly choppy because of COVID."  Seagate told investors that the pandemic had weighed on earnings by $0.25 to $0.35 per share.

25.    In addition to the headwinds from COVID-19-related disruptions, Seagate also faced challenges as the storage industry transitioned from HDDs to solid-state drives, or "SSDs," a newer, higher-performing technology.  As Northland analysts explained, SSDs were beginning to displace HDDs "as the cost of SSDs has declined at a more rapid pace than HDDs . . . .  SSDs have taken market share as they are small, faster, and more rugged."  Seagate lagged behind its competitors, particularly Western Digital, in developing and monetizing this new technology.  As Morningstar analysts noted in a June 2020 report, issued just before the start of the Class Period, "Relative to Western Digital, we believe Seagate is in a weaker competitive position" because of Seagate's slower development of SSD technology.

26.    As the COVID-19 pandemic squeezed Seagate on both revenue and earnings, investors grew anxious for news that critical HDD sales, the cornerstone of the Company's

---

[2] Seagate reports financial results on a fiscal year basis, with the fourth quarter ending at the beginning of July, rather than on a calendar basis.

business, would recover. Moreover, as a result of these headwinds, Fitch, a leading credit rating agency, downgraded Seagate's credit rating and revised the Company's "Outlook" to "Negative." This downgrade was particularly significant because Seagate depended on debt to fund its operations. At the start of the Class Period, Seagate had roughly $2.5 billion in debt, with a debt-to-capital ratio of 70%, which, as Zacks analysts noted, "is higher than the industry's figure of 54.7%."

27.    As discussed further below, in August 2020 – with the Company's financial performance and prospects at a nadir – the DOC imposed new export restrictions, compliance with which would have strained Seagate's revenue even further. Instead of complying, Seagate's management used those new restriction as an opportunity, albeit an illegal one, to obtain an effective monopoly over sales to one of the storage industry's most lucrative customers, Huawei – the largest telecommunications supplier in the world – and, thus, to keep the Company's sales steady during one of the most volatile economic periods in decades.

**B.    In August 2020, The DOC Imposed Broad Export Restrictions That Raised Investor Concerns About Seagate's All-Important HDD Revenue**

28.    In August 2020, the DOC, through the BIS, promulgated new export control regulations proscribing the unlicensed sale of U.S. technologies, and products manufactured with the aid of those technologies, to Chinese telecommunications giant Huawei. As discussed below, investors were deeply concerned that these new regulations would severely impact Seagate's critical HDD revenue at a time when the Company already was facing dire economic headwinds.

**1.    Background On BIS And Export Restrictions Aimed At Safeguarding Against The Threat To U.S. National Security Posed By Huawei**

29.    The BIS is an agency of the DOC and is responsible for safeguarding national security by ensuring the effective control of sensitive exports. According to BIS, "[t]he Bureau's paramount concern is the security of the United States. The Bureau's mission is to protect the security of the United States, which includes its national security, economic security, cyber security, and homeland security."

30.     Further to that mission, BIS implements and enforces the Export Administration Regulations ("EAR"), which regulate the export, re-export, and transfer of items that could be used or exploited in ways that compromise national security.  These items are identified in BIS regulations by an Export Control Classification Number ("ECCN"), and any person seeking to export such items must obtain a license to do so from BIS.  The EAR also include the "Entity List," a list of foreign persons and entities subject to export restrictions and license requirements independent of, and in addition to, those imposed elsewhere in the EAR.

31.     In May 2019, the DOC added Chinese telecommunications giant Huawei and certain of its affiliates to the Entity List, which, as BIS explained, imposed licensing requirements on exports "of all items subject to the EAR destined to or involving the listed Huawei entities." The DOC rule adding Huawei to the Entity List explained that multiple U.S. government agencies "determined that there is reasonable cause to believe that Huawei has been involved in activities contrary to the national security or foreign policy interests of the United States."  Among other things, the DOC cited a federal criminal indictment alleging that Huawei had "knowingly and willfully" conspired with the Iranian government to repeatedly ship U.S. goods and technology to Iran in violation of U.S. sanctions.  The indictment included multiple counts of bank and wire fraud (which concealed the illegal sales to Iran), obstruction of justice, and misappropriating trade secrets.

32.     Concurrently, the U.S. government also successfully sought the extradition (from Canada) of Huawei CFO Meng Wanzhou – who news outlets had long reported as having "deep links" to Iranian technology importers – to stand trial on the charges set forth in the indictment. Just months before the start of the Class Period, Meng entered into a deferred prosecution agreement, in which she admitted that she had worked to conceal Huawei's relationship with Iran.

33.     News media, academics, and industry experts have also long reported that Huawei has extensive links to the Chinese Communist Party and that it has actively aided (and continues to aid) the Chinese government's military espionage efforts, including by inserting backdoors into its equipment.  For instance, *The Wall Street Journal* reported in February 2020 – shortly before

the start of the Class Period – that U.S. intelligence agencies had concluded that for over a decade, Huawei had the ability to covertly exploit backdoors intended for law enforcement officials. Moreover, researchers at the Henry Jackson Society, a foreign policy think tank, released a 2019 report that analyzed 25,000 Huawei employees and found extensive connections between these current employees and China's Ministry of State Security, the People's Liberation Army, and a Chinese military unit accused of hacking U.S. corporations.  In a 2019 article, the *Los Angeles Times* quoted a former Huawei employee as stating, "The state wants to use Huawei, and it can use it if it wants."  Likewise, Jerome Cohen, a law professor at New York University and a senior fellow on the Council on Foreign Relations, stated succinctly, "The Party is embedded in Huawei and controls it."

34.     Further, for years leading up to the Class Period, government officials, academics, and other experts have reported the extensive financial support Huawei receives from the Chinese Communist Party, which allows Huawei to undercut competitors and destabilize global markets. For instance, in a December 2019 article, *The Wall Street Journal* reported that Huawei received approximately "$46 billion in loans and other support, coupled with $25 billion in tax cuts" designed to give Huawei an advantage in competing with Apple and Samsung.  China's state-owned banks also provide Huawei with lavish financial accommodations, including substantially below-market loans and a line of credit for at least $30 billion.  A European Commission investigation concluded that Huawei leveraged state support to underbid its competitors by up to 70 percent.  Notably, Huawei attempted to obstruct that investigation by offering the initial complainant $56 million to withdraw the complaint.

35.     In short, there was ample support for the DOC's conclusion that exports of U.S. technology to Huawei undermined the United States' national security and economic interests. Moreover, the threat posed to the United States by selling to Huawei would have, and should have, been readily apparent to Seagate and its management.  Indeed, over the remainder of 2019, the DOC added over 100 additional Huawei entities to the Entity List.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 2.    In August 2020, BIS Promulgated Expanded Export Restrictions Aimed At Huawei

36.    On August 17, 2020, the DOC issued a regulation that significantly expanded export restrictions on items produced using specified U.S. technologies to Huawei (the "Foreign Direct Product Rule" or "FDPR")[3] in order to "to better address the continuing threat to U.S. national security and U.S. foreign policy interests posed by Huawei and its non-U.S. affiliates."

37.    The FDPR provides that technologies are subject to restrictions, and that a license is required to export them, if there is reason to know that U.S. technologies will be incorporated into, or will be used in the "production" or "development" of, any "part," "component," or "equipment" produced, purchased, or ordered by Huawei. Specifically, as the DOC explained,

> [E]ffective August, 17, 2020, BIS imposed a license requirement on foreign produced direct products ("FDPR") of certain U.S.-origin software and technology when (1) "there is "knowledge" that [a listed Huawei entity] is a party to any transaction involving the foreign-produced item" and (2) "the foreign-produced item is *produced by any plant or major component of a plant* that is located outside the United States… [and that] itself is a direct product of U.S.-origin "technology" or "software" subject to the EAR that is specified in" certain Export Control Classification Numbers ("ECCN").

38.    Significantly, the FDPR provides that "any equipment [in one of the FDPR rule's specified ECCNs] that is involved *in any of the production stages* is considered *essential*" and therefore is subject to the FDPR's export restrictions. Moreover, under BIS regulations, Huawei and its affiliates carry a "*presumption of denial*" licensing policy, effectively proscribing the export of items implicated by the FDPR.

39.    As Seagate's law firm here explained, the FDPR's scope was extremely broad. For instance, on August 18, 2020, Wilson Sonsini Goodrich & Rosati, PC ("Wilson Sonsini"), which currently represents Seagate in this litigation, published an "Alert" titled, "Further Expansion of U.S. Export Controls on Huawei and Related Entities." That "Alert" explained that, through the FDPR, "BIS further expanded its jurisdiction over foreign-produced items developed or *produced* from a specified U.S. technology and software (or SUST/S) to cover *almost all transactions involving a Huawei entity*."

---

[3] The FDPR is codified at 85 Fed. Reg. 51596.

40.    Wilson Sonsini's August 18, 2020 Alert further made clear that the FDPR applies when the U.S. technologies are used at ***any stage*** of the production of the ultimate item being exported, explaining that the FDPR "now subjects foreign-made items to U.S. control not only when those items are developed or produced by or for Huawei using SUST/S or in a plant using SUST/S, but also certain foreign-produced commercial off-the-shelf items."

41.    Similarly, Covington & Burling LLP ("Covington"), which represented Seagate in connection with the BIS Settlement, explained in an August 19, 2020 client alert that "the expanded scope of [the FDPR] will ***impose licensing requirements on a very broad range of non-U.S.-made semiconductor items when destined for Huawei***."  In particular, Covington's alert explained that the FDPR proscribed the export of items where the subject technology was "broadly" used in "any of the production stages":

> Footnote 1(b): Foreign-produced items that are "produced by any plant or major component of a plant that is located outside the United States, when the plant or major component of a plant, whether made in the U.S. or a foreign country, itself is a direct product of U.S.-origin 'technology' or 'software' subject to the EAR" and described in the same list of ECCNs describing semiconductor-related software and technology.

> A note to this paragraph explains that a "major component of a plant" means "equipment that is essential to the 'production' of an item, including testing equipment." In the August 17 Final Rule, ***BIS interpreted "essential" broadly, stating that "any equipment subject to the [ECCNs] specified in [Footnote 1] that is involved in any of the production stages is considered essential***."

42.    Following BIS's announcement of the FDPR, investors and analysts were deeply concerned that the new regulations would impair Seagate's key HDD revenue.  Susquehanna analysts, for instance, worried that the FDPR "effectively closes the loophole that has allowed Huawei to buy key components from third parties" and that the required licensing process would "likely take months" for those who wished to ship to Huawei.

**C.    Throughout The Class Period, Defendants Reassured Investors That Seagate Was In Compliance With The FDPR And Downplayed The Company's Reliance On HDD Sales To Huawei**

43.    To assuage market concern about the FDPR's impact on Seagate's business, Defendants made a series of materially false and misleading statements throughout the Class

Period that concealed the Company's regulatory violations and its reliance on illegal HDD sales to Huawei.

44.    ***First***, in direct response to repeated analyst questions on the subject, Defendants reassured the market that Seagate was compliant with the FDPR and that none of the Company's HDD production processes implicated these export restrictions.  For instance:

- At an investor conference on September 14, 2020, the first day of the Class Period and shortly after the FDPR was enacted, an analyst asked Seagate's CFO, Defendant Romano, how the FDPR's "restrictions will impact Seagate."  Romano told investors, "So of course we are still going through the final assessment, but from what I have seen until now, ***I don't see any particular restriction for us in term[s] of being able to continue to ship to Huawei*** or any other customers in China.  So, we don't think we know we need to have a specific license."

- Just weeks later, on Seagate's October 22, 2020 earnings call, an analyst again sought assurances that Seagate was complying with the FDPR, asking, "Just want to confirm that can you talk about whether you are continuing to ship to Huawei and what is included in your December quarter guidance.  It looks like your competitor may have stopped shipping maybe back in the middle of September."  Seagate CEO Defendant Mosley responded unequivocally, "We continually monitor and ***remain in compliance with all the rules and regulations around***."

- Again, at a June 8, 2021 investor conference, an analyst asked Defendants, "we've been receiving a lot of questions around a particular customer of yours [Huawei] where there are some restrictions in place for shipments and I was wondering if you could comment at all on that."  Defendant Romano responded, "we always answer to this specific question the same way because that is ***the truth is we comply with all the rules and regulations***. And based on that, ***we ship for all our customers following those rules and regulations***. We don't comment on specific customers as we don't comment on specific suppliers or investors. But in general, ***it's part of our job to ensure that we understand and then we follow all the rules and regulations of trade***."

45.    Indeed, Defendants openly denied any suggestion or speculation that Seagate's HDD sales might run afoul of U.S. export control laws.  For instance, following a September 2021 report from the Minority Staff of the U.S. Senate Commerce Committee urging BIS to investigate Seagate for potential export control violations in connection with its sales to Huawei, Defendants issued a same-day statement denying any wrongdoing and stating that Seagate "complies with all laws applicable to its business and operations, including export control regulations."

46.     ***Second***, Defendants issued a series of statements that downplayed Seagate's reliance on HDD sales to Huawei, thus minimizing both the riskiness of the Company's reported revenue, and the legal, regulatory, and reputational risk that the Company faced as a result of any continued sales.  Again, in direct response to analysts' questions, Defendants assured investors that sales to Huawei did not meaningfully or materially contribute to Seagate's HDD revenue and financial performance.  For instance:

- At the September 14, 2020 investor conference discussed above, an analyst, concerned about the impact of the FDPR on Seagate's business, asked Defendants to identify "the revenue contribution of Huawei to Seagate."  Defendant Romano downplayed Seagate's reliance on revenue from HDD sales to Huawei, stating, "as you know, ***we should report if the customer is above 10%.  So, you can assume that [Huawei's revenue contribution] is not a bad level***."

- On Seagate's October 22, 2020 earnings call, another analyst asked Defendants to explain how reliant the Company was on HDD sales to Huawei: "First question is related to Huawei Just want to confirm that can you talk about whether you are continuing to ship to Huawei and what is included in your December quarter guidance . . . .  And do you think you're seeing some benefits of that in your December quarter?"  Defendant Mosley responded, "We continually monitor and remain in compliance with all the rules and regulations around.  I think relative to some of the legacy markets, ***I think we're just watching too much inventory out there.  So I don't think it's material*** [i.e., Huawei's revenue contribution], but it's all factored into our guide about what's going on in the end markets."

47.     Further, Defendants attributed Seagate's unusually positive HDD revenue during the Class Period to a variety of benign and legitimate business factors, including a supposedly strong resurgence of demand as the COVID-19 pandemic waned.  For instance:

- On Seagate's January 21, 2021 earnings call, Defendants reported a 13% jump in revenue and 39% growth in earnings, well above market estimates.  Defendant Mosley attributed these results to (1) the fact that "the enterprise markets began to recover for the first time since the onset of the pandemic"; (2) "stronger-than-expected growth in video and image applications or VIA markets, due in part to pent-up demand"; and (3) "strong seasonal demand for our desktop PC and consumer drives."

- Likewise, on Seagate's April 22, 2021 earnings call, Defendants reported Seagate's "***highest ever HDD shipments***," including mass capacity HDD sales that beat the prior record by ***21%***, and resulting in 8% sequential, and 16% year-over-year, revenue growth.  Defendants Mosley and Romano both attributed these results to "strong recovery from enterprise and OEM customers, as well as healthy growth from cloud" and "a better alignment in supply and demand" as the pandemic waned, which led to a "much better pricing environment."  In truth, and as discussed further below, Seagate's illegal sales to

Huawei contributed **15%** of the Company's reported HDD revenue during this quarter,[4] and the Company would have missed its revenue guidance but for those illegal sales.

- Similarly, on Seagate's July 21, 2021 earnings call, Defendants reported that "revenue topped the $3 billion mark for the first time in six years" along with "a third consecutive quarter of record hard disk drive capacity shipments." Defendants Mosley and Romano stated that this revenue had "**broad-based** demand across the mass capacity end markets and incredible execution by our global team," specifically "demand from storage-centric blockchain that's layered on top of healthy cloud data center demand and [an] improving enterprise OEM customer trend" and "[s]tronger than expected demand in the VIA market." In truth, Seagate's illegal sales to Huawei contributed **8%** of the Company's reported HDD revenue during this quarter, and the Company would have missed its revenue guidance had it not been for those illegal sales.

- Similarly, on Seagate's October 22, 2021 earnings call, Defendants reported a 5% jump in HDD revenue, with revenue from the mass capacity markets exceeding $2 billion for the first time. Defendant Mosley noted that those "results reflect record demand for our industry-leading mass capacity products and solid execution on cost reduction plans and our ongoing focus of balancing supply with demand." In truth, Seagate's illegal sales to Huawei contributed **10%** of the Company's reported HDD revenue during this quarter, and the Company would have missed its revenue guidance had it not been for those illegal sales.

48.     Investors and analysts credited Defendants' reassuring statements. For instance, in September and October 2020 reports, analysts with Deutsche Bank and Fox Advisors both repeated Defendants' statements that Seagate "does not need a special license to ship product to Huawei," and in an October 2020 report, Wedbush analysts wrote that they expected "Seagate to exceed original expectations helped in part by Huawei orders," which the Company assured investors it could continue to fulfill legally. Similarly, Wells Fargo analysts credited Defendants'

---

[4] Notably, and as Defendant Romano acknowledged, Defendants assured investors that Seagate would disclose any customer that contributed 10% or more of its revenue. Indeed, General Accepted Accounting Principles ("GAAP") required such disclosures. For instance, ASC 280-10-50-42 provides, "A public entity shall provide information about the extent of its reliance on its major customers. If revenues from transactions with a single external customer amount to 10 percent or more of a public entity's revenues, the public entity shall disclose that fact, the total amount of revenues from each such customer, and the identity of the segment or segments reporting the revenues." Likewise, ASC 275-10-50-18 provides for disclosure when "revenue from a specific customer equals 10% or more of total revenue; however, a reporting entity **should still consider disclosure in cases where the threshold has not been met**." This is particularly so where, as here, the source of the revenue is subject to significant legal risk.

statements downplaying Seagate's reliance on Huawei sales, noting that "Huawei has not been reported as a 10%+ customer for Seagate."

49. Further, analysts noted that Seagate's HDD revenue "significantly outperformed" its competitors' during the Class Period and repeatedly echoed Defendants' statements attributing that impressive revenue performance to a host of legitimate business factors. For example, UBS analysts issued a January 21, 2021 report stating that Seagate's revenue beat was "driven by recovery in the enterprise market, healthy cloud demand [] and better than expected [VIA] demand." Likewise, analysts from Deutsche Bank, Wells Fargo, and Goldman Sachs attributed Seagate's revenue growth during the second quarter of 2021 to recovery in the enterprise markets, stable demand from cloud customers, and robust demand from Seagate's VIA customers. And after Seagate's record-setting fourth quarter in 2021, Morgan Stanley reported that the blockchain demand shock "[is] having a lasting impact on industry fundamentals and is accelerating the timing of STX's long term financial targets."

50. As discussed below, Seagate's stock price ***more than doubled*** during Class Period, while the Company was padding its revenue and earnings with illegal HDD sales to Huawei, and before the truth began to emerge in March 2022. *See* Figure 1 below.



**Figure 1**. Seagate's stock price ***more than doubled*** during Class Period, during the time the Company was padding its revenue and earnings with illegal HDD sales.

**D.    In Truth, Seagate Used The FDPR To Secure An Illicit Monopoly Over Lucrative HDD Sales To Huawei, While Concealing The Company's Regulatory Violations And Its Reliance On Illegal Sales From Investors**

51.    In truth, and as Seagate has *admitted*, the Company's HDD sales to Huawei following enactment of the FDPR – sales that provided Seagate with over *$1.1 billion* in revenue – were illegal.  While the FDPR proscribed the export of any product that used *any* specified U.S. origin technology at *any* stage of production, Seagate has admitted that, contrary to its public statements, it used *multiple* specified U.S. origin technologies – technologies the Company characterized as "critical" to its manufacturing processes – at *multiple* stages of the HDD production process to manufacture *multiple* core components of its HDDs.  Indeed, Seagate has admitted that these technologies were "*essential*, i.e., *major component[s]*, of the Seagate HDD plants."  Accordingly, and as Seagate has also admitted, the Company repeatedly violated the FDPR by selling its HDDs to Huawei without even attempting to secure a license – again, contrary to Defendants' public statements to investors.

52.    Despite clear warnings that its conduct was illegal, including from the Company's lawyers, suppliers of restricted technologies, and competitors, Seagate used the FDPR, and its competitors' suspension of sales in response to it, as an opportunity to become Huawei's sole HDD supplier, allowing the Company to secure a lucrative monopoly that buoyed its revenue amidst the severe economic pressure and uncertainty precipitated by the COVID-19 pandemic.  Unbeknownst to investors, and as discussed above, Seagate generated *more than $1 billion* from its sales to Huawei over the course of the year it acted as the Chinese telecommunication giant's sole supplier, boosting Seagate's *Company-wide revenue by approximately 10%*.  During the Class Period, as much as *15% of Seagate's critical HDD revenue* was derived from its illegal sales to Huawei.  As a result, both Seagate's revenue and its stock price soared above its competitors' during the Class Period.  *See* Figure 2.  Indeed, as UBS analysts noted when the truth began to emerge, "It is worth noting that [Western Digital] (and Toshiba) ceased shipments after the new Foreign Direct Product Rule went into effect and *STX significantly outperformed WDC in subsequent Qs*."



**Figure 2**.  Seagate's illegal HDD sales allowed the Company to maintain relatively flat revenue, notwithstanding the COVID-19 pandemic, even as its principal competitor, Western Digital, experienced HDD revenue declines three times the size of Seagate's.  As UBS analysts noted, following enactment of the FDPR, "STX significantly outperformed WDC in subsequent Qs."

53.    Defendants, however, concealed Seagate's regulatory violations and its reliance on illegal HDD sales to Huawei from investors.  Unbeknownst to investors, Seagate made a calculated gamble that its lucrative monopoly over HDD sales to Huawei would offset any regulatory risk entailed by its illegal sales.  Indeed, in the two years prior to the start of the Class Period, BIS had brought only 14 enforcement actions for violating export restrictions against corporate entities, with an average monetary penalty of just over $2.3 million.  Seagate's monopoly over Huawei sales, on the other hand, was potentially worth billions of dollars.  In fact, by the start of the Class Period, BIS had brought just 16 enforcement actions based on export violations in 2020, only 4 of which were brought against corporate entities.

       **1.    As The Company Has Admitted, Seagate Used Advanced U.S. Origin Technologies To Manufacture Its HDDs, Triggering The FDPR's Prohibition on Sales To Huawei**

54.    As discussed above, the FDPR proscribed the export of any product that used ***any*** specified U.S. origin technology at ***any*** stage of production.  Seagate, however, admitted after the

Class Period that it used multiple advanced U.S. origin technologies specified in the FDPR, at multiple stages of the manufacturing process, to produce multiple core components of its HDDs.

55.     *First*, Seagate's HDD manufacturing plants – which were located in the United States, Ireland, and Asia – used a fully-automated laser-based surface inspection system, supplied by a U.S. company, to detect critical defects in the Company's HDDs (such as pits, bumps, or particles in any surfaces).  As part of the BIS Settlement, Seagate admitted that this technology was a restricted U.S. origin technology specified in the FDPR and was "essential" to the HDD manufacturing process.  Specifically, Seagate admitted that it was "subject to the EAR . . . and the direct product of U.S. origin ECCN 3E991 technology," that this equipment "was essential, i.e. a major component, of the Seagate HDD plants," and that Seagate's HDD sales to Huawei therefore violated the FDPR.  In fact, ECCN 3E991 specifically restricts the export of any products that are "*produced*" using U.S.-origin technology for "the *inspection or testing* of semiconductor devices, integrated circuits and 'electronic assemblies.'"

56.     Importantly, Seagate's use of this specified technology was not some arcane or technical detail that might have escaped Seagate's management's notice.  Again, the Company has admitted that the implementation of this technology was "essential" to the manufacture of its HDDs and "a major component of the Seagate HDD plants."

57.     Underscoring this admission, Seagate's own SEC filings both before and during the Class Period touted its advanced HDD manufacturing technologies as a "*critical element*" of the Company's business strategy and instrumental to its success in the highly competitive HDD market.  For instance, Seagate explained in SEC filings, "We maintain a highly integrated approach to our business by designing and manufacturing a significant portion of the components we view as critical to our products, such as read/write heads and recording media."  According to Seagate, "This integrated approach enables us to lower costs and to improve the functionality of components so that they work together efficiently."  Likewise, Seagate told investors, "We believe that because of our vertical design and manufacturing strategy, we are well positioned to take advantage of the opportunities to leverage the close interdependence of components for disk

drives. ***Our manufacturing efficiency and flexibility are critical elements of our integrated business strategy***."

58.    Seagate's own public filings highlighted specific components and manufacturing technologies that it "viewed as critical" to its products, including the manufacturing technology used in its "disk drive assembly," as part of which "the completed unit goes through ***extensive defect mapping and machine learning prior to packaging and shipment***" – the very technology that, as discussed above and unbeknownst to investors, was of U.S. origin and thus was subject to the FDPR's proscriptions.

59.    ***Second***, Seagate also used advanced equipment, manufactured by a U.S. processing systems manufacturer for what the Company has admitted were "critical" steps in manufacturing its HDD "read/write heads," the component that reads and records information stored in the HDD's magnetic media and a core piece of Seagate's HDD technology.  *See* Figure 3.  As Seagate explained in public filings, "The tolerances of read/write heads are extremely demanding and require state-of-the-art equipment and processes."  Specifically, as the Company admitted in the BIS Settlement, Seagate used the U.S. supplier's (1) Ion Beam Etch ("IBE") technology "for etching complex geometries and non-volatile materials for sensor, writer, and air bearing surfaces"; (2) Ion Beam Deposition ("IBD") technology for "depositing highly uniform step coverage with high quality film properties for the sensor"; and (3) Physical Vapor Deposition ("PVD") equipment to "to deposit thin films of metal and dielectric materials."



**Figure 3.** Central components of an HDD, including "read/write heads." Seagate has admitted that the automated laser-based based inspection system, IBE, IBD, and PVD technologies used to manufacture these components were restricted U.S. origin technologies specified in the FDPR, were all "essential, i.e. a major component, of the Seagate HDD plants," and specifically touted the Company's advanced manufacturing capabilities for these components to investors.

60. As with its laser-based surface inspection system, Seagate admitted, as part of the BIS Settlement, that these technologies were restricted U.S. origin technologies specified in the FDPR and were "essential" to the HDD manufacturing process. Again, Seagate specifically admitted that these technologies "were subject to the EAR . . . and the direct product of U.S.-origin ECCN 3E991 technology," that this equipment "was essential, i.e. a major component, of the Seagate HDD plants," and that, therefore, Seagate's HDD sales violated the FDPR.

61. And again, as Seagate admitted, the use of these technologies were not obscure details of the manufacturing process, but rather "essential" processes used to manufacture core components. In addition to its admission that the IBD, IBE, and PVD equipment were all "essential, i.e. a major component, of the Seagate HDD plants," Seagate again specifically touted its advanced read/write head manufacturing capabilities in the Company's SEC filings. Seagate highlighted that it "perform[ed] all primary stages of design and manufacture of read/write heads at our facilities," including the "thin-film and photolithographic processes" for which the U.S. suppliers' advanced technologies were used. Again, unbeknownst to investors, however, these technologies were of U.S. origin and thus were subject to the FDPR's proscriptions.

62. Notably, as a physicist who served as Seagate's former President of Operations and Technology and as a long-time R&D leader at Seagate, Defendant Mosley would have been well-aware of the details of the Company's reliance on these technologies, particularly given their "essential role" in manufacturing Seagate's most important product.

**2.  Seagate Secretly Ramped Up Its Sales To Huawei, Despite Clear Warnings That Those Sales Were Illegal**

63. From the time the FDPR was enacted through the remainder of the Class Period, Seagate received numerous warnings that, as the Company has now admitted, the "critical" technologies it used to manufacture its HDDs – its laser-based testing technology, IBE, IBD, and

PVD – triggered FDPR licensing requirements for its HDD sales to Huawei. As discussed above, the FDPR itself makes clear that an item may not be exported to Huawei if specified U.S. technology is "involved *in any of the production stages*" of that item and, indeed, specifically cites "testing equipment" as triggering the FDPR's restrictions.

64. Moreover, as also discussed, the law firms representing Seagate issued multiple client alerts making clear that the FDPR had a "very broad range" and prohibited sales to Huawei when the U.S. technologies are used at *any stage* of the production of the ultimate item being exported. Again, in its August 18, 2020 alert, issued prior to the Class Period, Wilson Sonsini explained that the FDPR expanded BIS's "jurisdiction over foreign-produced items developed or *produced* from a specified U.S. technology and software (or SUST/S) to cover *almost all transactions involving a Huawei entity*." That alert stated that unlicensed shipment of items to Huawei was prohibited "when those items are developed or produced by or for Huawei using SUST/S [specified U.S. technology or software] or in a plant using SUST/S."

65. And again, in its August 19, 2020 client alert, Covington warned that "the expanded scope of [the FDPR] will *impose licensing requirements on a very broad range of non-U.S.-made semiconductor items when destined for Huawei*." The client alert recited the FDPR's ban on unlicensed export to Huawei "of items that are 'produced by any plant or major component of a plant that . . . itself is a direct product of U.S.-origin 'technology' or 'software' subject to the EAR.'" Covington's alert explains,

> [A] "major component of a plant" means "equipment that is essential to the 'production' of an item, including testing equipment." In the August 17 Final Rule, *BIS interpreted "essential" broadly, stating that "any equipment subject to the [ECCNs] specified in [Footnote 1] that is involved in any of the production stages is considered essential*."

66. Shortly after the FDPR was announced, Seagate received another glaring red flag that the FDPR proscribed the unlicensed export of HDDs to Huawei, when, as discussed above, Western Digital and Toshiba – the only other U.S. suppliers of HDDs to Huawei – announced that they would stop shipments to the Chinese company. At a September 10, 2020 conference, Western Digital stated, "It's pretty straightforward, quite frankly, about how it [FDPR] applies . . . and we

will be in full compliance with the order." That is, Western Digital understood that "the regulations are if you have United States intellectual property or US equipment, you're not supposed to use that for products that you're selling into Huawei." Accordingly, Western Digital suspended hard drive sales to Huawei while it conducted "a very detailed analysis on everything" used to manufacture its hard drives in order to comply with the FDPR.

67.    Likewise, the five primary suppliers of semiconductors used by the top global producers of hard disk drives suspended sales directly to Huawei when the FDPR went into effect. In announcing the suspension of sales to Huawei, these companies cited the risk that their semiconductors might become a part of products destined to Huawei, thus violating the FDPR.

68.    As an October 2021 report released by the U.S. Senate Commerce Committee's Minority Staff stated, the refusal of participants in the HDD market, including both of Seagate's principal competitors, "to transact with Huawei without a license **suggests strong industry consensus about the rule's coverage**."

69.    Moreover, prior to enactment of the FDPR, Seagate itself had taken the position, in agreements and instructions to its customers, that its HDDs **could not** be transferred to any entity on the Restricted List. For example, Seagate required its Chinese customers to execute a certification that "Seagate products, software, or technology will not be directly or indirectly transferred to any parties listed on the United States restricted party lists" – a certification that, if applied to Seagate itself, would have prevented Seagate from shipping its products to Huawei. Similar language also appeared in Seagate's End User License Agreements, which also apply to Seagate's hardware and HDDs.

70.    Nevertheless, despite clear warnings that its conduct was illegal, including from both its lawyers and competitors, Seagate moved quickly following the enactment of the FDPR to secure a monopoly over HDD sales to Huawei. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier.

71.     Even as its competitors suspended HDD sales to Huawei, Seagate was radically *accelerating* its sales to Huawei and, in so doing, dramatically increasing the Company's legal, regulatory, and financial risk – all of which Defendants concealed from investors.  On December 7, 2020, Seagate signed a three-year Strategic Cooperation Agreement with Huawei, which named Seagate as "Huawei's strategic supplier" and granted Seagate "priority basis over other Huawei suppliers" – in other words, Huawei would seek to place all its HDD orders with Seagate.  In reality, as Seagate was well aware, there were no other HDD suppliers to compete for Huawei's business because its competitors had stopped selling to Huawei after the August 2020 FDPR rule was enacted.

72.     In return, and notwithstanding the FDPR (and, indeed, U.S. national security interests), Seagate agreed to extensively share its technology with Huawei, including by agreeing to provide Huawei with the Company's "*newest and most advanced technologies available* in order to support and sufficiently maintain Huawei's products in terms of innovation and market leadership."  Moreover, Seagate agreed to form a collaboration team that would "carry out *in-depth cooperation* in the areas of R&D, technology, quality, delivery, commercial affairs, and total cost of operation."

73.     The agreement designated Seagate's senior executives "as the sponsor[s] for the strategic partnership" between the Company and Huawei.  In recognition of the significance of its expanded relationship with Huawei, Seagate agreed to "set up a dedicated standalone service team to support the business with Huawei."

74.     Inside the Company, personnel, including senior management, acknowledged the growing importance of its HDD "partnership" with Seagate, celebrated record-breaking sales to Huawei, and noted the Chinese customer's reliance on Seagate's "support."  In a communication that the Company admitted was "forwarded to Seagate senior leadership," Seagate personnel wrote, "Huawei is grateful for our support – great milestone indeed with $600M revenue in [calendar year ('CY') 2020] just for HDD.  CY19 was less than $400M."  Huawei also

congratulated Seagate on becoming its priority supplier: "Seagate well seized the opportunity and successfully won the *big share*, laying a solid foundation for *our cooperation in the coming year*."

75.     In January 2021, shortly after Seagate entered into the Strategic Cooperation Agreement with Huawei, Huawei placed a massive order for *2 million HDDs* with Seagate, amounting to more than 25% of the $1.1 billion worth of HDDs illegally shipped to Huawei over 2020 and 2021.  As Seagate admitted as part of the BIS Settlement, "[a] Seagate US senior manager wrote [in an email] upon hearing news of the new purchase order, 'this is great!!!'"

76.     To facilitate this highly significant sale and encourage rapid follow-on HDD orders, Seagate began the process of extending Huawei of what would ultimately become *more than $1 billion in credit*.  On January 14, 2021, Seagate approved – in just a single business day – an extension to Huawei of a $280 million line of credit – *more than tripling* Huawei's then-existing line of credit with the Company.  Seagate never told investors that it was extending Huawei an unprecedented line of credit and thereby doubling down on the Company's exposure to risky and illegal HDD sales to Huawei.

### 3.     In January 2021, A Supplier Sent Seagate An "FDPR Rule Notification Letter," Clearly Warning That The Company's HDD Manufacturing Technologies Triggered FDPR Licensing Requirements, But Seagate Responded By Further Accelerating Illegal HDD Sales To Huawei

77.     On January 27, 2021, Seagate received yet another warning that its HDD sales to Huawei were illegal.  On that day, Seagate received an "FDPR rule notification" letter from the U.S. supplier that provided the Company with the IBD and IBE equipment Seagate has admitted was "essential" to manufacturing its HDDs and a "major component" of its HDD plants.  In the letter, which the Company admitted "was distributed to Seagate US," the supplier warned Seagate that the IBE and IBD equipment were made from ECCN 3E991 technology – one of the ECCNs specified in the FDPR as triggering export restrictions to Huawei.  The letter stated that, as such, a BIS license requirement would be triggered if the equipment was "involved in any essential 'production' or 'development' . . . including product engineering, manufacture, integration,

assembly (mounting), inspection, testing and quality assurance," and the item was being exported to Huawei or a Huawei entity on the Entity List.

78.     Once again, however, rather than come clean with investors, Seagate instead *ramped up* its HDD sales to Huawei, clearly cognizant that the clock was ticking on its valuable monopoly and under pressure from Huawei to deliver increasing volume given that Seagate's competitors had all stopped shipping to Huawei.  Indeed, by early February, Seagate implemented a plan – which it concealed from investors – to prioritize Huawei HDD sales over sales to all other customers and, in particular, to "swap deliver dates" and send HDDs produced and set to be delivered to other customer to Huawei instead.  Thus, unbeknownst to investors, Seagate was jeopardizing legitimate relationships with non-sanctioned clients in order to preserve its illicit monopoly on Huawei sales.

79.     Then, in March 2021, Seagate signed another agreement with Huawei that further deepened the partnership between the two companies.  As part of this Long Term Agreement ("LTA"), Huawei agreed to purchase *no less than 5.2 million units* of "enterprise class" HDDs "such as mission critical and nearline HDDs" in 2021.  The LTA reflected Seagate's intention to extensively share advanced technology with Huawei and, among other things, stated that the agreement "represents the intent of the parties to cooperate in new technology co-development, early access to new [HDD] Products and related business on a worldwide basis."  Seagate was named a "key strategic supplier" of Huawei, and agreed to "*regard Huawei as a strategic customer*" and to "maintain a service team for Huawei."

80.     Moreover, Seagate continued to secretly extend massive amounts of credit to Huawei in order to facilitate huge volumes of HDD sales.  On March 17, 2021, Seagate approved, *within minutes*, a request for a $350 million line of credit to Huawei.  Seagate personnel noted that this line of credit to Huawei – a restricted entity subject to extensive and draconian trading restrictions – "will be *the largest exposure of Seagate* following unlimited credit lines if approved."

1
2

### 4. Seagate Stonewalled A Congressional Investigation Into Its HDD Sales, While It Once Again Accelerated Shipments To Huawei By Secretly Extending The Customer Massive Amounts Of Credit

3
4
5
6
7
8
9

81.     For months during 2021, Seagate, in contrast to its competitors, stonewalled a non-public Congressional inquiry into its HDD sales to Huawei, while also working to accelerate those sales even further.    Significantly, Lead Counsel's investigation has revealed that this Congressional inquiry was prompted by non-public reports to U.S. Senator Roger Wicker, Ranking Member of the Senate Commerce Committee, from a whistleblower, making clear that, within the Company, it was, or should have been, well-known and understood, that Seagate's HDD sales to Huawei were illegal.

10
11
12
13
14
15

82.     Specifically, on May 10, 2021, Senator Wicker, as Ranking Member of the Senate Commerce Committee, sent letters to Seagate, Western Digital, and Toshiba "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR.  According to a report issued by the Commerce Committee Minority Staff, "[t]he letter probed each company's interpretation of the rule, including whether they believe selling hard disk drives to Huawei requires a license from BIS."

16
17
18

83.     Seagate, unlike its competitors, "declined to provide its interpretation of the rule, detail its transactional relationship with Huawei, or disclose whether the [C]ompany had obtained a license to continue shipment of hard disk drives to Huawei."

19
20
21
22

84.     Then, in August 2021, the Senate Commerce Committee again privately reached out to Seagate, "seeking to determine its interpretation of the Foreign Direct Product Rule."  As the Committee's report explains, Seagate not only refused to cooperate, but it did not even "respond to this request."

23
24
25
26

85.     Finally, in September 2021, the Commerce Committee staff sought and obtained nonpublic information from BIS concerning Seagate's export licensing.  The Export Control Reform Act empowers the Committee to release this non-public information if it determines that "withholding [it] is contrary to the national interest."

27
28

86.    Shortly after the Commerce Committee obtained this information, and facing considerable legal pressure and the threat of a public reckoning, Seagate finally agreed to an interview with Committee staff.  According to the report, Seagate officials acknowledged that "Seagate has not applied for any licenses to export hard disk drives to Huawei or its affiliates that are currently on the Entity List."  Significantly, Seagate officers, clearly cognizant of the enormous legal risk posed by the Company's sales to Huawei, "also disclosed that ***the company has stopped shipping hard disk drives to Huawei***, but declined to provide the date that shipments ended."

87.    Still, even after Congressional scrutiny and legal pressure forced Seagate to stop shipping HDDs to Huawei altogether, Defendants continued to categorically assure investors that the Company was in compliance with the FDPR while downplaying the Company's reliance on, and exposure to, Huawei sales.

88.    In fact, even as the Company worked to evade government scrutiny of its HDD sales to Huawei, Seagate ***continued*** to ramp up those sales, in an effort to maximize the value of its monopoly before it collapsed.  For instance, on July 14, 2021, Seagate extended Huawei yet another line of credit – this one for an additional $185 million over its existing $210 million line of credit – for its HDD shipments.  Again, Seagate personnel highlighted the significant exposure entailed by extending this credit line, writing that it "will be the 3rd largest exposure of Seagate following unlimited credit lines if approved."

89.    Again, on September 16, 2021, Seagate approved a $230 million additional line of credit to Huawei, nearly ***tripling*** Huawei's existing credit lines at the time.  Thus, Seagate extended Huawei over $1 billion of credit to facilitate and incentivize the Chinese telecom giant's massive HDD purchases during 2021.  Much of that credit was extended ***after*** Seagate received the FDPR notice letter directly from a key U.S. supplier of "essential" manufacturing technology directly warning the Company that the products made with that technology could not be shipped to Huawei without a license.  Seagate extended nearly half of the massive credit line to Huawei while it was working to evade a congressional inquiry into its HDD sales to that company.

90.    As discussed above, Defendants' illegal HDD sales to Huawei over the Class Period boosted the Company's reported revenue by 10% and inflated its critical HDD revenue by as much 15%. Repeatedly throughout the Class Period, Defendants' illegal HDD sales allowed Seagate to meet or exceed revenue guidance, inflating Seagate's stock price. *See* Figure 4.

| Quarter | Total Illegal Sales to Huawei | Total Consolidated Revenue (in millions) | % Total Revenue Derived from Illegal Sales | HDD Revenue (in millions) | % HDD Revenue Derived from Illegal Sales | Illegal Sales Allowed Seagate to Meet or Exceed Revenue Guidance? |
|---|---|---|---|---|---|---|
| **1Q2021[5]** (ended 10/2020) | $70,901,942 | $2,314 | 3.06% | $2,137 | 3% | Yes. Absent illegal sales, Seagate would have come in below the midpoint of its revenue guidance. |
| **2Q2021** (ended 1/1/2020) | $147,243,533 | $2,623 | 5.61% | $2,425 | 6% | Yes. Absent illegal sales, Seagate would have come in below the midpoint of its revenue guidance. |
| **3Q2021** (ended 4/2/2021) | $366,382,891 | $2,731 | 13.42% | $2,493 | 15% | Yes. Absent illegal sales, Seagate would have missed its revenue guidance range entirely. |
| **4Q2021** (ended 7/2/2021) | $230,988,485 | $3,013 | 7.67% | $2,737 | 8% | Yes. Absent illegal sales, Seagate would have come in below the midpoint of its revenue guidance. |
| **1Q2022** (ended 10/1/2022) | $289,215,355 | $3,115 | 9.28% | $2,864 | 10% | Yes. Absent illegal sales, Seagate would have missed its revenue guidance range entirely. |

---

[5] The FDPR became effective just two weeks before the end of the first (fiscal) quarter of 2021; accordingly, the total value of illegal sales cited here represents sales occurring over just two weeks. If total revenues are prorated to account for this (and total revenue and HDD revenues are divided by six), illegal sales contributed close to 20% of the Company's prorated HDD revenue over those two weeks.

| Quarter | Total Illegal Sales to Huawei | Total Consolidated Revenue (in millions) | % Total Revenue Derived from Illegal Sales | HDD Revenue (in millions) | % HDD Revenue Derived from Illegal Sales | Illegal Sales Allowed Seagate to Meet or Exceed Revenue Guidance? |
|---|---|---|---|---|---|---|
| **Totals** | **$1,104,732,205** | **$13.796** | **8%** (Illegal sales boosted total revenue by **8.7%**). | **$12.656** | **Illegal sales account for 8.73% of HDD Revenue** (Illegal sales boosted HDD revenue by **9.6%**) |
| **Totals for Quarters in which FDPR Was Effective Throughout** | **$1,033,830,264** | **$11.482** | **9%** (Illegal sales boosted revenue by **10%**). | **$10.519** | **Illegal sales account for 10.5% of HDD Revenue** (Illegal sales boosted revenue by **11.7%**) |

**Figure 4**. Seagate relied on its illegal HDD sales to Huawei to materially boost the Company's financial performance during the Class Period.

91.     Seagate's monopoly over Huawei sales also allowed the Company to significantly outperform its competitors. As UBS analysts explained as the truth began to emerge, "It is worth noting that WDC [Western Digital] (and Toshiba) ceased shipments after the new Foreign Direct Product Rule went into effect and ***STX significantly outperformed WDC in subsequent Qs***." Likewise, in a report issued after the end of the Class Period, Evercore analysts noted that "Seagate between Aug. 17, 2020 and Sept. 29, 2021 ***witnessed a revenue/EB windfall associated with ongoing shipments to Huawei, where peers ceased shipments due to export restrictions***," leaving concerned investors to wonder, "***What is Normalized Demand for Seagate***?" as Defendants' misstatements had concealed the truth about that "normalized" HDD demand from investors throughout the Class Period.

92.     Moreover, Seagate's monopoly on HDD sales to Huawei also inflated the Company's credit rating – an important metric for Seagate given the significant debt that the Company carried. As discussed above, after the FDPR was enacted, Fitch downgraded Seagate's credit rating, assigning the Company a "Negative" outlook. However, by September 2021, after Seagate had padded its revenue with illegal HDD sales for a year, Fitch revised Seagate's outlook to "Stable." In particular, Fitch highlighted Seagate's superior HDD sales volume relative to its primary competitor, Western Digital:

Seagate's ***product leadership in mass capacity drives over its competitor Western Digital Corp.*** (BB+/Stable), could accelerate revenue growth over at least the nearer-term . . . .  Lower capital spending, as the company absorbs recently elevated investments levels, ***in conjunction with stronger positive revenue growth*** and a richer profit mix will yield $500 million to $1 billion of annual FCF [free cash flow].

Notably, in October 2021, shortly after Fitch bumped Seagate's rating, the Company secured a new $1.2 billion term loan facility, and, in November, held a $500 million "exchange offering," whereby noteholders tendered existing Seagate notes for newly issued notes with a longer maturity.

93.     As discussed above, on October 26, 2021, Senator Wicker, as Ranking Member of the Commerce Committee, released a report calling for BIS to investigate whether Seagate had sold HDDs to Huawei following the FDPR's enactment and, if so, whether those sales were legal. The report noted that Seagate was alone amongst its competitors in stating that it planned to continue to ship HDDs to Huawei notwithstanding the FDPR, but refused to share with the Committee details concerning sales the Company had actually made following the FDPR's effective date.  Following the release of this report, Defendants quickly issued a statement that same day, printed in *The Wall Street Journal*, reassuring investors that "Seagate complies with all laws applicable to its business and operations, including export control regulations."

### E.     The Truth Emerges

94.     The truth about Seagate's HDD sales to Huawei, the Company's regulatory compliance, and its reliance on those illegal sales was revealed to investors in four disclosures that caused significant declines in the price of Seagate's common stock.

### 1.     On March 8, 2022, The Collapse of Seagate's Illegal Monopoly Caused The Company To Revise Earnings Guidance Significantly Downward, Leading To A Sharp Decline In Seagate's Stock Price

95.     Investors began to learn the truth about Seagate's reliance on its huge volume of illegal HDD sales when, on March 8, 2022, following the collapse of the Company's illicit monopoly in response to intensifying legal scrutiny, Seagate was forced to lower its earnings guidance.  Specifically, at a March 8, 2022 investor conference, Defendant Mosley cautioned investors that Seagate was facing revenue pressure and was "going to be at the lower end of [its

financial guidance] ranges" for the upcoming quarter as a result of "disruption in the Chinese market" for HDDs.

96.    Seagate's announcement began to reveal to the market the Company's reliance on illegal HDD sales to Huawei and to reflect the Company's financial condition but for its fraudulent statements concealing Seagate's regulatory violations, the scope of its illegal sales, and the magnitude of the risk entailed by its conduct.  Morgan Stanley analysts, for instance, reported that "China markets are driving incremental weakness" in the Company's HDD sales, which raised the risk of potential longer terms pressures.  UBS analysts likewise lowered their price target for Seagate common stock, noting "weakness seen in China."

97.    In response to Defendant Mosley's announcement of revenue pressures on the Company's financial guidance, the price of Seagate common stock declined by $9.52 per share, or 9.5%, from a closing price of $100.09 on March 7, 2022, to a closing price of $90.57 on March 8, 2022

98.    However, rather than admit that Seagate had lost a significant revenue stream in September 2021 when it finally stopped illegal HDD sales to Huawei, Defendants issued additional misleading statements to quell investor concern.  Specifically, Defendant Mosley attributed the weakness to a variety of "transitory" business factors, including "freight logistics."  Again, Defendants failed to disclose that a significant driver of Seagate's revenue weakness was the loss of its monopoly over Huawei sales, which also created significant legal and regulatory risk for the Company.  In fact, Defendant Mosley actually *touted* Seagate's export restriction compliance, citing the Company's adherence to restrictions on exports to Russia enacted after the Ukraine conflict.[6]

99.    Analysts were comforted by Defendants' soothing statements.  The Morgan Stanley analysts cited above, for instance, stated that "the expected downside doesn't change our longer-

---

[6] Unlike its illegal monopoly on sales to Huawei, Seagate had little to gain by flouting export restrictions to Russia because the market was a negligible contributor to the Company's revenue. Moreover, by this point, the Company's foreign transactions were then under considerably more scrutiny than they were at the start of the Class Period.

term view." Likewise, Bank of America analysts parroted Defendants' misleading statements, writing that they "view[ed] the headwinds as transitory." Moreover, crediting Defendant Mosley's statements, Rosenblatt analysts cited the Company's compliance with export control restrictions with approval.

> **2.    On July 21, 2022, Seagate Reported A Significant Revenue Miss And Further Reduced Revenue Guidance, As The Company's Financial Performance Continued To Assimilate The Loss Of Its Illegal Monopoly Over Huawei Sales**

100.    Investors continued to learn the truth about Seagate's reliance on illegal HDD sales to Huawei on July 21, 2022, when Seagate reported that its revenues declined by 12.8% year-over-year, driven by lagging HDD demand in Asia, missing the Company's entire revenue guidance range (and missing the midpoint of guidance by more than $150 million). The Company further guided down the coming quarter's revenue by 5% and reported that it was cutting HDD production because of customer "inventory overages" in China.

101.    Seagate's declining financial performance, which was driven by declining HDD sales in Asia due to the loss of the Company's Huawei sales, further revealed the truth concealed by Defendants' misstatements, as Seagate's financial performance continued to assimilate and reflect the loss of the Company's illegal monopoly. Again, analysts connected Seagate's poor financial performance to declining demand in Asia. Deutsche Bank analysts lowered their price target for Seagate stock and noted that even accounting for macroeconomic and secular forces, which the market had anticipated before financial results were announced, Seagate's "revenue cut is larger than we had expected." These analysts explained that the disappointed revenue results were "driven by [HDD] inventory adjustments across most segments" and specifically highlighted flagging demand in China. Similarly, Wedbush analysts reported that the Company's revenue miss surprised investors, which had accounted for macro and secular trends:

> Seagate meaningfully missed expectations, and guided below forward Street estimates to an even greater degree. With STX having been viewed as potentially somewhat insulated from economic disruption due to its significant exposure to the cloud (generally considered the healthiest end market), we believe the magnitude of STX's shortfall was not anticipated by the investment community.

Morgan Stanley analysts likewise reported that revenue results were "worse than expected, with revenue of $2.6B and EPS of $1.59 coming in 7% and 19% below our expectations," again citing demand issues in the Asian market.

102.    In response to Defendants' July 21, 2022 disclosures, the price of Seagate common stock declined by $6.78 per share, or 8.1%, from a closing price of $83.61 on July 21, 2022, to a closing price of $76.83 on July 22, 2022.

103.    Nevertheless, Defendants continued to issue misleading soothing statements to assuage investors' concerns and stem the Company's stock price decline.  Again, rather than disclose that the Company's poor revenue performance was driven in significant part by the loss of its Huawei monopoly (and that the Company faced further risks as a result), Defendants blamed its issues with flagging demand and inventory build-up in Asia on secular and short-term headwinds, including "impacts from COVID lockdowns in Asia, non-HDD component shortages, and global inflationary pressures."

104.    Analysts again credited these soothing statements.  For instance, Bank of America analysts repeated Defendants' statements attributing the Company's disappointing results to "[m]acro headwinds, supply constraints, [and] inventory" and wrote that "[d]espite the near-term macro headwinds, we reiterate Buy."  Likewise, while UBS analysts noted that Seagate was "hit by an inventory correction in its consumer end markets and demand in China is generally very poor," they repeated Defendants' statements attributing these issues to short-term macro headwinds (rather than the permanent loss of a major customer) and that "most of the likely downside" in the Company's stock price "*has already been reflected in the CQ2 dip* with CQ3 potentially representing the bottom."

### 3. On October 26, 2022, Seagate Finally Disclosed The Proposed Charging Letter From BIS, Which Alleged That The Company Had Violated U.S. Export Restrictions

105.    On October 26, 2022, Seagate disclosed in a Form 8-K that, in August 2022 (two months before making any disclosure), the Company had received a Proposed Charging Letter from BIS alleging violations of U.S. export restrictions.  That same day, Seagate again announced

disappointing financial results for the first quarter of 2022, reporting that HDD sales had continued to decline, falling by 26% due to declining demand in China. As a result of these newly disclosed financial risks, the Company announced that it had further lowered its production output and its fiscal year 2023 capital expenditures, and that it would implement a restructuring plan to reduce its global headcount by 8%.

106.    These disclosures further revealed the truth about Seagate's reliance on illegal HDD sales and the legal and regulatory risks the Company faced as a result. For instance, UBS analysts cut Seagate's price target by over 35% "from $85 to $55 and downgrad[ed] the stock to Neutral," in part because the "US Dept of Commerce charge that STX shipped in 2H:20/1H:21 to customers on the Entity List (reportedly Huawei) simply creates too much potential risk and offsets what is otherwise a fundamental set-up that is pretty good." UBS analysts also explained that it would be "difficult to handicap the outcome of this," noting that "it seems unlikely that BIS would have issued the letter unless it felt it had ample evidence," and cautioned that "the range of outcomes from any penalties due to the new BIS letter are potentially significant." As discussed above, these analysts noted that "WDC [Western Digital] (and Toshiba) ceased shipments after the new Foreign Direct Product Rule went into effect and STX significantly outperformed WDC in subsequent Qs." Barclays analysts likewise reported that the BIS charging letter validated, for the very first time, the market's "suspicions that the company was over-shipping to China," connecting the Company's flagging HDD revenue with the shipments that were the subject of the charging letter. Similarly, BNP Paribas analysts highlighted the significance of the charging letter (which Defendants had failed to disclose for two months), noting that it was "[p]erhaps the largest known unknown" surrounding Seagate stock and that it would be necessary "to see . . . clarity on the BIS letter before becoming more constructive."

107.    In response to this news, the price of Seagate common stock declined by $4.61 per share, or nearly 8%, from a closing price of $58.00 on October 25, to a closing price of $53.39 on October 26.

108.    Defendants, however, continued to issue misleading soothing statements to stem Seagate's stock price decline.  Defendants falsely assured investors that Seagate "did not engage in prohibited conduct," "complied with all relevant export control laws and regulations," and that "Seagate has committed to compliance through its global team of international trade compliance and legal professionals and by maintaining robust trade controls compliance policies and procedures."  In addition, Defendants again attributed revenue declines to macro headwinds.  Defendants' misstatements continued to conceal the full scope of Seagate's misconduct and its legal and regulatory exposure.  Defendants' misstatements also continued to conceal the multiple warnings the Company received that its sales were illegal, including the "FDPR rule notification" letter, and the multiple agreements and lines of credit extended to Huawei to facilitate those sales.

### 4.    On April 19, 2023, The Company Admitted That It Had Sold Over $1.1 Billion Worth Of HDDs To Huawei In Violation U.S. Export Restrictions And That BIS Imposed A $300 Million Penalty – The Largest In BIS History

109.    Finally, on April 19, 2023, after trading hours, the market learned the full extent and magnitude of Seagate's illegal HDD sales, when Seagate and BIS announced the Settlement Agreement.  In the Settlement Agreement, Seagate **admitted** that, contrary to its repeated statements that the Company "complied with all relevant export control laws and regulations," it had illegally sold more than $1.1 billion in HDDs to Huawei in violation of the FDPR.  Seagate further admitted that it had received direct warnings that these sales were illegal, including the "FDPR rule notification letter" from a key U.S. supplier, and that the Company's senior management had repeatedly ramped up Seagate's exposure to these illegal transactions through sweeping commercial agreements and massive extensions of credit to Huawei.  As a result of Seagate's admitted illegal conduct, BIS imposed a $300 million civil penalty, ***the largest standalone civil penalty in the agency's history***.  Additionally, the Settlement Agreement required Seagate to conduct a series of external audits focused on its export controls compliance program.  Any failure by Seagate either to pay the $300 million penalty, or to conduct the required audits, would result in a five-year denial of Seagate's export privileges, which would prohibit Seagate

from participating in any way in any transaction subject to the EAR.  The Settlement Agreement also provided that Seagate would not dispute any of the Company's admissions.

110.    The next day, April 20, 2023, Seagate issued an 8-K, which further revealed that the Board of Directors approved temporary salary reductions for the Company's named executive officers, and that beginning May 1, 2023, for a period of 6 months, the base salary for Defendants Mosley and Romano would be reduced by 100%.  Also on April 20, the Company announced the sudden departure of Jeffrey Nygaard, Seagate's then-Executive Vice President of Operations and Technology, who would leave the Company effective May 1, 2023, less than two weeks after the announcement.

111.    In response to these disclosures, the price of Seagate stock declined by $5.78, or more than 9%, from a closing price of $62.86 on April 19, 2023 to $57.08 on April 20, 2023.

112.    Analysts were shocked by Seagate's admissions concerning the full scope of its illegal conduct.  Susquehanna analysts lowered their price target for Seagate, including because "[t]he BIS settlement will, in our view, have further adverse impact on STX's HDD EB shipments as STX will no longer be able to ship to Huawei (that in the past had driven a material uptick in demand in the upcycle)."  Susquehanna also expressed concerns about the "$15M quarterly payments (for the next five years)" resulting from the BIS settlement, noting that "[t]hese pulls on cash are leading STX to conduct sale-leasebacks on some of their manufacturing facilities in order to generate cash."  Morningstar published an analyst report titled "Seagate Earnings: Poor Profits, Layoffs, and a Legal Settlement Combine for a Disappointing Quarter," in which it noted that the "trade violation settlement further soured the print.  Shares traded down after results, and we see them as slightly overvalued."  Evercore analysts emphasized that Seagate's illicit sales to Huawei raised concerns as to "What is Normalized Demand for Seagate," explaining that "Seagate between Aug. 17, 2020 and Sept. 29, 2021 witnessed a revenue/EB windfall associated with ongoing shipments to Huawei, where peers ceased shipments due to export restrictions."  They explained that Seagate faced more risk than its peers in the HDD industry because the "structural correction

1    following COVID-era overshipments" was "further exacerbated in Seagate's case by *temporary*

2    *Huawei-related share gains* in CY20/21 (after peers ceased shipments)."

3        113.    Seagate's settlement with BIS also received broader media coverage.  For instance,

4    Export Solutions, a consulting firm that specializes in helping companies comply with U.S. and

5    international import/export regulations, emphasized the "size," "swiftness," and "publicity" of the

6    settlement.   It noted that in previous cases, "investigations occur[red] over a span of years,"

7    whereas here, "the penalty was announced just 17 months after the activity ceased."  As to the

8    publicity of the settlement, Export Solutions emphasized the ramifications of Seagate's decision

9    to conceal its misconduct:

> BIS has held nothing back in its public statements about Seagate's activities and
> the alleged violations.   Notably, the agency has called out how Seagate's
> competitors reacted to the Huawei restrictions (ceasing all sales to the entity) and
> contrasted that with *Seagate's apparent lack of regard for the regulations*.  The
> agency is proactively communicating this settlement, and other recent enforcement
> news, to companies who have previously submitted voluntary disclosures.  BIS is
> also making it known that *Seagate did not voluntarily disclose the activity*, and that
> this contributed to the severity of the fine.

## V.    ADDITIONAL ALLEGATIONS OF SCIENTER

        114.    Numerous allegations set forth above and summarized below collectively give rise

to the strong inference that Defendants knowingly or at least recklessly misled investors about

Seagate's compliance with the FDPR and its reliance on, and exposure to, illegal HDD sales to

Huawei.  These allegations include the following:

        115.    *First*, Seagate was repeatedly and directly warned that its unlicensed HDD sales to

Huawei violated the FDPR.  Indeed, as alleged above, on January 27, 2021, Seagate received an

"FDPR rule notification" letter from a U.S. supplier of multiple manufacturing technologies the

Company has admitted were "essential" to producing HDDs and a "major component" of its HDD

plants.   That letter unambiguously warned Seagate's use of the supplier's equipment and

technology to manufacture the Company's HDDs triggered the FDPR's licensing requirements

with regard to any sales of those HDDs to Huawei.  Seagate has further admitted that the supplier's

"FDPR rule notification" letter "was distributed to Seagate US."  It is implausible that the "FDPR

rule notification" letter was not shared with members of Seagate senior management (or addressed to them in the first instance), given the significance of Seagate's relationship with Huawei; the market's concern about the legality of that relationship; and the seriousness of the legal risk raised by the "FDPR rule notification" letter.

116.    Even before it received the "FDPR rule notification" letter, Seagate was warned on multiple occasions that its HDD sales to Huawei were illegal.  As discussed above, the text of the rule itself the states clearly that an item may not be exported to Huawei if specified U.S. technology – which Seagate has admitted included its automated laser testing system, IBE, IBD, and PVD technology – is "involved *in any of the production stages*" of that item.

117.    Likewise, guidance issued by Seagate's lawyers made clear that the FDPR applied when the U.S. technologies are used at any stage of production.  For instance, Wilson Sonsini issued an August 18, 2020 client alert explaining that the FDPR proscribed the unlicensed export of any items "when those items are developed or produced by or for Huawei using SUST/S or in a plant using SUST/S," even if the items are "commercial off-the-shelf items."  Moreover, Covington's August 19, 2020 client alert explained that the FDPR proscribed the export of a "very broad range" of items, specifically any item where the subject technology used in "any of the production stages."

118.    Seagate received another warning that its unlicensed HDD sales violated the FDPR when, shortly after the FDPR was enacted, Western Digital and Toshiba – the only other U.S. suppliers of HDDs to Huawei – announced that they would stop all shipments to the company. Multiple other participants in the HDD market, including the five primary sellers of HDD semiconductors, likewise all stopped shipments to Huawei after the FDPR was announced.  Again, as the Senate Commerce Committee explained, the refusal of participants in the HDD market, including both of Seagate's principal competitors, "to transact with Huawei without a license *suggests strong industry consensus about the rule's coverage*."

119.    ***Second***, Defendants' efforts to evade and stonewall a Congressional investigation into Seagate's HDD sales, and their decision to abruptly and secretly stop all sales to Huawei as

the investigation ramped up, support a strong inference of scienter.  As discussed above, on May 10, 2021, the Ranking Member of the Senate Commerce Committee sent letters to Seagate, Western Digital, and Toshiba "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR.  Seagate not only refused to provide information concerning its relationship with Huawei, but it also declined to even share its interpretation of the FDPR – a refusal that indicates Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei.  Significantly, only Seagate refused to answer the Commerce Committee's questions; both Western Digital and Toshiba, companies that were compliant with FDPR, answered the Committee's straightforward questions.  Only when faced with the threat that the Commerce Committee might disclose nonpublic information concerning Seagate's export licensing history did the Company finally relent and agree to meet with Committee staff.  At that meeting, Seagate informed the Committee staff that the Company had suddenly stopped all HDD shipments to Huawei.  That Seagate stopped all Huawei sales *at the same time* that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements, yields a strong inference that the Company knew those sales contravened the FDPR.

120.    Moreover, and significantly, the Congressional inquiry itself was prompted by (non-public) reports from a whistleblower, making clear that it was, or should have been, well-known and understood inside Seagate that the Company's HDD sales to Huawei were illegal.

121.    *Third*, that Defendants' misstatements concerned the viability of, and Seagate's exposure to, sales of the Company's most important product to one of its most significant customers in the Company's most important business segment during the Class Period by far – sales that were also the subject of repeated investor inquiry over the Class Period – supports an inference of scienter.

122.    Seagate's HDD sales to Huawei were highly significant to the Company from a financial standpoint.  HDD was undoubtedly Seagate's most important business during the Class

Period by far, comprising ***more than 90% of the Company's consolidated revenue***.  Moreover, wholly contrary to Defendants' public statements, Seagate's illegal HDD sales to Huawei contributed significantly to that business.  As discussed above, Seagate's HDD sales to Huawei comprised as much as 15% of the Company's HDD sales during the Class Period, exceeding 13% of Seagate's Company-wide revenue.  Notably, as Defendant Romano acknowledged, GAAP required disclosure where transactions with a single customer contribute 10% or more of revenues.  Over the period during which Seagate was illegally selling HDDs to Huawei, those sales boosted the Company's overall revenue by 10% and repeatedly allowed the Company to hit financial guidance it would otherwise have missed.  Seagate's HDD sales to Huawei also boosted the Company's credit rating, which was important given Seagate's significant reliance on debt to fund its operations.  Moreover, senior Seagate management repeatedly signed major commercial agreements with Huawei during the Class Period, in which the Company agreed to "regard Huawei as a strategic customer," including by agreeing to maintain a team specially dedicated to servicing it.

123.    Further, Defendants' misstatements concerned, not just the size, but the very legality and legitimacy of Seagate's HDD revenue, and, as such, Seagate's HDD sales to Huawei was the subject of significant investor attention and concern during the Class Period.  Indeed, as discussed above, many of Defendants' misstatements were made in direct response to questions from securities analysts, who repeatedly asked Defendants to affirm that Seagate was complying with the FDPR and that the revenue contribution of these sales was *de minimis*.  These analysts specifically noted that they had "been receiving a lot of questions" from investors about whether and to what extent Seagate was continuing to sell HDDs to Huawei, and the nature of the legal risk the Company was taking on in so doing.

124.    Significantly, Defendants responded to these inquiries by assuring investors that they were deeply focused on these issues.  As Defendants Romano assured investors, Seagate senior management acknowledged that "it's part of our job to ensure that we understand and then we follow all the rules and regulations of trade."  Defendants' statements assuring investors that

they were closely monitoring Seagate's FDPR compliance further support an inference of scienter. Either Defendants performed the monitoring and regulatory assurance they told investors they did, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely reckless.

125.    Given the significance of, and investors' attention surrounding, Seagate's FDPR compliance, it is highly unlikely that senior management would have been unaware of clear warning signs of illegality, including the "FDPR rule notification" letter Seagate received from a key supplier of "essential" HDD manufacturing technologies, a Congressional investigation regarding the Company's HDD sales to Huawei (and Seagate's stonewalling in response to it), and clear advice from Seagate's law firms making clear that the Company's HDD sales triggered the FDPR's licensing requirements.

126.    The importance of Seagate's HDD business, the importance of the Company's Huawei sales to that business, and the importance of the Company's FDPR compliance all raise a strong inference that Defendants were laser focused on the viability, legality, and size of the Company's commercial relationship with Huawei.

127.    **Fourth**, as Defendant Romano acknowledged, GAAP required Seagate to disclose the magnitude of the Company's exposure to Huawei sales.  As discussed above, both ASC 280-10-50-42 and ASC 275-10-50-18 require disclosure where transaction with a single customer "amount to 10 percent or more of a public entity's revenues," and those provisions further instruct issuers to "consider disclosure in cases where the threshold has not been met."  For at least the third quarter 2021 (ended April 2, 2021), for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues.  Likewise, Seagate's HDD sales to Huawei contributed 9.3% of the Company's consolidated revenues in the first quarter of 2022 (ended October 1, 2021), a contribution that was particularly material (and thus subject to disclosure under GAAP) given the direct warnings from a key supplier that Seagate's sales were illegal, an ongoing Congressional investigation regarding those sales, and the Company's decision to stop all sales in

the face of mounting legal pressure and scrutiny. Defendants not only failed to make the required (let alone recommended) disclosures, but they also issued affirmative misstatements concealing Seagate's reliance on HDD sales to Huawei. That Defendants violated the GAAP rules with which they specifically claimed to be compliant further supports an inference that Defendants' misstatements were deliberately designed to conceal the scope of the Company's commercial relationship with Huawei.

128.    *Fifth*, Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following enactment of the FDPR further supports a strong inference that they were aware of, at a minimum, basic facts concerning this expanded commercial relationship, including the magnitude of the Company's HDD sales and red flags relating to the legal and regulatory risks thereto, including dire warnings from suppliers and efforts to evade ongoing governmental investigations. As discussed above, Seagate had admitted that its senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 –  in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs, to share Seagate's "newest and most advanced technologies," to "carry out in-depth cooperation in the areas of R&D [and] technology," and to "set up a dedicated standalone service team to support the business with Huawei."

129.    Following execution of the first agreement in December 2020, Huawei placed an order for 2 million HDDs, more than 25% of the $1.1 billion worth of HDDs Seagate illegally shipped to Huawei over the entire 2020-2021 period discussed above. Seagate has admitted that its senior management was aware of this massive sale. The second agreement, signed by Seagate senior management in March 2021, explicitly provided that Huawei would purchase *at least 5.2 million* HDDs from Seagate in 2021 – *more than 70%* of the $1.1 billion worth of HDDs the Company illegally shipped to Huawei over the entire 2020-2021 period discussed above. Inside Seagate, company personnel openly acknowledged the significance of these agreements and the Company's expanded relationship with Huawei. For instance, in an email following the December 2020 agreement that was "forwarded to Seagate senior leadership," Company personnel trumpeted

1   record-breaking HDD sales to Huawei: "Huawei is grateful for our support–great milestone indeed

2   with $600M revenue in [calendar year (CY) 2020] just for HDD.  CY19 was less than $400M."

3       130.    Further as discussed above, Seagate extended massive lines of credit to Huawei

4   during the Class Period in order to facilitate large volumes of orders and maximize the value of

5   the Company's monopoly on Huawei sales while that monopoly lasted.  In all, Seagate extended

6   over $1 billion in credit to Huawei in connection with the Company's illegal HDD sales.

7   Internally, Seagate personnel repeatedly acknowledged that these lines of credit to Huawei were

8   among the Company's single largest exposures.  Again, it is implausible that these extremely

9   significant exposures would have been authorized without senior management approval.

10      131.    *Sixth*, the egregious and widespread character of Seagate's FDPR violations also

11  supports an inference of scienter.  As discussed above, the FDPR proscribed the export of any

12  product that used *any* specified U.S.-origin technology at *any* stage of production.  Seagate has

13  *admitted* that it used *multiple* advanced U.S.-origin technologies specified in the FDPR – including

14  its automated laser-based surface inspection systems, IBE, IBD, and PVD, equipment and

15  technologies – at *multiple* critical stages of the manufacturing process, to produce *multiple* core

16  components of its HDDs, such as the read/write heads at the heart of the Company's HDD

17  technology.  Again, the use of this technology and equipment was not a minor or arcane part of

18  the HDD manufacturing process.  As discussed above, the Company has *admitted* they were all

19  "*essential*" to the manufacture of its HDDs and "*major component[s]* of the Seagate HDD plants."

20  Moreover, as Seagate stated in SEC filings, Defendants viewed the Company's manufacturing

21  processes, not as mere logistical details, but as a "*critical elements of our integrated business*

22  *strategy*."  Indeed, in its public filings, Seagate *specifically highlighted* the technologies and

23  components that were the subject of the Company's repeated FDPR violations, including its

24  "extensive defect mapping" process and those involved in "all primary stages of design and

25  manufacture of read/write heads."  Additionally, Seagate itself warned customers that its HDDs

26  were subject to export restrictions and could not be sold to individuals identified on the DOC's

27  Restricted Entity list.  And Defendant Mosley's experience as Seagate's President of Operations

28

and Technology and his substantial technical background and make it even less likely that he would have been unaware of these technologies or failed to grasp their importance to the manufacturing process.    That Seagate's FDPR violations involved multiple "essential" technologies involved in the "critical elements" of Company's much-trumpeted manufacturing processes further supports an inference of scienter, especially when coupled with direct warnings from a key supplier of those "essential" technologies that their use triggered FDPR restrictions.

132.    **Seventh**, the timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter.   At the end of the Class Period, when BIS released the complete charging letter and announced the historic penalty Seagate had agreed to pay for its illegal conduct, the Company announced the unexpected departure of its VP of Operations and Technology, Jeffrey Nygaard.  Nygaard had worked for Seagate for **nearly 30 years** and was responsible for overseeing Seagate's HDD operations across the globe.   Further, Seagate announced that the Company's Board had approved 100% salary reductions for both Defendants Mosley and Romano for a period of six months, and a 50% reduction in salary for the Company's Executive Vice President and Chief Commercial Officer, who, according to Seagate, was "responsible for product line management across HDD, SSD and Systems."

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

133.    Throughout the Class Period, Defendants made numerous materially false and misleading statements during Seagate's conference calls with investors, and in the Company's SEC filings and press releases.  Defendants' false and misleading statements generally fall into four categories: (i) statements, which Seagate had admitted were false, that the Company complied with the FDPR, and all applicable U.S. export restrictions, and that none of the Company's HDD production processes implicated these export restrictions; (ii) statements concerning Seagate's reliance on, and exposure to, sales to Huawei, including the extent to which Huawei sales

contributed to reported revenue; (iii) statements attributing Seagate's financial performance to a host of legitimate business factors, while failing to disclose that those results were driven in material part by the Company's HDD sales to Huawei and, later, the cessation of those sales; and (iv) statements certifying that Seagate's financial reports were prepared in accordance with GAAP.

## A.    Defendants' Materially False And Misleading Statements Concerning Seagate's Compliance With The FDPR

134.    As discussed above, throughout the Class Period, Defendants made materially false and misleading statements assuring investors that Seagate complied with the FDPR, and all applicable U.S. export restrictions, and that none of the Company's HDD production processes implicated these export restrictions.  As part of the post-Class Period BIS Settlement, Seagate has admitted that these statements were false.  Specifically, Seagate had admitted that, at the time these statements were made, the Company's sales *did* violate the FDPR because the Company's HDD production processes *did* implicate these export restrictions.

### 1.    False And Misleading Statements During The First Fiscal Quarter of 2021 (Ended October 2, 2020)

135.    On September 14, 2020, Defendant Romano attended that Deutsche Bank Technology Conference investor conference on behalf of Seagate.  At that conference, an analyst asked Defendant Romano:

> Starting off with Huawei, clearly, getting a lot of headlines lately especially given the new restrictions that were announced last month . . .  can you give us an update of how you think those restrictions will impact Seagate in the short term; when I think short term, it's like calendar Q3, Q4?  And maybe in the longer term, how does that work out?  And if you want to continue to sell to Huawei, would you be required to get a license approved by the Department of Commerce?

136.    Defendant Romano answered:

> "Yeah.  So, of course, we are still going through the final assessment, but *from what I have seen until now, I don't see any particular restriction for us in term [sic] of being able to continue to ship to Huawei or any other customers in China. So, we don't think we need to have a specific license*."

137.    At that same September 14, 2020 Deutsche Bank Technology Conference, another analyst again asked whether Seagate was "impacted by several Chinese companies being put on the Entity List." Defendant Romano responded, "I would say the majority of our customers are in China. We have a very high market share in China in general . . . . *We don't have any limitation right now in term [sic] of what we can ship to those customers*."

138.    Defendants' statements were materially false and misleading when made. It was misleading for Defendant Romano to state that Seagate did not "see any particular restriction for us in term of being able to continue to ship to Huawei" and that "we don't think we need to have a specific license," when, in truth: (i) as Seagate has admitted, the Company's HDD sales to Huawei *did* violate the FDPR because the Company's HDD production processes *did* implicate these export restrictions; (ii) the Company received numerous warnings, including from its competitors and its lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – *did* trigger FDPR export restrictions; and (iii) in instructions to its customers, Seagate had previously taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list.

### 2.    False And Misleading Statements During The Second Fiscal Quarter of 2021 (Ended January 1, 2021)

139.    On October 22, 2020, Seagate held its first quarter 2021 earnings call, attended by Defendants Mosley and Romano. On that call, an analyst asked:

> First question is related to Huawei. Just want to confirm that can you talk about whether you are continuing to ship to Huawei and what is included in your December quarter guidance. It looks like your competitor may have stopped shipping maybe back in the middle of September. And do you think you're seeing some benefits of that in your December quarter?

In response, Defendant Mosley stated, "*We continually monitor and remain in compliance with all the rules and regulations around*."

140.    On October 29, 2020, Seagate filed with the SEC its Form 10-Q for the first quarter of fiscal year 2021, signed by Defendants Mosley and Romano. In that filing's mandatory disclosure of risk factors, Defendants stated, "***There have been no material changes to the***

*description of the risk factors associated with our business previously disclosed in 'Risk Factors'*

*in Part I, Item 1A. in our Annual Report on Form 10-K for the fiscal year ended July 3, 2020*."

141.    In the "Risk Factors" section of the specified Form 10-K, Defendants stated,

> Our business is subject to regulation under a wide variety of U.S. federal and state and non-U.S. laws, regulations and policies.  There can be no assurance that laws, regulations and policies will not be changed in ways that will require us to modify our business model and objectives or affect our returns on investments by restricting existing activities and products, subjecting them to escalating costs or prohibiting them outright . . . .  ***Although we have implemented policies and procedures designed to ensure compliance***, there can be no assurance that our employees, contractors or agents will not violate these or other applicable laws, rules and regulations to which we are and may be subject.

142.    The Form 10-Q also contained Certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by both Mosley and Romano.  Each SOX Certification signed by Mosley and Romano stated, "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  In their SOX certifications, Defendants Romano and Mosley further stated that they "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."  Further, Defendants Mosley and Romano certified that the Company's SEC filing disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."

143.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendant Romano to state that "[w]e continually monitor and remain in compliance with all the rules and regulations around," to tout the Company's "controls and procedures to ensure compliance" with "applicable laws, rules and regulations," and to state that Defendants "ha[d] disclosed" "all significant deficiencies and material weaknesses in the design

or operation of internal control over financial reporting," when, in truth: (i) as Seagate has admitted, the Company *did not* "remain in compliance" with export rules and regulations, the Company's HDD sales to Huawei *did* violate the FDPR, and the Company's HDD production processes *did* implicate the Rule's export restrictions; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its competitors and its lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – *did* trigger FDPR export restrictions; (iv) in instructions to its customers, Seagate had previously taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; and (v) Seagate had dramatically expanded the Company's exposure to Huawei sales, and, as Seagate has admitted, had already positioned itself as Huawei's sole HDD supplier.

### 3.    False And Misleading Statements During The Third Fiscal Quarter of 2021 (Ended April 2, 2021)

144.    On January 21, 2021, Seagate held its second quarter 2021 earnings call, attended by Defendants Mosley and Romano.  On that call, an analyst asked, "I know asked this question last quarter on Huawei, but *given the current restrictions on the shipment to Huawei, does that change the way you think about the total addressable market for this calendar year for nearline drives* [a core segment of Seagate's HDD business]?"  While attempting to hedge, Defendant Romano nevertheless again assured investors that the FDPR had no impact on the Company's HDD sales: "So, like I said last time, we don't comment on any specific customers.  I think that the market demand globally *will not change* on how it's ultimately serviced, so if that answers your question."

145.    On January 28, 2021, Seagate filed with the SEC its Form 10-Q for the second quarter of fiscal year 2021, signed by Defendants Mosley and Romano.  In that filing's mandatory disclosure of risk factors, Defendants stated, "***There have been no material changes to the***

*description of the risk factors associated with our business previously disclosed in 'Risk Factors'*

*in Part I, Item 1A. in our Annual Report on Form 10-K for the fiscal year ended July 3, 2020*."

146.    In the "Risk Factors" section of the specified Form 10-K, Defendants

> Our business is subject to regulation under a wide variety of U.S. federal and state and non-U.S. laws, regulations and policies.  There can be no assurance that laws, regulations and policies will not be changed in ways that will require us to modify our business model and objectives or affect our returns on investments by restricting existing activities and products, subjecting them to escalating costs or prohibiting them outright . . . .  ***Although we have implemented policies and procedures designed to ensure compliance***, there can be no assurance that our employees, contractors or agents will not violate these or other applicable laws, rules and regulations to which we are and may be subject.

147.    The Form 10-Q also contained Certifications pursuant to SOX signed by both Mosley and Romano.  Each SOX Certification signed by Mosley and Romano stated, "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the Circumstances under which such statements were made, not misleading with respect to the Period covered by this report."  In their SOX certifications, Defendants Romano and Mosley further stated that they "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."  Further, Defendants Mosley and Romano certified that the Company's SEC filing disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."

148.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendant Romano to state that Seagate's HDD sales "will not change" as a result of the FDPR, to tout the Company's "controls and procedures to ensure compliance" with "applicable laws, rules and regulations," and to state that Defendants "ha[d] disclosed" "all significant deficiencies and material weaknesses in the design or operation of internal control over

financial reporting," while failing to disclose that, in truth: (i) as Seagate has admitted, the Company's HDD sales to Huawei **did** violate the FDPR because the Company's HDD production processes **did** implicate these export restrictions; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – **did** trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) in instructions to its customers, Seagate had previously taken the position that its HDDs **could not** be transferred to any entity on the Restricted Entity list; and (vi) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier.

### 4. False And Misleading Statements During The Fourth Fiscal Quarter of 2021 (Ended July 2, 2021)

149. On April 29, 2021, Seagate filed with the SEC its Form 10-Q for the third fiscal quarter of 2021, signed by Defendants Mosley and Romano. In that filing's mandatory disclosure of risk factors, Defendants stated, "***There have been no material changes to the description of the risk factors associated with our business previously disclosed in 'Risk Factors' in Part I, Item 1A. in our Annual Report on Form 10-K for the fiscal year ended July 3, 2020.***"

150. In the "Risk Factors" section of the specified Form 10-K, Defendants stated,

> Our business is subject to regulation under a wide variety of U.S. federal and state and non-U.S. laws, regulations and policies. There can be no assurance that laws, regulations and policies will not be changed in ways that will require us to modify our business model and objectives or affect our returns on investments by restricting existing activities and products, subjecting them to escalating costs or prohibiting them outright . . . . ***Although we have implemented policies and***

*procedures designed to ensure compliance*, there can be no assurance that our employees, contractors or agents will not violate these or other applicable laws, rules and regulations to which we are and may be subject.

151.    The Form 10-Q also contained Certifications pursuant to SOX signed by both Mosley and Romano.  Each SOX Certification signed by Mosley and Romano stated, "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the Circumstances under which such statements were made, not misleading with respect to the Period covered by this report."  In their SOX certifications, Defendants Romano and Mosley further stated that they "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."  Further, Defendants Mosley and Romano certified that the Company's SEC filing disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."

152.    On June 8, 2021, Defendant Romano attended the Bank of America Global Technology Conference on behalf of Seagate.  At that investor conference, an analyst asked Defendant Romano, "we've been receiving a lot of questions around a particular customer of yours where there are some restrictions in place for shipments and I was wondering if you could comment at all on that."  After the analyst clarified that Huawei that was the subject of the many investor questions they had received, Defendant Romano responded, "we always answer to this specific question the same way because that is *the truth is we comply with all the rules and regulations*. And based on that, *we ship for all our customers following those rules and regulations*. . . .  We don't comment on specific customers as we don't comment on specific suppliers or investors.  But *in general, it's part of our job to ensure that we understand and then we follow all the rules and regulations of trade*."

153.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendant Romano to state that, with regard to Seagate's Huawei sales, "the truth is we comply with all the rules and regulations," that "we ship for all our customers following those rules and regulations," that the Company was doing its "job to ensure that we understand and then we follow all the rules and regulations of trade," to tout Seagate's "controls and procedures to ensure compliance with all applicable regulations and orders," and to state that Defendants "ha[d] disclosed" "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," while failing to disclose that, in truth: (i) as Seagate has admitted, the Company *did not* "comply with all the rules and regulations" concerning the export of its products to Huawei (including the FDPR, which was the subject of the analyst's question), Seagate *did not* "ship for all our customers following those rules and regulations," and *did not* "follow all the rules and regulations of trade" because the Company's HDD sales to Huawei violated the FDPR; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – *did* trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate was refusing to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; and (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier.

1

### 5. False And Misleading Statements During The First Fiscal Quarter of 2022 (Ended October 1, 2021)

154.    On August 6, 2021, Seagate filed with the SEC its Form 10-K for the fiscal year 2021, signed by Defendants Mosley and Romano.  In that filing's mandatory disclosure of risk factors, Defendants stated,

> Some of our products and services are subject to export control laws and other laws affecting the countries in which our products and services may be sold, distributed, or delivered, and any changes to or violation of these laws could have a material adverse effect on our business, results of operations, financial condition and cash flows . . . .  Although *we have controls and procedures to ensure compliance with all applicable regulations and orders*, we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers.  Additionally, we cannot ensure that our interpretation of relevant restrictions and regulations will be accepted in all cases by relevant regulatory and enforcement authorities.

155.    The Form 10-K also contained Certifications pursuant to SOX signed by both Mosley and Romano.  Each SOX Certification signed by Mosley and Romano stated, "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  In their SOX certifications, Defendants Romano and Mosley further stated that they "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."  Further, Defendants Mosley and Romano certified that the Company's SEC filing disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."

156.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that export control "laws *could* have a material adverse effect

on our business," to tout the Company's "controls and procedures to ensure compliance with all applicable regulations and orders," to state that "we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers," and to state that "Defendants "ha[d] disclosed" "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," while omitting that: (i) Seagate's sales of HDDs to Huawei ***had already violated*** "export control laws and other laws"; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – ***did*** trigger FDPR export restrictions;  (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate was refusing to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list; and (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier.

### 6.    False And Misleading Statements During The Second Fiscal Quarter of 2022 (Ended December 31, 2021)

157.    On October 26, 2021, Senator Wicker's office released a report from the Commerce Committee's Minority Staff encouraging BIS to investigate Seagate's HDD sales to Huawei.  That same day, a *Wall Street Journal* article reporting on the release of the Committee's report quoted a "Seagate spokesman" as saying, "the company 'complies with all laws applicable to its business and operations, including export control regulations.'"

158.    On October 28, 2021, Seagate filed with the SEC its Form 10-Q for the first quarter of fiscal year 2022, signed by Defendants Mosley and Romano.  In that filing's mandatory disclosure of risk factors, Defendants stated, "***There have been no material changes to the description of the risk factors associated with our business previously disclosed in 'Risk Factors' in Part I, Item 1A. in our Annual Report on Form 10-K for the fiscal year ended July 2, 2021***."

159.    In the "Risk Factors" section of the specified Form 10-K, Defendants stated,

> Some of our products and services are subject to export control laws and other laws affecting the countries in which our products and services may be sold, distributed, or delivered, and any changes to or violation of these laws could have a material adverse effect on our business, results of operations, financial condition and cash flows . . . .  Although ***we have controls and procedures to ensure compliance with all applicable regulations and orders***, we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers.  Additionally, we cannot ensure that our interpretation of relevant restrictions and regulations will be accepted in all cases by relevant regulatory and enforcement authorities.

160.    The Form 10-Q also contained Certifications pursuant to SOX signed by both Mosley and Romano.  Each SOX Certification signed by Mosley and Romano stated, "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the Circumstances under which such statements were made, not misleading with respect to the Period covered by this report."  In their SOX certifications, Defendants Romano and Mosley further stated that they "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."  Further, Defendants Mosley and Romano certified that the Company's SEC filing disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."

161.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that, with regard to Seagate's Huawei sales, Seagate "complies with all laws applicable to its business and operations, including export control regulations," to tout the Company's "controls and procedures to ensure compliance with all applicable regulations and orders," to state that "we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers," and that Defendants "ha[d] disclosed" "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," while omitting that, in truth: while failing to disclose that, in truth: (i) as Seagate has admitted, the Company *did not* "compl[y] with all laws applicable to its business and operations, including export control regulations" with regard to the export of its products to Huawei, specifically the FDPR; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – *did* trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate had refused to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier; and (viii) Seagate had lost a "key customer" because it had stopped shipping HDDs to Huawei on or about September 29, 2021.

**7.    False And Misleading Statements During The Third Fiscal Quarter of 2022 (Ended April 1, 2022)**

162.    On January 27, 2022, Seagate filed with the SEC its Form 10-Q for the second quarter of fiscal year 2022, signed by Defendants Mosley and Romano.  In that filing's mandatory disclosure of risk factors, Defendants stated, "***There have been no material changes to the description of the risk factors associated with our business previously disclosed in 'Risk Factors' in Part I, Item 1A. in our Annual Report on Form 10-K for the fiscal year ended July 2, 2021***."

163.    In the "Risk Factors" section of the specified Form 10-K, Defendants stated,

> Some of our products and services are subject to export control laws and other laws affecting the countries in which our products and services may be sold, distributed, or delivered, and any changes to or violation of these laws could have a material adverse effect on our business, results of operations, financial condition and cash flows . . . .  Although ***we have controls and procedures to ensure compliance with all applicable regulations and orders***, we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers.  Additionally, we cannot ensure that our interpretation of relevant restrictions and regulations will be accepted in all cases by relevant regulatory and enforcement authorities.

164.    The Form 10-Q also contained Certifications pursuant to SOX signed by both Mosley and Romano.  Each SOX Certification signed by Mosley and Romano stated, "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the Circumstances under which such statements were made, not misleading with respect to the Period covered by this report."  In their SOX certifications, Defendants Romano and Mosley further stated that they "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."  Further, Defendants Mosley and Romano certified that the Company's SEC filing disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to

adversely affect the registrant's ability to record, process, summarize and report financial information."

165.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that export control "laws **could** have a material adverse effect on our business," to tout the Company's "controls and procedures to ensure compliance with all applicable regulations and orders," that "we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers," and that Defendants "ha[d] disclosed" "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," while failing to disclose that, in truth: (i) as Seagate has admitted, the Company **did not** "compl[y] with all laws applicable to its business and operations, including export control regulations" with regard to the export of its products to Huawei, specifically the FDPR; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – **did** trigger FDPR export restrictions;  (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate had refused to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs **could not** be transferred to any entity on the Restricted Entity list; (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier; and (viii) Seagate had lost a "key customer" because it had stopped shipping HDDs to Huawei on or about September 29, 2021.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**8.    False And Misleading Statements During The Fourth Fiscal Quarter (Ended July 1, 2022)**

166.    On April 28, 2022, Seagate filed with the SEC its Form 10-Q for the third quarter of fiscal year 2022, signed by Defendants Mosley and Romano.  In that filing's mandatory disclosure of risk factors, Defendants stated, "***There have been no material changes to the description of the risk factors associated with our business previously disclosed in 'Risk Factors' in Part I, Item 1A. in our Annual Report on Form 10-K for the fiscal year ended July 2, 2021***."

167.    In the "Risk Factors" section of the specified Form 10-K, Defendants stated,

Some of our products and services are subject to export control laws and other laws affecting the countries in which our products and services may be sold, distributed, or delivered, and any changes to or violation of these laws could have a material adverse effect on our business, results of operations, financial condition and cash flows . . . .  Although ***we have controls and procedures to ensure compliance with all applicable regulations and orders***, we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers.  Additionally, we cannot ensure that our interpretation of relevant restrictions and regulations will be accepted in all cases by relevant regulatory and enforcement authorities.

168.    The Form 10-Q also contained Certifications pursuant to SOX signed by both Mosley and Romano.  Each SOX Certification signed by Mosley and Romano stated, "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the Circumstances under which such statements were made, not misleading with respect to the Period covered by this report."  In their SOX certifications, Defendants Romano and Mosley further stated that they "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."  Further, Defendants Mosley and Romano certified that the Company's SEC filing disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to

adversely affect the registrant's ability to record, process, summarize and report financial information."

169. Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that export control "laws *could* have a material adverse effect on our business," to tout the Company's "controls and procedures to ensure compliance with all applicable regulations and orders," to state that "we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers," and that Defendants "ha[d] disclosed" "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," while failing to disclose that, in truth: (i) as Seagate has admitted, the Company *did not* "compl[y] with all laws applicable to its business and operations, including export control regulations" with regard to the export of its products to Huawei, specifically the FDPR; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – *did* trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate had refused to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier; and (viii) Seagate had lost a "key customer" because it had stopped shipping HDDs to Huawei on or about September 29, 2021.

**9.    False And Misleading Statements During The First Fiscal Quarter of 2023 (Ended September 30, 2022)**

170.    On August 5, 2022, Seagate filed with the SEC its Form 10-K for the fiscal year 2022, signed by Defendants Mosley and Romano.  In that filing's mandatory disclosure of risk factors, Defendants stated,

> Some of our products and services are subject to export control laws and other laws affecting the countries in which our products and services may be sold, distributed, or delivered, and any changes to or violation of these laws could have a material adverse effect on our business, results of operations, financial condition and cash flows . . . .  Although **we have controls and procedures to ensure compliance with all applicable regulations and orders**, we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers.  Additionally, we cannot ensure that our interpretation of relevant restrictions and regulations will be accepted in all cases by relevant regulatory and enforcement authorities.

171.    The Form 10-K also contained Certifications pursuant to SOX signed by both Mosley and Romano.  Each SOX Certification signed by Mosley and Romano stated, "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the Circumstances under which such statements were made, not misleading with respect to the Period covered by this report."  In their SOX certifications, Defendants Romano and Mosley further stated that they "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."  Further, Defendants Mosley and Romano certified that the Company's SEC filing disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."

172.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that export control "laws **could** have a material adverse effect

on our business," to tout the Company's "controls and procedures to ensure compliance with all applicable regulations and orders," to state that "we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers," and that Defendants "ha[d] disclosed" "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," while failing to disclose that, in truth: (i) Seagate's sales of HDDs to Huawei *had already violated* "export control laws and other laws"; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – *did* trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate was refusing to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier; and (viii) Seagate had lost Huawei as a "strategic customer" when it stopped shipping Huawei HDDs on or about September 29, 2021.

### 10.    False And Misleading Statements During The Second Fiscal Quarter of 2023 (Ended December 30, 2022)

173.    On October 26, 2022, Seagate disclosed in a Form 8-K that it, in August 2022 (two months before making any disclosure), the Company had received a proposed charging letter from BIS alleging violations of the export sanctions.  In that same Form 8-K, Seagate stated the

Company "did not engage in prohibited conduct," "complied with all relevant export control laws and regulations," and that "Seagate has committed to compliance through its global team of international trade compliance and legal professionals and by maintaining robust trade controls compliance policies and procedures."

174.    Later that day, Seagate held its Earnings Call for First Quarter 2023.  During the call, in an effort to soothe market worries about the news, Defendant Mosley stated "[w]e have responded to the letter and *believe that we've complied with all relevant export control laws and regulations*."

175.    On October 27, 2022, Seagate filed with the SEC its Form 10-Q for the first quarter of 2022, signed by Defendants Mosley and Romano.  In that filing's mandatory disclosure of risk factors, Defendants stated,

> Some of our products and services are subject to export control laws and other laws affecting the countries in which our products and services may be sold, distributed, or delivered, and any changes to or violation of these laws could have a material adverse effect on our business, results of operations, financial condition and cash flows . . . .  Although *we have controls and procedures to ensure compliance with all applicable regulations and orders*, we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers.  Additionally, we cannot ensure that our interpretation of relevant restrictions and regulations will be accepted in all cases by relevant regulatory and enforcement authorities.

176.    The Form 10-Q also contained Certifications pursuant to SOX signed by both Mosley and Romano.  Each SOX Certification signed by Mosley and Romano stated, "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  In their SOX certifications, Defendants Romano and Mosley further stated that they "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."  Further, Defendants Mosley and Romano certified

that the Company's SEC filing disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."

177.    Defendants' statements were materially false and misleading when made. It was misleading for Defendants to state that, with regard to Seagate's Huawei sales, Seagate "complies with all laws applicable to its business and operations, including export control regulations," that export control laws merely "***could*** have a material adverse effect on our business," to tout the Company's "controls and procedures to ensure compliance with all applicable regulations and orders," and state that Defendants "ha[d] disclosed" "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," while failing to disclose that, in truth: (i) as Seagate has admitted, the Company ***did not*** "with all laws applicable to its business and operations, including export control regulations" with regard to the export of its products to Huawei, specifically the FDPR; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – ***did*** trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate had refused to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list; (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier; and (viii) Seagate

had lost a "key customer" because it had stopped shipping HDDs to Huawei on or about September 29, 2021.

### 11. False And Misleading Statements During The Third Fiscal Quarter of 2023 (Ended March 31, 2023)

178. On January 25, 2023, Seagate filed with the SEC its Form 10-Q for the second fiscal quarter 2023, signed by Defendants Mosley and Romano. In that filing's mandatory disclosure of risk factors, Defendants stated,

> Some of our products and services are subject to export control laws and other laws affecting the countries in which our products and services may be sold, distributed, or delivered, and any changes to or violation of these laws could have a material adverse effect on our business, results of operations, financial condition and cash flows . . . . Although *we have controls and procedures to ensure compliance with all applicable regulations and orders*, we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers. Additionally, we cannot ensure that our interpretation of relevant restrictions and regulations will be accepted in all cases by relevant regulatory and enforcement authorities.

179. The Form 10-Q also contained Certifications pursuant to SOX signed by both Mosley and Romano. Each SOX Certification signed by Mosley and Romano stated, "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the Circumstances under which such statements were made, not misleading with respect to the Period covered by this report." In their SOX certifications, Defendants Romano and Mosley further stated that they "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." Further, Defendants Mosley and Romano certified that the Company's SEC filing disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."

180.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that Seagate "*may* be adversely affected by the loss of, or reduced, delayed or canceled purchases by, one or more of our key customers," that Defendants "have controls and procedures to ensure compliance with all applicable regulations and orders," and that Defendants "ha[d] disclosed" "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," while failing to disclose that, in truth: (i) as Seagate has admitted, the Company *did not* "compl[y] with all applicable regulations and orders" with regard to the export of its products to Huawei, specifically the FDPR; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – *did* trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate had refused to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier; and (viii) Seagate had lost a "key customer" because it had stopped shipping HDDs to Huawei on or about September 29, 2021.

**B.    Defendants' Materially False And Misleading Statements Downplaying Seagate's Reliance On HDD Sales To Huawei**

**1.    False And Misleading Statements During The First Fiscal Quarter of 2021 (Ended October 2, 2020)**

181.    As discussed above, Defendant Romano attended the September 14, 2020 Deutsche Bank Technology Conference on behalf of Seagate.  At that investor conference, an analyst asked:

> Starting off with Huawei, clearly, getting a lot of headlines lately especially given the new restrictions that were announced last month.  First of all, can you remind us ***what the revenue contribution of Huawei to Seagate is today***?  Second, can you give us an update of ***how you think those restrictions will impact Seagate*** in the short term; when I think short term, it's like calendar Q3, Q4?  And maybe in the longer term, how does that work out?

182.    Defendant Romano answered, "we don't disclose the level of revenue of specific customers.  But as you know, we should report if the customer is above 10%.  So, you can assume that is not a bad level."

183.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendant Romano to downplay the importance to Seagate of its HDD sales to Huawei and to state that Huawei's revenue contribution "is not a bad level," while failing to disclose that Seagate had already positioned itself as Huawei's sole HDD supplier, that sales to Huawei exceeded 3% of HDD revenue and was rapidly climbing, and that Huawei's revenue contribution was allowing the Company to meet its revenue guidance.

## 2.    False And Misleading Statements During The Second Fiscal Quarter of 2021 (Ended January 1, 2021)

184.    As alleged above, on Seagate's October 22, 2020 first quarter 2021 earnings call, an analyst asked Defendants to quantify the significance of the Company's sales to Huawei, particularly given that Seagate's competitors were no longer shipping to that customer, and how those sales figure into Seagate's financial reporting:

> First question is related to Huawei. Just want to confirm that can you talk about whether you are continuing to ship to Huawei and what is included in your December quarter guidance.  It looks like your competitor may have stopped shipping maybe back in the middle of September.  And do you think you're seeing some benefits of that in your December quarter?

185.    In response, Defendant Mosley told investors that Huawei's revenue contribution to Seagate was not "material," stating "We continually monitor and remain in compliance with all the rules and regulations around.  I think relative to some of the legacy markets, ***I think we're just***

1   ***watching too much inventory out there.  So I don't think it's material*** [i.e., Huawei's revenue
2   contribution], but it's all factored into our guide about what's going on in the end markets."

3       186.    Defendants' statements were materially false and misleading when made.  It was
4   misleading for Defendant Romano to downplay the importance to Seagate of its HDD sales to
5   Huawei and to state that Huawei's revenue was "not material" and that apparently increased
6   demand in certain markets was "just" a function of "too much inventory" in others,  while failing
7   to disclose that Seagate had already positioned itself as Huawei's sole HDD supplier, that sales to
8   Huawei exceeded 3% of HDD revenue for the quarter and was rapidly doubling at the time of
9   Defendants' statements, and that Huawei's revenue contribution was allowing the Company to
10  meet the mid-point of its revenue guidance.  Indeed, the FDPR had become effective just two
11  weeks prior to the end of the first quarter; during those two weeks Seagate generated more than
12  $70 million from illegal HDD sales to Huawei, which comprised closer to 20% of the Company's
13  prorated revenue over that period.

14          **3.      False And Misleading Statements During The Third Fiscal Quarter of
15                 2021 (Ended April 2, 2021)**

16      187.    On April 29, 2021, Seagate filed with the SEC its Form 10-Q reporting financial
17  results for the third fiscal quarter of 2021.  In Seagate's Form 10-Q, Defendants stated that the
18  Form 10-Q was "prepared in accordance with U.S. generally accepted accounting principles."

19      188.    Defendants' statement was materially false and misleading when made.  GAAP
20  (including both ASC 280-10-50-42 and ASC 275-10-50-18) require disclosures where transaction
21  with a single customer "amount to 10 percent or more of a public entity's revenues."  For the third
22  quarter of 2021, Seagate's sales to Huawei accounted for 13.42% of the Company's consolidated
23  revenues (and 15% of its critical HDD revenues), but Seagate's Form 10-Q failed to make any of
24  the required disclosures.  As such, Defendants' statement was materially false and misleading and
25  concealed from investors Seagate's reliance on HDD sales to Huawei.  Indeed, absent those sales
26  Seagate would have missed its revenue guidance range for the third quarter entirely.

27

28

189.   Investors relied on Seagate's silence coupled with its representation that the Company's financial reporting complied with GAAP, as assurance that the Seagate's sales to Huawei did not exceed 10% of the Company's revenue.  For instance, in evaluating the impact of the FDPR on Seagate, Wells Fargo analysts wrote in a March 2021 report, "We would note that ***Huawei ha**s **not been reported as a 10%+ customer for Seagate**.*" (emphasis in original).

**C.    Defendants' Materially False And Misleading Statements Concerning The Drivers Of Seagate's Financial Performance**

**1.    False And Misleading Statements During The Second Fiscal Quarter of 2021 (Ended January 1, 2021)**

190.   As alleged above, on October 22, 2020, Seagate held its first quarter 2021 earnings call.  On that call, Defendants reported revenue that was above the Company's guidance. Defendant Mosley stated that the Company's revenue results were driven by "solid double-digit revenue growth for our consumer drives, reflecting both the return to seasonal patterns and strength of the Seagate's brand among prosumers and gamers."  Likewise, Defendant Romano stated that Seagate's revenue "performance reflected strong recovery in the video and image application, or VIA, market."

191.   Also on October 22, 2020, Seagate issued a press release reporting its first quarter 2021 earnings results and filed that press release with the SEC on Form 8-K.  In that press release, Seagate attributed the Company's financial performance to "strong recovery in the video and image applications market and healthy cloud data center demand, which drove double digit year-over-year revenue growth for our mass capacity storage solutions."

192.   Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "strong recovery" in the "VIA market" and "the return to seasonal patterns and strength of the Seagate's brand among prosumers and gamers," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue was driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would have missed the midpoint of its revenue guidance absent those

sales; and (ii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal.

**2.    False And Misleading Statements During The Third Fiscal Quarter of 2021 (Ended April 2, 2021)**

193.    On January 21, 2021, Seagate held its second quarter 2021 earnings call.  On that call, Defendants reported 13% growth in Seagate's revenue, beating estimates.  Defendant Mosley stated that this positive revenue results was driven by: (1) the fact that "the enterprise markets began to recover for the first time since the onset of the pandemic," particularly improving demand "amongst large enterprise OEM customers, which led to strong sequential revenue growth for both nearline and mission critical drives"; (2) "stronger-than-expected growth in video and image applications or VIA markets, due in part to pent-up demand"; and (3) "strong seasonal demand for our desktop PC and consumer drives."

194.    On that same call, Defendant Romano likewise attributed Seagate's revenue performance to: (1) the fact that "[n]earline revenue increased sequentially, driven by stronger-than-expected demand from enterprise and OEM customers"; (2) that "[i]n the VIA market, revenue was above our expectation for the second consecutive quarter as pent-up demand from the COVID-related pause in the first half of the calendar year led to strong recovery in the September quarter and record revenue in the December quarter"; (3) and "a seasonal uptick for consumer drives and desktop PCs and improving demand for mission-critical drives, consistent with recovery in the enterprise market."

195.    Also on January 21, 2021, Seagate issued a press release reporting its second quarter 2021 financial results and filed that press release with the SEC on Form 8-K.  In that press release, Defendant Mosley touted Seagate's "double-digit revenue" growth and attributed it to "broad-based improvement across nearly every served market and geography, and we had solid customer demand for our mass capacity products."

196.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "stronger-than-expected demand from enterprise and OEM customers," stronger-than-expected

growth in video and image applications or VIA markets, due in part to pent-up demand," "strong seasonal demand for our desktop PC and consumer drives," and "***broad-based improvement***" in demand, while failing to disclose that: (i) far from being driven by "broad-based" growth, Seagate's revenue and critical HDD revenue was driven in material part by illegal sales to a single customer, Huawei, and indeed, Seagate would have missed its entire revenue guidance range absent those sales; and (ii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal.

### 3.    False And Misleading Statements During The Fourth Fiscal Quarter of 2021 (Ended July 2, 2021)

197.    On April 22, 2021, Seagate held its third quarter 2021 earnings call.  On that call, Defendants reported that Seagate "grew revenue quarter-over-quarter and year-over-year," once again beating the Company's revenue guidance.  Defendants reported Seagate's "***highest ever HDD shipments***," including mass capacity HDD sales that beat the prior record by ***21%***, and resulting in 8% sequential, and 16% year-over-year, revenue growth.  Defendant Mosley told investors that Seagate's revenue performance was driven by "Strong cloud data center demand and ongoing recovery in the enterprise markets," as well as "higher enterprise mission-critical sales and relatively stable desktop PC demand."

198.    Defendant Romano likewise attributed Seagate's revenue performance to "strong recovery from enterprise and OEM customers, as well as healthy growth from cloud"; "[i]mproving demand for mission-critical drives and stronger than anticipated demand for desktop PC"; and "a better align[ment] [in] supply [and] demand" as the pandemic waned.

199.    On that same earnings call, an analyst cited Seagate's improved revenue outlook and asked, "What's been the drivers of that change over the course of the last three months or so?" Defendant Mosley told investors that improving revenue was being driven by the fact that Seagate's business was insulated to a greater degree from supply chain headwinds, buttressed by the return of pent-up demand in other markets: "I think 2021, there is still some kind of supply concerns that people have about components everywhere. And so, there are people pulling things

in. From my perspective, mass capacity is relatively insulated from some of that . . . . . So, we look at this year as not having as profound an impact as we did in 2020, and that's where we get the 10% [revenue growth].  And it's ***largely on the strength of mass capacity.  Some of the VIA markets and things like that will be contributing as well.  There's largely the cloud and enterprise on-prem coming back***."

200.    Additionally, on that April 22, 2021 earnings call, an analyst cited Defendants "50-plus percent" HDD market share and asked, "what kind of led you to the position where you are right now where you're maintaining this higher percentage of share?"   Defendant Mosley attributed Seagate's longer-term demand planning with customer, as well as increasing market stability: "Since the lead times on the products are so long, we have good dialogues about not what do you need in six weeks, but what do you need in six months. And I think that's working quite well. Our customers appreciate it. We still have flexibility for them. But we're kind of co-planning in that respect. And I think that served us both very well on both ends . . . . [I]n general, it's become a way more stable environment than it used to be."

201.    Also on April 22, 2021, Seagate issued a press release reporting its third quarter 2021 financial results and filed that press release with the SEC on Form 8-K.  In that press release, Defendant Mosley attributed the Company's revenue performance to operational sales and record nearline sales:  "Seagate delivered another quarter of strong financial performance driven by ongoing operational execution and record sales of our high capacity nearline drives. We grew revenue, expanded profitability and achieved non-GAAP EPS above our guided range. Our March quarter results underscore the strength of our HDD product portfolio and increasing demand for mass capacity storage."

202.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "[s]trong cloud data center demand and ongoing recovery in the enterprise markets," "ongoing operational execution and record sales of our high capacity nearline drives," and "[i]mproving demand for mission critical drives and stronger than anticipated demand for desktop PC," and to

attribute Seagate's market share to longer-term demand planning with customer and increasing market stability, while failing to disclose that: (i) Seagate's revenue and critical HDD revenue was driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would have missed its entire revenue guidance range absent those sales; and (ii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal.

### 4. False And Misleading Statements During The First Fiscal Quarter of 2022 (Ended October 1, 2021)

203. On July 21, 2021, Seagate held its fourth quarter and full year 2021 earnings call, attended by both Defendants Mosley and Romano. On that call, Seagate reported $3.01 billion in revenue for the quarter, "up 10% sequentially and 20% year-over-year," "topp[ing] the $3 billion mark for the first time in six years" and beating guidance for both the quarter and the year. Defendant Mosley told investors that Seagate's revenue performance was driven by "***broad-based*** demand across the mass capacity end markets and incredible execution by our global team."

204. Likewise, Defendant Romano stated that the Company's revenue performance "was fueled by accelerating demand in the mass capacity market and distribution channel," specifically, "demand from storage-centric blockchain that's layered on top of healthy cloud data center demand and [an] improving enterprise OEM customer trend" and "[s]tronger than expected demand in the VIA market."

205. Defendants' statements were materially false and misleading when made. It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "***broad-based*** demand across the mass capacity end markets and incredible execution by our global team," "demand in the mass capacity market and distribution channel," "demand from storage-centric blockchain that's layered on top of healthy cloud data center demand and [an] improving enterprise OEM customer trend," and "[s]tronger than expected demand in the VIA market," while failing to disclose that: (i) far from being driven by "broad-based" demand, Seagate's revenue and critical HDD revenue was driven in material part by illegal sales to a single customer, Huawei, and indeed, Seagate would have missed its revenue guidance absent those sales;

and (ii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal and, as such, this revenue stream was both subject to, and exposed the Company to, heightened risk.

### 5. False And Misleading Statements During The Second Fiscal Quarter of 2022 (Ended December 31, 2021)

206.    On October 22, 2021, Seagate held its first quarter 2022 earnings call, attended by both Mosley and Romano.  On that call, Defendants reported $3.1 billion in quarterly revenue, representing "robust growth of 35% year-over-year and 3% above a very strong June quarter." Defendant Mosley attributed Seagate's revenue performance to "***broad-based*** growth across each of the end markets," with "[t]he cloud [as] the strongest contributor to the mass capacity markets and Seagate's revenue" and "[d]emand for video and image applications increase[ing] significantly," as well.  Defendant Mosley stated that the Company's "results reflect record demand for our industry-leading mass capacity products and solid execution on cost reduction plans and our ongoing focus of balancing supply with demand."

207.    Defendant Romano likewise told investors that Seagate's revenue "[g]rowth was driven by increasing demands for our mass capacity products . . . supported by growth across each of the underlying end markets," including "improving enterprise spending and healthy growth from cloud data center customers."

208.    Also on October 22, 2021, Seagate issued a press release reporting its second quarter 2021 financial results and filed that press release with the SEC on Form 8-K.  In that press release, Defendant Mosley touted Seagate's revenue performance and attributed it to several legitimate business factors:

> Seagate had an exceptional start to the fiscal year with solid revenue growth, significant profit expansion and higher free cash flow generation in the September quarter. Mass capacity revenue topped the $2 billion mark for the first time, ***led by ongoing demand from cloud data center customers and strength in the video and image applications markets***. Our results demonstrate consistent execution, a sustained healthy demand environment and positive structural change in storage industry dynamics.

209.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "***broad-based*** growth across each of the end markets" and "improving enterprise spending and healthy growth from cloud data center customers," while failing to disclose that: (i) far from being driven by "broad-based" growth, Seagate's revenue and critical HDD revenue was driven in material part by illegal sales to a single customer, Huawei, and indeed, Seagate would have missed its entire revenue guidance range absent those sales; and (ii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal and, as such, this revenue stream was both subject to, and exposed the Company to, heightened risk.

**6.    False And Misleading Statements During The Third Fiscal Quarter of 2022 (Ended April 1, 2021)**

210.    On January 26, 2022, Seagate held its second quarter 2022 earnings call, attended by both Mosley and Romano.  On that call, Defendants reported revenue of $3.12 billion. Defendant Mosley stated that the Company's revenue performance was driven by the Company's "capitalizing on the secular tailwinds driving long-term mass capacity storage demand," specifically, "record mass capacity revenue with growth led by demand from cloud customers."

211.    Defendant Romano also touted the Company's HDD revenue results: "In our hard disk drive business, we achieved a fifth consecutive quarter of record capacity shipments totaling 163 exabyte, up 3% sequentially and up 26% year-on-year."  Like Defendant Mosley, Romano attributed the Company's revenue performance to "[o]ngoing cloud demand for our nearline products," as well as "healthy demand for mid-capacity products from enterprise and OEM customers."

212.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "demand from cloud customers," as well as "healthy demand for mid-capacity products from enterprise and OEM customers," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue was driven in material part by the Company's HDD sales to Huawei and, indeed,

1    Seagate would have missed its entire revenue guidance range absent those sales; (ii) that Seagate

2    had received numerous warnings that its HDD sales to Huawei were illegal; and (iii) under pressure

3    from ongoing investigations, Seagate had halted shipments to Huawei, which was already

4    beginning to have a material negative effect on the Company's revenue.

5           **7.**     **False And Misleading Statements During The Fourth Fiscal Quarter of**

6                    **2022 (Ended June 30, 2022)**

7          213.    On April 27, 2022, Seagate held its third quarter 2022 earnings call.  On that call,

8    Defendants reported a 10% decline in Seagate's revenue.  Defendant Mosley stated that the

9    negative revenue results were driven by: (1) "***industry-wide supply challenges***"; (2) "***impacts from***

10   ***the ongoing conflict in Ukraine***"; and (3) "***COVID restrictions***" that were all "***constraining***

11   ***growth over the near term***."

12         214.    Also on April 27, 2022, Seagate issued a press release reporting its third quarter

13   2022 financial results and filed that press release with the SEC on Form 8-K.  In that press release,

14   Defendant Mosley cushioned the negative news about Seagate's revenue performance and

15   attributed the decline to legitimate business factors, specifically: "***multiple macro related***

16   ***headwinds that impacted other end markets, particularly video and image applications, and***

17   ***pressured profitability***."  Defendant Mosley declared that the Company's "***focus [was] on***

18   ***mitigating these external challenges through ongoing expense discipline, new pricing strategies***

19   ***and operational efficiencies***."

20         215.    Defendants' statements were materially false and misleading when made.  It was

21   misleading for Defendants to state that Seagate's revenue decline was driven by "industry-wide

22   supply challenges," "the ongoing conflict in Ukraine," "COVID restrictions" and "multiple macro

23   related headwinds," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue

24   had previously been driven in material part by the Company's HDD sales to Huawei and, indeed,

25   Seagate would have repeatedly missed the midpoint of its revenue guidance absent those sales;

26   and (ii) that the revenue decline in Third Quarter 2022 was actually driven by the loss of Seagate's

27   illegal monopoly on HDD sales to Huawei.

8.      **False And Misleading Statements During The First Fiscal Quarter of 2023 (Ended September 30, 2022)**

216.    On July 21, 2022, Seagate held its fourth quarter 2022 earnings call.  On that call, Defendants reported a 6.1% decline in Seagate's revenue.  Defendant Mosley stated that the negative revenue results were driven by: (1) "***impacts from a confluence of macro headwinds in other end markets, particularly in the consumer-facing legacy markets***"; (2) "***impacts from COVID lockdowns in Asia***"; (3) "***non-HDD component shortages***," and (4) "***global inflationary pressures***" that "***intensified late in the quarter***."  Defendant Mosley further stated that "***macro events are weighing on our near-term performance***."

217.    On the same call, Defendant Romano attributed the revenue shortfall to (1) "***intensifying economic pressure***," (2) "***buildup of inventory at our customers***," and (3) "***COVID-restrictive measures***."

218.    Also on July 21, 2022, Seagate issued a press release reporting its fourth quarter 2022 and fiscal year 2022 financial results, and filed that press release with the SEC on Form 8-K.  In that press release, Defendant Mosley attributed the revenue decline to legitimate business factors, specifically: "***the impacts of Covid restrictive measures in Asia and weakening global economic conditions on our other end markets***" as well as a "***confluence of macro-related challenges***" and customers' "***macro uncertainty and on-going non-HDD component shortages***."

219.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that Seagate's revenue decline was driven by "macro headwinds," "COVID lockdowns in Asia," "non-HDD component shortages," "intensifying economic pressure," and "buildup of inventory at our customers" while failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously been driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would have repeatedly missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in Fourth Quarter 2022 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei.

9.    **False And Misleading Statements During The Second Fiscal Quarter of 2023 (Ended December 30, 2022)**

220.    On October 26, 2022, Seagate held its first quarter 2023 earnings call.  On that call, Defendants reported a 22.4% decline in Seagate's revenue.  Defendant Mosley stated that the negative revenue results were driven by: (1) "[t]he impact of COVID lockdowns and the related economic slowdown in China"; (2) "broad-based customer inventory adjustments"; (3) "weakening global consumer spendings," and (4) "intensifying macro uncertainties."

221.    Also on October 26, 2022, Seagate issued a press release reporting its first quarter 2023 financial results and filed that press release with the SEC on Form 8-K.  In that press release, Defendant Mosley attributed the revenue decline to legitimate business factors, specifically: "[g]lobal economic uncertainties and broad-based customer inventory corrections" and "current macro uncertainties."

222.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that Seagate's revenue decline was driven by "[t]he impact of COVID lockdowns and the related economic slowdown in China," "broad-based customer inventory adjustments," and "weakening global consumer spendings," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously been driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would often have previously missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in First Quarter 2023 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei.

10.    **False And Misleading Statements During The Third Fiscal Quarter of 2023 (Ended March 31, 2023)**

223.    On January 25, 2023, Seagate held its second quarter 2023 earnings call.  On that call, Defendants reported a 7.4% decline in Seagate's revenue.  Defendant Mosley stated that the negative revenue results were driven by: (1) "the COVID-related economic slowdown in China"; (2) "the work down of nearline HDD inventories among US cloud and global enterprise customers under a more cautious demand environment"; (3) "macro related disruptions primarily impacting

our consumer-facing markets."  Defendant Mosley further stated that "macro events are weighing on our near-term performance."

224.    On the same call, Defendant Romano attributed the revenue shortfall to (1) "inventory correction among cloud and enterprise customers," (2) "COVID-related disruption in China," (3) "Seagate's own action to reduce production," and (4) "lower demand in the VIA market."

225.    Also on January 25, 2023, Seagate issued a press release reporting its second quarter 2023 financial results and filed that press release with the SEC on Form 8-K.  In that press release, Defendant Mosley attributed the revenue decline to legitimate business factors, specifically: "*a tough macroeconomic environment*."

226.    Defendants' statements were materially false and misleading when made.  It was misleading for Defendants to state that Seagate's revenue decline was driven by "COVID-related economic slowdown in China," "the work down of nearline HDD inventories among US cloud and global enterprise customers," "macro related disruptions," "Seagate's own action to reduce production," and "lower demand in the VIA market" while failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously been driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would often have previously missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in Second Quarter 2023 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei.

## VII.    LOSS CAUSATION

227.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class.  Throughout the Class Period, Seagate's stock price was artificially inflated as a result of Defendants' materially false and misleading statements and omissions that created false impressions concerning Seagate's regulatory and legal compliance with U.S. export restrictions and its reliance on HDD sales to Huawei.  As a result of Defendants' materially false and misleading statements and omissions, the market price of Seagate's common stock was inflated throughout the Class Period.

228.     The artificial inflation in Seagate's stock price was removed when the facts, risks, and conditions concealed from investors by Defendants' material misstatements and omissions were revealed to the market and/or materialized on: (1) March 8, 2022, when Seagate lowered its earnings guidance for the upcoming quarter; (2) July 21, 2022, when Seagate reported disappointing financial results for the fourth quarter of 2022; (3) October 26, 2022, when Seagate disclosed that BIS had issued the Proposed Charging Letter; and (4) April 19, 2023, when Seagate and BIS announced that a settlement of the Proposed Charging Letter, pursuant to which  Seagate admitted that had illegally sold more than $1.1 billion in HDDs to Huawei in violation of the FDPR, had received direct warnings that these sales were illegal, and that the Company's senior management had repeatedly ramped up Seagate's exposure to these illegal transactions through sweeping commercial agreements and massive extensions of credit to Huawei.

229.     *First*, on March 8, 2022, Seagate was forced to lower its earnings guidance for the third fiscal quarter of 2022, as the risk that Defendants previously had concealed (i.e., massive revenues resulting from illicit sales of HDDs to Huawei) first began to materialize.  Indeed, because Seagate's competitors had stopped selling HDDs to Huawei in order to comply with U.S. export control regulations, Seagate effectively obtained a lucrative monopoly on HDD sales to Huawei.  As discussed above, Seagate's illegal Huawei sales were a material driver of the Company's positive revenue performance during the Class Period.  When Seagate stopped selling HDDs to Huawei in September 2021, Seagate lost its illegal monopoly, which cut off a significant source of Seagate's revenue.  As a result, Seagate was forced to lower its earnings guidance. Defendant Mosley cautioned investors that Seagate was facing revenue pressure and was "going to be at the lower end of [its financial guidance] ranges" for the upcoming quarter as a result of "disruption in the Chinese market" for HDDs.

230.     On this news, the price of Seagate common stock declined by $9.52 per share, or 9.5%, from a closing price of $100.09 on March 7, 2022, to a closing price of $90.57 on March 8, 2022.

231.  **Second**, on July 21, 2022, Seagate reported that its revenues declined by 12.8% year-over-year, driven by lagging HDD demand in Asia, missing the Company's entire revenue guidance range (and missing the midpoint of guidance by more than $150 million). Seagate also guided the coming quarter's revenue down by 5% and reported that it was cutting HDD production because of customer "inventory overages" in China. Seagate's troubling financial performance reflected the continuing impact of the loss of its illegal revenue from HDD sales to Huawei.

232.  In response to Defendants' July 21, 2022 disclosures, the price of Seagate common stock declined by $6.78 per share, or 8.1%, from a closing price of $83.61 on July 21, 2022, to a closing price of $76.83 on July 22, 2022.

233.  **Third**, on October 26, 2023, Seagate finally revealed that, months earlier, in August 2022, BIS had issued a Proposed Charging Letter alleging that Seagate had violated U.S. export control regulations. That same day, Seagate again announced disappointing financial results for the first quarter of 2022, reporting that HDD sales had continued to decline, falling by 26% due to declining demand in China. As a result of these newly disclosed financial risks, the Company announced that it had further adjusted its production output, lowered its fiscal year 2023 capital expenditures, and would implement a restructuring plan that would reduce its worldwide headcount by 8%. These disclosures further revealed the truth about Seagate's reliance on illegal HDD sales and the legal and regulatory risk the Company faced as a result.

234.  In response to this news, the price of Seagate common stock declined by $4.61 per share, or nearly 8%, from a closing price of $58.00 on October 25, to a closing price of $53.39 on October 26.

235.  **Finally**, on April 19, 2023, after trading hours, the market learned the full scope and magnitude of Seagate's illegal HDD sales, when Seagate and BIS announced the Settlement Agreement. In the Settlement Agreement, Seagate **admitted** that it had illegally sold more than $1.1 billion in HDDs to Huawei in violation of the FDPR. Seagate further admitted that it had received direct warnings that these sales were illegal, including the "FDPR rule notification letter" from a key supplier of "essential" manufacturing technology, and that the Company's senior

management had repeatedly ramped up Seagate's exposure to these illegal transactions through sweeping commercial agreements and massive extensions of credit to Huawei.  As a result of Seagate's admitted illegal conduct, BIS had imposed a $300 million civil penalty, *the largest standalone civil penalty in the agency's history*.  Additionally, the Settlement Agreement required Seagate to conduct a series of three external audits focused on its export controls compliance program.  Any failure by Seagate either to pay the $300 million penalty, or to conduct the required audits, would result in a five-year denial of Seagate's export privileges, which would prohibit Seagate from participating in any way in any transaction subject to the Export Administration Regulations.  The Settlement Agreement also provided that Seagate would not dispute any of the Company's admissions therein.

236.    In response to these disclosures, the price of Seagate stock declined by $5.78, or more than 9%, from a closing price of $62.86 on April 19, 2023 to $57.08 on April 20, 2023.

237.    In all, disclosures of the true facts concerning Seagate's undisclosed reliance on illicit sales of HDDs to Huawei, which Defendants' materially false and misleading misstatements and omissions concealed, caused massive losses to investors, with Seagate shares falling nearly 43% from $100.09 at the close of trading on March 7, 2022, to $57.08 at the close of trading on April 20, 2023.

238.    It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of Seagate's common stock.  It was also foreseeable to Defendants that the revelation of the truth and/or materialization of the risks that they concealed would cause the price of the Company's common stock to decline as the artificial inflation caused by Defendants' misstatements and omissions was removed.  Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## VIII.    CLASS ACTION ALLEGATIONS

239.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased or otherwise acquired the

common stock of Seagate during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company at all relevant times, members of their immediate families, and Defendants' legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

240.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Seagate shares were actively traded on the Nasdaq Stock Market.  As of January 23, 2023, Seagate had nearly 206.5 million shares of common stock (referred to in the Company's SEC filings as "ordinary shares") issued and outstanding.  Although the exact number of Class members is unknown to Lead Plaintiffs at this time, as it can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are, at a minimum, thousands of members of the Class.  Class members who purchased Seagate common stock may be identified from records maintained by Seagate or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions. Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

241.    Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

242.    Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.  Lead Plaintiffs have no interest that conflicts with the interests of the Class.

243.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

        a.    whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

b.      whether Defendants Mosley and Romano are personally liable for the alleged misrepresentations and omissions described herein;

c.      whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

d.      whether the members of the Class have sustained damages, and the proper measure of damages.

244.    A class action is superior to all other available methods for the fair and efficient adjudication of this action.  Joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it practically impossible for such members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I
**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
(Against All Defendants)**

245.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

246.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (2) cause Lead Plaintiffs and other members of the Class to purchase Seagate common stock at artificially inflated prices.

247.    Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort

to maintain artificially high market prices for Seagate common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

248.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

249.    During the Class Period, Defendants made the false statements specified above, which they knew, or were deliberately reckless in not knowing, were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

250.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or were deliberately reckless in not knowing the true facts that were available to them.  Defendants engaged in this misconduct to conceal Seagate's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

251.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Seagate's common stock.  Lead Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Seagate's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

252.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

253.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**(Against Defendants Mosley and Romano)**

254.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

255.    Defendants Mosley and Romano acted as controlling persons of Seagate within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

256.    By reason of their high-level positions of control and authority as the Company's most senior officers, Defendants Mosley and Romano had the authority to influence and control, and did influence and control, the decision-making and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. Defendants Mosley and Romano were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Seagate during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.  Indeed, Defendants Mosley and Romano were the principal Seagate officer who communicated with investors on earnings calls and at investor conferences on the Company's behalf.  Defendants Mosley and Romano were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

257.    Defendants Mosley and Romano spoke to investors on behalf of the Company during the Class Period.  Therefore, Defendants Mosley and Romano were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Seagate during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

258. As set forth above, Seagate violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

259. By virtue of their positions as controlling persons of Seagate and as a result of their own aforementioned conduct, Defendants Mosley and Romano are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Seagate securities. As detailed above, during all relevant times, Defendants Mosley and Romano served as the CEO and CFO of Seagate, respectively.

260. As a direct and proximate result of Defendant Mosley's and Defendant Romano's conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Seagate common stock.

## X.   **PRAYER FOR RELIEF**

261. WHEREFORE, Lead Plaintiffs pray for judgment as follows:

a.   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.   Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.   Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.   Awarding such equitable, injunctive or other further relief as the Court may deem just and proper.

## XI.   **JURY DEMAND**

262. Lead Plaintiff hereby demands a trial by jury.

1    DATED: October 19, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
*/s/ Abe Alexander*
Salvatore Graziano (admitted *pro hac vice*)
(salvatore@blbglaw.com)
Hannah Ross (admitted *pro hac vice*)
(hannah@blbglaw.com)
Abe Alexander (admitted *pro hac vice*)
(abe.alexander@blbglaw.com)
Aasiya Farah Mirza Glover (admitted *pro hac vice*
(aasiya.glover@blbglaw.com)
Sarah Schmidt (*pro hac vice* forthcoming)
(sarah.schmidt@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

-*and*-

Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
Caitlin C. Bozman (Bar No. 343721)
(caitlin.bozman@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Co-Lead Counsel for Co-Lead Plaintiffs Public
Employees' Retirement System of Mississippi and
Arkansas Public Employees' Retirement System,
and the Class*

**MOTLEY RICE LLC**
Gregg S. Levin (admitted *pro hac vice*)
(glevin@motleyrice.com)
Lance V. Oliver (admitted *pro hac vice*)
(loliver@motleyrice.com)
William S. Norton (admitted *pro hac vice*)
(wnorton@motleyrice.com)
Joshua C. Littlejohn (admitted *pro hac vice*)
(jlittlejohn@motleyrice.com)
Christopher F. Moriarty (admitted *pro hac vice*)
(cmoriarty@motleyrice.com)
Andrew P. Arnold (admitted *pro hac vice*)
(aarnold@motleyrice.com)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Tel: (843) 216-9000

Fax: (843) 216-9450

*Co-Lead Counsel for Co-Lead Plaintiff Universal-Investment-Gesellschaft mbH, Universal-Investment-Luxembourg S.A., and UI BVK Kapitalverwaltungsgesellschaft mbH, and the Class*

**DAVIDSON BOWIE, PLLC**
John L. Davidson (*pro hac vice* forthcoming)
(jdavidson@dbslawfirm.net)
1062 Highland Colony Parkway 200 Concourse
Suite 275
Ridgeland, MS 39157
Telephone: (601) 932-0028

*Additional Counsel for Co-Lead Plaintiff Public Employees' Retirement System of Mississippi*

**BLEICHMAR FONTI & AULD LLP**
Lesley E. Weaver (SBN 191305)
lweaver@bfalaw.com
1330 Broadway, Suite 630
Oakland, CA 94612
Telephone: (415) 445-4003
Facsimile: (415) 445-4020

*Local Counsel for Co-Lead Plaintiff Universal-Investment-Gesellschaft mbH, Universal-Investment-Luxembourg S.A., and UI BVK Kapitalverwaltungsgesellschaft mbH*