Gregg S. Levin (admitted *pro hac vice*)
Lance V. Oliver (admitted *pro hac vice*)
William S. Norton (admitted *pro hac vice*)
Joshua C. Littlejohn (admitted *pro hac vice*)
Christopher F. Moriarty (admitted *pro hac vice*)
Andrew P. Arnold (admitted *pro hac vice*)
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
glevin@motleyrice.com
loliver@motleyrice.com
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com
aarnold@motleyrice.com

Salvatore J. Graziano (admitted *pro hac vice*)
Hannah Ross (admitted *pro hac vice*)
Abe Alexander (admitted *pro hac vice*)
Aasiya Farah Mirza Glover (admitted *pro hac vice*)
Sarah Schmidt (admitted *pro hac vice*)
**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
hannah@blbglaw.com
abe.alexander@blbglaw.com
aasiya.glover@blbglaw.com
sarah.schmidt@blbglaw.com

*Co-Lead Counsel for Co-Lead Plaintiffs
Universal-Investment-Gesellschaft mbH,
Universal-Investment-Luxembourg S.A., and
UI BVK Kapitalverwaltungsgesellschaft mbH,
and the Class*

*Co-Lead Counsel for Co-Lead Plaintiffs
Public Employees' Retirement System of
Mississippi and Arkansas Public Employees'
Retirement System, and the Class*

[Additional counsel appear on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| *In re Seagate Technology Holdings plc Securities Litigation* | Case No. 3:23-cv-03431-RFL <br><br> <u>CLASS ACTION</u> <br><br> **MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> Hearing Date: TBA <br> Time:   TBA <br> Courtroom:   15 (18th Floor) <br> Judge:   Hon. Rita F. Lin |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

TABLE OF ABBREVIATIONS.............................................................................................. v

STATEMENT OF ISSUES (CIVIL L.R. 7-4(a)(3))............................................................... 1

INTRODUCTION AND FACTUAL BACKGROUND ........................................................... 1

LEGAL STANDARDS.............................................................................................................4

ARGUMENT ........................................................................................................................... 5

I.     Defendants Made Materially False And Misleading Statements........................................ 5

    A.    Defendants' truth-on-the-market argument fails....................................................... 5

    B.    Defendants' affirmations of legal compliance are actionable.................................. 6

    C.    Defendants' revenue-related statements are actionable. ......................................... 8

    D.    The Company's risk factor statements and Individual Defendants' SOX certifications are actionable.................................................................................... 9

II.    Plaintiffs Adequately Plead Scienter................................................................................. 10

III.   Plaintiffs Adequately Plead Loss Causation ..................................................................... 14

CONCLUSION ..................................................................................................................... 14

CERTIFICATE OF SERVICE .............................................................................................. 17

## TABLE OF AUTHORITIES

**CASES**

*Allegheny County Employees' Retirement System v. Energy Transfer LP*,
  532 F. Supp. 3d 189 (E.D. Pa. 2021) ................................................................................. 11

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
  568 U.S. 455 (2013) .............................................................................................................. 5

*Berson v. Applied Signal Technology, Inc.*,
  527 F.3d 982 (9th Cir. 2008)................................................................................................. 5

*Eminence Capital, LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003)............................................................................................. 14

*Evanston Police Pension Fund v. McKesson Corp.*,
  411 F. Supp. 3d 580 (N.D. Cal. 2019) .................................................................................. 8

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000)................................................................................................... 8

*Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*,
  63 F.4th 747 (9th Cir. 2023) ................................................................................................. 5

*Glazer Capital Management, LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008)............................................................................................... 13

*Gray v. Alpha & Omega Semiconductor Ltd.*,
  2021 WL 4429499 (S.D.N.Y. Sept. 27, 2021)...................................................................... 9

*In re Amgen Inc. Securities Litigation*,
  2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)..................................................................... 14

*In re Apollo Group Inc. Securities Litigation*,
  395 F. Supp. 2d 906 (D. Ariz. 2005).................................................................................... 6

*In re Apple Computer Securities Litigation*,
  886 F.2d 1109 (9th Cir. 1989).............................................................................................. 6

*In re BioMarin Pharmaceutical Inc. Securities Litigation*,
  2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ........................................................................ 13

*In re Century Aluminum Co. Securities Litigation*,
  2011 WL 830174 (N.D. Cal. Mar. 3, 2011)......................................................................... 9

*In re Columbia Securities Litigation*,
  155 F.R.D. 466 (S.D.N.Y.1994) ........................................................................................... 6

*In re Convergent Technologies Securities Litigation*,
  948 F.2d 507 (9th Cir. 1991)................................................................................................. 6

*In re CytRx Corp. Securities Litigation*,
  2017 WL 5643161 (C.D. Cal. Aug. 14, 2017)...................................................................... 9

*In re Daou Systems, Inc. Securities Litigation*,
  411 F.3d 1006 (9th Cir. 2005).............................................................................................. 13

*In re Facebook, Inc. Securities Litigation*,
  84 F.4th 844 (9th Cir. 2023) ................................................................................. 6, 8, 14

*In re Galena Biopharma, Inc. Securities Litigation*,
  117 F. Supp. 3d 1145 (D. Or. 2015) ............................................................................. 11

*In re Gilead Sciences Securities Litigation*,
  536 F.3d 1049 (9th Cir. 2008).......................................................................................... 5

*In re Invision Technologies, Inc. Securities Litigation*,
  2006 WL 538752 (N.D. Cal. Jan. 24, 2006) ................................................................. 11

*In re Iso Ray, Inc. Securities Litigation*,
  189 F. Supp. 3d 1057 (E.D. Wash. 2016) ..................................................................... 12

*In re LDK Solar Securities Litigation*,
  584 F. Supp. 2d 1230 (N.D. Cal. 2008) .......................................................................... 5

*In re New Oriental Education & Technology Group Securities Litigation*,
  988 F. Supp. 2d 406 (S.D.N.Y. 2013)........................................................................... 10

*In re Oracle Corp. Securities Litigation*,
  627 F.3d 376 (9th Cir. 2010).......................................................................................... 10

*In re Qualcomm Inc. Securities Litigation*,
  2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) .............................................................. 12

*In re Sipex Corp. Securities Litigation*,
  2005 WL 3096178 (N.D. Cal. Nov. 17, 2005)............................................................... 13

*In re STEC Inc. Securities Litigation*,
  2012 WL 6965372 (C.D. Cal. Mar. 7, 2012) .................................................................. 6

*In re Syncor International Corp. Securities Litigation*,
  239 F. App'x 318 (9th Cir. 2007) .................................................................................... 8

*In re Toronto-Dominion Bank Securities Litigation*,
  2018 WL 6381882 (D.N.J. Dec. 6, 2018) ..................................................................... 13

*In re Van der Moolen Holding N.V. Securities Litigation*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005)............................................................................. 7

*In re Wash. Mutual, Inc. Securities, Derivative & ERISA Litigation*,
  694 F. Supp. 2d 1192 (W.D. Wash. 2009)..................................................................... 10

*Karinski v. Stamps.com, Inc.*,
  2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ................................................................... 8

*Karinski v. Stamps.com, Inc.*,
  472 F. Supp. 3d 747 (C.D. Cal. 2020) ............................................................................ 8

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018)............................................................................................ 7

*Lapin v. Goldman Sachs Group, Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006)............................................................................. 6

*Lloyd v. CVB Financial Corp.*,
  811 F.3d 1200 (9th Cir. 2016)........................................................................................ 14

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008)......................................................................................... 4, 13

*Mauss v. NuVasive, Inc.*,
    2015 WL 10857519 (S.D. Cal. Aug. 28, 2015) ......................................................... 14

*Mild v. PPG Industries, Inc.*,
    2018 WL 6787351 (C.D. Cal. Dec. 21, 2018) ........................................................... 12

*Miller v. Thane International, Inc.*,
    519 F.3d 879 (9th Cir. 2008)........................................................................................ 5

*Neborsky v. Valley Forge Composite Technologies, Inc.*,
    2014 WL 3767011 (S.D. Cal. July 29, 2014) .............................................................. 7

*Nguyen v. Endologix*,
    962 F.3d 405 (9th Cir. 2020)...................................................................................... 13

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015) ..................................................................................................... 7

*Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014)..................................................................................... 11

*Rubin v. Trimble*,
    1997 WL 227956 (N.D. Cal. Apr. 28, 1997) ............................................................... 6

*Schueneman v. Arena Pharmaceuticals, Inc.*,
    840 F.3d 698 (9th Cir. 2016)...................................................................................... 10

*Securities & Exchange Commission v. Leslie*,
    2012 WL 116562 (N.D. Cal. Jan. 13, 2012) ................................................................ 9

*Shapiro v. Matrixx Initiatives, Inc.*,
    2011 WL 13047298 (D. Ariz. Sept. 26, 2011)............................................................. 7

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009)..................................................................................... 10

*South Ferry LP # 2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009)................................................................. 10

*Steiner v. MedQuist Inc.*,
    2006 WL 2827740 (D.N.J. Sept. 29, 2006) ................................................................. 8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................................. 5, 10

*Todd v. STAAR Surgical Co.*,
    2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ............................................................. 7

*Weston v. DocuSign, Inc.*,
    2023 WL 3000583 (N.D. Cal. Apr. 18, 2023) ............................................................. 5

**TREATISES, RESTATEMENTS & LAW REVIEWS**

Halme et al., *How Stock Markets React to Guidance Revisions and Actual Earnings Surprises*,
    7 INT'L J. OF ECON. & MGMT. ENG'G 6 (2013) ........................................................ 9

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| "BIS" | Bureau of Industry and Security |
| "Class Period" | September 14, 2020 to April 19, 2023, inclusive |
| "Commerce Committee" | U.S. Senate Committee on Commerce, Science, and Transportation |
| "EAR" | Export Administration Regulations |
| "Defendants" | Seagate Technology Holdings plc, William D. Mosley, and Gianluca Romano |
| "FDP" | Foreign Direct Product Rule |
| "HDD" | Hard disk drive |
| "Huawei" | Huawei Technologies Co. |
| "GAAP" | Generally Accepted Accounting Principles |
| "IBD" | Ion Beam Deposition |
| "IBE" | Ion Beam Etch |
| "Individual Defendants" | William D. Mosley and Gianluca Romano |
| "Mem." | Defendants' Notice of Motion and Motion to Dismiss Consolidated Class Action Complaint for Violations of Federal Securities Laws (ECF No. 72) |
| "Moriarty Decl." | Accompanying Declaration of Christopher F. Moriarty |
| "PCL" | Proposed Charging Letter |
| "Seagate" or the "Company" | Seagate Technology Holdings plc |
| "SEC" | U.S. Securities and Exchange Commission |
| "SOX" | Sarbanes-Oxley Act of 2002 |
| "¶ _" | Paragraphs of the Consolidated Class Action Complaint for Violations of Federal Securities Laws (ECF No. 68) |

**STATEMENT OF ISSUES (CIVIL L.R. 7-4(a)(3))**

Does the Complaint state a claim under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder?

**INTRODUCTION AND FACTUAL BACKGROUND**

This case arises from Defendants' materially false and misleading statements concealing Seagate's mass export of over $1.1 billion in advanced HDD technology to Huawei, a hostile foreign entity, in flagrant violation of U.S. law. In August 2020, BIS promulgated export control regulations, the FDP, which proscribed the unlicensed sale of U.S. technologies, and products manufactured with the aid of those technologies, to Huawei, based on "'reasonable cause to believe that Huawei has been involved in activities contrary to the national security or foreign policy interests of the United States.'" ¶¶ 28, 31.[1] As one of Seagate's competitors explained the following month: "It's pretty straightforward, quite frankly . . . how it [the FDP] applies." ¶ 66.

Rather than comply with this "straightforward" mandate, as its competitors did, Seagate saw—and took—an opportunity to obtain an effective monopoly over sales of HDDs to one of the storage industry's most lucrative customers. Putting profits over national security, and unbeknownst to investors, Seagate expanded its commercial relationship with Huawei shortly after enactment of the FDP. The Company signed sweeping agreements with Huawei, pursuant to which Seagate agreed to: sell 7.4 million HDDs to Huawei—nearly *three times* the volume sold to Huawei the prior year; provide Huawei with its "*newest and most advanced technologies available*"; and to maintain a special team dedicated to servicing this single key customer. Huawei, in turn, agreed to make Seagate its "strategic supplier," with "priority basis over other Huawei suppliers." ¶ 71. Moreover, Seagate extended more than $1 billion in credit to Huawei to facilitate the swift placement of multiple high-volume orders. ¶ 76. Internally, Seagate acknowledged that the Company's lines of credit to Huawei were among its largest exposures. In all, the Company obtained over $1.1 billion in illegal revenue from its sales to Huawei between August 2020 and September 2021, before suspending shipments in the face of intense Congressional scrutiny. ¶ 51.

---

[1] All internal citations are omitted and emphasis to case citations added unless otherwise noted.

Defendants, however, concealed the truth from investors, reassuring them, in response to direct questioning, that Seagate "compl[ied] with all the rules and regulations" governing the export of its HDDs, and that, in any event, the Company's commercial relationship with Huawei was not material to Seagate's unusually positive revenue performance during the Class Period, which Defendants misleadingly attributed to legitimate business factors and conditions.

Defendants received numerous warnings that Seagate's sales were illegal. Indeed, prior to the Class Period, Seagate acknowledged that it could not sell HDDs to entities on the Restricted Entity List, just like Huawei. ¶ 69. Additionally, by the start of the Class Period, Seagate's outside law firms wrote that the FDP proscribed the export of any item "***produced*** from a specified U.S. technology . . . to cover ***almost all transactions involving a Huawei entity***"; that the FDP applies when U.S. technologies are used at ***any stage*** of the production of the item being exported; and "the expanded scope of [the FDP] will ***impose licensing requirements on a very broad range of non-U.S.-made semiconductor items when destined for Huawei***." ¶¶ 39-41. Then, on January 27, 2021, Seagate received an "FDP rule notification" letter from the supplier of its IBE and IBD equipment that Seagate has admitted is "essential" to manufacturing its HDDs and is a "major component" of its HDD plants. ¶ 77. The letter, which the Company admitted "was distributed to Seagate US," warned that the FDP classified the equipment as restricted technology and any items manufactured using that technology were subject to export restrictions to Huawei. *Id.*

Defendants were also aware that Seagate had dramatically accelerated sales to Huawei and that those sales were a driver of the Company's unusually positive revenue performance. Senior Seagate executives approved more than $1.1 billion in HDD sales to Huawei, were contractually designated as "sponsor[s]" of the "strategic partnership" between the two companies, ¶ 73, and approved massive extensions of credit to Huawei, ¶ 76. Throughout the Class Period, Seagate's Huawei sales significantly boosted Seagate's revenue, allowed the Company to meet guidance and outperform peers, and even helped Seagate repair its critically important credit rating. ¶¶ 90-92.

By May 2021, Congress began investigating Seagate's HDD sales following receipt of a whistleblower report. ¶¶ 81-82. In stark tension with Defendants' conclusory claims of good faith error, Seagate stonewalled this investigation and, unlike its competitors, refused to provide basic

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

information about its relationship with Huawei. ¶¶ 83-84. Significantly, notwithstanding **repeated** requests, Seagate would not even share its supposedly good faith "interpretation of the [BIS] rule" with the Commerce Committee. ¶ 83. It was not until September 2021, when the Commerce Committee threatened to expose Seagate's conduct publicly, that Company officials finally agreed to an interview with Congressional staff, during which they admitted that "Seagate has not applied for any licenses to export [HDDs] to Huawei" and had "stopped shipping [HDDs] to Huawei." ¶¶ 85-86. On August 29, 2022, Seagate received the PCL from BIS (which it withheld from the market for two months), ¶ 105, but continued to deny that its sales violated the FDP and downplayed the contribution of those sales to its financial performance, ¶ 175.

The truth regarding Seagate's illegal sales to Huawei was revealed in a series of disclosures: (1) March 8, 2022, when Seagate lowered its earnings guidance (because it no longer benefitted from illicit Huawei revenue); (2) July 21, 2022, when Seagate reported disappointing financial results for the fourth quarter of 2022 (for the same reason); (3) October 26, 2022, when Seagate belatedly disclosed that BIS had issued the PCL two months prior; and (4) April 19, 2023, when Seagate and BIS announced a settlement of the PCL and the Company admitted that it had illegally sold more than $1.1 billion in HDDs to Huawei in violation of the FDP, had received direct warnings that those sales were illegal, and that its senior management had repeatedly increased Seagate's exposure to those illegal transactions. ¶¶ 228-35.[2]

Given Seagate's admissions that its conduct was illegal, Defendants cannot meaningfully dispute that many of their statements, including that the Company complied with export laws, were false when made. Instead, Defendants ask this Court to hold, as a matter of law, that investors were aware Seagate was illegally selling massive volumes of HDDs. Not only is this fact-based "truth-on-the-market" defense inappropriate for resolution at this stage, it is incorrect: among other things,

---

[2] Defendants' assertion that "BIS's Order acknowledges that Seagate misinterpreted the EAR and so **believed its sales complied with the EAR at that time**" is false. Mem. 4. While BIS stated that Seagate "misinterpreted the EAR," it in no way concluded that Seagate "believed its sales complied with the EAR at that time" or in any way suggested (as Defendants do now) that this was an innocent mistake. Indeed, commentators cited the record-breaking size of Seagate's penalty, as well as the agency's statements that "Seagate did not voluntarily disclose the activity," as demonstrating that BIS concluded Seagate had acted in bad faith. ¶ 113.

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

investors did not know that the Company used restricted technology as a "major component" of its HDD manufacturing or that suppliers had specifically warned Seagate about this; that Seagate had tripled its sales volume to, and greatly expanded its relationship with, Huawei; or that Huawei sales were a material driver of the Company's performance. Indeed, Defendants made sure investors were unaware of these facts by repeatedly denying them.

At the same time that they assert investors knew Seagate was breaking the law, Defendants argue that the Company's senior executives were completely in the dark and, thus, the Complaint fails to allege scienter. These arguments also fail. Seagate received numerous warnings that its HDD sales were illegal, including direct warnings from suppliers, and the Company has admitted that its senior executives were instrumental in dramatically expanding its relationship with Huawei. Defendants' unsupported factual assertion that Seagate innocently misinterpreted the FDP is belied by, among other things, the unanimous agreement of Seagate's competitors that the FDP proscribed sales to Huawei; Seagate's suspicious refusal to share its supposedly "good faith" interpretation of the rule with Congressional investigators; and the record-breaking penalty the Company paid for its misconduct.[3] Defendants assert that the Complaint fails to plead a plausible fraudulent motive, but ignore the Complaint's allegations that Seagate faced significant economic pressure at the start of the Class Period, weighed the value of a lucrative monopoly against BIS's anemic enforcement history, and concluded that "the benefits of [the illegal conduct] might exceed the costs." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008). Far from "making no sense," courts have repeatedly noted that such motives are common.

## LEGAL STANDARDS

When assessing a motion to dismiss, a court must "accept all factual allegations . . . as true" and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights,*

---

[3] Notably, Defendants *still* do not describe this supposed misinterpretation. They suggest, without support, that they believed the FDP's *de minimis* rule excepted Seagate's HDDs from export restrictions. Mem. 4. This is nonsensical given their admission that the restricted technologies were "essential" and "major components" of the Company's manufacturing process. No wonder Defendants were reluctant to share this clearly implausible "interpretation" with Congress.

*Ltd.*, 551 U.S. 308, 322-23 (2007). "[A] district court ruling on a motion to dismiss is not sitting as a trier of fact[;] . . . so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). "[T]he PLSRA in no way turns FRCP 12 into a trial-type, papers-only proceeding, much less one in which defendants get the benefit of every conceivable doubt, including credibility calls." *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1260 (N.D. Cal. 2008).

## ARGUMENT

### I.    Defendants Made Materially False And Misleading Statements

A statement is false or misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Even "statements [that are] literally accurate can become, through their context and manner of presentation, devices which mislead investors." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Courts must "not impute the strong inference standard of scienter to the element of falsity." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). Instead, "[f]alsity is subject to a particular[it]y requirement and the *reasonable inference* of plausibility set out in *Twombly* and *Iqbal*." *Weston v. DocuSign, Inc.*, 2023 WL 3000583, at *17 (N.D. Cal. Apr. 18, 2023).

Defendants reassured the market that Seagate complied with applicable export regulations, that Huawei sales were immaterial, attributed the Company's revenues to legitimate business factors, and certified that its internal controls were effective and its financial results complied with GAAP. ¶¶ 133-226. As Defendants have *admitted*, none of this was true.

### A.    Defendants' truth-on-the-market argument fails.

By asserting that "Seagate told the world it would continue its unlicensed shipments to Huawei," Mem. 1, Defendants invoke a premature and unavailing "truth-on-the-market" defense. *See also id.* at 5-6. This fact-specific defense is inappropriate for resolution at this stage and is, instead, "'a matter for trial' (and presumably also for a summary-judgment motion under [Fed. R. Civ. P.] 56)." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 481-82 (2013); *see also*

*In re Columbia Sec. Litig.*, 155 F.R.D. 466, 482-83 (S.D.N.Y.1994) ("Defendants' burden [establishing truth-on-the-market is] ***extremely difficult, perhaps impossible***, to meet [even] at the summary judgment stage.").[4]

Defendants also attack a straw man. Plaintiffs do not allege Defendants concealed that Seagate might continue shipping HDDs to Huawei; they allege Defendants misled the market about the Company's compliance with the FDP and the extent to which Huawei sales contributed to its financial performance.[5] Moreover, when analysts speculated that Seagate *might* be breaking the law, Defendants swiftly and vigorously denied that fact. *See Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (allegedly curative disclosures were "counteracted by contemporaneous statements by Goldman"); *In re Apollo Grp. Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 910-13 (D. Ariz. 2005) (statements about regulator review "deceptively misled the market into believing that nothing adverse had occurred . . . , thereby comforting investors").

### B. Defendants' affirmations of legal compliance are actionable.

Throughout the Class Period, Defendants repeatedly represented that Seagate was in compliance with applicable export regulations. *See, e.g.*, ¶ 139 ("***We continually monitor and remain in compliance with all the rules and regulations around***."). Seagate responded to news of the 2021 Congressional inquiry by claiming it "***complies with all laws applicable to its business and operations, including export control regulations***." ¶ 93. After Seagate disclosed the PCL on October 26, 2022, Defendants reassured the market by stating that "***we have controls and***

[4]    Defendants rely on *In re Convergent Technologies Securities Litigation*, 948 F.2d 507 (9th Cir. 1991), but that case, which addressed ***summary judgment***, further confirms that their argument is improper at this stage. *In re Facebook, Inc. Securities Litigation*, 84 F.4th 844, 858 (9th Cir. 2023), cited for the general truth defense, actually explained that if the market were "aware of the allegedly concealed information," it "would already be reflected in the stock's price." By contrast here, large stock drops followed the corrective news, signifying that the truth was ***not*** already on the market. *See, e.g.*, *In re STEC Inc. Sec. Litig.*, 2012 WL 6965372, at \*12 (C.D. Cal. Mar. 7, 2012) (truth-on-the-market argument "belied" by stock price decline following corrective disclosure).

[5]    To establish truth-on-the-market, Defendants must show that "the ***very information*** necessary to make their public statements not misleading," *Rubin v. Trimble*, 1997 WL 227956, at \*7 (N.D. Cal. Apr. 28, 1997), was conveyed "to the public with a degree ***of intensity and credibility*** sufficient to effectively counter-balance any misleading impression created by" the alleged misstatements, *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989).

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

*procedures to ensure compliance with all applicable regulations and orders*," ¶¶ 170, 175, 178, and that we "*believe we've complied with all relevant export control laws and regulations*," ¶ 174. Courts routinely hold such statements actionable. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015) (opinion statements concerning legal compliance actionable when they lacked reasonable basis or did not "fairly align[] with the information in the issuer's possession at the time"); *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *3, 11 (C.D. Cal. Apr. 12, 2016) (statement that issuer "believes that it is substantially in compliance with the FDA's . . . regulations" held actionable); *Shapiro v. Matrixx Initiatives, Inc.*, 2011 WL 13047298, at *4 (D. Ariz. Sept. 26, 2011) (statement "we believe our products and claims comply in all material respects with the regulatory requirements" held actionable).

Defendants contend that they had no duty to disclose illegal conduct absent a conviction and that unproven (or uncharged) illegal conduct is immaterial. This is false. Undisclosed illegal conduct can render affirmative statements about legal compliance or the source of revenues misleading, notwithstanding the absence of a criminal conviction or even an active investigation. *See Neborsky v. Valley Forge Composite Techs., Inc.*, 2014 WL 3767011, at *6-7 (S.D. Cal. July 29, 2014) (affirmative statements triggered duty to disclose illegal exportation of semiconductors to China, notwithstanding the criminal conduct was uncharged); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005) (statements "concerning the sources and significance of the revenue generated" misleading when they failed to disclose revenue had been generated in part by trading activities that violated NYSE rules). As the Ninth Circuit has repeatedly explained, "once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018) (alterations in original). That BIS issued its findings "after the fact" is both an improper fact issue and irrelevant. Mem. 7. Defendants' misstatements concerned the Company's conduct and business *during the Class Period* and, as

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

Defendants' authority makes clear, this Circuit's "case law does not require harm to have materialized for a statement to be materially misleading." *Facebook*, 84 F.4th at 859-60.[6]

### C.    Defendants' revenue-related statements are actionable.

Defendants misleadingly told investors that Huawei sales did not meaningfully or materially contribute to Seagate's HDD revenue and financial performance and attributed the Company's unusually positive HDD revenue during the Class Period to legitimate factors such as "stronger-than-expected demand from enterprise and OEM customers" and "broad-based growth across each of the end markets," ¶¶ 196, 206, when those revenues were inflated by undisclosed illicit payments in excess of $1.1 billion from Huawei. When a company puts at issue the cause of its success, it must disclose that improper or illegal business practices also contributed. *See In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 320 (9th Cir. 2007) ("By attributing Syncor's success solely to legitimate practices, defendants implicitly (and falsely) warranted that there were no illegal practices contributing to that success."); *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *14 (C.D. Cal. Jan. 17, 2020) ("[F]inancial statements may be misleading if they put the source of illegal revenue at issue without disclosing the illegality."), *clarified by* 472 F. Supp. 3d 747 (C.D. Cal. 2020).[7]

Unable to argue that these statements are not misleading, Defendants instead ask this Court to create a new rule that a business practice is immaterial as a matter of law if it contributes less than 10% of company-wide revenue. Defendants' argument has no basis in the law and misstates the facts. First, courts have repeatedly held that misstatements of financial results by less than 10% are material. *See, e.g.*, *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (finding

---

[6]    Defendants' assertion that "[o]nce Seagate received [the PCL], Seagate publicly disclosed it," Mem. 8, omits that Seagate withheld the PCL until after the it had stopped selling to Huawei, ¶ 105.

[7]    *See also Steiner v. MedQuist Inc.*, 2006 WL 2827740, at *16 (D.N.J. Sept. 29, 2006) (statements "attributing its revenues to legitimate business factors such as 'increased sales to existing customers, sales to new customers and additional revenue from acquisitions'" misleading when they failed to disclose illicit "billing scheme"); *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 599 (N.D. Cal. 2019) ("Having touted the good news . . . , McKesson had a duty to also disclose that some portion of its increased profits was actually due to far riskier and less sustainable unlawful agreements.").

1.7% of company's total revenue *not* immaterial); *Gray v. Alpha & Omega Semiconductor Ltd.*, 2021 WL 4429499, at \*8 (S.D.N.Y. Sept. 27, 2021) (rejecting argument that "sales to Huawei" were immaterial because they "accounted for only 2 to 4.2 percent of AOS's overall business"); *see also Sec. & Exch. Comm'n v. Leslie*, 2012 WL 116562, at \*6 (N.D. Cal. Jan. 13, 2012) ("'[M]ateriality' is not limited to a percentage of a company's total profits.").[8] This is because statements may not be dismissed on materiality grounds "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *In re CytRx Corp. Sec. Litig.*, 2017 WL 5643161, at \*7 (C.D. Cal. Aug. 14, 2017).

Second, Seagate's sales to Huawei were both quantitatively *and* qualitatively material to the Company because those sales boosted its total and HDD revenue by more than 10% in several quarters and, for each, allowed it to meet or exceed revenue guidance, "significantly outperform[]" its competitors, repair its credit rating, and raise capital on more favorable terms. ¶¶ 91-92.[9]

### D.    The Company's risk factor statements and Individual Defendants' SOX certifications are actionable.

Defendants acknowledge that statements concerning risk factors in SEC filings can be actionable if the risk has already "come to fruition." Mem. 9. *See also Siracusano v. Matrixx*

---

[8]    Defendants conflate the materiality of the *affirmative* misstatements with the free-standing proactive duty to disclose (even absent any affirmative statement) 10% customers under (former) Item 103 of SEC Regulation S-K (which is not at issue here). Notably, Item 103 was amended during the Class Period to require disclose when material, without regard to a percentage threshold.

[9]    Defendants' argument that Seagate "*met* guidance," when it missed the midpoint, Mem. 12, is misplaced, as even a cursory review of analyst reports and academic literature makes clear, *see* Moriarty Decl. Ex. A (Oct. 26, 2022 analyst report noting Seagate's revenue "missed Street view"); Ex. B (Oct. 27, 2022 analyst report noting "the company missed consensus revenue expectations for fiscal 1Q21 (calendar 3Q20)"); Ex. C (Apr. 12, 2023 analyst report noting "[w]e believe F3Q (Mar) revenue could come in below the midpoint of guidance"); Ex. D (Apr. 13, 2023 analyst report noting "[w]e expect [Seagate's] March Q results to come in below the guidance midpoint"). *See also* Ciconte, et al., *Does the midpoint of range earnings forecasts represent managers' expectations?* (forthcoming *Review of Accounting Studies*) (investors react negatively when issuers miss *upper range* of guidance); Halme et al., *How Stock Markets React to Guidance Revisions and Actual Earnings Surprises*, 7 INT'L J. OF ECON. & MGMT. ENG'G 6 (2013) (investors react to changes in midpoint of guidance). The Court may take judicial notice of the attached analyst reports. *See In re Century Aluminum Co. Sec. Litig.*, 2011 WL 830174, at \*9 (N.D. Cal. Mar. 3, 2011) ("[C]ourts routinely take judicial notice of analyst reports.").

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

*Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) ("[T]he passage in the Form 10-Q speaks about the risks . . . in the abstract, with no indication that the risk 'may already have come to fruition.'"). Because the risks to the Company (such as heightened regulatory scrutiny) already had "come to fruition" once Seagate continued to sell to Huawei after BIS imposed the new export regulations, the Company's risk disclosures were inadequate.[10] Defendants' SOX certifications stating that Seagate had instituted controls to ensure compliance are likewise actionable because those controls were clearly inadequate given the Company illegally shipped millions of HDDs. *See In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1216, 1223 (W.D. Wash. 2009) (certifications of "effective internal controls" actionable when company had "internal control deficiencies").

## II.    Plaintiffs Adequately Plead Scienter

Scienter is "a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness.'" *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (citations omitted). A defendant "is reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010). The issue at this stage is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. The inference of "scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324.

***First***, that Seagate was repeatedly and directly warned that its unlicensed HDD sales to Huawei violated the FDP supports an inference of scienter. *See S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1258 (W.D. Wash. 2009) ("[N]otice of a risk is often enough [to allege scienter]:

---

[10]   That its auditor reported that Seagate maintained effective financial controls, Mem. 9, does not change this analysis. *See In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013) (on a motion to dismiss, "there is no way to determine what disclosures were made to the auditors and what considerations led the auditors to certify the financial statements").

'When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk.'"). Seagate received an FDP "rule notification" letter from a supplier directly warning that items manufactured with its equipment were subject to the FDP,[11] guidance from its outside lawyers making clear HDDs were subject to the FDP, announcements by competitors who uniformly concluded that the FDP proscribed unlicensed shipment of HDDs, and multiple investigations into the legality of Seagate's conduct. ¶¶ 66, 77, 81-86, 117.[12]

*Second*, Seagate's refusal to cooperate with the Commerce Committee's investigation (or to share its supposedly good faith interpretation of the FDP), "apparent lack of regard for the regulations," and failure to disclose the activity to BIS (which "contributed to the severity of the fine"), or even ask BIS for guidance in advance (as Defendants' exhibits demonstrate many other affected companies did) adds to the inference of scienter. ¶¶ 81-84, 113. *See also Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 233 (E.D. Pa. 2021) ("'[G]iven the serious ramifications of [government] investigations, it is implausible to suggest that Defendants were not aware of the existence of, or were not intimately familiar with, the allegations pertaining to' them."); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1167 (D. Or. 2015) ("Evidence that a defendant has taken steps to cover-up [*sic*] a misdeed is strong proof of scienter." (alteration in original)). That Defendants *wholly ignore* allegations concerning their suspicious refusal to provide any information to investigators concerning Seagate's sales to Huawei is telling.

*Third*, that the misstatements concerned the viability of Seagate's sales to one of its most significant customers in its most important business—sales that the Individual Defendants repeatedly discussed during the Class Period, often in response to analyst questions—supports an inference of scienter. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (noting "corporate officers have knowledge of the critical core operation of

---

[11]  Defendants speculate that Seagate might have had a different view than its supplier, but do not articulate any basis Seagate could have to dispute the supplier's assessment of *its own equipment and technology*.

[12]  Defendants cite *In re Invision Technologies, Inc. Securities Litigation*, 2006 WL 538752 (N.D. Cal. Jan. 24, 2006), but that case is inapposite because the plaintiffs there pled only "general assertions about the Individual Defendants' roles and responsibilities and motivations." *Id.* at *7.

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

their companies" and such allegations can bolster an inference of scienter); *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at \*11 (S.D. Cal. Mar. 18, 2019) (finding "specific [statements] . . . in response to questions from analysts and investors" may "give rise to a strong inference that Defendants acted with the required state of mind"). Here, the Company derived 92% of its revenue from HDD sales and noted that its advanced HDD manufacturing technologies were a "critical element" of its business strategy. ¶¶ 22, 57. Over $1.1 billion of that revenue came from illicit sales to Huawei between August 2020 and September 2021. ¶ 75. In addition, the Company extended over $1 billion in credit to Huawei, which was among Seagate's largest exposures. ¶ 130. Moreover, Defendants responded to concerns about the legality of Seagate's Huawei sales by assuring investors that they were deeply focused on these issues and that "it's part of our job to ensure that we understand and then we follow all the rules and regulations of trade." ¶ 120. Given the significance of Seagate's FDP compliance, it is highly unlikely that senior management would be unaware of clear warning signs of illegality, including the FDP "rule notification" letter. *See, e.g.*, *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1078-79 (E.D. Wash. 2016) (finding it "'absurd' to suggest" defendant lacked knowledge about matter "critical to [company]'s success").

*Fourth*, Seagate senior management's close involvement in accelerating the Company's HDD sales to Huawei following enactment of the FDP further supports a strong inference that they were aware of facts concerning this expanded commercial relationship, including the magnitude of the Company's HDD sales and red flags relating to the legal and regulatory risks they entailed.

*Fifth*, the magnitude of the BIS settlement and remedial measures forced on the Company generally, and the Individual Defendants specifically, add to the holistic inference of scienter. *See Mild v. PPG Indus., Inc.*, 2018 WL 6787351, at \*7 (C.D. Cal. Dec. 21, 2018) (finding "remedial measures" support inference of scienter). On April 19, 2023, Seagate announced that BIS had imposed a $300 million penalty on the Company, the largest in BIS's history. ¶ 109. The following day, Seagate announced 100% salary reductions for both Individual Defendants; a 50% reduction in salary for Seagate's Executive Vice President and Chief Commercial Officer, who was "responsible for product line management across HDD, SSD and Systems"; and the unexpected departure of the Company's VP of Operations and Technology. ¶ 132; *In re Sipex Corp. Sec. Litig.*,

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005) (finding remedial actions indicative of scienter and noting: "This was strong medicine. Such house-cleaning and reforms do not follow innocent mistakes. Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal controls.").[13]

***Finally***, myriad other factors enhance the already strong inference, including the widespread nature of the misconduct, *see In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *13 (D.N.J. Dec. 6, 2018) (finding scienter when "activities were widespread—and therefore widely known"); the violations of GAAP, *see In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1016 (9th Cir. 2005) ("Violations of GAAP standards can also provide evidence of scienter."); and the Individual Defendants' SOX certifications, *see Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008) (SOX certifications may be considered alongside other allegations in scienter analysis).

Defendants' assertion that the "Complaint is devoid of *any* contemporaneous facts" supporting scienter, Mem. 14, ignores the foregoing allegations, including specific allegations that they received warnings from suppliers, personally signed off on massive HDD sales and credit lines, and stonewalled a Congressional investigation. Similarly, Defendants' assertion that the Complaint does not allege a plausible fraudulent motive also ignores the Complaint's allegations, including that Seagate faced significant economic pressure at the start of the Class Period, weighed the value of a lucrative monopoly against BIS's anemic enforcement history, and concluded that "the benefits of [the illegal conduct] might exceed the costs." *Tellabs*, 513 F.3d at 710.[14]

---

[13] Defendants' argument that "[c]ourts refuse to infer scienter based on the 'magnitude' of a problem . . . , executive departures . . . , [or] a subsequent adjustment of a defendant's compensation," Mem. 14 n.6, ignores that while these factors *standing alone* may not be sufficient to plead a strong inference of scienter, they are all relevant to the holistic analysis under *Tellabs*.

[14] Defendants' reliance on *Nguyen v. Endologix*, 962 F.3d 405 (9th Cir. 2020), is misplaced. The plaintiffs there alleged defendants stated the FDA would approve a drug when they "knew that there was absolutely no hope" it would do so. *Id*. at 415. Here, the Complaint does ***not*** allege Defendants knew their fraud would inevitably be discovered; it alleges they held out hope that the benefits would outweigh the risks. *See In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *14 (N.D. Cal. Jan. 6, 2022) (finding *Nguyen*'s reasoning inapposite when "allegations are . . .

## III.    Plaintiffs Adequately Plead Loss Causation

"At the pleading stage, it is generally inappropriate to dismiss for failure to establish loss causation." *Facebook*, 84 F.4th at 864. "Neither the Federal Rules of Civil Procedure nor the federal securities laws 'impose any special further requirement in respect to the pleading of proximate causation or economic loss' beyond the 'short and plain statement of the claim' required by Rule 8." *Id*. In their motion, Defendants challenge two of the four disclosures (March 8, 2022 and July 21, 2022) on the basis that "neither disclosure mentioned Huawei" by name. Mem. 15. That is irrelevant because a corrective disclose need only "relate back to the misrepresentation." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).[15] Here, both disclosures involved negative revenue forecasts in Asia and results that were a direct consequence of Seagate's suspension of sales to Huawei under significant government pressure, and thus began to reveal to investors the true scope of Seagate's reliance on those sales. While the disclosures did not mention Huawei by name, they acknowledged that the poor results were driven by declining HDD sales in China, a connection that analysts also highlighted. ¶ 101.

## CONCLUSION

Defendants' motion to dismiss should be denied in its entirety.[16]

---

that [defendants] withheld important *warning signs* [of adverse regulatory outcome] from the market").

[15]   Additionally, a plaintiff may plead that a defendant's statements concealed a business practice that created a risk (here, a heightened risk of regulatory scrutiny and/or enforcement actions) that ultimately materialized, thereby diminishing the value of a company's stock. *See, e.g.*, *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *20 (C.D. Cal. Aug. 4, 2014) ("[N]umerous district courts in the Ninth Circuit . . . have expressly endorsed the [materialization of the risk] approach."); *see also Mauss v. NuVasive, Inc.*, 2015 WL 10857519, at *15 (S.D. Cal. Aug. 28, 2015) ("Plaintiff's theory—that Defendants . . . did not disclose the true risk of regulatory scrutiny to investors, who bought their shares at an artificially inflated price and were harmed when the foreseeable result of that risk materialized . . . —appears to be enough to support a claim.").

[16]   If the Court grants Defendants' motion to dismiss, or any part of it, Plaintiffs respectfully request leave to amend. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("Dismissal with prejudice and without leave to amend is not appropriate [in PSLRA case] unless it is clear on de novo review that the complaint could not be saved by amendment.").

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
                                                                          CASE NO. 3:23-CV-03431-RFL

DATED:  December 4, 2023

Respectfully submitted,

**MOTLEY RICE LLC**

*/s/ Christopher F. Moriarty*
Gregg S. Levin (admitted *pro hac vice*)
Lance V. Oliver (admitted *pro hac vice*)
William S. Norton (admitted *pro hac vice*)
Joshua C. Littlejohn (admitted *pro hac vice*)
Christopher F. Moriarty (admitted *pro hac vice*)
Andrew P. Arnold (admitted *pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
glevin@motleyrice.com
loliver@motleyrice.com
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com
aarnold@motleyrice.com

*Co-Lead Counsel for Co-Lead Plaintiffs Universal-Investment-Gesellschaft mbH, Universal-Investment-Luxembourg S.A., and UI BVK Kapitalverwaltungsgesellschaft mbH, and the Class*

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Salvatore J. Graziano (admitted pro hac vice)
Hannah Ross (admitted pro hac vice)
Abe Alexander (admitted pro hac vice)
Aasiya Farah Mirza Glover (admitted pro hac vice)
Sarah Schmidt (admitted pro hac vice)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
hannah@blbglaw.com
aasiya.glover@blbglaw.com
sarah.schmidt@blbglaw.com

-and-

Jonathan D. Uslaner (Bar No. 256898)
Caitlin Bozman (Bar No. 343721)
2121 Avenue of the Stars, Suite 2575

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

Los Angeles, California 90067
Telephone: (310) 819-3470
jonathanu@blbglaw.com
caitlin.bozman@blbglaw.com

*Co-Lead Counsel for Co-Lead Plaintiffs Public Employees' Retirement System of Mississippi and Arkansas Public Employees' Retirement System, and the Class*

**BLEICHMAR FONTI & AULD LLP**
Lesley E. Weaver (SBN 191305)
1330 Broadway, Suite 630
Oakland, California 94612
Telephone: (415) 445-4003
Facsimile: (415) 445-4020
lweaver@bfalaw.com

*Local Counsel for Co-Lead Plaintiff Universal-Investment-Gesellschaft mbH, Universal-Investment-Luxembourg S.A., and UI BVK Kapitalverwaltungsgesellschaft mbH*

**DAVIDSON BOWIE, PLLC**
John L. Davidson (*pro hac vice*)
1062 Highland Colony Parkway 200 Concourse, Suite 275 Ridgeland, MS 39157
Telephone: (601) 932-0028
jdavidson@dbslawfirm.net

*Additional Counsel for Co-Lead Plaintiffs Public Employees' Retirement System of Mississippi*

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on December 4, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel or parties of record.

Dated: December 4, 2023                    **MOTLEY RICE LLC**

*/s/ Christopher F. Moriarty*
Christopher F. Moriarty (admitted *pro hac vice*)

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL