*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

| No. | The Speaker(s), Date(s), and Medium | False and Misleading Statements | Reasons Statements Were False, Misleading, or Deceptive When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | **Defendants' Materially False and Misleading Statements Concerning Seagate's Compliance with the FDPR** | | |
| 1. | **When:** September 14, 2020<br><br>**Where:** Deutsche Bank Technology Conference<br><br>**Speaker(s):** Defendants Seagate and Romano<br><br>**Compl. ¶¶ 135-36.** | An analyst asked Defendant Romano "Starting off with Huawei, clearly, getting a lot of headlines lately especially given the new restrictions that were announced last month . . . can you give us an update of how you think those restrictions will impact Seagate in the short term; when I think short term, it's like calendar Q3, Q4? And maybe in the longer term, how does that work out? And if you want to continue to sell to Huawei, would you be required to get a license approved by the Department of Commerce?"<br><br>Defendant Romano answered: "Yeah. So, of course, we are still going through the final assessment, but from what I have seen until now, I don't see any particular restriction for us in term [sic] of being able to continue to ship to Huawei or any other customers in China. So, we don't think we need to have a specific license." | It was misleading for Defendants to state that Seagate did not "see any particular restriction for us in term of being able to continue to ship to Huawei" and that "we don't think we need to have a specific license," when, in truth: (i) as Seagate has admitted, the Company's HDD sales to Huawei *did* violate the FDPR because the Company's HDD production processes *did* implicate these export restrictions; (ii) the Company received numerous warnings, including from its competitors and its lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – *did* trigger FDPR export restrictions; and (iii) in instructions to its customers, Seagate had previously taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list. ¶ 138. | 1. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; (ii) pre-Class Period guidance from Seagate's lawyers who issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; and (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage." ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>2. That Defendants, alone among Seagate's competitors, subsequently stonewalled Congress's investigation beginning in May 2021, refusing to provide the Senate Commerce Committee information concerning its relationship with Huawei or even their interpretation of the FDPR, gives rise to an inference that they knew, or recklessly disregarded, the illegal character of those sales. ¶¶ 81-84, 113, 119.<br><br>3. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the |

|  |  |  |  | Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 121-26.

4. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely reckless. ¶¶ 21-26.

5. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying |

| | | | the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier.  ¶¶ 128-30.

6. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.

7. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132. |
|---|---|---|---|

| 2. | **When:** September 14, 2020<br><br>**Where:** Deutsche Bank Technology Conference<br><br>**Speaker(s):** Defendants Seagate and Romano<br><br>**Compl.** ¶ 137 | An analyst asked whether Seagate was "impacted by several Chinese companies being put on the Entity List."<br><br>Defendant Romano responded, "I would say the majority of our customers are in China. We have a very high market share in China in general . . . . We don't have any limitation right now in term [sic] of what we can ship to those customers." | It was misleading for Defendants to state that Seagate did not "have any limitation right now" in terms of shipping to companies on the BIS Entity List when, in truth: (i) as Seagate has admitted, the Company's HDD sales to Huawei *did* violate the FDPR because the Company's HDD production processes *did* implicate these export restrictions; (ii) the Company received numerous warnings, including from its competitors and its lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – *did* trigger FDPR export restrictions; and (iii) in instructions to its customers, Seagate had previously taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list. ¶ 138. | 1. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; (ii) pre-Class Period guidance from Seagate's lawyers who issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; and (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage." ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>2. That Defendants, alone among Seagate's competitors, subsequently stonewalled Congress's investigation beginning in May 2021, refusing to provide the Senate Commerce Committee information concerning its relationship with Huawei or even their interpretation of the FDPR, gives rise to an inference that they knew, or recklessly disregarded, the illegal character of those sales. ¶¶ 81-84, 113, 119.<br><br>3. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

| | | | | analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 121-26.<br><br>4. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely reckless. ¶¶ 21-26.<br><br>5. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. ¶¶ 128-30. |
| --- | --- | --- | --- | --- |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

| | | | | |
|---|---|---|---|---|
| | | | | 6. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.<br><br>7. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132. |
| 3. | **When:** October 22, 2020 | When an analyst asked: "First question is related to Huawei. Just want to confirm that can you | Defendants statement was materially false and misleading because (i) as Seagate has admitted, the Company ***did not*** "remain in compliance" with export rules and regulations, the Company's | 1. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

| | | | |
|---|---|---|---|
| **Where:** Earnings Call<br><br>**Speaker(s):**<br>Defendants Seagate and Mosley<br><br>**Compl.** ¶ 139 | talk about whether you are continuing to ship to Huawei and what is included in your December quarter guidance. It looks like your competitor may have stopped shipping maybe back in the middle of September. And do you think you're seeing some benefits of that in your December quarter?"<br><br>Defendant Mosley responded, ***"We continually monitor and remain in compliance with all the rules and regulations around."*** | HDD sales to Huawei ***did*** violate the FDPR, and the Company's HDD production processes did implicate the Rule's export restrictions; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its competitors and its lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – ***did*** trigger FDPR export restrictions; (iv) in instructions to its customers, Seagate had previously taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list; and (v) Seagate had dramatically expanded the Company's exposure to Huawei sales, and, as Seagate has admitted, had already positioned itself as Huawei's sole HDD supplier. ¶ 143 | Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list; (ii) pre-Class Period guidance from Seagate's lawyers who issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; and (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage." ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>2. That Defendants, alone among Seagate's competitors, subsequently stonewalled Congress's investigation beginning in May 2021, refusing to provide the Senate Commerce Committee information concerning its relationship with Huawei or even their interpretation of the FDPR, gives rise to an inference that they knew, or recklessly disregarded, the illegal character of those sales. ¶¶ 81-84, 113, 119.<br><br>3. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more |

favorable terms, supports an inference that Defendants were aware of, or recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 121-26.

4. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely reckless. ¶¶ 21-26.

5. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. ¶¶ 128-30.

6. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference

| | | | | |
|---|---|---|---|---|
| | | | | of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.<br><br>7. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132. |
| 4. | **When:**<br>1. October 29, 2020<br>2. January 28, 2021<br>3. April 29, 2021<br>4. October 28, 2021<br>5. January 27, 2022<br>6. April 28, 2022 | In the SEC-mandated disclosure of risk factors, Defendants stated, "There have been *no material changes* to the description of the risk factors associated with our business previously disclosed in 'Risk Factors' in Part I, Item 1A. in our Annual Report on Form | It was misleading for Defendants to state that there were "no material changes to the description of [Seagate's] business," that laws and regulations could be changed "in ways that will require us to modify our business," and to tout the Company's "policies and procedures designed to ensure compliance" when, in truth: (i) as Seagate has admitted, the Company *did not* "remain in compliance" with export rules and regulations, the Company's HDD sales to Huawei *did* violate the FDPR, and the Company's | 1. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; (ii) pre-Class Period guidance from Seagate's lawyers who issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to |

| | | | |
|---|---|---|---|
| **Where:** SEC Form 10-Q filings<br><br>**Speaker(s):**<br>Defendants Seagate, Mosley, and Romano<br><br>**Compl.** ¶¶ 140-41, 145-46, 149-50, 158-59, 162-63, 166-67 | 10-K for the fiscal year ended July 3, 2020."<br><br>Defendants further stated, "Our business is subject to regulation under a wide variety of U.S. federal and state and non-U.S. laws, regulations and policies. There can be no assurance that laws, regulations and policies will not be changed in ways that will require us to modify our business model and objectives or affect our returns on investments by restricting existing activities and products, subjecting them to escalating costs or prohibiting them outright . . . . Although we have implemented policies and procedures designed to ensure compliance, there can be no assurance that our employees, contractors or agents will not violate these or other applicable laws, rules and regulations to which we are and may be subject." | HDD production processes did implicate the Rule's export restrictions; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its competitors and its lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – *did* trigger FDPR export restrictions; (iv) in instructions to its customers, Seagate had previously taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; and (v) Seagate had dramatically expanded the Company's exposure to Huawei sales, and, as Seagate has admitted, had already positioned itself as Huawei's sole HDD supplier. ¶¶ 143, 148, 153, 156, 161, 165, 169. | the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier directly warning that any item manufactured with the supplier's equipment, which included multiple core components of Seagate's HDDs, was subject to the FDPR's export ban.  ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>2. Seagate, alone amongst its competitors, attempted to evade and stonewall the congressional investigation that began no later than May 2021 into its HDD sales to Huawei. Seagate not only refused to provide the Senate Commerce Committee information concerning its relationship with Huawei, but even declined to show its interpretation of the FDPR with the Committee. In September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit. Seagate's total refusal to cooperate with Congress and its sudden decision to stop shipping to Huawei as Congress began to closely scrutinize its relationship with Huawei,  give rise to an inference that, both before and after the investigation began, Defendants knew, or recklessly disregarded, the illegal character of those sales.  ¶¶ 81-84, 113, 119.<br><br>3. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the |

| | | | | illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶¶ 81-84, 113. |
| --- | --- | --- | --- | --- |
| | | | | 4. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 121-26. |
| | | | | 5. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they |

performed, in which case their statements on the subject were, at a minimum, severely reckless. ¶¶ 21-26.

6. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 128-30.

7. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial

| | | | | |
|---|---|---|---|---|
| | | | | measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used **multiple** advanced U.S.-origin technologies specified in the FDPR at **multiple** critical stages of the manufacturing process, to produce **multiple** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.<br><br>8. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132. |
| 5. | **When:**<br>1. October 29, 2020<br>2. January 28, 2021<br>3. April 29, 2021<br>4. August 6, 2021<br>5. October 28, 2021<br>7. January 27, 2022 | In their SEC-mandated SOX Certifications, Defendants Mosley and Romano stated, "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact | It was misleading for Defendants to state that they "ha[d] disclosed" "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," while failing to disclose that, in truth: (i) as Seagate has admitted, the Company *did not* "compl[y] with all applicable regulations and orders" with regard to the export of its products to Huawei, specifically the FDPR; (ii) as BIS found, Seagate's controls over | 1. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs **could not** be transferred to any entity on the Restricted Entity list; (ii) pre-Class Period guidance from Seagate's lawyers who issued client notifications that the FDPR proscribed |

| | | | |
|---|---|---|---|
| 8. April 28, 2022<br>9. August 5, 2022<br>10. October 27, 2022<br>11. January 25, 2023<br><br>**Where:** SEC Form 10-Q and Form 10-K Certifications pursuant to the Sarbanes-Oxley Act of 2002<br><br>**Speaker(s):**<br>Defendants Seagate, Mosley, and Romano<br><br>**Compl. ¶¶** 142, 147, 151, 155, 160, 164, 168, 171, 176, 179 | necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."<br><br>Defendants Romano and Mosley further stated in those certifications that they "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."<br><br>Further, Defendants Mosley and Romano certified that the Company's SEC filing disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information." | its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – *did* trigger FDPR export restrictions; (iv) in January 2021, a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate had refused to cooperate with a Congressional inquiry into its HDD sales to Huawei, which began in May 2021; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; (vii) beginning in December 2020, Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier; and (viii) Seagate had lost a "key customer" because it had stopped shipping HDDs to Huawei on or about September 29, 2021. ¶¶ 143, 148, 152, 156, 161, 165, 169, 172, 177, 180. | unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier directly warning that any item manufactured with the supplier's equipment, which included multiple core components of Seagate's HDDs, was subject to the FDPR's export ban.  ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>2. Seagate, alone amongst its competitors, attempted to evade and stonewall the congressional investigation that began no later than May 2021 into its HDD sales to Huawei. Seagate not only refused to provide the Senate Commerce Committee information concerning its relationship with Huawei, but even declined to show its interpretation of the FDPR with the Committee. In September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit. Seagate's total refusal to cooperate with Congress and its sudden decision to stop shipping to Huawei as Congress began to closely scrutinize its relationship with Huawei,  give rise to an inference that, both before and after the investigation began, Defendants knew, or recklessly disregarded, the illegal character of those sales.  ¶¶ 81-84, 113, 119. |

| | | | | 3. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶¶ 81-84, 113, 119.<br><br>4. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 121-26.<br><br>5. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period.  In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance.  Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants |

| | | | failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely reckless. ¶¶ 21-26. |
|---|---|---|---|
| | | | 6. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier.  Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management  agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei.  Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 128-30. |
| | | | 7. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the |

| | | | | enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131. |
| | | | | 8. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132. |
| 6. | **When:** January 21, 2021<br><br>**Where:** Q2 Earnings Call | An analyst asked Defendants, "I know asked this question last quarter on Huawei, but given the current restrictions on the shipment to Huawei, does that change the way you think about | It was misleading for Defendants to state that Seagate's market demand for HDD sales "will not change" as a result of the FDPR, while failing to disclose that, in truth: (i) as Seagate has admitted, the Company's HDD sales to Huawei *did* violate the FDPR because the Company's HDD production processes *did* implicate these export restrictions; (ii) as BIS found, Seagate's controls over | 1. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; (ii) pre-Class Period guidance from Seagate's lawyers |

17

| | | | |
|---|---|---|---|
| **Speaker(s):** Defendants Seagate and Romano<br><br>**Compl. ¶ 144** | the total addressable market for this calendar year for nearline drives [a core segment of Seagate's HDD business]?"<br><br>Defendant Romano stated that the FDPR had no impact on the Company's HDD sales: "So, like I said last time, we don't comment on any specific customers. I think that the market demand globally will not change on how it's ultimately serviced, so if that answers your question." | its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – ***did*** trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) in instructions to its customers, Seagate had previously taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list; and (vi) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier. ¶ 148. | who issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; and (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage." ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>2. That Defendants, alone among Seagate's competitors, subsequently stonewalled Congress's investigation beginning in May 2021, refusing to provide the Senate Commerce Committee information concerning its relationship with Huawei or even their interpretation of the FDPR, gives rise to an inference that they knew, or recklessly disregarded, the illegal character of those sales. ¶¶ 81-84, 113, 119.<br><br>3. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants |

|  |  |  | were aware of, or recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 121-26.

4. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely reckless. ¶¶ 21-26.

5. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management  agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs |

| | | | | to Huawei. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 128-30. |
| | | | | 6. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131. |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

| | | | | |
|---|---|---|---|---|
| | | | | 7. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132. |
| 7. | **When:** June 8, 2021<br><br>**Where:** Bank of America Global Technology Conference<br><br>**Speaker(s):** Defendants Seagate and Romano<br><br>**Compl.** ¶ 152 | An analyst asked Defendant Romano, "we've been receiving a lot of questions around a particular customer of yours where there are some restrictions in place for shipments and I was wondering if you could comment at all on that."<br><br>After the analyst clarified that Huawei that was the subject of the many investor questions they had received, Defendant Romano responded, "we always answer to this specific question the same way because that is ***the truth is we comply with all the rules and regulations.*** And based on that, ***we ship for all our customers following those rules and regulations.*** . . . We don't comment on specific customers as we don't comment on specific suppliers or investors. But ***in general, it's part of our job to ensure that we understand and*** | It was misleading for Defendants to state that, with regard to Seagate's Huawei sales, "the truth is we comply with all the rules and regulations," that "we ship for all our customers following those rules and regulations," and that the Company was doing its "job to ensure that we understand and then we follow all the rules and regulations of trade," while failing to disclose that, in truth: (i) as Seagate has admitted, the Company ***did not*** "comply with all the rules and regulations" concerning the export of its products to Huawei (including the FDPR, which was the subject of the analyst's question), Seagate ***did not*** "ship for all our customers following those rules and regulations," and ***did not*** "follow all the rules and regulations of trade" because the Company's HDD sales to Huawei violated the FDPR; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – ***did*** trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate was refusing to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs ***could not*** | 1. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list; (ii) pre-Class Period guidance from Seagate's lawyers who issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) an FDP "rule notification" letter from a supplier directly warning that any item manufactured with the supplier's equipment, which included multiple core components of Seagate's HDDs, was subject to the FDPR's export ban. ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>2. That Defendants, alone among Seagate's competitors, stonewalled Congress's investigation beginning in May 2021, refusing to provide the Senate Commerce Committee information concerning its relationship with Huawei or even their interpretation of the FDPR, gives rise to an inference that they knew, or |

| | | *then we follow all the rules and regulations of trade."* | be transferred to any entity on the Restricted Entity list; and (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier. ¶ 153. | recklessly disregarded, the illegal character of those sales. ¶¶ 81-84, 113, 119.<br><br>3. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶¶ 81-84, 113, 119.<br><br>4. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 121-26.<br><br>5. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the |

| | | | |
|---|---|---|---|
| | | | monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely reckless. ¶¶ 21-26.<br><br>6. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier.  Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management  agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei.  Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and |

| | | | congressional investigation—that the FDPR proscribed them. ¶¶ 128-30.<br><br>7. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.<br><br>8. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132. |
|---|---|---|---|

| 8. | **When:** 1. August 6, 2021 2. August 5, 2022 **Where:** SEC Form 10-K filings **Speaker(s):** Defendants Seagate, Mosley, and Romano **Compl. ¶¶ 154, 170,** | In the SEC-mandated disclosure of risk factors, Defendants stated, "Some of our products and services are subject to export control laws and other laws affecting the countries in which our products and services may be sold, distributed, or delivered, and any changes to or violation of these laws could have a material adverse effect on our business, results of operations, financial condition and cash flows . . . . Although we have controls and procedures to ensure compliance with all applicable regulations and orders, we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers. Additionally, we cannot ensure that our interpretation of relevant restrictions and regulations will be accepted in all cases by relevant regulatory and enforcement authorities." | It was misleading for Defendants to state that export control "laws could have a material adverse effect on our business," to tout the Company's "controls and procedures to ensure compliance with all applicable regulations and orders," and to state that "we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers," while omitting that: (i) Seagate's sales of HDDs to Huawei ***had already violated*** "export control laws and other laws"; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – ***did*** trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate was refusing to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list; and (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier. ¶¶ 156, 172. | 1. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list; (ii) pre-Class Period guidance from Seagate's lawyers who issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier directly warning that any item manufactured with the supplier's equipment, which included multiple core components of Seagate's HDDs, was subject to the FDPR's export ban. ¶¶ 66, 69, 77, 81-86, 115-118. 2. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. Seagate not only refused to provide the Senate Commerce Committee information concerning its relationship with Huawei, but even declined to show its interpretation of the FDPR with the Committee. That, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong |

| | | | inference that Defendants knew those sales contravened the FDPR. ¶¶ 81-84, 113, 119. |
|---|---|---|---|
| | | | 3. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶¶ 81-84, 113, 119. |
| | | | 4. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 121-26. |
| | | | 5. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the |

monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely reckless. ¶¶ 21-26.

6. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier.  Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management  agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei.  Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and

| | | | | |
|---|---|---|---|---|
| | | | | congressional investigation—that the FDPR proscribed them. ¶¶ 128-30. |

congressional investigation—that the FDPR proscribed them. ¶¶ 128-30.

7. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.

8. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.

| 9. | **When:** October 26, 2021<br><br>**Where:** *Wall Street Journal*<br><br>**Speaker(s):** Defendant Seagate<br><br>**Compl. ¶ 157** | A Seagate spokesman told the *Wall Street Journal* that Seagate ***"complies with all laws applicable to its business and operations, including export control regulations."*** | It was misleading for Defendants to state that, with regard to Seagate's Huawei sales, Seagate "complies with all laws applicable to its business and operations, including export control regulations," while failing to disclose that, in truth: (i) as Seagate has admitted, the Company ***did not*** "compl[y] with all laws applicable to its business and operations, including export control regulations" with regard to the export of its products to Huawei, specifically the FDPR; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – ***did*** trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate had refused to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list; (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier; and (viii) Seagate had lost a "key customer" because it had stopped shipping HDDs to Huawei on or about September 29, 2021. ¶ 161. | 1. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list; (ii) pre-Class Period guidance from Seagate's lawyers who issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) an FDP "rule notification" letter from a supplier directly warning that any item manufactured with the supplier's equipment, which included multiple core components of Seagate's HDDs, was subject to the FDPR's export ban.  ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>2. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. Seagate not only refused to provide the Senate Commerce Committee information concerning its relationship with Huawei, but even declined to show its interpretation of the FDPR with the Committee. That Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that |

Defendants knew those sales contravened the FDPR. ¶¶ 81-84, 113, 119.

3. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶¶ 81-84, 113, 119.

4. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 121-26.

5. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the

| | | | monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely reckless. ¶¶ 21-26. |
|---|---|---|---|
| | | | 6. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and |

| | | | | congressional investigation—that the FDPR proscribed them. ¶¶ 128-30.

7. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.

8. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132. |

| 10. | **When:** October 26, 2022<br><br>**Where:** Press Release/8-K<br><br>**Speaker(s):** Defendant Seagate<br><br>**Compl.** ¶ 173 | Defendants stated that Seagate ***"did not engage in prohibited conduct," "complied with all relevant export control laws and regulations,"*** and that ***"Seagate has committed to compliance through its global team of international trade compliance and legal professionals and by maintaining robust trade controls compliance policies and procedures."*** | It was misleading for Seagate to state that, with regard to Seagate's Huawei sales, Seagate "did not engage in prohibited conduct," "complied with all relevant export control laws and regulations," and that "Seagate has committed to compliance through its global team of international trade compliance and legal professionals and by maintaining robust trade controls compliance policies and procedures," while failing to disclose that, in truth: (i) as Seagate has admitted, the Company ***did not*** "with all laws applicable to its business and operations, including export control regulations" with regard to the export of its products to Huawei, specifically the FDPR; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – ***did*** trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate had refused to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list; (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier; and (viii) Seagate had lost a "key customer" because it had stopped shipping HDDs to Huawei on or about September 29, 2021. ¶ 177 | 1. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list; (ii) pre-Class Period guidance from Seagate's lawyers who issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier directly warning that any item manufactured with the supplier's equipment, which included multiple core components of Seagate's HDDs, was subject to the FDPR's export ban.   ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>2. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. Seagate not only refused to provide the Senate Commerce Committee information concerning its relationship with Huawei, but even declined to show its interpretation of the FDPR with the Committee. That Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that |

Defendants knew those sales contravened the FDPR. ¶¶ 81-84, 113, 119.

3. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶¶ 81-84, 113, 119.

4. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 121-26.

5. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the

monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely reckless. ¶¶ 21-26.

6. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and

| | | | | congressional investigation—that the FDPR proscribed them. ¶¶ 128-30. |
|---|---|---|---|---|
| | | | | 7. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131. |
| | | | | 8. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132. |

| | | | | |
|---|---|---|---|---|
| 11. | **When:** October 26, 2022<br><br>**Where:** Q1 Earnings Call<br><br>**Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl. ¶ 174** | Defendant Mosley stated "[w]e have responded to the letter and ***believe that we've complied with all relevant export control laws and regulations.*"** | It was misleading for Defendants to state that, with regard to Seagate's Huawei sales, Seagate "complied with all laws applicable to its business and operations, including export control regulations," while failing to disclose that, in truth: (i) as Seagate has admitted, the Company ***did not*** "with all laws applicable to its business and operations, including export control regulations" with regard to the export of its products to Huawei, specifically the FDPR; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – ***did*** trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate had refused to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list; (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier; and (viii) Seagate had lost a "key customer" because it had stopped shipping HDDs to Huawei on or about September 29, 2021. ¶ 177. | 1. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list; (ii) pre-Class Period guidance from Seagate's lawyers who issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier directly warning that any item manufactured with the supplier's equipment, which included multiple core components of Seagate's HDDs, was subject to the FDPR's export ban.  ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>2. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. Seagate not only refused to provide the Senate Commerce Committee information concerning its relationship with Huawei, but even declined to show its interpretation of the FDPR with the Committee. That Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that |

|  |  |  |  | Defendants knew those sales contravened the FDPR. ¶¶ 81-84, 113, 119.<br><br>3. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶¶ 81-84, 113, 119.<br><br>4. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 121-26.<br><br>5. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the |

| | | | |
|---|---|---|---|
| | | | monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely reckless. ¶¶ 21-26.<br><br>6. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier.  Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management  agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei.  Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and |

| | | | | congressional investigation—that the FDPR proscribed them. ¶¶ 128-30.<br><br>7. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.<br><br>8. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132. |
|---|---|---|---|---|

| 12. | **When:**<br>1. October 27, 2022<br>2. January 25, 2023<br><br>**Where:**<br>SEC Form 10-Q filings<br><br>**Speaker(s):**<br>Defendants Seagate,<br>Mosley, and Romano<br><br>**Compl. ¶¶ 175, 178** | In the SEC-mandated disclosure of risk factors, Defendants stated, "Some of our products and services are subject to export control laws and other laws affecting the countries in which our products and services may be sold, distributed, or delivered, and any changes to or violation of these laws could have a material adverse effect on our business, results of operations, financial condition and cash flows . . . . Although we have controls and procedures to ensure compliance with all applicable regulations and orders, we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers. Additionally, we cannot ensure that our interpretation of relevant restrictions and regulations will be accepted in all cases by relevant regulatory and enforcement authorities." | It was misleading for Defendants to state that they "cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products," and "have controls and procedures to ensure compliance with all applicable regulations and orders," while failing to disclose that, in truth: (i) as Seagate has admitted, the Company *did not* "compl[y] with all applicable regulations and orders" with regard to the export of its products to Huawei, specifically the FDPR; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – *did* trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate had refused to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier; and (viii) Seagate had lost a "key customer" because it had stopped shipping HDDs to Huawei on or about September 29, 2021. ¶¶ 177, 180. | 1. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; (ii) pre-Class Period guidance from Seagate's lawyers who issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier directly warning that any item manufactured with the supplier's equipment, which included multiple core components of Seagate's HDDs, was subject to the FDPR's export ban. ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>2. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. Seagate not only refused to provide the Senate Commerce Committee information concerning its relationship with Huawei, but even declined to show its interpretation of the FDPR with the Committee. That Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

| | | ¶¶ | | Defendants knew those sales contravened the FDPR. ¶¶ 81-84, 113, 119. |
| --- | --- | --- | --- | --- |
| | | | | 3. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶¶ 81-84, 113, 119. |
| | | ¶¶ | | 4. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 121-26. |
| | | | | 5. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period.  In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance.  Either Defendants performed the |

| | | | monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely reckless. ¶¶ 21-26.<br><br>6. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and |

| | | | | congressional investigation—that the FDPR proscribed them. ¶¶ 128-30.<br><br>7. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.<br><br>8. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132. |
|---|---|---|---|---|

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

| | | | | |
|---|---|---|---|---|
| **Statements Concerning Seagate's Reliance on HDD Sales to Huawei** | | | | |
| 13. | **When:** September 14, 2020<br><br>**Where:** Deutsche Bank Technology Conference<br><br>**Speaker(s):** Defendants Seagate and Romano<br><br>**Compl. ¶¶ 181-182** | When a Deutsche Bank analyst asked Defendant Romano "what the revenue contribution of Huawei to Seagate is" and how Defendant Romano thought the FDPR would "impact Seagate," Defendant Romano answered, "we don't disclose the level of revenue of specific customers. But as you know, we should report if the customer is above 10%. So, you can assume that is not a bad level."[1]<br><br>¶¶ | It was misleading for Defendants to downplay the importance to Seagate of its HDD sales to Huawei and to state that Huawei's revenue contribution "is not a bad level," while failing to disclose that Seagate had already positioned itself as Huawei's sole HDD supplier, that sales to Huawei exceeded 3% of HDD revenue and was rapidly climbing, and that Huawei's revenue contribution was allowing the Company to meet its revenue guidance. ¶ 183. | 1. Defendants knew, or recklessly disregarded, the truth concerning Seagate's reliance on HDD sales to Huawei because those sales (i) concerned Seagate's most important product, which comprised over 92% of its revenue (ii) concerned Huawei, one of Seagate's most significant customers; (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>2. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the Company's reliance on HDD sales to Huawei. ¶¶ 21-26. |

---

[1] The transcript attached as Exhibit A provides that Romano made the statement described above. Defendants contend that this transcript is incorrect and that Romano instead stated, "we don't disclose the level of revenue of specific customers. But as you know, we should report if the customer is above 10%. So, you can assume that is not [at that level]." While this factual dispute is inappropriate for resolution at this stage, even if Defendants are correct, Romano's statement is misleading for the same reasons. Indeed, as Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company was working to greatly expand its relationship with Huawei had positioned itself as Huawei's sole HDD supplier. In fact, on a prorated basis, Seagate's illegal HDD sales to Huawei contributed close to 20% of the Company's first quarter 2021 (ended October 2020) HDD revenue.

| | | | | 3. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. Both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. Defendants not only failed to make the required disclosures, they also issued affirmative misstatements concealing Seagate's reliance on HDD sales to Huawei. That Defendants violated the GAAP rules with which they specifically claimed to be compliant further supports an inference that Defendants' misstatements were designed to conceal the scope of the Company's commercial relationship with Huawei. ¶ 127. |
| | | | | 4. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning Seagate's expanded commercial relationship with Huawei. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. ¶¶ 128-30. |

| | | | |
|---|---|---|---|
| | | | 5. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.<br><br>6. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.<br><br>7. That Defendants received clear warnings that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly |

| | | | | |
|---|---|---|---|---|
| | | | | disregarded, the volume and value of Seagate's HDD sales to Huawei. ¶¶ 66, 69, 77, 81-86, 115-118. |
| 14. | **When:** October 22, 2020<br><br>**Where:** Q1 Earnings Call<br><br>**Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl.** ¶¶ 184-85. | An analyst asked, "First question is related to Huawei. Just want to confirm that can you talk about whether you are continuing to ship to Huawei and what is included in your December quarter guidance. It looks like your competitor may have stopped shipping maybe back in the middle of September. And do you think you're seeing some benefits of that in your December quarter?"<br><br>In response, Defendant Mosley told investors that Huawei's revenue contribution to Seagate was not "material," stating "We continually monitor and remain in compliance with all the rules and regulations around. I think relative to some of the legacy markets, I think we're just watching too much inventory out there. So I don't think it's material [i.e., Huawei's revenue contribution], but it's all factored into our guide about what's going on in the end markets." | It was misleading for Defendants to state that Huawei's revenue was "not material" and that increased demand in certain markets was "just" a function of "too much inventory" in others, while failing to disclose that Seagate had already positioned itself as Huawei's sole HDD supplier, that sales to Huawei exceeded 3% of HDD revenue for the quarter and was rapidly doubling at the time of Defendants' statements, and that Huawei's revenue contribution was allowing the Company to meet the mid-point of its revenue guidance. The FDPR had become effective just two weeks prior to the end of the first quarter; during those two weeks Seagate generated more than $70 million from illegal HDD sales to Huawei, which comprised closer to 20% of the Company's prorated revenue over that period. ¶ 186. | 1. Defendants knew, or recklessly disregarded, the truth concerning Seagate's reliance on HDD sales to Huawei because those sales (i) concerned Seagate's most important product, which comprised over 92% of its revenue (ii) concerned Huawei, one of Seagate's most significant customers; (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>2. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the Company's reliance on HDD sales to Huawei. ¶¶ 21-26.<br><br>3. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. Both ASC |

| | | | | |
|---|---|---|---|---|
| | | | | 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. Defendants not only failed to make the required disclosures, they also issued affirmative misstatements concealing Seagate's reliance on HDD sales to Huawei. That Defendants violated the GAAP rules with which they specifically claimed to be compliant further supports an inference that Defendants' misstatements were designed to conceal the scope of the Company's commercial relationship with Huawei. ¶ 127. |
| | | | | 4. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were indicates that that they were, at a minimum, aware of basic facts concerning Seagate's expanded commercial relationship with Huawei. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. ¶¶ 128-30. |
| | | | | 5. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the |

|  |  |  |  | enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131. |
|  |  |  |  | 6. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132. |
|  |  |  |  | 7. That Defendants received clear warnings that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, the volume and value of Seagate's HDD sales to Huawei. ¶¶ 66, 69, 77, 81-86, 115-118. |

| 15. | **When**: April 29, 2021<br><br>**Where:** Form 10-Q<br><br>**Speaker(s):**<br>Defendants Seagate, Mosley, and Romano<br><br>**Compl. ¶¶ 187-88** | Defendants stated that the Form 10-Q was "prepared in accordance with U.S. generally accepted accounting principles." | GAAP (including both ASC 280-10-50-42 and ASC 275-10-50-18) require disclosures where transaction with a single customer "amount to *10 percent* or more of a public entity's revenues." For the third quarter of 2021, Seagate's sales to *Huawei accounted for 13.42% of the Company's consolidated revenues* (and 15% of its critical HDD revenues), but Seagate's Form 10-Q failed to make any of the required disclosures. Defendants' statement was materially false and misleading and concealed from investors Seagate's reliance on HDD sales to Huawei. Absent those sales, Seagate would have missed its revenue guidance range for the third quarter entirely. ¶¶ 188-89. | 1. Defendants knew, or recklessly disregarded, the truth concerning Seagate's reliance on HDD sales to Huawei because those sales (i) concerned Seagate's most important product, which comprised over 92% of its revenue (ii) concerned Huawei, one of Seagate's most significant customers; (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>2. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the Company's reliance on HDD sales to Huawei. ¶¶ 21-26.<br><br>3. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. Both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's |

revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. Defendants not only failed to make the required disclosures, they also issued affirmative misstatements concealing Seagate's reliance on HDD sales to Huawei. That Defendants violated the GAAP rules with which they specifically claimed to be compliant further supports an inference that Defendants' misstatements were designed to conceal the scope of the Company's commercial relationship with Huawei. ¶ 127.

4. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning Seagate's expanded commercial relationship with Huawei. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Further, during the Class Period, Seagate extended over $1 billion in credit to Huawei to facilitate

the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval. ¶¶ 128-30.

5. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used **multiple** advanced U.S.-origin technologies specified in the FDPR at **multiple** critical stages of the manufacturing process, to produce **multiple** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.

6. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and

| | | | | |
|---|---|---|---|---|
| | | | | Romano, further support an inference of scienter. ¶¶ 110, 132.<br><br>7. That Defendants received clear warnings—including the January 2021 letter specifically warning that its HDD sales were illegal—that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, the volume and value of Seagate's HDD sales to Huawei. ¶¶ 66, 69, 77, 81-86, 115-118. |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

| | Statements Concerning the Drivers of Seagate's Financial Performance | | | |
|---|---|---|---|---|
| 16. | **When:** October 22, 2020<br><br>**Where:** Q1 Earnings Call<br><br>**Speaker(s):** Defendants Seagate, Mosley, and Romano<br><br>**Compl.** ¶ 190 | Defendant Mosley stated that the Company's revenue results were driven by "solid double-digit revenue growth for our consumer drives, reflecting both the return to seasonal patterns and strength of the Seagate's brand among prosumers and gamers."<br><br>Likewise, Defendant Romano stated that Seagate's revenue "performance reflected strong recovery in the video and image application, or VIA, market." ¶¶ | It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "strong recovery" in the "VIA market" and "the return to seasonal patterns and strength of the Seagate's brand among prosumers and gamers," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue was driven in material part by the Company's HDD sales to Huawei, and Seagate would have missed the midpoint of its revenue guidance absent those sales; and (ii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal. ¶ 192. | 1. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned Seagate's most important product, which comprised over 92% of its revenue, (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>2. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26.<br><br>3. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the |

significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280-10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127.

4. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. ¶¶ 128-30.

5. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate

56

| | | | | |
|---|---|---|---|---|
| | | | | has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.

6. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.

7. That Defendants received clear warnings that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 77, 81-86, 117. |
| 17. | **When:** October 22, 2020 | Seagate attributed the Company's financial performance to "strong recovery in the video and image | It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "strong recovery" in the "VIA market," and "healthy cloud data center demand," while failing to disclose that: (i) Seagate's revenue and critical HDD | 1. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned |

| | | | |
|---|---|---|---|
| **Where:** Press Release/8-K<br><br>**Speaker(s):**<br>Defendants Seagate and Romano<br><br>**Compl.** ¶ 191 | applications market and healthy cloud data center demand, which drove double digit year-over-year revenue growth for our mass capacity storage solutions." | revenue was driven in material part by the Company's HDD sales to Huawei, and Seagate would have missed the midpoint of its revenue guidance absent those sales; and (ii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal. ¶ 192 | Seagate's most important product, which comprised over 92% of its revenue, (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>2. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period.  Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26.<br><br>3. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer |

| | | | | |
|---|---|---|---|---|
| | | | | "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127.<br><br>4. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. ¶¶ 128-30.<br><br>5. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

| | | | | |
|---|---|---|---|---|
| | | | | specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.<br><br>6. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.<br><br>7. That Defendants received clear warnings that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 69, 77, 81-86, 115-118. |
| 18. | **When:** January 21, 2021<br><br>**Where:** Q2 Earnings Call<br><br>**Speaker(s):** Defendants Seagate, Mosley, and Romano<br><br>**Compl.** ¶¶ 193-94 | Defendants reported 13% growth in Seagate's revenue, beating estimates.<br><br>Defendant Mosley stated that this positive revenue results was driven by: (1) the fact that "***the enterprise markets began to recover for the first time since the onset of the pandemic***," particularly improving demand | It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "stronger-than-expected demand from enterprise and OEM customers," "pent-up demand," and "strong seasonal demand for our desktop PC and consumer drives," while failing to disclose that: (i) far from being driven by "broad-based" growth, Seagate's revenue and critical HDD revenue was driven in material part by illegal sales to a single customer, Huawei, and Seagate would have missed its entire revenue guidance range absent those sales; and (ii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal. ¶ 196. | 1. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned Seagate's most important product, which comprised over 92% of its revenue, (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have |

| | | | | |
|---|---|---|---|---|
| | | "amongst large enterprise OEM customers, which led to strong sequential revenue growth for both nearline and mission critical drives"; (2) "stronger-than-expected growth in video and image applications or VIA markets, due in part to ***pent-up demand***"; and (3) "strong seasonal demand for our desktop PC and consumer drives." ¶193.<br><br>Defendant Romano likewise attributed Seagate's revenue performance to: (1) the fact that "[n]earline revenue increased sequentially, driven by stronger-than-expected demand from enterprise and OEM customers"; (2) that "[i]n the VIA market, revenue was above our expectation for the second consecutive quarter as pent-up demand from the COVID-related pause in the first half of the calendar year led to strong recovery in the September quarter and record revenue in the December quarter"; (3) and "a seasonal uptick for consumer drives and desktop PCs and improving demand for mission-critical drives, consistent with | | otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>2. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26.<br><br>3. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127. |

| | | recovery in the enterprise market." | | 4. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results.  As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management  agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei.  Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the effects on Seagate's revenue performance. ¶¶ 128-30.<br><br>5. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

| | | | | |
|---|---|---|---|---|
| | | | | has admitted that it used **multiple** advanced U.S.-origin technologies specified in the FDPR at **multiple** critical stages of the manufacturing process, to produce **multiple** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.<br><br>6. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.<br><br>7. That Defendants received clear warnings that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 69, 77, 81-86, 115-118. |
| 19. | **When:** January 21, 2021 | Defendant Mosley touted Seagate's "double-digit revenue" growth and attributed it to "broad-based improvement | It was misleading for Defendants to tout Seagate's positive revenue performance and to state that it was driven by "broad-based improvement" in demand, while failing to disclose that: (i) far from being driven by "broad-based" growth, Seagate's revenue and | 1. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned |

| | | | |
|---|---|---|---|
| **Where:** Press Release/8-K<br><br>**Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl.** ¶ 195 | across nearly every served market and geography, and we had solid customer demand for our mass capacity products." | critical HDD revenue was driven in material part by illegal sales to a single customer, Huawei, and Seagate would have missed its entire revenue guidance range absent those sales; and (ii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal. ¶ 196. | Seagate's most important product, which comprised over 92% of its revenue, (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>2. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26.<br><br>3. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer |

| | | | | |
|---|---|---|---|---|
| | ¶ 127. | | | "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met."  For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127. |
| | | | | 4. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management  agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei.  Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the effects on Seagate's revenue performance. ¶¶ 128-30. |

| | | | | |
|---|---|---|---|---|
| | | | | 5. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.<br><br>6. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.<br><br>7. That Defendants received clear warnings that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and |

| | | | | |
|---|---|---|---|---|
| | | | | the extent to which the Company's financial results were driven by them. ¶¶ 66, 69, 77, 81-86, 115-118. |
| 20. | **When:** April 22, 2021<br><br>**Where:** Earnings Call<br><br>**Speaker(s):**<br>Defendants Seagate, Mosley, and Romano<br><br>**Compl. ¶¶ 197-98** | Defendants reported that Seagate "grew revenue quarter-over-quarter and year-over-year," once again beating the Company's revenue guidance. Defendants reported Seagate's "***highest ever*** HDD shipments," including mass capacity HDD sales that beat the prior record by 21%, and resulting in 8% sequential, and 16% year-over-year, revenue growth.<br><br>Defendant Mosley told investors that Seagate's revenue performance was driven by "***Strong cloud data center demand and ongoing recovery in the enterprise markets***," as well as "higher enterprise mission-critical sales and relatively stable desktop PC demand."<br><br>Defendant Romano likewise attributed Seagate's revenue performance to "***strong recovery from enterprise and OEM customers, as well as healthy growth from cloud***"; "[i]mproving demand for mission-critical drives and | Defendants' statements were materially false and misleading when made because it was misleading to attribute Seagate's revenue performance to factors, such as strong cloud data center demand, while failing to disclose that Seagate's critical HDD revenue was driven in material part by the Company's HDD sales to Huawei. In truth, Seagate's Huawei sales were material to the Company's revenue performance and, indeed, without them, the Company would have missed its entire revenue guidance range. ¶ 200. | 1. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned Seagate's most important product, which comprised over 92% of its revenue, (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>2. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26.<br><br>3. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the |

| | | | | |
|---|---|---|---|---|
| | | stronger than anticipated demand for desktop PC"; and "a better align[ment] [in] supply [and] demand" as the pandemic waned. | | significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met."  For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues.  ¶ 127.<br><br>4. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management  agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal |

HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the effects on Seagate's revenue performance. ¶¶ 128-30.

5. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.

6. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and

| | | | | |
|---|---|---|---|---|
| | | | | Romano, further support an inference of scienter. ¶¶ 110, 132.<br><br>7. That Defendants received clear warnings—including the January 2021 letter specifically warning that its HDD sales were illegal—that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 69, 77, 81-86, 115-118. |
| 21. | **When:** April 22, 2021<br><br>**Where:** Earnings Call<br><br>**Speaker(s):** Defendant Mosley<br><br>**Compl.** ¶ 199 | An analyst asked, "What's been the drivers of that change over the course of the last three months or so?"<br><br>Defendant Mosley told investors that improving revenue was being driven by the fact that Seagate's business was insulated to a greater degree from supply chain headwinds, buttressed by the return of pent-up demand in other markets: "I think 2021, there is still some kind of supply concerns that people have about components everywhere. And so, there are people pulling things in. From my perspective, mass capacity is relatively insulated from some of that . . . . . So, we look at this year as not having as profound an impact as we did in 2020, and that's where we get the | It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "the cloud and enterprise on-prem coming back," "VIA markets," and the "strength of mass capacity," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue was driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would have missed its entire revenue guidance range absent those sales; and (ii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal. ¶ 202 | 1. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned Seagate's most important product, which comprised over 92% of its revenue (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>2. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's |

| | | | |
|---|---|---|---|
| | | 10% [revenue growth]. And it's ***largely on the strength of mass capacity. Some of the VIA markets*** and things like that will be contributing as well. ***There's largely the cloud and enterprise on-prem coming back.*** " | FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26.<br><br>3. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127.<br><br>4. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole |

HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management  agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei.  Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the effects on Seagate's revenue performance. ¶¶ 128-30.

5. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent

| | | | | |
|---|---|---|---|---|
| | | | | lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.<br><br>6. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.<br><br>7. That Defendants received clear warnings—including the January 2021 letter specifically warning that its HDD sales were illegal—that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 69, 77, 81-86, 115-118. |
| 22. | **When:** April 22, 2021<br><br>**Where:** Earnings Call<br><br>**Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl.** ¶ 200 | An analyst asked, "what kind of led you to the position where you are right now where you're maintaining this higher percentage of share?"<br><br>Defendant Mosley attributed Seagate's longer-term demand planning with customer, as well as increasing market stability: "Since the lead times on the products are so long, we have good dialogues about not what do | It was misleading for Defendants to tout Seagate's positive revenue performance and to state that it was driven by longer-term demand planning with customer and increasing market stability, while failing to disclose that: (i) Seagate's revenue and critical HDD revenue was driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would have missed its entire revenue guidance range absent those sales; and (ii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal. ¶ 202. | 1. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned Seagate's most important product, which comprised over 92% of its revenue, (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, |

| | | | | |
|---|---|---|---|---|
| | | you need in six weeks, but what do you need in six months. And I think that's working quite well. Our customers appreciate it. We still have flexibility for them. But we're kind of co-planning in that respect. And I think that served us both very well on both ends . . . . [I]n general, it's become a way more stable environment than it used to be." | | and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>2. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26.<br><br>3. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127.<br><br>4. Defendant Seagate senior management's close involvement in dramatically accelerating the |

Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the effects on Seagate's revenue performance. ¶¶ 128-30.

5. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical

| | | | | |
|---|---|---|---|---|
| | | | | stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.<br><br>6. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.<br><br>7. That Defendants received clear warnings—including the January 2021 letter specifically warning that its HDD sales were illegal—that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 69, 77, 81-86, 115-118. |
| 23. | **When:** April 22, 2021<br><br>**Where:** Press Release/8-K | Defendant Mosley attributed the Company's revenue performance to operational sales and record nearline sales: "Seagate | It was misleading for Defendants to tout Seagate's positive revenue performance and to state that it was driven by "ongoing operational execution and record sales of our high capacity nearline drives," while failing to disclose that: (i) Seagate's revenue and critical | 1. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned |

| | | | | |
|---|---|---|---|---|
| | **Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl.** ¶ 201 | delivered another quarter of strong financial performance driven by ongoing operational execution and record sales of our high capacity nearline drives. We grew revenue, expanded profitability and achieved non-GAAP EPS above our guided range. Our March quarter results underscore the strength of our HDD product portfolio and increasing demand for mass capacity storage." | HDD revenue was driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would have missed its entire revenue guidance range absent those sales; and (ii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal. ¶ 202. | Seagate's most important product, which comprised over 92% of its revenue, (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>2. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26.<br><br>3. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer |

| | | | | |
|---|---|---|---|---|
| | ¶ 127. | | | "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met."  For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127.<br><br>4. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier.  Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management  agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei.  Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the effects on Seagate's revenue performance. ¶¶ 128-30. |

| | | | | |
|---|---|---|---|---|
| | | | | 5. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131. |
| | | | | 6. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132. |
| | | | | 7. That Defendants received clear warnings—including the January 2021 letter specifically warning that its HDD sales were illegal—that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

| | | | | |
|---|---|---|---|---|
| | | | | investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 69, 77, 81-86, 115-118. |
| 24. | **When:** July 21, 2021<br><br>**Where:** Q4 Earnings Call<br><br>**Speaker(s):** Defendants Seagate, Mosley, and Romano<br><br>**Compl. ¶¶ 203-04** | Seagate reported $3.01 billion in revenue for the quarter, "up 10% sequentially and 20% year-over-year," "topp[ing] the $3 billion mark for the first time in six years" and beating guidance for both the quarter and the year. Defendant Mosley told investors that Seagate's revenue performance was driven by "***broad-based demand across the mass capacity end markets** and incredible execution by our global team."*<br><br>Likewise, Defendant Romano stated that the Company's revenue performance "was fueled by **accelerating demand in the mass capacity market** and distribution channel," specifically, "demand from storage-centric blockchain that's layered on top of healthy cloud data center demand and [an] improving enterprise OEM customer trend" and "***[s]tronger than expected demand in the VIA market**.*" | Defendants' statements were materially false and misleading when made. It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "***broad-based*** demand across the mass capacity end markets and incredible execution by our global team," "demand in the mass capacity market and distribution channel," "demand from storage-centric blockchain that's layered on top of healthy cloud data center demand and [an] improving enterprise OEM customer trend," and "[s]tronger than expected demand in the VIA market," while failing to disclose that: (i) far from being driven by "broad-based" demand, Seagate's revenue and critical HDD revenue was driven in material part by illegal sales to a single customer, Huawei, and indeed, Seagate would have missed its revenue guidance absent those sales; and (ii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal and, as such, this revenue stream was both subject to, and exposed the Company to, heightened risk. ¶ 205. | 1. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned Seagate's most important product, which comprised over 92% of its revenue, (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>2. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26. |

| | | | | |
|---|---|---|---|---|
| | | | | 3. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127.<br><br>4. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate |

to sell hundreds of millions of dollars' worth of HDDs to Huawei. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the effects on Seagate's revenue performance. ¶¶ 128-30.

5. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s]" of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.

6. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and

| | | | | |
|---|---|---|---|---|
| | | | | Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.<br><br>7. That Defendants received clear warnings—including the January 2021 letter specifically warning that its HDD sales were illegal—that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>8. That Defendants knew Congress was investigating Seagate's HDD sales to Huawei gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 81-86. |
| 25. | **When:** October 22, 2021<br><br>**Where:** Q1 Earnings Call<br><br>**Speaker(s):** Defendants Seagate, Mosley, and Romano<br><br>**Compl.** ¶¶ 206-07 | Defendants reported $3.1 billion in quarterly revenue, representing "robust growth of 35% year-over-year and 3% above a very strong June quarter."<br><br>Defendant Mosley attributed Seagate's revenue performance to "broad-based growth across each of the end markets," with "[t]he cloud [as] the strongest | Defendants' statements were materially false and misleading when made. It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "***broad-based*** growth across each of the end markets" and "improving enterprise spending and healthy growth from cloud data center customers," while failing to disclose that: (i) far from being driven by "broad-based" growth, Seagate's revenue and critical HDD revenue was driven in material part by illegal sales to a single customer, Huawei, and indeed, Seagate would have missed its entire revenue guidance range absent those sales; and (ii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal and, | 1. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned Seagate's most important product, which comprised over 92% of its revenue, (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have |

| | | | |
|---|---|---|---|
| | | contributor to the ***mass capacity markets*** and Seagate's revenue" and "[d]emand for video and image applications increase[ing] significantly," as well. Defendant Mosley stated that the Company's "results reflect record demand for our industry-leading ***mass capacity products*** and solid execution on cost reduction plans and our ongoing focus of balancing supply with demand."<br><br>Defendant Romano likewise told investors that Seagate's revenue "[g]rowth was driven by increasing demands for our mass capacity products . . . supported by growth across each of the underlying end markets," including "improving enterprise spending and healthy growth from cloud data center customers." | as such, this revenue stream was both subject to, and exposed the Company to, heightened risk. ¶ 209. | otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>2. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26.<br><br>3. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280-10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127. |

4. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the effects on Seagate's revenue performance. ¶¶ 128-30.

5. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate

has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.

6. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.

7. That Defendants received clear warnings—including the January 2021 letter specifically warning that its HDD sales were illegal—that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 69, 77, 81-86, 115-118.

8. That Defendants knew Congress was investigating Seagate's HDD sales to Huawei gives rise to an

| | | | | |
|---|---|---|---|---|
| | | | | inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 81-86. |
| 26. | **When:** October 22, 2021<br><br>**Where:** Press Release/8-K<br><br>**Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl.** ¶ 208 | Defendant Mosley touted Seagate's revenue performance and attributed it to several legitimate business factors:<br><br>"Seagate had an exceptional start to the fiscal year with solid revenue growth, significant profit expansion and higher free cash flow generation in the September quarter. Mass capacity revenue topped the $2 billion mark for the first time, led by ongoing demand from cloud data center customers and strength in the video and image applications markets. Our results demonstrate consistent execution, a sustained healthy demand environment and positive structural change in storage industry dynamics." | It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "ongoing demand from cloud data center customers and strength in the video and image applications markets" and "sustained healthy demand environment and positive structural change in storage industry dynamics," while failing to disclose that: (i) far from being driven by "broad-based" growth, Seagate's revenue and critical HDD revenue was driven in material part by illegal sales to a single customer, Huawei, and indeed, Seagate would have missed its entire revenue guidance range absent those sales; and (ii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal and, as such, this revenue stream was both subject to, and exposed the Company to, heightened risk. ¶ 209. | 1. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned Seagate's most important product, which comprised over 92% of its revenue (ii) concerned Huawei, one of Seagate's most significant customers; (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>2. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26. |

| | | | | |
|---|---|---|---|---|
| | | | | 3. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127.<br><br>4. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management  agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate |

|  |  |  |  | to sell hundreds of millions of dollars' worth of HDDs to Huawei. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the effects on Seagate's revenue performance. ¶¶ 128-30.<br><br>5. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.<br><br>6. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and |

89

| | | | | |
|---|---|---|---|---|
| | | | | Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.<br><br>7. That Defendants received clear warnings—including the January 2021 letter specifically warning that its HDD sales were illegal—that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>8. That Defendants knew Congress was investigating Seagate's HDD sales to Huawei gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 81-86. |
| 27. | **When:** January 26, 2022<br><br>**Where:** Q2 Earnings Call<br><br>**Speaker(s):** Defendants Seagate, Mosley, and Romano<br><br>**Compl.** ¶¶ 210-11 | Defendant Mosley stated that the Company's revenue performance was driven by the Company's "capitalizing on the secular tailwinds driving long-term mass capacity storage demand," specifically, "record mass capacity revenue with growth led by demand from cloud customers." | It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "demand from cloud customers," as well as "healthy demand for mid-capacity products from enterprise and OEM customers," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue was driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would have missed its entire revenue guidance range absent those sales; (ii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal; and (iii) under pressure from ongoing investigations, Seagate had halted shipments to Huawei, which was already beginning to have a material negative effect on the Company's revenue. ¶ 212. | 1. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned Seagate's most important product, which comprised over 92% of its revenue, (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have |

| | | Defendant Romano also touted the Company's HDD revenue results: "In our hard disk drive business, we achieved a fifth consecutive quarter of record capacity shipments totaling 163 exabyte, up 3% sequentially and up 26% year-on-year." Defendant Romano further attributed the Company's revenue performance to "[o]ngoing cloud demand for our nearline products," as well as "healthy demand for mid-capacity products from enterprise and OEM customers." | | otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>2. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26.<br><br>3. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127. |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

| | | | | |
|---|---|---|---|---|
| | | | | 4. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management  agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei.  Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the effects on Seagate's revenue performance. ¶¶ 128-30.<br><br>5. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate |

92

has admitted that it used **multiple** advanced U.S.-origin technologies specified in the FDPR at **multiple** critical stages of the manufacturing process, to produce **multiple** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.

6. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.

7. That Defendants received clear warnings—including the January 2021 letter specifically warning that its HDD sales were illegal—that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 69, 77, 81-86, 115-118.

8. That Defendants knew Congress was investigating Seagate's HDD sales to Huawei gives rise to an

| | | | | |
|---|---|---|---|---|
| | | | | inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 81-86. |
| 28. | **When:** April 27, 2022<br><br>**Where:** Q2 Earnings Call<br><br>**Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl.** ¶ 213 | Defendant Mosley stated that the negative revenue results were driven by: (1) "industry-wide supply challenges"; (2) "impacts from the ongoing conflict in Ukraine"; and (3) "COVID restrictions" that were all "constraining growth over the near term." | It was misleading for Defendants to state that Seagate's revenue decline was driven by "industry-wide supply challenges," "the ongoing conflict in Ukraine," "COVID restrictions," and "multiple macro related headwinds," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously been driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would have repeatedly missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in Third Quarter 2022 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei, which was abruptly stopped in response to a congressional inquiry. ¶ 215. | 1. That Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew that the Company's negative revenue performance was driven by the loss of those sales. ¶ 119.<br><br>2. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned Seagate's most important product, which comprised over 92% of its revenue, (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>3. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the |

Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26.

4. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127.

5. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's

September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the effects on Seagate's revenue performance. ¶¶ 128-30.

6. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical

| | | | | |
|---|---|---|---|---|
| | | | | elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.<br><br>7. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.<br><br>8. That Defendants received clear warnings—including the January 2021 letter specifically warning that its HDD sales were illegal—that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>9. That Defendants knew Congress was investigating Seagate's HDD sales to Huawei gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 81-86. |
| 29. | **When:** April 27, 2022 | Defendant Mosley attributed the decline to legitimate business factors, specifically: "multiple | It was misleading for Defendants to state that Seagate's revenue decline was driven by "industry-wide supply challenges," "the ongoing conflict in Ukraine," "COVID restrictions" and "multiple | 1. That Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize |

| | | | |
|---|---|---|---|
| **Where:** Press Release/8-K<br><br>**Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl.** ¶ 214 | macro related headwinds that impacted other end markets, particularly video and image applications, and pressured profitability." Defendant Mosley declared that the Company's "focus [was] on mitigating these external challenges through ongoing expense discipline, new pricing strategies and operational efficiencies." | macro related headwinds," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously been driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would have repeatedly missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in Third Quarter 2022 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei, which was abruptly stopped in response to a congressional inquiry. ¶ 215. | the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew that the Company's negative revenue performance was driven by the loss of those sales. ¶ 119.<br><br>2. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned Seagate's most important product, which comprised over 92% of its revenue, (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>3. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly |

significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26.

4. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127.

5. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

| | | | | again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the effects on Seagate's revenue performance. ¶¶ 128-30.<br><br>6. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

| | | | | |
|---|---|---|---|---|
| | | | | "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.<br><br>7. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.<br><br>8. That Defendants received clear warnings—including the January 2021 letter specifically warning that its HDD sales were illegal—that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>9. That Defendants knew Congress was investigating Seagate's HDD sales to Huawei gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 81-86. |
| 30. | **When:** July 21, 2022<br><br>**Where:** Q4 Earnings Call | Defendant Mosley attributed negative revenue results were driven by: (1) "impacts from a confluence of macro headwinds in other end markets, particularly in the consumer-facing legacy markets"; (2) "*impacts from* | It was misleading for Defendants to state that Seagate's revenue decline was driven by "macro headwinds," "COVID lockdowns in Asia," "non-HDD component shortages," "intensifying economic pressure," and "buildup of inventory at our customers" while failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously been driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would have | 1. That Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant |

| | **Speaker(s):** Defendants Seagate, Mosley, and Romano<br><br>**Compl. ¶¶ 216-17** | ***COVID lockdowns*** in Asia"; (3) "non-HDD component shortages," and (4) "global inflationary pressures" that "intensified late in the quarter." Defendant Mosley further stated that "macro events are weighing on our near-term performance."<br><br>Defendant Romano attributed the revenue shortfall to (1) "intensifying economic pressure," (2) "buildup of inventory at our customers," and (3) "***COVID-restrictive measures.***" | repeatedly missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in Fourth Quarter 2022 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei, which was abruptly stopped in response to a congressional inquiry. ¶ 219. | extensions of credit, yields a strong inference that Defendants knew that the Company's negative revenue performance was driven by the loss of those sales. ¶ 119.<br><br>2. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned Seagate's most important product, which comprised over 92% of its revenue, (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>3. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26.<br><br>4. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that |

Defendants knew, or recklessly disregarded, the significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127.

5. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Further, Seagate extended over $1 billion in

| | | | | credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the effects on Seagate's revenue performance. ¶¶ 128-30. |
| | | | | 6. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131. |
| | | | | 7. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across |

| | | | | |
|---|---|---|---|---|
| | | | | Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.<br><br>8. That Defendants received clear warnings—including the January 2021 letter specifically warning that its HDD sales were illegal—that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>9. That Defendants knew Congress was investigating Seagate's HDD sales to Huawei gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them.  ¶¶ 81-86. |
| 31. | **When:** July 21, 2022<br><br>**Where:** Press Release/8-K<br><br>**Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl.** ¶ 218 | Defendant Mosley attributed the revenue decline to legitimate business factors, specifically: "***the impacts of Covid restrictive measures*** in Asia and weakening global economic conditions on our other end markets" as well as a "confluence of macro-related challenges" and customers' "macro uncertainty and on-going non-HDD component shortages." | It was misleading for Defendants to state that Seagate's revenue decline was driven by "macro headwinds," "COVID lockdowns in Asia," "non-HDD component shortages," "intensifying economic pressure," and "buildup of inventory at our customers" while failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously been driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would have repeatedly missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in Fourth Quarter 2022 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei, which was abruptly stopped in response to a congressional inquiry. ¶ 219. | 1. That Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew that the Company's negative revenue performance was driven by the loss of those sales. ¶ 119.<br><br>2. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned |

Seagate's most important product, which comprised over 92% of its revenue, (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.

3. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26.

4. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer

"amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127.

5. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the effects on Seagate's revenue performance. ¶¶ 128-30.

| | | | | |
|---|---|---|---|---|
| | | | | 6. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.<br><br>7. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.<br><br>8. That Defendants received clear warnings—including the January 2021 letter specifically warning that its HDD sales were illegal—that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they |

| | | | | |
|---|---|---|---|---|
| | | | | investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>9. That Defendants knew Congress was investigating Seagate's HDD sales to Huawei gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 81-86. |
| 32. | **When:** October 26, 2022<br><br>**Where:** Q1 Earnings Call<br><br>**Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl. ¶ 220** | Defendant Mosley attributed the negative revenue results were driven by: (1) ***"[t]he impact of COVID lockdowns and the related economic slowdown in China"***; (2) "broad-based customer ***inventory adjustments***"; (3) "weakening global consumer spendings," and (4) "intensifying macro uncertainties." | It was misleading for Defendants to state that Seagate's revenue decline was driven by "[t]he impact of COVID lockdowns and the related economic slowdown in China," "broad-based customer inventory adjustments," and "weakening global consumer spendings," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously been driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would often have previously missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in First Quarter 2023 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei, which was abruptly stopped in response to a congressional inquiry. ¶ 222. | 1. That Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew that the Company's negative revenue performance was driven by the loss of those sales. ¶ 119.<br><br>2. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned Seagate's most important product, which comprised over 92% of its revenue, (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

| | | ¶ | | Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>3. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26.<br><br>4. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127. |
| | | ¶ | | |

110

| | | | | 5. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the effects on Seagate's revenue performance. ¶¶ 128-30.<br><br>6. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate |

has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.

7. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.

8. That Defendants received clear warnings—including the January 2021 letter specifically warning that its HDD sales were illegal—that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 77, 81-86, 117.

9. That Defendants knew Congress was investigating Seagate's HDD sales to Huawei gives rise to an

| | | | | |
|---|---|---|---|---|
| | | | | inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 81-86. |
| 33. | **When:** October 26, 2022<br><br>**Where:** Press Release/8-K<br><br>**Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl.** ¶ 221 | Defendant Mosley attributed Seagate's reported revenue decline to legitimate business factors, specifically: "[g]lobal economic uncertainties and broad-based customer *inventory corrections*" and "current macro uncertainties." | It was misleading for Defendants to state that Seagate's revenue decline was driven by "[g]lobal economic uncertainties and broad-based customer inventory corrections" and "current macro uncertainties." while failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously been driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would often have previously missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in First Quarter 2023 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei, which was abruptly stopped in response to a congressional inquiry. ¶ 222. | 1. That Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew that the Company's negative revenue performance was driven by the loss of those sales. ¶ 119.<br><br>2. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned Seagate's most important product, which comprised over 92% of its revenue, (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26. |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

| | | | | |
|---|---|---|---|---|
| | | | | 3. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26.<br><br>4. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127.<br><br>5. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on |

114

| | | | | Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the effects on Seagate's revenue performance. ¶¶ 128-30.<br><br>6. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major |

| | | | | |
|---|---|---|---|---|
| | | | | component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.<br><br>7. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.<br><br>8. That Defendants received clear warnings—including the January 2021 letter specifically warning that its HDD sales were illegal—that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>9. That Defendants knew Congress was investigating Seagate's HDD sales to Huawei gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 81-86. |

| 34. | **When:** January 25, 2023<br><br>**Where:** Q1 Earnings Call<br><br>**Speaker(s):** Defendants Seagate, Romano, and Mosley<br><br>**Compl. ¶¶ 223-24** | Defendant Mosley attributed Seagate's negative reported revenue results to: (1) "*the COVID-related economic slowdown in China*"; (2) "the work down of nearline HDD inventories among US cloud and global enterprise customers under a more cautious demand environment"; (3) "macro related disruptions primarily impacting our consumer-facing markets." Defendant Mosley further stated that "macro events are weighing on our near-term performance."<br><br>Defendant Romano attributed the revenue shortfall to (1) "inventory correction among cloud and enterprise customers," (2) "*COVID-related disruption in China,*" (3) "Seagate's own action to reduce production," and (4) "lower demand in the VIA market." | It was misleading for Defendants to state that Seagate's revenue decline was driven by "the COVID-related economic slowdown in China," "the work down of nearline HDD inventories among US cloud and global enterprise customers under a more cautious demand environment," and "macro related disruptions primarily impacting our consumer-facing markets," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously been driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would often have previously missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in Second Quarter 2023 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei, which was abruptly stopped in response to a congressional inquiry. ¶ 226. | 1. That Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew that the Company's negative revenue performance was driven by the loss of those sales. ¶ 119.<br><br>2. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned Seagate's most important product, which comprised over 92% of its revenue, (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>3. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's |

| | | | | |
|---|---|---|---|---|
| | | | | relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26.<br><br>4. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280-10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127.<br><br>5. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at |

least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the effects on Seagate's revenue performance. ¶¶ 128-30.

6. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to

119

Case 3:23-cv-03431-RFL    Document 89    Filed 03/05/24    Page 120 of 124

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

| | | | | |
|---|---|---|---|---|
| | | | | "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.<br><br>7. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶¶ 110, 132.<br><br>8. That Defendants received clear warnings—including the January 2021 letter specifically warning that its HDD sales were illegal—that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 69, 77, 81-86, 115-118.<br><br>9. That Defendants knew Congress was investigating Seagate's HDD sales to Huawei gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 81-86. |
| 35. | **When:** January 25, 2023<br><br>**Where:** Press Release/8-K | Seagate issued a press release reporting its second quarter 2023 financial results and filed that press release with the SEC on Form 8-K. In that press release, Defendant Mosley attributed the revenue decline to legitimate | It was misleading for Defendants to state that Seagate's revenue decline was driven by "COVID-related economic slowdown in China," "the work down of nearline HDD inventories among US cloud and global enterprise customers," "macro related disruptions," "Seagate's own action to reduce production," and "lower demand in the VIA market" while failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously | 1. That Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

| | | | |
|---|---|---|---|
| **Speaker(s):** Defendants Seagate, Mosley, and Romano<br><br>**Compl.** ¶ 225 | business factors, specifically: "a tough macroeconomic environment." | been driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would often have previously missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in Second Quarter 2023 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei, which was abruptly stopped in response to a congressional inquiry. ¶ 226. | Defendants knew that the Company's negative revenue performance was driven by the loss of those sales. ¶ 119.<br><br>2. Defendants knew, or recklessly disregarded, the truth concerning the highly significant impact of Seagate's HDD sales to Huawei on the Company's positive revenue performance because those sales: (i) concerned Seagate's most important product, which comprised over 92% of its revenue, (ii) concerned Huawei, one of Seagate's most significant customers, (iii) boosted the Company's reported revenue by as much as 13% during the Class Period and inflated its critical HDD revenue by as much as 15% during the Class Period, (iv) allowed the Company to meet or exceed guidance it would have otherwise missed, (v) as noted by analysts after the Class Period, allowed the Company to outperform peers, and (vi) boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms. ¶¶ 121-26.<br><br>3. Seagate's HDD sales to Huawei were the subject of significant investor attention and concern during the Class Period. Further, Defendants assured investors that they were closely monitoring Seagate's FDPR compliance. In light of the significance of Seagate's FDP compliance and investor focus on the Company's relationship with Huawei, it is highly unlikely that senior management would be unaware of the highly significant impact Seagate's HDD sales to Huawei had on the Company's reported revenue results. ¶¶ 21-26.<br><br>4. GAAP rules requiring Seagate to monitor and report sales from large customers gives rise to an inference that Defendants knew, or recklessly disregarded, the |

121

significant impact the Company's HDD sales to Huawei had on its reported revenue results. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. As discussed above, both ASC 280- 10-50-42 and ASC 275-10-50-18 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and further instruct issuers to "consider disclosure in cases where the threshold has not been met." For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. ¶ 127.

5. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were, at a minimum, aware of basic facts concerning the significant impact that expanded relationship had on Seagate's reported revenue results. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL
**Plaintiffs' Submission Pursuant to Court Order (*See* ECF No. 86)**

HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the effects on Seagate's revenue performance. ¶¶ 128-30.

6. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 9, 113, 131.

7. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and

123

| | | ¶¶ | | Romano, further support an inference of scienter. ¶¶ 110, 132. |
|---|---|---|---|---|
| | | | | 8. That Defendants received clear warnings—including the January 2021 letter specifically warning that its HDD sales were illegal—that Seagate's HDD sales to Huawei were illegal gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 66, 69, 77, 81-86, 115-118. |
| | | ¶ | | 9. That Defendants knew Congress was investigating Seagate's HDD sales to Huawei gives rise to an inference that they investigated, or else recklessly disregarded, both the illegal character of those sales and the extent to which the Company's financial results were driven by them. ¶¶ 81-86. |
| | ¶¶ 81-86. | | | |