**Pages 1 - 52**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Rita F. Lin, Judge

IN RE: SEAGATE TECHNOLOGY          )
HOLDINGS PLC SECURITIES            )
LITIGATION.                        )
                                   )   **NO. 3:23-CV-03431-RFL**
                                   )
_____     )


                                    San Francisco, California
                                    Tuesday, March 26, 2024

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
            BERNSTEIN, LITOWITZ, BERGER, GROSSMANN, LLP
            1251 Avenue of the Americas, 44th Floor
            New York, NY 10020
        BY: **SALVATORE J. GRAZIANO**
            **ABE ALEXANDER**
            **ATTORNEYS AT LAW**

            MOTLEY RICE, LLC
            28 Bridgeside Boulevard
            Mt. Pleasant, SC 29464
        BY: **WILLIAM S. NORTON**
            **JOSHUA C. LITTLEJOHN**
            **ATTORNEYS AT LAW**

For Defendants:
            WILSON, SONSINI, GOODRICH & ROSATI
            650 Page Mill Road
            Palo Alto, CA 9430
        BY: **CAZ HASHEMI**
            **STEPHEN B. STRAIN**
            **ATTORNEYS AT LAW**


REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
                       Official United States Reporter

**Tuesday - March 26, 2024**                              **10:56 a.m.**

                          P R O C E E D I N G S

                              ---o0o---

          THE COURTROOM DEPUTY:  Calling civil case 23-3431, In Re: Seagate Technology Holdings PLC Securities Litigation.  Counsel, please states your appearances for the record beginning with the plaintiffs.

          MR. GRAZIANO:  Good morning, Your Honor.  It's Salvatore Graziano from Bernstein Litowitz for the lead plaintiffs.

     I do have some other colleagues here.  I'm not sure if you want their appearance.

     Yes?

          THE COURT:  Yes, please.

          MR. ALEXANDER:  Good morning, Your Honor.  Abe Alexander for the plaintiff, Bernstein Litowitz.

          MR. NORTON:  Good morning, Your Honor.  William Norton, Motley Rice, for the plaintiffs.

          MR. LITTLEJOHN:  Good morning, Your Honor.  Josh Littlejohn for the plaintiffs in the class.

          MR. HASHEMI:  Good morning, Your Honor.  Caz Hashemi, and with me is Stephen Strain.  We're here on behalf of the defendant Seagate, Mosley and Romano.

          THE COURT:  Good morning to all of you.

     So I put out a notice of questions for the hearing last

week.  I just wanted to make sure everybody got it.  I see everybody nodding.

Thank you.  I appreciate it.

Let me just start with the questions, and then if you have more you want to tell me, there will be an opportunity at the end.

So let's just start with question one.  It's a little long, so I'm not going to read the whole thing, but really the question is about Seagate's interpretation of the foreign direct product rule.  I want to understand why Seagate's interpretation of that, specifically its interpretation that only essential equipment in the final assemble phase of manufacturing could trigger the rule.  Why is that a reasonable interpretation of the rule?

I did see the reference to the de minimis clarification that was provided by BIS, but I also don't see how that guidance supports Seagate's interpretation.

So this is really a question for Seagate.  Will you explain that to me?

**MR. HASHEMI:**  Thank you, Your Honor.  May it please the Court, and thank you for the question.

Let me start with as the BIS settlement noted, Seagate interpreted the foreign direct product rule to require evaluation of equipment in the last stage of its manufacturing process rather than the entire process.

Based on the allegations in the complaint, the text of the rule and related BIS guidance, which I will get to, the Court can easily infer that Seagate's interpretation, the more compelling, nonculpable inference is that Seagate's interpretation was reasonable.  I will detail why that is the case, but the context of the BIS settlement is important, Your Honor.

After thoroughly reviewing the underlying issue with the company, and one can infer the two sets of outside counsel for the company who signed the BIS settlement, BIS found that the company incorrectly interpreted the FDP rule.  As part of the settlement, BIS did not find a knowing violation, did not find that the company unreasonably interpreted the rule, did not find that the company recklessly interpreted the rule, or even negligently interpreted the rule.  They simply said that BIS, Seagate's focus on last stage of its manufacturing process was incorrect.

Because this is a securities fraud case, Your Honor, the securities laws and Ninth Circuit precedent make it plaintiffs' burden to plead contemporaneous specific facts regarding what Seagate's analysis was at the time of the challenge statements.

In *City of Dearborn versus Align*, 856 F.3d 605, a case involving goodwill impairment, a judgmental area under certain accounting principles, the Ninth Circuit said that, quote:  "A plaintiff must allege additional facts that call into question

the manner in which the corporation conducted its goodwill analysis," end quote.

That's at 621.

Here, consistent with that precedent, plaintiffs need to plead specific facts regarding the manner in which Seagate conducted the FDP rule analysis at the time of the publicly disclosed compliance statements.  Plaintiffs then need to allege specific facts showing that analysis was inconsistent with the public statements and that the individual defendants made those statements with deliberate recklessness, which the Ninth Circuit has noted is a form of intentional and knowing misconduct.

Where is Seagate's FDP analysis in the complaint?  Who analyzed that issue?  What specific facts show that the analysis was inconsistent with the public statements?  Where in the complaint does it allege what analysis was shared with defendant Mosley, or what analysis was shared with defendant Romano, or when it was shared?  It's plaintiffs' burden to plead those specific facts under the securities laws, not the defendants to show otherwise.

They have not pled it.  That alone should end the inquiry under the heightened pleadings standards of the Private Securities Litigation Reform Act, which has additional requirements to Rule 9(b).

Nevertheless, I will cover the FDP rule analysis within

the bounds of the complaint and reasonable inferences that can be drawn from the allegations of the complaint and the record before the Court.  To answer the Court's question necessarily involves a review of 15 C.F.R., Section 734(e)(1)(ii) of the FDP rule; 15 C.F.R., 772.1 regarding a direct product; the preamble and text of 85 F.R., at 51600; and published BIS guidance at the time.

As an initial matter, Your Honor, the fact that the scope of the rule requires an evaluation of these various technical regulations and guidance from BIS demonstrates that this rule was complex, and plaintiffs' suggestion that as a simple rule anyone can understand is misplaced and not supportable.

As disclosed in the company's SEC filings, exhibit 1, 7 through 9, for example, manufacturing of Seagate's HDDs is a complicated multistage process.  Seagate's HDDs would have come within the second prong of the product scope of the FDP rule if the HDDs were the direct product of equipment essential to the production of the HDDs, and the equipment itself was a direct product of certain specified U.S. technology or software.

Critically, the EAR defined "direct product" as, quote, "immediate product," end quote, produced directly by the use of technology or software.  That's at 15 C.F.R., Section 772.1. It would be natural, Your Honor, to interpret the immediate

language to mean that for the purposes of complying with the FDP rule, one should analyze equipment at the later assembly stage.  Why would one define it direct as immediate if direct meant anywhere in the manufacturing process?

Because HDDs would have been the direct or immediate product of equipment in the later assembly process, it is a reasonable inference that Seagate reasonably evaluated only equipment used in the final assembly process when determining whether its HDDs fell within the second prong of the product scope provision.

It's also a reasonable inference, Your Honor, that at the time of this interpretation was supported by the text of the rule, guidance and advisory opinions.

First, the text of the rule, Your Honor.  The heading of the relevant provision read as follows at the time, quote: "Direct product of a complete plant or major component of a plant," end quote.  This makes clear that the provision applied only to the direct product of certain components.  That's the last page of our exhibit 9, Your Honor.  Notably, after the relevant period the heading changed, and it no longer has a direct product qualifier.

Second, Your Honor, in the introductory text to the FDP rule, 85 F.R., at 51600, our exhibit 9 highlighted it for Your Honor.  BIS responded to concerns about complying with the rule in the context of long and complex production processes which

would cause companies to dive into supply chains of vendors and customers.  BIS explained that the relevant prong of the FDP rule only applied to the direct product of essential equipment. Quote:  "This rule answers that question by imposing a license requirement, certain software or technology that is the direct product of certain software or technology subject to the EAR and certain items that are the direct product of major equipment subject to the EAR."

In other words, Your Honor, the rule applied to HDDs if the HDDs were a direct product of essential equipment subject to the EAR.

Finally, the BIS FAQ under the de minimis, exhibit 18. It's important to appreciate, Your Honor, that the relevant aspect of the guidence is not the de minimis rule.  We didn't reference that in our papers.  The question that was answered, the question was the following in the FAQ, quote:  "If a part that is subject to the EAR pursuant to the FDP rules is incorporated into a larger foreign product doesn't make the larger item subject to the EAR," end quote.

The first clause of the answer interpreted the FDP rule. Incorporation of a part that is subject to the EAR pursuant to the entity list FDP does not necessarily make the larger foreign product subject to the EAR.

That's the key part.  The larger item must be evaluated to determine whether it is subject to other foreign direct product

provisions.

The answer from BIS stated that the incorporation of a part subject to the FDP rule into a larger foreign product did not necessarily make the larger foreign product subject to the rule.  A reasonable inference for the Court is that the natural interpretation of the BIS language, equipment used to produce HDD precursors in an earlier part of the manufacturing process did not necessarily make the larger HDD product itself subject to the FDP rule.

I would like to take just a minute, Your Honor, and take us back to the securities laws.  Under the securities laws, an incorrect interpretation of the new export regulation is not sufficient to plead securities.  Cases in this district and the Ninth Circuit uniformly hold that securities fraud cannot be pled on hindsight, and there is no duty to disclose uncharged, unproven allegations and dismiss cases at the pleading stage pursuant to the reform act.

*Kang versus PayPal*, Judge Breyer, 2022, 620 F.Supp.3d, at 897:  "The preliminary problem" -- quote:  "The preliminary problem with plaintiff's argument that PayPal made misleading statements about compliance," it goes on, "is that a statement about compliance is not misleading just because a later inquiry occurs."

*Facebook*, Judge Davila, 2020.

THE COURT:  Let me -- I don't mean to interrupt you.

I saw a lot of those cases in the briefing, but maybe it goes more to question two that I had.

But do you think that it is potentially a different situation if a company's interpretation is so unreasonable that it could not possibly be in good faith?  Which is why I asked question number one in the first place, because on the briefing, it was not clear to me if there was any potentially reasonable basis for Seagate's interpretation, but not to get ahead of ourselves, but do you have cases that address a situation in which a company's interpretation has been -- is really in contravention of the plain text of the regulation or of the law, but that's not enough, because the plaintiff hasn't pled enough scienter evidence to show that the defendants knew that their interpretation was -- was wrong?

**MR. HASHEMI:**  Yes, I have that, and we're going to get to it in question two.

I would just respectfully say, again, it's plaintiffs' burdens to plead unreasonableness, and there's nothing in the complaint that alleges contemporaneous facts that Seagate's interpretation was inconsistent with the compliance statements.

For example, there are no allegations that Seagate's export loss specialist told anyone at Seagate, let alone the CEO or CFO, who are named defendants, that Seagate's evaluation of the late stage of the HDD manufacturing process --

(Reporter clarification.)

I'm sorry.  Just saying, I would say again:  There's nothing in the complaint that alleges contemporaneous facts that Seagate's interpretation was inconsistent with its compliance statements, and I gave an example.  There are no allegations that Seagate's export loss specialist said to anyone at Seagate, let alone the CEO or CFO, hey, you need a license for this.  Where is that allegation?  Where is that analysis?

I just went through, and, you know, tried to do my best as the -- but export specialists, who look at this for reasonable inferences evaluated this.  And so where are the allegations?  It's almost turning the burden on us, where it's the plaintiffs' burden to say, this was the analysis they did, it was inconsistent with the compliance statements, and this information was shared with the speakers.  None of that is in the complaint, Your Honor.

They're asking the Court to make leap upon leap and inference upon inference.  It comes to the borderline of speculation about what the analysis was.

It's not our burden; it's their burden.  That's what the reform act requires.  The reform act was put in place so something doesn't happen on Thing A, then plaintiffs come -- securities plaintiffs come along, take Thing A, try to cobble pieces of information together and create a securities fraud claim and get into past the pleading stage.

It is their burden, as *City of Dearborn versus Align* said, to plead with specificity the manner in which the analysis was done.

**THE COURT:** So is that -- is the *City of Dearborn* your best case to show a situation in which it's alleged the company had a totally unreasonable interpretation of the law in hindsight, but there wasn't enough to show that they should have realized that at the time?

**MR. HASHEMI:** Well, we have not found a case stating that an unreasonable interpretation of law is or is not sufficient to plead scienter under the reform act, that specific question. There are a few cases that I think are analogous.

*Zamir versus Bridgepoint*, 274 F.Supp.3d 1057. This case involved an interpretation of certain accounting principles. The plaintiff argued that the interpretation of an accounting principle was unreasonable and obviously wrong on its face, and something a nonaccountant, like one of the defendants, could understand. The Court concluded the allegations failed to give rise to a strong inference, that it raised an inference of scienter, quote, "much less a strong inference of deliberate wrongdoing," end quote, which is the standard. The accounting rule, quote, "is not the lucid or encyclopedic set of preexisting rules that plaintiff might perceive it to be," end quote.

No truer words could be said, Your Honor, about this new complex and technical export rule.

*City of Dearborn versus Align*, the Ninth Circuit affirmed dismissal, noting:  "The more compelling inference is goodwill evaluations that the positive factors outweigh the negative -- the more compelling inference is that the defendants made a good-faith but mistaken determination in its goodwill evaluations that the positive factors outweighed the negative ones," end quote. --

*Taleo* is another case, Your Honor.  *Taleo* is another case, 210 -- 2010 Westlaw 597987, at 13.  In a Restatement case, Judge White held that:  "Where plaintiffs did not rely, among other things, on confidential witnesses" -- no confidential witnesses here -- "or internal documents" -- no internal documents here -- "the Court, without more," quote, "cannot conclude that the malicious inference plaintiff urges is at least as compelling as any opposing innocent inference," end quote.

*Cheng versus Rentech*, 2018 Westlaw 4802058, at 9, accounting case that was supposedly, quote, "an obvious failure to follow GAP," end quote.  Not enough for scienter.  To give rise to a strong inference of scienter, the complaint needs to allege that the accounting error was nonsensical on its face and defied common sense.  The complaint does not here allege that interpretation was nonsensical or defied common sense, nor

could it.

Those are some examples.

Last one is a Ninth Circuit case, Your Honor, *Davoli versus Costco*, 854 F.App'x 116, 117.  It's a Ninth Circuit, 2021.  The Ninth Circuit said that allowing a plaintiff to plead scienter by alleging red flags regarding a possible misstatement would effectively be a negligence standard, and the Court reaffirmed that it has consistently held that a complaint must allege the defendant acted with deliberate recklessness, reflecting intentional or conscious misconduct.

There's nothing of the kind in this complaint, Your Honor.

**THE COURT:**  Let me just go back to the original statement that you're making about why Seagate's interpretation is not nonsensical.  You pointed to something about the immediate product.

Could you give me -- is there a citation --

**MR. HASHEMI:**  Yes.

**THE COURT:**  -- based on the exhibit that you submitted, which is the Federal Register?  Is that the document that it's in, exhibit 9?

**MR. HASHEMI:**  The last page of exhibit 9 has the language of the FDPR rule at the time.  I was talking about 15 C.F.R., Section 772.1.  In that part, the EAR makes -- gives certain definitions to terms and define direct product in that

section, again, 772.1, direct product as the immediate product. And what I was saying, Your Honor, it's natural to interpret the immediate language to mean for compliance with the rule, it's the later stages.  Otherwise, why didn't they just say through the entire manufacturing process?  They could have said that, but they called it -- first of all, they called it the foreign direct product rule, and then in the EAR defined direct as immediate.

**THE COURT:**  I understand.  Thank you.

Let me give plaintiff an opportunity to respond.  And really this is a response as to questions one and two, because it sounds like we got into defendant's response to question two also.

**MR. GRAZIANO:**  Correct.

And, you know, I had actually trouble following defense counsel's response to question one, but I think in the end he clarified it, and I think that just shows how unreasonable Seagate's interpretation was.

And what do I mean by that?

Essentially we hear two different arguments.  Number one, that the HDDs were not direct or immediate products, but they actually were immediate, direct products of this essential equipment, which was specified in ECCN.  The equipment made nothing else other than HDDs.  It wasn't as if a different small product was made somewhere else, and that little product

was then dropped into the HDDs, like a reading arm or something.

That's not their argument. That would be the only way they could get an exemption under the de minimis rule, because that would be a separate product being incorporated into a new larger product.

But here we have many reasons why it's not a reasonable interpretation, and all of these reasons are completely contemporaneous; they're not after the fact.

So what are they?

First and foremost, the rule itself, the plain language. It actually says: Any equipment specified in an ECCN that is involved in any production stage is considered essential. So that's a major problem for them. That -- there's no way out of that language, which makes it pretty clear that if you are making HDDs with software or with technology, and those software or technology are listed, specified in ECCNs, then you have a problem. You need a license. And that's what the rule says.

And it's not just our say-so. In fact, we looked at contemporaneous public notices that went out by major law firms, including, strangely enough, the two law firms that represent Seagate here, counsel's firm now, and more importantly, the Covington law firm that represented Seagate in front of the BIS. And Covington specifically put out a notice

on August 19th, two days after the rule change.  And in their notice, and it's quoted in paragraph 41, they say:  "The BIS interprets essential -- the word 'essential' broadly."  And in quotes it says:  "Any equipment subject to the ECCN specified that is involved in any production stages is considered essential."

So that plain rule right there makes their supposed interpretation unreasonable.

It's hard to tell actually what their interpretation was, because they refused to cooperate with the Senate committee. Yes, I know that BIS has that one line in that paragraph, but let's keep in mind that entire document is also a settlement agreement.  So I'm not surprised that there's not a finding of knowing wrongdoing; it's a settlement.

In fact, the Senate committee themselves, in exhibit 10 submitted by defendants, says:  "It appears that Seagate acted knowingly, in violation of the FDPR, for more than a year, and acted with reckless disregard."  So that was the Senate committee's interpretation.

But besides the plain language, the law firm interpretations that were public -- and clearly I saw them; Seagate of course saw them; they were from their own law firms -- Seagate receives a rule notification letter from one of the two companies making -- sorry, supplying them products to make their HDDs, notifying Seagate that their equipment is

subject to this FDPR.  And there is no suggestion in the record that Seagate was using the equipment for some other stage.  I mean, this was -- this was the final stage in terms of how these products were made.  Some of them were literally for reading for defects.

So I don't even know what stage they have in mind.  Maybe they mean putting it in the cardboard box and shipping it out.  I have no idea.  But they received the letter in January, and over 77 percent of their sales to Huawei, or over $850 million-worth, were done after that letter.  So that, again, shows a lack of good-faith interpretation.  It shows that they were on notice.

Then, when asked by the Senate committee, they refused to respond.  They were the only one of the three companies, Western Digital and the other competitors, that absolutely refused to cooperate with the Senate.  That also shows they didn't have a good-faith interpretation.  In fact, they didn't even communicate with the Senate subcommittee until they stopped selling to Huawei.  They first stopped selling to Huawei, and then they cooperate.

Now, why would they do that if they had a good-faith interpretation?  That --

**THE COURT:**  I don't want to interrupt you, but I think you're repeating what's in your briefs.  And I did see the evidence about law firm alerts, about the lack of

cooperation.

The reason I asked about the plain language is because I don't think that there is clear evidence that Seagate even saw the law firm alerts or that -- I don't think that I can infer a strong, certainly not a strong evidence or a strong inference of scienter based on that information alone, which is why it is -- I am so focused on the plain language of the regulation, because I think that that potentially provides the only possible hook for this claim.

But I think what I would really like to know and what I'm focused on from plaintiffs is a response to the defense argument about the law, because the law as the defendants are arguing it is that, yeah, maybe their interpretation was wrong, but it had to be so obviously wrong, like to the point that it was nonsensical.

And assuming that I -- even if I found that, is that alone enough for scienter, without it -- I mean, I understand you have some additional facts, but honestly the additional facts are not that -- are not that compelling in terms of an inference of scienter.

So help me understand if there's a situation where a company's interpretation is just so wrong that it alone is sufficient for scienter, without a lot more.

**MR. GRAZIANO:** The answer to that is yes, and I was going to shift to the law. But I don't want to do so with any

appearance that I agree with some of the premises of Your Honor's question, so I will circle back to them.

Let's go to the law first, because there is a case from the United States Supreme Court written by Justice Kagan that is completely on point, and that's the *Omnicare* case.  Because there, the question was when a company says they believe their conduct is lawful, what is the test for recklessness in that situation?  It was a securities fraud case.  And the citation is 575 U.S. 175.  It came out in 2015.

And Justice Kagan wrote the following.  It's sort of a long quote, but it's so close to this case it's unbelievable: "Consider an unadorned statement of opinion about legal compliance:  'We believe our conduct is lawful.'"  And that is what happened here; Seagate over and over again said they were in compliance.  And "if an issuer makes that statement without having consulted a lawyer, it could be misleadingly incomplete. In the context of the securities market, an investor, though recognizing that legal opinions can prove wrong in the end, still likely expects such an assertion to rest on some meaningful legal inquiry -- rather than mere intuition, however sincere.

"Similarly, if the issuer made the statement in the face of its lawyer's contrary advice, or with knowledge that the federal government was taking the opposite view, the investor has cause to complain.  He expects not just that the issuer

believes his opinion, however irrationally, but that it fairly aligns with the information in the issuer's possession at the time."

So let's think about that in the context of this case. Defense counsel said we don't have evidence of what the legal specialists were telling Seagate.  Your Honor, we will never have that evidence unless they waive privilege, so that's not really a reasonable argument.  We're not going to be in the room with what their lawyers told them, but we can see what their lawyers put on the Internet.

We have a case called *Valley Forge*, from 2014 Westlaw 3767011, where the companies were selling semiconductors in violations of almost exactly the similar rules illegally, and the Court there used the executive's industry experience to bridge the gap.  And there, the Court considered plausible opposing inferences that they didn't perceive a risk of exporting their semiconductors, but that is not enough to make the inference of scienter, or a lack thereof, greater, because we don't have to prove scienter today.  Right?  We have to prove an inference of scienter that has to be even just equal to the opposing inference.  We don't have to go beyond that, according to Justice Ginsburg in the *Telex* (phonetic) case; we win.

So let's go back to *Omnicom* (sic) for a second.  A lawyer's contrary advice.  We have the memorandum that were out

there in the public alerts.  I see those when they're in my field.  I don't think it's fair for the Court not to credit us at the pleading stage that Seagate would not have seen those. I mean, this was a major sea change in this business, and law firms are putting out alerts.  And I think I could even make the argument, go beyond that, that it's probably more plausible that, you know, Seagate talked to some of these lawyers, considering they employed them as their firms in this case. The federal government was taking the opposite view.

We saw all of the Q and A provided by the BIS.  We saw all the clarifications.  All of those cut against Seagate's supposed good-faith interpretation.

Now, the Supreme Court says you can look at -- well, investors must identify facts going -- you know, on their side of the argument.  And here, as I started to mention, besides the law firms' notification letter, we have the industry consensus.  We have the other competitors in real time, at the beginning of the class period, saying, Western Digital, this law is pretty straightforward.

So I think it's not true that we're just relying on the plain language, but I think that Justice Kagan's decision in *Omnicom* (sic) could not be more on point for this particular case.  It can't be that a company can just go ahead and repeatedly say they're in compliance and have their stock shoot up, have the analysts saying, well, they're saying they don't

need a license, and then say, oh, no, we were just wrong, we made a mistake.  That's not the law.  They need a reasonable basis when they make a statement like that.  Investors expect that.  The Supreme Court says that that is part of a statement like that.

When you say, we are following the law, there has to be some meaningful inquiry, and here there frankly was none.

**THE COURT:**  Let me -- I'm going to jump ahead to question four --

**MR. HASHEMI:**  Your Honor --

**THE COURT:**  -- but I'm sure you may have more to say in response.  I'll have a time period at the end, but I want to jump ahead right now to question four on the issue of the inference.

If Seagate really believed that this was illegal under the FDPR, why are they publicly announcing over and over again that they are continuing to sell HDDs to Huawei?  I didn't see a response to that argument in the briefing, and I wanted to give you an opportunity to respond to that.

**MR. GRAZIANO:**  Yes.

You know, we are very happy to respond to this, because I think the first part of our response has to clarify the premise of Your Honor's question.

I do not believe that Seagate said over and over again that they were selling HDDs to Huawei.  I think the complaint

shows quite clearly that they made one statement on September 14th, 2020, that I want to talk about, but thereafter they refused to comment, and they actually said, we're complying with the law, we're complying with the law.  They did not touch the issue again.

So what is the one statement that they made that's at the start of the class period?  On September 14th of 2020, the CFO was asked about selling to Huawei, and his answer at the time was -- and this is in paragraph 136:  "We are still going through the final assessment, but I don't see any particular restriction for us."

That's what he said in 136.

I can assure Your Honor that, thereafter, they didn't mention Huawei again.  Instead, so many times they were asked, and their answer was, we follow the rules.  "It's part of our job to ensure that we understand them, and we follow all the rules."

That's in paragraph 139 and paragraph 152.

They even refused to talk to the Senate committee about whether or not they were selling to Huawei until the Senate committee went to the BIS and got some confidential information.  In fact, Your Honor, in the quarter where they exceed 10 percent of sales to Huawei, they violate GAP and don't report that 10-percent customer.

And I understand the defendants are disputing GAP, but

that's not proper in a motion to dismiss, and I can cite some case law.

But I just want to start with the important part here that it's not true that they said over and over again they were selling to Huawei.  Even if they did, Your Honor, the investors didn't know the ECCN numbers how Seagate was making these products.  The securities analysts, in paragraph 48 of the complaint, are assuming that Seagate is telling the truth that there's no license requirement.

Something else very much interesting happens.  They sign a strategic cooperation agreement with Huawei in December 7th of 2020.  Then they signed a longterm supply agreement on March 29th of 2021.  They don't announce those.  We looked, and in the past when Seagate issued major -- reached major agreements like that with its customers, there's a big public splash announcement.  Here, nothing.  No investors are told that they have these new huge agreements, a billion dollars of credit.

Why is that, Your Honor?  Because I think, contrary to what Your Honor is asking, they said it once at the beginning cryptically and then thereafter never.

So why do they do that?  Let me try to now get to your question head on.  Obviously they should have refused to comment.  Right?  If they were going to break the law, they should have said nothing.  And perhaps that first statement,

where Romano was being somewhat, you know, noncommittal, we're still going through our final assessment, perhaps that's something they regret.

Perhaps they feared their stock would go down if they said we're stopping selling to Huawei.  This was a difficult time in this company's history.  They had just gone from COVID.  Their sales had been falling.

One thing that I find very interesting is we know they do stop selling to Huawei in September of '01.  They don't say that.  They don't say a word about it to their investors.  So maybe there is a fear on their part.  But I think ultimately, Your Honor, we don't have that burden of telling you why.  I think even in a criminal case we don't have to explain why. What we have to do is show you that they made statements at this point with a strong inference that were knowing or with reckless disregard, and I think we've done that.

I think beyond everything I've said so far, we know that Seagate reaped enormous benefits from this illegality.  Right? They finally restored their credit rating.  Their stock price went up.  Yes, eventually their conduct caused a whistleblower and frankly a relentless Senate committee.  Without them, I'm not sure what would have ever happened here.  But this was a long period of time before the market was given the full truth. Until that moment in time, there were some in the market saying they're still selling in Huawei, there were some in the market

saying, well, they don't need a license.  But the market didn't have the full truth, you know, until the facts eventually came out that they were doing so illegally, and that they did need a license and they didn't have one.

So it's a little strange, I agree with Your Honor, but I don't want Your Honor to have the impression that they kept saying, were selling to Huawei.  They actually got turned very cagey, and I can go through some statements if you need me to.

**THE COURT:**  No, I understand what you're saying. That makes sense.

Let me give defendant an opportunity to respond.  And also I know you were trying to break in earlier to respond.  If you would like to respond on the Omnicare issue, that would be great, too.

**MR. HASHEMI:**  Thank you, Your Honor.

First of all, with all due respect to my friend, the market knew we were selling to Huawei.  Paragraph 48, "Wedbush Securities expected," quote, "Seagate to expect -- exceed original expectations, helped, in part, by Huawei orders," end quote.

"Deutsche Bank attributed Seagate's increased HDD market share at Q4 2020, to the fact that Seagate" --

(Reporter clarification.)

**MR. HASHEMI:**  Sorry.

"On February 9th, 2021, Deutsche Bank attributed Seagate's increased HDD market share.  Seagate has not stopped shipping to Huawei."

There is paragraph 161.

And, Your Honor, the notion that the market did not know that the company continued to sell to Huawei is just belied by the allegations of the fact and should not be credited.

In addition, after the company received the proposed charging letter to Huawei, again, near the end of the class period, the company says:  "It believes it has complied with all relevant export laws and guidance, and Seagate is committed to compliance through its legal professionals."

And exhibit 10, Your Honor, not a Seagate disclosure, an investment analyst, Wedbush noted in March 21, quote:  "Seagate's legal team likely interpreted U.S. restrictions differently than its peers," end quote.

The market knew all this.  That's what the securities laws are there for.

Your Honor, *Omnicare*, I'm surprised counsel mentioned *Omnicare*, because I was going to mention *Omnicare*.  First of all, *Omnicare* was a Section 11 case; didn't have to do with scienter.  But let's put that to the side.  The exact quote counsel read is what I was going to read:  "An investor that recognizes legal opinions can prove wrong in the end still likely suggests -- expects such an assertion to rest on some

meaningful legal inquiry."

Where is the allegation in the complaint, nowhere, that there was no meaningful legal inquiry, and it rested on mere intuition. Where in the complaint does it say it was rested on mere intuition? Counsel itself is mentioning Covington and Berling. It is their burden. The reform act makes it their burden to allege what Covington's analysis was. They're suggesting Covington's law alert said "X". What did Covington say to the company, and how is that inconsistent with their public disclosures? Is it the more plausible inference that they, this company of over 10 billion in revenue, in a complicated multistage process for manufacturing HDDs made a meaningful inquiry, and the public statements were consistent with that? That's a very reasonable inference for the Court to take, and one that doesn't need some kind of waiver of the privilege.

It is what it is. It's plaint -- he's saying he almost, like he doesn't have discovery. They're relying on public statement, everything that's out there in public domain. They need to meet that burden. I know it's a difficult burden. I know it's a high burden. I know it's frustrating. But it is what it is.

It's their burden, and they failed to do any of these things, including what Justice Kagan said in *Omnicare*.

Finally, Your Honor, there's no allegation in the

complaint about the complicated HDD manufacturing process. Doesn't say where this component was put in place.

And then *Endologix*, we covered it.  Counsel is covering matters that were in the briefs.  We responded to all of them in the reply.  They encounter a first-level problem, as *Endologix* noted, the Ninth Circuit noted.  Why would *Endologix* say the FDA was going to approve their product, when they believed it was not going to?  They encountered the same first-level problem here the Ninth Circuit articulated and was the basis of the Court's question, and there is no answer to that.

Because under any analysis of looking at competing innocent explanations, they substantially outweigh the nefarious ones based on the record before the Court.

**THE COURT:**  I did want to go back and ask just briefly.  I don't think we need to spend a lot of time on it, but I wanted to ask briefly Seagate to address question three. Which, I don't want to read the whole thing, but essentially it's about the old version of the FDPR.  Why is Seagate saying that that version doesn't allow HDDs to be sold to people on the restricted list, but now suddenly that Huawei's on the restrictive list it's okay.  Explain that to me.

Or is there -- is that something I should be setting aside?

**MR. HASHEMI:**  I think you should be setting it aside.

Paragraph 69 faces an immediate issue as conclusory allegation under *Iqbal* and *Twombly*.  It comes out of nowhere, has no context, provides no date of the purported certification or contract and is conclusory.  It should not be credited under *Iqbal* and *Twombly*.

Paragraph 69 is based on the unsupported and conclusory suggestion that Seagate was not selling to Huawei prior to the FDP rule.  Other allegations in the complaint say the opposite.  Paragraph 2, paragraph 136, paragraph 44, an analyst asked whether the company continued to sell to Huawei in September of 2020.  Investors knew that Seagate sold to Huawei before and after the FDP rule.

There's no specific timing provided on when or what circumstances existed.  Was it in 2015 this certification existed?  2018?  Before or after Huawei was on the restricted list?

They don't plead any specific certification.

Second, Your Honor, to the extent -- I think the Court should set it aside.  To the extent the Court decides to use this paragraph in its analysis, the Court should consider the full text of the certification under the doctrine of incorporation by reference, including portions which are not mentioned.

I can also go through why it's consistent, even if the Court considers it as pled, which it should not, it is not

inconsistent with Seagate's interpretation of the FDP rule at the time, if the Court wishes.

THE COURT:  Well, let me just hear from plaintiff first before you go into that about the *Iqbal* and *Twombly* issue.

MR. GRAZIANO:  I don't actually understand that, because the certification is directly quoted in paragraph 69. We're not just paraphrasing, we have a literal quote.  And I think the problem Seagate has is they're sort of seeking to have it both ways.  Right?  The rule changed in August of 2020, and before that, it applied to U.S.-made products, and Seagate required all of its customers to certify they weren't, then, reselling its products to companies on the restricted list. But then in August of 2020 the rule changed, and it didn't matter where the products were made, you still couldn't now sell to Huawei.

So Seagate can't have it both ways.  They can't have strict enforcement in paragraph 69.  In fact, most of their products are not made in the United States, so 69 was not a big problem for them.  But now their products' made outside of the United States, their revenue is going to be shut down.  So they have a selfish, unreasonable interpretation of the rule.  So they're the only ones in the field, the only ones that can keep selling HDDs to Huawei.

That's what this case is about.

But, Your Honor, I'm sorry.  With your permission, I need to go back to something counsel said, because he's wrong about *Omnicare*.  There are three Ninth Circuit cases that say the standard is the same for 10(b), it's not just Section 11.  So let me just put one in the record, which is *Allied Nevada Gold*, and that's 743 F.App'x 887.  But there are at least three such cases.

Your Honor, earlier when I was talking about their interpretation being unreasonable, you know, rightfully said I was repeating what was in our briefs, but I have something that was not in our briefs.

Just rechecking my notes.

In preparing for today's argument, I noticed in their exhibit 10, at page 5, which is from the Senate committee, the Senate committee found something else that was quite shocking, which is even after Huawei stopped selling -- I'm sorry.  Even after Seagate stopped selling to Huawei in September of 2021, they were in the process of coming up with a secret new subsidiary, a new Huawei subsidiary that was going to be made up so that they could keep breaking the law, and that's on page 5 of exhibit 10.

I think that is astounding evidence of how -- the bad faith of this company in doing what it was doing in this case. So that was not in our briefs.

Another thing counsel brings up, inconsistent from what

he's saying in his papers, is that the market knew they were selling to Huawei.

First of all, our three kinds of false statements are not that they were selling -- just that they were selling to Huawei.  Category 1 is that they claimed to be in compliance with the law.  Category 2 is that they were hiding the amount of sales to Huawei, including the GAP rule.  And then category 3 was how that Huawei was driving their results all around.  But if he wants to rely on analysts, he's actually making a truth in the market argument even though he said in his brief he's not, because now he's not relying on company statements, he's relying on analyst statements.  That's an impossibly demanding burden that cannot be met on a motion to dismiss, especially when Seagate is saying over and over again, we are compliant with the law.

The last point I want to make is the *Endologix* case, which has to do with a company allegedly lying about its chances for FDA approval, doesn't fit this case at all.  Why not?  In the pharmaceutical field, you know, these companies need their new drug application approved before they can even begin to market the drug.  So if you're lying to investors about your chance of getting FDA approval, it's sort of a futile thing, because you're never going to get the approval, you're never going to get to sell the drug.

That's not what happened here.  Seagate was selling over a

billion dollars.  They were lying to investors about their compliance, but the sales, the revenue's already coming in. Those drug companies in a case like *Endologix*, they had zero revenue, because they weren't allowed to sell the drug without FDA approval.  So if they're lying about their chances before the FDA, you know, courts wonder, like, you know, why would they do that.  But here the lying makes sense.  I mean, I don't want to excuse it, but you see what happened because they were selling, and the lie was, oh, we're -- everything we're doing is fine.

It's very different than an FDA drug approval case, if I'm being clear about that.

**THE COURT:**  I'm just looking at the time, and I probably need to give the court reporter a break.  So let's just take a 10-minute recess so the court reporter can take a break, and then we'll come back and address question number five, and then you can let me know any final information you think I need to know.

**MR. GRAZIANO:**  Thank you, Your Honor.

**THE COURT:**  Thank you.

**MR. HASHEMI:**  Thank you, Your Honor.

(A recess was taken from 11:42 a.m. to 11:52 a.m.)

**THE COURT:**  Okay.  I see all counsel are back.  We're resuming in the argument in the case.

I just wanted to go back to question three before we move

on and give Seagate an opportunity to respond to the argument that, you know -- I understand what you're saying, that this certification, there's no date on it or anything like that, but obviously we're early in this case, and I think it'd be useful to talk about this in the event of amendment or anything like that.

So let me hear from you what your view is on the issue of the certification and why it's consistent with Huawei's position.

**MR. HASHEMI:**  Sure.

And we still don't know what the full certification says, notwithstanding their argument so far.

The last point I was going to make.  Even if the Court considers plaintiffs' allegations as pled, it is not inconsistent with Seagate's interpretation.  Contrary to the plaintiffs' inference, which we don't think is supported, there is more plausible, nonculpable inference for paragraph 69.  The customer certification language as alleged in paragraph 69 does not indicate that Seagate's interpretation of law at the time was such that it could not sell to Huawei.  The more reasonable inference is that the customer certification language is standard compliance language used in customer agreements to require that, as a commercial matter, customers not transfer products to restricted parties.  It has no bearing on the legal question of whether Seagate's products were subject to the

export restrictions.

Seagate was free to restrict its customers beyond the scope of what U.S. law might require in an individual circumstance, the inference being that Seagate was focused on compliance and making sure that they had visibility into and control of where their products ended up.  That's a much more innocent, nonculpable inference.  Especially, Your Honor, when you don't -- in light of the *Iqbal* and *Twombly* infirmities and the fact we don't have the full language of the certification or when it was --

**THE COURT:**  If the concern is don't sell our products to other people who might be reselling them, why isn't the provision restricted to people on the United States' restricted party list?

**MR. HASHEMI:**  Is that what the full certification says?

**THE COURT:**  It says --

**MR. HASHEMI:**  Well, the paragraph --

**THE COURT:**  The quote in the paragraph is:  "Seagate products, software or technology will not be directly or indirectly transferred to any party listed on the United States' restricted party list."

**MR. HASHEMI:**  Right.

I think it would -- from common experience, one could also infer the certification is larger, and one can infer that

Seagate -- there could be a variety of parties on the restricted list, and Seagate would like to be informed if such a -- or if their product is being transferred is.  And it doesn't necessarily mean that Seagate's interpretation was inconsistent with that.

It's a way of just having your products go to customers, Your Honor, and making sure, before they pass it on, Seagate understands where it's going.

**THE COURT:**  Okay.  Let's just move to question number five, then, which is really a question for plaintiffs.  In question number five, I wanted to understand better the revenue driver allegations that plaintiffs make.  So I want to focus on Q3 2021, because I think that's plaintiffs' potentially strongest argument.

In that quarter, sales to Huawei are 15 percent of FDD -- HDD revenue, and Seagate allegedly would miss its revenue guidance without those sales.  The defendant, Mosley, is having this earnings call for Q3 2021 and allegedly doesn't mention Huawei as a revenue driver and is pointing to mass capacity and VIA markets as the primary drivers, but I didn't see anything in the allegations about why those other drivers, VIA markets and mass capacity, are, in fact, less important than Huawei in overall revenue growth.

What's plaintiffs' response to that?

**MR. GRAZIANO:**  So, first, they don't have to be less

important.  As long as sales to Huawei are a material driver -- and I'll take you through the cases, but there is a premise in your question I need to clarify.  I think mass capacity is Huawei.

Remember, I said earlier today they stopped saying Huawei. It's remarkable that in their highest quarter of HDD sales in their entire corporate history, where we know Huawei was 15 percent, that they don't utter the word "Huawei".  So I just want to go back to your prior question that they kept saying Huawei.  This is crystal clear evidence that they stopped saying Huawei.

So first --

**THE COURT:**  So if mass capacity is Huawei, then aren't they mentioning Huawei as a revenue driver?

**MR. GRAZIANO:**  No, because it's code.  And mass capacity is Huawei, but other, other major companies that buy mass capacity, too.  They stopped using the word "Huawei". They're proud of their highest ever HDD shipments, but they use a lot of language.

Your Honor was pointing at one paragraph.  There are three paragraphs in the -- four paragraphs in the complaint that cover this quarter; it's paragraphs 197 through 201.  They use a lot of terms.  They talk about strong cloud data center demand; they talk about recovery in the enterprise markets; they talk about strong recovery from OEM customers; mass

capacity in VIA markets.  So they're citing a lot of things, but they're not saying Huawei.  We do think, Your Honor, but without discovery we cannot confirm, that some of these words are code for Huawei.

We do know that the sales to Huawei were so big, that they would have missed guidance without it.  But I want to go back to the direct answer to Your Honor's question, which is even if somehow VIA was more important to Huawei, that doesn't matter legally.  Huawei doesn't have to be less important.  What matters under the law, and I will cite some cases, is is the illegal improper business practice a material driver of the performance?  Is it a material driver?  Not is it the biggest one.

We know without Huawei they would have missed guidance.  Clearly it's a material driver.  We know --

THE COURT:  The reason I'm asking it this way is because if, if I were to find against plaintiffs on the issue of the compliance statements and we're just looking at the revenue driver statements standing alone, then the focus is on whether these statements are untruthful, and the statements are:  Our revenue is driven by mass capacity; it's driven by VIA markets; it's driven by cloud-based storage.  Are you saying that if the Court were to find against you in terms of the compliance statements, that really these other statements would fail also, because the argument about revenue

driver misstatements is really about hiding the illegal Huawei sales?

**MR. GRAZIANO:** No, Your Honor. They wouldn't fail.

There's a Ninth Circuit case directly on point, and that's the *Syncore* case, and that's 239 F.App'x 318, at page 320.

So just to read you a quote: "By attributing Syncore's success solely to legitimate practices" -- and that's what Your Honor's getting at, these other things like VIA -- "defendants implicitly and falsely warranted that there were no illegal practices contributing to that success." And that's what happened here. It's a half truth. They're saying, we had the best HDD sales of our lifetime, and thank goodness for VIA, you know, or a strong cloud -- those are half truths, because they're giving the legitimate reasons and hiding the illegal practices.

And the Ninth Circuit says specifically in the *Syncore* case, as long as the illegal practices were a significant reason for the sales growth, the statements would be materially incomplete.

**THE COURT:** Well, let me -- let's just assume, let's just assume for the sake of argument for this portion that the Court finds that Huawei -- or that Seagate had a reasonable but mistaken interpretation of the law, and that it wasn't a nonsensical interpretation. They had an interpretation that they held in good faith that they were in compliance with the

law; these were legal sales that they were making to Huawei.

Are the revenue driver statements that you cite in this section about Q3 2021, are they still actionable?

**MR. GRAZIANO:** Yes.

What I'm trying to get at, Your Honor, is if we take the illegality out of it, right, the market still wants to know what's going on with Huawei. They asked them almost every quarter, and they're hiding Huawei in multiple ways. I gave you one way where they're citing all the other factors, but there's another way they're hiding Huawei, and I want to cite a few more cases on this, but the other way they're hiding Huawei is they violate GAP. And my colleagues argue, no, GAP doesn't apply to a quarterly disclosure, but that's wrong. GAP requires this kind of disclosure every time an income statement is filed. There was an income statement filed in the 10Q. A dispute about whether or not we're right on GAP is not proper for a motion to dismiss.

But, yes, even if somehow they were mistakenly thinking Huawei was okay, the market share was worried about it, and they're hiding Huawei from the market by giving this half truth. They're saying, we had the best sales ever, and they're hiding the Huawei contribution, both in direct violation of GAP, but also in terms of their descriptions as to what's driving the performance.

And it's not just this *Syncore* case, which I understand

touched upon illegal practices, but in the *Oracle* case, which is at 527 F.Supp.3d 1151, there it wasn't Oracle's illegal behavior, but it was coercive sales tactics that were a material driver of cloud sales.  And there the same thing happened.  The company made statements about great success in the cloud revenue growth, but they neglected to mention their allegedly coercive sales practices.

Another case is the *Steiner v. Medquist* case, where there was an alleged improper billing scheme, and the Court there, in 2006 Westlaw 2827740, at Star 16, said that when Medquist was talking about their increased sales to their existing customers and sales to new customers, they put the source of its revenue growth at issue, and a major source of that revenue growth was a billing scheme that was alleged to be improper.

Again, it's not a criminal violation, but it's a source of revenue that's kind of being hidden from the other sources in terms of this, you know, broadcasting of how successful they are.

And I have additional cases, but I think that makes the point I'm trying to make, which is putting aside the allegedly good-faith belief in compliance, they were actively and affirmatively hiding Huawei.  Not just in this quarter, by the way; throughout the class period.  I think I agree with Your Honor this quarter is the most vivid because there was a specific GAP rule at play they just disregarded.

And we know they know about the GAP rule, because the CFO cited to the same GAP rule in the very beginning of the class period when he said they're not -- you know, and now there's a transcript question.  He said perhaps they're not at a bad level, they're not at that level.  But either way he cited to the GAP rule.  He knows the rules.  And he was talk about it in the context of a core.  This is a core also, and they're failing to be honest with their investors when they put the sources of revenue at issue.

THE COURT:  Let me give defendant an opportunity to respond.

MR. HASHEMI:  Thank you, Your Honor.

The answer to question five is, no, there are no allegations.  And there are certainly no allegations that defendants privately credited Huawei HDD sales for Seagate's performance that quarter.

More generally, Your Honor, as detailed in our papers, the alleged driver misstatements are general and innocuous statements.  You mentioned them yourself, talking about changing macroeconomic conditions, COVID, seasonal patterns, the Seagate branding.

And to answer your direct questions, I believe plaintiffs are amending their complaint on the spot.  The whole point of their case was it was based on illegal Huawei sales.  That's the whole premise of their entire case.  You take that premise

out, there is no case.

With respect to their two cases, Your Honor, with all due respect, the *Syncore* Ninth Circuit case, that one had confidential witnesses, with the defendants telling -- describing, as you know, terms of "bribe" and buying off doctors, confidential witnesses that the officers/directors were crediting an illegal payment scheme.  The CW told officers that there was a problem.  There is nothing remotely of that kind here.

And the *Medquist* case, Your Honor, respectfully, District of New Jersey case, out of circuit, was involved about a known fraudulent billing scheme.  I think that was readily distinguishable in our papers, as well.

**THE COURT:**  But I don't think I need more argument on question five, but let me just ask the parties to take your opportunity to tell me any last things you want me to know that were not in your papers.  Since this was defendant's motion I'll start with defendant.  Then plaintiff can have the last word.

**MR. HASHEMI:**  Just a few things, Your Honor.

I did not say the Ninth Circuit didn't adopt *Omnicare*, I said *Omnicare* did not address scienter.  We embrace Justice Kagan's language.  We think it helps us, because there's no allegation, there was no legal inquiry here.  We're not making a truth on the market argument.  We readily dismissed that in

our reply.

Respectfully, we believe counsel is moving past the pleading standard.  There's a lot of "thinks," and "I think this happened" and asking the Court to guess and speculate.  Normally, we're arguing about the reliability of confidential witnesses or internal reports or analyses.  Those often do not get past the pleading stage even when complaints include those.  Here, the complaint alleges nothing about confidential witness or internal documents reflecting Mr. Mosley or Mr. Romano's state of mind, let alone that they did anything with deliberate recklessness, a form of knowing and intentional misconduct.

I did not understand my friend's distinguishing of the *Endologix* case.  I'm happy to go through it more, but if the Court doesn't need that, I will conclude with the following:

Your Honor, as the Supreme Court in *Tellabs* made clear, courts must consider plausible, nonculpable inferences and explanations for defendant's conduct when considering the allegations.  Based on this complaint and other documents in the record, the more compelling inference is that Seagate, a global company with over 10 billion in revenue a year, with a very sophisticated and high technology process for developing HDDs, conducted an analysis of the export rule.  The inference is reasonable and nonculpable that that analysis was done by people in the field of export controls.  That analysis was

consistent with the company's statements, and that analysis was consistent with the company's disclosures, and nothing inconsistent was said to the CEO or CFO.

That's the more compelling nonculpable inference the Court should consider.  We think it's very much more compelling, and that entitles this case to be dismissed, this complaint to be dismissed in its entirety.

Thank you.

**MR. GRAZIANO:**  Your Honor, first, in terms of their knowledge of noncompliance, I think that is the core of the case, and I was not walking away from it, I was just answering Your Honor's direct question.

There's one more fact I wanted to cite as to why their supposed interpretation was unreasonable, and this comes from exhibit 9 of defendant's submissions.  It's at 51601.  There is a specific clarification in the Federal Register about what is essential, and it says:  "Because the definition of 'product' applies to all production stages, such as product engineering, manufacturing, integration assembly, inspection, testing and quality assurance, any equipment subject to the export control classification numbers" -- and I'm skipping over the cites of the law -- "in any of the product stages is considered essential."  So I think that's pretty explicit and completely undermines their supposed interpretation.

In terms of the questions Your Honor asked, I think Your

Honor, you know, covered pretty much two of the three arguments they were making which are about scienter and statements, but there's also a loss causation argument they briefly touched on, and I just wanted to mention that.  They are sort of seeking to dismiss the first two corrected disclosures, but not the second two.  We think they're wrong about the first two corrected disclosures.

Specifically the first one on March 8th of 2022 says that they're going to be at the lower end of their revenue expectations because of, quote, "disruption in the Chinese market."  We think that's a direct reference to Huawei.

Then in July 21 of 2022, their revenue is down well below expectations.  It's down 12.8 percent year over year.  They talk about missing guidance for the next coming quarter, and they blame lagging hard disc drive demands in Asia.  We think that's a direct reference to Huawei.  And here again we see the code language.  Right?  They're not talking about Huawei.  They're not.  They're saying, you know, coded words that we are parsing out.

In terms of loss causation, I want to take this opportunity to correct a cite to the Ninth Circuit's *Facebook* decision.  We still rely on that decision, but the Ninth Circuit actually changed its citation to that decision, and we'll put this in the submission after the hearing today.  It's still a proximate cause standard, but it's now reported at 87

F.4th, at 953 to '54.  It changed in -- after our brief went in.

And just maybe finally back to the statements to just clear up any ambiguity.  We are completely consistent with our complaint.  There are three kinds of false statements this company made.  First and foremost was their repeated assertions that we think were at least reckless about how they complied with the law.

They said in statement number 3:  "We continually monitor and remain in compliance with all the rules and regulations around."

In statement 7 they become even more brazen.  They say: "it is part of our job to ensure that we understand and we then follow all the rules and regulations of the trade."  I mean, that's quite a statement.  Under the *Omnicare* standard that statement fails to pass muster given all the facts we cite. There again, in that same statement they were being asked about Huawei, and they say they don't want to comment on specific customers.

They're just telling everybody, the truth is we comply with all the rules and regulations.

Even after the Senate committee went public, they -- you know, and they had all the Senate committee's, you know, views now about how they were being totally unreasonable, they still said:  "the company complies with all laws applicable to its

business operations, including export regulations."

Even after they get the charging letter, again, they could have said, no comment.  They could have said, we're going to look into it.  But, no, they don't do that.  They say on October -- in statement number 10, October 26th of 2022: "Seagate did not engage in the prohibited conduct.  It complied with all relevant export control laws."  I don't know what they have left as an excuse at this point.  They are just making a complete false denial.

Then in terms of the downplaying of their reliance on Huawei, I think we really covered it with Your Honor's question about the April quarter.  I think, you know, a GAP dispute cannot be resolved in a motion to dismiss.  And I don't think we have this case in our papers, so I'll cite you one, but there are many cases that say that.

One is *SEC versus Cotton*, 2006 Westlaw 6382128, and we'll submit that after.

And then, finally, the third category of misstatements, over and over again in, let's say statement 18, statement 20, which we specifically talked about, statement 21, they are purportedly listing for their investors the drivers of their performance, and they leave Seagate out entirely.

And then when things turn south and performance starts to go down because they stop selling to Seagate -- I'm sorry, they stopped selling to Huawei in January of 29th of 2021, they say

other things, but not, we've stopped selling to Huawei. They say there are COVID lockdowns in Asia in statement number 30. They say in statement number 31, their revenue decline is because of the impact of COVID-restrictive measures in Asia. So just as they cannot give half truths about the source of their success, they also cannot give half truths about the source of their decline.

Those are just mirror images of each other. And we primarily rely on the *Syncore* case.

They do cite in their brief one case called *Fastly*. And interestingly enough, that had to do with a proposed Tiktok ban, and that company, unlike this company, specifically said that Tiktok was 13 percent of its business, and a ban could happen.

That's not what Seagate did at all.

I think, Your Honor, just big picture, this is an extremely strong case on all of the elements: Scienter, falsity and loss causation. So if there's anything else, you know, we can provide the Court, we're happy to do so.

**THE COURT:** Thank you all. The argument was very helpful for the Court. I'll take the matter under submission and issue a written order.

**MR. GRAZIANO:** Thank you.

**MR. HASHEMI:** Thank you, Your Honor.

It was a privilege to appear before you for the first

time.

THE COURT:  Thank you.

THE COURTROOM DEPUTY:  Court is in recess.

(Proceedings concluded at 12:16 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Monday, April 1st, 2024

_____

Stephen W. Franklin, RMR, CRR, CPE
Official Reporter, U.S. District Court