UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SEAGATE TECHNOLOGY HOLDINGS PLC SECURITIES LITIGATION | Case No.  23-cv-03431-RFL<br><br>**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND**<br><br>Re: Dkt. No. 72 |

In this securities fraud putative class action, Plaintiffs allege that Seagate Technology Holdings plc and two of its executive officers, William D. Mosley and Gianluca Romano, violated Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, 17 C.F.R. § 240.10b-5.  The lawsuit is based on Defendants' statements regarding sales of Seagate's hard disk drive ("HDD") technology to the Chinese company Huawei Technologies Co., Ltd.

In August 2020, the Department of Commerce issued the Foreign Direct Product Rule ("FDPR"), prohibiting export of certain designated U.S. technologies to Huawei.  Seagate continued to sell HDDs to Huawei, repeatedly stating publicly that its sales were in compliance with the FDPR.  Seagate used third-party equipment to manufacture components of its HDDs, and in January 2021, a third-party supplier warned Seagate that its equipment was based on certain designated U.S. technologies.  Seagate, however, continued to publicly insist that it was complying with the FDPR.  In September 2021, after a congressional inquiry about FDPR compliance, Seagate publicly stated that it had stopped shipping the drives to Huawei.  In 2023, Seagate admitted it had violated the FDPR in its sale of HDDs to Huawei in 2020 and 2021, and

1

paid a $300 million civil penalty in a settlement with the Department of Commerce's Bureau of Industry and Security ("BIS").  Seagate did not admit in connection with that settlement that it had known its interpretation of the FDPR to be incorrect in 2020 and 2021.

Plaintiffs have now brought this securities fraud suit based on Defendants' statements about Seagate's compliance with the FDPR and the extent to which Seagate relied on the Huawei sales to meet its revenue targets.  Defendants move to dismiss the Consolidated Class Action Complaint ("Complaint") for failure to state a claim.  The motion to dismiss is **GRANTED WITH LEAVE TO AMEND**.  Although Seagate violated the FDPR, the Complaint does not contain sufficient allegations for the Court to infer that Seagate or the other defendants knew that Seagate's interpretation of the FDPR was incorrect at the time they claimed to be in compliance with the rule, or that Defendants made those statements with the required deceptive intent.  This ruling assumes the reader is familiar with the facts, the applicable legal standard, and the arguments made by the parties.[1]

*Section 10(b) and Rule 10b-5 claims.*  Plaintiffs fail to adequately allege falsity or scienter as to any of the challenged statements.  Those statements can be grouped into three categories: (1) affirmations of compliance with the FDPR and other applicable export restrictions; (2) statements about Seagate's reliance on sales to Huawei; and (3) statements about the drivers of Seagate's revenue.  The Court addresses each category in turn with respect to both falsity and scienter.

*Falsity*.  First, the Complaint does not adequately plead that Defendants' statements that Seagate complied with applicable regulations were false or misleading.  "Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018).  "A

---

[1] Defendants' request for either incorporation by reference or judicial notice of certain of Seagate's filings with the Securities and Exchange Commission, excerpts from four earnings and investor call transcripts, a U.S. Senate Committee investigation report into Seagate's sales of HDDs to Huawei, Seagate's settlement agreement with the Bureau of Industry and Security and the related BIS order, the FDPR, and a posting on BIS's website regarding the FDPR (Dkt. No. 72-1), which Plaintiffs did not oppose, is **GRANTED**.

statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (cleaned up). At the time Defendants made the challenged statements about compliance, Seagate had not been found to be noncompliant with the FDPR. While BIS ultimately later found that Seagate's interpretation of the FDPR was incorrect, "a statement about compliance is not made misleading just because a later regulatory inquiry occurs." *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 897 (N.D. Cal. 2022).

Plaintiffs claim that the compliance statements were materially false and misleading because Defendants made those statements when they knew that continued sales to Huawei would violate the FDPR. But the Complaint's factual allegations do not sufficiently support that Defendants knew their interpretation of the FDPR was erroneous at the time the challenged statements were made. For example, Plaintiffs point to Seagate's competitors' conduct (namely, that they all stopped shipping to Huawei in light of the FDPR), general client alerts about the scope of the FDPR published by two law firms retained by Seagate, and a letter from one of Seagate's suppliers that the supplier was subject to the FDPR. These allegations, however, concern only others' interpretations of the FDPR and do not speak to whether Seagate agreed with those interpretations behind closed doors.

Plaintiffs also do not adequately allege falsity as to Defendants' risk factor statements and SOX in filings with the Securities and Exchange Commission for the same reason. A representative example of a risk factor statement in Seagate's SEC filings was:

> Our business is subject to regulation under a wide variety of U.S. federal and state and non-U.S. laws, regulations and policies. There can be no assurance that laws, regulations and policies will not be changed in ways that will require us to modify our business model and objectives or affect our returns on investments by restricting existing activities and products, subjecting them to escalating costs or prohibiting them outright . . . . ***Although we have implemented policies and procedures designed to ensure compliance***, there can be no assurance that our employees, contractors or agents will not violate these or other applicable laws, rules and regulations to which we are and may be subject.

3

(Dkt. No. 68 ("Compl.")) ¶¶ 141, 146 (emphasis in Complaint).)  Seagate's statements that there were "no material changes" to the risk factor identified (*see, e.g.*, *id.* ¶ 145), or that changes to export laws "could have a material adverse effect on [Seagate's] business" (*id.* ¶ 154), would be false or misleading only if Seagate knew the risks had already materialized at the time the statements were made.  *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948–49 (9th Cir. 2023) (observing that falsity allegations based on risk disclosures may suffice where "a company's SEC filings warned that risks 'could' occur when, in fact, those risks had already materialized.").  Seagate had not yet been found to be noncompliant with applicable regulations, and Plaintiffs have not otherwise sufficiently alleged with particularity that Defendants knew that the risk had materialized at the time of the SEC filings.  *Cf. In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 693, 702–04  (9th Cir. 2021) (holding that falsity was adequately alleged based on statements in 2018 SEC filings where plaintiffs alleged that Alphabet employees had discovered a security glitch in 2018 but Alphabet nonetheless "made generic statements about how cybersecurity risks *could* affect their business, and stated that there had been no material changes to Alphabet's risk factors since 2017") (emphasis added).

     The same is true for Mosley's and Romano's SOX certifications, which stated that Defendants remained in compliance with applicable rules and regulations and that Defendants had disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."  (Compl. ¶ 142.)  With regard to the latter statements concerning Defendants' financial reporting controls in particular, Plaintiffs contend that those statements are "actionable because those controls were clearly inadequate given [Seagate] illegally shipped millions of HDDs."  (Dkt. No. 82 ("Opp.") at 16.)  But again, this rests on the assumption that Defendants knew that Seagate was violating the FDPR at the time they made those statements, which for the reasons described above, Plaintiffs have not adequately alleged.  Furthermore, there are no specific allegations regarding how Seagate's internal controls over financial reporting were deficient.

     Turning to the next category of statements, Plaintiffs have not alleged falsity as to

statements about Seagate's reliance on sales to Huawei.  In statements made in September and October 2020, Defendants allegedly suggested that revenue from Huawei was less than 10 percent of, or not material to, Seagate's total revenue.  Plaintiffs allege it was misleading for Defendants "to downplay the importance to Seagate of its HDD sales to Huawei."  (Compl. ¶ 183.)  As alleged, these statements were not misleading, as the Complaint indicates that Seagate's sales to Huawei were 3.06 percent of Seagate's total revenue for Q1 2021—which is less than 10 percent as Defendants represented—and Seagate would have met its revenue guidance for that quarter even without those sales.  (*Id.* ¶ 90 (alleging that "Seagate would have come in below the midpoint of its revenue guidance").)

As part of this category of statements, Plaintiffs also challenge Defendants' statement in Seagate's April 29, 2021 Form 10-Q that the document was "prepared in accordance with U.S. generally accepted accounting principles [("GAAP")]."  (*Id.* ¶ 187.)  This statement was allegedly false because GAAP requires disclosures where transactions with a single customer "amount to 10 percent or more of a public entity's revenues," and Defendants allegedly did not make any of the required disclosures, even though Seagate's sales to Huawei in the third quarter of 2021 accounted for 13.42 percent of the company's consolidated revenues.  (Compl. ¶ 188.)  However, as Defendants point out, the Complaint does not allege which GAAP rule requires such disclosures to be made for interim reporting periods, as opposed to on an annual basis (Huawei sales were allegedly only 7.63 percent for FY 2021), or what facts support the inference that Defendants knew this GAAP requirement applied to interim reporting periods when they represented their compliance with the GAAP rules.  The Complaint thus does not adequately allege a GAAP violation.

Furthermore, "the Ninth Circuit has recognized that alleged GAAP violations may qualify as actionable misrepresentations when they are significant."  *Oh v. Hanmi Fin. Corp.*, 621 F. Supp. 3d 1075, 1084 (C.D. Cal. 2022) (citing *In re Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005) ("If properly pled, overstating of revenues may state a claim for securities fraud, as under GAAP, revenue must be *earned* before it can be recognized.") (citations omitted, emphasis

5

in original)).  Even assuming a GAAP violation occurred, Plaintiffs do not sufficiently allege why Huawei's revenue share crossing above 10 percent for one quarter, while still remaining below 10 percent for the year, would be significant enough to constitute an actionable misrepresentation.  Accordingly, as alleged, the statement about compliance with GAAP is not false or misleading.

Finally, the Complaint does not sufficiently allege falsity as to the third category of statements about the drivers of Seagate's revenue during Q1 2021 to Q2 2023.  (*See* Compl. ¶¶ 190–226.)  Plaintiffs allege that, when making the challenged statements, it was misleading for Defendants to not disclose that Seagate's revenue performance "was driven in material part" by sales to Huawei, or the absence thereof.  (*See, e.g.*, *id.* ¶ 190.)  The statements made regarding revenue in Q1 2021, Q2 2021, and Q4 2021 are not adequately alleged to be misleading, because the Complaint concedes that sales to Huawei did not ultimately affect whether Seagate met its revenue guidance in those quarters.  As the Complaint alleges, Seagate "would have come in below the midpoint of its revenue guidance" absent sales to Huawei for those quarters anyway. (*Id.* ¶ 90.)  Thus, it cannot be said that sales to Huawei were such a major revenue driver that they should have been explicitly mentioned in statements about what was behind Seagate's positive revenue results in those quarters.  As for statements made regarding performance in Q2 2022, Seagate had already stopped shipping to Huawei, so sales to Huawei could not have been a driver of revenue for that quarter.

The statements about the drivers of revenue for Q3 2021 and Q1 2022 present a closer question, as Seagate allegedly would have missed its revenue guidance range entirely without its allegedly illegal sales to Huawei.  (*Id.*)  Plaintiffs allege that Defendants' various statements made during an earnings call on April 22, 2021, and in an associated press release from that day, were misleading because Defendants failed to mention sales to Huawei as one of the factors supporting Seagate's positive revenue performance.  But Plaintiffs do not allege that the identified factors (e.g., strong cloud data center demand and ongoing recovery in enterprise markets) were not actually drivers of Seagate's revenue or less consequential than sales to

6

Huawei. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (explaining that there is no affirmative duty "to disclose any and all material information" and that "[d]isclosure is required . . . only when necessary []to make . . . statements made, in the light of the circumstances under which they were made, not misleading."); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012) ("The *Matrixx* Court made it clear that not all adverse events would be material and, more importantly, that not all material adverse events would have to be disclosed."). The Complaint therefore does not sufficiently allege how the challenged statements are misleading without the disclosure of sales to Huawei, especially given that Seagate specifically told investors in the two previous quarterly earnings calls that the company did not provide information about individual customers. (Compl. ¶ 45; Dkt. 72-6 at 5; Dkt. 72-7 at 5.)[2]

The same reasoning holds true for statements made regarding the subsequent quarters where Seagate had negative revenue performance. Plaintiffs allege that Defendants' failure to identify "the loss of Seagate's illegal monopoly on HDD sales to Huawei" as a factor for the decline was misleading, but again, Plaintiffs do not allege that the identified factors (e.g., COVID restrictions, industry-wide supply challenges, and COVID-related disruption in China) were not material. While some investors may have found information about Seagate's Huawei's sales material, Plaintiffs do not adequately allege how the statements made are misleading absent disclosure of that information.

In sum, Plaintiffs have not alleged falsity as to any of the challenged statements.

***Scienter.*** Even assuming that the falsity is requirement is met for the challenged statements, the Section 10(b) and Rule 10b-5 claims fail because Plaintiffs do not adequately allege scienter. "A complaint will only survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw

---

[2] Those statements might present a different situation if Seagate allegedly knew its Huawei sales were illegal and privately credited those sales with Seagate's ability to meet the earnings targets. *See In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 320 (9th Cir. 2007), *as amended on denial of reh'g* (Oct. 9, 2007).

from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). "In this circuit, the required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 937 (9th Cir. 2023) (citation and internal quotation marks omitted). "'[D]eliberate recklessness' is more than '*mere* recklessness or a motive to commit fraud.'" *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (citation omitted) (emphasis in original). "It is instead 'an *extreme* departure from the standards of ordinary care,' which 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'" *Id.* (citation omitted) (emphasis in original). The Complaint raises multiple potential bases for scienter, but the allegations, taken separately or in combination, are insufficient to support a strong inference of scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009); *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, 63 F.4th 747, 766 (9th Cir. 2023).

First, Plaintiffs do not adequately allege that Defendants' interpretation of the FDPR was so patently unreasonable to support an inference of scienter. *See In re Medicis Pharm. Corp. Sec. Litig.*, No. CV-08-1821-PHX-GMS, 2010 WL 3154863, at *5 (D. Ariz. Aug. 9, 2010) (where scienter was allegedly based solely on defendant's incorrect claim of compliance with a rule, plaintiff must allege defendant's awareness of the rule, defendant's knowledge of the correct interpretation, and "facts explaining how the defendant's incorrect interpretation was so unreasonable or obviously wrong that it should give rise to an inference of deliberate wrongdoing"). Defendants interpreted the FDPR "to require evaluation of only the last stage of its HDD manufacturing process rather than the entire process." (Dkt. 72-19 ("BIS Order") at 5.) As Defendants' counsel explained at the hearing on the motion dismiss, this interpretation was not so obviously wrong, as the meaning of "direct product" is not immediately apparent from the plain language of the FDPR. (Dkt. No. 94 at 5:25–9:9.) The FDPR, as issued in August 2020, applied to the "direct product of a complete plant or major component of a plant." (Dkt. No. 72-11 at 35.) The Export Administration Regulations defined "direct product" as "[t]he *immediate*

8

*product* (including processes and services) produced directly by the use of technology or software." 15 C.F.R. § 772.1 (emphasis added). The potential ambiguity with the meaning of "direct product" is underscored by comments that BIS received about the FDPR's application to products with long and complex production lines: "How can we possibly delve that deeply into the supply chains and design chains of our customers and suppliers?'' (Dkt. No. 72-11 at 6.) Accordingly, Defendants' interpretation of the FDPR, without more, does not give rise to a strong inference of scienter.

The Complaint's remaining allegations in support of scienter are also weak. Specifically, Plaintiffs point to a rule notification letter from one of Seagate's suppliers, two client alerts from law firms retained by Seagate (which Plaintiffs do not allege Defendants actually saw), and the fact that Seagate's competitors ceased shipping to Huawei to claim that "Seagate was repeatedly and directly warned that its unlicensed HDD sales to Huawei violated the FDPR." (Compl. ¶¶ 115–18.) Plaintiffs also rely on Seagate's alleged slowness in cooperating with the Senate Commerce Committee's investigation, the size of the civil penalty paid to BIS, "senior management's close involvement in dramatically accelerating [Seagate's] HDD sales to Huawei following enactment of the FDPR," and the timing of the departure of one Seagate executive and salary reductions for others. (*Id.* ¶¶ 119–20, 128–30, 132.) In addition, the Complaint includes more general allegations about "the egregious and widespread character of Seagate's FDPR violations" and how the challenged statements concerned the sales of Seagate's "most important product to one of its most significant customers." (*Id.* ¶¶ 121–26, 131.)

These allegations, however, do not provide an adequate basis to draw a strong inference that Defendants had the required state of mind. For example, as noted above, others' interpretations of the FDPR are not a sufficient basis for the Court to plausibly infer that Defendants actually believed their contrary interpretation was wrong at the time the challenged statements were made or that their assertions of compliance with the law were deliberately reckless. Moreover, the Complaint's allegations are not inconsistent with Defendants' plausible, nonculpable explanation that they had a good faith, but ultimately erroneous, interpretation of the

FDPR, which the Court must consider in assessing scienter. *Tellabs*, 551 U.S. at 323–24 (holding that inference of scienter "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations"). If Seagate really believed its sales to Huawei to be illegal, it is hard to understand why the company would repeatedly and publicly acknowledge its continuing relationship with Huawei after the promulgation of the FDPR. The Complaint's allegations of scienter heavily rely on the benefit of hindsight, and there are no allegations of contemporaneous facts to supporting that Defendants knew that continued sales to Huawei violated the FDPR or were deliberately reckless in that belief.

Plaintiffs' reliance on Defendants' alleged GAAP violation (Compl. ¶ 127) fares no better. Even assuming a violation, a technical misunderstanding of the rule would not be sufficient to support scienter. *DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) ("[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. Rather, scienter requires more than a misapplication of accounting principles. The plaintiff must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts."). As currently alleged, any violation would be based on the applicability of the GAAP rule to interim reporting periods as well as annual reports, as detailed above. The Complaint does not contain facts from which the Court could plausibly infer that such a technical misapplication of the rules would be so egregious that it amounted to intentional deception.

Furthermore, the Complaint does not plead scienter with particularity as to the individual defendants. Scienter based on a core operations theory is deficiently pleaded, as Plaintiffs do not "provide either specific admissions by the executives that they were involved in the details of a company's operations or witness statements that the executives were specifically involved in producing the false reports." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1111

(9th Cir. 2021).

Overall, based on the allegations in the Complaint, the inference of scienter is not equally as compelling as the opposing inference that Defendants had a non-fraudulent intent and erroneously interpreted the FDPR.[3]

***Section 20(a) claims.***  Because Plaintiffs have not adequately alleged a primary violation of Section 10(b) or Rule 10b-5, their control person claims under Section 20(a) necessarily fail. *See Prodanova*, 993 F.3d at 1113.

Based on foregoing, Defendants' motion to dismiss is granted.  Since the Court cannot conclude that amendment would be futile, dismissal is with leave to amend.  If Plaintiffs wish to file an amended complaint correcting the deficiencies identified above, they shall do so within **21 days of the date of this Order**.  Plaintiffs may not add new claims or otherwise amend their complaint absent leave of the Court or stipulation by the parties pursuant to Federal Rule of Civil Procedure 15.  If no amended complaint is filed by that date, the complaint will remain dismissed, judgment will be entered in favor of Defendants, and the case will be closed.

**IT IS SO ORDERED.**

Dated: August 8, 2024

RITA F. LIN
United States District Judge

---

[3] As the Complaint fails to allege both falsity and scienter as to the challenged statements, the Court does not reach whether loss causation has been adequately pleaded.