*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| No. | The Speaker(s), Date(s), and Medium | False and Misleading Statements | Reasons Statements Were False, Misleading, or Deceptive When Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | **Defendants' Materially False and Misleading Statements Concerning Seagate's Compliance with the FDPR** | | |
| 1. | **When:** September 14, 2020<br><br>**Where:** Deutsche Bank Technology Conference<br><br>**Speaker(s):** Defendants Seagate and Romano<br><br>**Compl. ¶¶ 166-67** | An analyst asked Defendant Romano "Starting off with Huawei, clearly, getting a lot of headlines lately especially given the new restrictions that were announced last month . . . can you give us an update of how you think those restrictions will impact Seagate in the short term; when I think short term, it's like calendar Q3, Q4? And maybe in the longer term, how does that work out? And if you want to continue to sell to Huawei, would you be required to get a license approved by the Department of Commerce?"<br><br>Defendant Romano answered: "Yeah. So, of course, we are still going through the final assessment, but from what I have seen until now, I don't see any particular restriction for us in term [sic] of being able to continue to ship to Huawei or any other customers in China. So, we don't think we need to have a specific license." | It was misleading for Defendant Romano to state that Seagate did not "see any particular restriction for us in term of being able to continue to ship to Huawei" and that "we don't think we need to have a specific license," when, in truth: (i) as Seagate has admitted, the Company's HDD sales to Huawei did violate the FDPR because the Company's HDD production processes did implicate these export restrictions (specifically they used technologies specified in ECCN numbers that analysts and public investors would not have known about); (ii) the Company received numerous warnings, including from its competitors and its outside law firms, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – did trigger FDPR export restrictions; and (iii) in instructions to its customers, Seagate had previously taken the position that its HDDs could not be transferred to any entity on the Restricted Entity list. ¶ 169. | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty |

1

following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; and (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage." ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are

complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly

stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR

*In re Seagate Technology Holdings plc, Securities Litigation*, **No. 23-cv-03431-RFL**

compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶¶ 148-49.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 130, 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination

guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly ***trebled*** the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.

12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.

13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163.

*In re Seagate Technology Holdings plc, Securities Litigation*, **No. 23-cv-03431-RFL**

| 2. | **When:** September 14, 2020<br><br>**Where:** Deutsche Bank Technology Conference<br><br>**Speaker(s):** Defendants Seagate and Romano<br><br>**Compl.** ¶ 168 | An analyst asked whether Seagate was "impacted by several Chinese companies being put on the Entity List."<br><br>Defendant Romano responded, "I would say the majority of our customers are in China. We have a very high market share in China in general . . . . We don't have any limitation right now in term [sic] of what we can ship to those customers." | It was misleading for Defendant Romano to state that Seagate did not "see any particular restriction for us in term of being able to continue to ship to Huawei" and that "we don't think we need to have a specific license," when, in truth: (i) as Seagate has admitted, the Company's HDD sales to Huawei did violate the FDPR because the Company's HDD production processes did implicate these export restrictions (specifically they used technologies specified in ECCN numbers that analysts and public investors would not have known about); (ii) the Company received numerous warnings, including from its competitors and its outside law firms, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – did trigger FDPR export restrictions; and (iii) in instructions to its customers, Seagate had previously taken the position that its HDDs could not be transferred to any entity on the Restricted Entity list. ¶ 169. | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to |

*In re Seagate Technology Holdings plc, Securities Litigation*, **No. 23-cv-03431-RFL**

| | | | participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable. |
|---|---|---|---|
| | | | 2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; and (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage." ¶¶ 135-39. |
| | | | 3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee— |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei

to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they

| | | | performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶¶ 148-49. |
|---|---|---|---|
| | ¶ | | 9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and |

that management would be unaware of the numerous red flags that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants" and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per

13

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | |
|---|---|---|---|---|
| | | | *Id.* ¶¶ 161-62. | violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.

12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.

13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 3. | **When:** October 22, 2020<br><br>**Where:** Earnings Call | When an analyst asked: "First question is related to Huawei. Just want to confirm that can you talk about whether you are | It was misleading for Defendant Romano to state that "[w]e continually monitor and remain in compliance with all the rules and regulations around," to tout the Company's "controls and procedures to ensure compliance" with "applicable laws, rules | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a |

14

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

**Speaker(s):**
Defendants Seagate and Mosley

**Compl**. ¶ 170

continuing to ship to Huawei and what is included in your December quarter guidance. It looks like your competitor may have stopped shipping maybe back in the middle of September. And do you think you're seeing some benefits of that in your December quarter?"

Defendant Mosley responded, *"We continually monitor and remain in compliance with all the rules and regulations around."*

and regulations," and to state that Defendants "ha[d] disclosed" "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," when, in truth: (i) as Seagate has admitted, the Company did not "remain in compliance" with export rules and regulations, the Company's continuing HDD sales to Huawei did violate the FDPR, and the Company's HDD production processes did implicate the Rule's export restrictions; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its competitors and its lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – did trigger FDPR export restrictions; (iv) in instructions to its customers, Seagate had previously taken the position that its HDDs could not be transferred to any entity on the Restricted Entity list; and (v) Seagate had dramatically expanded the Company's exposure to Huawei sales, and, as Seagate has admitted, had already positioned itself as Huawei's sole HDD supplier. ¶ 174.

company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in any of the production stages of the item"; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do— demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom,

Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs could not be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; and (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage." ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee— indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. ¶¶ 140-41.

| | | | | 4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.<br><br>5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "knowingly" violated the FDPR, having made "the strategic calculation to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.<br><br>6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this |

| | | | | patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject |

were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags that the FDPR proscribed them. ¶¶ 156-58.

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | 10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used multiple advanced U.S.-origin technologies specified in the FDPR at multiple critical stages of the manufacturing process, to produce multiple core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.<br><br>11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly trebled the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" |

*In re Seagate Technology Holdings plc, Securities Litigation*, **No. 23-cv-03431-RFL**

| | | | | |
|---|---|---|---|---|
| | | | | including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.<br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 4. | **When:**<br>1. October 29, 2020<br>2. January 28, 2021<br>3. April 29, 2021<br>4. October 28, 2021<br>5. January 27, 2022 | In the SEC-mandated disclosure of risk factors, Defendants stated, "There have been ***no material changes*** to the description of the risk factors associated with our business previously disclosed in | It was misleading for Defendants to state that there were "no material changes to the description of [Seagate's] business," that laws and regulations could be changed "in ways that will require us to modify our business," and to tout the Company's "policies and procedures designed to ensure compliance" when, in truth: (i) as Seagate has admitted, the Company ***did not*** "remain in | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire |

| | | | |
|---|---|---|---|
| 6. April 28, 2022<br><br>**Where:** SEC Form 10-Q filings<br><br>**Speaker(s):**<br>Defendants Seagate, Mosley, and Romano<br><br>**Compl.** ¶¶ 170-71, 176-77, 180-81, 189-90, 193-94, 197-98 | 'Risk Factors' in Part I, Item 1A. in our Annual Report on Form 10-K for the fiscal year ended July 3, 2020."<br><br>Defendants further stated, "Our business is subject to regulation under a wide variety of U.S. federal and state and non-U.S. laws, regulations and policies. There can be no assurance that laws, regulations and policies will not be changed in ways that will require us to modify our business model and objectives or affect our returns on investments by restricting existing activities and products, subjecting them to escalating costs or prohibiting them outright . . . . Although we have implemented policies and procedures designed to ensure compliance, there can be no assurance that our employees, contractors or agents will not violate these or other applicable laws, rules and regulations to which we are and may be subject." | compliance" with export rules and regulations, the Company's continuing HDD sales to Huawei *did* violate the FDPR, and the Company's HDD production processes did implicate the Rule's export restrictions; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its competitors and its lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – *did* trigger FDPR export restrictions; (iv) in instructions to its customers, Seagate had previously taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; and (v) Seagate had dramatically expanded the Company's exposure to Huawei sales, and, as Seagate has admitted, had already positioned itself as Huawei's sole HDD supplier. ¶¶ 174, 179, 184, 187, 192, 196, 200. | regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in."  Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless.  The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed |

were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "***are subject***" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "***any stage of production***" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—

| | | | indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei.  Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021.  Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew those sales contravened the FDPR.  ¶¶ 140-41. |
|---|---|---|---|
| | | | 4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company.  ¶ 142. |
| | | | 5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties."  That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its |

competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded,

the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of

millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations"

and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶¶ 130, 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.

12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across

| | | | | |
|---|---|---|---|---|
| | | | | Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 5. | **When:**<br>1. October 29, 2020<br>2. January 28, 2021<br>3. April 29, 2021<br>4. August 6, 2021<br>5. October 28, 2021<br>7. January 27, 2022<br>8. April 28, 2022<br>9. August 5, 2022<br>10. October 27, 2022<br>11. January 25, 2023<br><br>**Where:** SEC Form 10-Q and Form 10-K Certifications pursuant to the Sarbanes-Oxley Act of 2002<br><br>**Speaker(s):**<br>Defendants Seagate, Mosley, and Romano | In their SEC-mandated SOX Certifications, Defendants Mosley and Romano stated, "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."<br><br>Defendants Romano and Mosley further stated in those certifications that they "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial | It was misleading for Defendants to state that they "ha[d] disclosed" "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," while failing to disclose that, in truth: (i) as Seagate has admitted, the Company *did not* "compl[y] with all applicable regulations and orders" with regard to the export of its products to Huawei, specifically the FDPR; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – *did* trigger FDPR export restrictions; (iv) in January 2021, a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate had refused to cooperate with a Congressional inquiry into its HDD sales to Huawei, which began in May 2021; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; (vii) beginning in December 2020, Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any*" of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | |
|---|---|---|---|
| **Compl. ¶¶ 173, 178, 182, 186, 190, 194, 199, 202, 207, 210** | reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."<br><br>Further, Defendants Mosley and Romano certified that the Company's SEC filing disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information." | sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier; and (viii) Seagate had lost a "key customer" because it had stopped shipping HDDs to Huawei on or about September 29, 2021. ¶¶ 174, 179, 183, 187, 192, 196, 200, 203, 208, 211. | Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.<br><br>2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter |

from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "*are subject*" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "*any stage of production*" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee— indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021. Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew those sales contravened the FDPR. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this

patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject

| | | | were, at a minimum, severely, deliberately reckless. ¶ 148.<br><br>9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and |
|---|---|---|---|

congressional investigation—that the FDPR proscribed them.  ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter.  Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs.  Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy."  Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine."  ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations.   Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement.   Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per

| | | | | |
|---|---|---|---|---|
| | | | | violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.<br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 6. | **When:** January 21, 2021 | An analyst asked Defendants, "I know asked this question last quarter on Huawei, but given the | It was misleading for Defendants to state that Seagate's market demand for HDD sales "will not change" as a result of the FDPR, while failing to disclose that, in truth: (i) as Seagate has admitted, | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | |
|---|---|---|---|
| **Where:** Q2 Earnings Call<br><br>**Speaker(s):** Defendants Seagate and Romano<br><br>**Compl.** ¶ 175 | current restrictions on the shipment to Huawei, does that change the way you think about the total addressable market for this calendar year for nearline drives [a core segment of Seagate's HDD business]?"<br><br>Defendant Romano stated that the FDPR had no impact on the Company's HDD sales: "So, like I said last time, we don't comment on any specific customers. I think that the market demand globally will not change on how it's ultimately serviced, so if that answers your question." | the Company's HDD sales to Huawei ***did*** violate the FDPR because the Company's HDD production processes ***did*** implicate these export restrictions; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – ***did*** trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDPR rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) in instructions to its customers, Seagate had previously taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list; and (vi) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier. ¶ 179. | in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in ***any*** of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the |

proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; and (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage." ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this

| | | | | |
|---|---|---|---|---|
| | | ¶ | | patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.<br><br>7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.<br><br>8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject |

| | | ¶ | | were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags that the FDPR proscribed them. ¶¶ 156-58. |

*In re Seagate Technology Holdings plc, Securities Litigation*, **No. 23-cv-03431-RFL**

| | | | |
|---|---|---|---|
| | | | 10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter.  Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs.  Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy."  Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine."  ¶ 159.<br><br>11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations.   Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly ***trebled*** the fines it imposed on Seagate as part of the settlement.   Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation).  However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" |

| | | | | including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.<br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 7. | **When:** June 8, 2021<br><br>**Where:** Bank of America Global Technology Conference | An analyst asked Defendant Romano, "we've been receiving a lot of questions around a particular customer of yours where there are some restrictions | It was misleading for Defendants to state that, with regard to Seagate's Huawei sales, "the truth is we comply with all the rules and regulations," that "we ship for all our customers following those rules and regulations," and that the Company was doing its "job to ensure that we understand and then we follow all the rules | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which |

| | | | | |
|---|---|---|---|---|
| | **Speaker(s):** Defendants Seagate and Romano<br><br>**Compl.** ¶ 183 | in place for shipments and I was wondering if you could comment at all on that."<br><br>After the analyst clarified that Huawei that was the subject of the many investor questions they had received, Defendant Romano responded, "we always answer to this specific question the same way because that is *the truth is we comply with all the rules and regulations.* And based on that, *we ship for all our customers following those rules and regulations.* . . . We don't comment on specific customers as we don't comment on specific suppliers or investors. But *in general, it's part of our job to ensure that we understand and then we follow all the rules and regulations of trade."* | and regulations of trade," while failing to disclose that, in truth: (i) as Seagate has admitted, the Company *did not* "comply with all the rules and regulations" concerning the export of its products to Huawei (including the FDPR, which was the subject of the analyst's question), Seagate *did not* "ship for all our customers following those rules and regulations," and *did not* "follow all the rules and regulations of trade" because the Company's continued HDD sales to Huawei violated the FDPR; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – *did* trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDP rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate was refusing to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; and (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier. ¶ 184. | triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do— demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the |

BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "*are subject*" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "*any stage of production*" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its

interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors

they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized

without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.

12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.

13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163.

| 8. | **When:** 1. August 6, 2021 2. August 5, 2022 <br><br> **Where:** SEC Form 10-K filings <br><br> **Speaker(s):** Defendants Seagate, Mosley, and Romano <br><br> **Compl. ¶¶ 185, 201** | In the SEC-mandated disclosure of risk factors, Defendants stated, "Some of our products and services are subject to export control laws and other laws affecting the countries in which our products and services may be sold, distributed, or delivered, and any changes to or violation of these laws could have a material adverse effect on our business, results of operations, financial condition and cash flows . . . . Although we have controls and procedures to ensure compliance with all applicable regulations and orders, we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers. Additionally, we cannot ensure that our interpretation of relevant restrictions and regulations will be accepted in all cases by relevant regulatory and enforcement authorities." | It was misleading for Defendants to state that export control "laws could have a material adverse effect on our business," to tout the Company's "controls and procedures to ensure compliance with all applicable regulations and orders," and to state that "we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers," while omitting that: (i) Seagate's sales of HDDs to Huawei *had already violated* "export control laws and other laws"; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – *did* trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDP rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate was refusing to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; and (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier. ¶¶ 187, 203. | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do— demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate |

| | | | | |
|---|---|---|---|---|
| | ¶¶ 48-49 | | | in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct.  ¶¶ 48-49.  At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.<br><br>2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "***are subject***" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "***any stage of production***" of any of Seagate's products sold to Huawei.  ¶¶ 135-39.<br><br>3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei.  After receiving a letter from |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | |
|---|---|---|
| | | the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee— indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021. Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew those sales contravened the FDPR. ¶¶ 140-41. |
| | | 4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142. |
| | | 5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the |

prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by

| | | | | analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.<br><br>8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period.  In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance.    Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless.  ¶ 148.<br><br>9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales.  As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier.  Seagate senior management signed at least two sweeping commercial |
|---|---|---|---|---|

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs.  These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them.  ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs.  Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s]

of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly ***trebled*** the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.<br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
|---|---|---|---|---|
| 9. | **When:** October 26, 2021<br><br>**Where:** *Wall Street Journal*<br><br>**Speaker(s):** Defendant Seagate<br><br>**Compl.** ¶ 188 | A Seagate spokesman told the *Wall Street Journal* that Seagate ***"complies with all laws applicable to its business and operations, including export control regulations."*** | It was misleading for Defendants to state that, with regard to Seagate's Huawei sales, Seagate "complies with all laws applicable to its business and operations, including export control regulations," while failing to disclose that, in truth: (i) as Seagate has admitted, the Company ***did not*** "compl[y] with all laws applicable to its business and operations, including export control regulations" with regard to the export of its products to Huawei, specifically the FDPR; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – ***did*** trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDP rule notification" letter warning Seagate that use of its equipment in the manufacture of | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in ***any*** of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing |

| | | | | any product triggered FDPR export restrictions for that product; (v) Seagate had refused to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list; (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier; and (viii) Seagate had lost a "key customer" because it had stopped shipping HDDs to Huawei on or about September 29, 2021. ¶ 192. | triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless.  The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do— demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.<br><br>2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client |

notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "***are subject***" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "***any stage of production***" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021. Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial

|  |  | ¶ |  | "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew those sales contravened the FDPR. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45. |

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors

they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized

| | | | | without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58. |
| | | | | |
| | | | | 10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159. |
| | | | | |
| | | | | 11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly ***trebled*** the fines it imposed on Seagate as |

| | | | | |
|---|---|---|---|---|
| | | | | part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.<br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| 10. | **When:** October 26, 2022<br><br>**Where:** Press Release/8-K<br><br>**Speaker(s):** Defendant Seagate<br><br>**Compl. ¶ 204** | Defendants stated that Seagate ***"did not engage in prohibited conduct," "complied with all relevant export control laws and regulations,"*** and that ***"Seagate has committed to compliance through its global team of international trade compliance and legal professionals and by maintaining robust trade controls compliance policies and procedures."*** | It was misleading for Seagate to state that, with regard to Seagate's Huawei sales, Seagate "did not engage in prohibited conduct," "complied with all relevant export control laws and regulations," and that "Seagate has committed to compliance through its global team of international trade compliance and legal professionals and by maintaining robust trade controls compliance policies and procedures," while failing to disclose that, in truth: (i) as Seagate has admitted, the Company ***did not*** "with all laws applicable to its business and operations, including export control regulations" with regard to the export of its products to Huawei, specifically the FDPR; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – ***did*** trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDP rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate had refused to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list; (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier; and (viii) Seagate had lost a "key customer" because it had stopped shipping HDDs to Huawei on or about September 29, 2021. ¶ 208. | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in ***any*** of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do— demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate |

in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "***are subject***" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "***any stage of production***" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from

the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021. Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew those sales contravened the FDPR. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the

prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial

|  |  |  |  | agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.<br><br>10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] |

of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from

| | | | | conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.<br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 11. | **When:** October 26, 2022<br><br>**Where:** Q1 Earnings Call<br><br>**Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl.** ¶ 205 | Defendant Mosley stated "[w]e have responded to the letter and ***believe that we've complied with all relevant export control laws and regulations.*** | It was misleading for Defendants to state that, with regard to Seagate's Huawei sales, Seagate "complied with all laws applicable to its business and operations, including export control regulations," while failing to disclose that, in truth: (i) as Seagate has admitted, the Company ***did not*** "with all laws applicable to its business and operations, including export control regulations" with regard to the export of its products to Huawei, specifically the FDPR; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – ***did*** trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDP rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in ***any*** of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would |

| | | | | (v) Seagate had refused to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier; and (viii) Seagate had lost a "key customer" because it had stopped shipping HDDs to Huawei on or about September 29, 2021. ¶ 208. | include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.<br><br>2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed |
| | | | ¶¶ 132-34. | |

shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "***are subject***" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "***any stage of production***" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021. Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew those sales contravened the FDPR. ¶¶ 140-41. |
|---|---|---|---|---|

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors

they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized

without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly ***trebled*** the fines it imposed on Seagate as

part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.

12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.

13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163.

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| 12. | **When:** 1. October 27, 2022 2. January 25, 2023 **Where:** SEC Form 10-Q filings **Speaker(s):** Defendants Seagate, Mosley, and Romano **Compl. ¶¶ 206, 209** | In the SEC-mandated disclosure of risk factors, Defendants stated, "Some of our products and services are subject to export control laws and other laws affecting the countries in which our products and services may be sold, distributed, or delivered, and any changes to or violation of these laws could have a material adverse effect on our business, results of operations, financial condition and cash flows . . . . Although we have controls and procedures to ensure compliance with all applicable regulations and orders, we cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products and services to existing or new customers. Additionally, we cannot ensure that our interpretation of relevant restrictions and regulations will be accepted in all cases by relevant regulatory and enforcement authorities." | It was misleading for Defendants to state that they "cannot predict whether changes in laws or regulations by the U.S., China or another country will affect our ability to sell our products," and "have controls and procedures to ensure compliance with all applicable regulations and orders," while failing to disclose that, in truth: (i) as Seagate has admitted, the Company *did not* "compl[y] with all applicable regulations and orders" with regard to the export of its products to Huawei, specifically the FDPR; (ii) as BIS found, Seagate's controls over its export compliance were deficient and necessitated that the Company complete a series of extensive audits over several years; (iii) the Company received numerous warnings, including from its suppliers, competitors and lawyers, that its "essential" production processes – processes Seagate has admitted were "major components" of its HDD factories – *did* trigger FDPR export restrictions; (iv) a major Seagate supplier of manufacturing technology had sent the Company an "FDP rule notification" letter warning Seagate that use of its equipment in the manufacture of any product triggered FDPR export restrictions for that product; (v) Seagate had refused to cooperate with a Congressional inquiry into its HDD sales to Huawei; (vi) in instructions to its customers, Seagate had previously taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list; (vii) Seagate had dramatically expanded the Company's exposure to Huawei sales, including by signing sweeping commercial agreements designating Huawei as a "strategic customer" and extending Seagate massive lines of credit to facilitate outsized HDD purchases, and, as Seagate has admitted, the Company positioned itself as Huawei's sole HDD supplier; and (viii) Seagate had lost a "key customer" because it had stopped shipping HDDs to Huawei on or about September 29, 2021. ¶¶ 208, 211. | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any*" of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do— demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate |

*In re Seagate Technology Holdings plc, Securities Litigation*, **No. 23-cv-03431-RFL**

¶¶ 48-49.

in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "***are subject***" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "***any stage of production***" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from

the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei.  Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021.  Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew those sales contravened the FDPR.  ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company.  ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the

prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by

| | | | analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51. |
| | | | |
| | | | 8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period.  In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance.   Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless.  ¶ 148. |
| | | | |
| | | | 9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales.  As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier.  Seagate senior management signed at least two sweeping commercial |

agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs.   These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei.  Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures.  Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them.  ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s]

of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly **trebled** the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from

*In re Seagate Technology Holdings plc, Securities Litigation*, **No. 23-cv-03431-RFL**

| | | | |
|---|---|---|---|
| | | | conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.<br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |

| Statements Concerning Seagate's Reliance on HDD Sales to Huawei | | | |
|---|---|---|---|
| 13. | **When:** September 14, 2020<br><br>**Where:** Deutsche Bank Technology Conference<br><br>**Speaker(s):** Defendants Seagate and Romano<br><br>**Compl. ¶¶ 212-213** | When a Deutsche Bank analyst asked Defendant Romano "what the revenue contribution of Huawei to Seagate is" and how Defendant Romano thought the FDPR would "impact Seagate," Defendant Romano answered, "we don't disclose the level of revenue of specific customers. But as you know, we should report if the customer is above 10%. So, you can assume that is not [at that] level." | It was misleading for Defendants to downplay the importance to Seagate of its HDD sales to Huawei and to state that Huawei's revenue contribution "is not [at that] level," while failing to disclose that Seagate had already positioned itself as Huawei's sole HDD supplier, that sales to Huawei exceeded 3% of HDD revenue and were rapidly climbing, and that Huawei's revenue contribution was allowing the Company to meet its revenue guidance. ¶ 214. | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in ***any*** of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do— demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike |

other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; and (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage." ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—

*In re Seagate Technology Holdings plc, Securities Litigation*, **No. 23-cv-03431-RFL**

indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei

to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they

performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and

| | | | |
|---|---|---|---|
| | | | congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.<br><br>10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used **multiple** advanced U.S.-origin technologies specified in the FDPR at **multiple** critical stages of the manufacturing process, to produce **multiple** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.<br><br>11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly **trebled** the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per |

| | | | | violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.<br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
|---|---|---|---|---|
| 14. | **When:** October 22, 2020 | An analyst asked, "First question is related to Huawei. Just want to confirm that can you talk about whether you are continuing to | It was misleading for Defendants to state that Huawei's revenue was "not material" and that increased demand in certain markets was "just" a function of "too much inventory" in others, while failing to disclose that Seagate had already positioned itself as | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a |

*In re Seagate Technology Holdings plc, Securities Litigation*, **No. 23-cv-03431-RFL**

**Where:** Q1 Earnings Call

**Speaker(s):** Defendants Seagate and Mosley

**Compl. ¶¶ 214-215.**

ship to Huawei and what is included in your December quarter guidance. It looks like your competitor may have stopped shipping maybe back in the middle of September. And do you think you're seeing some benefits of that in your December quarter?"

In response, Defendant Mosley told investors that Huawei's revenue contribution to Seagate was not "material," stating "We continually monitor and remain in compliance with all the rules and regulations around. I think relative to some of the legacy markets, I think we're just watching too much inventory out there. So I don't think it's material [i.e., Huawei's revenue contribution], but it's all factored into our guide about what's going on in the end markets."

Huawei's sole HDD supplier, that sales to Huawei exceeded 3% of HDD revenue for the quarter and was rapidly doubling at the time of Defendants' statements, and that Huawei's revenue contribution was allowing the Company to meet the mid-point of its revenue guidance, and that Seagate expected to take advantage of its monopoly on HDD supply to Huawei in the December quarter. The FDPR had become effective just two weeks prior to the end of the first quarter; during those two weeks Seagate generated more than $70 million from illegal HDD sales to Huawei, which comprised closer to 20% of the Company's prorated revenue over that period. ¶ 217.

company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom,

| | | | | Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.<br><br>2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; and (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage." ¶¶ 135-39.<br><br>3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. ¶¶ 140-41. |

| | | | | 4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this |

| | | | | patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.<br><br>7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.<br><br>8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | ¶ | | were, at a minimum, severely, deliberately reckless. ¶ 148. 9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags that the FDPR proscribed them. ¶¶ 156-58. |
|---|---|---|---|---|

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | 10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159. |
|---|---|---|---|
| | | | 11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | |
|---|---|---|---|---|
| | | | | including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.<br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 15. | **When**: April 29, 2021<br><br>**Where:** Form 10-Q<br><br>**Speaker(s):**<br>Defendants Seagate, Mosley, and Romano | Defendants stated that the Form 10-Q was "prepared in accordance with U.S. generally accepted accounting principles." | GAAP (including ASC 280-10-50-) require disclosures where transaction with a single customer "amount to **10 percent** or more of a public entity's revenues," Or where the concentration "in the volume of business transacted with a particular customer" makes the issuer vulnerable to a near-term severe impact. For the third quarter of 2021, Seagate's sales to ***Huawei accounted for 13.42% of the Company's consolidated revenues*** (and 15% of its critical | 1. As Defendant Romano acknowledged, GAAP required Seagate to monitor and disclose the magnitude of the Company's exposure to Huawei sales. ASC 280-10-50-42 require disclosure where transactions with a single customer "amount to 10 percent or more of a public entity's revenues" and that provision further |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| Compl. ¶¶ 218-219 | | | HDD revenues), but Seagate's Form 10-Q failed to make any of the required disclosures. Defendants' statement was materially false and misleading and concealed from investors Seagate's reliance on HDD sales to Huawei. Absent those sales, Seagate would have missed its revenue guidance range for the third quarter entirely. ¶¶ 219-220. | instructs issuers to "provide information about the extent of [their] reliance on [their] major customers" regardless of the revenue threshold. For at least the third quarter 2021, for instance, illegal sales to Huawei accounted for 13.42% of Seagate's consolidated revenues. Defendants not only failed to make the required disclosures, they also issued affirmative misstatements concealing Seagate's reliance on HDD sales to Huawei. Additionally, Item 101(c)(1)(i) of Regulation S-K further required Seagate to describe "any dependence" on "customers" that is material to understanding the business as a whole in its Form 10-K and 10-Q filings, without regard to a 10% revenue threshold, but Seagate disclosed no such dependence on Huawei in any of the SEC filings during the Class Period, even though, in over just nine months, Seagate had extended more than $1.12 billion in credit to Huawei to effectuate HDD sales—an amount equivalent to more than 10% of Seagate's revenues for the entire fiscal year ended July 2021 and constituting one of Seagate's largest exposures. That Defendants violated the GAAP rules with which they specifically claimed to be compliant further supports an inference that Defendants' misstatements were designed to conceal the scope of the Company's commercial relationship with Huawei. Defendants not only failed to make the required (let alone recommended) disclosures, but they also issued affirmative misstatements concealing Seagate's reliance on HDD sales to Huawei. That Defendants violated the GAAP rules with which they specifically claimed to be compliant, failed to disclose Seagate's dependence on Huawei in violation of Item 101(c)(1)(i), and even reversed their practice of disclosing the names of customers representing a concentration of credit risk, further supports an inference that Defendants' |

misstatements were deliberately designed to conceal the scope of the Company's commercial relationship with Huawei. ¶ 152.

2. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an

| | | | | application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.<br><br>3. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "***are subject***" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "***any*** |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

*stage of production*" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

4. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee— indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. ¶¶ 140-41.

5. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

6. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "*knowingly*" violated the FDPR, having made "*the strategic calculation* to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that

|  |  |  | Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.<br><br>7. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.<br><br>8. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, |

| | | | the clear red flags that those sales violated the FDPR. ¶¶ 146-51. |
|---|---|---|---|
| | | | 9. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148. |
| | | | 10. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of |

millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.

11. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used **multiple** advanced U.S.-origin technologies specified in the FDPR at **multiple** critical stages of the manufacturing process, to produce **multiple** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations"

and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

12. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations.    Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly ***trebled*** the fines it imposed on Seagate as part of the settlement.    Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation).  However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness";    "recklessness/gross    negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.

13. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across

110

| | | | | |
|---|---|---|---|---|
| | | | | Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>14. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |

111

| | | | | |
|---|---|---|---|---|
| **Statements Concerning the Drivers of Seagate's Financial Performance** | | | | |
| 16. | **When:** October 22, 2020<br><br>**Where:** Q1 Earnings Call<br><br>**Speaker(s):** Defendants Seagate, Mosley, and Romano<br><br>**Compl.** ¶ 221 | Defendant Mosley stated that the Company's revenue results were driven by "solid double-digit revenue growth for our consumer drives, reflecting both the return to seasonal patterns and strength of the Seagate's brand among prosumers and gamers."<br><br>Likewise, Defendant Romano stated that Seagate's revenue "performance reflected strong recovery in the video and image application, or VIA, market." | It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "strong recovery" in the "VIA market" and "the return to seasonal patterns and strength of the Seagate's brand among prosumers and gamers," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue were driven in material part by the Company's HDD sales to Huawei, and Seagate would have missed the midpoint of its revenue guidance absent those sales; and (ii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal. ¶ 223. | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in."  Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless.  The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do— |

demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; and (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage." ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its

| | | | | relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. ¶¶ 140-41.<br><br>4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.<br><br>5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45. |

| | | | | |
|---|---|---|---|---|
| | | | | 6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei.  The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR.  ¶ 143.<br><br>7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.<br><br>8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period.  In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance.   Either Defendants performed the monitoring and regulatory assurance they told investors |

they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been

authorized without senior management approval and that management would be unaware of the numerous red flags that the FDPR proscribed them.  ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs.  Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations.  Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement.  Specifically, BIS's penalty

117

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | |
|---|---|---|---|---|
| | | | | schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.<br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 17. | **When:** October 22, 2020 | Seagate attributed the Company's financial | It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "strong recovery" in | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | |
|---|---|---|---|
| | **Where:** Press Release/8-K<br><br>**Speaker(s):** Defendants Seagate and Romano<br><br>**Compl.** ¶ 222 | performance to "strong recovery in the video and image applications market and healthy cloud data center demand, which drove double digit year-over-year revenue growth for our mass capacity storage solutions." | the "VIA market," and "healthy cloud data center demand," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue were driven in material part by the Company's HDD sales to Huawei, and Seagate would have missed the midpoint of its revenue guidance absent those sales; and (ii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal. ¶ 223. | to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do— demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have |

informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; and (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage." ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of

the rule that would support the Company's continued HDD sales to Huawei. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "*knowingly*" violated the FDPR, having made "*the strategic calculation* to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set

|  |  |  |  | up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.<br><br>7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.<br><br>8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject |

| | | | | were, at a minimum, severely, deliberately reckless. ¶ 148.<br><br>9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags that the FDPR proscribed them. ¶¶ 156-58. |
| | | | | |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | |
|---|---|---|---|---|
| | | | | 10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.<br><br>11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | |
|---|---|---|---|---|
| | | | | "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.<br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 18. | **When:** January 21, 2021<br><br>**Where:** Q2 Earnings Call | Defendants reported 13% growth in Seagate's revenue, beating estimates.<br><br>Defendant Mosley stated that this positive revenue results was | It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "stronger-than-expected demand from enterprise and OEM customers," "pent-up demand," and "strong seasonal demand for our desktop PC and consumer drives," while failing to disclose that: (i) far from being driven by "broad-based" growth, Seagate's revenue and critical | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | |
|---|---|---|---|
| | **Speaker(s):**<br>Defendants Seagate, Mosley, and Romano<br><br>**Compl.** ¶¶ 224-225 | driven by: (1) the fact that "*the enterprise markets began to recover for the first time since the onset of the pandemic*," particularly improving demand "amongst large enterprise OEM customers, which led to strong sequential revenue growth for both nearline and mission critical drives"; (2) "stronger-than-expected growth in video and image applications or VIA markets, due in part to *pent-up demand*"; and (3) "strong seasonal demand for our desktop PC and consumer drives." ¶193.<br><br>Defendant Romano likewise attributed Seagate's revenue performance to: (1) the fact that "[n]earline revenue increased sequentially, driven by stronger-than-expected demand from enterprise and OEM customers"; (2) that "[i]n the VIA market, revenue was above our expectation for the second consecutive quarter as pent-up demand from the COVID-related pause in the first half of the calendar year led to strong recovery in the September quarter and record revenue in the December quarter"; (3) and "a seasonal uptick for consumer | HDD revenue was driven in material part by illegal sales to a single customer, Huawei, and Seagate would have missed its entire revenue guidance range absent those sales; (ii) that the "stronger-than-expected demand from enterprise and OEM customers" generally was actually due to the drastically increased sales of "enterprise class" HDDs to one specific OEM customer: Huawei; and (iii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal. ¶ 227. | regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed |

| | | drives and desktop PCs and improving demand for mission-critical drives, consistent with recovery in the enterprise market." | | were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.<br><br>2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; and (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage." ¶¶ 135-39.<br><br>3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. ¶¶ 140-41.<br><br>4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or |

| | | ¶ | | should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51. |
| | | | | |
| | | | | 8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148. |
| | | | | |
| | | | | 9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the |

enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used

130

| | | | | any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the FDPR at ***multiple*** critical stages of the manufacturing process, to produce ***multiple*** core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly ***trebled*** the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | | | | Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.<br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 19. | **When:** January 21, 2021<br><br>**Where:** Press Release/8-K<br><br>**Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl.** ¶ 226 | Defendant Mosley touted Seagate's "double-digit revenue" growth and attributed it to "broad-based improvement across nearly every served market and geography, and we had solid customer demand for our mass capacity products." | It was misleading for Defendants to tout Seagate's positive revenue performance and to state that it was driven by "broad-based improvement" in demand, while failing to disclose that: (i) far from being driven by "broad-based" growth, Seagate's revenue and critical HDD revenue was driven in material part by illegal sales to a single customer, Huawei, and Seagate would have missed its entire revenue guidance range absent those sales; (ii) that the "stronger-than-expected demand from enterprise and OEM customers" generally was actually due to the drastically increased sales of "enterprise class" HDDs to one specific OEM customer: Huawei; and (iii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal. ¶ 227. | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items |

cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i)

| | | | | before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; and (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage." ¶¶ 135-39.<br><br>3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. ¶¶ 140-41.<br><br>4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.<br><br>5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee |
|---|---|---|---|---|

found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue

| | | | | by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51. |
|---|---|---|---|---|
| | | | | 8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148. |
| | | | | 9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to |

*In re Seagate Technology Holdings plc, Securities Litigation*, **No. 23-cv-03431-RFL**

Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among tSeagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these

137

technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations.  Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement.  Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation).  However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | |
|---|---|---|---|---|
| | | | | conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62. |
| | | | | 12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160. |
| | | | | 13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 20. | **When:** April 22, 2021 <br><br> **Where:** Earnings Call <br><br> **Speaker(s):** Defendants Seagate, Mosley, and Romano <br><br> **Compl.** ¶¶ 228-229 | Defendants reported that Seagate "grew revenue quarter-over-quarter and year-over-year," once again beating the Company's revenue guidance. Defendants reported Seagate's "***highest ever*** HDD shipments," including mass capacity HDD sales that beat the prior record by 21%, and resulting in 8% sequential, and 16% year-over-year, revenue growth. <br><br> Defendant Mosley told investors that Seagate's revenue performance was driven by "***Strong cloud data center demand and ongoing recovery*** | Defendants' statements were materially false and misleading when made because it was misleading to attribute Seagate's revenue performance to factors, such as strong cloud data center demand, while failing to disclose that Seagate's critical HDD revenue was driven in material part by the Company's HDD sales to Huawei. In truth, Seagate's Huawei sales were material to the Company's revenue performance and, indeed, without them, the Company would have missed its entire revenue guidance range. ¶ 231. | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in ***any*** of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would |

*in the enterprise markets*," as well as "higher enterprise mission-critical sales and relatively stable desktop PC demand."

Defendant Romano likewise attributed Seagate's revenue performance to "*strong recovery from enterprise and OEM customers, as well as healthy growth from cloud*"; "[i]mproving demand for mission-critical drives and stronger than anticipated demand for desktop PC"; and "a better align[ment] [in] supply [and] demand" as the pandemic waned.

include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do— demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "*are subject*" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "*any stage of production*" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei.  After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company.  ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to

| | | | | Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during |
|---|---|---|---|---|

the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements

downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs.  These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures.  Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them.  ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used ***multiple*** advanced U.S.-origin technologies specified in the

144

FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently

| | | | | |
|---|---|---|---|---|
| | | | | may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.<br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 21. | **When:** April 22, 2021<br><br>**Where:** Earnings Call<br><br>**Speaker(s):** Defendant Mosley<br><br>**Compl.** ¶ 230 | An analyst asked, "What's been the drivers of that change over the course of the last three months or so?"<br><br>Defendant Mosley told investors that improving revenue was being driven by the fact that Seagate's business was insulated to a greater degree from supply chain headwinds, buttressed by the return of pent-up demand in other markets: "I think 2021, there is still some kind of supply concerns that people have about | It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "the cloud and enterprise on-prem coming back," "VIA markets," and the "strength of mass capacity," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue was driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would have missed its entire revenue guidance range absent those sales; (ii) that Seagate's "cloud data center demand," "enterprise" markets, and sales and demand for "nearline" and "mission critical" drives were driven in material part by the drastically increased sales to Huawei under the LTA; and (iii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal. ¶ 233. | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very |

| | | components everywhere. And so, there are people pulling things in. From my perspective, mass capacity is relatively insulated from some of that . . . . . So, we look at this year as not having as profound an impact as we did in 2020, and that's where we get the 10% [revenue growth]. And it's ***largely on the strength of mass capacity. Some of the VIA markets*** and things like that will be contributing as well. ***There's largely the cloud and enterprise on-prem coming back.***" | | manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do— demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs could not be transferred to any entity on the Restricted Entity list, |

which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "are subject" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "any stage of production" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or

| | | | | should have been well-known inside the Company. ¶ 142. |
|---|---|---|---|---|
| | | ¶ | | 5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "knowingly" violated the FDPR, having made "the strategic calculation to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45. |
| | | | | 6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143. |
| | | ¶¶ 144-45. | | 7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important |

product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the

150

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company,

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used multiple advanced U.S.-origin technologies specified in the FDPR at multiple critical stages of the manufacturing process, to produce multiple core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly trebled the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice";

| | | | | |
|---|---|---|---|---|
| | | | | "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.<br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 22. | **When:** April 22, 2021<br><br>**Where:** Earnings Call<br><br>**Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl.** ¶ 231 | An analyst asked, "what kind of led you to the position where you are right now where you're maintaining this higher percentage of share?"<br><br>Defendant Mosley attributed Seagate's longer-term demand planning with customer, as well as increasing market stability: | It was misleading for Defendants to tout Seagate's positive revenue performance and to state that it was driven by longer-term demand planning with customer and increasing market stability, while failing to disclose that: (i) Seagate's revenue and critical HDD revenue was driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would have missed its entire revenue guidance range absent those sales; (ii) that Seagate's "cloud data center demand," "enterprise" markets, and sales and demand for "nearline" and "mission critical" drives were driven in material part by the drastically increased sales to Huawei under the | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, |

| | | "Since the lead times on the products are so long, we have good dialogues about not what do you need in six weeks, but what do you need in six months. And I think that's working quite well. Our customers appreciate it. We still have flexibility for them. But we're kind of co-planning in that respect. And I think that served us both very well on both ends . . . . [I]n general, it's become a way more stable environment than it used to be." | LTA; and (iii)that Seagate had received numerous warnings that its HDD sales to Huawei were illegal. ¶ 233. | its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless.  The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct.  ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable. |

| | | | | 2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs could not be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "are subject" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "any stage of production" of any of Seagate's products sold to Huawei.  ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei.  After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of |

the rule that would support the Company's continued HDD sales to Huawei. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "knowingly" violated the FDPR, having made "the strategic calculation to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set

up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject

were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter

and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used multiple advanced U.S.-origin technologies specified in the FDPR at multiple critical stages of the manufacturing process, to produce multiple core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly trebled the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately

159

| | | | | |
|---|---|---|---|---|
| | | | | $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.<br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 23. | **When:** April 22, 2021 | Defendant Mosley attributed the Company's revenue performance to operational sales and record | It was misleading for Defendants to tout Seagate's positive revenue performance and to state that it was driven by "ongoing operational execution and record sales of our high capacity nearline drives," | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified |

*In re Seagate Technology Holdings plc, Securities Litigation*, **No. 23-cv-03431-RFL**

| | | | |
|---|---|---|---|
| **Where:** Press Release/8-K<br><br>**Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl.** ¶ 232 | nearline sales: "Seagate delivered another quarter of strong financial performance driven by ongoing operational execution and record sales of our high capacity nearline drives. We grew revenue, expanded profitability and achieved non-GAAP EPS above our guided range. Our March quarter results underscore the strength of our HDD product portfolio and increasing demand for mass capacity storage." | while failing to disclose that: (i) Seagate's revenue and critical HDD revenue was driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would have missed its entire revenue guidance range absent those sales; (ii) that Seagate's "cloud data center demand," "enterprise" markets, and sales and demand for "nearline" and "mission critical" drives were driven in material part by the drastically increased sales to Huawei under the LTA; and (iii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal. ¶ 233. | in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do— demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the |

proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs could not be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "are subject" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "any stage of production" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to

|  |  |  |  | provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "knowingly" violated the FDPR, having made "the strategic calculation to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly |

| | | | | stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.<br><br>6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.<br><br>7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.<br><br>8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR |
|---|---|---|---|---|

compliance.    Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs.    These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest

165

exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used multiple advanced U.S.-origin technologies specified in the FDPR at multiple critical stages of the manufacturing process, to produce multiple core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export

regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly trebled the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.

12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.

13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a

| | | | | hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
|---|---|---|---|---|
| 24. | **When:** July 21, 2021<br><br>**Where:** Q4 Earnings Call<br><br>**Speaker(s):** Defendants Seagate, Mosley, and Romano<br><br>**Compl. ¶¶ 234-235** | Seagate reported $3.01 billion in revenue for the quarter, "up 10% sequentially and 20% year-over-year," "topp[ing] the $3 billion mark for the first time in six years" and beating guidance for both the quarter and the year. Defendant Mosley told investors that Seagate's revenue performance was driven by "***broad-based demand across the mass capacity end markets*** and incredible execution by our global team."<br><br>Likewise, Defendant Romano stated that the Company's revenue performance "was fueled by ***accelerating demand in the mass capacity market*** and distribution channel," specifically, "demand from storage-centric blockchain that's layered on top of healthy cloud data center demand and [an] improving enterprise OEM customer trend" and "***[s]tronger than expected demand in the VIA market***." | Defendants' statements were materially false and misleading when made. It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "***broad-based*** demand across the mass capacity end markets and incredible execution by our global team," "demand in the mass capacity market and distribution channel," "demand from storage-centric blockchain that's layered on top of healthy cloud data center demand and [an] improving enterprise OEM customer trend," and "[s]tronger than expected demand in the VIA market," while failing to disclose that: (i) far from being driven by "broad-based" demand, Seagate's revenue and critical HDD revenue was driven in material part by illegal sales to a single customer, Huawei, and indeed, Seagate would have missed its revenue guidance absent those sales; (ii) that Seagate's "cloud data center demand" and "enterprise customer trend" were driven in material part by the drastically increased sales to Huawei under the LTA; and (iii) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal and, as such, this revenue stream was both subject to, and exposed the Company to, heightened risk. ¶ 236. | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in ***any*** of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do— demonstrating that, at the very least, Seagate acted with |

deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "***are subject***" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "***any stage of production***" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

| | | | | 3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and |

interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded,

| | | | | |
|---|---|---|---|---|
| | | ¶ | | the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of |

| | | | | millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over \$1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58. |
| | | | | |
| | | | | 10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's |

apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly ***trebled*** the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.

12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's

| | | | | |
|---|---|---|---|---|
| | | | | announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 25. | **When:** October 22, 2021<br><br>**Where:** Q1 Earnings Call<br><br>**Speaker(s):**<br>Defendants Seagate, Mosley, and Romano<br><br>**Compl.** ¶¶ 237-238 | Defendants reported $3.1 billion in quarterly revenue, representing "robust growth of 35% year-over-year and 3% above a very strong June quarter."<br><br>Defendant Mosley attributed Seagate's revenue performance to "broad-based growth across each of the end markets," with "[t]he cloud [as] the strongest contributor to the ***mass capacity markets*** and Seagate's revenue" and "[d]emand for video and image applications increase[ing] significantly," as well. Defendant Mosley stated that the Company's "results reflect record demand for our industry-leading ***mass capacity products*** and solid execution on cost reduction plans and our ongoing | Defendants' statements were materially false and misleading when made. It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "***broad-based*** growth across each of the end markets" and "improving enterprise spending and healthy growth from cloud data center customers," as well as indicating that future "down quarters" would be driven by seasonality while failing to disclose that: (i) far from being driven by "broad-based" growth, Seagate's revenue and critical HDD revenue was driven in material part by illegal sales to a single customer, Huawei, and indeed, Seagate would have missed its entire revenue guidance range absent those sales; (ii) that Seagate's "cloud data center customers," "nearline" and "enterprise spending" were driven in material part by the drastically increased sales to Huawei under the LTA; (iii) that Seagate's expected future "down quarters" were driven in part by lower sales following cessation of sales to Huawei, mitigated by a hoped-for resumption of sales following a corporate subsidiary restructuring; and (iv) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal and, as such, this revenue stream was both subject to, and exposed the Company to, heightened risk. ¶ 242. | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in ***any*** of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's |

| | | focus of balancing supply with demand." Defendant Romano likewise told investors that Seagate's revenue "[g]rowth was driven by increasing demands for our mass capacity products . . . supported by growth across each of the underlying end markets," including "improving enterprise spending and healthy growth from cloud data center customers." | | essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable. 2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; |

| | | | | |
|---|---|---|---|---|
| | | | | and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "*are subject*" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "*any stage of production*" of any of Seagate's products sold to Huawei. ¶¶ 135-39.<br><br>3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021. Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew those sales contravened the FDPR. ¶¶ 140-41. |

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this

patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject

| | | | | were, at a minimum, severely, deliberately reckless. ¶ 148. |
|---|---|---|---|---|
| | | | | 9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter |

and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately

| | | | | |
|---|---|---|---|---|
| | | | | $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.<br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 26. | **When:** October 22, 2021 | In prepared remarks, Defendant Mosley announced that Seagate was "raising our fiscal [year] | Defendants' statements were materially false and misleading when made. It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "broad-based growth | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | |
|---|---|---|---|
| | **Where:** Earnings Call<br><br>**Speaker(s):**<br>Defendants Seagate and Mosley<br><br>**Compl. ¶¶ 237-238** | 2022 revenue growth outlook from the high-single-digit percentage range to the low-double-digit range."<br><br>In response to an analyst's request for "what's embedded" in Seagate's "assuming a down quarter sequentially in March and/or June," Defendant Mosley stated:<br><br>"So, I think if you go back to last quarter, it would have been seasonality and it would have been more biased towards the legacy business. Obviously, the the VIA markets are seasonal as well. And I would say, now, it's even more muted seasonality in some of the strength in the exabyte growth that we see in the cloud, particularly at the top end of the mass capacity markets. So, that kind of explains what's changed, I think, in the last three months."<br><br>Defendant Romano then stated, "Yeah, we think the nearline is still very strong and, of course, now every quarter we will update on our visibility on the fiscal year." | across each of the end markets" and "improving enterprise spending and healthy growth from cloud data center customers," as well as indicating that future "down quarters" would be driven by seasonality while failing to disclose that: (i) far from being driven by "broad-based" growth, Seagate's revenue and critical HDD revenue was driven in material part by illegal sales to a single customer, Huawei, and indeed, Seagate would have missed its entire revenue guidance range absent those sales; (ii) that Seagate's "cloud data center customers," "nearline" and "enterprise spending" were driven in material part by the drastically increased sales to Huawei under the LTA; (iii) that Seagate's expected future "down quarters" were driven in part by lower sales following cessation of sales to Huawei, mitigated by a hoped-for resumption of sales following a corporate subsidiary restructuring; and (iv) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal and, as such, this revenue stream was both subject to, and exposed the Company to, heightened risk. ¶ 242. | in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "*are subject*" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "*any stage of production*" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021. Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew those sales contravened the FDPR. ¶¶ 140-41. |
| | | | | 4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142. |
| | | | | 5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached |

this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more

186

favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as

187

"Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy."

Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations.  Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement.  Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation).  However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.

*In re Seagate Technology Holdings plc, Securities Litigation*, **No. 23-cv-03431-RFL**

| | | | | |
|---|---|---|---|---|
| | | | | 12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 27. | **When:** October 22, 2021<br><br>**Where:** Press Release/8-K<br><br>**Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl.** ¶ 241 | Defendant Mosley touted Seagate's revenue performance and attributed it to several legitimate business factors:<br><br>"Seagate had an exceptional start to the fiscal year with solid revenue growth, significant profit expansion and higher free cash flow generation in the September quarter. Mass capacity revenue topped the $2 billion mark for the first time, led by ongoing demand from cloud data center customers and strength in the video and image applications markets. Our results demonstrate consistent execution, a sustained healthy demand environment and positive structural change in storage industry dynamics." | It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "ongoing demand from cloud data center customers and strength in the video and image applications markets" and "sustained healthy demand environment and positive structural change in storage industry dynamics," while failing to disclose that: (i) far from being driven by "broad-based" growth, Seagate's revenue and critical HDD revenue was driven in material part by illegal sales to a single customer, Huawei, and indeed, Seagate would have missed its entire revenue guidance range absent those sales; (ii) that Seagate's "cloud data center customers," "nearline" and "enterprise spending" were driven in material part by the drastically increased sales to Huawei under the LTA; (iii) that Seagate's expected future "down quarters" were driven in part by lower sales following cessation of sales to Huawei, mitigated by a hoped-for resumption of sales following a corporate subsidiary restructuring; and (iv) that Seagate had received numerous warnings that its HDD sales to Huawei were illegal and, as such, this revenue stream was both subject to, and exposed the Company to, heightened risk. ¶ 242. | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation |

of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the

| | | | | Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "*are subject*" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "*any stage of production*" of any of Seagate's products sold to Huawei. ¶¶ 135-39.<br><br>3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021. Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that |
|---|---|---|---|---|

| | | ¶ | | Defendants knew those sales contravened the FDPR. ¶¶ 140-41. |
| | | | | |

Defendants knew those sales contravened the FDPR. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set

up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject

| | | | | were, at a minimum, severely, deliberately reckless. ¶ 148.<br><br>9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter |
|---|---|---|---|---|

and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately

| | | | | |
|---|---|---|---|---|
| | | | | $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62. <br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160. <br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 28. | **When:** January 26, 2022 | Defendant Mosley stated that the Company's revenue performance was driven by the Company's | It was misleading for Defendants to tout Seagate's revenue performance and to state that it was driven by "demand from cloud customers for nearline products" as well as "healthy demand for | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | |
|---|---|---|---|---|
| | **Where:** Q2 Earnings Call<br><br>**Speaker(s):**<br>Defendants Seagate, Mosley, and Romano<br><br>**Compl.** ¶¶ 243-244 | "capitalizing on the secular tailwinds driving long-term mass capacity storage demand," specifically, "record mass capacity revenue with growth led by demand from cloud customers."<br><br>Defendant Romano also touted the Company's HDD revenue results: "In our hard disk drive business, we achieved a fifth consecutive quarter of record capacity shipments totaling 163 exabyte, up 3% sequentially and up 26% year-on-year." Defendant Romano further attributed the Company's revenue performance to "[o]ngoing cloud demand for our nearline products," as well as "healthy demand for mid-capacity products from enterprise and OEM customers." | mid-capacity products from enterprise and OEM customers," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue was driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would have missed its entire revenue guidance range absent those sales; (ii) that Seagate's "demand from cloud customers" for "nearline products" and demand from "enterprise and OEM customers" were driven in material part by the drastically increased sales to Huawei under the LTA; (iii)that Seagate had received numerous warnings that its HDD sales to Huawei were illegal; and (iv) under pressure from ongoing investigations, Seagate had halted shipments to Huawei, which was already beginning to have a material negative effect on the Company's revenue. ¶ 245. | in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "*are subject*" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "*any stage of production*" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to

199

provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021. Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew those sales contravened the FDPR. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached

this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as

"Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy."

| | | | | Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159. |
|---|---|---|---|---|
| | | | | 11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations.  Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly ***trebled*** the fines it imposed on Seagate as part of the settlement.  Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation).  However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62. |

| | | | | |
|---|---|---|---|---|
| | | | | 12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 29. | **When:** April 27, 2022<br><br>**Where:** Q2 Earnings Call<br><br>**Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl.** ¶ 246 | Defendant Mosley stated that the negative revenue results were driven by: (1) "industry-wide supply challenges"; (2) "impacts from the ongoing conflict in Ukraine"; and (3) "COVID restrictions" that were all "constraining growth over the near term." | It was misleading for Defendants to state that Seagate's revenue decline was driven by "industry-wide supply challenges," "the ongoing conflict in Ukraine," "COVID restrictions," and "multiple macro related headwinds," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously been driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would have repeatedly missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in Third Quarter 2022 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei, which was abruptly stopped in response to a congressional inquiry. ¶ 248. | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in ***any*** of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only |

competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do— demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests

strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "*are subject*" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "*any stage of production*" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee— indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021. Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | Defendants knew those sales contravened the FDPR. ¶¶ 140-41. |
|---|---|---|---|---|
| | | | | 4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142. |
| | | | | 5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45. |
| | | | | 6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set |

up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject

were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter

and congressional investigation—that the FDPR proscribed them.  ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs.  Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine."  ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations.  Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement.  Specifically, BIS's penalty schedule called for the imposition of an approximately

| | | | | $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62. <br><br> 12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160. <br><br> 13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
|---|---|---|---|---|
| 30. | **When:** April 27, 2022 | Defendant Mosley attributed the decline to legitimate business factors, specifically: "multiple | It was misleading for Defendants to state that Seagate's revenue decline was driven by "industry-wide supply challenges," "the ongoing conflict in Ukraine," "COVID restrictions" and "multiple | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified |

| | | | |
|---|---|---|---|
| **Where:** Press Release/8-K<br><br>**Speaker(s):**<br>Defendants Seagate and Mosley<br><br>**Compl. ¶ 247** | macro related headwinds that impacted other end markets, particularly video and image applications, and pressured profitability." Defendant Mosley declared that the Company's "focus [was] on mitigating these external challenges through ongoing expense discipline, new pricing strategies and operational efficiencies." | macro related headwinds," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously been driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would have repeatedly missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in Third Quarter 2022 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei, which was abruptly stopped in response to a congressional inquiry. ¶ 248. | in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the |

proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "*are subject*" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "*any stage of production*" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to

provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021. Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew those sales contravened the FDPR. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached

this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more

favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as

"Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among the Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy."

Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | |
|---|---|---|---|---|
| | | | | 12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 31. | **When:** July 21, 2022<br><br>**Where:** Q4 Earnings Call<br><br>**Speaker(s):** Defendants Seagate, Mosley, and Romano<br><br>**Compl.** ¶¶ 249-250 | Defendant Mosley attributed negative revenue results were driven by: (1) "impacts from a confluence of macro headwinds in other end markets, particularly in the consumer-facing legacy markets"; (2) "*impacts from COVID lockdowns* in Asia"; (3) "non-HDD component shortages," and (4) "global inflationary pressures" that "intensified late in the quarter." Defendant Mosley further stated that "macro events are weighing on our near-term performance."<br><br>Defendant Romano attributed the revenue shortfall to (1) "intensifying economic pressure," (2) "buildup of inventory at our customers," and | It was misleading for Defendants to state that Seagate's revenue decline was driven by "macro headwinds," "COVID lockdowns in Asia," "non-HDD component shortages," "intensifying economic pressure," and "buildup of inventory at our customers" while failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously been driven in material part by the Company's HDD sales to Huawei and Seagate would have repeatedly missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in Fourth Quarter 2022 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei, which was abruptly stopped in response to a congressional inquiry. ¶ 252. | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | |
|---|---|---|---|---|
| | | (3) *"COVID-restrictive measures."* | | of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do— demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.<br><br>2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the |

Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "*are subject*" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "*any stage of production*" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee— indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021. Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that

222

| | | | | Defendants knew those sales contravened the FDPR. ¶¶ 140-41.<br><br>4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.<br><br>5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.<br><br>6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set |

up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject

were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter

| | | | | and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.<br><br>10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.<br><br>11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | |
|---|---|---|---|---|
| | | | | $107 million penalty (429 violations at $250,000 per violation).  However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62. <br><br> 12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160. <br><br> 13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 32. | **When:** July 21, 2022 <br><br> **Where:** Press Release/8-K | Defendant Mosley attributed the revenue decline to legitimate business factors, specifically: "***the impacts of Covid restrictive*** | It was misleading for Defendants to state that Seagate's revenue decline was driven by "macro headwinds," "COVID lockdowns in Asia," "non-HDD component shortages," "intensifying economic pressure," and "buildup of inventory at our customers" while | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | |
|---|---|---|---|---|
| | **Speaker(s):** Defendants Seagate and Mosley <br><br> **Compl. ¶ 251** | *measures* in Asia and weakening global economic conditions on our other end markets" as well as a "confluence of macro-related challenges" and customers' "macro uncertainty and on-going non-HDD component shortages." | failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously been driven in material part by the Company's HDD sales to Huawei and Seagate would have repeatedly missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in Fourth Quarter 2022 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei, which was abruptly stopped in response to a congressional inquiry. ¶ 252. | company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.<br><br>2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "***are subject***" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "***any stage of production***" of any of Seagate's products sold to Huawei. ¶¶ 135-39.<br><br>3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its |

relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021. Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew those sales contravened the FDPR. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "*knowingly*" violated the FDPR, having made "*the strategic calculation* to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including

| | | | | through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.<br><br>6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.<br><br>7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants |
|---|---|---|---|---|

| | | | | were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.<br><br>8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148.<br><br>9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These |

agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the

| | | | | record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations.  Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement.  Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation).  However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.

12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and |

| | | | | |
|---|---|---|---|---|
| | | | | Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 33. | **When:** October 26, 2022<br><br>**Where:** Q1 Earnings Call<br><br>**Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl.** ¶ 253 | Defendant Mosley attributed the negative revenue results were driven by: (1) *"[t]he impact of COVID lockdowns and the related economic slowdown in China"*; (2) "broad-based customer *inventory adjustments*"; (3) "weakening global consumer spendings," and (4) "intensifying macro uncertainties." | It was misleading for Defendants to state that Seagate's revenue decline was driven by "[t]he impact of COVID lockdowns and the related economic slowdown in China," "broad-based customer inventory adjustments," and "weakening global consumer spendings," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously been driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would often have previously missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in First Quarter 2023 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei, which was abruptly stopped in response to a congressional inquiry. ¶ 255. | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) |

Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do— demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter

from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "***are subject***" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "***any stage of production***" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee— indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021. Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew those sales contravened the FDPR. ¶¶ 140-41.

| | | | | 4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.<br><br>5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.<br><br>6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | were, at a minimum, severely, deliberately reckless. ¶ 148. |
|---|---|---|---|---|
| | | | | 9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter |

| | | | | and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.<br><br>10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.<br><br>11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately |
|---|---|---|---|---|

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | |
|---|---|---|---|---|
| | | | | $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.<br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 34. | **When:** October 26, 2022 | Defendant Mosley attributed Seagate's reported revenue decline to legitimate business | It was misleading for Defendants to state that Seagate's revenue decline was driven by "[g]lobal economic uncertainties and broad-based customer inventory corrections" and "current macro | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified |

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | |
|---|---|---|---|
| **Where:** Press Release/8-K<br><br>**Speaker(s):** Defendants Seagate and Mosley<br><br>**Compl.** ¶ 254 | factors, specifically: "[g]lobal economic uncertainties and broad-based customer *inventory corrections*" and "current macro uncertainties." | uncertainties." while failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously been driven in material part by the Company's HDD sales to Huawei and, indeed, Seagate would often have previously missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in First Quarter 2023 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei, which was abruptly stopped in response to a congressional inquiry. ¶ 255. | in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the |

proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "***are subject***" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "***any stage of production***" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to

provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021. Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew those sales contravened the FDPR. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "*knowingly*" violated the FDPR, having made "*the strategic calculation* to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached

this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more

favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as

"Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy."

248

Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out… Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.

| | | | | |
|---|---|---|---|---|
| | | | | 12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 35. | **When:** January 25, 2023<br><br>**Where:** Q1 Earnings Call<br><br>**Speaker(s):** Defendants Seagate, Romano, and Mosley<br><br>**Compl.** ¶¶ 256-257 | Defendant Mosley attributed Seagate's negative reported revenue results to: (1) "*the COVID-related economic slowdown in China*"; (2) "the work down of nearline HDD inventories among US cloud and global enterprise customers under a more cautious demand environment"; (3) "macro related disruptions primarily impacting our consumer-facing markets." Defendant Mosley further stated that "macro events are weighing on our near-term performance."<br><br>Defendant Romano attributed the revenue shortfall to (1) "inventory correction among cloud and enterprise customers," (2) "*COVID-related disruption in China*," (3) "Seagate's own | It was misleading for Defendants to state that Seagate's revenue decline was driven by "the COVID-related economic slowdown in China," "the work down of nearline HDD inventories among US cloud and global enterprise customers under a more cautious demand environment," and "macro related disruptions primarily impacting our consumer-facing markets," while failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously been driven in material part by the Company's HDD sales to Huawei and Seagate would often have previously missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in Second Quarter 2023 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei, which was abruptly stopped in response to a congressional inquiry. ¶ 259. | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only |

| | | action to reduce production," and (4) "lower demand in the VIA market." | | competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.<br><br>2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs ***could not*** be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests |

strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "***are subject***" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "***any stage of production***" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee— indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021. Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that

|  |  | ¶¶ |  | Defendants knew those sales contravened the FDPR. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.

6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set |

253

up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.

7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.

8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject

were, at a minimum, severely, deliberately reckless. ¶ 148.

9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

| | | | | and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations. Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly *trebled* the fines it imposed on Seagate as part of the settlement. Specifically, BIS's penalty schedule called for the imposition of an approximately

| | | | | |
|---|---|---|---|---|
| | | | | $107 million penalty (429 violations at $250,000 per violation). However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.<br><br>12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
| 36. | **When:** January 25, 2023 | Seagate issued a press release reporting its second quarter 2023 financial results and filed that press release with the SEC on | It was misleading for Defendants to state that Seagate's revenue decline was driven by "COVID-related economic slowdown in China," "the work down of nearline HDD inventories among US cloud and global enterprise customers," "macro related | 1. Under the FDPR itself, Seagate had "knowledge" that its shipments to Huawei violated this rule because sales to Huawei ran afoul of a "Red Flag Indicator" identified in BIS regulations, namely transactions involving a |

*In re Seagate Technology Holdings plc, Securities Litigation*, **No. 23-cv-03431-RFL**

| | | | |
|---|---|---|---|
| **Where:** Press Release/8-K<br><br>**Speaker(s):** Defendants Seagate, Mosley, and Romano<br><br>**Compl.** ¶ 258 | Form 8-K. In that press release, Defendant Mosley attributed the revenue decline to legitimate business factors, specifically: "a tough macroeconomic environment." | disruptions," "Seagate's own action to reduce production," and "lower demand in the VIA market" while failing to disclose that: (i) Seagate's revenue and critical HDD revenue had previously been driven in material part by the Company's HDD sales to Huawei and Seagate would often have previously missed the midpoint of its revenue guidance absent those sales; and (ii) that the revenue decline in Second Quarter 2023 was actually driven by the loss of Seagate's illegal monopoly on HDD sales to Huawei, which was abruptly stopped in response to a congressional inquiry. ¶ 259. | company identified on Restricted Entity List, which triggered the "duty to exercise due diligence to inquire regarding the suspicious circumstances and ensure appropriate end-use, end-user, or ultimate country of destination in the transactions you propose to engage in." Had Seagate conducted the required due diligence, its violation of the FDPR would have been made plain because (a) the text of the rule states clearly that items cannot be exported to Huawei if they the very technology Seagate has admitted it used is "involved in *any* of the production stages of the item; (b) the very manufacturer of the technology at issue warned Seagate that use of that technology at any stage of manufacturing triggered FDPR requirements: (c) due diligence would include consultation with Seagate's law firms, which provided public guidance making clear that the transactions were illegal; (d) inquiring into the cessation of sales by Western Digital and Toshiba, Seagate's only competitors, would have revealed that Seagate's essentially identical transactions were illegal; and (e) Congressional inquiries, which Seagate stonewalled and attempted to circumvent by setting up secret backchannels to continue its illegal sales, would have revealed that Seagate's supposed "interpretation" of the FDPR was baseless. The FDPR and BIS Red Flag Indicators further provided that any uncertainty following such due diligence required submission of an application for licensure, which Seagate did not do—demonstrating that, at the very least, Seagate acted with deliberate recklessness. ¶¶ 132-34. Additionally, unlike other industry participants Seagate failed to participate in the review and comment process with BIS prior to the implementation of the FDPR, a process that would have informed Defendants whether their interpretation of the proposed rule was correct. ¶¶ 48-49. At bottom, |

Defendants' deliberate refusal to seek comment from the BIS about any terms in the FDPR that they believed were ambiguous or unclear was deliberately reckless, and otherwise undermines Defendants' claim that their interpretation was reasonable.

2. Seagate received direct warnings that its unlicensed HDD sales to Huawei violated the FDPR, including: (i) before the Class Period, in instructions to its customers, Seagate had taken the position that its HDDs *could not* be transferred to any entity on the Restricted Entity list, which had included Huawei since May 2019; (ii) in pre-Class Period guidance, Seagate's lawyers issued client notifications that the FDPR proscribed unlicensed shipments of HDDs to Huawei; (iii) prior to the start of the Class Period, Seagate's competitors all ceased HDD shipments to Huawei in light of the FDPR, which, as the Senate Commerce Committee explained, "suggests strong industry consensus about the rule's coverage"; and (iv) a January 2021 FDP "rule notification" letter from a supplier stated that the supplier's own products were "made from ECCN 3E991 technology" and that this 3E991-based "equipment" "*are subject*" to export "restrictions" – and specifically, a BIS license requirement – if that equipment was involved in "*any stage of production*" of any of Seagate's products sold to Huawei. ¶¶ 135-39.

3. Seagate, alone amongst its competitors, attempted to evade and stonewall a congressional investigation into its HDD sales to Huawei. After receiving a letter from the Senate Commerce Committee "seeking to determine whether industry-leading hard disk drive suppliers are complying with the" FDPR, Seagate not only refused to provide the Committee information concerning its

relationship with Huawei, but even declined to share its interpretation of the FDPR with the Committee—indicating that Seagate had no plausible interpretation of the rule that would support the Company's continued HDD sales to Huawei. Demonstrating Defendants' knowing or at least deliberately reckless violation of the law, over $380 million or over 35% of Seagate unlawful HDD sales to Huawei were made after its receipt of this letter on May 10, 2021. Further, that, in September 2021, Seagate abruptly stopped all Huawei sales at the very same time that Congress began to closely scrutinize the Company's relationship with Huawei, notwithstanding the significant commercial "partnership" it had forged with the Company through multiple secret agreements and highly significant extensions of credit, yields a strong inference that Defendants knew those sales contravened the FDPR. ¶¶ 140-41.

4. Further, Congress' inquiry was prompted by non-public whistleblower reports, making clear that the illegality of Seagate's HDD sales to Huawei was or should have been well-known inside the Company. ¶ 142.

5. Following a months-long investigation into Seagate's compliance with the FDPR and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly***" violated the FDPR, having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." That a Senate Committee reached this finding after months of investigation, including

|  |  |  |  | through non-public documentary evidence and interviews with, among others, Seagate and its competitor companies, strongly indicates that Defendants knew they were violating the FDPR and chose short-term profits over their legal obligations and the long-term interests of Seagate's shareholders. Further, that Defendants "knowingly" made the "strategic calculation" to continue shipments as long as they could get away with it is further supported by the fact that, after September 2020, Defendants suddenly stopped answering questions about whether Seagate was continuing to ship to Huawei. ¶¶ 144-45.<br><br>6. Even as it told Congress it had stopped selling HDDs to Huawei, Seagate began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei. The Commerce Committee cited this patently deceptive scheme as part of its evidence that Seagate had "knowingly violated" the FDPR. ¶ 143.<br><br>7. That Defendants' misstatements concerned the very viability of sales (i) of Seagate's most important product, which comprised over 92% of its revenue; (ii) to Huawei, one of Seagate's most significant customers; (iii) that had a significant impact on the Company's financial performance, including boosting the Company's reported revenue by as much as 13% during the Class Period and inflating its critical HDD revenue by as much as 15% during the Class Period; (iv) that allowed the Company to meet or exceed guidance it would have otherwise missed; (v) that, as noted by analysts after the Class Period, allowed the Company to outperform peers; and (vi) that boosted Seagate's credit rating, allowing the Company to raise capital on more favorable terms, supports an inference that Defendants |

| | | | | |
|---|---|---|---|---|
| | | | | were aware of, or deliberately recklessly disregarded, the clear red flags that those sales violated the FDPR. ¶¶ 146-51.<br><br>8. Seagate's FDPR compliance, and specifically, the legitimacy of its HDD sales to Huawei, were the subject of significant investor attention and concern during the Class Period. In response to direct questions from analysts, Defendants specifically assured investors that they were closely monitoring Seagate's FDPR compliance. Either Defendants performed the monitoring and regulatory assurance they told investors they performed, in which case they would have learned the truth about Seagate's Huawei sales, or Defendants failed to perform the monitoring they told investors they performed, in which case their statements on the subject were, at a minimum, severely, deliberately reckless. ¶ 148.<br><br>9. Defendant Seagate senior management's close involvement in dramatically accelerating the Company's HDD sales to Huawei following the enactment of the FDPR indicates that that they were aware of, or deliberately recklessly disregarded, red flags relating to the legal and regulatory risks relating to those sales. As Seagate has admitted, "within days" of Defendant Romano's September 14, 2020 statements downplaying the importance of Huawei sales to Seagate's HDD revenue, the Company had positioned itself as Huawei's sole HDD supplier. Seagate senior management signed at least two sweeping commercial agreements with Huawei over the Class Period – in December 2020 and again in March 2021 – in which Seagate's senior management agreed to act as "Huawei's strategic supplier" of HDDs. These |

agreements called for Seagate to sell hundreds of millions of dollars' worth of HDDs to Huawei. Just as Defendants concealed Huawei's revenue impact, Defendants never publicly announced these agreements, despite the fact that Seagate had previously publicly touted the signing of similar strategic cooperation agreements with companies such as Baidu and Micron. Further, Seagate extended over $1 billion in credit to Huawei to facilitate the Company's illegal HDD sales, lines of credit that were among Seagate's single largest exposures. Again, it is implausible that these extremely significant exposures would have been authorized without senior management approval and that management would be unaware of the numerous red flags—including the January 2021 notification letter and congressional investigation—that the FDPR proscribed them. ¶¶ 156-58.

10. The egregious and widespread character of Seagate's FDPR violations, as evidenced by the magnitude of the enforcement penalty Seagate paid to BIS and remedial measures forced on the Company, supports an inference of scienter. Specifically, while the FDPR proscribed the export of any product that used any specified U.S.-origin technology at any stage of production, Seagate has admitted that it used *multiple* advanced U.S.-origin technologies specified in the FDPR at *multiple* critical stages of the manufacturing process, to produce *multiple* core components of its HDDs. Moreover, Seagate has admitted that these technologies were all "essential" to the manufacture of its HDDs and "major component[s] of the Seagate HDD plants and specifically touted them in SEC filings as "critical elements of our integrated business strategy." Further, commentators noted that, in announcing the

*In re Seagate Technology Holdings plc, Securities Litigation*, No. 23-cv-03431-RFL

record-breaking penalty, BIS "called out . . . Seagate's apparent lack of regard for the regulations" and its failure to "voluntarily disclose the activity" as "contribut[ing] to the severity of the fine." ¶ 159.

11. The size of the $300 million penalty imposed by the BIS – the largest standalone penalty imposed in agency history – and Seagate's willingness to accept it also supports a strong inference that Seagate acted in willful, or at least deliberately reckless, disregard of export regulations.   Indeed, BIS' penalty determination guidance (15 C.F.R. Pt. 766, Supp. 1) shows that the agency nearly ***trebled*** the fines it imposed on Seagate as part of the settlement.   Specifically, BIS's penalty schedule called for the imposition of an approximately $107 million penalty (429 violations at $250,000 per violation).  However, the agency's regulatory guidance states that it may adjust the size of a penalty upwards in "egregious" cases involving "aggravating factors" including "willful or reckless violation of law"; "willfulness"; "recklessness/gross negligence"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." Thus, far from "simple negligence or carelessness" or a "good-faith misinterpretation" of the FDPR – circumstances which BIS's guidance states "frequently may be addressed with a no action determination letter or . . . a warning letter" – Defendants' decision to continue to sell to Huawei in all likelihood resulted from conduct that was both egregious and willful or (at the very least) deliberately reckless. *Id.* ¶¶ 161-62.

12. The timing and circumstances surrounding the unexpected departure of Seagate's VP of Operations and

264

*In re Seagate Technology Holdings plc, Securities Litigation*, **No. 23-cv-03431-RFL**

| | | | | Technology, Jeffrey Nygaard, and the Board's announcement of draconian salary reductions across Seagate's C-suite, including Defendants Mosley and Romano, further support an inference of scienter. ¶ 160.<br><br>13. That Seagate sold and leased back hundreds of millions of dollars of its corporate real estate shortly after it received the BIS's proposed charging letter demonstrates its awareness that it would have to pay a hefty fine for its knowing or deliberately reckless misconduct. ¶ 163. |
|---|---|---|---|---|