CAZ HASHEMI, State Bar No. 210239
STEPHEN B. STRAIN, State Bar No. 291572
BETTY CHANG ROWE, State Bar No. 214068
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:  (650) 565-5100
Email: chashemi@wsgr.com
        sstrain@wsgr.com
        browe@wsgr.com

Attorneys for Defendants
Seagate Technology Holdings plc,
William D. Mosley, and Gianluca Romano

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| *In re Seagate Technology Holdings plc, Securities Litigation* | CASE NO.:  3:23-cv-03431-VC |
| | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| | Hearing Date:  March 4, 2025<br>Time:          10:00 a.m.<br>Courtroom:     15 – 18th Floor<br>Honorable Rita F. Lin |

DEFS' MOT. TO DISMISS AMENDED COMPLT;
CASE NO. 3:23-CV-03431-RFL

**TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION .................................................................................................1

STATEMENT OF ISSUES (CIVIL L.R. 7-4(a)(3)).........................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................................1

INTRODUCTION.................................................................................................................................1

STATEMENT OF FACTS....................................................................................................................2

ARGUMENT ........................................................................................................................................5

I. APPLICABLE LEGAL STANDARDS.................................................................................5

II. THE AC FAILS TO PLEAD A MATERIAL MISSTATEMENT OR OMISSION ..........6

 A. No Falsity As To Compliance Statements, Risk Factors, and SOX Certifications .....................................................................................................................7

 B. No Falsity As To Statements "Downplaying" "Reliance On" Huawei HDD Sales .................................................................................................................................8

 C. No Falsity As To Statements Regarding Revenue "Drivers" ...............................11

III. THE AC FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER ......................13

 A. Plaintiffs' New Scienter Allegations Do Not Raise a Strong Inference of Scienter...........................................................................................................................14

 B. Plaintiffs Rehash Their Old Inadequate Scienter Allegations...............................17

 C. Considered Holistically, The More Plausible Inference Is Defendants Made A Good Faith Interpretation Of The FDPR That BIS Subsequently Deemed Incorrect .........................................................................................................................20

IV. THE AC FAILS TO PLEAD A VIOLATION OF RULE 10b-5(a) AND 5(c) ................21

V. THE AC FAILS TO PLEAD LOSS CAUSATION ..........................................................24

VI. ANOTHER AMENDMENT WOULD BE FUTILE.........................................................25

CONCLUSION ...................................................................................................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Abbate v. Wells Fargo Bank, N.A.*,
  2011 WL 9698215 (C.D. Cal. Nov. 17, 2011) .................................................................. 24

*Alliance for the Wild Rockies v. Petrick*,
  68 F.4th 475 (9th Cir. 2023) ........................................................................................... 15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................ 18

*Biotechnology Value Fund, LP v. Celera Corp.*,
  12 F. Supp. 3d 1194 (N.D. Cal. 2013) ............................................................................ 18

*Borteanu v. Nikola Corp.*,
  2023 WL 1472852 (D. Ariz. Feb. 2, 2023) ........................................................ 18, 23, 24

*Brody v. Transitional Hosp. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ............................................................................... 6, 12, 16

*Browning v. Amyris, Inc.*,
  2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) .................................................................. 5

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ............................................................................. 17, 18, 21

*City of Royal Oak Retirement System v. Juniper Networks, Inc.*,
  2013 WL 2156358 (N.D. Cal. May 17, 2013) ................................................................. 25

*Davoli v. Costco Wholesale Corp.*,
  854 F. App'x 116 (9th Cir. 2021) .................................................................................... 15

*DeMarco v. DepoTech Corp.*,
  149 F. Supp. 2d 1212 (S.D. Cal. 2001) ........................................................................... 19

*DSAM Glob. Value Fund v. Altris Software, Inc.*,
  288 F.3d 385 (9th Cir. 2002) ........................................................................................... 18

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ........................................................................................................ 24

*Eshelman v. OrthoClear Holdings, Inc.*,
  2009 WL 506864 (N.D. Cal. Feb. 27, 2009) ................................................................... 18

*Exxon Mobil Corp. v. United States EPA*,
  217 F.3d 1246 (9th Cir. 2000) ......................................................................................... 15

*Feola v. Cameron*,
  2016 WL 11750382 (C.D. Cal. Aug. 25, 2016) .............................................................. 17

*Ferreira v. Funko Inc.*,
  2021 WL 880400 (C.D. Cal. Feb. 25, 2021) ................................................................... 17

*Ikeda v. Baidu, Inc.*,
    2021 WL 1299046 (N.D. Cal. Apr. 7, 2021) ....................................................................... 7

*In re Bank of America Corp.*,
    2011 WL 740902 (N.D. Cal. Feb. 24, 2011) ..................................................................... 18

*In re Cloudera, Inc. Sec. Litig.*,
    2021 WL 2115303 (N.D. Cal. May 25, 2021) ................................................................... 8

*In re Facebook, Inc. Sec. Litig.*,
    477 F. Supp. 3d 980 (N.D. Cal. 2020), *aff'd in part, rev'd in
    part on other grounds*, 87 F.4th 934 (9th Cir. 2023),
    *cert. granted in part*, 144 S. Ct. 2629 (2024) .................................................................... 7

*In re Facebook, Inc. Sec. Litig.*,
    87 F.4th 934 (9th Cir. 2023), *cert. granted in part*,
    144 S. Ct. 2629 (2024) ...................................................................................................... 8

*In re Fastly, Inc. Sec. Litig.*,
    2021 WL 5494249 (N.D. Cal. Nov. 28, 2021) ............................................................ 11, 12

*In re HP Sec. Litig.*,
    2013 WL 6185529 (N.D. Cal. Nov. 26, 2013) ................................................................. 15

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) .......................................................................................... 5

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) .......................................................................................... 25

*In re Paypal Holdings, Inc. S'holder Deriv. Litig.*,
    2018 WL 466527 (N.D. Cal. Jan. 18, 2018) .................................................................... 7

*In re Rigel Pharm., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) .......................................................................................... 11

*In re Silicon Graphic, Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ............................................................................... 5, 10, 19

*In re Taleo Corp. Sec. Litig.*,
    2010 WL 597987 (N.D. Cal. Feb. 17, 2010) ................................................................... 18

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) .................................................................................... 6, 25

*In re VeriFone Sec. Litig.*,
    11 F.3d 865 (9th Cir. 1993) .............................................................................................. 7

*In re VMware, Inc. Stockholder Deriv. Litig.*,
    2023 WL 2600477 (N.D. Cal. Mar. 21, 2023) ............................................................... 25

*Jaszczyszyn v. SunPower Corp.*,
    2024 WL 3463348 (N.D. Cal. Jul. 17, 2024) ................................................................... 8

*Kang v. PayPal Holdings, Inc.*,
    620 F. Supp. 3d 884 (N.D. Cal. 2022) ...................................................................... 7, 22

*Lamontagne v. Tesla, Inc.*,
    2024 WL 4353010 (N.D. Cal. Sept. 30, 2024)..............................................................21, 22

*Lopes v. Fitbit, Inc.*,
    2020 WL 1465932 (N.D. Cal. Mar. 23, 2020),
    *aff'd*, 848 F. App'x 278 (9th Cir. 2021) ......................................................................21, 25

*Lopes v. Fitbit, Inc.*,
    848 F. App'x 278 (9th Cir. 2021)........................................................................................25

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) .............................................................................................9, 10, 11

*McGovney v. Aerohive Networks, Inc.*,
    2019 WL 8137143 (N.D. Cal. Aug. 7, 2019)....................................................................25

*Mehedi v. View, Inc.*,
    2023 WL 3592098 (N.D. Cal. May 22, 2023) ...................................................................22

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008).................................................................................5, 20, 25

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020)..............................................................................13, 20, 21

*Oh v. Hanmi Fin. Corp.*,
    621 F. Supp. 3d 1075 (C.D. Cal. 2022)..............................................................................11

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pen. Fund*,
    575 U.S. 175 (2015) .............................................................................................................7

*Patterson v. Jump Trading LLC*,
    710 F. Supp. 3d 692 (N.D. Cal. 2024),
    *appeal docketed*, No. 24-670 (9th Cir. Feb. 7, 2024)............................................22, 23, 24

*Plumbers & Pipefitters Local Union #295 Pension Fund v. CareDx, Inc.*,
    2023 WL 4418886 (N.D. Cal. May 24, 2023) ...................................................................24

*Police Ret. System v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014)............................................................................................12

*Prodanova v. H.C. Wainwright & Co.*,
    993 F.3d 1097 (9th Cir. 2021)......................................................................................17, 21

*Rok v. Identiv, Inc.*,
    2017 WL 35496 (N.D. Cal. Jan. 4, 2014),
    *aff'd sub nom. Cunningham v. Identiv, Inc.*, 716 F. App'x 663
    (9th Cir. 2018) ...................................................................................................................20

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001)..............................................................................................10

*SEC v. Lucent Techns., Inc.*,
    610 F. Supp. 2d 342 (D.N.J. 2009) ....................................................................................23

*SEC v. Smith*,
    2020 WL 6115077 (C.D. Cal. June 3, 2020)........................................................................ 23

*Simpson v. AOL Time Warner, Inc.*,
    452 F.3d 1040 (9th Cir. 2006), *vacated on other grounds*
    *by Simpson v. Homestore.com*, 519 F.3d 1041 (9th Cir. 2008) .................................. 22, 23

*Sneed v. AcelRx Pharm., Inc.*,
    2022 WL 4544721 (N.D. Cal. Sept. 28, 2022)................................................................. 22

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
    552 U.S. 148 (2008) ........................................................................................................ 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .......................................................................................................... 6

*Universal Health Svcs., Inc. v. Thompson*,
    363 F.3d 1013 (9th Cir. 2004)......................................................................................... 15

*Webb v. SolarCity Corp.*,
    884 F.3d 844 (9th Cir. 2018).................................................................................. 5, 20, 21

*Weston Family Partnership LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022)......................................................................................... 6, 10

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021)......................................................................................... 17

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)................................................................... 5, 6, 19, 20, 25

## STATUTES

15 U.S.C. § 77q(a)(1) .............................................................................................................. 21

15 U.S.C. § 77q(a)(3) .............................................................................................................. 21

15 U.S.C. § 78u-4(b)(2)(A) ....................................................................................................... 5

15 U.S.C. § 78u-4(b)(3)(A) ....................................................................................................... 6

15 U.S.C. § 78u-4(b)(4) ........................................................................................................... 24

## RULES

15 C.F.R. § 734.9(e) ................................................................................................................. 3

15 C.F.R. § 764.2(e) ............................................................................................................. 5, 19

15 C.F.R. § 772.1 ................................................................................................................. 4, 14

85 Fed. Reg. 51596 .............................................................................................................. 3, 4

85 Fed. Reg. 51600 ................................................................................................................... 4

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that at the above-referenced time and date, Defendants will move to dismiss the Amended Complaint ("AC" or "¶") pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Fed. R. Civ. P. 9(b) and 12(b)(6).

## STATEMENT OF ISSUES (CIVIL L.R. 7-4(a)(3))

Does the Amended Complaint state a claim under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5?

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiffs again fail to state a securities fraud claim against Defendants. Several months ago, the Court dismissed Plaintiffs' Consolidated Complaint ("CC"), detailing the numerous defects in Plaintiffs' falsity and scienter allegations. *See* ECF No. 96 (the "Dismissal Order"). In so doing, the Court clearly and repeatedly identified an overarching deficiency in this action: Plaintiffs' failure to plead contemporaneous facts showing that Defendants knew their interpretation of the new Foreign Direct Product Rule ("FDPR") was incorrect at the time the challenged statements were made. ECF No. 96 at 3-4, 8-10. The Court found that Plaintiffs' pleading "heavily rel[ied] on the benefit of hindsight, and there are no allegations of contemporaneous facts to support[] that Defendants knew that continued sales to Huawei violated the FDPR or were deliberately reckless in that belief." *Id.* at 10. The AC is more of the same. It adds no new allegations that go to the crux of this action—Seagate's interpretation of the FDPR.

The vast majority of the AC simply parrots the allegations of its dismissed predecessor. It does not add anything new about the language of the FDPR. It does not add any new contemporaneous facts—no confidential witnesses, no internal documents, no internal meetings, no internal conversations, no admission, no action by Defendants—showing that Defendants knew their interpretation of the FDPR was incorrect at the time of the statements. Instead, the 107-page AC spends pages upon pages rehashing or repackaging the same FDPR language, the same "warnings" (a supplier letter, two law firm alerts, and competitors' actions), the same penalty size, the same alleged GAAP violation, the same congressional inquiry, the same core operations

allegations, etcetera, that the Court already found inadequate to plead a claim.

And while Plaintiffs offer a scattershot of random "new" allegations, none say anything about any Defendant's state of mind at the time of the statements. For example, Plaintiffs allege that scienter can be inferred from Seagate's sale and leaseback of a corporate campus but the very document on which they rely indicated that Seagate had been selling and consolidating its campuses long *before* the promulgation of the FDPR. As another example, Plaintiffs complain that Seagate did not comment on the proposed FDPR during the regulatory rulemaking process, but Plaintiffs plead no facts supporting the gigantic leap from the absence of comments to knowledge, many months later, that Defendants' interpretation of the FDPR was incorrect when the challenged statements were made. As shown by these few examples, Plaintiffs have scraped the bottom of the proverbial barrel. None of the new allegations addresses the gravamen of this case and none cures the deficiencies identified by the Court. It is clear that Plaintiffs have no additional facts to plead. The AC should be dismissed, this time with prejudice.

## STATEMENT OF FACTS

***Seagate.*** Seagate, a leading provider of data storage technology, produces a broad range of data storage products, including Hard Disk Drives ("HDDs"). ¶ 21. HDDs are sophisticated, complex products that store digitally encoded data (*id.*), the design and manufacture of which depend on highly advanced technology and involve multiple complex technical steps, stages, and processes. Ex. 1 at 4, 7-9.[1]

Seagate's revenue came from a broad base of customers; no customer accounted for more than 10% of its consolidated revenue in FY 2019 and 2020 and only one customer (which was not Huawei) accounted for about 10% or more of consolidated revenue in FY 2021, 2022, and 2023. Ex.1 at 91; Ex. 2 at 85; Ex. 3 at 87. As is common practice, Seagate did not disclose information regarding its specific customers' revenue contributions and repeatedly informed investors of that. ¶ 213 ("we don't disclose the level of revenue of specific customers"); Ex. 4 at 12 ("we don't comment on any specific customers"); Ex. 5 at 15 ("we don't talk about individual customers").

---

[1] Exhibits ("Ex.") are attached to the Declaration of Betty C. Rowe in Support of Defendants' Motion to Dismiss, filed concurrently herewith.

***U.S. Export Restrictions Relating to Huawei.*** In May 2019, the Department of Commerce ("DOC") added Huawei and certain of its affiliates to the Entity List, thus imposing a licensing requirement on the export of items subject to the Export Administration Regulations ("EAR") that were destined to or involving the listed Huawei entities. ¶ 32. On August 17, 2020, the DOC, through the Bureau of Industry and Security ("BIS"), implemented a revised version of the Entity List FDPR, which added a license requirement for certain foreign-produced items that satisfy both the product scope and end-user scope of the rule. *See* 85 Fed. Reg. 51596 (Ex. 6); 15 C.F.R. § 734.9(e).

***Market Awareness of Seagate's Interpretation.*** On the first day of the Class Period, Seagate transparently disclosed its belief that its HDD sales to Huawei were not subject to the EAR. In response to an analyst question about the FDPR, the CFO stated, "***I don't see any particular restriction for us in term [sic] of being able to continue to ship to Huawei*" "*[s]o, we don't think we need to have a specific license.***" ¶ 167 (emphasis in original); *see* ¶ 168 (reiterating Seagate's belief that there were no limitations regarding shipments to China). During the Class Period, Seagate repeatedly told the market it believed it was in compliance with applicable export provisions (¶¶ 170, 183) based on its disclosed belief that a license was not required for the Huawei HDD sales.[2] The market also was aware of Seagate's continued relationship with Huawei. *E.g.*, ¶¶ 51, 55, 167, 212, 220; Ex. 8 at 2 (Deutsche Bank attributing Seagate's increased HDD market share in Q4 2020 to the fact that Seagate "'has not stopped shipping to Huawei'"); *id.* at 2 (Wedbush Securities stating, "it has been common knowledge within the storage industry that Seagate continued shipping parts to Huawei post the U.S. restrictions implemented in August."). Seagate voluntarily ceased HDD shipments to Huawei on or about September 29, 2021. *E.g.*, ¶¶ 192(viii), 196(viii). Even without Huawei sales, Seagate *met* its revenue guidance for the two quarters after the shipments stopped.[3]

---

[2] Seagate also warned in its SEC filings that its interpretation of relevant export restrictions may not "be accepted in all cases by relevant regulatory and enforcement authorities" (*e.g.*, ¶¶ 185, 190, 194), that its results may be impacted by changes in export regulations, and that it was subject to laws, the violation of which could materially affect the Company. Ex. 1 at 31; Ex. 7 at 20, 25.

[3] Revenue for Q2 2022 (ended December 31, 2021) was $3.11 billion (Ex. 9 at 5), hitting guidance of $3.1 billion +/- $150 million (Ex. 10). For Q3 2022 (ended April 1, 2022), revenue was $2.8 billion (Ex. 11 at 5), meeting the lower range of guidance of $2.9 billion +/- $150 million (Ex. 12).

***BIS Actions.*** On August 29, 2022, Seagate received a Proposed Charging Letter ("PCL") from BIS, alleging that Seagate's HDD shipments to a customer between August 2020 and September 2021 violated the EAR and FDPR.  ¶¶ 8, 122. After receipt of the PCL (which Seagate disclosed), Seagate reiterated its firm belief that its HDDs were not subject to the EAR and that Seagate had complied with relevant export laws.  *See* Ex. 13; Ex. 14 at 27; Ex. 15 at 27. On April 19, 2023, Seagate entered into a Settlement Agreement with BIS (the "BIS Order").  ¶ 126; Ex. 16. The BIS Order found that HDDs shipped to Huawei between August 2020 and September 2021 were subject to the EAR and FDPR because they were produced by certain equipment, which BIS identified as major components of Seagate's HDD plants, manufactured by "Company One" and "Company Two" that themselves were subject to the EAR, and were the "direct products" of specified U.S.-origin technology.  Ex. 16 ¶¶ 6, 9-10.

This conclusion was far from clear at the outset due to the complexities and technicalities of the EAR and FDPR.  Seagate's HDDs resulted from a long, complex production process that incorporated numerous components from a complicated supply chain in earlier phases of production. The EAR, Federal Register, and BIS guidance indicated that the new restrictions applied only to a "direct product," not an indirect product.  *See* 15 C.F.R. § 772.1; 85 Fed. Reg. 51596 (Ex. 6).  In the preamble to the FDPR on August 20, 2020, in response to commenters' question, "How can we possibly delve that deeply into the supply chains and design chains of our customers and suppliers?," BIS confirmed that the new rule applied to the "direct product."  85 Fed. Reg. 51600 (Ex. 6).  In December 2020, BIS again confirmed the "direct product" standard in guidance, stating that "incorporation of a part that is subject to the EAR pursuant to the [Entity List] FDP rule *does not necessarily make the larger foreign product subject to the EAR*[.]"[4]  Ex. 17 at 3.  The EAR defined "direct product" as "[t]he immediate product (including processes and services) produced directly by the use of technology or software."  15 C.F.R. § 772.1.

Seagate and BIS disagreed on the product scope of the FDPR and the technical application of the text.  In the end, BIS determined that "[t]he company incorrectly interpreted the FDP rule to require evaluation of only the last stage of its HDD manufacturing process rather than the entire

---

[4] All emphases in quotations are added unless otherwise noted.

process." Ex. 16 ¶ 8. BIS found that Seagate's conduct fell within Section 764.2(a) of the EAR's proscription against "prohibited conduct." *See* Ex. 16 ¶ 28. Thus, although Seagate admitted to committing the alleged conduct (Ex. 16 at 9), Seagate in no way admitted that it knowingly violated the EAR nor was it charged with a knowing violation under Section 764.2(e) of the EAR. To the contrary, BIS's Order acknowledges that Seagate misinterpreted the EAR and believed its sales complied with the EAR at the time. Indeed, Seagate's contemporaneous statements and conduct consistently indicated its belief that it complied with all applicable laws.

*Procedural History.* Defendants moved to dismiss Plaintiffs' prior complaint in November 2023. The Court granted Defendants' motion on August 8, 2024, finding that Plaintiffs failed to adequately plead falsity and scienter because, *inter alia*, Plaintiffs failed to plead that Defendants knew their interpretation of the FDPR was erroneous at the time the challenged statements were made. ECF No. 96 at 3-4, 8-10. The Court found that overall, "the inference of scienter is not equally as compelling as the opposing inference that Defendants had a non-fraudulent intent and erroneously interpreted the FDPR." *Id.* at 11. Plaintiffs filed the AC on September 12, 2024.

## ARGUMENT

### I.    APPLICABLE LEGAL STANDARDS

To state a securities fraud claim, Plaintiffs must plead specific facts showing, among other things, (1) a material misrepresentation or omission; (2) scienter; and (3) loss causation. *Webb v. SolarCity Corp.*, 884 F.3d 844, 850 (9th Cir. 2018). Under the PSLRA, a securities fraud complaint must "'plead with particularity both falsity and scienter.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). These requirements are "formidable." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008). Plaintiffs must "state *with particularity* facts giving rise to a *strong inference*" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). Scienter "'refers to a mental state embracing intent to deceive, manipulate, or defraud.'" *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014). Scienter requires deliberate recklessness or conscious misconduct. *Id.* Deliberate recklessness is "a form of intentional or knowing misconduct." *In re Silicon Graphic, Inc. Sec. Litig.*, 183 F.3d 970, 976 (9th Cir. 1999); *see Browning v. Amyris, Inc.*, 2014 WL 1285175, at *15 (N.D. Cal. Mar. 24, 2014) (degree of

recklessness required "'strongly suggests actual intent'"). Courts must consider scienter allegations holistically and "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007). A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. A complaint not meeting these high pleading requirements "shall" be dismissed. 15 U.S.C. § 78u-4(b)(3)(A).

## II.     THE AC FAILS TO PLEAD A MATERIAL MISSTATEMENT OR OMISSION

Plaintiffs assert the same categories of alleged misstatements and omissions as in their previous complaint: (1) statements that Seagate complied with the FDPR and applicable export laws; (2) statements concerning Seagate's alleged reliance on Huawei sales; (3) alleged omissions that Seagate's financial results were "driven" in material part by Huawei sales; and (4) certifications in Seagate's Form 10-Q for the third fiscal quarter of 2021 that the filing was prepared in accordance with GAAP. ¶¶ 164, 218-219. To be false or misleading, a statement must either "'directly contradict what the defendant knew at the time,'" *Weston Family Partnership LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022), or "create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Plaintiffs fail to plead either for each category asserted. The AC adds no confidential witness statements, no internal corporate documents, no admission, and no action by Defendants that show that any challenged statements were false when made. Plaintiffs merely recycle the same allegations the Court already held were insufficient. That Plaintiffs failed to correct the deficiencies "is 'a strong indication that the plaintiffs have no additional facts to plead.'" *Zucco*, 552 F.3d at 1007 (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1098 (9th Cir. 2002)).[5]

---

[5] Many of the alleged misstatements are nonactionable statements of opinion. *E.g.*, ¶¶ 167 ("we don't think we need to have a specific license"), 175 ("I think that the market demand globally will not change on how it's ultimately serviced"), 205 ("[we] believe that we've complied with all relevant export control laws and regulations"), 216 ("I think we're just watching too much inventory out there. So I don't think it's material"), 230 ("I think 2021, there is still some kind of supply concerns that people have about components everywhere[;]" "[f]rom my perspective, mass capacity is relatively insulated drom some of that"), 240 ("we think the nearline is still very strong"). The Supreme Court held that opinion statements require allegations of subjective falsity
(continued...)

**A. No Falsity As To Compliance Statements, Risk Factors, and SOX Certifications**

The AC challenges the same compliance statements, the same risk factors, and the same SOX certifications, for the same reasons, as before—with no meaningful differences.[6]  Those statements are not false or misleading for the reasons stated in the Court's Dismissal Order.

*Compliance Statements.*  The Court's Dismissal Order held that the compliance statements were not false or misleading because (1) "[a]t the time Defendants made the challenged statements about compliance, Seagate had not been found to be noncompliant with the FDPR" and, (2) the "factual allegations do not sufficiently support that Defendants knew their interpretation of the FDPR was erroneous at the time the challenged statements were made."  ECF No. 96 at 3.  The first defect is incurable and the second was not cured.  Like its predecessor, the AC contains no contemporaneous facts to show that Defendants knew at the time of the statements that Seagate's interpretation of the FDPR was incorrect.  Plaintiffs simply repeat the same allegations of Defendants' purported knowledge — including but not limited to Seagate's competitor's conduct, two law firm alerts, and a supplier letter — that the Court already held did not plead falsity.  *See* ECF No. 96 at 3.  The Court should again dismiss all claims based on the compliance statements.[7]

*Risk Factors.*  The same is true for the risk factors.  The AC again challenges the risk factors

---

or facts inconsistent with information available to defendants at the time.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pen. Fund*, 575 U.S. 175, 188-89 (2015).  As noted, Plaintiffs again fail to allege specific facts indicating that Defendants did not believe what they said or facts showing the statements were inconsistent with other information available to Defendants at the time.

[6] *Compare* ¶¶ 165-211, *with* CC ¶¶ 134-180 (compliance statements); *compare e.g.*, ¶¶ 171-172, 176-77, 180-181, *with* CC *e.g.*, ¶¶ 140-141, 145-46, 149-50 (risk factors); *compare e.g.*, ¶¶ 173, 178, 182, 186, *with* CC *e.g.*, ¶¶ 142, 147, 151, 155 (SOX certifications).

[7] *See*, *e.g.*, *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 897 (N.D. Cal. 2022) (dismissing complaint; "a statement about compliance is not made misleading just because a later regulatory inquiry occurs"); *Ikeda v. Baidu, Inc.*, 2021 WL 1299046, at *9 (N.D. Cal. Apr. 7, 2021) (dismissing complaint; "Plaintiff has not alleged specific facts that suggest that, at the time of the [statements], Baidu was not in compliance with Chinese regulations."): *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1024 (N.D. Cal. 2020) ("Defendants had no obligation or requirement to elaborate on any alleged non-compliance *because they had not yet been found to be non-complaint*") (emphasis in original), *aff'd in part, rev'd in part on other grounds*, 87 F.4th 934 (9th Cir. 2023), *cert. granted in part*, 144 S. Ct. 2629 (2024); *In re Paypal Holdings, Inc. S'holder Deriv. Litig.*, 2018 WL 466527, at *3 (N.D. Cal. Jan. 18, 2018) ("Federal securities laws do not impose upon companies a 'duty to disclose uncharged, unadjudicated wrongdoing.'"); *accord In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993) (that a statement "proves to be wrong in hindsight does not render the statement untrue when made.").

in Seagate's Forms 10-Q and 10-K, filed on October 29, 2020 (1Q 2021) through January 25, 2023 (2Q 2023), which stated that there have been "no material changes" to the description of the risk factors associated with Seagate's business and that "[a]though we have implemented policies and procedures designed to ensure compliance" with laws and regulations, "there can be no assurance" that Seagate "will not violate these or other applicable laws, rules and regulations to which we are and may be subject" (and variations thereof). *E.g.*, ¶¶ 171-172, 176-177, 180-181. The Court held the risk factors were not misleading because "Seagate had not yet been found to be noncompliant with applicable regulations, and Plaintiffs have not otherwise sufficiently alleged with particularity that Defendants knew that the risks had materialized at the time of the SEC filings." ECF No. 96 at 4; *id.* (finding that the challenged risk factors would be false or misleading "only if Seagate knew the risks had already materialized at the time the statements were made.") (citing *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948-49 (9th Cir. 2023), *cert. granted in part*, 144 S. Ct. 2629 (2024)). Plaintiffs still have not pled with particularity facts showing that Defendants knew the risks had materialized at the time of the statements. *See* Section III., *infra*. Therefore, the Court should dismiss all claims based on the risk factors once more.[8]

*SOX Certifications.* Plaintiffs again claim that the SOX certifications were false because they did not disclose the allegedly illegal sales to Huawei. *E.g.*, ¶¶ 142-143, 147-148, 151, 153. Plaintiffs' allegations are verbatim from the dismissed CC and as such, remain afflicted with the same defects: they "rest[] on the assumption that Defendants knew that Seagate was violating the FDPR at the time they were made" and "there are no specific allegations regarding how Seagate's internal controls over financial reporting were deficient." ECF No. 96 at 4.

**B. No Falsity As To Statements "Downplaying" "Reliance On" Huawei HDD Sales**

Allegations challenging statements "downplaying" Seagate's "reliance on" Huawei HDD sales are also a rehash of the same statements identified in the dismissed CC. They fail for the same

---

[8] *See*, *e.g.*, *Jaszczyszyn v. SunPower Corp.*, 2024 WL 3463348, at *7 (N.D. Cal. Jul. 17, 2024) (finding plaintiff "fail[ed] to establish contemporaneous knowledge that the risks warned of had come to fruition."); *In re Cloudera, Inc. Sec. Litig.*, 2021 WL 2115303, at *23 (N.D. Cal. May 25, 2021) (risk factors were not actionable where plaintiffs failed to plead "the risks have already 'come to fruition' at the time of the statement").

reasons as they did previously.

*September 14, 2020 Conference.*  The Court held that statements made during conference calls on September 14, 2020 and October 22, 2020 suggesting that revenue from Huawei was less than 10 percent of, or not material to, Seagate's total revenue, were not false or misleading.  ECF No. 96 at 5.  The Court found that "Seagate's sales to Huawei were 3.06 percent of Seagate's total revenue for Q1 2021—which is less than 10 percent as Defendants represented[.]"  *Id.*; *see* ¶ 107.  The AC adds no material allegations regarding the September 2020 statement.

*October 22, 2020 Q1 2021 Earnings Call.*  Plaintiffs now assert that the October 22, 2020 statement was false because it conveyed that Huawei's revenue contribution to Seagate's *December quarter guidance* was not "material."  ¶¶ 215-216.  Specifically, Plaintiffs claim that Seagate omitted that "Seagate had already positioned itself as Huawei's sole HDD supplier," that "sales to Huawei exceeded 3% of HDD revenue for the quarter and was rapidly doubling," and that Huawei's revenue contribution "was allowing the Company to meet the mid-point of its revenue guidance[.]" ¶ 217.  These allegations fail.  Dooming these allegations is Plaintiffs' failure to plead the basic facts to support falsity, such as what the "December quarter guidance" was, the components of that guidance, and the portion of that guidance attributable to Huawei HDD sales, let alone the materiality of Huawei to that guidance.   That alone should end the Court's inquiry.

In any event, the purported omissions do not render the statement false.  Plaintiffs' assertion that Seagate "had already positioned itself as Huawei's sole HDD supplier" as of October 2020 (¶ 217) lacks specificity and is unsupported by any facts.[9]  That Huawei's contribution to Seagate's HDD revenue in the prior quarter (Q1 2021) supposedly exceeded 3% (¶ 107) is irrelevant to the Company's guidance for next quarter, the "December quarter" (Q2 2021).  And Plaintiffs plead no facts showing that Huawei sales were "rapidly doubling at the time" of the statement.  ¶ 217.  Likewise, the allegation that Huawei's revenue contribution "was allowing the Company to meet

---

[9] To the extent Plaintiffs rely on the Strategic Cooperation Agreement, that agreement (which named Seagate as Huawei's "strategic," not "sole," supplier) was signed in December 2020 (¶ 84)—two months *after* the statement.  Seagate had no independent duty to disclose this commercial agreement as Section 10(b) does "not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).

the mid-point of its revenue guidance" (¶ 217) is unaccompanied by any facts and is puzzling. Revenues from *every* customer "allow" Seagate to meet its revenue guidance. Seagate had no duty to call out one customer, especially when in that same statement, Dr. Mosley reminded investors, "we don't talk about individual customers." Ex. 5 at 15; *see Matrixx*, 563 U.S. at 44.

In the end, the crux of Plaintiffs' grievance with the October 2020 statement is that "sales to Huawei *would ultimately* account for 13.42% of the Company's consolidated revenues and 15% of HDD revenues" for "the December quarter." ¶ 217, n.14. Plaintiffs confuse Seagate's quarters; the quarter in which Huawei sales were allegedly 13.42% of revenue, was Q3 2021 (ending April 2, 2021) (¶ 107), not Q2 2021, which was the quarter discussed in the October 2020 statement. In any event, Plaintiffs' grievance is pure hindsight and a securities claim cannot be pled on hindsight.[10]

*3Q 2021 Form 10-Q.* Once more, Plaintiffs claim that Seagate's Form 10-Q for the Q3 2021 (ending April 2, 2021) was misleading and violated GAAP (the fourth category of the alleged misstatements) because it did not disclose that sales to Huawei accounted for 10% or more of the Company's revenue that quarter. ¶¶ 152, 218-219. The Court previously rejected these allegations because Plaintiffs did "not allege which GAAP rule requires such disclosures to be made for interim reporting periods, as opposed to on an annual basis[.]" ECF No. 96 at 5. Plaintiffs now point to ASC 280-10-50-42 (¶ 219), but that accounting rule does not require disclosure of specific customers at all, let alone on an interim basis. That rule pertains to "Information about Major Customers" as one of the three categories of "Entity-wide" disclosures and does not apply to interim reporting. Ex. 18. ASC 280-10-50-39 states, "Entity-wide disclosures are required *only for annual reporting*." *Id.* Moreover, for the annual report, ASC 280-10-50-42 provides that issuers "*need not disclose the identity of a major customer or the amount of revenues that each segment reports from that customer*," only "th[e] fact" of a customer who contributed 10% or more

---

[10] *See*, *e.g.*, *Weston Family*, 29 F.4th at 621 ("it is simply not enough to assume or implausibly infer that the defendants must have known about these issues … based on later facts or developments."); *Ronconi v. Larkin*, 253 F.3d 423, 430 n.12 (9th Cir. 2001) ("'Fraud by hindsight is not actionable.'"); *Silicon Graphics*, 183 F.3d at 988 ("Congress enacted the PSLRA to put an end to the practice of pleading 'fraud by hindsight.'"). Indeed, even if one were to accept that the "December quarter" referred to Q3 2021, that would mean Dr. Mosley's October 2020 statements were false for failure to predict the Company's results for a quarter ending *five months* later.

to revenue, among other things (Ex. 18; ¶ 54, n.6). Plaintiffs fail to plead a GAAP violation, again.

The Dismissal Order further held, "[e]ven assuming a GAAP violation occurred, Plaintiffs do not sufficiently allege why Huawei's revenue share crossing above 10 percent for one quarter, while still remaining below 10 percent for the year, would be significant enough to constitute an actionable misrepresentation." ECF No. 96 at 5-6 (citing *Oh v. Hanmi Fin. Corp.*, 621 F. Supp. 3d 1075, 1084 (C.D. Cal. 2022)). The AC does not correct this defect either.

### C. No Falsity As To Statements Regarding Revenue "Drivers"

As a variant of Plaintiffs' "reliance on" Huawei theory, the AC challenges the same revenue "driver" statements the Court already found were not misleading. ECF No. 96 at 6-7.[11] Nonetheless, Plaintiffs repeat nearly verbatim the same allegations, claiming that Seagate's statements attributing its financial performance for Q2 2021 through Q3 2023 to "a host of legitimate business factors" (*e.g.*, ¶¶ 2, 5, 54) were misleading because Seagate did not identify Huawei HDD sales (or the absence thereof) as a purported "driver" of its performance. *E.g.*, ¶¶ 59, 241-242, 247-248. As before, Plaintiffs do not claim that Seagate's performance was *not* due to the "legitimate business factors." Instead, Plaintiffs insist Seagate should have disclosed that the legitimate factors, in turn, were purportedly due to "drastically increased sales" to Huawei. *See*, *e.g.*, ¶¶ 227(ii); 233(ii); 236(ii). But having truthfully disclosed the main factors, Seagate had no duty to disclose the underlying details.

Again, a company is not required to disclose all information that a reasonable investor might want to know. *See Matrixx*, 563 U.S. at 44; *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012). Seagate had no freestanding duty to disclose the specifics of its customers, including their identity, revenue level, or commercial agreements. *See In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at *11 (N.D. Cal. Nov. 28, 2021) ("the omission of TikTok as

---

[11] Plaintiffs add statements from Seagate's Q2 2022 earnings call, claiming they falsely indicated that future "down" performance would be driven by seasonality rather than the cessation of sales to Huawei. ¶¶ 239-240, 242. Plaintiffs' prior pleading also challenged various "driver" statements regarding seasonality. CC ¶¶ 190, 192-194, 196. The Court found that Plaintiffs did not allege facts showing that the sundry of identified factors "were not actually drivers of Seagate's revenue or less consequential than sales to Huawei" and that the "same reasoning holds true for statements made regarding the subsequent quarters where Seagate had negative revenue performance." ECF No. 96 at 6-7. The allegations regarding the additional Q2 2022 statement are no different.

a customer is not actionable" because "Defendants did not represent at any point that TikTok was not a Fastly customer."); Ex. 18 (ASC 280-10-50-42).  Again, Seagate made explicit disclaimers that it could not discuss specific customers.  ¶ 213; Ex. 4 at 12; Ex. 5 at 15. Plaintiffs' demand for a more fulsome report on the disclosed legitimate factors also runs headlong into well-established Ninth Circuit law that "expressly declined to require a rule of completeness for securities disclosures[.]" *Police Ret. System v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) ("Rule 10b-5 prohibits '*only* misleading and untrue statements, not statements that are incomplete.'"); *Brody*, 280 F.3d at 1006 n.8 ("if a company reports that its sales have risen from one year to the next, that statement is not misleading even though it does not include a detailed breakdown of the company's region by region or month by month sales.").

Plaintiffs' real gripe is that Seagate did not disclose that its HDD sales to Huawei – a publicly *known* fact (*see* ECF No. 96 at 10; p.3, *supra*) – were "illegal" because they were unlicensed.  But Seagate had no such disclosure duty because such sales had not been found to violate any laws at the time of the statements.  *See* Section II.A., *supra*.  Nor does the alleged omission convey an impression of a state of affairs that differed materially from reality.  At no time did Seagate state that it had a license or needed a license to sell HDDs to Huawei.   Seagate stated the opposite.  *See* ¶ 167 ("we don't think we need to have a specific license.").

On top of these major deficiencies, Plaintiffs again fail to plead with specificity facts showing that Seagate's financial results *were* "driven in material part" by Huawei HHD sales.  The AC pleads no material new facts in this regard.  As this Court found, for Q1 2021, Q2 2021, and Q4 2021, "it cannot be said that sales to Huawei were such a major revenue driver that they should have been explicitly mentioned" given Plaintiffs' concession that Huawei sales "did not ultimately affect whether Seagate met its revenue guidance in those quarters."  ECF No. 96 at 6.  Likewise, the AC admits that Seagate "would have come in below the midpoint of its revenue guidance" for these quarters without the Huawei sales.  ¶ 107.  Attempting to minimize these admissions, Plaintiffs suggest that results falling below the midpoint but within the lower bounds of guidance equates to a guidance miss.  *See* ¶ 107 n.8 (claiming that securities analysts "focus on the midpoint of issuer revenue guidance in evaluating an issuer's financial performance").  Plaintiffs plead no

legal authority for their novel view,[12] which would render meaningless the ubiquitous practice among public companies of providing *range* forecasts. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415, 420 (9th Cir. 2020) (affirming dismissal; "The allegation does not resonate in common experience"). Regarding Q2 2022, the Court found that "Seagate had already stopped shipping to Huawei, so sales to Huawei could not have been a driver of revenue for that quarter." ECF No. 96 at 6. The AC contains no allegations that would alter that conclusion.

For Q3 2021 and Q1 2022, the Court held that the driver statements were not misleading because "Plaintiffs do not allege that the identified factors (e.g., strong cloud data center demand and ongoing recovery in enterprise markets) were not actually drivers of Seagate's revenue or less consequential than sales to Huawei." ECF No. 96 at 6-7. Plaintiffs still do not. The Court further opined, "[t]hose statements might present a different situation if Seagate allegedly knew its Huawei sales were illegal and privately credited those sales with Seagate's ability to meet the earnings targets." *Id.* at 7 n.2. Plaintiffs plead no facts showing either situation. The Court also found, "[t]he same reasoning holds true for statements made regarding the subsequent quarters where Seagate had negative revenue performance." ECF No. 96 at 7. This same holding applies.

In sum, Plaintiffs' "driver" allegations lack factual support and are belied by allegations showing Seagate's *non*-dependence on Huawei HDD sales during the Class Period. *See*, *e.g.*, ¶ 59, Fig. 2 (Seagate's HDD revenue *increased* after Huawei shipments stopped), ¶ 107 (Seagate would have met guidance in three of the four quarters in fiscal 2021 without Huawei sales); *id.* (Huawei HDD sales comprised only 7.63% of Seagate's consolidated revenue for fiscal 2021).

**III.    THE AC FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER**

In its Dismissal Order, the Court held that Plaintiffs failed to adequately allege "that Defendants' interpretation of the FDPR was so patently unreasonable to support an inference of scienter." ECF No. 96 at 8. Nothing has changed. The AC largely repackages and rehashes Plaintiffs' old insufficient scienter allegations and is remarkable for what it does not address.

---

[12] Plaintiffs' academic article (¶ 107 n.8) merely "predict[ed]" that "the midpoint is a poor proxy for management expectation" and "predict[ed] that managers' true earnings expectations [were] close to the upper bound of range forecasts." Ex. 19 at 2-3, 5. The article does not support Plaintiffs' suggestion that the midpoint represents the lowest point of a forecast range.

The Court found that Defendants' interpretation of the FDPR – "to require evaluation of only the last stage of its HDD manufacturing process rather than the entire process" (Ex. 16 ¶ 8) – "was not so obviously wrong, as the meaning of 'direct product' is not immediately apparent from the plain language of the FDPR." ECF No. 96 at 8. The Court reasoned that the term "direct product" is defined as "the *immediate product* (including processes and services) produced directly by the use of technology or software." *Id.* at 8-9 (quoting 15 C.F.R. § 772.1) (emphasis in original). The Court pointed to certain comments received by BIS during the rulemaking process about the FDPR's application to products with long and complex production lines as further buttressing the finding that Seagate's interpretation of the FDPR was not unreasonable. *Id.* at 9. As a result, the Court correctly concluded that Defendants' interpretation of the FDPR did not give rise to a strong inference of scienter. *Id.* Surprisingly, the AC does ***not*** engage with the very deficiency identified by the Court—the meaning of "direct product." Plaintiffs simply ignore this fundamental fatal flaw in their case. Plaintiffs' silence indicates they have no meaningful response to the Court's analysis. Instead, Plaintiffs reiterate the same regulatory language previously pled in their dismissed pleading (*e.g.*, ¶¶ 39-40, 46, 49) and add a few allegations that miss the mark.

**A.    Plaintiffs' New Scienter Allegations Do Not Raise a Strong Inference of Scienter**

Unable to cite a single contemporaneous facts —no witnesses, no documents, no meetings— demonstrating Defendants' state of mind at the time of the challenged statements, the AC adds a hodgepodge of five random scienter allegations regarding (1) the comment period during agency rulemaking process; (2) "Red Flag Indicators" in BIS regulations; (3) Seagate's sale and leaseback of certain real estate; (4) Item 101(c)(1)(i) of Regulation S-K; and (5) Seagate's disclosures of accounts receivables in its 2021 Form 10-K. These scattershot allegations are so far removed from any showing of Defendants' mental state that they serve only to underscore the absence of scienter.

***Agency Rulemaking Process.*** Plaintiffs claim that Seagate's failure to ask questions about the FDPR during the rule's comment period raises a strong inference of scienter. *See* ¶¶ 48, 133. This claim is so far-fetched, it strains credulity on its face. And Plaintiffs' legal authorities (¶¶ 48 n.5 & 133 n.12) are inapposite. Those cases concerned the doctrine of administrative waiver, which holds that a plaintiff challenging an agency action in a civil suit waives the challenge if the plaintiff

failed to raise it to the agency pre-suit.[13]  The administrative waiver doctrine, however, is inapplicable because Seagate clearly is not challenging any agency action here.  It certainly does not raise a strong inference of scienter for purposes of pleading securities fraud.

*"Red Flag Indicators."*  Plaintiffs grasp onto the "Red Flag Indicators" in BIS regulations, arguing that one Indicator gave rise to a "duty to exercise due diligence" when an entity listed on the Restricted Entity List is involved and that "due diligence would have made the violation plain[.]" ¶ 132; *see* ¶¶ 42-43.  These allegations are deficient in many respects, the most salient of which is that due diligence speaks to negligence.  A Section 10(b) claim requires "deliberate recklessness reflecting intentional or conscious misconduct," at a minimum.  *Davoli v. Costco Wholesale Corp.*, 854 F. App'x 116, 117 n.1 (9th Cir. 2021) (rejecting plaintiff's attempt to "plead scienter by alleging 'red flags' . . . because such a standard is effectively a negligence standard."); *see* ECF No. 96 at 8.  Thus, the "Red Flag Indicators" are irrelevant as they concern a legal standard inapplicable here.[14]

*Sale/Leaseback of Real Estate.*  Continuing to reach for some indicia of scienter, Plaintiffs claim that Seagate's effort to sell and leaseback its Fremont campus in late 2022 to mid-2023 shows Seagate's "awareness" that it would have to pay a fine to BIS.  ¶ 163.  Nonsense.  The *San Francisco Business Times* article (¶ 163) indicated that the sale listing was on the heels of an 8% employee headcount reduction and was part of Seagate's "ongoing efforts to optimize [the Company's] capital assets and opportunities for reinvestment[.]"  Ex. 20. The article further observed, "[e]ven before

_____

[13] *See Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475, 485, 487-88 (9th Cir. 2023) (plaintiff sued U.S. Forest Service for an injunction against the implementation of a logging project; the court considered "whether the doctrine of administrative waiver bars [plaintiff's] challenge in [the lawsuit] because [Plaintiff] did not raise its arguments during the public-comment period."); *Universal Health Svcs., Inc. v. Thompson*, 363 F.3d 1013, 1017, 1020 (9th Cir. 2004)  (hospitals filed suit, claiming that "the [agency] acted in an arbitrary and capricious fashion in setting" hospital reimbursement levels; the court discussed "the issue of waiver in notice-and-comment rulemaking"); *Exxon Mobil Corp. v. United States EPA*, 217 F.3d 1246, 1247, 1249 (9th Cir. 2000) (oil companies petitioned for judicial review of a final rule issued by the Environmental Protection Agency; "Petitioners have waived their right to judicial review of these final two arguments as they were not made before the administrative agency, in the comment to the proposed rule").

[14] Even under Plaintiffs' erroneous standard, Plaintiffs offer no specific contemporaneous facts showing a failure to exercise due diligence, only sheer speculation that is insufficient to plead a securities claim.  *See* n. 19, *infra*.  And Plaintiffs' *argument* that Seagate "has still not explained how it could possibly have reached that interpretation" (¶ 133) runs afoul the Dismissal Order (ECF No. 96 at 8; *see also* Ex. 16 ¶ 8), and is an improper "attempt to burden shift," which "fails to compensate for the absence of specific pleadings establishing a strong inference of scienter." *In re HP Sec. Litig.*, 2013 WL 6185529, at *8 (N.D. Cal. Nov. 26, 2013).

the pandemic, Seagate was actively consolidating its Bay Area locations." *Id.* (noting real estate sales in 2017 and 2019). Thus, Seagate was consolidating its locations *before* the promulgation of the FDPR in August 2020. Plaintiffs plead no nexus between the sale/leaseback of the Fremont campus, the FDPR, and Defendants' mental state at the time the statements were made.

*Item 101 of Regulation S-K.* Plaintiffs claim that Item 101(c)(1)(i) of Regulation S-K "*required* Seagate to describe 'any dependence'" on 'customers' that is material to understanding the business as a whole[.]" ¶ 153. Not so. Item 101(c)(1)(i) required a "description" of "the business done" by the registrant in its annual reports, which description "*may*" include "dependence" on "customers." Ex. 21. Item 101(c)(1)(i) did not create a duty to disclose Huawei (a customer already known by the market). Even if disclosure were required, Plaintiffs' allegations do not satisfy the heightened pleading standards of the PSLRA or Rule 9(b) as they do not define the term "dependence" as used in that regulation. Also, the alleged omission did not create an impression that materially differed from reality (*see Brody*, 280 F.3d at 1006); the AC fails to allege facts showing that Seagate was "dependent" on Huawei during the Class Period. *See* Section II.C., *supra*.

*Accounts Receivables Disclosure in the 2021 Form 10-K.* The entirety of Plaintiffs' allegations regarding the accounts receivables disclosure is that Seagate's historical Form 10-Ks disclosed the names of customers accounting for more than 10% of the Company's accounts receivable, but the 2021 Form 10-K did not, and competitor Western Digital's 2021 Form 10-K did. *Id.* It is difficult to discern how these allegations have anything to do with anything in this case, including scienter. Plaintiffs do not allege that Huawei accounted for more than 10% of Seagate's accounts receivable for fiscal year 2021.[15] Plaintiffs also do not allege a GAAP requirement for the disclosure they seek. Plaintiffs also do not allege that the actual disclosures of Seagate's accounts receivable in the 2021 Form 10-K were false or misleading. And Plaintiffs do not explain how another company's accounting practices would have any bearing on Defendants' scienter. Plaintiffs are simply grasping for straws.

---

[15] The two unspecified customers in Seagate's 2021 Form 10-K are identified as accounting for 10%+ of Seagate's accounts receivable as of the end of Seagate's 2021 fiscal year *and* 2020 fiscal year, indicating they are the same customers who were identified by name in Seagate's 2020 Form 10-K—Arrow Electronics Inc. and Dell Inc. Ex. 1 at 62; Ex. 7 at 61. Neither was Huawei.

## B.     Plaintiffs Rehash Their Old Inadequate Scienter Allegations

The rest of Plaintiffs' scienter allegations merely regurgitate the same plethora of allegations already held inadequate.  Those allegations remain defective.

***Same Purported "Warnings."***  Plaintiffs continue to rely on the same supplier letter, the same two law firm alerts, and the same competitors' actions as supporting scienter.  *E.g.*, ¶¶ 3, 59, 76-79, 90, 135-139, 150.  The Court addressed these allegations twice in its Dismissal Order, finding that they "concern only others' interpretations of the FDPR and do not speak to whether Seagate agreed with those interpretations behind closed doors."  ECF No. 96 at 3; *see id.* at 9.[16]  The AC adds nothing new, except for Plaintiffs' concession that the letter was "from a supplier about *its own products*" (¶ 90; *see* ¶ 135)—not Seagate's products, which belie scienter.  These allegations still concern *others'* interpretation of the FDPR, not Defendants' mental state.

***Same Core Operation Theory.***  Plaintiffs again claim that scienter can be inferred because the challenged statements concern sales of Seagate's "most important product" to "one of its most significant customers[.]"  ¶ 146; *see* ¶¶ 147, 151.  The Court previously held, "[s]cienter based on a core operations theory is deficiently pleaded, as Plaintiffs do not 'provide either specific admissions by the executive that they were involved in the details of a company's operations or witness statements that the executives were specifically involved in producing the false reports.'"  ECF No. 96 at 10 (quoting *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1111 (9th Cir. 2021)).  The AC still does not.  Plaintiffs have no executive admission or witness statement to plead.

***Same GAAP Allegations.***  Scienter allegations predicated on a GAAP violation (¶¶ 152-155) fail because, as shown above, Plaintiffs do not allege noncompliance with GAAP.  Even assuming a violation, as this Court found, "a technical misunderstanding of the rule would not be

---

[16] *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021) (no facts showing that CEO ever accepted certain employees' views that a "goal was impossible"); *Ferreira v. Funko Inc.*, 2021 WL 880400, at *28 (C.D. Cal. Feb. 25, 2021) ("Plaintiffs fail to allege sufficient particularized facts to show Defendants shared CW1's 'pessimism' or 'gloomy view' that [company] could not meet its" projections); *Feola v. Cameron*, 2016 WL 11750382, at *11 (C.D. Cal. Aug. 25, 2016) (a competitor's actions were "of limited force" "as to what Defendants knew and believed."); *accord City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 621 (9th Cir. 2017) ("a corporation's mere knowledge of negative factors … does not of itself support an inference that the corporation acted with scienter").

sufficient to support scienter." ECF No. 96 at 10 (citing *DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002)). The AC's allegations do nothing to alter this conclusion.

**Same Unidentified "Senior Management's" Involvement.** Scienter allegations based on "senior management's close involvement" in Seagate's two post-FDPR commercial agreements with Huawei are identical to those pled in the dismissed CC. *Compare* ¶¶ 156-158, *with* CC ¶¶ 128-130. The Court already found these allegations "do not provide an adequate basis to draw a strong inference" of scienter. ECF No. 96 at 9. Nothing has changed.

**Same Instructions to Customers.** Plaintiffs again claim that scienter can be inferred from language in Seagate's license agreements with customers, allegedly posted on the Company's website, that restricted customer distribution of Seagate products to "restricted end-user[s]" under U.S. export laws. *Compare* ¶¶ 81-82, *with* CC ¶ 69. That general language did not mention Huawei and is not indicative of fraud as it was a business means through which Seagate could maintain control over its customers' distribution of its products, which *lessens* the risk of potential improper uses. The customer instructions do not plead scienter. *See Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (court must consider an "'obvious alternative explanation'" in assessing plausibility); *Borteanu v. Nikola Corp.*, 2023 WL 1472852, at *25 (D. Ariz. Feb. 2, 2023) (fraud not alleged where "it [was] just as or even more likely that the [compensation] system was chosen for some other non-fraudulent reason.").

**Same Magnitude of the Problem and Penalty.** The Court already found that allegations regarding "the size of the civil penalty"[17] and "the egregious and widespread character" of the violations "do not provide an adequate basis to draw a strong inference that Defendants had the required state of mind."[18] ECF No. 96 at 9. Nonetheless, the AC repeats the same inadequate

---

[17] *See In re Bank of America Corp.*, 2011 WL 740902, at *13 n.5 (N.D. Cal. Feb. 24, 2011) (allegations regarding regulatory settlements "do not alter" court's finding of lack of scienter); *Eshelman v. OrthoClear Holdings, Inc.*, 2009 WL 506864, at *8 (N.D. Cal. Feb. 27, 2009) ("the mere fact of a settlement" did not support scienter; "settlements can be made for many reasons").

[18] *See Align*, 856 F.3d at 622-23 (declining to infer scienter from the "magnitude" of the goodwill write downs); *Biotechnology Value Fund, LP v. Celera Corp.*, 12 F. Supp. 3d 1194, 1202-03 (N.D. Cal. 2013) (plaintiffs' "'magnitude' argument does not afford a strong inference of scienter"); *In re Taleo Corp. Sec. Litig.*, 2010 WL 597987, at *11 (N.D. Cal. Feb. 17, 2010) (allegations regarding magnitude of the restatement did not support scienter).

allegations without adding new contemporaneous facts. *Compare* ¶¶ 159, 161, *with* CC ¶¶ 109, 127, 131. Instead, Plaintiffs try to *manufacture* a BIS determination of willful or reckless conduct by *arguing* that based on the BIS Guidelines on Charging and Penalty Determinations, BIS must have found willful or reckless conduct given the penalty size. ¶¶ 64-65, 161. These allegations are not *facts*, but rather, rank speculation that do not support scienter.[19] The Court should decline Plaintiffs' invitation to divine the mind of BIS. What is crystal clear are the *fact* that the BIS Order contained *no* findings of willful or reckless conduct by Seagate and the *fact* that BIS did not charge Seagate with a knowing violation—both of which negate an inference of willful or reckless conduct.

***Same Congressional Inquiry.*** Plaintiffs repeat the same allegations about Seagate's purported non-cooperation with the Congressional inquiry (¶¶ 95-102, 142, 144, 150) which the Court already found do not raise a strong inference of scienter. ECF No. 96 at 9. Plaintiffs resurrect the October 2021 Commerce Committee report pled in their dismissed pleading, claiming the report "found that Seagate had 'knowingly' violated the FDPR." ¶ 144. Plaintiffs exaggerate. The report stated, "*it appears* that Seagate Technology knowingly violated the [FDPR]" (¶ 102) but left it to BIS to make a "determination about whether enforcement actions are necessary" against Seagate. Ex. 8 at 6. Subsequently, BIS did ***not*** charge Seagate with a *knowing* violation (15 C.F.R. § 764.2(e)). The committee report and its tentative views do not raise a strong inference of scienter. In fact, the report supports the lack of scienter in that it highlighted BIS' "[f]ailure" "to provide clarity on the rule's scope[.]" Ex. 8 at 6. Thus, even the Congressional committee investigating the FDPR believed the scope of the FDPR was unclear as of October 2021.

Relying solely on the committee report again, Plaintiffs allege that Seagate "began quietly working with Huawei to continue those sales through foreign subsidiaries set up by Huawei" (¶ 143) as giving rise to a strong inference of scienter. Plaintiffs overreach. The report stated that the staff had received unspecified "evidence indicating that Seagate *may* plan to resume shipments to Huawei once the Chinese company is restructured with an operational data server subsidiary to reroute hard

---

[19] *Zucco*, 552 F.3d at 995 (allegations cannot be based on speculation); *Silicon Graphics*, 183 F.3d at 985 ("It is not enough for [plaintiff] to state facts giving rise to a mere speculative inference of deliberate recklessness[.]"); *DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1228 (S.D. Cal. 2001) (dismissing securities complaint alleging "unsupported speculation and conjecture").

disk drives through the supply chain." Ex. 8 at 5. There is no suggestion that Seagate ever resumed shipments to Huawei. And the report contains no information about what the "evidence" was, its source, whether it was discussed with Seagate, when the alleged "plan" was created, or whether it was ever approved or implemented. This one speculative sentence in the 6-page committee report and Plaintiffs' mischaracterization are devoid of any specificity and do not come close to satisfying the PSLRA's "'exacting' pleading obligation" for pleading scienter. *See Endologix*, 962 F.3d at 414 ("The PSLRA's 'strong inference' requirement has teeth" and "is an 'exacting' pleading obligation"). Further, Plaintiffs' allegation that a *Bloomberg* article "corroborated the evidence" described in the report (¶ 103) is also wrong. That article did not mention Seagate. *See* Ex. 22.

Moreover, Plaintiffs fail to explain how the committee report issued in October 2021 shows Defendants' mental state when the compliance statements were made, as much as more than a year earlier. *See Metzler*, 540 F.3d at 1066 (scienter requires "'allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made'"). In sum, allegations about the congressional inquiry and report do not give rise to a strong inference of scienter.

***Same Executive Departures and Compensation.*** The scienter allegations based on certain executives' departure and compensation are verbatim from the dismissed CC. *Compare* ¶ 160, *with* CC ¶ 132. The Court found these allegations insufficient to plead scienter. ECF No. 96 at 9; *see Webb*, 884 F.3d at 857 ("corporate reshuffling" allegations were insufficient to plead scienter); *Zucco*, 552 F.3d at 1002 (similar); *Rok v. Identiv, Inc.*, 2017 WL 35496, at \*14-15 (N.D. Cal. Jan. 4, 2014) (adjustment of a defendant's compensation did not support scienter), *aff'd sub nom. Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018). Again, nothing has changed.

**C.      Considered Holistically, The More Plausible Inference Is Defendants Made A Good Faith Interpretation Of The FDPR That BIS Subsequently Deemed Incorrect**

In dismissing the prior pleading, the Court held that the "allegations are not inconsistent with Defendants' plausible, nonculpable explanation that they had a good faith, but ultimately erroneous, interpretation of the FDPR[.]" ECF No. 96 at 9-10. As shown above, the AC is substantially similar to, and at times identical to, its predecessor. Therefore, the Court's prior holding applies with equal

DEFS' MOT. TO DISMISS AMENDED COMPLT;                                -20-
CASE NO. 3:23-CV-03431-RFL

force to the AC.

Indeed, the 107-page AC contains no allegations of contemporaneous facts showing that Defendants knew that Seagate's unlicensed HDD sales to Huawei violated the FDPR at the time the statements were made—not a single witness statement, internal document, or inconsistent statement or action by any Defendant. And Plaintiffs' core underlying theory continues to make no sense. As this Court observed, "[i]f Seagate really believed its sales to Huawei to be illegal, it is hard to understand why the company would repeatedly and publicly acknowledge its continuing relationship with Huawei after the promulgation of the FDPR." ECF No. 96 at 10; *see Endologix*, 962 F.3d at 415 (affirming dismissal where plaintiff's theory "encounter[ed] an immediate first-level problem" and "does not make a whole lot of sense."); *Prodanova*, 993 F.3d at 1107 (affirming dismissal where plaintiff's theories "are divorced from common experience."); *Lamontagne v. Tesla, Inc.*, 2024 WL 4353010, at \*16 (N.D. Cal. Sept. 30, 2024) (no scienter; plaintiffs' theory that defendants knew the software was unsafe "would have inevitably been revealed" when defendants missed development timeline). Considered holistically, the AC's allegations do not overcome the competing inference that Defendants made a reasonable interpretation of the EAR and FDPR, as the Court previously held. *See* ECF No. 96 at 8-10.[20] Overall, "the inference of scienter is not equally as compelling as the opposing inference that Defendants had a non-fraudulent intent and erroneously interpreted the FDPR." *Id.* at 11.

## IV.    THE AC FAILS TO PLEAD A VIOLATION OF RULE 10b-5(a) AND 5(c)

The AC fails to plead a violation of Rules 10b-5(a) and (c)[21] based on a dissemination of fraud theory (¶¶ 288-292) or scheme liability theory (¶¶ 282-287). Plaintiffs' failure to plead that Defendants made a false or misleading statement with an intent to defraud (*see* Sections II. and III.,

---

[20] *See Lopes v. Fitbit, Inc.*, 2020 WL 1465932, at \*12 (N.D. Cal. Mar. 23, 2020), ), *aff'd*, 848 F. App'x 278 (9th Cir. 2021) ("'Plaintiffs' allegations do not overcome the competing inference that Defendants simply miscalculated the demand for a new product'"); *Webb*, 884 F.3d at 856 (the "facts do not give rise to an inference of scienter that is at least as compelling as the inference of an honest mistake."); *Align*, 856 F.3d at 621 ("the more compelling inference is that Defendants made a good faith but mistaken determination in its goodwill valuations").

[21] Rules 10(b)-5(a) and (c) prohibit any person, in the offer or sale of securities, "to employ any device, scheme, or artifice to defraud" or "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser," respectively. 15 U.S.C. §§ 77q(a)(1), (3).

*supra*) defeats the first theory. *See Lamontagne*, 2024 WL 4353010, at *17 ("Plaintiffs have not adequately alleged any false or misleading statements or scienter, and thus may not proceed under [the dissemination of fraud] theory.").[22]  The scheme allegations fare no better.

The first element of a scheme liability claim is that the defendant "use[d] or employ[ed] any manipulative or deceptive device or contrivance."[23]  *Simpson*, 452 F.3d at 1047.  That is, Plaintiffs must allege with particularity facts showing that *each* defendant "engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Id.* at 1048, 1052.  The AC, however, fails to adequately plead a "scheme," let alone that Defendants engaged in prohibited conduct required for scheme liability.  From what can be discerned from the AC, the alleged scheme was that "Defendants orchestrated a secret 'priority' business relationship with Huawei to hide the extent of Seagate's reliance upon illegal sales to Huawei and Seagate's repeated violations of the FDPR."  ¶ 283.  This is merely a repackaging of the alleged misstatements and does not survive scrutiny.

As the Court found, Seagate "repeatedly and publicly acknowledge[d] its continuing relationship with Huawei after the promulgation of the FDPR."  ECF No. 96 at 10; *see*, *e.g.*, ¶¶ 51, 53, 55, 166-168.  Therefore, that relationship was not "deceptive."  To the extent Plaintiffs contend the deception was "hid[ing] the extent of Seagate's reliance" on Huawei sales, Plaintiffs fail to adequately plead "reliance" on Huawei or a duty to disclose the alleged reliance.  *See* Sections II.B., II.C., and III.A., *supra*; *Patterson v. Jump Trading LLC*, 710 F. Supp. 3d 692, 717 (N.D. Cal. 2024) ("'Rule 10b-5 is violated by nondisclosure only where there is a duty to disclose.'"), *appeal docketed*, No. 24-670 (9th Cir. Feb. 7, 2024).  Moreover, scheme liability is typically limited to

---

[22] *See also Mehedi v. View, Inc.*, 2023 WL 3592098, at *24 (N.D. Cal. May 22, 2023) (finding scheme liability claim failed for the same reason as other Section 10(b) claim); *Kang*, 620 F. Supp. 3d at 902 (no violation of Rules 10b-5(a) and (c) where scheme consisted entirely of alleged misstatements which were not adequately pled); *Sneed v. AcelRx Pharm., Inc.*, 2022 WL 4544721, at *6 (N.D. Cal. Sept. 28, 2022) (plaintiffs' failure to adequately plead a false statement and scienter precluded dissemination theory).

[23] The remaining elements of a Rule 10(b)-5(a) and (c) claim are identical to the elements for a Rule 10(b)-5(b) claim:  scienter, connection with the purchase or sale of a security, reliance, economic loss, and loss causation.  *See Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1047 (9th Cir. 2006), *vacated on other grounds by Simpson v. Homestore.com*, 519 F.3d 1041 (9th Cir. 2008).  Plaintiffs also fail to pled scienter.  *See* Section III., *supra.*

conduct involving "sham" or "'inherently deceptive' transactions." *SEC v. Lucent Techns., Inc.*, 610 F. Supp. 2d 342, 360 (D.N.J. 2009).[24]  Plaintiffs do not allege that Seagate's relationship and agreements with Huawei were a sham or that its sales to Huawei were not bona fide sales.  No further analysis is required.

If the Court were inclined to look further, "[i]t is not enough that a *transaction* in which a defendant was involved had a deceptive purpose and effect; the defendant's *own conduct* contributing to the transaction or overall scheme must have had a deceptive purpose and effect." *Simpson*, 452 F.3d at 1048 (emphasis in original).  The conduct of "each defendant" "must be viewed alone" for whether it "had the purpose and effect of creating a false appearance of fact in the furtherance of an overall scheme to defraud." *Id.* at 1050.  If the actions of the defendant were not deceptive on their own, but only facilitated the scheme, the defendant would not be a primary violator. *Id.* at 1052.  Here, Plaintiffs assert three types of conduct—Seagate's quarterly sales to Huawei, two commercial agreements with Huawei, and Defendants' purported cessation of communications with investors about Huawei (¶¶ 284-286)[25]—none of which support scheme lability against any, let alone each, Defendant.

Seagate's quarterly sales to, and two commercial agreements with, Huawei (¶¶ 285-286) do not support scheme liability because "[c]onduct that is consistent with the defendants' normal course of business would not typically be considered to have the purpose and effect of creating a misrepresentation." *Simpson*, 452 F.3d at 1050.  Neither the quarterly sales nor the commercial agreements were outside the course of Seagate's normal business practices because Defendants did not know at the time that their interpretation of the FDPR was incorrect. *See Patterson*, 710 F. Supp. 3d at 717 (defendant's conduct in purchasing "massive amounts" of cryptocurrency "could

---

[24] *See SEC v. Smith*, 2020 WL 6115077, at *3 (C.D. Cal. June 3, 2020) (scheme allegations based on "a Ponzi scheme").

[25] Plaintiffs allege that the scheme "was built on the conduct *alleged above* including the below non-exhaustive list."  ¶ 283. To the extent the alleged conduct is purportedly encompassed somewhere within the "above" *282* paragraphs in the AC, Plaintiffs' allegations fail to satisfy Rule 9(b)'s particularity standard. *See Borteanu*, 2023 WL 1472852, at *23 ("'the conduct underlying claims for scheme liability must be alleged with particularity under Rule 9(b).'").  Defendants will address the conduct that is alleged for scheme liability (¶¶ 284-287) but reserve the right to address other conduct once such conduct is specifically identified as an alleged basis for scheme liability.

reflect a benign business decision"); *Borteanu*, 2023 WL 1472852, at \*24 (individual defendants' decision to sign SEC filings "says nothing about *the purpose* behind" that decision, as corporate officials sign SEC filings "on a regular basis") (emphasis in original); *id*. at \*25 (plaintiffs failed to plead that denials were "for *the purpose* of furthering the scheme to defraud" as it was "not inherently unreasonable for a company acting in the regular course of business to . . . deny allegations made in a short-seller report") (emphasis in original).

The remaining alleged conduct—that "Defendants shut down all communications with investors about its illegal sales" after the September 2020 statement (¶ 284)—is vague, is not pled with particularity as required by Rule 9(b), and is contrary to this Court's finding that Seagate "repeatedly and publicly acknowledge[d] its continuing relationship with Huawei after the promulgation of the FDPR." ECF No. 96 at 10. It is also belied by allegations of Defendants' purported "assur[ances]" regarding Huawei sales. *E.g.*, ¶¶ 53, 55. And it is consistent with Defendants' repeated statements to investors that Seagate did not comment on specific customers. *See* ¶ 213, Ex. 4 at 12; Ex. 5 at 15. In short, Plaintiffs fail to plead with particularity facts showing conduct that had the "principal purpose and effect" of creating "a false appearance of fact in furtherance of the alleged scheme." Nor has Plaintiffs done so on a Defendant-by-Defendant basis.[26] Plaintiffs' Rule 10(b)-5(a) and 5(c) claims should be dismissed.

## V.    THE AC FAILS TO PLEAD LOSS CAUSATION

Plaintiffs fail to plead loss causation, "a causal connection between the material misrepresentation and the loss," with regard to the March 8, 2022 and July 21, 2022 disclosures. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342-46 (2005); *see* 15 U.S.C. § 78u-4(b)(4). Neither disclosure mentioned Huawei or the alleged regulatory violations. At most, both disclosures

---

[26] In addition, to the extent Plaintiffs aver the commercial agreements were "secret" (¶¶ 4, 6, 141, 283, 286), Plaintiffs fail to plead reliance because allegedly "deceptive acts" that were "not disclosed to the investing public, are too remote to satisfy the requirement of reliance." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 161 (2008); *see Plumbers & Pipefitters Local Union #295 Pension Fund v. CareDx, Inc.*, 2023 WL 4418886, at \*12 (N.D. Cal. May 24, 2023) (dismissing complaint; "[w]ithout knowledge of [defendant's] deceptive acts, Plaintiffs have not adequately alleged reliance on a scheme liability."); *Abbate v. Wells Fargo Bank, N.A.*, 2011 WL 9698215, at \*4 (C.D. Cal. Nov. 17, 2011) (similar).

revealed financial health that was less robust than expected,[27] but market reactions to "poor financial health generally" do not support loss causation. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 393 (9th Cir. 2010), quoting *Metzler*, 540 F.3d at 1063. The AC thus fails to plead loss causation based on the March 8, 2022 and July 21, 2022 disclosures.[28]

## VI.   ANOTHER AMENDMENT WOULD BE FUTILE

"Leave to amend need not be granted when an amendment would be futile." *Vantive*, 283 F.3d at 1097. Futility may be shown by Plaintiffs' failure to plead additional facts when given the opportunity. *See id.* at 1098; *Zucco*, 552 F.3d at 1007. Here, Plaintiffs have been given the opportunity to plead additional facts, yet the AC fails to correct the deficiencies identified in the Dismissal Order. As shown above, the AC is a near replica of the CC, recycling the same falsity and scienter allegations previously found inadequate, with no additional contemporaneous facts that would show Defendants' knowledge that their interpretation of the FDPR was incorrect at the time the statements were made. Plaintiffs are on their third complaint.[29] It is clear Plaintiffs have made their best case. Further amendment would be futile. *City of Royal Oak Retirement System v. Juniper Networks, Inc.*, 2013 WL 2156358, at *10 (N.D. Cal. May 17, 2013) (dismissing action with prejudice after second round of motion to dismiss briefing).[30]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion to dismiss and dismiss the Amended Complaint in its entirety with prejudice.

---

[27] Contrary to Plaintiffs' claim that Seagate "lower[ed] its earnings guidance" on March 8, 2022 (¶ 262), that disclosure revealed that Seagate expected to be *within* guidance. *See* Ex. 23 at 5 (Seagate was "still good for the [guidance] ranges" but believed it was "going to be at the lower end of the ranges"). Regardless, a lowered guidance does not support loss causation. *See Lopes*, 2020 WL 1465932, at *12.

[28] Plaintiffs' Section 20(a) claim fails for failure to plead a primary violation of securities law. *See Lopes v. Fitbit, Inc.*, 848 F. App'x 278, 280 (9th Cir. 2021).

[29] Plaintiffs filed their first complaint on July 26, 2023 in Case No. 5:23-cv-3711-EJD (N.D. Cal.), before the matter was consolidated into this case. ECF Nos. 23, 50. Plaintiffs' CC was filed on October 19, 2023 (ECF No. 68), and their AC on September 12, 2024 (ECF No. 100).

[30] *See also In re VMware, Inc. Stockholder Deriv. Litig.*, 2023 WL 2600477, at *12 (N.D. Cal. Mar. 21, 2023) (same); *McGovney v. Aerohive Networks, Inc.*, 2019 WL 8137143, at *24 (N.D. Cal. Aug. 7, 2019) (same).

DEFS' MOT. TO DISMISS AMENDED COMPLT;   -25-
CASE NO. 3:23-CV-03431-RFL

Dated:  October 28, 2024

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI,
Professional Corporation

By:  */s/ Caz Hashemi*
       Caz Hashemi

*Attorneys for Defendants*

DEFS' MOT. TO DISMISS AMENDED COMPLT;
CASE NO. 3:23-CV-03431-RFL

-26-