Gregg S. Levin (admitted *pro hac vice*)
Lance V. Oliver (admitted *pro hac vice*)
William S. Norton (admitted *pro hac vice*)
Joshua C. Littlejohn (admitted *pro hac vice*)
Christopher F. Moriarty (admitted *pro hac vice*)
Andrew P. Arnold (admitted *pro hac vice*)
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
glevin@motleyrice.com
loliver@motleyrice.com
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com
aarnold@motleyrice.com

*Co-Lead Counsel for Co-Lead Plaintiffs*
*Universal-Investment-Gesellschaft mbH,*
*Universal-Investment-Luxembourg S.A., and*
*UI BVK Kapitalverwaltungsgesellschaft mbH,*
*and the Class*

Salvatore J. Graziano (admitted *pro hac vice*)
Hannah Ross (admitted *pro hac vice*)
Abe Alexander (admitted *pro hac vice*)
Aasiya Farah Mirza Glover (admitted *pro hac vice*)
Sarah Schmidt (admitted *pro hac vice*)
**BERNSTEIN LITOWITZ BERGER**
 **& GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
hannah@blbglaw.com
abe.alexander@blbglaw.com
aasiya.glover@blbglaw.com
sarah.schmidt@blbglaw.com

*Co-Lead Counsel for Co-Lead Plaintiffs*
*Public Employees' Retirement System of*
*Mississippi and Arkansas Public Employees'*
*Retirement System, and the Class*

[Additional counsel appear on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| *In re Seagate Technology Holdings plc Securities Litigation* | Case No. 3:23-cv-03431-RFL<br><br>CLASS ACTION<br><br>**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Hearing Date: March 4, 2025<br>Time:    10:00 a.m.<br>Courtroom:  15 (18th Floor)<br>Judge:    Hon. Rita F. Lin |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................ii

TABLE OF ABBREVIATIONS...............................................................................................vii

STATEMENT OF ISSUES (CIVIL L.R. 7-4(a)(3))................................................................ 1

INTRODUCTION ..................................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................... 3

LEGAL STANDARDS..............................................................................................................8

ARGUMENT .............................................................................................................................8

I.      The Additional Facts in the Amended Complaint Demonstrate that Defendants
        Acted with Scienter ...................................................................................................... 8

        A.      Defendants Took Deliberate Steps to Conceal Seagate's Illegal Sales.................. 9

        B.      The Plain Language of the Final Rule Contradicts Seagate's Interpretation ........ 10

        C.      Defendants Ignored Multiple Warnings that Their Interpretation of the Final
                Rule Was Wrong ................................................................................................. 13

        D.      BIS's $300 Million Settlement and Its "Guidance on Charging and Penalty
                Determinations" Support a Strong Inference that Seagate's Violation Was
                Willful or Reckless.............................................................................................. 15

        E.      The Commerce Committee Found "Evidence" that Seagate "Knowingly
                Violated" the Final Rule and "Made the Strategic Calculation to Continue
                Violating National Security Regulations"............................................................ 16

        F.      Plaintiffs' Additional Allegations Further Support Scienter................................. 17

        G.      Defendants' Proffered Inference Is Not More Compelling .................................. 17

II.     The Additional Facts in the Amended Complaint Demonstrate that Defendants'
        Statements Concerning Seagate's Sales and Revenue Drivers Were Misleading ............ 19

III.    Defendants' Remaining Arguments Fail........................................................................ 22

        A.      Plaintiffs Adequately Plead a Deceptive Scheme ................................................ 22

        B.      Plaintiffs Adequately Plead Misstatements.......................................................... 23

        C.      Plaintiffs Adequately Plead Loss Causation ....................................................... 25

CONCLUSION ....................................................................................................................... 25

CERTIFICATE OF SERVICE ................................................................................................ 28

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

# TABLE OF AUTHORITIES

**CASES**

*Abdo v. Fitzsimmons*,
2021 WL 616324 (N.D. Cal. Feb. 17, 2021) .............................................................................. 22

*Bach v. Amedisys, Inc.*,
2016 WL 4443177 (M.D. La. Aug. 19, 2016) ........................................................................... 16

*Barrie v. Intervoice-Brite, Inc.*,
397 F.3d 249 (5th Cir. 2005).................................................................................................... 12

*Bielousov v. GoPro, Inc.*,
2017 WL 3168522 (N.D. Cal. July 26, 2017)........................................................................... 17

*Bioscience Advisors, Inc. v. S.E.C.*,
2023 WL 163144 (N.D. Cal. Jan. 11, 2023) ............................................................................ 14

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021) ................................................................................. 19, 21

*Brody v. Transitional Hosp. Corp.*,
280 F.3d 997 (9th Cir. 2002)................................................................................................... 23

*Brown v. China Integrated Energy, Inc.*,
875 F. Supp. 2d 1096 (C.D. Cal. 2012) .................................................................................. 17

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (2017)................................................................................................................... 9

*Damian v. A-Mark Precious Metals, Inc.*,
2017 WL 6940515 (C.D. Cal. Aug. 28, 2017)......................................................................... 18

*Delaware Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*,
606 F. Supp. 3d 124  (E.D. Pa. 2022) ..................................................................................... 21

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) .................................................................................... 21

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001)................................................................................................... 11

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ................................................................................................... 24

*Ikeda v. Baidu, Inc.*,
2021 WL 1299046 (N.D. Cal. Apr. 7, 2021) ........................................................................... 24

*In re Alphabet, Inc. Sec. Litig.*,
1 F. 4th 687 (9th Cir. 2021) ......................................................................................... 19, 20, 23

*In re Amlyin Pharms., Inc., Sec. Litig.*,
2003 WL 21500525 (S.D. Cal. May 1, 2003)........................................................................... 18

*In re Apple Inc. Sec. Litig.*,
678 F. Supp. 3d 1147 (N.D. Cal. 2023) .................................................................................. 18

*In re CytRx Corp. Sec. Litig.*,
2015 WL 5031232 (C.D. Cal. July 13, 2015) ............................................................................ 23

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ................................................................................................... 8

*In re Facebook, Inc. Sec. Litig.*,
87 F.4th at 934 (9th Cir. 2023) ................................................................................................ 24

*In re Fibrogen, Inc.*,
2022 WL 2793032 (N.D. Cal. July 15, 2022) ...................................................................... 9, 11

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) ......................................................................................... 9

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ................................................................................................... 8

*In re Medicis Pharmaceutical Corp. Sec. Litig.*,
2010 WL 3154863 (D. Ariz. Aug. 9, 2010) ...................................................................... 10, 11

*In re Mylan N.V. Sec. Litig.*,
2023 WL 3539371 (W.D. Pa. May 18, 2023) .......................................................................... 22

*In re Nature's Sunshine Prods. Sec. Litig.*,
486 F.Supp.2d 1301 (D. Utah 2007) ....................................................................................... 10

*In re Network Assocs., Inc., Sec. Litig.*,
2000 WL 33376577 (N.D. Cal. Sept. 5, 2000) .......................................................................... 9

*In re Obalon Therapeutics, Inc.*,
2019 WL 4729461 (S.D. Cal. Sept. 25, 2019) ......................................................................... 20

*In re PayPal Holdings, Inc. S'holder Derivative Litig.*,
2018 WL 466527 (N.D. Cal. Jan. 18, 2018) ...................................................................... 23, 24

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007) ..................................................................................... 15

*In re Syncor Int'l Corp. Sec. Litig.*,
239 F. App'x 318 (9th Cir. 2007) ............................................................................................ 21

*In re Toyota Motor Corp. Sec. Litig.*,
2012 WL 3791716 (C.D. Cal. Mar. 12, 2012) ........................................................................ 18

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
2017 WL 1658822 (D.N.J. Apr. 28, 2017) .............................................................................. 23

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005) ..................................................................................... 15

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ............................................................................................. 14, 16

*In re WageWorks, Inc., Sec. Litig.*,
2020 WL 2896547 (N.D. Cal. June 1, 2020) ........................................................................... 25

*Kang v. PayPal Holdings, Inc.*,
620 F. Supp. 3d 884 (N.D. Cal. 2022) ............................................................................... 23, 24

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

*Karinski v. Stamps.com, Inc.*,
    2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ................................................................................ 22

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018)........................................................................................................ 8

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011)....................................................................................................... 19

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016)..................................................................................................... 25

*Lorenzo v. SEC*,
    587 U.S. 71 (2019)................................................................................................................. 22, 23

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ....................................................................................................................... 9

*McPhail v. First Command Fin. Plan., Inc.*,
    2006 WL 8455139 (S.D. Cal. July 27, 2006) ............................................................................ 16

*Mehedi v. View, Inc.*,
    2023 WL 3592098 (N.D. Cal. May 22, 2023) ........................................................................... 23

*Middlesex Ret. Sys. v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ..................................................................................... 17

*Nathanson v. Polycom, Inc.*,
    87 F. Supp. 3d 966 (N.D. Cal. 2015) ..................................................................................... 9, 19

*Noto v. 22nd Century Grp., Inc.*,
    650 F. Supp. 3d 33 (W.D.N.Y. 2023) ....................................................................................... 18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)..................................................................................................................... 24

*Peltz v. Polyphase Corp.*,
    36 F. App'x 316 (9th Cir. 2002) ................................................................................................ 14

*Plaskin v. Newsight Reality, Inc.*,
    2020 WL 1651995 (C.D. Cal. Feb. 6, 2020).............................................................................. 18

*Police & Fire Ret. Sys. of the City of Detroit v. Crane*,
    87 F. Supp. 3d 1075 (N.D. Cal. 2015) ....................................................................................... 19

*Rabkin v. Lion Biotechnologies, Inc.*,
    2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ............................................................................. 23

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014)........................................................................................................ 8

*S.E.C. v. Leslie*,
    2012 WL 116562 (N.D. Cal. Jan. 13, 2012) ........................................................................ 19, 21

*S.E.C. v. Todd*,
    642 F.3d 1207  (9th Cir. 2011).......................................................................................... 19, 20, 24

*Schueneman v. Arena Pharma., Inc.*,
    840 F. 3d 698, (9th Cir. 2016)...................................................................................................... 9

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

*SEC v. Brincat*,
　2001 WL 1662099 (N.D. Ill. Dec. 6, 2001) ................................................................................. 18

*SEC v. Infinity Grp.*,
　212 F.3d 180 (3d Cir. 2000) ....................................................................................................... 17

*SEC v. Platforms Wireless Int'l Corp.*,
　617 F.3d 1072 (9th Cir. 2010) .................................................................................................... 18

*Shawmut Bank, N.A. v. Kress Assocs.*,
　33 F.3d 1477 (9th Cir. 1994) ...................................................................................................... 21

*Simpson v. AOL Time Warner Inc.*,
　452 F.3d 1040 (9th Cir. 2006) .................................................................................................... 23

*Sneed v. AcelRx Pharmaceuticals, Inc.*,
　2022 WL 4544721 (N.D. Cal. Sept. 28, 2022) ........................................................................... 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
　551 U.S. 308 (2007) .................................................................................................................. 8, 9

*Todd v. STAAR Surgical Co.*,
　2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ............................................................................ 24

*United States ex rel. Ormsby*,
　444 F. Supp. 3d 1010 (N.D. Cal. 2020) ...................................................................................... 11

*United States ex rel. Schutte v. SuperValu Inc.*,
　9 F.4th 455 (7th Cir. 2021) ......................................................................................................... 11

*United States v. Craig*,
　178 F.3d 891 (7th Cir. 1999) ...................................................................................................... 15

*Universal Health Servs., Inc. v. Thompson*,
　363 F.3d 1013 (9th Cir. 2004) .................................................................................................... 14

*Wanca v. Super Micro Computer, Inc.*,
　2018 WL 3145649 (N.D. Cal. June 27, 2018) ............................................................................ 25

*Weston Family Partnership LLLP v. Twitter, Inc.*,
　29 F.4th 611 (9th Cir. 2022) ....................................................................................................... 23

*York Cnty. ex rel. Cnty. of York Ret. Fund v. HP, Inc.*,
　2024 WL 1327247 (N.D. Cal. Mar. 27, 2024) ............................................................................ 22

**REGULATIONS**

15 C.F.R. § 736.2(b)(2) ................................................................................................................. 12

15 C.F.R. § 736.2(b)(3) ................................................................................................................. 13

15 C.F.R. Pt. 732, Supp. 3 ........................................................................................................ 12, 15

15 C.F.R. Pt. 744, Supp. 4 .......................................................................................................... 3, 14

15 C.F.R. Pt. 766, Supp. 1 ........................................................................................................... 7, 15

17 C.F.R. § 240.10b-5(a) .............................................................................................................. 22

17 C.F.R. § 240.10b-5(c) .............................................................................................................. 22

85 Fed. Reg. 22961 ........................................................................................................................ 3

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

85 Fed. Reg. 29849 ................................................................................................ vii, 3, 5, 14

85 Fed. Reg. 51596 ................................................................................................ vii, 3

85 Fed. Reg. 51600 ................................................................................................ 12, 15

85 Fed. Reg. 51601 ................................................................................................ 4, 5, 12

85 Fed. Reg. 51629 ................................................................................................ 14

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| 1934 Act | Securities Exchange Act of 1934 |
| "AC" | Plaintiffs' Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws |
| "BIS" | Bureau of Industry and Security |
| "BIS Settlement" | Order Issued by BIS on April 19, 2023 (*see* Ex. C) |
| "Class Period" | September 14, 2020 to April 19, 2023, inclusive |
| "Commerce Committee" | U.S. Senate Committee on Commerce, Science, and Transportation |
| "EAR" | Export Administration Regulations |
| "ECCN" | Export Control Classification Number |
| "ERC" | End-User Review Committee |
| "Ex. __"[1] | Exhibits to the accompanying Declaration of William S. Norton |
| "Defendants" | Seagate, William D. Mosley, and Gianluca Romano |
| "Final Rule"[2] | 85 Fed. Reg. 51596 (Aug. 17, 2020) (*see* Ex. B) |
| "FDP" or "FDPR" | Foreign Direct Product Rule (the "Final Rule") |
| "HDD" | Hard Disk Drive |
| "Huawei" | Huawei Technologies Co. |
| "GAAP" | Generally Accepted Accounting Principles |
| "IBD" | Ion Beam Deposition |
| "IBE" | Ion Beam Etch |
| "Individual Defendants" | William D. Mosley and Gianluca Romano |
| "Interim Final Rule" | 85 Fed. Reg. 29849 (May 19, 2020) (*see* Ex. A) |
| "LTA" | Seagate's March 2021 Long Term Agreement with Huawei |
| "MTD" or "Motion" | Defendants' Notice of Motion and Motion to Dismiss Consolidated Class Action Complaint for Violations of Federal |

---

[1] The Court may take judicial notice of the attached exhibits, which are "incorporated into the complaint by reference." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 927 (9th Cir. 2023).

[2] While the AC refers to the August 17, 2020 Final Rule, 85 Fed. Reg. 51596, as the "FDPR," ¶38 n.3, the Final Rule was promulgated to add Huawei-affiliated entities to the Entity List based on pre-existing authority provided by the previously existing FDPR, 15 C.F.R. § 736.2(b)(3). To clarify this distinction, Plaintiffs refer to 85 Fed. Reg. 51596 as the "Final Rule."

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

| | |
|---|---|
| | Securities Laws (ECF No. 104) |
| "MTD Order" | Order Granting Motion to Dismiss with Leave to Replead (Aug. 8, 2024) (ECF No. 96) |
| "PCL" | Proposed Charging Letter (*see* Ex. F) |
| "Seagate" or the "Company" | Seagate Technology Holdings plc |
| "SEC" | U.S. Securities and Exchange Commission |
| "SOX" | Sarbanes-Oxley Act of 2002 |
| "¶__" | Paragraphs of the Consolidated Class Action Complaint for Violations of Federal Securities Laws (ECF No. 68) |

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

**STATEMENT OF ISSUES (CIVIL L.R. 7-4(a)(3))**

Do Plaintiffs state claims under Sections 10(b) and 20(a) of the 1934 Act, and Rule 10b-5 thereunder, by pleading that Defendants engaged in a scheme to defraud (Count I.A., ¶¶282-87) and made affirmative misrepresentations (Count I.B, ¶¶288-92)? Do Plaintiffs state a claim for control person liability under Section 20(a) of the 1934 Act (Count II, ¶¶293-99)?

**INTRODUCTION**

This case arises from Defendants' false and misleading statements concealing Seagate's illegal mass export of $1.1 billion worth of HDD technology—sales that had a material impact on Seagate's financial performance, including by inflating Company-wide revenue by at least 10% during the Class Period, allowing Seagate to meet publicly disclosed revenue guidance, and boosting the Company's credit rating. In its August 8, 2024 Order, the Court identified three principal areas with respect to which Plaintiffs' pleading required greater specificity: (1) that Defendants knew or recklessly disregarded that Seagate's HDD sales to Huawei were illegal; (2) relatedly, that Seagate's supposed good-faith interpretation of the relevant export restrictions (the "Final Rule") was more compelling than the inference of scienter; and (3) that Seagate's illegal HDD sales to Huawei were material to the Company's performance. The AC's new allegations address each of these concerns.

***First***, the Court held that Plaintiffs had not adequately pled that "Defendants actually believed" that Seagate's HDD sales to Huawei violated the Final Rule. MTD Order at 9. The AC adds allegations that Defendants took deliberate steps to conceal Seagate's significant, and expanding, business relationship with Huawei from investor and government scrutiny. For instance, the AC details Seagate's reaction to Congressional scrutiny that threatened its lucrative monopoly: (1) Seagate stonewalled Congressional requests for information, declining to even share its supposedly good-faith interpretation of the Final Rule, supporting the strong inference that Seagate had no plausible interpretation of the FDPR that would support the Company's continued HDD sales to Huawei; (2) in response to the Congressional inquiry, Seagate abruptly stopped all ***direct*** shipments to Huawei, notwithstanding its extensive commercial commitments to this significant customer; and (3) even as Seagate misleadingly told Congress it had ceased HDD shipments to Huawei, the Company began working to set up secret foreign subsidiaries to continue those sales.

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

Further, the AC adds that, after a months-long investigation, a Senate Committee found "evidence" that Seagate appeared to have "***knowingly violated*** the [Final Rule] for more than one year." The AC also adds how BIS's Charging Guidelines indicate that the $300 million fine—BIS's largest ever—resulted from its finding that Seagate's violations were "egregious" and "willful or reckless."

***Second***, the Court held that Plaintiffs had not adequately alleged that "Defendants' interpretation of the Final Rule was so patently unreasonable to support an inference of scienter." MTD Order at 8. The AC includes additional allegations making clear that Seagate's supposed interpretation was contradicted by both the Rule's plain language and the fact that Defendants received warnings from the ***manufacturers of the very technology at issue*** stating that export of any items manufactured with it to Huawei was prohibited. ***Defendants do not dispute*** that Seagate knew the technology at issue was restricted. Instead, Defendants claim that Seagate believed in good faith that the FDPR barred the export of items only where such restricted technology was used "***in the last stage*** of its HDD manufacturing process." But the Final Rule specifically states that its ban applies to "***all*** production stages" and that it bars the use or export of any item where restricted technology is used at "***any stage*** of production." Defendants do not explain how they can reconcile their supposed interpretation with the plain text of the rule.

***Third***, the Court held that Plaintiffs had not adequately alleged that "sales to Huawei, or the absence thereof" were material to "Seagate's revenue performance." MTD Order at 6. The AC adds allegations clarifying that HDD sales had a material impact on the Company's financial performance. While the Court held that the Complaint "concede[d] that sales to Huawei did not ultimately affect whether Seagate met its revenue guidance," the AC adds several clarifying allegations, including that (1) the mid-point of earnings guidance *is* a material benchmark to investors and Seagate would have repeatedly missed that material benchmark absent illegal sales to Huawei; (2) even putting aside the fact that Seagate would have missed critical guidance benchmarks absent its illicit sales, sales to Huawei were material to Seagate's performance; (3) as numerous courts have recognized, an illicit revenue stream is qualitatively material, even putting aside quantitative considerations, because it exposes companies to significant legal and regulatory consequences, just as occurred here; and (4) as courts have uniformly held, Defendants' statements

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

concerning the material drivers of Seagate's HDD business are misleading because they fail to disclose that an illicit, improper, or materially risky business practice is *also* a driver of the issuer's financial performance.

## FACTUAL BACKGROUND

***Huawei Poses a "Continuing Threat to U.S. National Security."*** On May 21, 2019, BIS, the division of the U.S. Department of Commerce charged with advancing national security and U.S. foreign policy, added Huawei and 68 of its affiliates to BIS's "Entity List." *See* 85 Fed. Reg. 22961-01, 2019 WL 2174205 (May 21, 2019); *see also* 15 C.F.R. Pt. 744, Supp. 4 (Entity List). Huawei was added to the Entity List because "there [was] reasonable cause to believe that [Huawei] has been involved in activities determined to be contrary to the national security or foreign policy interests of the United States." 85 Fed. Reg. 22961.

On May 19, 2020, BIS issued an Interim Final Rule further amending the Entity List and further expanding export restrictions to Huawei. The amendment prohibited exports to Huawei (and its 114 affiliates) of "*any* foreign-produced item" for which U.S.-origin "technology" or "software"—"specified [by] Export Control Classification Number (ECCN)"—that was the direct product of "equipment that is *essential* to [that item's] 'production . . . including testing equipment.'" 85 Fed. Reg. 29849; *see also* Ex. A.[3] BIS intended the amendment to "impose a new control over certain foreign-produced items, when there is knowledge that such items are destined to a designated entity on the Entity List." *Id.* at 29849-51.

On August 17, 2020, BIS issued its Final Rule, 85 Fed. Reg. 51596, which specified that it applied to "*any*" and "*all* production stages" and to "*any* equipment subject to the [ECCNs] specified" in the Final Rule—including, specifically ECCN 3E991. In the Final Rule, BIS responded to public comments inquiring as to the meaning of the term "essential" as used in the Interim Final Rule. *Id.* at 51599; *see also* Ex. B. BIS answered by clarifying that equipment that is "essential" includes technology used in '"*all* production stages" and that "*any* equipment subject to the [ECCNs] specified in footnote 1 . . . that is involved in *any* of the production stages is considered

---

[3] The Interim Final Rule listed ECCN "3E991" as among the "essential" technology "subject to [15 C.F.R.] § 736.2(b)(3) of the EAR (the foreign-produced direct product rule)." *Id.* at 29849-50.

essential." 85 Fed. Reg. 51601.

To ensure that the scope of the Final Rule was abundantly clear, BIS offered the public an opportunity to comment. One public commenter asked, "How can we possibly delve that deeply into the supply chains and design chains of our customers and suppliers?" *Id.* at 51600. BIS responded that its *Know Your Customer* guidance and the EAR's definition of "knowledge" provide direction. *Id.* at 51600. The BIS guidance identifies several factors that put companies like Seagate on notice that their products would be subject to the Final Rule—including if the customer is on the Entity List. ¶42. And if any doubt remains, the guidance instructs companies to seek approval by applying for a license—or else run the risk of knowingly violating the FDPR. ¶¶42-43, 132.

***Seagate Failed to Participate in the Final Rule's Review and Comment Process.*** To the extent Seagate believed terms like "essential" or "direct product" were ambiguous or questioned their applicability to the Company's products, Defendants had every opportunity—and, in fact, the obligation (¶132)—to seek clarification from BIS. ¶¶48-49. They failed to do so. *Id*.

***Defendants Equivocated, then Refused to Confirm Their Assessment of the Final Rule.*** In response to the Final Rule, on September 14, 2020, Romano, Seagate's CFO, stated: "we are still going through the final assessment [of the Final Rule] . . . [but] we don't think we know we need to have a specific license." ¶¶51, 167. Seagate never told investors that this "final assessment" veered drastically off course from those conducted by Toshiba and Western Digital, the only two companies capable of manufacturing the same or similar HDDs. *See* Ex. C at 6 ¶17; Ex. D at 3 n.10. These companies ceased shipments to Huawei after the Final Rule went into effect in September 2020, allowing Seagate to generate a substantial financial windfall by becoming Huawei's "sole source provider"[4] of HDDs for more than a year, generating a dramatic increase in the Company's stock price during the Class Period. ¶¶56-58; *see also* Ex. C at 3-4 ¶8.

On October 22, 2020, an analyst asked Defendants to confirm whether the Company could continue selling to Huawei without a license, noting that its competitors stopped shipping to Huawei in September 2020. ¶¶51, 170. Mosely, Seagate's CEO, refused to answer the question and instead

---

[4] Far from "lack[ing] specificity" or being "unsupported by any facts," MTD at 9, Seagate *admitted* in the BIS Settlement that it was "Huawei's sole source provider of HDDs." Ex. C at 5 ¶13.

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

added: "[w]e continually monitor and remain in compliance with all the rules and regulations around." *Id*. In subsequent quarters, analysts repeatedly asked Defendants (because they had refused to confirm) whether the Company was continuing to sell its HDDs to Huawei. Each time, Defendants misleadingly denied any suggestion or suspicion that Seagate's HDD sales might run afoul of U.S. export control laws. *See, e.g.*, ¶183 ("[Analyst:] [W]e've been receiving a lot of questions around a particular customer of yours where there are some restrictions in place for shipments and I was wondering if you could comment at all on that?"; "[Romano:] we always answer this specific question the same way because [ ] the truth is we comply with all the rules and regulations."); ¶175 ("[W]e don't comment on any specific customers").[5]

***Seagate Was Notified that Inputs to Its HHDs Were Manufactured Using Technology Subject to the FDPR.*** To produce the HDDs Seagate sold to Huawei, Seagate used ion beam etch ("IBE") and deposition ("IBD") equipment supplied by "Company Two" to create "wafers and sliders" that enabled the HDDs to store data. ¶71; *see also* Ex. C at 4 ¶¶10-11. Around January 27, 2021, Seagate received a letter from Company Two stating that Company Two's IBE and IBE equipment was manufactured with "specified ECCN" technology, and specifically "ECCN 3E991." ¶90; Ex. C at 6 ¶18; 85 Fed. Reg. 51601 (explaining that "*any* equipment subject to the [specified ECCNs] and "involv[ing] in *any* of the production stages" is "considered essential"); 85 Fed. Reg. 29849 (imposing exports controls over certain ECCN technology, including specifically, "ECCN 3E991").[6] This letter placed Defendants on actual notice that the wafers contained in Seagate's

[5] Plaintiffs respectfully disagree with the Court's conclusion that Seagate "repeatedly and publicly acknowledge[d] its continuing relationship with Huawei." MTD Order at 10. While several analysts *suspected* Seagate continued to sell the Huawei, the AC does not allege—and nothing in the record supports—that Defendants "repeatedly and publicly" acknowledged this fact. *See* ¶¶55, 212, 215, 220 (examples where equity analysts, *not Defendants*, discussed Huawei). Defendants only discussed Huawei at the beginning of the Class Period on September 14, 2020, when Romano stated that Seagate was still "going through the final assessment." *See* ¶¶51, 167 (referencing same quotes). Defendants agree. *See* MTD at 2, 10, 11 ("[W]e don't talk about individual customers"; "we don't comment on any specific customers."; explaining that "Seagate had no freestanding duty to disclose its customers, including their identity, revenue level, or commercial agreements").

[6] BIS guidance from December 2020 provided similar notice. *See* MTD Ex. 17 at 2 ("Q6:  Does the FDP rule apply to finished and unfinished wafers? A6: Yes, it applies to both finished and unfinished wafers.").

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

HDDs were produced with ECCN 3E991 equipment, technology that is expressly referenced in the Final Rule. ¶40. Despite the receipt of this direct warning, the vast majority of Seagate's sales to Huawei—over $850 million or over 77%—and nearly all of Seagate's extensions of credit to Huawei occurred *after* the receipt of this letter. ¶¶93-94.

*For Two Fiscal Quarters, Seagate Would Have Missed Revenue Guidance Entirely but for Sales to Huawei.* Once Seagate solidified its role as sole source provider to Huawei, the Company's financials were quickly impacted. From Seagate's fiscal Q2 2021 (ended January 1, 2020) to its fiscal Q3 2021 (ended April 2, 2021), sales to Huawei increased from $147.24 million (6% of total revenue) to $366.38 million (15% of total revenues)—a 150% increase. ¶107. Instead of attributing any of this dramatic increase to the Company's new "sole source" role, Defendants refused to acknowledge Huawei at all, instead attributing these "highest ever HDD shipments" to generic factors like "strong" and "increasing" "demand" and "ongoing operational execution." ¶¶228-33. Defendants also failed to tell investors that without Seagate's illegal sales to Huawei during the quarter, the Company would have missed its Q3 2021 revenue guidance *entirely*. ¶¶107, 233. The same is true for Seagate's fiscal Q1 2022 (ending October 1, 2021), when Seagate would have missed its revenue guidance entirely without its illegal sales to Huawei. ¶107. Like Q3 2021, Defendants again attributed its strong revenues to factors other than Huawei, representing instead that revenues were "broad-based . . . across each of the end markets" and "led by ongoing demand from cloud data center customers." ¶¶237-42. Thus, during two of the four quarters that Seagate continued to sell to Huawei, without those illicit sales, the Company would have missed revenue guidance completely.

*The Senate Report Concluded that Seagate "Knowingly" Violated the Final Rule.* On May 10, 2021, Senator Wicker, the Ranking Member of the Commerce, Science and Transportation Committee, sent a letter to Seagate asking whether the Company believed a license from BIS was necessary to sell HDDs to Huawei. Ex. E; *see also* Ex. D at 4. According to the Minority Staff's October 21, 2021 report, in response to Senator Wicker's letter, "Seagate declined to provide its interpretation of the rule, detail its transactional relationship with Huawei, or disclose whether the company had obtained a license to continue shipment of [HDDs] to Huawei." *Id.*

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

Several months later, the Minority Staff requested and received license information from BIS. *Id*. at 5. Shortly after obtaining this information, Seagate met with the Minority Staff. *Id*. During this meeting, Seagate allegedly told the Committee that it had not applied for a BIS license and that it discontinued selling to Huawei (but refused to disclose when those sales ceased). *Id*. Following this meeting, Minority Staff "received evidence" that Seagate was exploring ways to circumvent the Final Rule: "Seagate may plan to resume shipments to Huawei" by "avoid[ing] shipping the product through currently prohibited entities, even though the destination is Huawei." *Id*. The report concluded that Seagate appears to have "knowingly violated the [Final Rule] for more than one year." *Id*. at 6. The same day the report was issued, Defendants released a statement denying any wrongdoing and reiterating that Seagate, "complies with all laws applicable to its business and operations, including export control regulations." ¶52.

***The Historic BIS Settlement and Charging Guidelines Strongly Imply Willful or Reckless Conduct.*** On October 26, 2022, Seagate disclosed that two months earlier, in August 2022, it had received the PCL from BIS alleging violations of U.S. export control laws. The PCL alleged Seagate provided HHDs to an unnamed customer and affiliates listed on the Entity List. ¶¶122-23; Ex. F. While Seagate did not mention Huawei by name, numerous analysts suspected that the PCL resulted from the Company's sales to Huawei. ¶123.

On April 19, 2023, Seagate admitted for the first time that for more than a year, it sold more than $1.1 billion in HDDs to Huawei in violation of the Final Rule. This included an admission to all conduct alleged in the PCL. ¶126; *see also* Ex. C at 9 ("Seagate admits committing the alleged conduct described in the [PCL]."). As a penalty for these violations, BIS imposed a $300 million civil fine (the largest in the agency's history) and required Seagate to conduct three compliance audits, including an external audit by an unaffiliated third-party consultant with expertise in U.S. export control laws. *Id*. at 12. The three audits covering periods 2021-2023, 2024-2025, and 2026 and were required to be provided to BIS. *Id*.

According to BIS Guidelines on Charging and Penalty Determinations, 15 C.F.R. Pt. 766, Supp. 1, export control violations resulting from "simple negligence or carelessness," or "good-faith misinterpretation" are "frequently [ ] addressed with a no action determination letter or . . . a warning

7

letter." ¶¶64-65, 162. Penalties are adjusted upwards in "egregious" cases resulting from "willful or reckless violation of law," "concealment," "management involvement," and "actual knowledge." *Id*. Here, BIS's charging guidelines imply a maximum fine a $107 million fine (429 violations x $250,000 per violation). ¶¶64-65, 161-62. Yet, the penalty BIS actually imposed was $300 million—nearly three times this amount. *Id*. BIS's guidelines strongly imply that BIS concluded that Defendants acted knowingly, or at the very least with willful or reckless disregard.

On April 20, 2023, Seagate announced that the base pay for Mosley and Romano would be reduced by *100%*. ¶127.

## LEGAL STANDARDS

When assessing a motion to dismiss, a court must "accept all factual allegations . . . as true" and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). Dismissal "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). "[A] district court ruling on a motion to dismiss is not sitting as a trier of fact[;] . . . so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

## ARGUMENT

I.     **The Additional Facts in the Amended Complaint Demonstrate that Defendants Acted with Scienter**

To plead scienter, a plaintiff must allege that the defendant "made false or misleading statements either intentionally or with deliberate recklessness." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). "The inference . . . need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. Instead, it is sufficient for plaintiffs to allege that defendants "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [they] could have done so without extraordinary effort." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire*

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

*Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (2017). And, because it is "rare that a wrongdoer will admit to the required state of mind," scienter "can be proven and pled through circumstantial evidence." *In re Network Assocs., Inc., Sec. Litig.*, 2000 WL 33376577, at *8 (N.D. Cal. Sept. 5, 2000).

Courts have found deliberate recklessness when a defendant "elected not to disclose" negative information—even where a defendant disagreed with that information—"because it understood their likely effect on the market" and concealed that information or the risk resulting from it from the public. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 49 (2011); *Schueneman v. Arena Pharma., Inc.*, 840 F. 3d 698, 709 (9th Cir. 2016) (rejecting defendants' claim of "good-faith scientific disagreement" with the FDA "about the meaning" of certain negative studies, and finding scienter because "the simple fact that Arena had an explanation for its view of the data does not mean investors would not want to know that Arena and the FDA were at odds").

Scienter is adequately pled when, "assess[ing] all the allegations holistically," the plaintiff has created an inference of scienter that is "*at least as compelling* as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324, 326. Plaintiffs readily meet that standard.

### A.    Defendants Took Deliberate Steps to Conceal Seagate's Illegal Sales

The Court previously held that Plaintiffs had not adequately alleged that Defendants "actually believed their contrary interpretation [of the FDPR] was wrong at the time the challenged statements were made or that their assertions of compliance with the law were deliberately reckless." MTD Order at 9. The AC adds significant, new allegations that Defendants' purported misinterpretation was knowing or deliberately reckless and that Defendants deliberately concealed Seagate's significant—and expanding—business relationship with Huawei. *See In re Fibrogen, Inc.*, 2022 WL 2793032, at *20-21 (N.D. Cal. July 15, 2022) (defendants' efforts to conceal known safety issues by manipulating data in test results supported inference of scienter); *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 979 (N.D. Cal. 2015) (one does not take steps to conceal misconduct "without intent to defraud"); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1166 (D. Or. 2015) (executive's "alleged attempts to hide" the misconduct "support a strong inference of

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

scienter"); *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F.Supp.2d 1301, 1311 (D. Utah 2007) ("Evidence that a defendant has taken steps to cover-up [sic] a misdeed is strong proof of scienter.").

*First*, as Plaintiffs previously alleged (ECF No. 68), Seagate, alone amongst its competitors, stonewalled Congressional requests for information and refused to share any supposed good-faith interpretation of the Final Rule with Congress. ¶¶95-103, 132. The AC now adds that, *after* receiving a letter from a Ranking Member of the Senate Commerce Committee inquiring into Seagate's HDD sales and seeking to determine whether Seagate was complying with the Final Rule, Seagate sold over $380 million worth of HDDs to Huawei. ¶¶96-97, 104-06, 140.

*Second*, throughout the Class Period, Seagate drastically expanded its commercial partnership with Huawei, including through the execution of multiple strategic partnership agreements and by extending massive lines of credit to Huawei to facilitate large volumes of orders. ¶¶156-58. The AC adds that, to further expand its commercial relationship with Huawei, after Seagate told Congress that it had ceased shipments to Huawei, Seagate was quietly taking steps to continue selling HDDs by setting up foreign subsidiaries, to divert shipments around the Final Rule restrictions. ¶¶103, 143.

*Third*, the AC adds allegations that, after September 2020, Defendants stopped answering questions about whether Seagate was continuing to ship to Huawei—further supporting the inference that Defendants made a strategic calculation to avoid scrutiny into their Huawei sales to sell as much as possible before enforcement. ¶¶102, 145. Instead, for the first time, Defendants answered questions about Huawei sales by stating that Seagate did not comment on specific customers, while also reassuring investors that "[we] remain in compliance with all the rules and regulations around." ¶¶51, 170.

### B.     The Plain Language of the Final Rule Contradicts Seagate's Interpretation

The Court, relying on *In re Medicis Pharmaceutical Corp. Sec. Litig.*, 2010 WL 3154863 (D. Ariz. Aug. 9, 2010), held that Plaintiffs had not adequately alleged that "Defendants' interpretation of the FDPR was so patently unreasonable to support an inference of scienter." MTD

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

Order at 8.[7] Plaintiffs respectfully submit that the legal standard in *Medicis* is inapplicable to the facts of this case, and in any event, the AC adds new allegations that support the conclusion that Defendants' purported misinterpretation was unreasonable.

*First*, the reasonableness of a purported interpretation must depend in part on the text being interpreted, and the consequences of a mistake. Unlike the Final Rule—a serious export restriction with severe penalties for a violation, imposed to protect the nation's security in response to known security risks—*Medicis* did not involve a legal misinterpretation, but a misinterpretation of GAAP. *Medicis*, 2010 WL 3154863, at *1. Further, Seagate's "misinterpretation" resulted in "429 violations" that carried an historic $300 million fine, the highest penalty ever imposed by the agency. ¶¶29-32, 64, 126.

*Second*, "even if a regulated party adopts a 'reasonable' interpretation of an 'ambiguous' statute, it can nonetheless be deemed liable for knowingly making a false statement if it 'had been warned away from that interpretation' by authoritative agency guidance." *United States ex rel. Ormsby*, 444 F. Supp. 3d 1010, 1071 (N.D. Cal. 2020); *see also United States ex rel. Schutte v. SuperValu Inc.*, 9 F.4th 455, 471 (7th Cir. 2021) (holding that even "a permissible interpretation" of Medicare drug-pricing regulations "is no defense if there existed authoritative guidance [from the Centers from Medicare and Medicaid Services] that should have warned defendants away from their erroneous interpretation.").

*Third*, whether a defendant, who in fact violated the law, made a "good faith misinterpretation" of that law is a fact-intensive inquiry requiring assessment of the plain language of the FDPR in context with BIS's and Defendants' other conduct. *See Fibrogen*, 2022 WL 2793032, at *20-21 (whether defendants purported disagreement with regulators was "honest" or "reasonable" considered in the context of defendants' withholding information from the market or federal regulators); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001) ("[W]hether [accounting issues] were handled within the parameters of good faith decision-making or whether the decisions amounted to recklessness w[ould] surely be the focus of any trial

---

[7] *See* MTD Order at 8 (quoting *Medicis*, 2010 WL 3154863, at *5). Significantly, Defendants do not even cite to *Medicis* in their Motion.

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

of this case."); *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257 (5th Cir. 2005) ("Because the accounting questions in this case are disputed, dismissal was not appropriate.").

*In any event*, even if scienter rested solely on the plain language of the Final Rule, the AC adds allegations that the plain language of the Rule and BIS rules and guidance make clear that the Final Rule prohibits unlicensed sales even where there is no "positive knowledge" of a violation, but only "Red Flags."[8] ¶¶42-43. Defendants' claim that they interpreted the Final Rule "to require evaluation of *only the last stage* of its HDD manufacturing process rather than the entire process," MTD at 14, conflicts with the plain language of the Final Rule, which stated that "*any* equipment [with ECCN-designated technology] that is involved in *any of the production stages* is considered essential." 85 Fed. Reg. 51601. In response to a comment asking BIS to define "essential," the agency reiterated that "essential" covers the use of restricted technology (including specifically, ECCN 3E991) at "*any*" stage of production. ¶40 (quoting 85 Fed. Reg. 51601). Whether Seagate did or could—in good faith—interpret "*any* of the production *stages*" as "*only the last stage*" at best presents a disputed question of fact that is inappropriate for resolution at this stage.

Further, BIS expressly clarified that the text of the Final Rule "answers th[e] question" from commenters regarding, "[h]ow can we possibly delve that deeply into the supply chains and design chains of our customers and suppliers"? The Rule applies to "*any*" part, "*any*" component, "*any*" equipment, or "*any*" transaction with Huawei. 85 Fed. Reg. 51600-01. BIS even reiterated the requirements if any ambiguity could possibly remain: look to "EAR's definition of 'knowledge' and BIS's *Know Your Customer* guidance" for "direction on the scope of due diligence warranted." *Id*.

Defendants' purported "good faith" interpretation of the Final Rule suffers from a continued, misleading, reliance upon guidance concerning inapplicable provisions. Specifically, in claiming that "Seagate and BIS disagreed" on the scope of the meaning of "*direct* product" Defendants again highlight language from BIS Guidance that cites directly to EAR's "*de minimis*" provision, *see* MTD at 4 (quoting MTD Ex. 17 at 3), which is the EAR's "General Prohibition Two," 15 C.F.R. § 736.2(b)(2). But in this case, Seagate's violations and BIS's enforcement action have nothing to

---

[8] *See* 15 C.F.R. Pt. 732, Supp. 3 (effective June 27, 2014 to Nov. 16, 2023) (Red Flags impose a duty to inquire or seek a license from BIS to export).

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

do with this "*de minimis*" provision; rather, this case concerns Seagate's violation of "General Prohibition Three—Foreign-direct product (FDP) rules," 15 C.F.R. § 736.2(b)(3), as amended by the Final Rule, 85 Fed. Reg. 51596. The "*de minimis*" guidance Defendants cite merely reiterates that a product "must be evaluated to determine whether it is subject to . . . the foreign direct product provisions in [15 C.F.R.] § 736.2(b)(3), **or** the *de minimis* rules . . . ." MTD EX. 17 at 3. Thus, rather than "confirm[] the 'direct product' standard," MTD at 4, BIS merely reaffirmed that regardless, companies must evaluate their products under the "[FDP] provisions," which Seagate failed to do.[9]

### C.    Defendants Ignored Multiple Warnings that Their Interpretation of the Final Rule Was Wrong

The AC also adds new allegations that Defendants ignored facts that rendered their statements misleading. As Plaintiffs previously alleged, Seagate's knowing or reckless disregard that its HDD sales to Huawei were illegal under BIS's export ban was supported by the fact that Seagate encountered multiple red flags, including: (1) shortly after BIS issued the Final Rule, Western Digital and Toshiba announced that they would stop all shipments to Huawei (¶¶59, 78, 108); (2) two of Seagate's own outside laws firms published client alerts reiterating that BIS's Final Rule applied to items for which covered U.S. technologies are used at any stage of production (¶¶44-46, 76-77, 137); and (3) the May 10, 2021 letter from Senator Wicker to Defendant Mosely "prob[ing] [Seagate's] interpretation of the [Final Rule], including whether [Seagate] believe[d] selling [HDDs] to Huawei require[d] a license from BIS" (¶96 (quoting Ex. D at 4); *see also* Ex. E). In addition, the AC now also alleges that Seagate turned a blind eye to even more red flags.

***First***, as previously alleged, Seagate received an "FDP rule notification" letter from a U.S. supplier of multiple manufacturing technologies the Company has since admitted were "essential" to producing HDDs. ¶90. The AC now clarifies that this letter was not just another company's interpretation of the FDPR; the letter was a ***definitive finding*** from Seagate's ***own supplier*** that its "equipment" which Seagate used to manufacturer HDDs was "subject to [ECCNs]," including

---

[9] During the hearing on Defendants' previous motion to dismiss, when the Court noted it did not "see how that [*de minimis*] guidance supports Seagate's interpretation," Seagate's counsel conceded "that the relevant aspect of the guidance is ***not*** the de minimis rule. We didn't reference that in our papers." ECF No. 94 at 3:15-17, 8:13-15. Yet, Defendants repeat this same argument. MTD at 4 (citing MTD Ex. 17 at 3).

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

specifically ECCN 3E991, which was *expressly referenced* in both the Interim Final Rule and Final Rule, which added "ECCN 3E991" beside "Huawei" on the Entity List. ¶¶90, 135; 85 Fed. Reg. 29849; 85 Fed. Reg. 51629 n.1; 15 C.F.R. Pt. 744, Supp. 4 (Entity List). The AC also adds that the majority of Seagate's sales to Huawei—over $850 million or over 77%—and nearly all of Seagate's extensions of credit to Huawei occurred *after* Seagate received this letter. ¶¶93-94.

***Second***, the AC also adds that Seagate failed to seek clarification on the scope of the Final Rule by refusing to participate in BIS's public comment period. ¶¶48, 133. Seagate's "strategic calculation" to risk being fined for violating BIS's "national security regulations," ¶102, by not taking part in "notice-and-comment rulemaking" to clarify any alleged ambiguities was reckless because under Ninth Circuit precedent this likely resulted in a "waiver" that "barred [Seagate] from raising" such "argument[s]" later in court. *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004); *see also* ¶48 & n.5. While Defendants largely ignore this, MTD 14-15, courts in this Circuit routinely find waiver for failing to participate in the rule making process. *See Bioscience Advisors, Inc. v. S.E.C.*, 2023 WL 163144, at *6 (N.D. Cal. Jan. 11, 2023) (finding waiver where "Plaintiff failed to raise [ ] arguments it now asserts during the notice and comment period at all").[10]

These allegations add to the allegations that Defendants turned a blind eye to numerous warnings that its Huawei sales violated the Final Rule—including those BIS specifically enumerated as Red Flags. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) ("Recklessly turning a 'blind eye' to impropriety is . . . culpable conduct under Rule 10b–5."); *Peltz v. Polyphase Corp.*, 36 F. App'x 316, 319 (9th Cir. 2002) (considering "red flags" as "circumstantial

---

[10] Defendants argue that Plaintiffs fail to address the (purported) ambiguity of the term "direct product." MTD at 14. Defendants ignore, however, that the basis for their supposed "good faith" interpretation of the Final Rule has shifted over time. In their prior motion, Defendants first argued that they had misinterpreted the Final Rule "to require evaluation of only the last stage of [Seagate's] HDD manufacturing process." ECF No. 72 at 4. Next, they "point[ed] to BIS guidance about the 'de minimis' rule." ECF No. 90 at 1. Finally, *for the first time at the hearing*, "Defendants' counsel explained . . . [that] the meaning of 'direct product' is not immediately apparent from the plain language of the [Final Rule]." MTD Order at 8; *see also* ECF No. 94 (3/23/24 Hr'g Tr.) at 6:10-13 (arguing "this rule was complex" and not a "simple rule anyone can understand"). If Seagate truly found that the Final Rule, or any of its terms, were ambiguous—it could have sought clarification from BIS, but never did. ¶133.

evidence of scienter").[11] Seagate's "failure to ask questions that would certainly arise from the circumstances . . . is evidence that could lead a jury to determine" that Defendants "deliberately avoided learning the truth." *United States v. Craig*, 178 F.3d 891, 897 (7th Cir. 1999) (affirming trial court's use of "ostrich" instruction against defendant convicted by jury for "deliberately remain[ing] ignorant of the scam").[12]

> ### D. BIS's \$300 Million Settlement and Its "Guidance on Charging and Penalty Determinations" Support a Strong Inference that Seagate's Violation Was Willful or Reckless

The AC adds allegations that under the standards articulated in BIS's formal "Guidance on Charging and Penalty Determinations," the sheer size of the penalty assessed against Seagate—the largest in the history of BIS—strongly implies that BIS found that Seagate engaged with willful or at a minimum reckless conduct. ¶¶64-65 (citing 15 C.F.R. Pt. 766, Supp. 1). This guidance shows that the \$300 million penalty nearly trebled the standard per-violation penalty set forth in BIS regulations, which also provide that BIS should only impose an upwards penalty adjustment in "egregious" cases involving "aggravating factors" such as: "willful or reckless violation of law"; "willfulness"; "concealment"; a "pattern of conduct"; "prior notice"; "management involvement"; "awareness of conduct at issue"; "actual knowledge"; and "reason to know." ¶64 (quoting 15 C.F.R. Pt. 766, Supp. 1). BIS distinguishes such aggravating factors from those involving "isolated occurrences, the result of a good-faith misinterpretation, or . . . no more than simple negligence or carelessness." *Id.* Thus, viewing the \$300 million penalty in the context of BIS's own "Charging and Penalty" regulations easily supports a strong inference that BIS viewed Seagate's violations as

---

[11] Contrary to Defendants' assertion (MTD at 15), red flags raised to management *do* support scienter. *See, e.g.*, *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) (finding scienter in light of "reasonably available facts, or 'red flags,' that should have put the officers on notice' that the public statements were false"); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 406-09 (S.D.N.Y. 2005) (red flags, including notification of investigation, contributed to inference of scienter).

[12] Defendants argue that their failure to inquire with BIS "is so far-fetched, it strains credulity" (MTD at 14), while ignoring that this is precisely what BIS's guidance required. *See* Final Rule, 85 Fed. Reg. 51600 (directing commenter asking "How can we possibly delve that deeply into the supply chains," to "BIS's Know Your Customer guidance," 15 C.F.R. Pt. 732, Supp. 3, for "direction on the scope of due diligence warranted"); *see also* 15 C.F.R. Pt. 732, Supp. 3 ("If there are 'red flags', inquire"; "[d]o not self-blind").

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

egregious, lacking in good faith, and—at the very minimum—a "reckless violation of law." *See VeriFone Holdings*, 704 F.3d at 708; *Bach v. Amedisys, Inc.*, 2016 WL 4443177, at *11 (M.D. La. Aug. 19, 2016) (finding company "all-but admitted that it engaged in Medicare fraud" by entering into a multi-million dollar settlement of DOJ False Claims Act action and it was "of no relevance" that the company did not admit liability); *see also McPhail v. First Command Fin. Plan., Inc.*, 2006 WL 8455139, at *3 n.5 (S.D. Cal. July 27, 2006) ("[C]ourts generally have allowed plaintiffs to satisfy particularity and scienter requirements with the findings of an administrative agency when the agency's findings are relevant to plaintiffs' claims").

### E.    The Commerce Committee Found "Evidence" that Seagate "Knowingly Violated" the Final Rule and "Made the Strategic Calculation to Continue Violating National Security Regulations"

The AC adds allegations that the Commerce Committee's October 26, 2021 Report further supports Defendants' scienter. Following a months-long investigation into Seagate's compliance with the Final Rule and Seagate's sales to Huawei, in October 2021, the Commerce Committee found that Seagate had "***knowingly violated***" the Final Rule having made "***the strategic calculation*** to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." ¶¶102, 144. That a Senate Committee reached this finding after months of investigation, including through non-public documentary evidence and interviews with Seagate and its competitors, supports the inference that Defendants knew they were violating the Final Rule and chose short-term profits over their legal obligations.

Recognizing that the Committee's finding of knowledge is a compelling support for scienter, Defendants contend that the words "it appears" destroys any implication of knowledge. MTD at 19. Not so. A finding of "apparent" knowledge—"[b]ased on the evidence" gleaned from a months-long Senate investigation which found that Seagate made a "strategic calculation to . . . violat[e] national security regulations," ¶102—is more than sufficient to support a pleading-stage ***inference*** of knowledge. Nor does the fact that the Committee "left it to BIS to make a 'determination'" (MTD at 19) about enforcement actions dispel the Committee's views on knowledge; the Committee directed the agency with the enforcement powers to enforce based on findings of ***knowledge***. That

16

BIS did not charge a "knowing" violation is not determinative, *id.*, where, as here BIS charging guidelines state that such a penalty was reserved only for "egregious" cases of "willful" or "reckless" conduct. *See supra*, 7-8, 15.

### F.     Plaintiffs' Additional Allegations Further Support Scienter

Numerous additional allegations in the AC collectively give rise to a strong inference of Defendants' scienter. *See* ¶¶131-63.

***First***, the unexpected departure of Seagate's VP of Operations and Technology, Jefferey Nygard, and the drastic salary reductions across the C-suite further support scienter. ¶160.

***Second***, the significance to Seagate of both HDD sales—particularly to Huawei—and export compliance permit a "core operations" inference here. ¶151; *see Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1123 (C.D. Cal. 2012) (finding it inconceivable "that China Integrated's directors and officers did not know that a factory that was purportedly so critical to the company's business that it generated 20% of total company sales was not functioning").

***Third***, Defendants' SOX certifications, *e.g.*, ¶¶173-74, further support scienter because such certifications require executives "to access sufficient reporting information to certify that the information provided did not omit any material facts to make the report not misleading." *Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at *7 (N.D. Cal. July 26, 2017). "For these certifications to have any substance, signatories to the certifications must be held accountable for the statements." *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007).[13]

### G.     Defendants' Proffered Inference Is Not More Compelling

Defendants' ***sole***, non-fraudulent inference is that they had a good-faith, but ultimately erroneous, interpretation of the Final Rule. In the light of the numerous allegations of contemporaneous knowledge described in §§ I.A-F *supra*, Defendants' competing inference is not well-supported, much less compelling. *See SEC v. Infinity Grp.*, 212 F.3d 180, 193 (3d Cir. 2000) ("A good faith belief is not a 'get out of jail free card.'"). But the AC's theory of scienter "makes sense": When Seagate's only competitors halted their sales to Huawei, Seagate "made the strategic calculation" to secure a monopoly over Huawei sales and assumed that this lucrative monopoly

---

[13] Plaintiffs do not waive or discount the other facts supporting scienter set forth in ¶¶131-63.

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

would offset any regulatory risk entailed by illicit sales. ¶¶60-61, 91, 102; Ex. D at 6; *see In re Amlyin Pharms., Inc., Sec. Litig.*, 2003 WL 21500525, at \*5 (S.D. Cal. May 1, 2003) (finding scienter where defendant "knew that there may be a problem" with drug trial data but "took the calculated risk of continuing the trials and application process as originally planned"). After all, the average penalty for a violation of export restrictions—prior to Seagate's historic $300 million penalty—was only $2.3 million:  a small price to pay for $1 billion in sales. ¶¶60-61.

In any event, Defendants' "good faith interpretation" claim is beside the point. *See* MTD at 20-21. ***First***, an argument that a defendant violated the law while "act[ing] in good faith" is a quintessential "affirmative defense." *In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716, at \*7 n.15 (C.D. Cal. Mar. 12, 2012). "[W]hile an affirmative defense may be raised in a motion to dismiss when 'the defense raises no disputed issues of fact," the question of whether an action was taken "with fraudulent intent and whether a [defendant] acted in good faith . . . are questions of fact." *Damian v. A-Mark Precious Metals, Inc.*, 2017 WL 6940515, at \*6 (C.D. Cal. Aug. 28, 2017). And, when (as here) a "plaintiff alleges facts suggesting that defendant did not act in good faith," the case is "not amenable to resolution on a motion to dismiss." *Id*.

***Second***, good faith (an inherently subjective inquiry) presents a prototypical factual question for a jury. *See In re Apple Inc. Sec. Litig.*, 678 F. Supp. 3d 1147, 1156 (N.D. Cal. 2023) (although "evidence of good faith . . . can cut against a finding of scienter, *such evidence is to be weighed by the jury*" (emphasis added)); *Plaskin v. Newsight Reality, Inc.*, 2020 WL 1651995, at \*6 (C.D. Cal. Feb. 6, 2020) (same). Even then, "good faith" is not an absolute defense to reckless misconduct, and subjective belief is not an absolute defense to scienter allegations. *See SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1095 (9th Cir. 2010) ("If such a self-serving assertion could be viewed as controlling, there would never be a successful prosecution or claim for fraud."); *SEC v. Brincat*, 2001 WL 1662099, at \*1 (N.D. Ill. Dec. 6, 2001) ("[G]ood faith does not necessarily preclude a finding of recklessness."); *Noto v. 22nd Century Grp., Inc.*, 650 F. Supp. 3d 33, 49 (W.D.N.Y. 2023) (holding, in Rule 10b-5(b) action, that courts cannot "weigh . . . evidence of good faith compliance" against "allegations of fraudulent intent at the [pleading] stage").

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

## II.    The Additional Facts in the Amended Complaint Demonstrate that Defendants' Statements Concerning Seagate's Sales and Revenue Drivers Were Misleading

Whether a statement about the drivers of financial success is misleading depends on whether the statement "disclose[s] all material information on that topic"; thus, as when assessing materiality, a statement is misleading if "defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 123-24 (D. Conn. 2021).

A misrepresentation or omission is material where "there is 'a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available' for the purpose of decision making by stockholders concerning their investments." *In re Alphabet, Inc. Sec. Litig.*, 1 F. 4th 687, 699-700 (9th Cir. 2021); *see also Police & Fire Ret. Sys. of the City of Detroit v. Crane*, 87 F. Supp. 3d 1075, 1082 (N.D. Cal. 2015) (same). For this reason, the size of the financial impact is not determinative. Rather, "the Court must consider qualitative factors" because "materiality is not merely a quantitative inquiry." *Polycom*, 87 F. Supp. 3d at 973. Even where a misstatement or omission is "minor or technical in nature" and "thus quantitatively immaterial," it may be material to investors who "would consider [the information] important." *Id.* at 974; *see also S.E.C. v. Leslie*, 2012 WL 116562, at *6 (N.D. Cal. Jan. 13, 2012) (misrepresentations "were *qualitatively* material because they altered indicators relied upon by analysts and the market in evaluating [the company] for investment"); *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717-19 (2d Cir. 2011) (emphasizing that "qualitative factors" must also be considered when evaluating materiality). Thus, information may be material even if it does not "have an immediate financial impact on the company." *Alphabet*, 1 F. 4th at 704.

"The rule is that a company must disclose material information (regardless of how one characterizes it) if the failure to disclose would leave the public with a misimpression about the health of the company." *Crane*, 87 F. Supp. 3d at 1083. Thus, "[i]nformation regarding a company's financial condition is material to investment." *S.E.C. v. Todd*, 642 F.3d 1207, 1221 (9th Cir. 2011). Likewise, "how officers and directors of a public corporation describe revenue growth to investors is important." *Id*. Materiality can be pled through risk warnings, public statements about the

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

importance of the information, the scale of the omitted problem, the market reaction to the disclosure, increased regulatory and governmental scrutiny, and media coverage of the disclosure. *Alphabet*, 1 F. 4th at 703 (listing each example).

Here, the AC added allegations that Defendants' misrepresentations about Seagate's reliance on Huawei sales were false or misleading because they omitted information that would have been material to investors. *First*, the AC alleges that, under GAAP, Seagate was required to disclose the extent of its reliance on its major customers, "regardless of their total contribution to Seagate's revenue," even for interim reporting periods. ¶54 n.6 (alleging that Seagate was required to report on an interim basis because ASC-280-10-50-20 requires public entities to make this disclosure "for each period for which an income statement is presented," and Seagate presented an income statement in its quarterly filings).[14] Defendants' statements that Seagate complied with GAAP were therefore false or misleading, as Seagate violated GAAP by failing to disclose that Huawei sales contributed more than 10% of revenue in the third quarter of 2021, and that, in other quarters, Huawei was a "major customer" although total revenues were lower than 10%. ¶107.

The scale of the Huawei sales was material, even if they did not comprise 10% of yearly revenues, because they allowed Seagate to "significantly outperform" its competitors, ¶108, and meet guidance, ¶107, while simultaneously subjecting Seagate to the heightened risk of increasing regulatory penalties for every sale, ¶64. *See Alphabet*, 1 F. 4th at 704-05 n.7 (omissions material where concealed problem did not prevent Alphabet's revenue from "***increas[ing]*** from $12 billion to $30 billion," and omitted information could "cause a range of substantial costs and harms," including "litigation and legal risks," "reputational damage," and "damage to stock price and shareholder value"); *In re Obalon Therapeutics, Inc.*, 2019 WL 4729461, at *8 (S.D. Cal. Sept. 25, 2019) (misleading statement "'qualitatively' material because the overstatement 'masked . . . expectations for the enterprise' and concerns a segment of the business that 'plays a significant role'

---

[14] Even if GAAP did not require interim disclosures, Defendants' failure to disclose Seagate as a 10% customer in the third quarter of 2021 was misleading after Mosley expressly told investors Seagate would disclose if Huawei were a 10% customer. ¶53; *see also Todd*, 642 F.3d at 1217 ("[T]echnical compliance with GAAP does not preclude a finding that an accounting treatment was a material misrepresentation" and "materially misleading to investors.").

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

in [the company's] profitability).[15] The sales thus altered the "total mix" of investor information about Seagate's financial condition, expectations for future growth, and regulatory risk.

*Second*, the AC adds allegations that securities analysts and investors "focus on the midpoint of issuer revenue guidance in evaluating an issuer's financial performance." ¶107 & n.8. Such analysts and investors would find it misleading if Seagate disclosed innocent revenue drivers while omitting that its ability to meet midpoint was contingent upon Huawei sales. *Cf.* MTD Order at 6. However, even if investors based their expectations on the low end of guidance, Seagate's statements about its revenue drivers were misleading because investors would want to know "how the company was growing and derived its revenue." *Delaware Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*, 606 F. Supp. 3d 124, 139 (E.D. Pa. 2022); *see also Alexion*, 556 F. Supp. 3d at 121, 124-25 (statements misleading where "Defendants failed to disclose that illegal and unethical sales practices were key drivers of Alexion's financial results" even without allegations of "what impact (if any) the allegedly 'illegal' conduct had on Alexion's performance" because of "the serious repercussions of Defendants' fraud" including a criminal investigation and $13 million settlement).

The revenue driver statements are misleading for the independent reason that they purport to represent the reasons for the Company's financial performance as lawful, when, in fact, Seagate's success and failure were driven in part by illegal practices. *See In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 320 (9th Cir. 2007) (revenue driver statements misleading because "[b]y attributing Syncor's success solely to legitimate practices, defendants implicitly (and falsely) warranted that there were no illegal practices contributing to that success"); *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 600 (N.D. Cal. 2019) ("[E]xplanations for financial statements may be misleading if they put the source of illegal revenue at issue without disclosing the illegality."); *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at \*14 (C.D. Cal. Jan.

---

[15] Plaintiffs respectfully submit that sales need not be more than 10% for statements about revenues to be "misleading," "material," or "actionable." MTD Order at 5-6. *See Leslie*, 2012 WL 116562, at \*6 ("'[M]ateriality' is not limited to a percentage of a company's total profits."); *Shawmut Bank, N.A. v. Kress Assocs.*, 33 F.3d 1477, 1485 (9th Cir. 1994) ("[I]llegal payments that are so small as to be relatively insignificant to the corporation's bottom line can still have vast economic implications," since they can endanger all of a corporation's business if they are discovered.").

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

17, 2020) ("[F]inancial statements may be misleading if they put the source of illegal revenue at issue without disclosing the illegality.").

III.    **Defendants' Remaining Arguments Fail**

        A.    **Plaintiffs Adequately Plead a Deceptive Scheme**

Defendants also engaged in a "scheme . . . to defraud" and in "act[s], practice[s], or [a] course of business" that operated "as a fraud or deceit" under Rule 10b-5(a) and (c). 17 C.F.R. § 240.10b-5(a), (c). "These provisions capture a wide range of conduct," including "conduct involving false or misleading statements." *Lorenzo v. SEC*, 587 U.S. 71, 79-80 (2019). As detailed in AC § IV, Plaintiffs allege a scheme to defraud that included not only false and misleading statements but fundamentally deceptive conduct designed to conceal Seagate's "strategic calculation to continue violating national security" from both government regulators and investors. *See York Cnty. ex rel. Cnty. of York Ret. Fund v. HP, Inc.*, 2024 WL 1327247, at \*13 (N.D. Cal. Mar. 27, 2024) (allegations that defendants took actions to artificially inflate sales numbers stated scheme liability claim); *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at \*18 (W.D. Pa. May 18, 2023) (scheme liability alleged when defendants imposed "a pervasive, top-down scheme to . . . ignore regulatory compliance best practices in the name of juicing manufacturing output and increasing corporate profits").

Defendants' arguments lack merit. ***First***, Defendants argue that their conduct was not "deceptive" because Seagate had "publicly acknowledge[d] its continuing relationship with Huawei after the promulgation of the FDPR" and that their conduct did not have "a deceptive purpose and effect." MTD at 22-23. This is incorrect; Defendants misstate the facts. As discussed above, the AC adds allegations that Defendants ***refused*** to publicly acknowledge Seagate's relationship with Huawei, and Defendants' entire course of conduct—hiding their strategic partnership and agreements with Huawei, stonewalling Congressional investigations, attempting to divert new sales through a secret subsidiary—constitute a series of deceptive acts in violation of Rule 10b-5(a) and (c). ¶¶282-87. Ultimately, the combined "purpose and effect" of Defendants' actions and false statements was "to create the false appearance of fact, [which] constitutes a deceptive act." *Abdo v. Fitzsimmons*, 2021 WL 616324, at \*11 (N.D. Cal. Feb. 17, 2021) (quoting *Simpson v. AOL Time*

*Warner Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006)).

**Second**, Plaintiffs' scheme-liability claim is not "merely a repackaging of the alleged misstatements." MTD at 22. The AC's examples of deceptive acts are notable for their secrecy and silence—not their statements. *Compare* ¶¶21-163, 282-87, *with* ¶¶164-271, 288-92. That some of the "alleged acts are closely connected to the alleged misrepresentations and omissions . . . does not mean that Plaintiffs' scheme liability claim is a mere recast of their misrepresentation claim." *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at *17 (N.D. Cal. Feb. 15, 2018); *Lorenzo*, 139 S. Ct. at 1100. Defendants' cases, MTD at 22 n.22, are not to the contrary. In both *Mehedi v. View, Inc.*, 2023 WL 3592098 (N.D. Cal. May 22, 2023) and *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884 (N.D. Cal. 2022), the scheme "consist[ed] entirely" of "misstatements," and *Sneed v. AcelRx Pharmaceuticals, Inc.* acknowledged that "dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5," 2022 WL 4544721, at *6 (N.D. Cal. Sept. 28, 2022) (quoting *Alphabet*, 1 F.4th at 1100-02).

### B.    Plaintiffs Adequately Plead Misstatements

The parties agree that "[t]o be false or misleading, a statement must either 'directly contradict what the defendant knew at the time,' *Weston Family Partnership LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022), or 'create an impression of a state of affairs that differs in a material way from the one that actually exists.' *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)." MTD 6 (quotations omitted). Plaintiffs need not prove absolute, incontrovertible falsity; the relevant question is "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *In re CytRx Corp. Sec. Litig.*, 2015 WL 5031232, at *3 (C.D. Cal. July 13, 2015). Falsity does not require confidential witnesses or internal documents. *See In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *11 (D.N.J. Apr. 28, 2017) (holding that a "lack of citations to confidential informants and internal documents does not preclude the Court from finding sufficient allegations").

**First**, Defendants represented that Seagate was in compliance with applicable export regulations. *See* ¶¶164-259. Each of those statements were materially false and misleading, as Defendants admitted and BIS and the Commerce Committee found. *See, e.g.*, ¶¶72, 102, 126. That

BIS had not taken action against Seagate at the time of the misstatements is both irrelevant and incorrect. *See In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949 (9th Cir. 2023) (noting that "case law does not require harm to have materialized for a statement to be materially misleading").

To the extent Defendants argue that "the AC contains no contemporaneous facts to show that Defendants knew *at the time* of the statements that Seagate's interpretation of the [Final Rule] was incorrect," MTD at 7-8, the AC adequately pleads Defendants' scienter. *See* § I *supra*. For the same reason, Defendants' argument (in a footnote) that "[m]any of the alleged misstatements are nonactionable statements of opinion" is equally unpersuasive. MTD at 6 n.5. That is, the challenged statements did not "fairly align[]" with other information available to them. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015); *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *3, *11 (C.D. Cal. Apr. 12, 2016) (statement that issuer "believes that it is substantially in compliance with the FDA's . . . regulations" held actionable). In any event, courts must not "impute the strong inference standard of scienter to the element of falsity; we do not require a 'strong inference of fraud.'" *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023).[16]

***Second***, Seagate's risk disclosures in its quarterly and annual reports (*see, e.g.*, ¶¶185, 201) are also actionable. Defendants repeatedly represented that export control laws "***could*** have a material adverse effect on our business" (¶¶185, 190, 194, 198, 201, 206), while omitting that Seagate's sales of HDDs to Huawei ***had already violated*** export control laws—thus rendering these risk disclosures misleading. *See Facebook*, 87 F.4th at 949-50 (falsity allegations "sufficient to survive a motion to dismiss when the complaint plausibly allege[s] that a company's SEC filings

---

[16] Defendants' cases are inapplicable and not persuasive. *See* MTD at 7 n.7; *Kang*, 620 F. Supp. 3d 884 (plaintiffs had "fail[ed] to plausibly allege that PayPal in fact violated any regulatory obligation" and, instead, only alleged "investigations" into potential misconduct, unlike here, where Seagate admitted to 429 export control violations); *Ikeda v. Baidu, Inc.*, 2021 WL 1299046, at *9 (N.D. Cal. Apr. 7, 2021) (defendant company's counsel had provided an actual "legal opinion that it was in compliance with Chinese regulations," unlike here, where Defendants' conduct contradicted their counsel's public legal opinions, and plaintiff had not even identified the specific regulations violated); *In re PayPal Holdings, Inc. S'holder Derivative Litig.*, 2018 WL 466527, at *5 & n.8 (N.D. Cal. Jan. 18, 2018) (no allegations that "defendants received information that would have put them on notice that the statements were misleading," unlike here).

warned that risks 'could' occur when, in fact, those risks had already materialized").

***Third***, Defendants' SOX certifications stating that Seagate had (i) designed internal controls to ensure the reliability of financial reporting and the preparation of financial statements; and (ii) instituted controls to ensure compliance with applicable laws are also actionable. *See, e.g.*, ¶207. To plead falsity as to those certifications, Plaintiffs must "allege facts explaining why the declarants knew the financial reporting was false at the time it was made." *Wanca v. Super Micro Computer, Inc.*, 2018 WL 3145649, at *6 (N.D. Cal. June 27, 2018). Plaintiffs have done so. *See* § I.F *supra*.

***Fourth***, the AC alleges Defendants misleadingly told investors that Huawei sales did not materially contribute to Seagate's HDD revenue and financial performance while attributing the Company's unusually positive HDD revenue to legitimate factors. ¶¶225, 237. As discussed in AC § VI.C, Seagate's undisclosed, illicit Huawei sales rendered Defendants' statements regarding the reasons for Seagate's financial performance misleading. ¶¶221-59.

### C.    Plaintiffs Adequately Plead Loss Causation

Loss causation does not impose a high burden at the pleading stage. *See In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020) ("low bar" for pleading loss causation). Defendants challenge two of the four disclosures (March 8, 2022 and July 21, 2022), asserting that "[n]either disclosure mentioned Huawei" by name. *See* MTD at 24. But that is irrelevant: a corrective disclose need only "relate back to the misrepresentation." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). Here, both disclosures involved negative revenue forecasts in Asia and results that were a direct consequence of Seagate's suspension of sales to Huawei under significant government pressure, and thus began to reveal to investors the true scope of Seagate's reliance on those sales. While the disclosures did not mention Huawei by name, they acknowledged that the poor results were driven by declining HDD sales in China, a connection that analysts also highlighted. ¶118.[17] As such, loss causation is adequately pled.

### CONCLUSION

Defendants' Motion should be denied in its entirety.

---

[17] Contrary to Defendants' only argument regarding the Section 20(a) claim, MTD at 25 n.28, Plaintiffs adequately plead a primary violation of Section 10(b) and thus the Section 20(a) claim,

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

DATED:  December 12, 2024

Respectfully submitted,

**MOTLEY RICE LLC**

*/s/ William S. Norton*

Gregg S. Levin (admitted *pro hac vice*)
Lance V. Oliver (admitted *pro hac vice*)
William S. Norton (admitted *pro hac vice*)
Joshua C. Littlejohn (admitted *pro hac vice*)
Christopher F. Moriarty (admitted *pro hac vice*)
Andrew P. Arnold (admitted *pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
glevin@motleyrice.com
loliver@motleyrice.com
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com
aarnold@motleyrice.com

*Co-Lead Counsel for Co-Lead Plaintiffs Universal-Investment-Gesellschaft mbH, Universal-Investment-Luxembourg S.A., and UI BVK Kapitalverwaltungsgesellschaft mbH, and the Class*

**BERNSTEIN LITOWITZ BERGER**
**  & GROSSMANN LLP**
Salvatore J. Graziano (admitted pro hac vice)
Hannah Ross (admitted pro hac vice)
Abe Alexander (admitted pro hac vice)
Aasiya Farah Mirza Glover (admitted pro hac vice)
Sarah Schmidt (admitted pro hac vice)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
hannah@blbglaw.com
aasiya.glover@blbglaw.com
sarah.schmidt@blbglaw.com

-and-

Jonathan D. Uslaner (Bar No. 256898)
Caitlin Bozman (Bar No. 343721)
2121 Avenue of the Stars, Suite 2575

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL

Los Angeles, California 90067
Telephone: (310) 819-3470
jonathanu@blbglaw.com
caitlin.bozman@blbglaw.com

*Co-Lead Counsel for Co-Lead Plaintiffs Public
Employees' Retirement System of Mississippi and
Arkansas Public Employees' Retirement System, and
the Class*

**BLEICHMAR FONTI & AULD LLP**
Lesley E. Weaver (SBN 191305)
1330 Broadway, Suite 630
Oakland, California 94612
Telephone: (415) 445-4003
Facsimile: (415) 445-4020
lweaver@bfalaw.com

*Local Counsel for Co-Lead Plaintiff
Universal-Investment-Gesellschaft mbH,
Universal-Investment-Luxembourg S.A., and
UI BVK Kapitalverwaltungsgesellschaft mbH*

**DAVIDSON BOWIE, PLLC**
John L. Davidson (*pro hac vice*)
1062 Highland Colony Parkway 200 Concourse,
Suite 275 Ridgeland, MS 39157
Telephone: (601) 932-0028
jdavidson@dbslawfirm.net

*Additional Counsel for Co-Lead Plaintiffs Public
Employees' Retirement System of Mississippi*

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on December 12, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel or parties of record.

Dated:  December 12, 2024                          **MOTLEY RICE LLC**

*/s/ William S. Norton*
William S. Norton (admitted *pro hac vice*)

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 3:23-CV-03431-RFL