# Exhibit F

<u>PROPOSED CHARGING LETTER</u>

<u>VIA EXPRESS COURIER</u>

Seagate Technology LLC
47488 Kato Road
Fremont, CA 94538

Seagate Singapore International Headquarters PTE. LTD.
90 Woodlands Avenue 7
Singapore 737911

*Attention:*    Dr. Dave Mosley
            *Chief Executive Officer*

Dear Dr. Mosley,

The Bureau of Industry and Security, U.S. Department of Commerce ("BIS"), has reason to believe that Seagate Technology LLC, of Fremont, California ("Seagate US") and Seagate Singapore International Headquarters Pte. Ltd., of Singapore ("Seagate Singapore"), working with other Seagate entities (collectively, "Seagate"), committed 429 violations of the Export Administration Regulations (the "Regulations" or "EAR").[1]  Specifically, BIS charges the following violations:

## **<u>STATEMENT OF CHARGES</u>**

**Charges 1 - 429        15 C.F.R. § 764.2(a) – Engaging in Prohibited Conduct**

1.  As described in greater detail below and in the attached Schedule of Violations, between on or about August 17, 2020 and on or about September 29, 2021, Seagate US and Seagate Singapore engaged in conduct prohibited by the Regulations on 429 occasions when they ordered or caused the reexport, export from abroad, or transfer (in-country) of approximately 7,420,496 hard disk drives ("HDDs"), items subject to the EAR and valued at approximately $1,104,732,205, to Huawei Technologies Co., Ltd. ("Huawei") or other Huawei entities listed on the BIS Entity List and/or where listed Huawei entities were a party to a transaction involving such items without a license or other authorization from BIS.[2]

---

[1] The Regulations are currently codified in the Code of Federal Regulations at 15 C.F.R. Parts 730-774 (2022).  The charged violations occurred in 2020 - 2021.  The Regulations governing the violation at issue are found in the 2020 - 2021 versions of the Code of Federal Regulations (15 C.F.R. Parts 730-774 (2020 - 2021)).  The 2022 Regulations set forth the procedures that apply to this matter.
[2] *See* 85 Fed. Reg. 51596 (Aug. 20, 2020).

Seagate Technology LLC
Seagate Singapore International Headquarters PTE. LTD.
Proposed Charging Letter
Page 2

## Huawei Added to the Entity List

2. On May 16, 2019, Huawei and certain of its non-U.S. affiliates were added to the Entity List.  Licensing requirements were imposed on exports, reexports, and transfers (in-country) of all items subject to the EAR destined to or involving the listed Huawei entities.[3]

3. The Entity List designation was based on a determination made by multiple U.S. government agencies "that there is reasonable cause to believe that Huawei has been involved in activities contrary to the national security or foreign policy interests of the United States."[4]  Specifically, the End-User Review Committee, composed of representatives of the U.S. Departments of Commerce (Chair), State, Defense, and Energy, determined that the listings were necessary to protect U.S. national security or foreign policy.

4. In announcing the designation, BIS cited allegations contained in a 2019 superseding criminal indictment in the U.S. District Court for the Eastern District of New York, charging Huawei with 13 counts of violating U.S. law ("Superseding Indictment").  The Superseding Indictment alleged that "Huawei and an Iranian based affiliate, working with others, knowingly and willfully conspired to impair, impede, obstruct, and defeat, through deceitful and dishonest means, the lawful government operations of OFAC [the Treasury Department's Office of Foreign Assets Control]."[5]

5. Over time, other Huawei entities were added to the Entity List as the Departments of Commerce, Defense, State, and Energy determined "those affiliates pose a significant risk of involvement in activities contrary to the national security or foreign policy interests of the United States."[6]  Over 100 Huawei entities were placed on the Entity List by August 2019 and more than 150 by the end of the following year.

## The Foreign-Produced Direct Product Rule

6. On August 17, 2020, due to continued national security and foreign policy concerns, BIS imposed controls over certain foreign-produced items "to better address the continuing threat to U.S. national security and U.S. foreign policy interests posed by Huawei and its

---

[3] *See* 84 Fed. Reg. 22961 (May 21, 2019), 84 Fed. Reg. 43493 (Aug. 21, 2019), and 85 Fed. Reg. 51596 (Aug. 20, 2020).
[4] *See* 84 Fed. Reg. 22961.
[5] *Id.*
[6] *See* 84 Fed. Reg. 43493 (Aug. 21, 2019) and 85 Fed. Reg. 51596 (Aug. 20, 2020).

Seagate Technology LLC
Seagate Singapore International Headquarters PTE. LTD.
Proposed Charging Letter
Page 3

non-U.S. affiliates."[7]  Specifically, effective August, 17, 2020, BIS imposed a license requirement on foreign produced direct products ("FDP") of certain U.S.-origin software and technology when (1) "there is "knowledge" that [a listed Huawei entity] is a party to any transaction involving the foreign-produced item" and (2) "the foreign-produced item is produced by any plant or major component of a plant that is located outside the United States… [and that] itself is a direct product of U.S.-origin "technology" or "software" subject to the EAR that is specified in" certain Export Control Classification Numbers ("ECCN"), including, but not limited to, ECCN 3E991.[8]

7.  As a consequence of the controls described above, Huawei cannot receive items subject to the FDP rule or act as a party to the transaction, e.g., as the "purchaser," "intermediate consignee," "ultimate consignee," or "end-user," without a license from BIS.[9]

8.  Two of the three companies capable of making HDDs promptly—and publicly—stated that they had ceased sales to Huawei.  The two companies also indicated that they would not sell to Huawei unless or until they received authorization from BIS.  Only Seagate continued HDD sales and transactions involving Huawei.  The company incorrectly interpreted the FDP rule to require evaluation of only the last stage of its HDD manufacturing process rather than the entire process.

**Seagate's HDD Plants**

9.  Seagate had HDD manufacturing sites in China, Northern Ireland, Malaysia, Singapore, Thailand, and the United States.  Seagate used equipment, including testing equipment, subject to the EAR and the FDP rule.  Seagate used a fully automated laser-based surface inspection system manufactured by Company One ("Company One's equipment") to detect and classify critical defects on HDDs' substrates and media such as micro pits, bumps, and particles.  Company One's equipment also contained multiple applications for research and development, process development, production monitoring, and failure

---

[7] *See* 85 Fed. Reg. 51596 (Aug. 20, 2020) (imposing licensing requirements on the foreign-produced direct product of certain U.S.-origin technologies and software, effective August 17, 2020).  The August 20, 2020 rule amended changes to the FDP rule made earlier that year "in response to public comments identifying ways Huawei and its non-U.S. affiliates on the Entity List may be procuring items not subject to the EAR that are the direct product of specified U.S. technology or software and, in so doing, creating an uneven playing field for persons whose comparable items are subject to the EAR." *Id*. at 51602 (referencing a May 2020 rule, 85 Fed. Reg. 29,849 (May 19, 2020)).  The FDP rule has since been moved from footnote 1 of Supp. No. 4 to Part 744 of the Regulations to Section 734.9(e)(1) of the Regulations. *See* 87 Fed. Reg. 6022 (Feb. 3, 2022) and 87 Fed. Reg. 62186 (Oct. 13, 2022).

[8] *See* 85 Fed. Reg. 51596 (Aug. 20, 2020).  *See also* 15 C.F.R. § 772.1 (defining the terms "knowledge," "technology," and "software").

[9] 85 Fed. Reg. 51596 (Aug. 20, 2020).

Seagate Technology LLC
Seagate Singapore International Headquarters PTE. LTD.
Proposed Charging Letter
Page 4

analysis. At all relevant times, Company One's equipment was subject to the EAR, classified as ECCN 3B992, and was the direct product of U.S.-origin ECCN 3E991 technology. "[A]ny equipment [in one of the FDP rule's specified ECCNs] that is involved in any of the production stages is considered *essential*."[10] As such, Company One's equipment was essential, i.e. a major component, of the Seagate HDD plants. As a result, pursuant to footnote 1 of Supp. No. 4 to Part 744 of the EAR, Seagate was prohibited from exporting the HDDs from abroad to a listed Huawei entity, and from involving a listed Huawei entity as a party to the transaction, without a BIS license.

10. Seagate also used other equipment subject to the EAR and the FDP rule to produce the HDDs it shipped to, or in transactions involving, Huawei and its listed affiliates. In particular, to produce the HDDs' wafers and sliders, Seagate used Company Two's Ion Beam Etch ("IBE"), Ion Beam Deposition ("IBD"), and Physical Vapor Deposition ("PVD") equipment (collectively, "Company Two's equipment"), which were subject to the EAR, classified under ECCN 3B992, and the direct product of U.S.-origin ECCN 3E991 technology.

11. Like Company One's equipment, Company Two's equipment was essential, i.e. a major component, of Seagate's HDD plants. The IBE and IBD were used in critical head manufacturing steps in wafer and slider fabrication facilities in Northern Ireland, Thailand, and the United States. The IBE was used for etching complex geometries and non-volatile materials for sensor, writer, and air bearing surfaces while the IBD was used for depositing highly uniform step coverage with high quality film properties for the sensor. The PVD equipment was used to deposit thin films of metal and dielectric materials.

## Seagate's Unlicensed Sales to and involving Huawei

12. On or about September 14, 2020, during a conference at which a Seagate HDD competitor said publicly that it had ceased sales to listed Huawei entities and saw no current path forward to continue the sales absent a BIS license, Seagate announced it was charting a different path.

13. Seagate US's Executive Vice President and CFO said "So of course we are still going through the final assessment, but from what I have seen until now, I don't see any particular restriction for us in term[s] of being able to continue to keep the Huawei or any other customers in China. So, we don't think we know we need to have a specific license…." Within days of that statement, which came less than a month after

---

[10] See 85 Fed. Reg. at 51601 (emphasis in original).

4

Seagate Technology LLC
Seagate Singapore International Headquarters PTE. LTD.
Proposed Charging Letter
Page 5

publication of the August 2020 FDP rule, Seagate was already Huawei's sole source provider of the HDDs since Seagate's competitors had stopped selling due to the rule.

14. On or about December 7, 2020, Huawei and Seagate entered a three-year *Strategic Cooperation Agreement*. The agreement signed on behalf of Seagate Singapore by Seagate US, named Seagate as "Huawei's strategic supplier," granting Seagate "priority basis over other Huawei suppliers." At the time, there were no other HDD suppliers to compete for Huawei's business because its competitors had stopped selling to Huawei after the August 2020 FDP rule.

15. As part of the *Strategic Cooperation Agreement*, Seagate agreed to provide Huawei with Seagate's "newest and most advanced technologies available in order to support and sufficiently maintain Huawei's products in terms of innovation and market leadership…." The companies agreed to the formation of dedicated collaboration teams "to carry out in-depth cooperation in the areas of R&D, technology, quality, delivery, commercial affairs, and total cost of operation." Seagate and Huawei agreed to designate senior executives "as the sponsor[s] for the strategic partnership" and appoint staff to coordinate activities and management of the relationship. Seagate agreed to "set up a dedicated stand-alone service team to support the business with Huawei."

16. Huawei, in turn, expressed its appreciation to still have an HDD supplier. Writing to Seagate days after the signing of the companies' *Strategic Cooperation Agreement*, a Huawei executive stated that, "In 2020, despite the global pandemic, Seagate and Huawei are about to reach our new milestone of 600+M USD thanks to our concerted efforts." Huawei congratulated Seagate on becoming the company's priority supplier: "Seagate well seized the opportunity and successfully won the big share, laying a solid foundation for our cooperation in the coming year." Huawei's words were forwarded to Seagate senior leadership: "Huawei is grateful for our support–great milestone indeed with $600M revenue in [calendar year ("CY") 2020] just for HDD. CY19 was less than $400M."

17. Seagate's sales to Huawei continued over time, even as multiple companies announced that they had stopped shipping to Huawei:
    - STMicroelectronics – Earnings Call, Q3 2020 – "We have stopped to ship any pieces to Huawei starting September 15…";
    - Western Digital – Deutsche Bank Conference – "We have paused shipping to Huawei, so we're currently not shipping to Huawei for hard drives…";
    - Micron Technology – Earnings Call, Q4 2020 – "We halted shipments to Huawei on September 14…";
    - SK Hynix – Earnings Call, Q3 2020 – [RE: shipments to Huawei] "…we have

Seagate Technology LLC
Seagate Singapore International Headquarters PTE. LTD.
Proposed Charging Letter
Page 6

> requested a license from the U.S. government";
> - Nikkei Asian Review article – September 2020 – "Japanese chip makers [Sony, Kioxia, Mitsubishi, Renesas, Toshiba] scramble to replace Huawei sales after US ban"; [11]
> - Taipei Times, September 2020, "Macronix seeks US break on Huawei"; [12] and
> - Broadcom – Form 10-Q, September 2020 – "…require us to suspend sales to Huawei unless we first obtain licenses from the U.S. Department of Commerce."

## FDP Rule Notification to Seagate

18. On or about January 27, 2021, Company Two sent Seagate a FDP rule notification saying "[Company Two] and its subsidiaries are subject to U.S. export controls and therefore any equipment, parts and components (and associated technology and software) sold by [Company Two] are subject to these new restrictions."  The notice, which was distributed to Seagate US, said that Company Two's IBE and IBD were made from ECCN 3E991 technology.  As a result, a BIS license requirement would be triggered if the equipment was "involved in any essential "production" or "development"… including product engineering, manufacture, integration, assembly (mounting), inspection, testing and quality assurance" and the foreign-produced item was destined to or involved a listed Huawei entity.  After receiving this notification, Seagate continued its shipments to Huawei.

## Seagate Extends Huawei Multiple Credit Lines

19. In January 2021, Seagate US was notified that Huawei had placed a purchase order for two million HDDs.  A Seagate US senior manager wrote upon hearing news of the new purchase order, "this is great!!!"  Seagate proceeded to cause the export from abroad or transfer (in-country) of millions of HDDs to Huawei and repeatedly extended credit lines for Huawei's purchases.

20. For example, on or about January 14, 2021, a Seagate credit and collections monitor submitted a request seeking Seagate US authorization to extend Huawei a temporary credit line with Seagate for $280 million.  The new credit line was in addition to Huawei's existing permanent credit line of $120 million as well as a $230 million

---

[11] Yoichiro Hiroi, *Japanese chipmakers scramble to replace Huawei sales after US ban*, NIKKEI Asia (Sept. 16, 2020), https://asia.nikkei.com/Spotlight/Huawei-crackdown/Japanese-chipmakers-scramble-to-replace-Huawei-sales-after-US-ban.

[12] Lisa Wang, *Macronix seeks US break on Huawei*, Taipei Times (Sept. 11, 2020), https://www.taipeitimes.com/News/biz/archives/2020/09/11/2003743175.

Seagate Technology LLC
Seagate Singapore International Headquarters PTE. LTD.
Proposed Charging Letter
Page 7

temporary extension granted in 2019.  Seagate US approved the January 2021 credit line extension for $280 million by close of business on the day of the request.

21. On or about March 17, 2021, an additional temporary line of credit for Huawei of $350 million was sought.  The requestor also noted "that this temp line will be the largest exposure of Seagate following unlimited credit lines if approved."  The request was approved by Seagate US within minutes.

22. On or about July 14, 2021, yet another temporary line of credit for Huawei was sought. This request was for $185 million over the existing $210 million line of credit.  The request noted "that this temp line will be the 3rd largest exposure of Seagate following unlimited credit lines if approved."  This request was approved by Seagate US.

23. On or about September 16, 2021, a Seagate credit and collections monitor again initiated a request for a temporary line of credit for $230 million.  This temporary line was in addition to Huawei's $120 million permanent credit line and would supersede the then-current temporary credit line of $185 million.   Once again, the request was approved by Seagate US.

24. As a result of the approvals detailed above, between in or around January 2021 and in or around September 2021, Seagate US authorized extending to Huawei multiple temporary credit lines totaling more than one billion dollars.  In the meantime, the sales volume and quick timeframe meant that Seagate struggled to maintain production.  On or about December 8, 2020, in a conversation among Seagate US senior leadership, a member of Seagate US senior leadership, in response to an expression of disappointment with the shipping volume requested by a U.S. customer, explained that "On [U.S. customer], we took the numbers down actually, moved supply to support China." Seagate was still unable to meet Huawei's demands for more HDDs.  In an email sent on or about January 18, 2021, among Seagate staff that was marked both "critical" and "urgent," Seagate staff noted that "Huawei is getting anxious as we have been their only HDD supplier since 15Sep'20 and they are close to line down situation should we be unable to support [HDD] Evans pilot shipments."

## Continued Exports from Abroad to and involving Listed Huawei Entities

25. Huawei's push to have Seagate produce an increasing number of HDDs continued as Seagate's competitors declined to ship their items to Huawei absent a BIS license.  By early February 2021, Huawei, attempting to preserve the appearance of being able to maintain its production line despite the BIS Entity List designation, suggested that it would look elsewhere for a supplier: "Huawei is still pushing us on the supply, but this

Seagate Technology LLC
Seagate Singapore International Headquarters PTE. LTD.
Proposed Charging Letter
Page 8

time they add a time line [sic] that if we cannot make more support <u>before end of Feb</u>, will be <u>risk to cancel POs in March</u>." (Emphasis in original.) Seagate began internal discussions about swapping earlier delivery dates of HDDs from other customers and sending the HDDs to Huawei instead.

26. Despite production and supply concerns, Huawei and Seagate Singapore signed a *Long Term Agreement* ("LTA") on or about March 29, 2021. The agreement, in effect between January 1, 2021 – December 31, 2021, and subject to automatic extension unless terminated, was signed on Seagate Singapore's behalf by Seagate US. The LTA "represents the intent of the parties to cooperate in new technology co-development, early access to new [HDD] Products and related business on a worldwide basis." Under the terms of the LTA, Huawei agreed to purchase no less than 5.2 million units of "enterprise class" HDDs "such as mission critical and nearline HDDs" in 2021. Seagate was named a "key strategic supplier" of Huawei and agreed to "regard Huawei as a strategic customer" and "maintain a service team for Huawei." Seagate also agreed to "engage in-depth technical collaboration" and customer support "subject to compliance to US trade entity list rules (if applicable), and any other applicable export related laws and rules, for new product qualification and joint development."

27. Seagate's sales to or involving listed Huawei entities continued until on or about September 29, 2021. By then, more than a year had elapsed since the publication of the August 2020 FDP rule as well as public statements from Seagate's competitors that they had ceased HDD sales to or involving listed Huawei entities. Between on or about August 17, 2020 and on or about September 29, 2021, Seagate ordered or caused the reexport, export from abroad, or transfer (in-country) of approximately 7.4 million HDDs, valued at approximately $1.1 billion, to or involving listed Huawei entities.

28. Through its conduct described above, Seagate US and Seagate Singapore committed 429 violations of Section 764.2(a) of the Regulations, for which they are jointly and severally liable.

Accordingly, Seagate US and Seagate Singapore are hereby notified that an administrative proceeding is instituted against them pursuant to Part 766 of the Regulations for the purpose of obtaining an order imposing administrative sanctions, including, but not limited to any or all of the following:

Seagate Technology LLC
Seagate Singapore International Headquarters PTE. LTD.
Proposed Charging Letter
Page 9

- The maximum civil penalty allowed by law of up to the greater of $353,534 per violation,[13] or twice the value of the transaction that is the basis of the violation;[14]
- Denial of export privileges;
- Exclusion from practice before BIS; and/or
- Any other liability, sanction, or penalty available under law.

If Seagate US and Seagate Singapore fail to answer the charges contained in this letter within 30 days after being served with notice of issuance of this letter, that failure will be treated as a default. See 15 C.F.R. §§ 766.6 and 766.7. If Seagate US and Seagate Singapore default, the Administrative Law Judge may find the charges alleged in this letter are true without a hearing or further notice to Seagate US and Seagate Singapore. The Under Secretary of Commerce for Industry and Security may then impose up to the maximum penalty for the charges in this letter.

Seagate US and Seagate Singapore are further notified that they are entitled to an agency hearing on the record if they file a written demand for one with their answer. See 15 C.F.R. § 766.6. Seagate US and Seagate Singapore are also entitled to be represented by counsel or other authorized representative who has power of attorney to represent them. See 15 C.F.R. §§ 766.3(a) and 766.4.

The Regulations provide for settlement without a hearing. See 15 C.F.R. § 766.18. Should Seagate US and Seagate Singapore have a proposal to settle this case, Seagate US and Seagate Singapore should transmit it to the attorney representing BIS named below.

Seagate US and Seagate Singapore are further notified that under the Small Business Regulatory Enforcement Flexibility Act, Seagate US and Seagate Singapore may be eligible for assistance from the Office of the National Ombudsman of the Small Business Administration in this matter. To determine eligibility and get more information, please see: http://www.sba.gov/ombudsman/.

The U.S. Coast Guard is providing administrative law judge services in connection with the matters set forth in this letter. Accordingly, Seagate US and Seagate Singapore's answer must be filed in accordance with the instructions in Section 766.5(a) of the Regulations with:

U.S. Coast Guard ALJ Docketing Center
40 S. Gay Street
Baltimore, Maryland 21202-4022

---

[13] See 15 C.F.R. § 6.3(c)(6). This amount is subject to annual increases pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Sec. 701 of Public Law 114-74, enacted on November 2, 2015. See 88 Fed. Reg. 3, 5 (Jan. 3, 2023) (adjusting for inflation the maximum civil monetary penalty under ECRA from $328,121 to $353,534, effective January 15, 2023).
[14] See Export Control Reform Act of 2018, 50 U.S.C. § 4819(c)(1)(A) (2019).

Seagate Technology LLC
Seagate Singapore International Headquarters PTE. LTD.
Proposed Charging Letter
Page 10


In addition, a copy of Seagate US and Seagate Singapore's answer must be served on BIS at the following address:

> Chief Counsel for Industry and Security
> Attention: Adrienne Frazier, Esq, and Adam Berry, Esq,
> Room H-3839
> 14th Street and Constitution Avenue, N.W.
> Washington, D.C. 20230

Adrienne Frazier and Adam Berry are the attorneys representing BIS in this case; any communications that Seagate US and Seagate Singapore may wish to have concerning this matter should occur through them.  They may be contacted by telephone at (202) 482-5301.


Sincerely,



John Sonderman
Director
Office of Export Enforcement