**Pages 1 - 40**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Rita F. Lin, Judge

IN RE SEAGATE TECHNOLOGY     )
HOLDINGS PLC SECURITIES     )
LITIGATION.     )
     )   **NO. 3:23-CV-03431-RFL**
     )
_____)

San Francisco, California
Tuesday, March 4, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
     BERNSTEIN, LITOWITZ, BERGER, GROSSMANN, LLP
     1251 Avenue of the Americas, 44th Floor
     New York, NY 10020
   **BY: SALVATORE J. GRAZIANO**
     **ATTORNEY AT LAW**

     BERNSTEIN, LITOWITZ, BERGER, GROSSMANN, LLP
     1251 Avenue of the Americas, 44th Floor
     New York, NY 10020
     **AASIYA F.M. GLOVER**
     **ATTORNEY AT LAW**

     MOTLEY RICE, LLC
     28 Bridgeside Boulevard
     Mt. Pleasant, SC 29464
   **BY: WILLIAM S. NORTON**
     **ATTORNEY AT LAW**

(Appearances continued on following page.)

REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
                     Official United States Reporter

<u>APPEARANCES (CONT.'D):</u>

For Defendants:

WILSON, SONSINI, GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, CA 94304
**BY:  CAZ HASHEMI**
**ATTORNEY AT LAW**

WILSON, SONSINI, GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, CA 94304
**STEPHEN B. STRAIN**
**ATTORNEY AT LAW**

**Tuesday - March 4, 2025**                              **10:04 a.m.**

                              **P R O C E E D I N G S**

                                 ---o0o---

        **THE COURTROOM DEPUTY:**  Calling civil case 23-3431, In Re:  Seagate Technology Holdings PLC Securities Litigation.  Counsel, please come to the podiums and state your appearances for the record beginning with the plaintiffs.

        **MR. GRAZIANO:**  Good morning, Your Honor.  Salvatore Graziano from Bernstein Litowitz from the plaintiffs.

     I have some of my colleagues in court with me today, as well.

        **MR. HASHEMI:**  Good morning, Your Honor.  Caz Hashemi from Wilson Sonsini on behalf of the Seagate defendants.

        **THE COURT:**  Good morning to both of you.

     I put out a notice of questions last week, so let's just walk through the questions I have, and then I can at the end hear anything else you're interested in letting me know.

        So the first question is really for Seagate.  So I'm not going to read the whole question, but in essence, the BIS guidance interpreting the foreign direct product rule refer companies to this Know Your Customer guidance, and in there it says in essence that if a company like Seagate has reasons for concern after inquiring into its compliance with the foreign direct product rule, it should either refrain from the transaction or submit all the relevant information to BIS in

the form of an application for a license or some other form so BIS can give guidance.

So by representing that Seagate was in compliance with the applicable regulations, was Seagate representing that it was aware of this guidance and in compliance with the regulations as interpreted by the guidance?  Let's just start with that question.

**MR. HASHEMI:**  Thank you for the question, Your Honor. And may it please the Court.  It's great to be in your courtroom again.

The reasonable inferences that can be drawn from the amended complaint answer Your Honor's questions, because Seagate publicly said it will continue to sell to Huawei after the foreign direct product rule, it's reasonable to infer it was aware of and in compliance with this guidance.  This shows even more why plaintiffs have not come close to pleading scienter under the alleged facts and the applicable legal standard.

As Your Honor noted, the guidance is about Know Your Customer.  Here the end user was obviously Huawei; everyone knew that.

Did Seagate have a concern that its sales to Huawei were not in compliance with the EAR after the rule was issued and after conducting an analysis inquiry or due diligence?  That goes to the heart of the matter, Your Honor.

**THE COURT:** So let me just stop you before you get into that issue, because I want to make sure I am on the same page with you as to the preceding question.

So really the preceding question, before we get into whether Seagate had reasons for concern, is: Was Seagate representing, when it said that it was in compliance with the DPR regulation, that it was in compliance with the Know Your Customer guidance?

I hear you saying "yes" to that question and then kind of moving on to the next question. Am I understanding you correctly?

**MR. HASHEMI:** Yes. The know your guidance -- Know Your Customer guidance, Your Honor, is about knowing your customer, and everyone knew the end user and customer here was Huawei.

**THE COURT:** So is it fair to say, then, that Seagate was representing that it had no reasons for concern that its sales to Huawei violated the foreign direct product rule?

**MR. HASHEMI:** It's the same. And respectfully, this is the same issue the Court addressed previously, and it compels the same result, because --

**THE COURT:** Well, I just want to know. What is the answer? Is it "yes," or is it "no," or is it something else?

**MR. HASHEMI:** There are no allegations in the

complaint that the company did not engage in an analysis inquiry or --

**THE COURT:** I know that's your position, but I want to know: Was Seagate representing that it had reason -- it had no reason for concern that its sales to Huawei violated the foreign direct product rule?

**MR. HASHEMI:** Yes, that's the reasonable inference that could be drawn from the allegations of the complaint, Your Honor.

**THE COURT:** Okay.

**MR. HASHEMI:** But the key is under the federal securities laws, it's not our burden. It's their burden to allege facts that the allegations, specific facts that the in-house team, external team on export issues did not engage in an inquiry or assessment. It's their burden to allege facts that Dr. Mosley or Mr. Romano, two nonlawyers, two non-export experts, that the sales to Huawei, they have to allege specific facts that they knew that that was unlawful. There's nothing in their complaint that says that. It's the exact opposite inference --

**THE COURT:** I'd like to move on to question 2 now. So I broke these up for a reason. So I wanted to focus on question one to understand what Seagate's view was as to what it had represented when it represented it was in compliance. I hear you conceding that Seagate was representing that it

believed itself to be in compliance with the foreign direct product rule and with this Know Your Customer guidance, and that it believed that there were no reasons for concern as to its compliance with the foreign direct product rule.

So we're moving on to question 2 now, which is:  Was there a reason for concern, and did Seagate know that there were reasons for concern about legality?  So let's hear what you have to say about that.

**MR. HASHEMI:**  Sure.

If I can start with the predicate, again, if you'd indulge me, Your Honor.  Again, it's the plaintiffs' burden to make specific factual allegations that inferences can be drawn of culpable conduct.  There are no allegations in the complaint that Seagate did not engage in analysis or inquiry.  There is no allegations.  There's simply nothing in the complaint on these topics that the company or anyone inside the company believed sales to Huawei were illegal.  The exact opposite inference can come from the allegations of the complaint, Your Honor.

First, on the first day of the class period, September 14th, 2020, one month after the rule was passed, the company publicly acknowledged it would continue to sell to Huawei and publicly disclosed, quote:  We don't think we need to have a specific license, end quote.  Nothing in the complaint, nothing shows that that belief was not, in fact,

held by the company after an assessment or that it ever changed.

No contemporaneous allegations, no confidential witnesses, no internal documents.

Two, Seagate's response to the proposed charging letter two years later noted that Seagate and BIS disagree about Seagate's assessment of the rule.  Seagate said in an SEC filing, exhibit 14, quote:  The company has responded to the PCL, proposed charging letter, setting forth its position that it did not engage in prohibited conduct.  It further said, quote:  Seagate believes it has complied with all relevant export laws and regulations, end quote, even after receiving the BIS charging letter.

It further disclosed, quote:  The company believes these allegations are without merit and will defend itself vigorously.  Also stated that the company had, quote:  A global team of international trade compliance and legal professionals, end quote.

The third thing that shows there is no reasons for concern, Your Honor, the inference that you can draw on from the allegations of the complaint, is the BIS settlement agreement itself, exhibit 16.  BIS' ultimate determination that Seagate incorrectly interpreted the rule necessarily presupposes that the company did do an inquiry.  How could BIS take issue with how Seagate interpreted and assessed the rule

when it was issued if Seagate didn't interpret and assess the rule when it was issued?

Your Honor, and although this may be all relevant if BIS and Seagate were litigating and arguing about the interpretation of this complicated new regulation that was put in place regarding the complicated manufacturing process of Seagate, which is a multistage process.  What does the Ninth Circuit require in this type of case, a securities fraud case?  And the Ninth Circuit precedent --

**THE COURT:**  Before we get into that, on the issue of whether Seagate knew there were reasons for concern, I don't necessarily read the complaint as saying that Seagate failed to conduct an inquiry.

**MR. HASHEMI:**  Uh-huh.

**THE COURT:**  And I agree with you that there are a lot of indications that Seagate, at least at the outset, believed that it was in compliance with the foreign direct product rule. The reason I'm so focused on this term, "reasons for concern," is because I think what the complaint is saying is that Seagate, after doing whatever inquiry it did, knew that at the very least there was a reason for concern.

Seagate might have believed that it ultimately would prevail and that it had the right interpretation, but it's hard for me to imagine that Seagate didn't think that there was any reason for concern that its interpretation of the foreign

direct product rule would be different than what BIS ultimately concluded and what the Senate commerce committee ultimately concluded.

So it does seem to me significant that there were these moments when Seagate initially started talking about Huawei and said it was selling to Huawei in September 2020, but then by October they start saying, even in response to direct questions about Huawei they start saying, oh, we don't talk about who our customers are, and then they don't announce this major partnership with Huawei, which is highly profitable and normally the type of thing they would announce.

So are those allegations sufficient to indicate that Seagate knew there was a reason for concern after their investigation, especially in conjunction with the finding from the Senate commerce committee that Seagate -- that Seagate essentially knowingly violated the foreign direct product rule starting in September 2020 through October 2021?

**MR. HASHEMI:** The minority staff, Senator Wicker's staff, the -- not -- I think they -- I can address each one of those, but if I can start it under the federal -- I'll get to the reasons for concerns. Respectfully that's not the standard under the federal securities laws. As the Court noted in its previous dismissal order, the standard is allegations sufficient that the defendant knew that the continued sales to Huawei violated the FDPR or were deliberately reckless in that

belief.  There's no allegation of that.

With respect to even the reasons for concern, Your Honor, where is the --

**THE COURT:**  If you could change -- I understand what you're saying about the legal standard generally, but the legal standard is whether the statement you made was true -- whether Seagate knew the statement made was false, right?

**MR. HASHEMI:**  Correct.

**THE COURT:**  So the statement at issue, though, is we're in compliance with this Know Your Customer guidance, and so we had no reason for concern, that's why we never asked for a license.  That's the representation.  So when the representation is "we had no reason for concern," then the inquiry is:  Did Seagate know that it did have reason for concern.

**MR. HASHEMI:**  Where is the allegation, respectfully, where it said Seagate had reasons for concern?  Where is the allegation?  I read the entire 300 paragraphs.  There's not a single paragraph, sentence or word that speaks to Dr. Mosley, Mr. Romano, anyone's belief internal at Seagate.

We're doing leaps upon leaps on inferences and guesses and speculation.

Your Honor said in your dismissal order previously, where are the allegations regarding what Seagate did internally?  It's just based on guesses.

Your Honor, Ninth Circuit controlling precedent addresses your question, if I could just have one minute on it.  *City of Dearborn versus Align,* 856 F.3d, the Ninth Circuit addressed the situation that is nearly on all fours with this one.

**THE COURT:**  I'm sorry, I didn't get the end of the citation.

**MR. HASHEMI:**  Sure.  *City of Dearborn Versus Align*, 856 F.3d 605, 2017, the Ninth Circuit addressed goodwill -- interim goodwill testing.  Plaintiffs alleged in that case that the company had overvalued its good will, and facts later rose that should have alerted the company that it needed to conduct an interim goodwill assessment.

Plaintiffs cited confidential witnesses in support.  No confidential witnesses here.  Plaintiffs argued that company's failure to conduct the interim goodwill impairment testing demonstrated scienter.  Notably, later the company wrote down $80 million of good will, the entirety of the good will.

The Ninth Circuit observed that Align needed only conduct the interim testing if it concluded after assessing the totality of events that the circumstances would likely cause impairment.  And here's the language, Your Honor.  The Ninth Circuit said a company, quote:  A company's mere knowledge of negative factors that could potentially indicate goodwill impairment does not support an inference that a corporation acted with scienter in exercising its judgment, end quote.

That's at 621.

The Court further said:  To plead an inference of scienter in this context, a plaintiff must allege additional facts that call into question the manner in which the corporation conducted its goodwill analysis, end quote.  The Court found the plaintiff failed to allege the precise assumptions defendants used in its goodwill analysis.  Without those allegations, it wasn't known what factors the company considered.  The Court therefore concluded, quote:  The more compelling inference is that defendants made a good-faith but mistaken determination in its goodwill evaluations, end quote. Plaintiffs ignore Align in its opposition.

Here --

**THE COURT:**  I could see the logic of that in a situation where the representation is we're in compliance with the law or this is what our good will is valid at.  But when the representation is there are no reasons for concern, then the analysis is a little different.  So help me understand how the allegations that I listed out aren't sufficient to show that Seagate had to recognize that there was a reason for concern or that Seagate behaved in a way that indicated it knew there were reasons for concern, like not announcing this giant partnership that it developed with Huawei and keeping that from the market.

**MR. HASHEMI:**  Well, I would ask the plaintiffs, my

friend, by the way, who they didn't use the phrase "reasons for concerns" in the complaint or in their opposition, and I would again respectfully submit that I think it's changing the standard.  But even using the language you're using, where are the well-pled facts about how Seagate analyzed a rule and that it caused reasons for concern?  Where are the factors and assumptions that went into Seagate's analysis that showed there were reasons for concern?  Who analyzed the issue?  Where are the contemporaneous facts showing that analysis was inconsistent with their public statements?  That's the securities law framework, Your Honor.  They need to allege specific facts the defendants were told this was illegal but made their compliance statements anyway.  That's what the standard is that *Align* set.  It's very analogous to a situation where the company said, this is our good will, it doesn't need to be impaired.  There were factors that later the plaintiffs pointed to that it should have put you on notice it needed to be impaired.

            **THE COURT:**  Do you have a case that's more than like ours, you know, I think the analogy in the goodwill context would be if the company said there are no reasons to doubt that the goodwill number that we've put out is the accurate one, we are absolutely certain that this is the number and there is no room for debate on the issue.  No one could come to a different conclusion as to this.

Is there a case that's kind of more like that that you'd point me to?

**MR. HASHEMI:**  We have cases that we've cited from the Ninth Circuit regarding the good-faith belief of companies. That was in our motion at -- we cited cases at our reply at 10. But Your Honor, that's not what Seagate said.  Seagate didn't say that.  They said the public statements are we believe we can continue to sell with the -- to Huawei without a license. We're taking a leap and creating a new standard that does not exist, and --

**THE COURT:**  I started out with question 1, isn't Seagate representing that it believed there were no reasons for concern when it --

**MR. HASHEMI:**  I think the reasonable --

**THE COURT:**  -- said that it was complying with the regulations, which require you to go to BIS if you have a reason for concern, instead of continuing to sell?

**MR. HASHEMI:**  Yeah, the -- I would respectfully say there are no -- again, it's the plaintiffs' burden to allege that whatever Seagate said, that a reasonable inference is consistent with culpable conduct as required by Ninth Circuit standard of deliberate recklessness, which is a form of knowing and conscious misconduct, and there is not a single allegation about what Seagate did to conduct their analysis.

How do we get to the point that we have to assume there

was a reason for concern that therefore then triggers the deliberate recklessness standards of the reform act?  I don't believe Your Honor can do that.  And none of this was briefed, this standard.

And if there's any inclination for the Court to use this standard, I would respectfully suggest that we have the opportunity to brief it, because it is not the correct standard under the Ninth Circuit precedent.

**THE COURT:**  You have briefed the issue.  It's just that the cases all deal with a situation where the statement is about compliance with the law and not about there being no reason for concern.  I couldn't find in the cases that you had cited an analogous representation and so I was hoping you had one that you could refer me to, but I'm hearing that there's not really something that's exactly on point.

**MR. HASHEMI:**  But if we do that, Your Honor, we'd be changing the standard of deliberate recklessness to reasons for concern.  That's~-- the mental state that needs to be put in place is the high pleading standard that Congress put in place and the Ninth Circuit has interpreted for over 30 years, and that is a intentional misconduct.  So it would be literally allegations --

**THE COURT:**  I suppose my question is:  How does that standard apply in a situation where the representation is that there is no doubt or no reason for concern?

**MR. HASHEMI:**  Your Honor, I would say respectfully what Seagate said was, we are in compliance with the regulations, which means a reasonable inference is that they engaged in a good-faith evaluation of that and felt they were in compliance with.

And the Know Your Customer, Your Honor, that guidance is about trying to figure out who the customer is.  That's what the guidance is about is when you have a red flag about do you not know who the customer is.  The Know Your Customer guidance is about whether you have issues, not whether you actually know who the end user is.  Here everyone knew it was Huawei.  No one represented that it Huawei.  The company said, we're gonna sell to Huawei.  We -- the rule came in a month earlier.  So I'm having trouble understanding how we get to the leap that the company's analysis was so infirm or so wrong that these individuals and the company, when it made a false statement about that with the requisite state of mind, there's not a single allegation, not a single one, about what the analysis was.  So how are we leaping to this conclusion that they made it knowingly?

There's nothing in the record --

**THE COURT:**  What about the allegation that they didn't announce this partnership with Huawei in December 2020?  I saw that in plaintiffs' complaint and in the papers, but I didn't see really a response from Seagate on that.

**MR. HASHEMI:** So, Your Honor, the issue -- that came out in December of 2020. The company announced in September that it's going to continue sales to Huawei. I think everyone knew that. So there's no concealment of the fact that they're going to continue a partnership with Huawei. Everyone announced that. It was announced in September of 2020. Our motion and Your Honor noticed that -- confirmed that in the order previously.

And in any event, there is no duty to disclose under the federal securities laws. A fundamental tenet of federal securities laws established 37 years ago by the Supreme Court is that, quote: Silence absent a duty to disclose is not misleading on Rule 10(b)(5), end quote.

**THE COURT:** It's not misleading on its own, but doesn't it support an inference of scienter? I get that they had said they were continuing to sell with Huawei, but there's a difference between continuing to sell to a customer entering this strategic partnership to the tune of hundreds of millions of dollars and not even mentioning it to your investors, which normally would be something you'd want to tout to your investors.

So I'm just wondering why is it that the Court wouldn't draw an inference that Seagate failed to announce this due to a concern about the -- their reliance on Huawei sales?

**MR. HASHEMI:** Your Honor, there is no authority cited

that for the proposition that Seagate had a duty to disclose this type of partnership. There is no duty to disclose for companies that partnerships are the customers.

THE COURT: But not a duty to disclose, couldn't it still be a basis for inferring scienter?

MR. HASHEMI: No, Your Honor, because that's just -- they don't comment on any customers. The record and the allegations are that Seagate does not comment on customers. And we're creating a duty when none exists. And there's no allegation that Mr. Romano or Dr. Mosley were told of this duty and decided not to disclose it. There has to be some knowledge put on the individual defendants and Seagate to meet the standard of knowing or conscious misconduct. When there's no duty to disclose and there is -- under the law it's a fundamental tenet of the securities laws that you don't have to disclose any, every and all information.

In *Matrix* the Court said -- specifically addressed this, the Supreme Court: The federal securities laws, quote, do not create an affirmative duty to disclosure (sic) any and all material information. Even with respect to information that a reasonable investor might consider material, companies can control what they disclose under the provisions by controlling what they said in the market, end quote. That's *Matrix*, 563 U.S. at 44 to 45.

THE COURT: Even if the statement doesn't itself

support an independent claim, the failure to disclose the strategic partnership wouldn't support an independent claim because it -- there's no duty to disclose that partnership. The hiding of the partnership and that failure to disclose it can be a basis for inferring that Seagate was trying not to tell investors about its reliance on Huawei, and therefore that Seagate had concern that its sales to Huawei could ultimately be found to be illegal.

MR. HASHEMI:  Where is the allegation that says -- that supports that inference?

THE COURT:  That's the question I have about -- that's the question I have about the --

MR. HASHEMI:  Partnership?

THE COURT:  About scienter.  Why -- I understand that the failure to disclose a strategic partnership is not itself the basis for an independent claim.  However, it can be a fact that is supportive of a strong inference of scienter.  Why else would Seagate be hiding its sales to Huawei?

MR. HASHEMI:  Your Honor, respectfully you keep saying the word "hiding".  There's nothing in the record.  There is no specific facts pled that the defendants, individuals were engaged in any type of hiding.  It's the exact opposite.  They disclosed to the public they're going to sell to Huawei. There's no duty, if I may --

THE COURT:  But they said that in September 2020, but

did they say that again after that?  It looked to me like the allegations were that after September 2020 something happened, and they found out everybody else stopped selling to Huawei, and then they just stopped talking about it.  Am I misreading the complaint, or is there something later on that shows that they kept talking about Huawei?

MR. HASHEMI:  I don't think there is any allegations in the complaint, none, going into the analysis that was conducted internally at Seagate.  The words that are being used, respectfully, are hiding, not sharing, nefarious terms that not supported by any allegations in the complaint. Literally nothing, nothing is said about these other cases I mentioned, Ninth Circuit where it was affirmed dismissal, there were confidential witnesses.  That's what we're normally talking about.

There's none here talking --

Your Honor noted in your dismissal order there's nothing. The supplier warning letters, the law firm client alerts, the sales to Huawei, these -- also, the strategic agreement was in the prior complaint, as well.  None of this is alleged to go into what the actual thinking was within the company, and that's what *Align* and the other cases say.  You must allege additional facts saying what the actual analysis was, what the presumption was.  On every one of these issues what was the analysis the company did with respect to the strategic

partnership?  What was the analysis it did with respect to saying, we're in compliance with laws and we don't need to talk about the continued relationship with Huawei?  There's nothing in there.

We are making guesses and conjecture.  This is what the Ninth Circuit has instructed not to do, not to engage in conjecture and speculation when there's no well-pled facts.  I can't read anywhere in the 300-page paragraph (sic) where it talks about Seagate's actual analysis of these issues, how Seagate interpreted it, how Seagate went about it.  And clearly by the time the PCL came, the charging letter, they said they're going to defend it vigorously.  They did not believe they were in violation of the law at the time of the compliance statements.  So why would you talk about something if you don't believe you're doing anything unlawful?  There's -- there's -- and they spoke to it at the beginning of the class period, Your Honor, and they spoke it two years later, they were in compliance.  I just think we're making a lot of inferential leaps not supported by the well-pled allegations in the complaint.

THE COURT:  Let me give plaintiff an opportunity to respond.

MR. GRAZIANO:  Your Honor, I'd like to actually respond to question 1 and 2 even though you acknowledge they were for Seagate.  And first I think very importantly, we

agree with them that the answers to question 1 -- and there really are two questions there -- are both "yes," and those answers take us a long way in terms of the analysis of this complaint.

So first, was Seagate representing that it was in compliance with the regulations, and by saying so, was it acknowledging that it was aware of the guidance?  The answer is "yes," and I want to walk you through some of their specific statements to make that crystal clear.

Secondly, was that then a representation that Seagate had no reasons for concern?  And the answer there again is "yes".

So breaking them in pieces, first, were they representing they were aware of the guidance?  Just two examples of specific statements they made.

Paragraph 170, October 22nd, 2020, Defendant Mosley, the CEO:  We continually monitor and remain in compliance with all the rules and regulations around.

Just one more, but there's plenty in the complaint. June 8th, 2021, Defendant Romano -- and again, they're being asked specifically, are you still selling to Huawei.  They're not answering that.  They're being evasive.  But this is what ROM says, the CFO:  The truth is, we can comply with all of the rules and regulations, and based on that, we ship to all of our customers following those rules and regulations.  It is part of our job to ensure that we understand and then follow all the

rules and regulations of trade.

So obviously, Your Honor, the answer couldn't be more strongly "yes," they were representing they were aware of the guidance.

So now secondly, were they saying, therefore, that they had no reasons for concern?  And first the guidance they claimed to be in compliance with specifically included this standard that Your Honor highlighted in your questions.  In our opposition brief we cite to this on page 12.  And the Know Your Customer guidance is part of what they said they were in compliance with.

That guidance does not, as we have in paragraphs 42 to 43 of the complaint, require positive knowledge or even substantial certainty that a transaction is legal.  That's not what's required.  That's not what their statements are representing.

And in terms of what to do, if there were any reasons for concern, there would have to be an inquiry made to the BIS.  We know that did not happen here.  So by definition, the second part of question one, they were repeatedly representing they had no reasons for concern.  Your Honor, they were doing this at a time when all of their competitors stopped selling to Huawei and said the law is pretty straightforward.

So I don't know how they get out of that falsity box that they put themselves in.  I don't know how they could honestly

say they had no reasons for concern, given what the regulations required which they failed to do, what their customers were saying.

And we're going to go into more in terms of question 2, but just sticking with question 1, and we have a direct case on point from the Supreme Court of the United States, the *Omnicare* case, 575 U.S. 175. And the Supreme Court has instructed us that: In the context of the securities market, an investor, though recognizing that legal opinions can prove wrong in the end, still likely expects that such an assertion to rest on some meaningful legal inquiry rather than mere intuition.

So here the meaningful legal inquiry is directed by the rules, the regulations, and they say you have to go to the BIS. And we know that this company did not do that. There is no question that Seagate did not go to BIS while continuing to sell $1 billion of hard disk drives to Huawei until they started being examined by the Congressional committee.

More importantly, Your Honor, there is this embedded confusion that persists in the case that somehow Seagate announced on the beginning of the class period that they were still selling to Huawei. The statement they made in September 14th of 2020 was not that they're continuing to sell to Huawei. What they said -- and this was Defendant Romano who spoke in paragraph 166 of the complaint: I don't see any particular restriction for us in terms of being able to

continue to ship to Huawei or any other customers.  He's not saying, we're still -- we're still selling.  He's saying he didn't see any restriction, and he said he would look into it. That's what he said.

There's very little acknowledgment.

So now shifting to question 2:  In combination with indicators that Seagate's competitors are no longer selling to Huawei, do these allegations support a strong inference that by December of 2020, Seagate knew there were reasons for concern? And then the second part of question 2 is the findings of the Senate commerce committee and BIS' historically large fine to Seagate.

So first, what are the indicators that Seagate had reasons for concern?  And unlike my colleague, I see these all over the complaint, and I just want to delineate some of them for Your Honor without going into too much detail.  The reasons for concern indicia in the complaint are:

Number one, repeated steps by the Seagate and each of the officers at issue, Romano and Mosley, to dodge direct questions as to whether or not they were selling to Huawei.

Number two, to not announce strategic partnerships they had reached with Huawei that of course Romano and Mosley knew about.  These were billion dollars of sales.  These were announcements that were typically made by this company in much smaller circumstances that we delineate in the complaint in

paragraphs 84 and paragraph 92.

But it's more than that, Your Honor.  They're not just refusing to answer questions to investors, refusing to announce strategic partnership agreements.  They get an inquiry from Congress.  They refuse to answer that.  They get a second inquiry from Congress, they refuse to answer that.  Only when Congress gets confidential information from the BIS do they suddenly stop selling to Seagate (sic) and then respond to Congress.  By that time they had sold over a billion dollars.  They had issued over a billion dollars of credit.

They also -- this is something, we clarify it in our amendment.  They also violated GAAP.  And I know we have a dispute on this, but under the GAAP rules in paragraph 54 of our complaint, if you cross the 10 percent threshold, even in a quarter, not just annual, anytime an income statement is filed is what GAAP says, you have a requirement to disclose the customer breached the 10 percent rule.  We have a quarter where sales to Seagate were 13.42 percent.  That's another example of them refusing to tell investors what's going on.  They violate GAAP because they don't want to say this.  They don't want to disclose this.

And we'll cite a case to Your Honor, *SEC v. Cotton*, 2006 Westlaw 6382128, that this is not the time to resolve a heated GAAP dispute between the parties.  This is the subject for expert testimony, and that is what that case says.

There's no question defendants knew about this GAAP rule, because defendant Romano, the CFO, had talked about it earlier during the class period, and that was in paragraph 213 of the complaint.

So all of these facts, Your Honor --

**THE COURT:**  I have a question about the GAAP rule that you mentioned, because when I looked at the GAAP rules that the parties had cited, it looked to me like the GAAP rule that you're relying on is in this section that is really about the entire entity, disclosures having to do with the whole entity's sales.  And then there's a provision saying that that's only on an annual basis and not on a quarterly basis, and there's no allegation that at the point you're focused on, that Huawei had crossed the 10 percent threshold on an annual basis, it's just that they had crossed it for that particular quarter.

So help me understand what plaintiffs' GAAP theory is.

**MR. HASHEMI:**  Sure.

So it's in paragraph 54, footnote 7 of the complaint we cite the specific GAAP rule at issue.  That's 280-10-50-19. And there it talks about major customer disclosure, and it says:  Public entities are required to make the disclosure, quote, for each period for which an income statement is presented.  Seagate presented an income statement in each of its Forms 10-K.

Therefore, they violated this rule specifically in the one

quarter where sales breached the 10 percent threshold.  So the basic point is the rule applies quarterly, not just annually. And Seagate knew about this because, in fact, in paragraph 213 of the complaint, defendant Romano, the CFO, is actually talking about the same rule in the context of quarters.  And I think it would be helpful if I just read to you what he said, and this is in paragraph 213.  He says:  We don't disclose the level of revenue of specific customers, but as you know, we should report it if the customer is above 10 percent.  So you can assume they are not at that level.  So he's talking about the 10 percent rule, the same rule I'm talking about, in the context of a quarter at the start of the class period, because he's being asked in September 14th of 2020, not year end, what Huawei's contribution was -- what Seagate's sales to Huawei contributed to their revenue.

So there's absolutely a quarterly disclosure violation of GAAP here, and --

**THE COURT:**  It's -- but the GAAP rules say that issuers are encouraged to report that.  But for the quarterly, in a situation where it's each period in which the income statement is presented, which is 280-10-50-20, that requirement I think refers to 280-10-50-19, which is saying that issuers are encouraged to report information about segments that do not meet the quantitative thresholds?

And then for the entity-wide disclosures it says that

that's only on an annual basis.

**MR. GRAZIANO:** Right. I think we're talking about two different things.

The encouragement is when the quantitative numbers don't meet the level that management believes is material. But once you get to 10 percent, the rule is in effect. There's no materiality judgment at that point. That is when you get to the threshold for which disclosure is required under the rule. That's how we understand the rule from consultation with our experts, and we can do a further submission on that.

But Your Honor, I would like to go back to question 2 if possible. So I was pointing out that besides competitors not selling to Huawei, we have plenty of other allegations demonstrating Seagate's reasons for concern contrary to the representations, and the GAAP violation rule is one of them, but the failure to comply with investor questions, congressional inquiry and the like is very strong evidence. We're talking about the -- we're talking about strong inference standard at this point, but there's a second part of that question number 2 that Your Honor asked about which I think is very important for this case, which is: What about the BIS' large fine to Seagate.

Because we know from the complaint that the BIS has a stated policy of dealing with a good-faith mistake with only a warning letter. We know in this case that the fine that the

BIS imposes was the largest in history.  We know that there's specific guidance that the BIS put out, both in general, and then they talked about this case in particular.  And that is that fines and penalties should be imposed only for egregious conduct.

So, first, the regulations generally say in paragraph 65 of our complaint that negligent violations or good-faith mistakes will receive no action or a warning letter.  Second, we have in paragraphs 64 through 65 of our complaint that the BIS will apply an upward adjustment if the conduct is egregious, if there are aggregating factors, such as willful or reckless violations of the law, concealment, a pattern of conduct, prior notice, management involvement, awareness of the conduct, actual knowledge, reasons to know.

And in this case, Your Honor, we are worlds away from no action or a warning letter.  We have the largest fine in the BIS' history of $300 million, nearly three times what the guidance would have called for.  In addition, a requirement to submit to three years of external audits on compliance.  And according just to the numbers, before I get to Michael Axeral's (phonetic) commentary on this, just the numbers, they scream of a willful or reckless violation of law.

**THE COURT:**  I'm familiar with the allegations.  I just want to be conscious of time, because I have another case on after you that will probably be long also.

I just want to make sure to focus on the Senate commerce committee component of the question.  This really takes us into question 3, and then I'll give Seagate an opportunity to respond and have the last word on that.

But, so the commerce committee report, I recognize it's the minority report, it says:  It appears that Seagate knowingly violated the FDPR for more than a year.  So then, but the problem is that committee report doesn't really explain what the underlying evidence is that they've relied on.  So how can I rely on that finding without knowing what the evidence is specifically, the nonpublic evidence is that they relied on when they're saying they interviewed the Seagate employees and others on this topic?

**MR. GRAZIANO:**  We brought some cases for the Court to address this issue that are not in the briefs, and I'll walk you through them.  But first just generally at this stage we are not required to plead evidence.  The commerce committee's findings of a knowing violation should be taken into account as part of the Court's holistic analysis, and the ultimate findings should be enough under the *Tellabs* standard.

So what cases am I talking about specifically?  We looked at this as comparable to when there have been other cases where there was an SEC finding or a congressional committee finding, an outside accounting firm or some other administrative agency, and we have cases across the board on this where very similar

patterns have emerged.

So first, in *York County versus Hewlett Packard*, the Ninth Circuit, 65 F.4th 459, at 461, Note 1, relied heavily on an SEC cease and desist order, and it did not have the underlying interviews and documents that the SEC had.  The SEC cease and desist orders are usually less than 10 pages long, but that was enough for the Ninth Circuit.

In *Erickson V. Corinthian Colleges*, 215 Westlaw 12732435 at Star 15, the Central District of California judge specifically relied on a congressional committee report, and the allegation there was that there was churning going on and that -- and the Court said specifically:  If these churn findings are true, they could render the defendant's statements misleading, and the Court relied on them, taking them as true for the purposes of motion to dismiss, because we are in the world of competing inferences, we are not in the world of pleading evidence at this moment in time.

Another case regarding an administrative agency was *McPhail versus First Command*, 2006 Westlaw 8455139, Southern District of California case from 2006.  The quote here is:  Courts generally have allowed plaintiffs to satisfy particularity and scienter requirements with the findings of an administrative agency.

So this is nothing new, Your Honor.

We have another case.  It's getting to be a lot.  I'll

just say it quickly, *Wilmington Trust Bank*.  The reliance there was on the Federal Reserve bank's findings that there were extensive failings in lending and risk management at Wilmington Trust, and they were used not against Wilmington Trust, but against the outside auditor, KPMG.  And that's 29 F.Supp.3d at 432.

Your Honor, I also want to just take slight issue with the premise that all we have is the ultimate conclusion of the committee, because we do have a lot of detail that came from them, right?  We have the refusal to cooperate more than once, we have the sudden willingness to meet once the committee obtained confidential information from the BIS, we have what I think is the shocking allegation in paragraph 103 that even when all this happened, there was evidence that Seagate was starting to plan around doing this again through a Seagate subsidiary.  And that's not just in the committee report.  It is there.  It's in the exhibit the defense has cited, but it's also in a Bloomberg article.

And, Your Honor, there are just a mountain of additional allegations in the complaint.  And I know we're pressed on time, so I promise to be brief.  But Seagate received a letter from one of its two providers for the technology, and this wasn't like some small product that was dropped into a bigger product.  The only use for the technology was to make these hard disk drives.  The argument that somehow they misunderstood

because it was an early phase or not the final phase, it doesn't even hold up logically.  These HDDs were nothing but a direct product of the prohibited technology.

There is just no comprehensible way we can read their arguments.

And after that letter came in to them, over 850 million, or 77 percent of their legal sales happened then.

**THE COURT:**  I remember this argument well from the briefing, but let me just give defendant an opportunity to respond as to question 3 and anything else you have left.  I'm going to give you the last word on this.

**MR. HASHEMI:**  So, thank you, Your Honor.

Just briefly on *Omnicare*.  As with the last argument, we embrace *Omnicare*.  The burden plaintiff wants to do is to shift it to defendants.  The burden is on plaintiffs.  There is no allegation there was no meaningful legal inquiry, and that Seagate's analysis rested on mere intuition.

I'll cite two other Ninth Circuit cases just for Your Honor to consider.  Both involved confidential witnesses; none here.

On the red flags, *Davilo (phonetic) v. Costco*, 854 F.3d 116-117, the Court said expressly that scienter -- rejected plaintiff's argument that scienter can be pled by alleging red flags regarding a possible misstatement because such a standard is effectively a negligence standard.

And second, Your Honor, *Endologics*, which we cited last time.  Again, the plaintiffs ignore.  Engaging in a first-level problem, why would defendants promise the market that the FDA would approve it if they believed they wouldn't?

And, Your Honor, in its dismissal order at 10, Seagate really believed its sales to Huawei to be legal, but it is hard to understand why the company publicly said it will continue to sell to Huawei after the rule was in place.

If I can address a lot of the things plaintiff said, I would respectfully submit that nothing in argument would have satisfied the requirements the Ninth Circuit has set in the *Align* case for an analysis like this.

On the concealment point, again, nothing was concealed.  They said it on the first day.  Our motion made clear the market was aware of it.  That's our motion at 3.  And the company repeatedly stated that it was -- it believed it was in compliance with the rules and regulations.  As I mentioned, there's no duty to answer questions, and plaintiffs do not cite any case law to support that.

And under an omissions theory under the federal securities laws, it must an extreme departure from the standard of ordinary care.  It must be so obvious that they must have known.  There's no allegation about Dr. Mosley or Mr. Romano it was so obvious they must have known.

We've covered the competitors' action, Your Honor.

Discussed it in the order, that it says nothing about Seagate's analysis.

I didn't get a chance to talk about the Senate commerce findings. We don't believe the Court can rely on it at all.

First of all, it said it was appeared there was a knowing violation.

Second this is a minority staff's report for the ranking member, Senator Wicker, of Mississippi. They did not provide any information on the following: No allegation regarding what testimony or evidence the committee reviewed, no allegation of facts before the committee undermined the statement, no allegation how Seagate presented its position and whether the position was in any way inconsistent with its public statements.

Without any of this, we're just left with rank speculation.

On the size of the penalty, because this is a securities fraud case they must plead specific contemporaneous facts showing scienter. The law in the Ninth Circuit has been for decades and continues to be that a security fraud complaint cannot be pled on hindsight.

When the Court dismissed the prior complaint, the Court found the allegations regarding the size of the penalty do not provide an adequate basis. We cited case, again, similarly in our motion at 18 supporting that note -- that finding.

Instead, plaintiffs invite this Court to guess what BIS was thinking and how the settlement amount was reached.  Trying to guess why BIS did not issue a warning letter is purely a guess.  They plead no contemporaneous facts.  There is no allegation that BIS made a finding of knowing, negligent, reckless or any of the sort, but they want the Court to make that inferential leap.

Your Honor, if you have no questions on that, I have one other thing to say before closing.  You know, the Court must take into account competing inferences.  We did this last time.  And as I mentioned, a company over 10 billion in revenue, it's hard to imagine that just Dr. Mosley and Romano got together and tried to figure out this complicated new export regulation rule on their complicated manufacturing process.

You know, the core of this securities fraud case, Your Honor, has been and continues to be whether the allegations show that Seagate and the individual defendants knew they were violating the rule when they were selling to Huawei, and previously the Court found that the allegations were based on hindsight.  There's nothing has changed.  Nothing in this complaint speaks to the individual defendants' knowledge or Seagate's knowledge.  As I mentioned, on the contrary, the opposite inference is shown to the allegations in the complaint.

One, they announced it;

Two, the public knew they were selling to Huawei;

Three, after receiving the charging letter they said, we're still in compliance; and

Four, there was no knowing violation found by BIS.

And, Your Honor, trying to take a disagreement between BIS and a private company, the difference of opinion of how a new regulation should be implemented -- and that's what it was, between a company and the U.S. Government -- and turning that into a securities fraud case is exactly what Congress wanted to stop when it enacted the Private Securities Litigation Reform Act.

Because if this case gets past the pleading stage because of a regulatory disagreement between a company and the government, and then they have to now deal with a fraud suit, when there was no finding of a knowing violation I think would be setting a bad precedent, Your Honor, and that's what we have here.  And just throwing everything at the wall to get past the pleading stage is what Congress tried to stop in the reform act and I think the Ninth Circuit has recognized.

**MR. HASHEMI:**  Your Honor, may I just make one brief point I didn't make before?

The notion that Mosley and Romano were unaware is inconsistent with the fact that 100 percent of their base pay was taken away from them in paragraph 127 after this event. This is just their spin on it, we win with a tie.  We are

beyond a tie in terms of the inferences at this stage, Your Honor.

**THE COURT:**  Thank you all for the argument.  I will take the matter under submission and issue a written order.

Let's take a 15-minute recess for the court reporter before our next matter.

**MR. GRAZIANO:**  Thank you for your patience, Your Honor.

**MR. HASHEMI:**  Thank you, Your Honor.

**THE COURTROOM DEPUTY:**  Court is in recess.

(Proceedings concluded at 10:58 a.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Friday, March 14, 2025

_____

Stephen W. Franklin, RMR, CRR, CPE
Official Reporter, U.S. District Court