# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td>

**OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM,**

                    **Plaintiff,**

              **-against-**

**ELON R. MUSK, ELON MUSK REVOCABLE TRUST DATED JULY 22, 2003, EXCESSION, LLC, AND JARED BIRCHALL,**

                    **Defendants.**

</td><td>

**22-cv-03026 (ALC)**

**<u>OPINION AND ORDER</u>**

</td></tr>
</table>

**ANDREW L. CARTER, JR., United States District Judge:**

Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Lead Plaintiff" or "Plaintiff") brings this federal securities class action against Defendants Elon R. Musk, the Elon Musk Revocable Trust dated July 22, 2003 (the "Trust"), Excession LLC ("Excession"), and Jared Birchall (collectively, the "Defendants"). The action revolves around Defendants' alleged scheme to acquire Twitter, Inc. ("Twitter[1]" or the "Company") and the untimely disclosure of Musk's intent to control Twitter. Musk's untimely disclosure of beneficial ownership of the company is also at the center of an ongoing Securities and Exchange Commission ("SEC") investigation (the "SEC Investigation").

The Amended Complaint alleges that Defendants committed securities fraud in violation of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(a), (b), and (c) promulgated thereunder ("Count I") and Section 20(a) of the Exchange Act ("Count II"). Lead Plaintiff brings this class action on behalf of a putative class of investors who

---

[1] Although the Company is now known as "X," the Court will only refer to "Twitter" in accordance with the Complaint and the Parties' briefing.

sold Twitter securities while Musk concealed his material ownership stake in Twitter between March 25, 2022 and April 4, 2022, inclusive (the "Class Period").

On September 29, 2023, the Court granted in part and denied in part Defendants' motion to dismiss Plaintiff's initial Complaint. *See* ECF No. 49. Currently pending before the Court is Defendants' motion to dismiss Plaintiff's Amended Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). For the following reasons, Defendants' motion is **GRANTED** in part and **DENIED** in part**.**

**BACKGROUND**

### I. Procedural Background[2]

Plaintiff filed its Amended Complaint on May 1, 2024. ECF No. 73. The Amended Complaint included information that Plaintiff gathered from initial discovery in this case, some of which was filed with a substantial number of redactions. *See id.* Plaintiff concurrently filed under seal a unredacted version of the Amended Complaint. *See* ECF No. 74. Also on May 1, 2024, Magistrate Judge Gabriel W. Gorenstein entered an order requiring any party or non-party seeking redactions in the Amended Complaint to set forth its position as to why the redactions should remain sealed. ECF No. 75. On May 20, 2024, after weighing letters by the Parties and a third-party, Morgan Stanley, Judge Gorenstein ordered Plaintiff to refile the Amended Complaint and only redact the names of nonparty Morgan Stanley employees. ECF No. 95. On May 28, 2024, Plaintiff refiled the Amended Complaint with fewer redactions. ECF No. 99 ("Am. Compl."). The Court will refer to this version of this Amended Complaint throughout its order and opinion.

---

[2] The Court presumes the Parties' familiarity with the antecedent procedural background relating to the initial Complaint as outlined in the Court's September 29, 2023 opinion and order granting in part and denying in part Defendants' motion to dismiss Plaintiff's initial Complaint. *See* ECF No. 49.

On May 14, 2024, prior to the filing of the lesser redacted Amended Complaint, Defendants filed a premotion conference request in connection with its anticipated motion to dismiss the Amended Complaint.  ECF No. 90.  On May 17, 2024, Plaintiff filed its response.  ECF No. 92.  On May 23, 2024, the Court granted Defendants leave to file a motion to dismiss the Amended Complaint.  ECF No. 96.  On July 3, 2024, Defendants filed their motion to dismiss the Amended Complaint and an accompanying memorandum of law.  ECF No. 105; 108 ("Def. Br.").  On August 12, 2024, Plaintiff filed its opposition.  ECF No. 111 ("Pl. Opp.").  On August 20, 2024, Plaintiff filed a letter alerting the Court to supplemental authority.  ECF No. 113.  On September 9, 2024, Defendants filed their reply.  ECF No. 114 ("Def. Reply").

## II.      Factual Background

The Court accepts as true for purposes of this motion the well-pleaded allegations of the Complaint as supplemented by the documents incorporated by reference.

### A.  The Relevant Parties

Lead Plaintiff Oklahoma Firefighters Pension and Retirement System is a public pension fund that provides retirement allowances and other benefits to firefighters in Oklahoma.  Am. Compl. ¶ 31.  Lead Plaintiff managed approximately $3.4 billion in assets on behalf of nearly 26,000 participants.  *Id*.  Lead Plaintiff sold over 14,000 shares of Twitter stock on the New York Stock Exchange ("NYSE") during the Class Period and alleges that it suffered damages as a result of the Defendants' violations of federal securities laws.  *Id*.

Defendant Musk became the owner of Twitter following a $44 billion takeover transaction that closed on October 27, 2022.  *Id*. ¶ 32.  After purchasing Twitter, Musk dubbed himself the Company's "Chief Twit," removed Twitter's top executives, and terminated approximately half

3

of Twitter's workforce. *Id*. Musk's net worth is approximately $180 billion, although this figure depends heavily on the stock price of his companies, including Tesla and Space-X. *Id.* ¶ 33.

Musk's trust—the Elon Musk Revocable Trust dated July 22, 2003—is also a named Defendant. *Id*. ¶ 34. The Trust is a revocable trust of which Musk is the sole trustee. *Id*. According to a Schedule 13D filed by Musk on April 5, 2022, the Twitter common stock beneficially owned by Musk is "held by the Elon Musk Revocable Trust dated July 22, 2003." *Id*.

Excession—Musk's family office—is also a named Defendant. *Id.* ¶ 35. Excession is thought to be responsible for a range of wealth and investment activity on Musk's behalf, including his purchases of Twitter stock and ultimate acquisition of the Company. *Id.*

Jared Birchall is a former banker who is known as Musk's "right hand man" and, since 2016, has served as Musk's wealth manager and the managing director of Excession. *Id.* ¶ 36. Birchall has power of attorney over all of Musk's brokerage accounts. *Id.* ¶ 39. Moreover, he has testified in a separate investigation that he is essentially Musk's sole point of contact with Excession. *Id.*

## B. Relevant Non-Parties

Twitter is a global social media company whose stock traded on the NYSE during the Class Period. *Id*. ¶ 40. Twitter users interact with each other by publishing "tweets," of up to 280 characters, which can be liked, commented on, or reposted by other users. *Id*. Twitter users also can "follow" each other to view and interact with each other's tweets more readily. *Id*. Since its origin in 2006, Twitter has become one of the biggest and most influential social media platforms. *Id*.

Morgan Stanley is a financial advisor that highly values "Musk's lucrative business" and supported the deal to acquire Twitter. *See id.* ¶ 42. A managing director and private wealth advisor

4

(hereinafter, "Advisor A") employed by Morgan Stanley Private Wealth Management also appears repeatedly throughout the Amended Complaint.[3] Advisor A's team manages over $75 billion of "Musk's personal assets, foundation assets, and a 'comprehensive wealth advisory relationship with [Musk's] extended family members.'" *Id.* ¶ 41. Musk has been one of Advisor A's clients for over 17 years and Birchall has been described as one of Morgan Stanley's former business partners. *Id.*

### C. The Alleged Scheme

Plaintiff alleges that beginning in January 2022, Defendants devised a scheme to secretly acquire a massive active ownership interest in Twitter, enlisting Advisor A to develop a trading strategy that would "get in under the radar" and "not press the price" of Twitter, ensuring secrecy and a substantial discount for Musk. *Id.* ¶ 82. Plaintiff alleges that Defendants knew about—and skirted—their disclosure obligations to the SEC in connection with the acquisition. *Id.* ¶¶ 82–140. Section 13 of the Exchange Act requires investors who surpass ownership of 5% of a company's shares to file a Schedule 13D disclosure detailing their interest in, and intentions for, the company within 10 days. *Id.* ¶¶ 63–72. As an exception to this rule, passive investors may file a Schedule 13G form, but they must certify their status as passive investors. *Id.* ¶¶ 69–72.

Initially, Defendants sought just under 5% ownership of Twitter stock to avoid disclosing under Rule 13. *Id.* ¶ 90. On January 31, 2022, Musk purchased over 600,000 shares of Twitter stock for $22.8 million. *Id.* at 30–31, Tbl. 1; *see infra* Table 1. That day, Advisor A messaged the trader placing the orders for Musk's purchases and told him "[Musk] is nervous we are moving the stock price, though I see us as under the [volume-weighted average price ("VWAP")] . . . he seems other stocks not moving as much though orders are up over 3%." Am. Compl. ¶ 92. Advisor

---

[3] On May 20, 2024, Judge Gorenstein ordered that this individual's identity be sealed in public court filings. *See* ECF No. 95. For ease of reference, this individual will be referred to as "Advisor A" hereinafter.

A instructed the trader to "pull back" and "[w]ork it reallllly slowlllly" to ensure that Defendants' trades would evade detection.  *Id.*

Afterwards, Musk continued to silently purchase hundreds of thousands of shares of Twitter stock—and, in many instances, millions of shares—on a near daily basis in the weeks leading up to the Class Period.  *See id.* at 30–31, Tbl. 1; *see infra* Table 1.  Plaintiff alleges that Defendants were focused on concealing their trades from the market to keep the stock price artificially low and conceal their scheme.  *Id.* ¶ 92.  Over the course of several weeks, Advisor A and Birchall communicated about the scheme.  *Id.* ¶¶ 92–110.  In one instance, Birchall told Advisor A "It looks a lot like we're pushing the stock . . . [t]he trader is going to have to be very comfortable defending himself vs that accusation[.]" *Id.* ¶ 93.  Advisor A replied that Defendants' trades were "running on an algorithm that picks up 5% of the volume that passes through the market," and that "[their] execution helps tell the story as [they] are under the VWAP" and therefore undetected by the market.  *Id.*  Advisor A also logged Musk's cost savings relative to the VWAP each trading day.  *Id.* ¶ 97.  In turn, Birchall kept Musk informed of the scheme in their weekly meetings.  *Id.*  Birchall testified in the SEC Investigation that only Defendants, Advisor A, Advisor A's assistant, and a trader working for Advisor A knew about the trading scheme.  *Id.* ¶ 107.

Musk would go from owning zero shares of Twitter stock as of January 28, 2022, to spending over $2.6 billion to secretly purchase over 70 million shares of the Company at a reduced price by April 4, 2022.  *Id*. ¶ 91.  Plaintiff includes a table of Musk's pre-Class Period purchases of Twitter stock, which the Court recreates below.

**TABLE 1: Musk's Pre-Class Period Purchases of Twitter Stock**
(January 31, 2022—March 24, 2022)

| Date | Shares Bought | Price | Cost to Musk |
|------|---------------|-------|--------------|
| 1/31/2022 | 620,083 | $36.828 | $22,836,416.72 |
| 2/1/2022 | 542,496 | $37.549 | $20,370,182.30 |
| 2/2/2022 | 850,373 | $36.748 | $31,249,507.00 |
| 2/3/2022 | 3,649,957 | $34.391 | $125,525,671.19 |
| 2/4/2022 | 1,070,429 | $36.184 | $38,732,402.94 |
| 2/7/2022 | 4,839,507 | $36.515 | $176,714,598.11 |
| 2/8/2022 | 730,000 | $35.733 | $26,085,090.00 |
| 2/9/2022 | 638,283 | $36.886 | $23,543,706.74 |
| 2/10/2022 | 2,604,907 | $36.642 | $95,449,002.29 |
| 2/11/2022 | 1,291,432 | $36.523 | $47,166,970.94 |
| 2/14/2022 | 958,849 | $35.920 | $34,441,856.08 |
| 2/15/2022 | 371,075 | $36.511 | $13,548,319.33 |
| 2/16/2022 | 655,000 | $35.814 | $23,458,170.00 |
| 2/17/2022 | 731,581 | $35.891 | $26,257,173.67 |
| 2/18/2022 | 1,331,040 | $34.506 | $45,928,866.24 |
| 2/22/2022 | 1,256,751 | $33.231 | $41,763,092.48 |
| 2/23/2022 | 1,063,170 | $32.806 | $34,878,355.02 |
| 2/24/2022 | 838,793 | $33.765 | $28,321,845.65 |
| 2/25/2022 | 695,849 | $34.784 | $24,204,411.62 |
| 2/28/2022 | 1,025,518 | $35.320 | $36,221,295.76 |
| 3/1/2022 | 897,656 | $35.326 | $31,710,595.86 |
| 3/2/2022 | 992,785 | $34.575 | $34,325,541.38 |
| 3/3/2022 | 1,211,426 | $33.971 | $41,153,352.65 |
| 3/4/2022 | 1,016,259 | $33.376 | $33,918,660.38 |
| 3/7/2022 | 1,779,530 | $33.067 | $58,843,718.51 |
| 3/8/2022 | 2,228,858 | $33.769 | $75,266,305.80 |
| 3/9/2022 | 1,005,125 | $34.154 | $34,329,039.25 |
| 3/10/2022 | 1,228,833 | $33.932 | $41,696,761.36 |
| 3/11/2022 | 2,927,000 | $33.238 | $97,287,626.00 |
| 3/14/2022 | 2,770,284 | $33.082 | $91,646,535.29 |
| **Musk Reaches 5% Ownership:** | | | |
| 41,822,849 shares at a cost of $1,365,228,535.27 | | | |
| 3/15/2022 | 1,966,000 | $33.791 | $66,433,106.00 |
| 3/16/2022 | 2,978,376 | $34.992 | $104,219,332.99 |
| 3/17/2022 | 1,500,000 | $37.089 | $55,633,500.00 |
| 3/18/2022 | 2,858,340 | $38.252 | $109,337,221.68 |
| 3/21/2022 | 1,942,482 | $37.280 | $72,415,728.96 |
| 3/22/2022 | 2,476,000 | $38.542 | $95,429,992.00 |
| 3/23/2022 | 2,502,140 | $38.149 | $95,454,138.86 |
| 3/24/2022 | 1,926,764 | $38.675 | $74,517,597.70 |
| **Total Shares Purchased:** | | **59,972,951** | |

7

| Total Cost: | $2,130,315,688.73 |
|---|---|

*Id.* at 30–31, Tbl. 1. On March 14, 2022, Musk's acquisitions of Twitter stock crossed the 5% ownership threshold. *Id.* By that day, Musk had purchased 41,822,849 shares of Twitter stock. *Id.* This figure represented over 5.2% of Twitter's 800,641,166 shares of common stock outstanding as of February 10, 2022, as reported in Twitter's Annual Report on Form 10-K for the year ending December 31, 2022. *Id.* ¶ 137. By crossing the 5% threshold, Musk triggered the start of the 10-day window to timely file a Schedule 13 form. *Id.* ¶ 138.

According to Plaintiff, Schedule 13 filings are carefully tracked by investors, in part because they signal that a company is "in play" for a potential takeover, which in turn will likely result in a stock price increase for the target company. *Id.* ¶ 65. Plaintiff alleges that for any investor, the filing of a Schedule 13D would represent a red flag that the Company is the target of a potential takeover and that the stock price will likely go up. *Id.* ¶ 67. Accordingly, the investor would halt any plans for continued selling if a Schedule 13D were filed. *Id.* Given the importance of Schedule 13 filings to investors, broker-dealers will customarily inform their clients as their purchases approach the 5% threshold requiring disclosure under Rule 13. *Id.* ¶ 68.

These notifications are provided as a matter of course and are particularly common amongst large-scale broker-dealers with shareholder reporting programs, such as Morgan Stanley. *Id.* Indeed, Advisor A expressly notified Birchall and Musk that Musk's position in Twitter was approaching the 5% threshold and Birchall testified in the SEC Investigation that he and Musk discussed the 5% threshold. *Id.* Moreover, Plaintiff cites to testimony as to knowledge of the 5% reporting threshold by Musk ("U.S. reporting requirements start at 5 percent.") and Birchall ("[W]e knew that five percent meant something . . . we knew that that would trigger something where at some point we would have to disclose something."). *Id.* ¶¶ 10–11.

8

On March 8, 2022, as Defendants approached the 5% threshold, Advisor A told Birchall, "As you can see[,] we are likely to cross over the 5% soon. (Pls confirm that you are comfortable with a year-end filing of the 13D/G)." *Id.* Later that day, Birchall responded that he and Musk were "fine with the year-end filing." *Id.*

Advisor A also iterated to Birchall the need to consult with legal counsel with respect to the requisite Schedule 13 filing. Plaintiff alleges that on or around March 27, 2022, after Defendants had amassed a 7.93% ownership stake in Twitter, Advisor A told Birchall "[y]ou'll want to have your counsel confirm the reading of the rule." *Id.* ¶ 119. Birchall responded by sharing a law firm article dealing with SEC reporting obligations which noted the 10-day filing deadline under Rule 13. *Id.* ¶ 120. That same day, Advisor A stated in an email to Birchall, "Have counsel confirm timing of [the Section 13] filing around recent / future statements." *Id.* ¶ 121. In the SEC Investigation, Advisor A testified that Birchall assured Advisor A that Defendants' trading strategy had been blessed by counsel. *Id.* ¶ 83. However, Plaintiff alleges that Defendants did not actually retain counsel until after the scheme was completed. *Id.* ¶¶ 126–29.

On March 24, 2022—the last day of the 10-day window—Musk did not file the requisite Schedule 13D. *Id.* ¶ 139. In so doing, Musk allegedly violated Rule 13, disregarded his reporting obligations, and continued to secretly amass an ever-increasing ownership stake in Twitter. *Id.* That same day, according to texts subsequently made public through *Twitter, Inc. v. Musk*, C.A. No. 2022-0613-KSJM (Del. Ch.) (the "*Twitter* Action"), Musk texted with "TJ" (which news reports subsequently revealed to be Musk's ex-wife) that Musk would "Maybe buy [Twitter] and change it to properly support free speech." *Id.* ¶ 140.

Plaintiff's Class Period begins on March 25, 2022, the day after Musk allegedly violated his obligation to file a Schedule 13D. *Id.* ¶ 141. Plaintiff alleges that on that day, over 20.7 million

Twitter shares changed hands on the NYSE as Twitter investors sold or traded their Company securities without knowing about Musk's significant ownership interest or that "Twitter was in play for a potential takeover by Musk." *Id.* By then, Defendants and Advisor A continued to explore acquiring a greater ownership stake in Twitter without alerting the public. *Id.* Plaintiff included a table of key events during the Class Period, which the Court recreates below.

**TABLE 2: Key Events During the Class Period[4]**

| Date(s) | Key Events |
|---|---|
| Thursday, March 24, 2022 | <ul><li>Ten-day deadline for compliance with Rule 13 expires.</li><li>Musk files nothing and fails to satisfy his reporting requirements under Rule 13.</li><li>Musk teases the public with critiques about "de facto bias in 'the Twitter algorithm'" and polls Twitter users on whether the "Twitter algorithm should be open source."</li></ul> |
| Friday, March 25, 2022 | <ul><li>**Beginning of Class Period.**</li><li>Musk purchased 3,491,274 shares of Twitter stock for $133,373,649.35.</li><li>Musk again teases the public with a poll on whether Twitter "rigorously adheres" to Free Speech and warns that "[t]he consequences of this poll will be important."</li></ul> |
| Saturday, March 26, 2022 | <ul><li>Musk and Jack Dorsey (founder and then-director of Twitter) privately "discuss[ed] the future direction of social media, including the benefits of open social protocols."</li><li>Dorsey privately texted Musk that "Twitter started as a protocol. It should have never been a company. That was the original sin."</li><li>Musk responded, "***I'd like to help if I am able to***… I think it's worth both trying to move Twitter in a better direction and doing something new that's decentralized."</li><li>Musk again teases the public with a poll on whether Twitter "rigorously adheres" to Free Speech and warns that "[t]he consequences of this poll will be important."</li></ul> |
| Saturday, March 26, 2022 Sunday, March 27, 2022 | <ul><li>Musk spoke with Egon Durban (Twitter director) about "the potential of Mr. Musk joining the Twitter Board, ***as well as the fact that Mr. Musk had purchased a significant stake of more than five percent of [Twitter's] common stock."***</li></ul> |

---

[4] All italicized and bolded text are as filed in the Amended Complaint.

| Sunday, March 27, 2022 | • Musk spoke with Bret Taylor (then-Chair of Twitter's Board) and Parag Agrawal (Twitter's then-CEO) about "Mr. Musk['s] interest in Twitter and potentially joining the Twitter Board." During this discussion, "Mr. Musk stated that he was considering various options with respect to his ownership, including potentially joining the Twitter Board" or "seeking to take Twitter private."<br>• Egon Durban texted Musk as well as Agrawal, Taylor, and Martha Lane-Fox, Head of Nominating and Governance Committee, and stated: "Hi everyone. Parag (Ceo), Bret (Chairman) and Martha (head of gov) – You are connected with Elon. He is briefed on my conversations w you. Elon – everyone excited about prospect of you being involved and on [the] board." |
|---|---|
| Monday, March 28, 2022 | • Musk purchased 2,603,779 shares of Twitter stock for $100,953,719.39. |
| Tuesday, March 29, 2022 | • Musk purchased 2,875,934 shares of Twitter stock for $115,903,016.13. |
| Thursday, March 31, 2022 | • Musk again privately spoke with Agrawal and Taylor, "reiterat[ing] his interest in potentially joining the Twitter Board to help improve Twitter['s] business as a director of Twitter."<br>• In a private text message with Parag Agrawal and Bret Taylor, Musk internally determined that he wanted to buy Twitter to rid it of "crypto spam," which he viewed as a "major blight on the user experience."<br>• Musk purchased 2,000,000 shares of Twitter stock for $77,636,000.00. |
| Friday, April 1, 2022 | • Musk purchased 2,171,100 shares of Twitter stock for $85,413,245.10.<br>• This was Musk's last purchase of shares as he had spent the money from the proceeds of his sale of Tesla shares.<br>• After spending over $2 billion to secretly amass Twitter stock, Defendants for the first time seek legal counsel concerning their disclosure obligations under Rule 13. |
| Sunday, April 3, 2022. | • Twitter formally invited Musk to join its Board of Directors.<br>• Musk sent a text message to Jared Birchall, Musk's wealth manager, stating "Jared, there is important paperwork to be done to allow for me to hopefully join the Twitter Board." |
| Monday, April 4, 2022 | • Before the market opened, Musk partially disclosed his interest in Twitter and falsely filed a Schedule 13G with the SEC. The Schedule 13G revealed Musk's 9.2% ownership in Twitter.<br>• The SEC privately probes Musk about inconsistences in his Schedule 13G.<br>• **End of Class Period.** |
| Tuesday, April 5, 2022 | • Before market open, Twitter filed a Form 8-K that announced the Company would appoint Musk to its Board of Directors |

| | • Before market open, Musk and Agrawal announced Musk's appointment to Twitter's Board on Twitter.<br>• After market close, Musk belatedly filed a Schedule 13D disclosing his 9.1% ownership of Twitter and activist intentions. |
|---|---|

*See id.* at 63–65, Tbl. 3. Defendant Musk purchased 2,000,000 to nearly 3,500,000 shares of Twitter stock on a near-daily basis, marking the highest overall volume of Twitter shares Musk purchased since his buying spree started on January 31, 2022. *Id.* ¶ 174. All told, Musk purchased approximately 13,000,000 shares of Twitter stock during the Class Period, representing almost 20% of his total holdings. *Id.*

Plaintiff alleges that Defendants' refusal to comply with their legal disclosure obligations allowed them to continue to acquire Twitter shares at artificially low prices and for Musk to continue his takeover campaign free of public scrutiny. *Id.* ¶ 144. Because the public was unaware that Musk was buying up Twitter stock, the stock price was artificially depressed by Musk's alleged deception. *Id.* Plaintiff also alleges that Defendants knew Musk was saving a considerable amount of money by omitting disclosure of his Twitter interest, but at the time they did not know exactly how much he was saving. *Id.* ¶ 145 Defendants also knew that these savings would end as soon as he disclosed his growing stake in Twitter to the public—as investors would know that the Company was in play for a takeover, would stop selling their shares at artificially low prices, and many investors would start buying—thereby driving up Twitter's stock price. *Id.* Plaintiff alleges that the scheme saved Musk over $200 million on his acquisitions of Twitter shares during the Class Period. *Id.*

On the other hand, investors who sold Twitter securities during the Class Period, were allegedly "cheated out" of the true value of the securities that they traded. *Id.* ¶ 146. As alleged by Plaintiff, the filing of a Schedule 13D predictably drives up the price of a company's stock and

12

therefore Defendants' "willful concealment" of Musk's Twitter interests; the misleading statements in service of the scheme; and Defendants' refusal to comply with Rule 13 resulted in millions of shares sold during the Class Period at artificially depressed prices. *Id.*

Plaintiff contends that, instead of disclosing his growing stake in Twitter, Musk teased the public about potential changes to Twitter's platform. *Id.* ¶ 147. All the while, Musk privately continued to amass more Twitter stock. *Id.* For example, on March 24, 2022, Musk tweeted "I'm worried about de facto bias in 'the Twitter algorithm' having a major effect on public discourse" and asked, "How do we know what's really happening?" *Id.* ¶ 149. After publicly voicing these concerns, Musk polled Twitter users on whether the "Twitter algorithm should be open source." *Id.* Over a million Twitter users voted in Musk's poll. *Id.*

The next day, on March 25, 2022, Musk posted a poll to Twitter, stating "Free Speech is essential to a functioning democracy. Do you believe that Twitter rigorously adheres to this principle?" *Id.* ¶ 150. He later tweeted: "The consequences of this poll will be important. Please vote carefully." *Id.* After more than 2,035,000 votes, over 70% of the participants said "No." *Id.* In the midst of Musk's tweets, Advisor A texted Birchall "So when is [Musk] announcing? Goodness can't be more obvious." *Id.* ¶ 153. Birchall replied "[Musk] can't announce before building most of the position[.]" *Id.* Also on March 25, 2022, Advisor A messaged a Morgan Stanley trader tasked with placing Musk's trades, stating "[Y]ou can see [Musk's] twitter polls. someone is gonna figure something out so [Birchall] wants to get as many shares in as possible." *Id.* ¶ 154.

Then, on March 26, 2022, Musk followed up on his poll by tweeting "Given that Twitter serves as the de facto public town square, failing to adhere to free speech principles fundamentally undermines democracy. What should be done?" and then replying, "Is a new platform needed?"

*Id.* ¶ 156.  Later that same day, Musk replied to a Twitter user by stating that he is "giving serious thought" to building a new social media platform.  *Id.* ¶ 160.  Musk also suggested that he could hypothetically buy Twitter, while not revealing that he already owned nearly ten percent of the Company.  *Id.* ¶ 158.  In response to reply from a Twitter user to his poll who told Musk "just buy twitter . . . and change the bird logo to a doge[,]"  Musk replied "Haha that would [be] sickkk."  *Id.* at 57, ¶ 158  Following Musk's tweets, on March 30, 2022, Advisor A told Birchall "Hope [Musk] appreciated how we have kept it so quiet . . . Esp (especially) given what others said would be the case . . . [and] given our two-months' history on this project alone . . ."  *Id.* ¶ 165.

In addition to Musk's public-facing statements, Musk held a number of private meetings with Company insiders.  On March 26, 2022, the second day of the Class Period and the same day Musk tweeted that he was "giving serious thought" to creating a rival platform to Twitter, Musk contacted Jack Dorsey (Twitter's founder, former CEO, and then-current director).  *Id.* ¶ 167 (citing Form PREMA14A filed with the SEC on May 17, 2022 (the "Proxy")).  Musk and Dorsey privately "discuss[ed] the future direction of social media, including the benefits of open social protocols."  *Id.*  Dorsey privately texted Musk that "Twitter started as a protocol.  It should have never been a company.  That was the original sin."  *Id.*  Musk responded, "I'd like to help if I am able to … I think it's worth both trying to move Twitter in a better direction and doing something new that's decentralized."  *Id.*  According to Plaintiff, Musk's response confirmed that his intention was to change or influence the control of the Company.  *Id.*

On both March 26 and 27, 2022, Musk spoke with Egon Durban (a Twitter director) about "the potential of Mr. Musk joining the Twitter Board, as well as the fact that Mr. Musk had purchased a significant stake of more than five percent of [Twitter's] common stock."  *Id.* ¶ 168 (quoting Proxy at 42).  Also on March 27, 2022, Musk spoke with Bret Taylor (then-Chair of

14

Twitter's Board) and Parag Agrawal (Twitter's then-CEO) about "Mr. Musk's interest in Twitter and potentially joining the Twitter Board." *Id.* ¶ 170 (quoting Proxy at 42). During this discussion, "Mr. Musk stated that he was considering various options with respect to his ownership, including potentially joining the Twitter Board" or "seeking to take Twitter private." *Id.* That same day Egon Durban (a Twitter director) texted Musk as well as Agrawal, Taylor, and Martha Lane-Fox (the former Head of Twitter's Nominating and Governance Committee) and stated: "Hi everyone. Parag (Ceo), Bret (Chairman) and Martha (head of gov) – You are connected with Elon. He is briefed on my conversations w you. Elon – everyone excited about prospect of you being involved and on [the] board." *Id.*

On March 30, 2022, Lane Fox messaged Dorsey on Twitter stating, "Elon has bought 7% of company in open market" and "he wants a board seat." The same day, the Board swiftly moved to schedule a meeting to take place over the weekend on April 3, 2022, "in case the Board needs to discuss a new director nomination." *Id.* ¶ 171.

On March 31, 2022, Musk again privately spoke with Agrawal and Taylor, "reiterat[ing] his interest in potentially joining the Twitter Board to help improve Twitter's business as a director of Twitter." *Id.* ¶ 172 (quoting Proxy at 42). Plaintiff also alleges that on March 31, 2022, Musk texted Agrawal and Taylor and internally determined that he wanted to buy Twitter to rid it of "crypto spam." *Id.* ¶ 173.

On April 3, 2022, unbeknownst to investors, Twitter formally invited Musk to join its Board of Directors. *Id.* ¶ 176. That same day, Musk texted Birchall, Musk's stating "there is important paperwork to be done to allow for me to hopefully join the Twitter Board." *Id.* That same day, Birchall texted Advisor A to confirm whether the Twitter shares were purchased in the name of the Trust, which Advisor A confirmed to be true. *Id.* ¶ 177. Advisor A also stated that,

15

in anticipation of Musk's long-anticipated revelation of his ownership interest and role in Twitter, he was "also prepping for when you break the internet tomorrow . . . here to help." *Id.* Advisor A and Birchall allegedly concurrently strategized about how to manufacture "plausible den[iability]" concerning the scheme. *Id.*

On April 4, 2022, Musk and Twitter entered into a letter agreement providing, *inter alia*, that Musk would be appointed to Twitter's Board. *Id*. at ¶ 178. Plaintiff alleges that knowing Twitter would disclose that he was joining its Board—which would likely lead to the disclosure of his ownership in the Company—Musk understood that his secret buying scheme had to come to an end. *Id*. ¶ 179.

Also on April 4, 2022, Musk belatedly provided this information to investors when he and Birchall authorized a partial disclosure of his interest in Twitter in a Schedule 13G filed with the SEC. *Id*.; *see also* ECF No. 73-1. This Schedule 13G reported that Musk owned 9.2% of Twitter's common stock. Am. Compl. ¶ 179. In this filing, Musk noted that the "Date of Event" that required the submission of the filing was March 14, 2022. *Id*. Plaintiff contends that this confirms "beyond question that [the filing] was 11 days late, and 21 days after his Twitter interest had crossed the 5% threshold." *Id*. This is also when the public first learned that Musk was Twitter's largest shareholder. *Id*. ¶ 180. The Wall Street Journal reported on May 11, 2022 that the "lag" allowed Musk "to buy more stock without alerting other shareholders to his ownership." *Id*.

The Amended Complaint alleges that Musk's Schedule 13G filing only partially revealed the truth. *Id*. ¶ 181. Schedule 13 forms reveal the name, ownership stake, and the stated intentions of the filer. *Id*. ¶¶ 69. The specific type of Schedule 13 that must be filed—Schedule 13D or Schedule 13G—largely depends on the investor's intentions for the target company. *Id*. The default presumption for investors that hit the 5% beneficial ownership threshold is that they are

"active investors" and must file a Schedule 13D that discloses the purpose of their acquisition. *Id.* ¶ 70; *see also* Rule 13d-1(a), 17 C.F.R. § 240.13d-1.

However, if certain exceptions apply, an investor may disclose an over-5% interest in a company via a Schedule 13G, which is a "short-form" filing with fewer requirements. Am. Compl. ¶ 71. An investor may file a Schedule 13G if they acquired the securities without a purpose or effect "of changing or influencing the control of the issuer." *Id.* (quoting 17 C.F.R. § 240.13d-1(c)(1)). As such, a Schedule 13G filing signals to the market that the investor is taking a passive interest in the target company. *Id.* Indeed, when filing a Schedule 13G form pursuant to this exception, an investor must expressly certify that they have "not acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having that purpose or effect." *Id.* (quoting 17 C.F.R. § 240.13d-1(c)(1)). In fact, in Question and Answer 103.04 of the SEC's Questions and Answers of General Applicability for Section 13(d), the SEC explained that reaching the 5% threshold while becoming a member of a target company's board presumptively qualifies as acquiring securities "with the effect of, changing or influencing the control of the issuer," and thus "eliminate[s] … eligibility to file on Schedule 13G pursuant to Rule 13d-1(c)." *Id.* ¶ 72.

Plaintiff alleges that, in order to delay the full disclosure of his activist intentions, Musk and his collaborators affirmatively deceived investors through his filing of the Schedule 13G. *Id.* ¶ 181. First, they chose the Schedule 13G form, which is reserved for passive investors (which Musk was not). *Id.* Second, Musk's Schedule 13G made no mention of Musk joining Twitter's Board. *Id.* Third, Plaintiff contends that Defendants had their lawyers deliberately manipulate the Schedule 13G form to omit a required certification and that this deliberate act underscores that

17

Musk knew—or at minimum was reckless as to—the misleading nature of his Schedule 13G filing. *Id.* ¶ 182.

In his Schedule 13G form, Musk claimed he was filing a Schedule 13G pursuant to the exemption in 17 C.F.R. § 240.13d-1(c), which requires the filer to swear to the following certification as a condition of filing:

> Item 10. Certifications
>
> By signing below I certify that, to the best of my knowledge and belief, the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect, other than activities solely in connection with a nomination under § 240.14a-11.

*Id.* ¶ 183.[5]   However, Plaintiff alleges Musk intentionally removed this language in the Schedule 13G that he personally signed and filed on April 4, 2022.  *Id.*   Instead, Musk replaced the certification language with the words "Not Applicable."  *Id.*   Later that same day, unknown to investors at the time, the SEC's Office of Mergers and Acquisitions sent Musk a letter inquiring about improprieties in his Schedule 13G.  *Id.* ¶ 184; *see also* ECF No. 43-3.  This letter was publicly filed on April 6, 2022.  Am. Compl. ¶ 184.  Specifically, the SEC's questions included the following:

> (a) "Please advise us why the Schedule 13G does not appear to have been made within the required 10 days from the date of acquisition as required by Rule 13d-1(c), the rule upon which you represented that you relied to make the submission."
>
> (b) "Given that a beneficial owner relying upon Rule 13d-1(c) to make a filing on Schedule 13G in lieu of Schedule 13D must provide a response to Item 10(c) of the form, please advise us why the response provided in Item 10 of this Schedule 13G, titled 'Certifications,' indicates that you determined the line item was '[n]ot [a]pplicable.'"

---

[5] The SEC publishes a standard form that has this certification language included by default (available here: https://www.ecfr.gov/current/title-17/chapter-II/part-240/section-240.13d-102).  *See* Am. Compl. ¶ 183.

(c) "Please provide us with a brief analysis of the bases upon which you determined that you were eligible to rely upon Rule 13d-1(c) to make the filing on Schedule 13G. Your response should address, among other things, your recent public statements on the Twitter platform regarding Twitter (the issuer), including statements questioning whether Twitter (the issuer) 'rigorously adheres to' 'free speech principles.'"

*Id.* Plaintiff alleges that although investors did not know the full truth regarding Musk's plans for Twitter, investors reacted strongly to the revelation of Musk's ownership interest in Twitter. *Id.* ¶ 185. In response, Twitter's stock price increased precipitously, soaring approximately 27% on unusually high trading volume—an increase of $10.66 per share—to close at $49.97 on April 4, 2022 (up from the prior close of $39.31 on Friday, April 1, 2022). *Id.*

Plaintiff contends that analysts noted Musk's substantial stake in Twitter but believed that it was passive given the Schedule 13G filing. *Id.* ¶ 186. For example, Bank of America analysts stated that they "expect[ed] the news to drive significant retail investor interest in, and activity for, the stock" and "highlight platform value to potential acquirers"—but explained that "[t]he type of form used (13G) often indicates the investor isn't seeking to acquire control, or to influence who controls it." *Id.*

Before the markets opened for trading on April 5, 2022, Twitter filed a Form 8-K press release announcing that Twitter would appoint Musk to its Board of Directors. *Id.* ¶ 187. Shortly after filing the Form 8-K, Agrawal and Musk announced Musk's appointment to the Board on Twitter. *Id.* Agrawal disclosed that "[t]hrough conversations with Elon in recent weeks, it became clear to us that he would bring great value to our Board." *Id.* Musk responded that he was "[l]ooking forward to working with Parag & Twitter board to make significant improvements to Twitter in coming months!" *Id.*

That same day, Twitter's stock price closed at $50.98 per share on April 5, 2022, an unusually high trading volume, up from $49.97 on April 4, 2022—a total increase of nearly 30%

19

since Musk first publicly disclosed his ownership stake in Twitter on April 4, 2022. *Id.* ¶ 188. Plaintiff alleges that later that day—and after the markets had closed—Musk's lawyers amended his Schedule 13G and filed a Schedule 13D form that disclosed both Musk's ownership stake in Twitter and the fact that he was joining the Board. *Id.* ¶ 189.[6]

### D. Alleged Materially False and Misleading Statements and Omissions

Plaintiff alleges that, in furtherance of the scheme, Musk omitted disclosure of his plans to potentially takeover Twitter and that his silence was a materially misleading omission each day of the Class Period because Musk knew he owned an interest greater than 5% in Twitter and intended to, or did, change or influence the control of Twitter. *Id.* ¶ 227.

Additionally, Plaintiff highlights Musk's misleading affirmative statements in support of the scheme, including Musk's posts on Twitter about the future of the platform and statements made in the Schedule 13G form. Indeed, Plaintiff alleges that as to the Schedule 13G originally filed on April 4, 2022, Defendant Musk falsely and misleadingly omitted the required certification under Item 10 of the Schedule 13G that the investor "[h]as not acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer," and instead affirmatively stated that this certification was "Not Applicable." *Id.* ¶ 232. Musk also "certif[ied] that the information set forth in" the Schedule 13G was "true, complete and correct." *Id.*

Plaintiff alleges that the statements in Musk's April 4, 2022 Schedule 13G were materially false and misleading and omitted material facts. First, by the time the Schedule 13G was filed, Defendants had masterminded a scheme to silently purchase an ownership interest in Twitter. *Id.* ¶ 233. Additionally, Musk engaged in numerous discussions with Twitter's leadership, including

---

[6] The Schedule 13D form shows that all Twitter shares beneficially owned by Musk are held by the Trust and further admitted that "Musk is the sole Trustee" of the Musk Trust. Am. Compl. ¶ 189; ECF No. 70-2.

about joining Twitter's Board or taking Twitter private; Musk had agreed to join Twitter's Board on April 4, 2022 (the same day he filed the misleading Schedule 13G); and Musk soon carried out his plan to take over Twitter by making an offer to purchase the Company on April 14, 2022. *Id*. Plaintiff contends that Musk was not a "passive" investor, and he was therefore subject to a statutory obligation to adequately disclose his activist intentions and ownership via a Schedule 13D filing. *Id*.

### E. Post-Class Period Events

On April 9, 2022, in a private conversation with Agrawal, Musk revealed his plan to buy the Company outright. *Id*. ¶ 197. On April 13, 2022, Musk delivered an official non-binding proposal to purchase Twitter to the Board for $54.20 per share. *Id*. On April 25, 2022, Twitter announced that it accepted Musk's proposal to acquire the company at $54.20 per share. *Id*. ¶ 199. A joint press release announcing the buyout included Musk's personal promise to "make Twitter better" by "defeating the spam bots." *Id*.

On July 8, 2022, Musk claimed that he was terminating the deal, and on July 12, 2022, Twitter filed a complaint in Delaware Court of Chancery alleging breach of Musk's contractual obligations under the merger agreement, seeking specific performance of Musk's obligations under the agreement. *Id*. ¶¶ 203–04. On October 4, 2022, Musk announced that he would abandon his "battle" with Twitter and pay shareholders the originally offered $54.20 per share. *Id*. ¶ 205. On October 28, 2022, Musk and Twitter closed the deal. *Id*. ¶ 206. After the deal closed, Musk terminated roughly half of Twitter's workforce, including by ousting top executives such as Twitter CEO Agrawal and the Company's Board of Directors, leaving Musk as the sole director of the Company. *Id*. ¶ 207.

## LEGAL STANDARD

### I.       Motions to Dismiss Under Rule 12(b)(6)7

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, the Court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Claims should be dismissed when a plaintiff has not pleaded enough facts that "plausibly give rise to an entitlement for relief." *Id.* at 679.

A claim is plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). While not akin to a "probability requirement," the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, where a plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). The Court's function on a motion to dismiss "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

---

[7] Although the Court generally should not look outside of the pleadings to decide a motion to dismiss a complaint, the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" of which a court may take judicial notice. *Sgalambo v. McKenzie*, 739 F.Supp.2d 453, 470 (S.D.N.Y. 2010) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007)).

## II.    Motions to Dismiss Under Fed. R. Civ. P. 9(b) and the PLSRA

When a plaintiff has alleged securities fraud claims, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake."

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citation and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)). To determine that an inference of scienter is strong, the court must decide whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

A plaintiff alleging fraud based on deceptive acts "must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue[.]" *SEC v. Wey,* 246 F. Supp. 3d 894, 924 (S.D.N.Y. 2017) (quoting *In re Refco, Inc. Sec. Litig.*, 609 F.Supp.2d 304, 310 (S.D.N.Y. 2009), *aff'd sub nom. Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144 (2d Cir. 2010)).

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal,* make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible

23

inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

## DISCUSSION

Plaintiff brings claims under Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants. Plaintiff also brings claims under Section 20(a) of the Exchange Act against Defendants Musk and Birchall as controlling persons of the Trust and Excession.

Like the allegations in the initial Complaint, the allegations in the Amended Complaint involve Defendants' failure to make the requisite disclosures about beneficial ownership via a Schedule 13D form. Defendants generally dispute that the failure to timely file a correct Rule 13 disclosure was anything more than a mistake. Before turning to the alleged securities violations, the Court readopts its primer on Section 13 from its prior opinion.

"Section 13(d) of the Securities Exchange Act requires 'certain disclosures to be filed on a Schedule 13D by a person that acquires an interest in more than 5% of certain classes of securities.'" *Puddu v. 6D Glob. Techs., Inc*, No. 15-CV-8061, 2021 WL 1198566, at *6 (S.D.N.Y. Mar. 30, 2021) (quoting *Amida Capital Mgmt. II, LLC v. Cereberus Capital Mgmt., L.P.*, 669 F. Supp. 2d 430, 438 (S.D.N.Y. 2009)); *see also* 15 U.S.C. § 78m(d) and 17 C.F.R. § 240.13d–101. Rule 13d-1, promulgated under Section 13(d) of the Exchange Act, provides that any person who becomes "directly or indirectly the beneficial owner of more than five percent of [a covered class of equity security] shall, within 10 days after the acquisition, file with the Commission, a statement containing the information required by Schedule 13D." *See* 17 C.F.R. § 240.13d-1(a).

"Section 13(d)'s purpose is to alert investors to potential changes in corporate control so that they [can] properly evaluate the company in which they had invested or were investing."

*United States v. Bilzerian*, 926 F.2d 1285, 1297 (2d Cir. 1991) (citation and quotation marks omitted) (alteration in original); *accord GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971) ("[T]he purpose of section 13(d) is to alert the marketplace to large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control[.]").  "Thus, an intentional failure to disclose beneficial ownership information when disclosure was expressly required signals falsely to investors that there is no such ownership to disclose." *Puddu*, 2021 WL 1198566, at *6.

### I.      Rule 10b-5(a) and (c) Claims[8]

With respect to Plaintiff's Rule 10(b)-5(a) and (c) claims—which deal with the scheme to depress the value of Twitter shares—Defendants contend that Plaintiff fails to plead a deceptive or manipulative act and has not demonstrated an inference of scienter.

Scheme liability claims brought under subsections (a) and (c) of Rule 10b-5 "must show: '(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance.'" *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (quoting *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020)).

### A.      Plaintiff Pleaded a Deceptive or Manipulative Act

Defendants argue that Plaintiff has not pleaded a deceptive or manipulative act.  Def. Br. at 6–11.  Rule 10b-5(a) and (c) actions must "irreducibly entail[] some act that gives the victim a false impression." *See United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008).  But according

---

[8] Defendants also do not challenge whether Plaintiff has properly alleged claims against the corporate defendants, the Trust and Excession.  The Court therefore concludes that Plaintiff has plausibly alleged scheme liability under Rule 10b-5(a) and (c) for the Trust and Excession.  *See* Am. Compl. ¶ 34 ("According to Musk's Schedule 13D filed on April 5, 2022, the Twitter common stock beneficially owned by Musk is 'held by the [Musk Trust].'"); ¶ 35 ("Excession is Musk's family office, and Bloomberg indicates that Excession 'is responsible for a range of wealth and investment management activities" on behalf of Musk—including, for example, Musk's purchases of Twitter stock and ultimate purchase of Twitter.'").

25

to Defendants, Plaintiff's claims are mostly held together by alleged misstatements and omissions about Musk's acquisition of Twitter, which Defendants argue are insufficient to properly state a claim in the scheme liability context. *See* Def. Br. at 7.

The Second Circuit has held that "misstatements and omissions can form *part* of a scheme liability claim, but an actionable scheme liability claim also requires something *beyond* misstatements and omissions, such as dissemination." *SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (emphasis in original). *Rio Tinto* clarified the scope of the Supreme Court's decision in *Lorenzo v. SEC*, in which the majority held: "Those who disseminate false statements with intent to defraud are primarily liable under Rules 10b–5(a) and (c), § 10(b), and § 17(a)(1), even if they are secondarily liable under Rule 10b–5(b)." *Lorenzo v. SEC*, 587 U.S. 71, 73 (2019). Although *Lorenzo* primarily addressed dissemination, "the Supreme Court held that the capacious words and 'expansive language' of 'device,' 'scheme' and 'artifice' 'capture a wide range of conduct.'" *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 249 (S.D.N.Y. 2022) (citing *Lorenzo*, 587 U.S. at 78–79); *see also Rio Tinto*, 41 F.4th a 54 (instructing that dissemination is but "one example of something extra that makes a violation a scheme").

Defendants point out that Plaintiff relies primarily on Defendants' failure to disclose Musk's ownership stake in Twitter, rendering it a pure omission that is not actionable under Rule 10b-5 after *Rio Tinto*. Def. Br. at 2, 7. As to Musk's allegedly improper Schedule 13G filing and his misleading tweets about Twitter's future, Defendants argue that because Musk disseminated "his own alleged misrepresentations[,]" Plaintiff is attempting an end-run around Rule 10b-5(b). *See id.* at 4 (citing *In re Turquoise Hill*, 625 F. Supp. 3d at 249 ("The [*Rio Tinto*] court made clear that subsections (a) and (b) of Rule 10b–5 should not be interpreted in a manner that would render Rule 10b–5(b) surplusage . . . [or the repackaging of] any Rule 10b–5(b) claims as Rule 10b–5(a)

26

or (c) claims . . . .")). To that end, Defendants cite *In re Turquoise Hill* for the proposition that a scheme liability claim requires Plaintiff to plead an act "distinct from an alleged misstatement." *Id.* at 253; *see also* Def. Br. at 8. Defendant further notes that cases cited by Plaintiff in support of their dissemination theory predate *Rio Tinto*. Def. Reply at 2.

The Court does not need to spill much ink in weighing whether Musk's dissemination alone satisfies *Rio Tinto*. Here, Plaintiff alleges that—in addition to the dissemination of tweets—Defendants engaged in separate, additional acts to perpetuate the scheme: (1) carrying out a coordinated trading strategy to silently build up Musk's position in Twitter and (2) making false statements of legal blessing as to their trading strategy. Indeed, theories based on these acts, if well-pleaded, involve *all* Defendants, as opposed to Plaintiff's dissemination theory which could at most implicate Musk (who signed the April 4, 2022 Schedule 13G and whose account disseminated tweets) and the Trust (who is identified as the beneficial owner on the April 4, 2022 Schedule 13G). *See* Am. Compl. ¶¶ 155–66; ECF No. 43-1.

Turning first to Plaintiff's allegations as to the trading scheme, Defendants contend that the claim fails because "[a]dvanced trading strategies are not inherently deceptive or manipulative." Def. Br. at 8. Defendants distinguish the instant case from others in which traders manipulated the market with trading algorithms, *Harrington Glob. Opportunity Fund, Ltd. V. CIBC World Mkts. Corp.*, 585 F. Supp. 3d 405, 416, 424 (S.D.N.Y. 2022), or where a trading algorithm "sen[t] a false pricing signal to the market[,]" *SEC v. Masri*, 523 F. Supp 2d 361, 367 (S.D.N.Y. 2007). Defendants reduce Plaintiff's argument as just another attempt to sneak in its omission theory merely because the trading strategy was carried out during the period in which Defendants failed to disclose Musk's interest in Twitter. Def. Br. at 9.

27

Plaintiff argues that "[a]ny trading strategy that artificially maintains or otherwise manipulates a company's stock price for fraudulent purposes constitutes a 'deceptive act.'" Pl. Opp. at 10. (citing *SEC v. Stubos*, 634 F. Supp. 3d 174, 201 (S.D.N.Y. 2022); *United States v. Wey*, 2017 WL 237651, at *8 (S.D.N.Y. Jan. 18, 2017)). To support its position, Plaintiff cites to *Stubos*—a post-*Rio Tinto* case—in which the court denied a motion to dismiss in part upon a finding that the defendant's trading strategy amounted to the "something extra" needed for a securities violation alleging dissemination to also constitute a scheme. *See Stubos*, 634 F. Supp. 3d at 201; Pl. Opp. at 10.

The court in *Stubos* found allegations about the defendant's scheme liability to be plausible when the defendant engaged in a pump-and-dump scheme in which he (1) concealed his majority ownership of the shares of two companies by "[breaking] his ownership into blocks of less than 5% to avoid market scrutiny and to allow him to continue to hold unrestricted shares[;]" (2) "failed to register his sales of these shares with the SEC as required under the securities laws[;]" (3) directed traders "via encrypted messages to strategically buy stock to inflate its price[;]" (4) and subsequently "secretly sold his stock without making the disclosures required by federal law[.]" *Stubos*, 634 F. Supp. 3d at 201. All the while, the defendant was "pumping up the price of the stock through misleading disclosures made by stock promoters paid with money from him that was funneled through intermediary nominees." *Id.*

Despite the differences between the underlying facts and *Stubos*, *Stubos* is instructive. Here, in addition to alleging a dissemination theory based on Musk's filing of the Schedule 13G and his tweets, Plaintiff has also alleged that Defendants participated in a course of conduct to conceal his ownership from investors. It is plausible that Defendants deployed the scheme to keep

Musk's acquisition "under the radar" and to "not press the price" of Twitter, constituting avoidance of scrutiny like in *Stubos*.  Am. Compl. ¶ 82.

Unlike in *Stubos*, in which the defendant sought to inflate share prices, Defendants in the instant case sought to suppress inflation of the stock price, thereby avoiding detection.  Plaintiff plainly alleges that Defendants used Advisor A in a scheme to accomplish this end.  *See id.*  Indeed, the first day Musk purchased Twitter stock, Advisor A warned traders that "[Musk] is nervous we are moving the stock price, though I see us as under the VWAP . . . he sees other stocks not moving as much though orders are up over 3%."  *Id.* ¶ 92.  Advisor A then instructed the trader to "pull back" and "[w]ork it reallllly slowlllly" to ensure that Defendants' trades would evade public detection.  *Id.*

Defendants maintain that "there are no allegations here that the alleged strategy sent 'a false pricing signal to the market,' *i.e.,* 'injected inaccurate information into the marketplace or created a false impression of supply and demand for' Twitter shares."  Def. Reply at 3 (citing *ATSI Comm'n v. Shaar Fund*, 493 F.3d 87, 100–01 (2d Cir. 2007) (citations omitted); *In re Alstom SA*, 406 F. Supp. 2d 433, 477 (S.D.N.Y. 2005) (finding no scheme liability where underlying conduct was not deceptive)).  But as the Court noted in its prior opinion, "[a]n intentional failure to disclose beneficial ownership information when disclosure was expressly required signals falsely to investors that there is no such ownership to disclose."  ECF No. 49 at 23 (quoting *Puddu*, 2021 WL 1198566, at *6).  *Puddu* predates *Rio Tinto*, so the Court does not rest its opinion on the cited proposition.  However, the Court agrees with the *Puddu* court that the failure to disclose sends a false pricing signal to the market.  The Court concludes that when viewed in conjunction with the alleged scheme, Plaintiff has met its burden here.  Indeed, *Stubos* also considers the failure by the defendant in that case to make required disclosures as "something extra" that substantiated a

29

scheme liability claim. *See Stubos*, 634 F. Supp. 3d at 201. As such, the Court concludes that the facts surrounding the trading strategy evince a deceptive act in furtherance of a scheme to defraud. *See id.*

The Court is less convinced that Plaintiff's other theory—that Birchall's alleged assurances to Advisor A that the trading strategy had been blessed by counsel—amounts to a deceptive act under the strictures of Rule 10b-5(a) and (c). Here, Defendants challenge Plaintiff's invocation of a presumption of reliance under *Affiliate Ute*. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54 (1972) (holding that plaintiffs need not demonstrate affirmative proof of reliance in securities fraud cases "involving primarily a failure to disclose" if the "facts withheld [were] material in the sense that a reasonable investor might have considered them important in the making of this decision"). Birchall made a misrepresentation—and not an omission—only to Advisor A, so a presumption of reliance on scheme liability is not established because Plaintiff has not demonstrated that "the investing public had knowledge, either actual or presumed, of [Birchall's] deceptive acts[.]" *See Stoneridge Inv. Partners v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008).

However, Defendants did not challenge reliance with respect to the trading strategy and dissemination. Thus, because all Defendants participated in the trading strategy to conceal Musk's ownership, the Court finds that Plaintiff has properly alleged all of the elements for at least one deceptive or manipulative act to satisfy *Rio Tinto* and Rule 10(b)-5(a) and (c).

## B.    Plaintiff Adequately Pleaded Scienter

In arguing against a culpable state of mind, Defendants contend that, at most, "Defendants wanted to avoid public attention, to the extent permissible, and were generally aware that crossing the 5% threshold required disclosure *at some point*. But none of this shows that Defendants

30

intended to conceal information from investors in knowing or reckless disregard of disclosure requirements. Indeed, despite the benefit of discovery . . . Plaintiff makes no allegation that Defendants received clear, specific information that Rule 13 required immediate disclosure." Def. Br. at 11–12. In response, Plaintiff points to the Court's prior determinations as to Musk's scienter and raise additional facts from discovery supporting an inference as to both Musk's and Birchall's scienter.

To plead scienter under the PSLRA, a plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009); *see* 15 U.S.C. § 78u–4(b)(2)). The scienter required under Section 10(b) and Rule 10b–5 is "an intent to deceive, manipulate or defraud." *In re Turquoise Hill*, 625 F. Supp. 3d at 234 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001)). Recklessness may also suffice to plead scienter for securities fraud in the Second Circuit. *See ECA*, 553 F.3d at 198.

The inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 324. In determining whether this inference exists, courts consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively. *In re Turquoise Hill*, 625 F. Supp. 3d at 234 (citing *ECA*, 553 F.3d at 198); *Tellabs*, 551 U.S. at 323 (instructing that "the court must take into account plausible opposing inferences"). A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the 'motive and opportunity' to commit the alleged fraud, or (2) constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 317 (S.D.N.Y. 2021) (quoting *ECA*, 553 F.3d at 198).

31

"Scienter claims may be assessed 'holistically' when assessing whether a strong inference of fraudulent intent has been established." *Puddu*, 2021 WL 1198666, at *11 (quoting *Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 213 n.11 (2d Cir. 2020)). "At the motion to dismiss stage, a tie on scienter goes to the plaintiff." *Skiadas v. Acer Therapeutics Inc.*, No. 1:19-CV-6137-GHW, 2020 WL 3268495, at *10 (S.D.N.Y. June 16, 2020); *see also In re Insys Therapeutics, Inc. Sec. Litig.*, No. 17-CV-1954 (PAC), 2018 WL 2943746, at *6 (S.D.N.Y. June 12, 2018) ("[E]ven if the allegations of motive were weak, they can still support a strong inference of scienter when they are accompanied by 'extensive allegations of circumstantial evidence of recklessness and misconduct that strongly buttress the motive alleged.'" (citing *In re Silvercorp Metals, Inc. Sec. Litig*, 26 F. Supp. 3d 266, 275 (S.D.N.Y. 2014))).

Conscious misbehavior, "generally consists of deliberate, illegal behavior." *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 236–37 (S.D.N.Y. 2020) (quoting *In re Lululemon*, 14 F. Supp. 3d at 573). "Recklessness, on the other hand, can be adequately pleaded where the allegations show that defendants' conduct was 'highly unreasonable' and constituted 'an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* (quoting *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009). Circumstantial evidence of scienter includes evidence that a defendant "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *ECA, Loc. 134*, 553 F.3d at 199).

32

In its prior opinion, the Court found that "Plaintiff's allegations [as to Musk], taken together, sufficiently support an inference of scienter for Defendant Musk's nondisclosure of his ownership stake." *See* ECF No. 49 at 31–38. Because both the Complaint and Amended Complaint deal with Musk's nondisclosure and that the Amended Complaint alleges at least the same bases for a finding of scienter as to Musk, the Court also finds scienter as to Musk in the Rule 10-5(a) and (c) contexts.

As to Birchall, the facts alleged in the Amended Complaint also support a finding of scienter. Plaintiff submits that "in connection with the related SEC Investigation, Birchall testified, '[W]e knew that five percent meant something . . . we knew that that would trigger something where at some point we would have to disclose something.'" Am. Compl. ¶ 10. "[S]cienter can be sufficiently pleaded through 'facts that suggest [that Defendants] knew they had a duty to disclose' information they withheld[.]" *In re Kirkland Lake Gold Ltd. Sec. Litig.*, No. 20-CV-4953, 2021 WL 4482151, at *4 (S.D.N.Y. Sept. 30, 2021) (quoting *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1213 (S.D.N.Y. 1996)).

Further strengthening an inference of scienter, Plaintiff put forth evidence of Birchall's misrepresentations to Advisor A about the trading strategy being blessed by counsel. As stated above, the Court did not consider Birchall's assertions to Advisor A to constitute deceptive acts for scheme liability because Plaintiff did not demonstrate that investors relied on those assertions. However, the Court nonetheless finds an inference of scienter from those same assertions.

Plaintiff alleged that Advisor A testified that Birchall—who served as an intermediary between Musk and Advisor A in the trading strategy—assured him that Defendants' approach had been blessed by counsel, when in fact Defendants did not actually retain counsel until after the scheme was accomplished. *Id.* ¶¶ 83, 126–29.

33

The Court concludes that it is reasonable (at least at the pleadings stage) to infer that Birchall acted recklessly in lying to Advisor A, evincing his state of mind with respect to the perpetuation of the scheme more broadly. *See In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 351 (S.D.N.Y. 2004) (finding allegations that a party who "'quashed' the dissent of a junior auditor who questioned [the propriety of fraudulent accounting schemes]" to be "sufficient to satisfy the requirements of pleading actual control and culpable participation").

In response to Plaintiff's inferences of scienter, Defendants generally argue that "Plaintiff's own allegations demonstrate that Defendants had no intent to defraud, but rather were, at worst, negligent." Def. Br. at 19. Indeed, Defendants believe "the more compelling (if not only) inference is that Defendants made a mistake, not that they intentionally committed unconcealable federal crimes for the sole purpose of lowering the cost on a $44 billion purchase by a fraction of a percent." Def. Reply at 1. Defendants submit several specific competing inferences.

First, Defendants point out that Plaintiff concurrently alleges that "Defendants intended to disclose Musk's position, no later than year-end" and also "alleges a scheme, which was *guaranteed* to be revealed to the market within a matter of months." Def. Br. at 19 (emphasis in original). But this is not a compelling counterpoint to Plaintiff's inference that Defendants knew that they had to eventually disclose Musk's position, but not until Musk had "buil[t] most of the position" in Twitter. *See* Am. Compl. ¶ 153. Indeed, this is the core of Plaintiff's scheme liability argument. Although Defendants' proposed inference is plausible, "this alternative explanation merely raises a factual dispute that the Court must resolve in plaintiff's favor at this stage and is therefore not enough to defeat this inference of scienter." *See City of Warren Police*

*& Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 137 (S.D.N.Y. 2020) (citing

*In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006)).

Defendants also highlight another purported inconsistency by Plaintiff: in an attempt to convince Advisor A that Musk did not need to disclose until the end of the year, Birchall both allegedly told Advisor A that he consulted with counsel, yet also (1) shared a law firm article outlining the 10-day disclosure filing deadline and (2) asked Advisor A to confirm his reading of Rule 13. Def. Br. at 19–20. Here again, Defendants ask that the Court favor an inference of mistake as opposed to an inference that Birchall consciously or recklessly misled Advisor A.

To support their proposed inference of mistake, Defendants point to a March 27, 2022 text conversation between Advisor A and Birchall in which Birchall states, in part: "I am operating on the belief that, based on rule 13G, we will need to file something within 10 days after the month in which we hit 10% ownership. Do you agree with this?" ECF No. 107-1 at 2. Advisor A replies stating "I agree with that. . . . You'll want to have your counsel confirm the reading of the rule. Based on this cross of 10 percent makes sense." ECF No. 107–2 at 2.

And here again, Defendants' opposing inference is plausible but outranked by Plaintiff's inference. At the motion to dismiss stage, the Court can properly draw a strong inference of scienter when Birchall assured Advisor A that the trading strategy had been blessed by counsel when in fact counsel was not retained until after the scheme was completed. *See* Am. Compl. ¶¶ 83; 126–29. The Court also notes Advisor A's subsequent warnings to Birchall to consult with outside counsel *after* Birchall had shared the law firm article, as well as the absence of any evidence that Birchall ever told Advisor A that no outside counsel was involved. *See id.* ¶¶ 121– 22, 124–25.

35

In this proposed inference, Defendants also seemingly ask the Court to conclude that it is plausible they were mistaken as to the reporting requirements for crossing the 5% threshold, even though Birchall asked Advisor A to confirm the disclosures triggered by crossing the 10% threshold. In light of Plaintiff's allegations that Advisor A repeatedly warned Defendants about crossing the 5% threshold, the Court is not persuaded by Defendants' competing inference. Rather, the Court credits Plaintiff's more compelling inference—that Defendants knew about the 5% threshold and did not file the requisite forms.

Last, Defendants raise the fact that they promptly disclosed Musk's ownership in a Schedule 13G form after learning that disclosure was required and that a corrected Schedule 13D was filed less than 24 hours later. *See* Def. Br. 20–21. This competing inference of mistake is plausible and is perhaps the most compelling. However, Plaintiff repeatedly alleges that Defendants knew about their disclosure requirements and their eventual disclosure "was 11 days late, and 21 days after [Musk's] Twitter interest had crossed the 5% threshold." Am. Compl. ¶ 179. Here, the two inferences are equally as compelling. However, "[a]t the motion to dismiss stage, a tie on scienter goes to the plaintiff." *Skiadas*, 2020 WL 3268495, at *10.

The Court has weighed the opposing inferences proposed by Defendants, but concludes that "[t]aken together, and even in light of opposing inferences, the [Amended] Complaint's allegations articulate Defendants' [scienter.]" *Employees' Ret. Sys. of Gov't of the Virgin Islands*, 794 F.3d at 309. The Court concludes that Plaintiff's scheme liability claim under Rule 10(b)-5(a) and (c) survives to the extent the only deceptive acts are construed as: (1) the improper Schedule 13G filing; (2) Musk's misleading tweets about Twitter's future, and (3) the carrying out of a coordinated trading strategy to silently build up Musk's position in Twitter.

36

**II.    Rule 10b-5(b) Claims**

As to the Rule 10(b)-5(b) claims—which deal with Musk's allegedly material misstatements and omissions—Defendant similarly argues Plaintiff has neither shown a material representation or omission, nor demonstrated scienter.

To plead a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014); *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 n.23 (2d Cir. 2017).

The Rule 10b-5(b) claims in Plaintiff's initial Complaint relied in part on an omission theory—based on Musk's nondisclosure of his plans to acquire Twitter—which is no longer viable. After the Court's September 29, 2023 opinion and order in this case, the Supreme Court rendered a decision in *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024). In *Macquarie*, the Supreme Court unanimously held that "[p]ure omissions are not actionable under Rule 10b–5(b)." *Id.* at 257. *Macquarie* also sets out that "Rule 10b–5(b) requires disclosure of information necessary to ensure that statements already made are clear and complete. Logically and by its plain text, Rule 10b–5(b) therefore covers half-truths, not pure omissions, because it requires identifying affirmative assertions (*i.e.*, 'statements made') before determining if other facts are needed to make those statements 'not misleading.'" *Id.* at 258. As a result, the Court only considers Plaintiff's allegations to the extent they involve misrepresentations and not omissions.

## A.	Plaintiff Pleaded Some Material Representations

The Court is thus left to consider whether Musk's tweets are material representations under Rule 10b-5(b). As a threshold matter, Defendants argue that Plaintiff is time-barred from bringing claims based on Musk's tweets prior to the Twitter acquisition. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 638 (2010) (holding "that a cause of action accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation'—whichever comes first" and "that the 'facts constituting the violation' include the fact of scienter, "a mental state embracing intent to deceive, manipulate, or defraud[]'"). A securities claim "is timely if filed no more than two years after the plaintiffs "discover[ed] the facts constituting the violation." *See id.* at 637 (citing 28 U.S.C. § 1658(b)(1)). Plaintiff contends that it "only learned through discovery that Musk's misstatements were issued to mislead investors after he was warned that '[s]omeone is gonna figure something out', and that Musk had taken no steps to explore an alternate platform." Pl. Opp. at 25. The Court considers that the claims as to these tweets were filed timely.

Turning now to the tweets themselves, Defendants mostly argue that the tweets do not "establish any affirmative misrepresentation[,]" thereby warranting dismissal. Def. Br. at 22 (quoting *In re Refco Cap. Markets, Ltd. Brokerage Customer Sec. Litig.*, 586 F. Supp. 2d 172, 192 (S.D.N.Y. 2008), *aff'd sub nom. Cap. Mgmt. Select Fund Ltd. v. Bennett*, 680 F.3d 214 (2d Cir. 2012)). In turn, Plaintiff argues that "Musk's tweets misrepresented his intention to build an alternative platform to Twitter and misdirected public attention away from Musk's growing interest in Twitter." Pl. Br. at 23.

The Court agrees with Defendants with respect to various posts cited by Plaintiff, including Musk's March 25, 2022 Twitter poll, the March 26, 2022 "What should be done?" tweet, and the

38

March 26, 2022 "Is a new platform needed?" tweet. *See* Am. Compl. ¶¶ 155–57. Although Plaintiff alleges that these tweets are examples of Musk's misdirection, the Court is not persuaded that Plaintiff has alleged with sufficient particularity that questions and musings about the future of Twitter amount to affirmative misrepresentations.

However, two of Musk's tweets warrant further discussion. In response to his March 26, 2022 "Is a new platform needed?" tweet, a Twitter user, WSBChairman tweeted "just buy twitter" and also "and change the bird logo to a doge." *Id.* ¶ 158. Musk then replied, "Haha that would [be] sickkk[,]" "leaving out the critical information that he ***already owned*** nearly ten percent of the company." *Id.* (emphasis in original).



*Id.* at 56. Defendants note that Musk is solely replying to a tweet about changing the Twitter logo to a doge, but it is reasonable to construe Musk's post as a reply to the two preceding tweets which are threaded together. It is also reasonable to read his tweet as a statement meant to misdirect the public to think that buying Twitter was just a fantasy. In so doing, Musk could continue purchasing Twitter without relaying to the public that he had acquired over 5%

beneficial ownership.  Indeed, by March 26, 2022, Musk already owned more than 7.49% of Twitter stock and had been a beneficial owner for 12 days.  *See id.* at Tbl. 1, Tbl. 3.

Another notable tweet is a response by Musk to a twitter user, PPathole, who tweeted on March 26, 2022 "Would you consider building a new social media platform, @elonmusk?  One that would consist [sic] an open source algorithm, one where free speech and adhering to free speech is given top priority, one where propaganda is very minimal.  I think that kind of a platform is needed."  *Id.* at 58.  Musk replied that same day "Am giving serious thought to this."  *Id.*



*Id.*  Here, too, Musk's tweet can be reasonably read as an affirmative representation that Musk had no interest in Twitter, but was rather building out a rival platform.  And again, by the time Musk tweeted this on March 26, 2022, he owned a significant share of Twitter and had not timely disclosed his beneficial ownership.  *See id.* at Tbl. 1, Tbl. 3.

The Court concludes that Plaintiff has alleged with particularity enough facts to support a plausible inference that it is more likely than not that Musk issued a material misleading representation.

### B.      Plaintiff Adequately Pleaded Scienter

Defendants argue that Musk's "tweets were not misleading. . . . If anything, then, the 'teasing' tweets undermine scienter because they potentially brought unwanted attention to Musk concerning Twitter."  Def. Br. at 17.   Plaintiff, on the other hand, contends that "Musk's inner

circle was concerned that the public might discover Musk's interests in Twitter, so Musk tweeted the misleading statements about building a rival platform to 'deceive the public about, or distract the public from looking further into' Defendants' secret scheme." Pl. Opp. at 21 (citing *Handal v. Tenet Fintech Grp. Inc.*, 2023 WL 6214109, at \*17 (E.D.N.Y. Sept. 25, 2023). The Court finds that a reasonable person would find both inferences "cogent and at least as compelling as [the] opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 311. Therefore, Plaintiff has adequately pleaded scienter as to its Rule10b-5(b) claim against Musk and the claim can proceed to the extent the material misstatements are construed as Musk's March 26, 2022 "Haha that would [be] sickkk" tweet and his March 26, 2022 "Am giving serious thought to this" tweet.

### III. Section 20(a) Claims

Last, with respect to the Section 20(a) claims, Defendants succinctly argue that because there is no primary violation, these claims must also be dismissed. Def. Br. at 24. Plaintiffs similarly rest on the argument that the claim is adequately pleaded because "Musk and Birchall each controlled the Trust and Excession, and each culpably participated in the fraud by acting with scienter." Pl. Opp. at 25.

Under Section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under [the Exchange Act and its regulations] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ." 15 U.S.C. § 78t(a). "To state a claim under § 20(a), a plaintiff must demonstrate . . . a primary violation by the controlled person." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022) (citing *ATSI*, 493 F.3d at 108 (affirming district court

dismissal of control person liability claim because when a plaintiff "fails to allege any primary violation . . . it cannot establish control person liability")).

Because Plaintiff plausibly alleges primary violations under Rule 10b-5, the Court finds that its Section 20(a) claims as to Musk and Birchall claims should proceed.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **DENIED** to the extent the 10(b)-5(a) and (c) claims are predicated on the following acts:  (1) the improper Schedule 13G filing; (2) Musk's misleading tweets about Twitter's future, and (3) the carrying out of a coordinated trading strategy to silently build up Musk's position in Twitter.  Defendants' motion to dismiss is **DENIED** to the extent the 10(b)-5(b) claim is predicated on the following statements: (1) Musk's March 26, 2022 "Haha that would [be] sickkk"; and (2) Musk's March 26, 2022  "Am giving serious thought to this" tweet.  Defendants motion to dismiss is also **DENIED** as to Plaintiff's Section 20(a) claims.

Defendants' motion to dismiss is **GRANTED** to the extent the 10(b)-5(a) and (c) claims are predicated on the allegedly deceptive act of Defendants making false statements of legal blessing as to their trading strategy.  Defendants' motion to dismiss is **GRANTED** to the extent the 10(b)-5(b) claim is predicated on the following statements:  (1) Musk's March 25, 2022 Twitter poll; (2) Musk's March 26, 2022 "What should be done?" tweet; and (3) Musk's March 26, 2022 "Is a new platform needed?" tweet.

Additionally, Plaintiff's motion for oral argument is **DENIED.**  The Parties' letter motions to seal are **GRANTED**.  All pending letter motions for conferences are **DENIED**.  The parties are hereby **ORDERED** to file a joint status report on the proposed next steps in this matter thirty (30)

42

days after the entry of this order.  The Clerk of the Court is respectfully directed to terminate

the open motions at ECF Nos. 89, 90, 93, 104, 105, and 112.

**SO ORDERED.**

Dated:       **March 28, 2025**
             **New York, New York**

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**

43