UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SEAGATE TECHNOLOGY HOLDINGS PLC SECURITIES LITIGATION | Case No. 23-cv-03431-RFL<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>Re: Dkt. No. 106 |

In this putative class action alleging securities fraud, Plaintiffs contend that Seagate Technology Holdings plc ("Seagate") and two of its executive officers, William D. Mosley and Gianluca Romano, violated Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, 17 C.F.R. § 240.10b-5. Plaintiffs' claims are based on Defendants' statements regarding Seagate's sales of hard disk drive ("HDD") technology to the Chinese company Huawei Technologies Co., Ltd. ("Huawei").

In August 2020, the Department of Commerce, through its Bureau of Industry and Security ("BIS"), issued the Foreign Direct Product Rule ("FDPR"), which prohibited exports of certain designated U.S. technologies to Huawei, based on national security and foreign policy concerns. In 2020 and 2021, Seagate continued to sell HDDs to Huawei, even after its competitors ceased shipments, and allegedly sold over $1 billion in HDDs to Huawei after the FDPR went into effect. In April 2023, Seagate admitted that those sales were illegal under the FDPR, and paid a historically large $300 million civil penalty in a settlement with BIS. This securities lawsuit alleges that, in 2020 and 2021, Seagate falsely represented to investors that its sales were in fact in compliance with the FDPR based on its continual monitoring of the regulations.

Seagate's motion to dismiss the Complaint was previously granted with leave to amend

because, among other things, Plaintiffs had not adequately alleged that Seagate *knew* its sales to Huawei were illegal at the time those statements were made. Plaintiffs have now added allegations that the BIS guidance interpreting the FDPR required that, in any situation where there was "reasonable suspicion that a transaction will violate" the Export Administration Regulations ("EAR"), Seagate had an obligation to (1) engage in further inquiry, and (2) to refrain from the transaction or seek guidance from BIS if the company continued to have "reasons for concern" after its inquiry. (Dkt. No. 100 ("Compl.") ¶ 43 (quoting BIS guidance).) Seagate neither refrained from further sales to Huawei nor sought guidance from BIS. Accordingly, by stating its compliance with the FDPR and touting its familiarity with the regulations, Seagate was allegedly also representing to investors that it did not have "reasons for concern" that its sales to Huawei were illegal.

Plaintiffs have sufficiently alleged that Seagate's actions support a strong inference that, by October 2020, the company was well aware that there were "reasons for concern" about the legality of its continued sales to Huawei under the FDPR. Although Seagate had openly discussed Huawei's role as a customer in September 2020, the company allegedly shifted its policy to stop discussing its sales to customers by October 2020. Indeed, on December 7, 2020, Seagate allegedly signed a strategic cooperation agreement with Huawei where it became Huawei's priority supplier, and in January 2021, Huawei allegedly placed a "massive" order for 2 million HDDs and received a $280 million line of credit from Seagate. Yet, despite Seagate's allegedly typical practice of announcing similar partnerships, Seagate remained silent rather than touting those developments, supporting an inference that it was aware of reasons for concern about its ongoing sales to Huawei. From May 2021 through September 2021, Seagate also allegedly refused to answer questions from Congress about its sales to Huawei, further suggesting the company had reasons for concern about those sales. And, ultimately, an October 2021 minority report from the Senate Commerce Committee concluded that Seagate had "knowingly violated the Foreign Direct Product Rule for more than one year." (*Id.* ¶ 102 (quoting the report).) Those allegations support a strong inference that Seagate was, at the very

least, aware of reasons for concern about the legality of its sales to Huawei.

For the reasons stated below, the Court **GRANTS IN PART WITHOUT LEAVE TO AMEND AND DENIES IN PART** Defendants' motion to dismiss the Amended Consolidated Class Action Complaint ("Complaint") for failure to state a claim. As to most of Seagate's statements regarding compliance with the FDPR, the drivers of its revenue, and its reliance on sales to Huawei to meet its revenue projections, Plaintiffs have sufficiently pled their claims.

## I. BACKGROUND

### A. The Foreign Direct Product Rule

On August 20, 2020, BIS issued the FDPR. In relevant part, footnote 1 of the FDPR—titled "Foreign-produced direct product items involving footnote 1 designated entities"—provides:

> You may not reexport, export from abroad, or transfer (in-country) without a license or license exception any foreign-produced item specified in paragraph (a) or (b) of this footnote when there is "knowledge" that:
>
> (1) The foreign-produced item will be incorporated into, or will be used in the "production" or "development" of any "part," "component," or "equipment" produced, purchased, or ordered by any entity with a footnote 1 designation in the license requirement column of this supplement; or
> (2) Any entity with a footnote 1 designation in the license requirement column of this supplement is a party to any transaction involving the foreign-produced item, *e.g.*, as a "purchaser," "intermediate consignee," "ultimate consignee," or "end-user."

Paragraph (b) of the footnote, titled "Direct product of a plant or major component of a plant," states: "The foreign-produced item is produced by any plant or major component of a plant that is located outside the United States, when the plant or major component of a plant, whether made in the U.S. or a foreign country, itself is a direct product of U.S.-origin 'technology' or 'software' subject to the EAR that is specified in" particular Export Control Classification Numbers of the Commerce Control List. And, according to the notes to paragraph (b), "[a] major component of a plant located outside the United States means equipment that is essential to the 'production' of an item, including testing equipment."

The term "direct product" is defined elsewhere in the Export Administration Regulations as "[t]he *immediate product* (included processes and services) produced directly by the use of technology or software." 15 C.F.R. § 772.1 (emphasis added). Based on that definition, Seagate contended that the rule could be read as prohibiting only the export of the immediate product of equipment using the prohibited technology. Specifically, Seagate argued that it interpreted the FDPR "to require evaluation of only the last stage of its HDD manufacturing process rather than the entire process." (Dkt. No. 72-19 ("BIS Order") at 5.)[1]

However, footnote 1 expressly contemplates that foreign-produced items may be direct products when produced by plants or major components of plants that are themselves direct products of the prohibited technology. Moreover, a "major component" of a plant is defined to include "equipment that is essential to the 'production' of an item"—meaning that a "major component" appears to include essential equipment from any phase of production of the product. Based on footnote 1 of the FDPR, the rule is fairly read to prohibit the export of items "produced by" any essential equipment, where such *equipment* was the direct product of the prohibited technology. So long as the *equipment* was the direct product, all items produced by that equipment would similarly be barred from export throughout the entire manufacturing chain.

The latter interpretation appears more faithful to the plain text of the FDPR. Otherwise, the rule's knowledge requirement—which prohibits the item's "incorporate[ion]" or "use[]" in the "production" or "development" of any part or equipment used by the entity when there is knowledge—would be rendered pointless, if the rule were read to only apply to the last stage of production. BIS guidance confirms this point. In response to a public comment requesting a definition for the term "essential," BIS stated that "[b]ecause the definition of production applies to 'all production stages, such as: Product engineering, manufacture, integration, assembly (mounting), inspection, testing, and quality assurance', any equipment subject to the Export Control Classification Numbers specified in footnote 1 of supplement no. 4 to part 744 of the

[1] Citations to page numbers refer to the ECF pagination.

EAR that is involved in any of the production stages is considered *essential*." Addition of Huawei Non-U.S. Affiliates to the Entity List, the Removal of Temporary General License, and Amendments to General Prohibition Three (Foreign-Produced Direct Product Rule), 85 Fed. Reg. 51,596 (Aug. 20, 2020) (to be codified at 15 C.F.R. pts. 736, 744, 762) (emphasis in original). It would not make sense for the agency to define essential equipment to include the entire chain of production if the final stage of manufacturing was the only stage that mattered.

Seagate's strained interpretation also defies the purpose of the export restrictions—which is to avoid allowing Huawei to access products that could allow them to reverse-engineer prohibited technology. Although Seagate could conceivably have been unaware that its interpretation was wrong, the BIS guidance specified that once Seagate was put on notice that its conduct might conceivably violate the FDPR, Seagate was not entitled to bury its head in the sand, but instead was under an affirmative obligation to engage in further inquiry. According to the guidance, when a company becomes aware that its customer is on the U.S. restricted party list—as Huawei is—that "should cause reasonable suspicion that a transaction will violate the EAR," and the company has "a duty to check out the suspicious circumstances." "The purpose of this inquiry is . . . to determine whether the 'red flags' can be explained or justified." But if a company "continue[s] to have reasons for concern" after their initial inquiry, the guidance explains that it "should either refrain from the transaction or submit all the relevant information to BIS in the form of an application for a license or in such other form as BIS may specify."[2]

### B. The Court's Prior Motion to Dismiss Order

In its prior order on the motion to dismiss, the Court found that there were insufficient allegations contained in the complaint from which to infer that "Seagate or the other defendants knew that Seagate's interpretation of the FDPR was incorrect at the time they claimed to be in compliance with the rule, or that Defendants made those statements with the required deceptive

---

[2] In the final rule promulgating the FDPR, BIS referred companies to this guidance in response to a public commenter's question about how deeply companies must dive into the supply chains and design chains of their customers.

intent." (Dkt. No. 96 ("MTD Order") at 2.) That version of the complaint did not contain any allegations about the BIS guidance—which describes the affirmative duties that are triggered once a company has reasons for concern. As explained above, that BIS guidance required Seagate to either refrain from the transaction or seek guidance from BIS in the face of uncertainty, which it did not.

### C. Timeline of Events

The FDPR was promulgated on August 20, 2020. Immediately following the promulgation of the FDPR, Seagate's competitors announced that they would stop shipping HDDs to Huawei. Seagate did not follow suit. Instead, as will be discussed in greater detail below, at a Deutsche Bank Technology Conference on September 14, 2020, Romano assured investors that although Seagate was "still going through the final assessment," based on what the company had "seen until now," it did not "see any particular restriction for [Seagate] in term[s] of being able to continue to ship to Huawei or any other customers in China." (Dkt. No. 101 at 1.) Additionally, Romano stated that Seagate "[did not] think [it] need[ed] to have a specific license." (*Id.*)

However, by the time that an investor call took place on October 22, 2020, Seagate's approach to discussing its sales to Huawei had changed. Despite Seagate's willingness to openly discuss sales to Huawei during the previous month, when asked explicitly about whether Seagate was continuing to ship to Huawei, Mosley did not respond to the question directly, stating only that Seagate "continually monitor[s] and remain[s] in compliance with all the rules and regulations around." (*Id.* at 15.) And by January 21, 2021, when asked about Huawei on an earnings call, Romano stated that Seagate does not "comment on any specific customers." (*Id.* at 37.)

On December 7, 2020, Seagate signed a three-year strategic cooperation agreement with Huawei, which provided Seagate with priority over other Huawei suppliers. Though most companies would presumably be eager to tout a large and highly profitable deal to investors, Seagate allegedly did not publicize this agreement with Huawei at all. That approach contrasted

with Seagate's approach to similar agreements in the past—such as on February 12, 2025, when Seagate publicly announced a strategic alliance with Micron Technology, and on September 18, 2017, when Seagate publicly announced a strategic cooperation agreement with Baidu. (Compl. ¶ 84 n.7.)

Through 2021, Seagate continued to receive notice that it may be in violation of the FDPR, yet continued to publicly claim compliance. On January 27, 2021, one of Seagate's third-party suppliers sent Seagate an "FDP rule notification" letter, notifying it that the supplier's own technology was restricted under the FDPR. And on May 10, 2021, Senator Wicker—the Ranking Member of the Senate Commerce Committee—sent a letter to Seagate (in addition to Western Digital and Toshiba), "seeking to determine whether industry-leading hard disk drive suppliers are complying" with the FDPR. (Compl. ¶ 96 (quoting letter).) The letter asked the companies to provide their interpretation of the FDPR, including their opinion on whether a license was required to continue selling HDDs to Huawei. Although its competitors responded to the request, Seagate "declined to provide its interpretation of the rule, detail its transactional relationship with Huawei, or disclose whether the company had obtained a license to continue shipment of hard disk drives to Huawei." (Dkt. No. 104-10 ("Committee Investigation Report") at 6.) In August 2021, the Minority Staff of the Commerce Committee contacted Seagate again, "seeking to determine its interpretation" of the rule. (*Id.* at 7.) Seagate refused to respond.

It was not until after the Commerce Committee received nonpublic information from BIS—including information regarding any license applications submitted by suppliers—that Seagate representatives agreed to interview with Minority Staff. In the interview, Seagate representatives "disclosed that Seagate ha[d] not applied for any licenses to export hard disk drives to Huawei or its affiliates that are currently on the Entity List" and "that the company ha[d] stopped shipping hard disk drives to Huawei," though it "declined to provide the date that shipments ended." (*Id.*) It was later revealed that Seagate ceased HDD shipments to Huawei on or around September 29, 2021. On October 26, 2021, the Commerce Committee Minority Staff published its report, in which it stated that based on the "evidence available to Minority Staff, it

appears that Seagate Technology knowingly violated the Foreign Direct Product Rule for more than one year" and that "Seagate likely made the strategic calculation to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." (*Id.* at 8.)

On August 29, 2022, Seagate received a proposed charging letter from BIS, alleging that it had violated the FDPR. In April 2023, Seagate paid a $300 million civil penalty in connection with a settlement with BIS, admitting that it had violated the FDPR. Although Seagate never admitted that it knew its interpretation of the FDPR was incorrect, BIS's penalty guidance states: "Many apparent violations are isolated occurrences, the result of a good-faith misinterpretation, or involve no more than simple negligence or carelessness. In such instances, absent the presence of aggravating factors, the matter frequently may be addressed with a no action determination letter or, if deemed necessary, a warning letter." (Compl. ¶ 65 (quoting BIS penalty guidance).) Taking the penalty guidance into account, the $300 million penalty assessed against Seagate suggests that BIS concluded that, at the very least, the company's conduct was not the result of negligence or carelessness.

## II. DISCUSSION

### A. Section 10(b) and Rule 10b-5 Claims

Section 10(b) of the Securities Exchange Act of 1934 prohibits the use of "any manipulative or deceptive device or contrivance in contravention" of the Securities and Exchange Commission's rules. 15 U.S.C. § 78j(b). The SEC's implementing regulation, Rule 10b-5, makes it unlawful for any person "[t]o make any untrue statement or a material fact . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). Plaintiffs must prove each of the following elements to recover under Rule 10b-5(b): "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

To survive a motion to dismiss, a plaintiff's complaint "must contain sufficient factual matter, accepted as true, to state a plausible claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For private securities fraud actions, a complaint must satisfy the additional pleadings requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and the heightened pleading standard of Rule 9(b). Under the PSLRA, where a plaintiff alleges that the defendant "made an untrue statement of a material fact," they must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Similarly, "with respect to each act," a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A). Under Rule 9(b), a plaintiff is required to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

The challenged statements can be grouped into three categories: (1) affirmations of compliance with the FDPR and other applicable export restrictions; (2) statements about Seagate's reliance on sales to Huawei; and (3) statements about the drivers of Seagate's revenue. Each category is addressed in turn.

**1. Statements of compliance**

"Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). "A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (cleaned up). Moreover, "[a] complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007). "In this circuit, the required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 937 (9th Cir. 2023)

(citation and internal quotation marks omitted). "[D]eliberate recklessness is more than *mere* recklessness or a motive to commit fraud." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (citation omitted) (emphasis in original). "It is instead an *extreme* departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* (citation omitted) (emphasis in original).

Plaintiffs adequately pled with particularity both falsity and scienter as to all of Seagate's statements of compliance, except for those made on September 14, 2020. As previously described, at a Deutsche Bank Technology Conference on September 14, 2020, Romano stated that although Seagate was "still going through the final assessment," based on what the company had "seen until now," it did not "see any particular restriction for [Seagate] in term[s] of being able to continue to ship to Huawei or any other customers in China." (Dkt. No. 101 at 1.) Additionally, Romano assured investors that Seagate "[did not] think [it] need[ed] to have a specific license." (*Id.*) On that same call, Romano responded to another question about whether Seagate was impacted by several Chinese companies being put on the Entity List by stating: "I would say the majority of our customers are in China. We have a very high market share in China in general . . . . We don't have any limitation right now in term[s] of what we can ship to those customers." (*Id.* at 8.)

The Complaint's factual allegations do not support an inference that Defendants knew, by September 14, 2020, that their interpretation of the FDPR was erroneous, or that they were required to obtain a license in order to continue shipments to Huawei. Though Seagate's competitors had previously ceased shipments, Seagate explained that it was still going through its final assessment of the rule. These statements imply that, at that point in time, Seagate was still forming its opinion on the potential consequences of the rule. Because Plaintiffs have not alleged that Seagate's assessment of the rule was complete by the time at which Romano made this statement, or that Seagate had reason to know that it was not in compliance with the rule prior to concluding its assessment, Seagate's statements on September 14, 2020 do not provide a

basis from which scienter or falsity can be plausibly inferred.

However, by October 22, 2020, Seagate's behavior changed. Notwithstanding Romano's willingness to specifically discuss Huawei during the call that took place just the month prior, when asked explicitly on an investor call about whether Seagate was continuing to ship to Huawei, Mosley responded only with the following statement: that Seagate "continually monitor[s] and remain[s] in compliance with all the rules and regulations around." (*Id.* at 15.) And by January 21, 2021, when asked again asked about Huawei, Romano stated that Seagate does not "comment on any specific customers." (*Id.* at 37.) Seagate's shift to refusing to discuss Huawei supports an inference that Seagate was, at the very least, aware that there were reasons for concern that its activities were not in compliance with the FDPR.

As Seagate confirmed at oral argument, its assertion that it remained in compliance with "all the rules and regulations" was a representation that Seagate remained in compliance with the BIS guidance. In turn, that guidance required Seagate to either refrain from the transaction or seek guidance if it had "reasons for concern" about the legality of its sales to Huawei. Because Seagate neither stopped its sales nor sought guidance, Seagate's statement of compliance was a representation that it had no reasons for concern. Accordingly, Seagate's alleged awareness of reasons for concern about its Huawei sales provides a basis for both falsity and scienter. If Seagate truly believed its interpretation of the FDPR was reasonable, and thus, that it had no reasons for concern that it was non-compliant with the rule, why not continue to openly tout its business with Huawei?

Seagate's refusal to directly answer questions about Huawei on investor calls is not the only evidence that Seagate was aware that there were reasons for concern. As previously described, Seagate's choice to not publicize its strategic cooperation agreement with Huawei, despite the large size of the agreement and despite allegedly doing so when entering into similar agreements with other companies in the past, provides an additional basis to infer that Seagate was aware that its activities might not comply with the requirements of the FDPR. Likewise, Seagate's choice to stonewall the congressional investigation, including by refusing to provide

the Commerce Committee with its own interpretation of the FDPR, further supports an inference that the company believed it had reasons for concern that its interpretation was incorrect. This conduct supports an inference of scienter, especially when analyzed in light of the other indications that Seagate's interpretation was incorrect—such as that Seagate knew its interpretation was different from others', that it received notice from a third-party supplier that the supplier's technology was restricted under the rule, and that the Commerce Committee was investigating the issue.

Seagate suggests that to infer scienter based on "reasons for concern" rather than known illegal conduct would lower the pleading requirement of deliberate recklessness to the standard for negligence. But Seagate allegedly represented to investors, effectively, that it had no "reasons for concern" about the legality of its HDD sales. Because that is the representation Seagate made, the inquiry focuses on whether Seagate's representation was in fact false and whether Seagate knew it was false. That does not change the legal requirements for scienter.

Interpreted against this backdrop, Seagate's repeated affirmations of compliance—that is, that there were no "reasons for concern"—are sufficiently alleged to be false, and known to be false to Seagate at the time. For example, Seagate made the following statement of compliance on June 8, 2021:

> We always answer to this specific question the same way because that is the truth is we comply with all the rules and regulations. And based on that, we ship for all our customers following those rules and regulations . . . . We don't comment on specific customers as we don't comment on specific suppliers or investors. But in general, it's part of our job to ensure that we understand and then we follow all the rules and regulations of trade.

(*Id.* at 44.) On October 26, 2021, Seagate also made the following statement:

> Seagate "complies with all laws applicable to its business and operations, including export control regulations."

(*Id.* at 58.) And on October 26, 2022, Seagate made the following statements:

> Seagate "did not engage in prohibited conduct," "complied with all relevant export control laws and regulations," and that "Seagate has committed to compliance through its global team of international trade compliance and legal professionals and by maintaining robust

> trade controls compliance policies and procedures."
>
> "We have responded to the letter and believe that we've complied with all relevant export control laws and regulations."

(*Id.* at 66, 73.)

Finally, Defendants' risk factor statements in their annual and quarterly financial reporting, and associated SOX certifications, are also adequately alleged to be false and to support a strong inference of scienter. A representative example of a risk factor statement contained in Seagate's Form 10-Q is the following:

> There have been no material changes to the description of the risk factors associated with our business previously disclosed in "Risk Factors" in Part I, Item 1A. in our Annual Report on Form 10-K for the fiscal year ended July 3, 2020.
>
> Our business is subject to regulation under a wide variety of U.S. federal and state and non-U.S. laws, regulations and policies. There can be no assurance that laws, regulations and policies will not be changed in ways that will require us to modify our business model and objectives or affect our returns on investments by restricting existing activities and products, subjecting them to escalating costs or prohibiting them outright . . . . Although we have implemented policies and procedures designed to ensure compliance, there can be no assurance that our employees, contractors or agents will not violate these or other applicable laws, rules and regulations to which we are and may be subject.

(*Id.* at 21-22) (emphasis added).) This statement was included in Seagate's filings from October 29, 2020, January 28, 2021, April 29, 2021, October 28, 2021, January 27, 2022, and April 28, 2022. In the SEC-mandated SOX certifications associated with those filings, Romano and Mosley represented that, based on their knowledge, "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and moreover, that the filing disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information." (Dkt. No. 101 at 29-30.)

Once a risk is known to the company, a statement that no material changes have occurred

is misleading. *In re Alphabet, Inc. Secs. Litig.*, 1 F.4th 687 (9th Cir. 2021), is instructive. There, in the aftermath of the discovery of a bug, Google's legal and policy team created a memo describing the bug, as well as the ongoing security vulnerabilities that risked additional data exposures. As such, the Ninth Circuit concluded that "[g]iven that the April 10-Q filing was made after the detection of Google's cybersecurity issues [and] after internal deliberation based on the Privacy Bug Memo . . . the complaint plausibly alleges that omission of any mention of the Three-Year Bug or the other security vulnerabilities made the statements in each Form 10-Q materially misleading to a reasonable investor and significantly altered the total mix of information available to investors." *Id.* at 702. Similar logic applies here. The allegations here support a strong inference that, by October 2020, Seagate was aware that there were reasons for concern that its sales were illegal, and thus, that it was required to either refrain from those sales or seek further guidance from BIS, but did not do so. As such, Seagate's continued statements that there were "no material changes" to its risk were misleading, precisely because Seagate had allegedly already become aware that there were reasons for concern—and thus, that it was out of compliance with the FDPR's requirement to refrain from sales or seek guidance—and failed to disclose that noncompliance to investors.

In conclusion, Plaintiffs have sufficiently pled scienter and falsity as to all of Seagate's statements of compliance, except for those made by Seagate on September 14, 2020. Accordingly, referencing Plaintiffs' chart of challenged representations (Dkt. No. 101), the motion to dismiss is denied with respect to Statements 3 through 12 (dated October 22, 2020 through January 25, 2023), and granted as to Statements 1 and 2 (dated September 14, 2020).[3]

**2. Statements of revenue drivers**

As to the second category of statements, Plaintiffs have pled with particularity both scienter and falsity as to all statements, except for the January 26, 2022 statement made during

---

[3] For ease, the Court will follow the same numerical identification that Plaintiffs assigned to each challenged statement for purposes of its amended complaint. (Dkt. No. 101 (chart identifying the statement number, the false and misleading statement, reasons the statements was false, misleading, or deceptive when made, and facts giving rise to a strong inference of scienter).)

the 2022 Q2 earnings call (Statement 28). Specifically, Plaintiffs allege that in making statements about the drivers of Seagate's revenue during Q1 2021 through Q2 2023, it was misleading for Seagate not to disclose that its revenue "was driven in material part by illegal sales to a single customer, Huawei." (Compl. ¶ 227.) The following are representative examples of the types of statements Seagate made:

> Seagate's revenue results were driven by "solid double-digit revenue growth for our consumer drives, reflecting both the return to seasonal patterns and strength of the Seagate's brand among prosumers and gamers." (Statement 16, October 22, 2020, Q1 Earnings Call).
>
> Seagate's revenue "performance reflected strong recovery in the video and image application, or VIA, market." (Statement 16, October 22, 2020, Q1 Earnings Call).
>
> Seagate's positive revenue results were driven by (1) the fact that "the enterprise markets began to recover for the first time since the onset of the pandemic," particularly improving demand "amongst large enterprise OEM customers, which led to strong sequential revenue growth for both nearline and mission critical drives"; (2) "stronger-than expected growth in video and image applications or VIA markets, due in part to pent-up demand"; and (3) "strong seasonal demand for our desktop PC and consumer drives." (Statement 18, January 21, 2021, Q2 Earnings Call).
>
> "Seagate delivered another quarter of strong financial performance driven by ongoing operational execution and record sales of our high capacity nearline drives. We grew revenue, expanded profitability and achieved non-GAAP EPS above our guided range. Our March quarter results underscore the strength of our HDD product portfolio and increasing demand for mass capacity storage." (Statement 23, April 22, 2021, Press Release/8-K).

(Dkt. No. 101 at 112, 126, 161, 205.)

These statements are misleading because they imply that the driving causes of Seagate's strong financial performance were lawful rather than attributable, in significant part, to its allegedly illegal HDD sales to Huawei. To the contrary, Plaintiffs allege that, "[a]bsent illegal sales, Seagate would have come in below the midpoint of its revenue guidance" for Q1 of 2021, Q2 of 2021, and Q4 of 2021, and would have "missed its revenue guidance range entirely" for Q3 of 2021 and Q1 of 2022. (Compl. ¶ 107.) Furthermore, in the Amended Complaint, Plaintiffs added allegations explaining that the midpoint of revenue guidance is a metric that is

"highly material to investors in evaluating an issuer's financial performance." (*Id.*) To support this proposition, Plaintiffs explain in a footnote that, "[a]s numerous studies have explained, securities analysts focus on the midpoint of issuer revenue guidance in evaluating an issuer's financial performance," and cite to one such study that makes this argument as an example. (*Id.* ¶ 107 n.9.) Thus, as to all these statements (excluding Statement 28), Defendants' failure to mention that sales to Huawei was among the factors materially driving Seagate's positive revenue performance was misleading because it created the false impression that sales to Huawei were not necessary for Seagate to reach the midpoint of its revenue guidance for these quarters. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) ("Disclosure is required . . . when necessary to make statements made, in light of the circumstances under which they were made, not misleading" (cleaned up)).

The prior dismissal order regarding these statements observed that a "different situation" might be presented "if Seagate allegedly knew its Huawei sales were illegal and privately credited those sales with Seagate's ability to meet the earnings targets." (MTD Order at 7 n.2.) Plaintiffs have now sufficiently pled that Seagate *did* likely know that it was in violation of the FDPR's requirements that it cease sales or seek guidance if it had reasons for concern about the legality of those sales, as discussed above. Moreover, with that knowledge, beginning in October 2020, Seagate allegedly pointed investors to other drivers of its revenue, while also refusing to speak about revenues from Huawei, even as its Huawei sales skyrocketed through a major strategic partnership. Those actions support a strong inference of scienter: that, allegedly, the company privately understood the significance of its sales to Huawei and sought to downplay them in light of its realization that there were reasons for concern about their legality. *See, e.g.*, *In re Syncor Int'l Corp. Secs. Litig.*, 239 F. App'x 318, 320 (9th Cir. 2007) (finding "defendants' statements attributing overseas growth solely to legitimate business practices [] at least incomplete" where they "omitt[ed] any mention of illegal payments," and stating that "[i]ncomplete statements are misleading if they affirmatively create an impression of a state of affairs which differs in a material way from the one that actually exists" (internal quotation

omitted)).

However, the Court's prior conclusion as to the January 26, 2022 statement (Statement 28) during the Q2 2022 earnings call still stands. Q2 2022 ended on December 31, 2021. Prior to that quarter, "Seagate had already stopped shipping to Huawei, so sales to Huawei could not have been a driver of revenue for that quarter." (MTD Order at 6.) No new allegations address this deficiency. Thus, this statement was not materially misleading.

After that January 26, 2022 statement, Seagate then allegedly embarked on another series of representations. Specifically, Seagate's HDD revenues allegedly declined in subsequent quarters after sales to Huawei were halted on September 29, 2021, but Seagate represented that these declines were driven by a variety of other non-Huawei factors. For example:

> Seagate's negative revenue results were driven by: (1) "industry-wide supply challenges"; (2) "impacts from the ongoing conflict in Ukraine"; and (3) "COVID restrictions" that were all "constraining growth over the near term." (Statement 29, April 27, 2022, Q2 Earnings Call).
>
> Seagate's revenue decline attributable to legitimate business factors, including: "[g]lobal economic uncertainties and broad-based customer inventory corrections" and "current macro uncertainties." (Statement 34, October 26, 2022, Press Release/8-K).

(Dkt. No. 101 at 205, 243.) These statements are misleading because they suggest that the cause for Seagate's declining revenue was unrelated to its loss of sales to Huawei, but instead, was attributable to supply challenges, global conflict, COVID restrictions, and other factors. Thus, for the same reasons outlined above, falsity and scienter are sufficiently alleged as to these statements.

In conclusion, Plaintiffs have sufficiently pled falsity and scienter. Accordingly, the motion to dismiss is denied with respect to Statements 16 through 36 (dated October 22, 2020 through January 25, 2023), except as to Statement 28 (dated January 26, 2022).

### 3. Statements of reliance on sales to Huawei

For the same reasons, Plaintiffs have adequately alleged falsity and scienter as to Mosley's statement to investors on October 22, 2020, that Huawei's revenue contribution to

Seagate was not "material" to Seagate's December quarter guidance for Q2 2021. Although Huawei's revenue contribution for that quarter accounted for 5.61% of Seagate's HDD revenue, Plaintiffs have alleged that Seagate would have missed the midpoint of its revenue guidance for that quarter without those sales and that Seagate sought to downplay those sales in light of the reasons for concern about the legality of sales to Huawei.

However, Plaintiffs have failed to adequately plead falsity as to the remainder of Seagate's statements about its reliance on sales to Huawei. On September 14, 2020, in response to a question about the Huawei's revenue contribution to Seagate, Romano stated: "[W]e don't disclose the level of revenue of specific customers. But as you know, we should report if the customer is above 10%. So, you can assume that [it] is not [at that] level." (*Id.* at 89.) During Q1 of 2021, Seagate's sales to Huawei were 3.06% of HDD revenue—which is under 10%. Although Plaintiffs allege that Defendants "downplay[ed] [Seagate's] reliance on, and exposure to, Huawei sales," Romano's statement on that date accurately conveyed that Huawei was not above the 10% level. (Compl. ¶ 104.) Nor does that statement promise to immediately report Huawei's sales the moment those sales increase beyond 10%. Instead, that statement appears to reference GAAP requirements for annual disclosures of certain major customers, as discussed below. There is no allegation Seagate failed to comply with such required annual reporting. Thus, there is no basis to infer that Seagate's statement was false or misleading.

Plaintiffs also challenge Defendants' statement in Seagate's April 29, 2021 Form 10-Q, which represents that the document was "prepared in accordance with U.S. generally accepted accounting principles [("GAAP")]." (Dkt. No. 101 at 102.) This statement is allegedly false because GAAP requires disclosure where transactions with a single customer amount to 10% or more of a public entity's revenues. Seagate made no such disclosure, despite Seagate's sales to Huawei amounting to 13.42% for Q3 of 2021. In its prior order, the Court dismissed the claim with respect to this statement because Plaintiffs did "not allege which GAAP rule requires such disclosures to be made for interim reporting periods, as opposed to on an annual basis." (MTD Order at 5.) Now, Plaintiffs point to ASC-280-10-50-19, which states that issuers "are

encouraged to report information about segments that do not meet the quantitative thresholds if management believes that it is material." (Compl. ¶ 54 n.6.) Although this "encouragement" applies "for each period for which an income statement is presented," per ASC-280-10-50-20, it is just that: an encouragement, not a requirement. (*Id.*) And as ASC-280-10-50-39 indicates, entity-wide disclosure requirements only apply to annual reports. Accordingly, failure to comply with the ASC-280-10-50-19 encouragement does not render Seagate's GAAP compliance representation false.

Accordingly, Plaintiffs have failed to adequately plead falsity as to Statements 13 and 15, but not as to 14. Accordingly, the motion to dismiss is granted with respect to Statement 13 (dated September 14, 2020) and Statement 15 (dated April 29, 2021), and denied as to Statement 14 (dated October 22, 2020).

**4. Scheme liability theory**

Additionally, Plaintiffs allege that Seagate engaged in a fraudulent scheme to defraud investors, based on Seagate's alleged orchestration of "a secret 'priority' business relationship with Huawei to hide the extent of Seagate's reliance upon illegal sales to Huawei and Seagate's repeated violations of the FDPR." (*Id.* ¶ 283.) To state a claim under this theory, each defendant must have "committed a deceptive or manipulative act in furtherance of the alleged scheme," in addition to the other elements described above. *York Cnty. on Behalf of Cnty. Of York Ret. Fund v. HP Inc.*, 738 F. Supp. 3d 1182, 1206 (N.D. Cal. 2024). Plaintiffs have plausibly stated a claim, as Plaintiffs have sufficiently alleged that each Defendant acted in a deceptive and manipulative manner in making false statements that downplayed or obscured Seagate's sales to Huawei, as described above. At this stage, this is sufficient to state a claim.

**5. Loss causation**

To plead loss causation, Plaintiffs must allege "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). At the pleadings stage, alleging loss causation is a "low bar." *In re WageWorks, Inc., Secs. Litig.*, No. 18-cv-01523, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020). Defendants argue that

Plaintiffs failed to plead loss causation with respect to Seagate's March 8, 2022 disclosure—where Seagate lowered its earnings guidance for the upcoming quarter—and its July 21, 2022 disclosure—where Seagate reported depressed financial results for the fourth quarter of 2022. However, Plaintiffs have adequately pled a causal connection between the statements and the loss, as a corrective disclosure need only "relate back to the misrepresentation" to survive a motion to dismiss. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). Plaintiffs allege that "Seagate's stock price was artificially inflated as a result of Defendants' materially false and misleading statements and omissions that created false impressions concerning Seagate's regulatory and legal compliance with U.S. export restrictions and its reliance on HDD sales to Huawei. As a result of Defendants' materially false and misleading statements and omissions, the market price of Seagate's common stock was inflated." (Compl. ¶ 260.) Moreover, Plaintiffs allege that "Seagate's declining financial performance, which was driven by declining HDD sales in Asia due to the loss of the Company's Huawei sales, further revealed the truth concealed by Defendants' misstatements, as Seagate's financial performance continued to assimilate and reflect the loss of the Company's illegal monopoly. Again, analysts connected Seagate's poor financial performance to declining demand in Asia . . . . These analysts explained that the disappointed revenue results were 'driven by HDD inventory adjustments across most segments' and specifically highlighted flagging demand in China." (*Id.* ¶ 118.) That is sufficient at this stage.

**B. Section 20(a) Claim**

Section 20(a) of the Exchange Act contemplates liability for certain "controlling" individuals for violations of Section 10(b) and Rule 10b-5. 15 U.S.C. § 78t(a). Thus, "a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (quoting *No. 84 Emp.-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp. ("America*

*West")*, 320 F. 3d 920, 945 (9th Cir. 2003)). Defendants' only argument as to the Section 20(a) claim is that it "fails for failure to plead a primary violation of securities law." (Dkt. No. 104 at 31 n.28.) Because Plaintiffs have adequately pled a primary violation of securities law, this claim survives as well. Accordingly, the motion to dismiss with respect to this claim is denied.

## III. CONCLUSION

For the reasons stated above, the motion to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claims is denied with respect to Statements 3 through 12, Statement 14, Statements 16 through 27, and Statement 29 through 36. The motion to dismiss is similarly denied with respect to Plaintiffs' Section 20(a) claim. The motion to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claims is granted without leave to amend with respect to Statements 1 and 2, Statement 13, Statement 15, and Statement 28.

**IT IS SO ORDERED.**

Dated: May 12, 2025

RITA F. LIN
United States District Judge