CAZ HASHEMI, State Bar No. 210239
STEPHEN B. STRAIN, State Bar No. 291572
BETTY CHANG ROWE, State Bar No. 214068
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (866) 974-7329
Email: chashemi@wsgr.com
        sstrain@wsgr.com
        browe@wsgr.com


MARK R. YOHALEM, State Bar No. 243596
JULIA HU, State Bar No. 338226
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
953 East Third Street, Suite 100
Los Angeles, CA 90013
Telephone: (323) 210-2900
Facsimile: (866) 974-7329
Email: mark.yohalem@wsgr.com
        julia.hu@wsgr.com

Attorneys for Defendants
Seagate Technology Holdings plc,
William D. Mosley, and Gianluca Romano

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| *In re Seagate Technology Holdings plc, Securities Litigation* | ) Case No.: 3:23-cv-03431-RFL <br> ) <br> ) **DEFENDANTS' NOTICE OF** <br> ) **MOTION AND MOTION TO** <br> ) **CERTIFY ORDER FOR** <br> ) **INTERLOCUTORY APPEAL AND TO** <br> ) **STAY PROCEEDINGS** <br> ) <br> ) Date:  August 12, 2025 <br> ) Time:  10:00 a.m. <br> ) Judge: Honorable Rita F. Lin <br> ) Courtroom:    15 – 18th Floor <br> ) <br> ) |

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................................ii

TABLE OF ABBREVIATIONS.........................................................................................................v

NOTICE OF MOTION AND MOTION ...........................................................................................1

STATEMENT OF ISSUES (CIVIL L.R. 7-4-(A)(3)) ......................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................................1

BACKGROUND................................................................................................................................2

ARGUMENT ....................................................................................................................................3

    I.     The Court Should Certify the Order for Interlocutory Review ...............................3

          A.     The Order Presents Two Controlling Questions of Law ............................4

          B.     Substantial Grounds for Difference of Opinion Exists on Both
                Questions ....................................................................................................5

                1.     Question 1: Whether the EAR Requires a Company to Seek
                        Guidance from BIS When It Has "Reasons for Concern"
                        Over Its Legal Interpretation of the FDPR's "Product Scope"
                        Provision.......................................................................................5

                2.     Question 2: Whether "Reasons for Concern" Must Rise
                        Beyond "Notice that Conduct Might Conceivably Violate the
                        FDPR" to a Level Akin to Willful Blindness..................................9

          C.     Immediate Appeal Would Materially Advance the Litigation..................14

    II.     The Court Should Grant a Stay Pending the Appeal.............................................14

CONCLUSION ...............................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Appalachian Power Co. v. E.P.A.*,
208 F.3d 1015 (D.C. Cir. 2000) ............................................................................................. 10

*Asis Internet Servs. v. Active Response Grp.*,
2008 WL 4279695 (N.D. Cal. Sept. 16, 2008) ...................................................................... 14

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ............................................................................................................... 12

*Beal v. Royal Oak Bar*,
2016 WL 3230887 (N.D. Cal. June 13, 2016) ......................................................................... 5

*Border Power Plant Working Grp. v. Dep't of Energy*,
467 F. Supp. 2d 1040 (S.D. Cal. 2006) .................................................................................. 10

*City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*,
254 F.3d 882 (9th Cir. 2001) ................................................................................................... 5

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) .................................................................................................. 13

*Davoli v. Costco Wholesale Corp.*,
854 F. App'x 116 (9th Cir. 2021) ........................................................................................... 11

*Doe 1 v. Github, Inc.*,
2024 WL 4336532 (N.D. Cal. Sept. 27, 2024) .......................................................... 8, 14, 15

*Ernst & Ernst. v. Hochfelder*,
425 U.S. 185 (1976) ............................................................................................................... 11

*Facebook Inc. v. Namecheap Inc.*,
2021 WL 961771 (D. Ariz. Mar. 15, 2021) ........................................................................... 14

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) .................................................................................................. 11

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) ................................................................................................... 9, 10, 12

*ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*,
22 F.4th 1125 (9th Cir. 2022) ................................................................................................ 14

*In re Cement Antitrust Litig.*,
673 F.2d 1020 (9th Cir. 1981) ................................................................................................. 4

*In re Google Inc. St. View Elec. Comm'ns Litig.*,
2011 WL 13257346 (N.D. Cal. July 18, 2011) ..................................................................... 8, 9

*In re Medicis Pharm. Corp. Sec. Litig.*,
689 F. Supp. 2d 1192 (D. Ariz. 2009) .................................................................................... 11

*In re Paypal Holdings, Inc.*,
  2018 WL 466527 (N.D. Cal. Jan. 18, 2018) ................................................................. 12

*In re Silicon Graphics, Inc. Sec. Litig.*,
  183 F.3d 970 (1999) ................................................................................................... 11

*Kang v. PayPal Holdings, Inc.*,
  620 F. Supp. 3d 884 (N.D. Cal. 2022) ....................................................................... 12

*Largan Precision Co, Ltd v. Genius Elec. Optical Co., Ltd.*,
  2015 WL 2063988 (N.D. Cal. May 4, 2015), *aff'd*, 646 F. App'x 946
  (Fed. Cir. 2016) .......................................................................................................... 12

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
  601 U.S. 257 (2024) .................................................................................................... 12

*Meyers v. Birdsong*,
  83 F.4th 1157 (9th Cir. 2023) ...................................................................................... 8

*Minn. Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*,
  2010 WL 889864 (E.D. Mo. Mar. 8, 2010), *aff'd*, 641 F.3d 1023
  (8th Cir. 2011) ............................................................................................................ 13

*Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*,
  45 F.4th 121 (D.C. Cir. 2022) ..................................................................................... 10

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) .................................................................................................... 13

*Ottesen v. Hi-Tech Pharms., Inc.*,
  2024 WL 589089 (N.D. Cal. Feb. 13, 2024) ................................................................ 15

*Reese v. BP Expl. (Alaska) Inc.*,
  643 F.3d 681 (9th Cir. 2011) ...................................................................... 1, 4, 5, 8, 14

*Reese v. Browne*,
  2009 WL 10668680 (W.D. Wash. July 2, 2009) ............................................................ 4

*Resol. Tr. Corp. v. Smith*,
  879 F. Supp. 1059 (D. Or. 1995) .................................................................................. 4

*Rollins v. Dignity Health*,
  2014 WL 6693891 (N.D. Cal. Nov. 26, 2014) .............................................................. 15

*SG Cowen Sec. Corp. v. U.S. Dist. Ct.*,
  189 F.3d 909 (9th Cir. 1999) ...................................................................................... 15

*Silbersher v. Allergan Inc.*,
  2021 WL 292244 (N.D. Cal. Jan. 28, 2021) ................................................................ 15

*Steering Comm. v. United States*,
  6 F.3d 572 (9th Cir. 1993) ........................................................................................... 4

*Stinson v. United States*,
  508 U.S. 36 (1993) ...................................................................................................... 10

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) ...................................................................................................... 13

*Tsyn v. Wells Fargo Advisors, LLC*,
2016 WL 7635883 (N.D. Cal. June 27, 2016) ............................................................... 5

*United States v. Jewell*,
532 F.2d 697 (9th Cir. 1976) (en banc) ......................................................................... 9

*United States v. Real Prop. & Improvements Located at 2441 Mission St., S. F., Cal.*,
2014 WL 1350914 (N.D. Cal. Apr. 4, 2014) ................................................................ 14

*Veal v. LendingClub Corp.*,
423 F. Supp. 3d 785 (N.D. Cal. 2019) .......................................................................... 13

*Victor v. Nebraska*,
511 U.S. 1 (1994) .......................................................................................................... 12

*Williams v. Cty. of Monterey*,
2021 WL 1966711 (N.D. Cal. May 17, 2021) ................................................................ 5

**STATUTES**

28 U.S.C. § 1292(b) .............................................................................................. 1, 3, 14

**REGULATIONS**

15 C.F.R § 732.1 ............................................................................................................. 6

15 C.F.R. § 732.3 ......................................................................................................... 6, 7

15 C.F.R. § 734.9 ..................................................................................................*passim*

15 C.F.R. § 764.2 .......................................................................................................... 10

15 C.F.R. § 772.1 ..................................................................................................... 6, 10

15 C.F.R. Pt. 732, Supp. 3 ............................................................................... 7, 8, 9, 10

**MISCELLANEOUS**

*Export Administration Regulation; Simplification of Export Administration Regulations*, 61 Fed. Reg. 12714, 12714 (Mar. 25, 1996) ................................................ 10

H.R. Conf. Rep. No. 104-369 ....................................................................................... 15

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| 3/4/25 RT | Transcript of Proceedings of the March 4, 2025 Motion to Dismiss Hearing |
| BIS | Bureau of Industry and Security |
| Compl. or Complaint | Consolidated Class Action Complaint for Violations of the Federal Securities Laws, filed October 19, 2023 (ECF No. 68) |
| Defendants | Seagate Technology Holdings plc, William D. Mosley, and Gianluca Romano |
| EAR | Export Administration Regulations |
| FAC or Amended Complaint | Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, filed September 12, 2024 (ECF No. 100) |
| FDPR | Foreign Direct Product Rule |
| Guidance | BIS's "Know Your Customer" Guidance and Red Flags, codified at 15 C.F.R. Pt. 732, Supp. 3. For the Court's convenience, the then-applicable version of the Guidance has been provided as Exhibit 1 to the Declaration of Stephen B. Strain in support of this Motion. |
| HDDs | Hard disk drives |
| Huawei | Huawei Technologies Co. |
| Order | May 12, 2025 Order on Defendants' Motion to Dismiss (ECF No. 113) |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| Seagate or Company | Seagate Technology Holdings plc |

In the Memorandum, emphasis is added unless otherwise noted. Certain quotation marks, alteration marks, citations, and emphases have been omitted.

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that at the above-referenced time and date, Defendants shall move for an order certifying an interlocutory appeal under 28 U.S.C. § 1292(b) from the Court's May 12, 2025 Order on Defendants' motion to dismiss (ECF No. 113, or "Order"), and for an order staying proceedings pending resolution of any interlocutory appeal.

## STATEMENT OF ISSUES (CIVIL L.R. 7-4-(A)(3))

1. Whether the Court should certify its May 12, 2025, Order on Defendants' motion to dismiss for interlocutory review under 28 U.S.C. § 1292(b).

2. Whether the Court should stay proceedings during any interlocutory appeal.

## MEMORANDUM OF POINTS AND AUTHORITIES

In contrast to its initial order dismissing Plaintiffs' securities fraud claims because Plaintiffs failed to allege Defendants *knew* Seagate's sales to Huawei *were* illegal, the Court allowed the Amended Complaint to go forward because Defendants purportedly had "reasons for *concern*" that the sales *might be* illegal. The Court focused on Plaintiffs' new "allegations about the BIS guidance," which the Court construed as "describ[ing] the affirmative duties that are triggered once a company has reasons for concern." Order 6. The Guidance, however, does not apply to the circumstances alleged here: legal uncertainty about how to interpret the product scope of a regulation, rather than factual uncertainty about a product's end-user. And even if the Guidance did apply, it would not support liability based on "notice that conduct *might conceivably* violate the FDPR." Order 5. The purely legal determination of the Guidance's scope was dispositive in the Order, and the Order's legal framework—under which Section 10(b) liability turns on whether Defendants had "reasons for concern"—goes to the heart of this case. Further, these legal rulings are significant to the disclosure obligations of all companies under the securities and export laws.

Accordingly, Defendants ask the Court to certify the Order for interlocutory review under 28 U.S.C. § 1292(b). Immediate appeal is warranted to resolve "novel and difficult questions of first impression" that would materially advance the termination of the litigation. *Reese v. BP Expl. (Alaska) Inc.* (*Reese II*), 643 F.3d 681, 688 (9th Cir. 2011). Defendants respectfully submit that the Order presents two such controlling questions of law on which reasonable jurists might disagree:

1. Whether the EAR—even as interpreted by the BIS's "Know Your ***Customer***" Guidance—require a company to seek guidance from BIS before engaging in a transaction as to which it has "reasons for concern" over its legal interpretation of the "***product*** scope" provision of the FDPR;

2. Whether—assuming that "reasons for concern" standard applies to legal interpretations of the FDPR's product scope—Section 10(b) and the EAR's definition of "knowledge" require the "reasons for concern" to rise beyond "notice that conduct *might conceivably* violate the FDPR" to a level akin to willful blindness.

## BACKGROUND

Seagate sold HDDs to Huawei in 2020 and 2021. Although export regulations were amended in 2020 to prohibit selling certain items to Huawei, Seagate believed its HDD sales were lawful based on its interpretation of the FDPR's product scope, and it advised investors that it would continue the sales to Huawei. Based on a different interpretation of the FDPR's product scope, BIS later deemed the HDD sales to be unlawful and imposed a penalty on Seagate via a settlement.

***First Motion to Dismiss***. After the settlement, Plaintiffs filed a putative securities class action claiming that Seagate's statements to investors were rendered false because Seagate did not disclose its alleged noncompliance with the FDPR. Defendants moved to dismiss, pointing out this theory's fundamental defect: insufficient allegations that Defendants *knew* at the time the statements were made that Seagate's HDD sales to Huawei were unlawful. ECF No. 72 at 5-8. The Complaint lacked allegations from confidential witnesses, internal materials, or the like demonstrating that Defendants did not honestly believe in their interpretation of the FDPR.

The Court agreed: "Although Seagate violated the FDPR, the Complaint does not contain sufficient allegations for the Court to infer that Seagate or the other defendants *knew* that Seagate's interpretation of the FDPR was incorrect at the time they claimed to be in compliance with the rule, or that Defendants made those statements with the required deceptive intent." ECF No. 96 at 2. The allegations—including the rule notification letter from one of Seagate's suppliers, law firm client alerts, the conduct of Seagate's competitors, and the alleged implausibility of Seagate's interpretation of the FDPR—"heavily rel[ied] on the benefit of hindsight, and there [were] no

allegations of contemporaneous facts to support[] that Defendants *knew* that continued sales to Huawei violated the FDPR or were deliberately reckless in that belief." *Id.* at 9-10.

***Second Motion to Dismiss***. Plaintiffs filed an Amended Complaint. Although their core theory did not change, Plaintiffs added conclusory allegations misstating the scope of the Guidance. (FAC ¶¶ 42-43.) Defendants moved to dismiss, arguing Plaintiffs had failed to cure the central defect identified in the Court's first ruling: insufficient allegations that Defendants *knew* Seagate's interpretation of the FDPR was incorrect at the time the challenged statements were made.

The Court denied the motion to dismiss in part. Reading the Guidance as applying to the "product scope" restrictions in the FDPR, the Court held that Seagate was required to seek a license from BIS if it had "reasons for concern" that the HDDs sold to Huawei could fall within the product scope of the FDPR. Order 2, 5. Based on this reading, the Court no longer required allegations that Defendants *knew* its interpretation of the FDPR was unlawful, but instead let the complaint go forward based on the lower standard of "reasons for concern." *Id.* at 5, 12. The Court ruled that it could be inferred that Defendants had "reasons for concern" about its interpretation of the FDPR's product scope from Defendants' alleged refusal to discuss Huawei directly in investor calls and decision not to announce two strategic partnership agreements with Huawei. *Id.* at 11.[1] The Court further ruled that Defendants' statements were rendered false, as alleged, because Defendants did not disclose that Seagate's transactions with Huawei violated the Guidance in that Seagate had not sought guidance from BIS despite allegedly having "reasons for concern." Order 5-6.

## ARGUMENT

### I.    The Court Should Certify the Order for Interlocutory Review

The Court should certify the Order for interlocutory review because it (1) involves two "controlling question[s] of law," as to which (2) there are "substantial ground[s] for difference of opinion," and (3) an immediate appeal "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

---

[1] The first complaint contained these same allegations (*e.g.*, Compl. ¶¶ 46, 123, 139, 144, 152, 184-85 (responses to investor questions); *id.* ¶¶ 73-76, 79-80, 148, 153, 156, 161, 165, 169, 172, 177, 180 (strategic agreements)), but the FAC added a footnote alleging two announcements by Seagate of two unrelated customer agreements (*e.g.*, FAC ¶ 84 & n.7).

### A.   The Order Presents Two Controlling Questions of Law

An entity's obligations under a regulatory regime present "a question of law appropriate for interlocutory appeal." *See, e.g.*, *Steering Comm. v. United States*, 6 F.3d 572, 575 (9th Cir. 1993) (deeming "[w]hether the district court failed to articulate the appropriate standard of conduct for pilots under the federal aviation regulations" appropriate for certification). Here, the two questions of law are controlling ones. "[A]ll that must be shown in order for a question to be 'controlling' is that resolution of the issue on appeal could materially affect the outcome of litigation." *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1981). A question need not "have a final, dispositive effect on the litigation," *Reese II*, 643 F.3d at 688, but that standard is met here.

Both questions here would have a dispositive effect because they go directly to the legal basis on which the Court denied the dismissal that it previously granted. The Order is explicit that the outcome changed because of the application of the Guidance's "reasons for concern" standard to Defendants' alleged actions. Order 6. The Court initially ruled that Plaintiffs had failed to show Defendants *knew* their interpretation of the FDPR was unlawful, but those same allegations were deemed sufficient to show "reasons for concern"; and, having "reasons for concern," Seagate could not truthfully represent it was in compliance because it sold the HDDs without consulting BIS. *Id.* at 2, 11-12, 16. The circumstances here are similar to *Reese v. Browne* (*Reese I*), 2009 WL 10668680 (W.D. Wash. July 2, 2009), where the court recognized there was "no other basis in [its] order for allowing Plaintiffs' action to proceed" than the issue addressed by the proposed questions, and certified because "[a] question of law is clearly 'controlling' if reversal of the order would terminate the action." *Id.* at *5; *Reese II*, 643 F.3d at 688 (deeming certification proper). Further, the ruling that Plaintiffs can establish liability through "reasons for concern" amounting to "notice that conduct *might conceivably* violate the FDPR"—rather than Section 10(b) scienter or even EAR knowledge—will materially affect any further litigation, defining "the standard for [any] liability" and the scope of discovery. *See Resol. Tr. Corp. v. Smith*, 879 F. Supp. 1059, 1061 (D. Or. 1995).

Finally, these questions have import beyond this case: The scope of a company's disclosure obligations to both investors and regulators regarding compliance with export laws implicates countless companies and should be addressed promptly by the Ninth Circuit.

**B.      Substantial Grounds for Difference of Opinion Exists on Both Questions**

"[A] substantial ground for difference of opinion exists where novel and difficult questions of first impression are presented." *Reese II*, 643 F.3d at 688. This includes "where reasonable jurists *might* disagree on an issue's resolution, not merely where they have already disagreed." *Id.* That is true as to both questions here.

**1.      Question 1: Whether the EAR Requires a Company to Seek Guidance from BIS When It Has "Reasons for Concern" Over Its Legal Interpretation of the FDPR's "Product Scope" Provision**

A substantial ground for difference of opinion exists as to whether the "Know Your *Customer*" Guidance imposes affirmative obligations on a company that has "reasons for concern" regarding its legal interpretation of the "*product* scope" provision of the FDPR. Although no other court appears to have passed on the meaning of the Guidance, "a novel issue may be certified for interlocutory appeal without first awaiting development of contradictory precedent." *Reese II*, 643 F.3d at 688. The correct interpretation of the Guidance is a pure question of law that impacts the obligations of companies under the EAR more generally. The "reasons for concern" language in the Guidance was not squarely raised by Plaintiffs' Amended Complaint or Opposition, and Defendants welcome this opportunity to brief how the Guidance fits with the FDPR.[2]

The FDPR prohibits, as "subject to the EAR," the unlicensed export of certain items to certain customers (the "Entity List"). A transaction is "subject to the EAR" under the FDPR only if it meets both the FDPR's "product scope" (*i.e.*, what type of item) and its "end-user scope" (*i.e.*, to what customer). 15 C.F.R. § 734.9(e). These two requirements are analyzed "separately." *See id.* § 734.9. Here, the "end-user scope," 15 C.F.R. § 734.9(e)(1)(ii), was undisputed: the HDDs were going to Huawei, which was on the Entity List. Only the interpretation of the "product scope," 15

---

[2] As an alternative to certification, the Court has the inherent power to "reconsider, or modify," its Order. *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 886 (9th Cir. 2001); *accord Williams v. Cty. of Monterey*, 2021 WL 1966711, at *2 (N.D. Cal. May 17, 2021); *see also Tsyn v. Wells Fargo Advisors, LLC*, 2016 WL 7635883, at *1 (N.D. Cal. June 27, 2016) ("[A] district court may reconsider and reverse a previous interlocutory decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of controlling law."); *Beal v. Royal Oak Bar*, 2016 WL 3230887, at *2 (N.D. Cal. June 13, 2016) ("Although the Federal Rules of Civil Procedure and this District's Local Rules create avenues for reconsideration, they do not abridge the court's inherent, common-law based authority to grant relief from interlocutory orders.").

C.F.R. § 734.9(e)(1)(i), was at issue. (*E.g.*, FAC ¶¶ 39-40, 49.) As explained below, compliance with the "Know Your Customer" Guidance—addressing factual "reasons for concern" about a product's end-user—is distinct from Seagate's legal interpretation of the product scope provision.

The Guidance is a "Supplement" to Part 732, in which BIS provides twenty-nine "Steps for Using the EAR." These steps guide a company through "the appropriate order for [it] to consider the various provisions of the EAR." 15 C.F.R § 732.1(a)(2). Following those steps makes clear that the "Know Your Customer" Guidance did not speak to the determination at issue in this case. The Amended Complaint alleges at paragraph 49 that Seagate took the position that the HDDs it sold to Huawei were not "direct products" within the "product scope" of the FDPR. *See* 15 C.F.R. § 734.9(e)(1)(i) ("product scope" applies only if the item is "the 'direct product' of 'technology' or 'software' subject to the EAR" or "produced by any complete plant or 'major component' of a plant" that is itself a "direct product"); *id.* § 772.1 (defining "direct product" as "[t]he *immediate* product (including processes and services) produced *directly* by the use of technology or software"). That is a determination made at "Step 11: Foreign-produced direct product rule." *See id.* § 732.3(f). If, at Step 11, the company determines the "item" at issue "does not meet the conditions of" the FDPR's product scope, then it has "completed the steps necessary to determine whether [its] transaction is subject to the EAR." *Id.* Nothing further is required to assess compliance.

A company that determines at Step 11 that its item is outside of the FDPR's product scope therefore "may skip the remaining steps," 15 C.F.R. § 732.3(f), including "Step 18: Review the 'Know Your Customer' Guidance …," *id.* § 732.3(m). Thus, BIS's own directions make clear the Guidance is separate from (and seven steps subsequent to) the product scope determination.[3]

Nor would it make sense to apply the "Know Your Customer" Guidance to a legal interpretation of product scope. BIS offers separate guidance for the product-scope determination, providing on-point questions and answers. *E.g.*, ECF No. 104-19. In contrast, the "Know Your Customer" Guidance addresses factual uncertainty that may arise at a later stage: if a product *is*

---

[3] Consistent with Part 732, the preface to the FDPR explains that only "[i]f a foreign-produced item is subject to the EAR" should the company "*separately* determine the license requirements that apply to that foreign-produced item (e.g., by assessing the item classification, *destination, end-use, and end-user* in the relevant transaction)." 15 C.F.R. § 734.9.

within the FDPR's scope, will this transaction lead to the product ending up with a customer on the Entity List, even if the initial purchaser is not on the Entity List? As the Court explained, the Guidance answers questions "about how deeply companies must dive into the supply chains and design chains of their customers" to get to the bottom of the facts about the end-user. Order 5 n.1.

The Guidance thus advises on "the process for the evaluation of information about *customers, end-uses, and end-users*," 15 C.F.R. § 732.3(m), to help a company resolve any factual uncertainty about a product's "*end-use, end-user, [or] ultimate destination*," *id.* Pt. 732, Supp. 3; *accord id.* § 734.9(e)(1)(ii)(A). That help includes enumerating "red flags" that are "[p]ossible indicators that an unlawful diversion might be planned by [the] customer." *Id.* Pt. 732, Supp. 3. The red flags describe "abnormal circumstances in a transaction that indicate that the export may be destined for an *inappropriate end-use, end-user, or destination*," notwithstanding its nominal purchaser. *Id.* Pt. 732, Supp. 3(a)(1). Where a red flag is present, the company has "a duty to … inquire about the *end-use, end-user, or ultimate country of destination*"; if "after [such] inquiry" the company still has "reasons for concern," it should "refrain from the transaction or" apply for a license. *Id.* Pt. 732, Supp. 3(a)(2) & (a)(6). That these are "reasons for concern" that could be resolved by an "inquir[y] about the end-use, end-user, or ultimate country of destination" underscores that that "reasons for concern" are factual ones about where the product ends up. *Id.*

The detailed "Know Your Customer" Guidance is thus useful when a company does not know for sure *who* will be using its product—but that was not the case here. Instead, Plaintiffs' theory is that Seagate always knew that the HDDs would be used by Huawei (*e.g.*, FAC ¶ 143), which was on the Entity List (*e.g.*, *id.* ¶ 32). As counsel argued at the hearing, Seagate complied with any obligation to know its customer and thus with the Guidance and had no "reasons for concern" that its customer was anyone other than Huawei. 3/4/25 RT 5:4-6:9, 17:1-11; *cf.* Order 11. Plaintiffs do not allege that Seagate had any uncertainty regarding end-user for the Guidance to help with (at Step 18); instead, the purported "reasons for concern" in this case allegedly arose at a logically prior stage of determining product scope (at Step 11).

Nor could a company readily analogize the "Know Your Customer" Guidance for use in reaching a legal determination about the FDPR's product scope. The Guidance is meant to help

with "[v]arious requirements of the EAR [that] are dependent upon a person's *knowledge* of the end-use, end-user, ultimate destination, or other facts relating to [a] transaction or activity" and thus offers "guidance on how individuals and firms should act under this *knowledge* standard." *Id.* Pt. 732, Supp. 3. But while "this knowledge standard" applies to the factual "knowledge" required in the FDPR's "end-user scope" provision, *id.* § 734.9(e)(1)(ii), there is no knowledge requirement in the "product scope" provision, *id.* § 734.9(e)(1)(i), and thus nothing for the Guidance to gloss.

Thus, on a close reading of the underlying regulations and text of the Guidance, "reasons for concern" means only factual "reasons for concern" that the "end-use, end-user, or destination" may be different than the transacting party. 15 C.F.R. Pt. 732, Supp. 3(a)(6); *see Meyers v. Birdsong*, 83 F.4th 1157, 1160 (9th Cir. 2023) (courts read "words in their context and with a view to their place in the overall [regulatory] scheme"). "Reasons for concern" under the Guidance do not include concerns about a legal interpretation. Because Seagate already knew that an entity on the Entity List (Huawei) was "a party to [the] transaction," 15 C.F.R. § 734.9(e)(1)(ii)(B) (second prong of FDPR's "end-user scope"), Seagate complied with the Guidance's direction to "Know Your Customer." With Huawei as the customer, no BIS guidance was needed on whether the HDDs would "be incorporated into, or [would] be used in the 'production' or 'development' of any 'part,' 'component,' or 'equipment' produced, purchased, or ordered by" some other prohibited entity. *Id.* § 734.9(e)(1)(ii)(A) (first prong of FDPR's "end-user scope"). Seagate *did* know its customer (as did the market), and was fully aware that Huawei was on the Entity List. Fully "knowing its customer" and having judged the HDDs to be out of the FDPR's "product scope," Seagate reasonably believed itself in compliance with relevant regulations and the Guidance.

In sum, reasonable jurists could differ over the legal premise that Seagate's statements about compliance were false because Seagate did not affirmatively consult with BIS despite allegedly having "reasons for concern" about its legal interpretation of the FDPR's ***product*** scope. The Court should certify this novel controlling question. *See Reese II*, 643 F.3d at 688; *Doe 1 v. Github, Inc.*, 2024 WL 4336532, at *1 (N.D. Cal. Sept. 27, 2024) (certifying "purely legal question of statutory interpretation"); *In re Google Inc. St. View Elec. Comm'ns Litig.*, 2011 WL 13257346, at *1 (N.D. Cal. July 18, 2011) (certifying based on the "novelty of the issues presented").

**2.**    **Question 2: Whether "Reasons for Concern" Must Rise Beyond "Notice that Conduct Might Conceivably Violate the FDPR" to a Level Akin to Willful Blindness**

Second, a substantial ground for difference of opinion exists as to whether—assuming the Guidance's "reasons for concern" standard applied to legal interpretations of the FDPR's product scope—that standard can be met by "notice that conduct *might conceivably* violate the FDPR" (Order 5) or whether the "reasons for concern" must rise to a level akin to willful blindness. The Guidance expressly applies the EAR's definition of "knowledge," 15 C.F.R. Pt. 732, Supp. 3(a), which the FDPR incorporates as its own definition of "knowledge," *id.* § 734.9(a)(i). As explained below, both EAR "knowledge" and Section 10(b) scienter set a threshold akin to willful blindness, under which the defendant must "almost be said to have actually known the critical facts." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). Willful blindness requires both that the defendant "subjectively believe[s] that there is a ***high probability*** that a fact exists" and "take ***deliberate actions*** to avoid learning of that fact." *Id.* The Order, however, interpreted "reasons for concern" as establishing a standard that is much lower than that. Given the wide-ranging ramifications such a standard would have on companies' legal obligations and liabilities, this novel question is worthy of certification.

The law has long recognized that even when knowledge is required, something slightly less than actual knowledge can suffice: willful blindness (or "deliberate ignorance"). A paradigmatic formulation came from the *en banc* Ninth Circuit in 1976: "To act 'knowingly,' therefore, is not necessarily to act only with positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question." *United States v. Jewell*, 532 F.2d 697, 700 (9th Cir. 1976) (en banc) (recognizing this principle in both England and the United States); *Global-Tech*, 563 U.S. at 766-67 (tracing first recognition by Supreme Court to 1899).

The EAR defines "knowledge" using nearly the exact words that *Jewell* used in explaining how willful blindness could substitute for actual knowledge: "Knowledge … includes not only positive knowledge that a circumstance exists … but also an awareness of a high probability of its existence." 15 C.F.R. § 772.1; *compare also id.* ("willful avoidance of facts"), *with Global-Tech*, 563 U.S. at 769 ("deliberate actions to avoid learning of that fact"). Indeed, Plaintiffs affirmatively

allege that the EAR knowledge standard and the Guidance's red flags were meant to address "willful blindness." FAC ¶ 42. This "knowledge" definition applies generally in the EAR[4]—for instance, if a company is charged with "[a]cting with knowledge of a violation" under the FDPR. 15 C.F.R. § 764.2(e). Significantly, as is clear from the record and undisputed, BIS did not charge Seagate with a "knowing" violation of the FDPR in the settlement. *See* Dkt. 104-18 at 3.

The Guidance's "reasons for concern" language applies the EAR knowledge standard—which is, again, nearly verbatim the *Jewell* formulation for willful blindness. The Guidance addresses "how individuals and firms should act under this [EAR] knowledge standard," and "***does not change*** or interpret ***the EAR***." 15 C.F.R. Pt. 732, Supp. 3(a). BIS confirmed that the Guidance must be read in tandem with the EAR's definition of knowledge when answering a question about "how deeply companies must dive into the supply chains and design chains of their customers" in its "final rule promulgating the FDPR." Order 5 n.2. BIS explained that "[t]he EAR's definition of 'knowledge' and BIS's *Know Your Customer* guidance provide direction on the scope of due diligence warranted" when figuring out whether a covered product would end up with Huawei. ECF No. 72-11 at 6. Not only does this underscore that "reasons for concern" apply to end-user scope and not product scope, *see supra* pp. 6-8, it also confirms that BIS intended for the Guidance's "reasons for concern" to be understood in light of "[t]he EAR's definition of 'knowledge.'"[5]

This is true for the FDPR as well, because where "knowledge" is assessed, the FDPR takes its own definition of "knowledge" from "part 772 of the EAR." 15 C.F.R. § 734.9(a)(i). As explained *supra* p. 8, there is no "knowledge" element in the FDPR's product scope provision for the Guidance to apply to. But, as just noted, the Guidance is clear that the "reasons for concern"

---

[4] *See Export Administration Regulation; Simplification of Export Administration Regulations*, 61 Fed. Reg. 12714, 12714 (Mar. 25, 1996) ("BXA has decided to adopt the term 'knowledge' (together with variants, such as 'know' or 'knowing') as the standard usage and defines this term in the EAR. This definition is added to part 772—Definitions.").

[5] Nor could mere guidance materially expand the scope of liability under the EAR, let alone under Section 10(b). *See Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1028 (D.C. Cir. 2000) ("The more expansive reading of the rule, unveiled in the Guidance, cannot stand."); *Border Power Plant Working Grp. v. Dep't of Energy*, 467 F. Supp. 2d 1040, 1058 (S.D. Cal. 2006) ("the guidance document's interpretation [must be] 'not plainly erroneous or inconsistent' with the regulations themselves" (quoting *Stinson v. United States*, 508 U.S. 36, 45 (1993)); *Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 45 F.4th 121, 127 (D.C. Cir. 2022) ("The [agency's] guidance conflicts with the Statute, so we … set aside the guidance.").

language helps *apply* and *does not change* the EAR knowledge standard. Thus, even if the "reasons for concern" concept were applied to a company's legal interpretation of the FDPR's "product scope"—which it should not be—the allegations regarding "reasons for concern" would need to rise to the high level of EAR knowledge.

The overlay of Section 10(b) merely reaffirms this conclusion because Section 10(b)'s "deliberate recklessness" standard also requires a showing akin to willful blindness. A claim fails under Section 10(b) absent a strong and cogent inference that the defendant either *actually knew* a statement to be false or was *deliberately reckless* as to its falsity. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023). "Deliberate recklessness is a higher standard than mere recklessness" and it requires "'*extreme*'" circumstances in which the danger of falsity was "'so *obvious* that the actor must have been aware of it.'" *Id.* (Court's emphases). It cannot be satisfied by mere doubts or concerns. *See In re Medicis Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192, 1211 (D. Ariz. 2009) (holding that although a company's accounting methodology proved not to be GAAP-compliant, "[v]ague allegations of disagreement and ***concern*** … do not establish that [the defendants] were deliberately reckless with respect to" the accounting principle at issue). Indeed, citing precedent under which the deliberate recklessness standard would "requir[e] allegations of willful blindness," the Ninth Circuit expressly "reject[ed]" the argument that the standard could be satisfied "by alleging 'red flags' regarding a possible misstatement and 'access' to underlying facts." *Davoli v. Costco Wholesale Corp.*, 854 F. App'x 116, 117 n.1 (9th Cir. 2021); *accord Ernst & Ernst. v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976); *see also In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 976 (1999) (deliberate recklessness is "a form of intentional or *knowing* misconduct").

Whether considered separately or in tandem, both Section 10(b)'s requirements for scienter and the EAR's requirements for knowledge indicate that the "reasons for concern" must reach a high level comparable to that required for willful blindness. As explained above, to show willful blindness, the allegations would need to give rise to strong and cogent inferences of two things: "(1) The defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech*, 563 U.S.

at 769. "A court can properly find willful blindness only where it can almost be said that the defendant actually knew." *Id.* (cleaned up). The Order, however, permitted a much lower showing.

Like the standard for willful blindness, the Order's standard for "reasons for concern" entailed two parts, but the showing for each part was much lower. First, rather than requiring that a company "subjectively believe that there is a *high probability* that" its conduct violates the FDPR, *Global-Tech*, 563 U.S. at 769, the Order required only that a company be "put on notice that its conduct *might conceivably* violate the FDPR." Order 5; *see also* 3/4/25 RT 14:19-25 (suggesting "reasons for concern" might mean "room for debate" or anything less than "absolute[] certainty" that conduct is permitted). Second, the Order indicated that if a company has any "uncertainty" and does not "seek guidance from BIS" (Order 6), such inaction is culpable. But as to willful blindness, where the defendant has not "taken it upon itself to make such an investigation, the fact that it did not do so is not evidence that it took deliberate actions to avoid learning the answer." *Largan Precision Co, Ltd v. Genius Elec. Optical Co., Ltd.*, 2015 WL 2063988, at *4 (N.D. Cal. May 4, 2015), *aff'd*, 646 F. App'x 946 (Fed. Cir. 2016). Given the breadth of legal interpretations that a company must make when attempting to comply with the EAR—and given that "absolute certainty is unattainable in matters relating to human affairs," *Victor v. Nebraska*, 511 U.S. 1, 13 (1994)—the Order's "reasons for concern" standard would have considerable sweep.

The practical effect of the Order's approach to "reasons for concern" would be difficult to reconcile with precedent concerning falsity, duty to disclose, and scienter under Section 10(b) for statements of compliance. "Silence, absent a duty to disclose, is not misleading under Rule 10b–5" or Section 10(b). *Basic Inc. v. Levinson*, 485 U.S. 224, 239, n.17 (1988); *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 265 (2024). And a company has "no obligation or requirement to elaborate on any alleged non-compliance [where] it ha[s] not yet been found to be non-compliant." *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 897 (N.D. Cal. 2022).[6] Thus,

---

[6] "Federal securities laws do not impose upon companies a 'duty to disclose uncharged, unadjudicated wrongdoing.'" *In re Paypal Holdings, Inc.*, 2018 WL 466527, at *3 (N.D. Cal. Jan. 18, 2018) (citation omitted). "Companies are not required to engage in 'self-flagellation' by disclosing unproven allegations." *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 806 (N.D. Cal. 2019). As the Second Circuit has held, "disclosure is not a rite of confession, and companies do not
(continued...)

a company's stated "opinion about legal compliance" would not be misleading even if the issuer failed to disclose "that a single junior attorney expressed doubts about a practice's legality" that "ultimately proved correct." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015). But the very example given by the Supreme Court as *not creating* liability would seem to satisfy the "reasons for concern" standard that the Order held *would create* liability.

Indeed, the Order's approach to "reasons for concern" would pressure companies to make other disclosures also not required by law. Here, the Court inferred that Seagate had "reasons for concern that its activities were not in compliance with the FDPR" based on Seagate's alleged "shift to refusing to discuss Huawei" in investor calls and decision not to publicize two strategic agreements with Huawei. Order 6-7, 10-12. But other courts have made clear that scienter *cannot* be inferred from a company's departure from its "established 'pattern' of disclosing [similar] events" in the past. *Minn. Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.* ("*MEMC I*"), 2010 WL 889864, at *5 (E.D. Mo. Mar. 8, 2010), *aff'd*, 641 F.3d 1023 (8th Cir. 2011) ("*MEMC II*").[7] For good reason: the Supreme Court has long cautioned that "management's fear of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information" if the standards in securities cases are set "unnecessarily low." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1976).

In sum, reasonable jurists could disagree whether—even if the Guidance's "reasons for concern" applied to a product scope determination—liability could be found under the "notice that its conduct *might conceivably* violate the FDPR" standard articulated in the Order. And given the

---

have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).

[7] In *MEMC I*, the plaintiff alleged the defendants had a duty to disclose disruptions at their plants in June 2008 because the defendants had a "pattern" of disclosing similar disruptions in production. 2010 WL 889864 at *4-5. Notwithstanding this "pattern," the court rejected the notion that "defendants' failure to immediately reveal the June 2008 disruptions" could establish scienter. *Id.* at *7. "Plaintiff has failed to meet his heightened burden of establishing that any inference from his allegations is 'cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Id.* The Eighth Circuit affirmed, noting it was "unable to find any legal authority directly supporting [the plaintiff's] pattern theory." *MEMC II*, 641 F.3d at 1028. The Eighth Circuit "decline[d] to recognize a new cause of action absent extraordinary circumstances not present here. To do so could encourage companies to disclose as little as possible." *Id.* at 1029.

potentially broad impact of the Order's novel approach on companies' disclosure obligations, guidance from the Ninth Circuit would be particularly valuable.

### C.     Immediate Appeal Would Materially Advance the Litigation

Resolution of a question materially advances a case if it "may appreciably shorten the time, effort, or expense of conducting a lawsuit," *ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*, 22 F.4th 1125, 1131 (9th Cir. 2022), for instance because "getting a final decision on a controlling legal issue sooner, rather than later in order … save[s] the courts and the litigants unnecessary trouble and expense," *Facebook Inc. v. Namecheap Inc.*, 2021 WL 961771, at *2 (D. Ariz. Mar. 15, 2021).

Although this factor does not *require* that immediate resolution of the questions would have a "final, dispositive effect on the litigation," *Reese II*, 643 F.3d at 688, that would be the effect here. Defendants' first motion to dismiss was granted; the second was not, based on how the Order resolved both questions now presented for certification. If the Ninth Circuit were to rule in Defendants' favor on any of those questions, the case would presumably be dismissed, and the Court and the parties would save the "time, effort, [and] expense" of discovery, motions practice, and potentially trial. *ICTSI*, 22 F.4th at 1131; *see also Namecheap*, 2021 WL 961771, at *3.

### II.     The Court Should Grant a Stay Pending the Appeal

If the Court grants certification, it should stay the case pending appeal. The Court has broad discretion to stay the case "both under § 1292(b) itself and the court's inherent authority to manage its docket." *United States v. Real Prop. & Improvements Located at 2441 Mission St., S. F., Cal.*, 2014 WL 1350914, at *4 n.3 (N.D. Cal. Apr. 4, 2014). A stay pending interlocutory appeal is appropriate where "resolution of the issue will likely alter the direction of the current proceedings, and a stay would promote efficiency and economy of time for the Court and the litigants." *Id.*[8]

---

[8] A stay is warranted here under any of the different ways courts in this District have articulated the standard. *Compare e.g.*, *Real Prop. & Improvements*, 2014 WL 1350914, at *4 n.3 ("appropriate to promote economy of time and effort for itself, for counsel, and for litigants"); *Asis Internet Servs. v. Active Response Grp.*, 2008 WL 4279695, at *4 (N.D. Cal. Sept. 16, 2008) (similar) *with Github, Inc.*, 2024 WL 4336532, at *2 (considering "(1) the possible damage which may result from the granting of a stay; (2) the hardship or inequity which a party may suffer if the case is allowed to go forward; and (3) the orderly course of justice measured in terms of the simplifying or complicating

(continued...)

Here, the Ninth Circuit's resolution of the two questions will materially advance, and likely terminate, the litigation. The Ninth Circuit's decision could resolve all of Plaintiffs' remaining claims and would, at minimum, define the nature and scope of discovery into any remaining claims. *See Github*, 2024 WL 4336532, at *2 ("[J]udicial economy will be best served by staying this case as the Ninth Circuit's decision is likely to provide substantial guidance that may materially alter the Court's decisions in the instant case." (cleaned up)). Thus, "[i]mposing a stay promotes orderly litigation by preventing the parties from arguing and the Court from deciding issues that may be rendered moot by the Ninth Circuit's decision." *Rollins*, 2014 WL 6693891, at *5.

By contrast, "going forward in the trial court will result in burdensome and expensive discovery and this cost may be needless, depending on the Ninth Circuit's decision on appeal." *Silbersher v. Allergan Inc.*, 2021 WL 292244, at *3 (N.D. Cal. Jan. 28, 2021). Such "significant and potentially unnecessary" expenditure of resources by the parties and the Court in discovery, motions practice, and trial in the absence of a stay would undermine the very purposes of an interlocutory appeal. *Ottesen v. Hi-Tech Pharms., Inc*., 2024 WL 589089, at *4 (N.D. Cal. Feb. 13, 2024). That drain of resources is particularly salient in securities cases, where discovery costs on defendants can be astronomical. *See generally SG Cowen Sec. Corp. v. U.S. Dist. Ct.*, 189 F.3d 909, 911 (9th Cir. 1999) (observing the PSLRA's automatic stay of discovery was "intended to prevent unnecessary imposition of discovery costs on defendants," which "account[ed] for roughly 80% of total litigation costs in securities fraud cases") (quoting H.R. Conf. Rep. No. 104-369, at 32).

Meanwhile, Plaintiffs will suffer no harm from a stay. They "will not be injured by freezing discovery now; they will merely have to wait until a later date, when it is clearer that such discovery is needed." *Rollins*, 2014 WL 6693891, at *5. Nor is this a case in which Plaintiffs need protection from the challenged conduct, which has long ceased. Accordingly, a stay is warranted here.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court certify the Order for interlocutory appeal and grant a stay pending such appeal.

---

of issues, proof, and questions of law which could be expected to result from a stay"); *Rollins v. Dignity Health*, 2014 WL 6693891, at *4–5 (N.D. Cal. Nov. 26, 2014) (similar).

Dated: June 9, 2025

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:     */s/ Caz Hashemi*
        Caz Hashemi

*Attorney for Defendants Seagate Technology Holdings plc, William D. Mosley, and Gianluca Romano*