# EXHIBIT 1

Case 3:23-cv-03431-RFL   Document 124-2   Filed 06/09/25   Page 2 of 4

Code of Federal Regulations
  Title 15. Commerce and Foreign Trade
    Subtitle B. Regulations Relating to Commerce and Foreign Trade
      Chapter VII. Bureau of Industry and Security, Department of Commerce (Refs & Annos)
        Subchapter C. Export Administration Regulations
          Part 732. Steps for Using the Ear (Refs & Annos)

This section has been updated. Click here for the updated version.

**Effective: June 27, 2014 to November 16, 2023**

15 C.F.R. Pt. 732, Supp. 3

## SUPPLEMENT NO. 3 TO PART 732—BIS'S "KNOW YOUR CUSTOMER" GUIDANCE AND RED FLAGS

"Know Your Customer" Guidance

Various requirements of the EAR are dependent upon a person's knowledge of the end-use, end-user, ultimate destination, or other facts relating to a transaction or activity. These provisions include the nonproliferation-related "catch-all" sections and the prohibition against proceeding with a transaction with knowledge that a violation of the EAR has occurred or is about to occur.

(a) BIS provides the following guidance on how individuals and firms should act under this knowledge standard. This guidance does not change or interpret the EAR.

(1) Decide whether there are "red flags". Take into account any abnormal circumstances in a transaction that indicate that the export may be destined for an inappropriate end-use, end-user, or destination. Such circumstances are referred to as "red flags". Included among examples of red flags are orders for items that are inconsistent with the needs of the purchaser, a customer declining installation and testing when included in the sales price or when normally requested, or requests for equipment configurations that are incompatible with the stated destination (e.g., 120 volts in a country with 220 volts). Commerce has developed lists of such red flags that are not all-inclusive but are intended to illustrate the types of circumstances that should cause reasonable suspicion that a transaction will violate the EAR.

(2) If there are "red flags", inquire. If there are no "red flags" in the information that comes to your firm, you should be able to proceed with a transaction in reliance on information you have received. That is, absent "red flags" (or an express requirement in the EAR), there is no affirmative duty upon exporters to inquire, verify, or otherwise "go behind" the customer's representations. However, when "red flags" are raised in information that comes to your firm, you have a duty to check out the suspicious circumstances and inquire about the end-use, end-user, or ultimate country of destination. The duty to check out "red flags" is not confined to the use of License Exceptions affected by the "know" or "reason to know" language in the EAR. Applicants for licenses are required by part 748 of the EAR to obtain documentary evidence concerning the transaction, and misrepresentation or concealment of material facts is prohibited, both in the licensing process and in all export control documents. You can rely upon representations from your customer and repeat them in the documents you file unless red flags oblige you to take verification steps.

(3) Do not self-blind. Do not cut off the flow of information that comes to your firm in the normal course of business. For example, do not instruct the sales force to tell potential customers to refrain from discussing the actual end-use, end-user, and

**6**

Case 3:23-cv-03431-RFL   Document 124-2   Filed 06/09/25   Page 3 of 4

ultimate country of destination for the product your firm is seeking to sell. Do not put on blinders that prevent the learning of relevant information. An affirmative policy of steps to avoid "bad" information would not insulate a company from liability, and it would usually be considered an aggravating factor in an enforcement proceeding.

(4) Employees need to know how to handle "red flags". Knowledge possessed by an employee of a company can be imputed to a firm so as to make it liable for a violation. This makes it important for firms to establish clear policies and effective compliance procedures to ensure that such knowledge about transactions can be evaluated by responsible senior officials. Failure to do so could be regarded as a form of self-blinding.

(5) Reevaluate all the information after the inquiry. The purpose of this inquiry and reevaluation is to determine whether the "red flags" can be explained or justified. If they can, you may proceed with the transaction. If the "red flags" cannot be explained or justified and you proceed, you run the risk of having had "knowledge" that would make your action a violation of the EAR.

(6) Refrain from the transaction or advise BIS and wait. If you continue to have reasons for concern after your inquiry, then you should either refrain from the transaction or submit all the relevant information to BIS in the form of an application for a license or in such other form as BIS may specify.

(b) Industry has an important role to play in preventing exports and reexports contrary to the national security and foreign policy interests of the United States. BIS will continue to work in partnership with industry to make this front line of defense effective, while minimizing the regulatory burden on exporters. If you have any question about whether you have encountered a "red flag", you may contact the Office of Export Enforcement at 1–800–424–2980 or the Office of Exporter Services at (202) 482–4532.

Red Flags

Possible indicators that an unlawful diversion might be planned by your customer include the following:

1. The customer or purchasing agent is reluctant to offer information about the end-use of a product.

2. The product's capabilities do not fit the buyer's line of business; for example, a small bakery places an order for several sophisticated lasers.

3. The product ordered is incompatible with the technical level of the country to which the product is being shipped. For example, semiconductor manufacturing equipment would be of little use in a country without an electronics industry.

4. The customer has little or no business background.

5. The customer is willing to pay cash for a very expensive item when the terms of the sale call for financing.

6. The customer is unfamiliar with the product's performance characteristics but still wants the product.

7. Routine installation, training or maintenance services are declined by the customer.

8. Delivery dates are vague, or deliveries are planned for out-of-the-way destinations.

9. A freight forwarding firm is listed as the product's final destination.

10. The shipping route is abnormal for the product and destination.

11. Packaging is inconsistent with the stated method of shipment or destination.

12. When questioned, the buyer is evasive or unclear about whether the purchased product is for domestic use, export or reexport.

13. You receive an order for "parts" or "components" for an end item in 9x515 or the "600 series." The requested "parts" or "components" may be eligible for License Exception STA, another authorization, or may not require a destination-based license requirement for the country in question. However, the requested "parts" or "components" would be sufficient to service one hundred of the 9x515 or "600 series" end items, but you "know" the country does not have those types of end items or only has two of those end items.

14. The customer indicates or the facts pertaining to the proposed export suggest that a 9x515 or "600 series" item may be reexported to a destination listed in Country Group D:5 (see Supplement No. 1 to part 740 of the EAR).

## Credits

[62 FR 25453, 25456, May 9, 1997; 78 FR 22706, April 16, 2013; 79 FR 27434, May 13, 2014]

SOURCE: 61 FR 12734, 12740, March 25, 1996; 61 FR 55741, Oct. 29, 1996; 61 FR 68577, Dec. 30, 1996; 63 FR 2455, Jan. 15, 1998; 65 FR 38149, June 19, 2000; 65 FR 62603, Oct. 19, 2000; 67 FR 20631, April 26, 2002; 67 FR 38859, June 6, 2002; 67 FR 54952, Aug. 27, 2002; 68 FR 50472, Aug. 21, 2003; 69 FR 23628, April 29, 2004; 71 FR 20883, April 24, 2006; 72 FR 3724, Jan. 26, 2007; 72 FR 50870, Sept. 5, 2007; 72 FR 67637, Nov. 30, 2007; 73 FR 56968, Oct. 1, 2008; 73 FR 57503, Oct. 3, 2008; 74 FR 48010, Sept. 21, 2009; 75 FR 53865, Sept. 2, 2010; 76 FR 58395, Sept. 21, 2011; 77 FR 56767, Sept. 14, 2012; 78 FR 76740, Dec. 19, 2013; 79 FR 51476, Aug. 29, 2014; 80 FR 51730, Aug. 26, 2015; 80 FR 52960, Sept. 2, 2015; 81 FR 10084, Feb. 29, 2016; 81 FR 60255, Sept. 1, 2016; 82 FR 45961, Oct. 3, 2017; 85 FR 4172, Jan. 23, 2020; 85 FR 29852, May 19, 2020; 87 FR 57077, Sept. 16, 2022, unless otherwise noted.

AUTHORITY: 50 U.S.C. 4801–4852; 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Westlaw. © 2025 Thomson Reuters   |   Privacy Statement   |   Accessibility   |   Supplier Terms   |   Contact Us   |   1-800-REF-ATTY (1-800-733-2889)   |   Improve Westlaw/Report an error

