CAZ HASHEMI, State Bar No. 210239
STEPHEN B. STRAIN, State Bar No. 291572
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: chashemi@wsgr.com
        sstrain@wsgr.com

JOHN I. KARIN (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
31 West 52nd Street
Fifth Floor
New York, NY 10019
Telephone: (212) 999-5800
Facsimile: (866) 974-7329
Email: jkarin@wsgr.com

*Attorneys for Defendants*
*Seagate Technology Holdings plc,*
*William D. Mosley, and Gianluca Romano*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| *In re Seagate Technology Holdings plc,* *Securities Litigation* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO.: 3:23-cv-03431-RFL **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, APPPOINTMENT OF CLASS REPRESENTATIVES, AND APPROVAL OF CLASS COUNSEL** Hearing Date: April 14, 2026 Time:          10:00 a.m. Courtroom:   15 – 18th Floor Honorable Rita F. Lin **Redacted Version** |

**TABLE OF CONTENTS**

                                                                                        **Page**

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 3

    A.    Discovery Has Shown That Defendants and the Legal Advisors Believed Seagate's Sales of HDDs to Huawei Complied with the FDPR. ........................... 3

    B.    Investors Knew All Material Facts by No Later Than March 2021 ........................ 4

    C.    This Litigation. .................................................................................................... 6

ARGUMENT .......................................................................................................................... 7

I.    Legal Standards ............................................................................................................ 7

    A.    Class Certification Requires a Rigorous Analysis of the Evidence. ...................... 7

    B.    Individual Issues Will Predominate if Defendants Rebut the Presumption of Reliance. ............................................................................................................ 8

II.    Plaintiffs Cannot Use the *Basic* Presumption Because the Challenged Statements Had No Impact on Seagate's Stock Price ......................................................................... 9

    A.    The March 8, 2022 Disclosures Do Not Establish Price Impact. .......................... 10

    B.    The July 21, 2022 Disclosures Do Not Establish Price Impact. ........................... 14

    C.    The October 26, 2022 Disclosures Do Not Establish Price Impact. ..................... 15

    D.    The April 19, 2023 Disclosures Do Not Establish Price Impact. .......................... 17

III.    Plaintiffs Cannot Rely on the *Affiliated Ute* Presumption Because this Case Involves Primarily Alleged Misstatements, Not Omissions. ........................................... 19

IV.    The Proposed Class Period Should Begin on October 22, 2020 Because the Court Dismissed All Earlier Challenged Statements. ............................................................... 20

CONCLUSION ....................................................................................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972) ........................................................................ 2, 3, 8, 19, 20

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013) ...................................................................................... 8, 9

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023)................................................................................. 9

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ................................................................... 1, 8, 9, 12, 19

*Binder v. Gillespie*,
184 F.3d 1059 (9th Cir. 1999).......................................................................... 20

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ............................................................................................. 8

*Crago v. Charles Schwab & Co.*,
2021 WL 4990234 (N.D. Cal. Oct. 27, 2021) ................................................. 19

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
594 U.S. 113 (2021) ................................................................ 2, 8, 9, 10, 17

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .................................................................................. 8, 9, 12

*Holwill v. AbbVie Inc.*,
2025 WL 1908156 (N.D. Ill. July 10, 2025) ............................................. 16, 17

*In re Allstate Corp. Sec. Litig*,
966 F.3d 595 (7th Cir. 2020)............................................................................. 9

*In re Concho Res., Inc. Sec. Litig.*,
2025 WL 1040379 (S.D. Tex. Apr. 7, 2025) ............................................. 11, 14

*In re Didi Global Inc. Securities Litigation*,
2025 WL 2345696 (S.D.N.Y. Aug. 13, 2025) ................................................. 20

*In re Fibrogen Sec. Litig.*,
2024 WL 1064665 (N.D. Cal. Oct. 3, 2024) ................................. 2, 10, 12, 13, 15, 16, 17

*In re Intuitive Surgical Sec. Litig.*,
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ........................................... 11, 14

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ....................................... 13, 15, 17, 18, 19

*In re Miva, Inc., Sec. Litig.*,
2008 WL 681755 (M.D. Fla. Mar. 12, 2008)................................................... 22

*In re Mylan N.V. Sec. Litig.*,
666 F. Supp. 3d 266 (S.D.N.Y. 2023) ...................................................................... 16, 17

*In re Overstock Sec. Litig.*,
119 F.4th 787 (10th Cir. 2024) ....................................................................................... 21

*In re Parmalat Sec. Litig.*,
2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) ................................................................ 20

*In re Qualcomm Inc. Sec. Litig.*,
2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) .......................................... 10, 13, 15, 16, 17

*In re Sanofi-Aventis Sec. Litig.*,
293 F.R.D. 449 (S.D.N.Y. 2013) ................................................................................... 20

*In re Smith Barney Transfer Agent Litig.*,
290 F.R.D. 42 (S.D.N.Y 2013) ..................................................................................... 20

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
2 F.4th 1199 (9th Cir. 2021) ................................................................................... 2, 3, 19

*In re WorldCom, Inc. Sec. Litig.*,
219 F.R.D. 267 (S.D.N.Y. 2003) ................................................................................... 20

*Luna v. Marvell Tech. Grp., Ltd.*,
2017 WL 4865559 (N.D. Cal. Oct. 27, 2017) ........................................................... 20, 21

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ............................................................................................ 8

*Poulos v. Caesars World, Inc.*,
379 F.3d 654 (9th Cir. 2004) ......................................................................................... 19

*Ramirez v. Exxon Mobil Corp.*,
2023 WL 5415315 (N.D. Tex. Aug. 21, 2023) ...................................................... 12, 14, 16

*Stromberg v. Qualcomm Inc.*,
14 F.4th 1059 (9th Cir. 2021) .......................................................................................... 8

*Venkataraman v. Kandi Techs. Grp., Inc.*,
2024 WL 4345571 (S.D.N.Y. Sept. 30, 2024) ......................................................... 20, 22

*W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
325 F.R.D. 280 (D. Minn. 2018) ................................................................................... 20

*Zinser v. Accufix Research Inst., Inc.*,
253 F.3d 1180 (9th Cir.), *amended*, 273 F.3d 1266 (9th Cir. 2001) .................................. 7

**RULES**

Fed. R. Civ. P. 23 ............................................................................................... 7, 8, 12

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| ¶ or Complaint | Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, filed September 12, 2024, ECF No. 100 |
| BIS | Bureau of Industry and Security |
| Cain Report | Expert report from Dr. Matthew Cain, filed December 12, 2025 (ECF No. 152-1) |
| Defendants | Seagate Technology Holdings plc, William D. Mosley, and Gianluca Romano |
| EAR | Export Administration Regulations |
| Ex. | Exhibits attached to the Declaration of John I. Karin, filed herewith |
| Exchange Act | The Securities Exchange Act of 1934 |
| FDPR | Foreign Direct Product Rule |
| HDD | Hard disk drives |
| Huawei | Huawei Technologies Co. Ltd |
| Individual Defendants | William D. Mosley and Gianluca Romano |
| Motion or Mot. | Lead Plaintiffs' Notice of Motion and Motion for Class Certification, Appointment of Class Representatives, and Approval of Class Counsel, filed December 16, 2025 (ECF No. 151) |
| Order | May 12, 2025 Order on Defendants' Second Motion to Dismiss (ECF No. 113) |
| PCL | Proposed Charging Letter |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| Seagate or Company | Seagate Technology Holdings plc |
| United States Senate Committee on Commerce, Science, and Transportation Minority Staff | Senate Minority Staff |
| Zurek Report | Expert Report of Paul Zurek, Ph.D., filed herewith as Ex. 69 to Karin Declaration |

## **INTRODUCTION**

This putative securities class action arises from a disagreement between Seagate and BIS regarding Seagate's interpretation of the Foreign Direct Product Rule. Now at the class certification stage, Plaintiffs must prove that common issues predominate over individual issues under Rule 23(b). However, Plaintiffs cannot do so because the fraud-on-the-market presumption on which their case depends does not apply where, as here, investors already knew the allegedly omitted information and therefore "the market price would not have been affected by the[] [alleged] misrepresentations." *See Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988).

Plaintiffs presume that Defendants' statements regarding compliance with U.S. export regulations and drivers of revenue impacted Seagate's stock price between September 14, 2020 and April 19, 2023 (the "Proposed Class Period"). Mot. at 1, 4-5. They claim that these statements misled by failing to disclose that Seagate: became "Huawei's sole HDD supplier" (¶ 217); received "warnings . . . from . . . competitors" (¶ 174); earned revenue "driven in material part by . . . HDD sales to Huawei" that "exposed the Company to[] heightened risk" (¶¶ 223, 236); was subject to government inquiries (¶ 184); "had stopped shipping HDDs to Huawei on or about September 29, 2021" (¶ 192); and later experienced disappointing financial results "driven in part by lower sales following cessation of sales to Huawei" (¶ 242).

But Plaintiffs ignore that long before the corrective disclosures alleged in the Complaint, it had "been common knowledge within the storage industry that [Seagate] continued shipping parts to Huawei" (Ex. 10 at 3); it was "not surprising that [Seagate] took market share . . . as it . . . ha[d] not stopped shipping to Huawei, unlike [its competitor]" (Ex. 6 at 1); investors learned that BIS was investigating Seagate for "improperly selling hard drives to . . . Huawei" (Ex. 8 at 2) and that "Commerce [wa]s investigating [Seagate's] continued shipments of HDDs to Huawei" (Ex. 11 at '066); and it was public that "Seagate . . . stopped shipments (something the [Commerce] report also acknowledge[d])" by October 2021 (Ex. 18 at 17). Because stale information cannot impact a stock price, *see Basic*, 485 U.S. at 248, Plaintiffs cannot assume based on the stock price declines on the alleged corrective disclosure dates that the challenged statements impacted Seagate's stock price. Therefore, given that Plaintiffs cannot presume

reliance on a classwide basis, each putative class member will have to prove that they actually relied on the challenged statements—a highly individualized inquiry, which would predominate any questions common to the putative class. Class certification should be denied in full.

None of the four alleged corrective disclosures on which Plaintiffs rely shows that the challenged statements had any impact on Seagate's stock price. All four fail for the reason above—they did not reveal *new* information about the alleged fraud. At most, the stock price declines on those dates reflected materialization of *known* risks. Plaintiffs also ignore the many new facts unrelated to the alleged fraud disclosed on the alleged corrective disclosure dates, which explain why Seagate's stock price declined on those dates.

The first two alleged corrective disclosures (on March 8, 2022 and July 21, 2022) fail because there is a clear mismatch between those disclosures—which do not mention Huawei at all—and the challenged statements, which are all about Huawei. *See Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 594 U.S. 113, 123 (2021) (inference that "back-end price drop equals front-end inflation" "starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure"). Although Plaintiffs argue that Seagate's disappointing financial results released on those days somehow signaled to investors that "Seagate lost its illegal monopoly" (¶ 262), investors knew months before these disclosures that Seagate had stopped selling to Huawei. These two alleged corrective disclosures account for approximately two-thirds of Plaintiffs' theoretical damages. If the Court were to conclude that just these two disclosures do not show any price impact, the impact on this matter would be dramatic. *See In re Fibrogen Sec. Litig.*, 2024 WL 1064665, at *12-16 (N.D. Cal. Oct. 3, 2024) (rejecting one alleged corrective disclosure for lack of price impact and denying class certification in part); § II below.

As a backup if the Court agrees that they may not rely on the fraud-on-the-market presumption at all, Plaintiffs point to the presumption of reliance set forth in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), but that presumption applies only where the plaintiffs "*primarily* allege omissions" and reliance would be "*impossible or impractical* to prove[.]" *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2

F.4th 1199, 1205-06 (9th Cir. 2021) (emphases added).  Here, the Complaint alleges that Defendants affirmatively misled investors about Seagate's compliance—not that investors did not even know to ask the question.  Accordingly, the *Affiliated Ute* presumption is unavailable. *See* § III below.

Finally, even if the Court were inclined to certify a class under the fraud-on-the-market or *Affiliated Ute* presumptions, Plaintiffs' Proposed Class Period would still be impermissibly overbroad because it begins before the first statement held potentially actionable by the Court. *See* § IV below.

## FACTUAL BACKGROUND

Seagate is a leading provider of data storage technology and infrastructure solutions.  Ex. 70 at 4.  Its principal products are HDDs.  *Id.*  Individual Defendants William Mosley and Gianluca Romano were and currently are Seagate's CEO and CFO, respectively. Plaintiffs are purported investors who allegedly purchased or acquired Seagate stock between September 14, 2020 and April 19, 2023.

**A.    Discovery Has Shown That Defendants and the Legal Advisors Believed Seagate's Sales of HDDs to Huawei Complied with the FDPR.**

In August 2020, BIS amended the FDPR to prohibit certain transactions with Huawei involving direct products of specified technology or software.  ECF No. 104-8.  Documents, which include in-house and external counsel for Seagate, reflect that Defendants believed Seagate was compliant with the FDPR in its transactions with Huawei.  In addition, no documents from either in-house or external counsel for Seagate, or from any attorneys at BIS, discussed BIS's Know Your Customer Guidance or its "reasons for concern" standard as being relevant to the analysis of whether Seagate was compliant with the FDPR.

In August 2022, after an investigation, BIS charged Seagate with violations under BIS's interpretation of the FDPR.  ¶ 204.  BIS did not mention the Know Your Customer Guidance or the "reasons for concern" standard when describing its allegations and interpretation of the FDPR in the settlement agreement or otherwise.  *See* ECF No. 104-18 (BIS Order and Settlement).

**B.      Investors Knew All Material Facts by No Later Than March 2021.**

Discovery confirms that investors knew about Seagate's continued sales to Huawei and understood the sales carried risk.  During a September 14, 2020 investor conference, Seagate CFO Gianluca Romano stated, "I don't see any particular restriction for us in terms of being able to continue to ship to Huawei[.]"  Ex. 1 at 5.  Analysts observed that Seagate's FDPR interpretation differed from that of its competitors Western Digital and Toshiba, which both stopped Huawei sales, and that this difference illustrated the risk that Seagate's interpretation could be incorrect.  *See, e.g.*, Ex. 2 at 1 ("Seagate and Western Digital. . . may need to obtain a license to sell these products to Huawei.  Surprisingly, the two firms seem to have different opinions about such a license"); Ex. 4 at '484 ("[Seagate] appears to be the only vendor still shipping to Huawei"); Ex. 5 at '053 ("[Seagate] noted as only vendor shipping to Huawei in C2H20"); Ex. 6 at 1 ("It is not surprising that [Seagate] took market share in the quarter as it . . . has not stopped shipping to Huawei, unlike [Western Digital]"); Ex. 7 at '363 ("While [Western Digital] has applied for a license to ship to Huawei (both NAND and HDDs), it has not yet been granted a license. We would note that Seagate has been shipping to Huawei"); Ex. 10 at 3 ("We believe it has been common knowledge within the storage industry that [Seagate] continued shipping parts to Huawei . . . [i]n contrast to [Western Digital] and Toshiba, both of which stopped supplying the Chinese OEM . . . **[Seagate's] legal team likely interpreted US restrictions differently than its peers**" (emphasis added)); Ex 11 at '066 ("[Seagate] indeed was shipping drives to Huawei, whereas its competitors stopped shipments in August. Our belief is [Seagate] likely interpreted restrictions differently than its peers").

On March 17, 2021—nearly a year before the first alleged corrective disclosure—*The Washington Times* reported that BIS was investigating Seagate for "improperly selling hard drives to Chinese tech giant Huawei."  Ex. 8 at 2.  Defendants' expert, Dr. Paul Zurek, concluded based on event study analysis that Seagate's stock price declined by a statistically significant amount after this disclosure, which shows that to the extent there was any uncertainty regarding the risk of Seagate's continued sales, investors certainly understood there was a risk by this date at the latest.  Ex. 69 ¶¶ 55-62.  On May 11, 2021, Senator Roger Wicker announced his own

inquiry into Seagate's FDPR compliance through a letter published on that date. Ex. 13 at 1. On August 6, 2021, Seagate added to its Form 10-K risk factors that "we cannot ensure that our interpretation of relevant restrictions and regulations will be accepted in all cases by relevant regulatory and enforcement authorities" and "[i]f we were ever found to have violated applicable export control laws, we may be subject to various penalties available under the laws, any of which could have a material and adverse impact on our business[.]" Ex. 70 at 31. This risk factor also appeared in the next Form 10-K and each Form 10-Q throughout the Proposed Class Period. ¶¶ 190, 194, 198, 201, 206, 209. On October 26, 2021, the Senate Minority Staff publicly released a report stating: "Seagate Technology likely violated the Foreign Direct Product Rule by continuing to ship hard disk drives without a license to Huawei" and "the company has stopped shipping hard disk drives to Huawei." Ex. 71 at 2, 5. On November 15, 2021, certain members of the Senate Commerce Committee published a letter to the Department of Commerce criticizing "the Commerce Department's lax enforcement" of the FDPR. Ex. 69 ¶¶ 63, 70. Dr. Zurek concluded that none of these disclosures had a statistically significant impact on Seagate's stock price, which again confirms that the risk of Seagate's sales to Huawei had already been incorporated into Seagate's stock price. *See* Ex. 69 ¶¶ 63-71.

Analyst reports also confirm that investors understood the risks stemming from these inquiries. *See* Ex. 25 at 13 ("[P]olitical risk remains an area to monitor for Seagate, particularly following a US Senate report alleging that Seagate continued to supply Huawei without a license after restrictions went into effect on September 14, 2020 – something that we believe most investors would also concur with"); Ex. 39 at 2 ("we believe the commercial relationship between [Seagate] and one of its Chinese customers has been well-known by investors"); Ex. 40 at '736 ("feedback over the past 2 years in our notes has expressed surprise at [Seagate's] ability to continue to ship to Huawei when peers had stopped"); Ex. 41 at '065 ("Recall that we have been highlighting geopolitical risk to Seagate for several quarters now, following an October 2021 Senate report . . . something that we believe most investors would also concur with").

Investors also knew the approximate volume of Seagate's HDD sales to Huawei. *See* Ex. 69 ¶¶ 89-99; Ex. 3 at '390 ("Seagate has been shipping to Huawei (less than 10% of sales) and

does not intend on applying for any specific licenses"); Ex. 9 at '701 ("We would note that Huawei has **not** been reported as a 10%+ customer for Seagate"); Ex. 17 at 1 ("[Seagate] supplied a substantial share of [Huawei]'s estimated $800 million worth of annual purchases of hard-disk drives after the tougher restrictions took effect in September 2020"); *accord* ¶ 107 (alleging that sales to Huawei accounted for 8% of Seagate's total revenue during the relevant period). Investors also knew the point in time at which Seagate had stopped shipping to Huawei. *See* Ex. 71 at 5; Ex. 18 at 17 ("Seagate has since stopped shipments (something the [Commerce] report also acknowledges)").

Finally, investors were aware of the risk of a potential penalty from BIS and the range of the potential penalty. *See* Ex. 10 at 3 ("the most likely implications would be: 1) [Seagate] ceasing shipments to Huawei, and 2) some monetary penalty related to [Seagate's] actions"); Ex. 11 at '067 ("our best guess regarding negative consequences would be a fine somehow congruent with amount of product [Seagate] shipped"); Ex. 25 at 13 ("While Seagate has since stopped shipments . . . the risk remains that the US government penalizes them for taking such actions in the past – something that could take the form of a one-time fine."); Ex. 43 at '132 ("any investigation and/or litigation will likely result in some expense for [Seagate] with the potential for future fines"); Ex. 39 at 2 (the investigation "could result in a sizable fine (potentially as high as hundreds of millions of dollars depending on the size of the transactions) if [Seagate] formally charged"); Ex. 47 at '121, 123 ("Reuters reported today that [Seagate] could face penalties of up to~$300K per violation or 2X the value of the transaction, whichever is greater" "if the maximum penalty were imposed this could be a number larger than [Seagate's] current stated ~ $500MM of excess liquidity on its balance sheet").

C.    **This Litigation.**

This action was filed on July 10, 2023. ECF No. 1. The Court appointed MissPERS, APERS, and Universal as Lead Plaintiffs and Bernstein Litowitz and Motley Rice as Lead Counsel on September 25, 2023. ECF No. 50. A consolidated class complaint was filed on October 19, 2023 and a motion to dismiss was granted in full with leave to amend on August 8, 2024. ECF No. 68; ECF No. 96. The operative Complaint was filed on September 12, 2024 and

a second motion to dismiss was granted in part and denied in part on May 12, 2025. Compl.; Order. The Order dismissed several statements challenged in the Complaint, leaving three categories of alleged misstatements: "(1) affirmations of compliance with the FDPR and other applicable export restrictions; (2) statements about Seagate's reliance on sales to Huawei; and (3) statements about the drivers of Seagate's revenue." Order at 9.[1] The "reasons for concern" standard in BIS's Know Your Customer Guidance was critical to the Court's Order. Order at 2-3, 6, 11-12, 14, 16, 18. As explained above, however, discovery has provided no support for determining that this standard is relevant to the legal interpretation of the FDPR in this case. § A. Indeed, Plaintiffs are not pressing this theory in their case. The Complaint alleges that Seagate's stock price declined on four dates when the purported truth was revealed (March 8, 2022, July 21, 2022, October 26, 2022, and April 19, 2023). ¶¶ 111-130.

Plaintiffs moved for class certification on December 16, 2025. Mot. The Motion seeks to certify a class of purchasers and/or acquirers of Seagate common stock between September 14, 2020 and April 19, 2023, subject to certain exclusions. *Id.* at 1-2. The Motion seeks appointment of MissPERS, APERS, and Universal as class representatives, with Bernstein Litowitz and Motley Rice as class counsel. *Id.* at 1. The Motion relies on a report submitted by Plaintiffs' expert, Dr. Matthew Cain. ECF No. 152-1.

## ARGUMENT

### I. Legal Standards

#### A. Class Certification Requires a Rigorous Analysis of the Evidence.

A party seeking to certify a class bears the burden of proof in demonstrating that it has satisfied all four prerequisites of Rule 23(a) and that its action falls within one of the three types of actions permitted under Rule 23(b). *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *amended*, 273 F.3d 1266 (9th Cir. 2001). Because they seek to certify a

---

[1] The Motion and Dr. Cain appear to collapse the second and third categories of challenged statements into a single category called "Revenue Driver Misstatements and Omissions." Cain Rep. at 5. Defendants adopt this convention for this Opposition.

proposed class under Rule 23(b)(3), Plaintiffs must prove that common questions of law or fact predominate over questions affecting only individual class members.  Fed. R. Civ. P. 23(b)(3).

Plaintiffs "must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23."  *Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II)*, 573 U.S. 258, 275 (2014); *see also Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1066 (9th Cir. 2021) ("The party seeking class certification has the burden of affirmatively demonstrating that the class meets the requirements of Rule 23." (cleaned up)).  It is often necessary for courts "to probe behind the pleadings before coming to rest on the certification question" because "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (cleaned up).  This "rigorous analysis" will frequently entail "overlap with the merits of the plaintiff's underlying claim" because the "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  *Id.* at 27-28 (cleaned up); *Goldman*, 594 U.S. at 122 ("a court has an obligation before certifying a class to determine that Rule 23 is satisfied, even when that requires inquiry into the merits") (cleaned up).  Courts must find by a preponderance of the evidence that the plaintiff has established predominance under Rule 23(b)(3).  *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664-665 (9th Cir. 2022).

### B.     Individual Issues Will Predominate if Defendants Rebut the Presumption of Reliance.

Reliance is a required element of Plaintiffs' claims and, typically, an individualized inquiry.  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460-461 (2013).  In the context of publicly traded securities, however, the Supreme Court has recognized a rebuttable presumption of reliance on public misstatements because "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations."  *Basic*, 485 U.S. at 246.  Ordinarily, plaintiffs attempt to prove class-wide reliance through the *Basic* presumption (or, less commonly, through the *Affiliated Ute* presumption).  Defendants may rebut the *Basic* presumption by proving that the challenged

statements in fact had no impact on the company's stock price. *Halliburton II*, 573 U.S. at 263-64. Defendants "bear the burden of persuasion to prove a lack of price impact by a preponderance of the evidence[,]" although "the burden of persuasion should rarely be outcome determinative." *Goldman*, 594 U.S. at 117.

The Court must consider all evidence in assessing price impact, even if the evidence overlaps heavily with merits questions, such as materiality or loss causation. *Goldman*, 594 U.S. at 122 ("In assessing price impact at class certification, courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense") (cleaned up). Failure to consider such evidence is reversible error. *See Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 102-105 (2d Cir. 2023) (reversing class certification); *In re Allstate Corp. Sec. Litig*, 966 F.3d 595, 608-609 (7th Cir. 2020) (reversing class certification and remanding with instruction to consider broad evidence).

If the evidence shows there is no price impact, class certification is defeated because thousands of independent inquiries would be required to prove each class member's reasons for purchasing the stock. *See Halliburton II*, 573 U.S. at 279-82; *Amgen*, 568 U.S. at 462-63 ("Absent the fraud-on-the-market theory . . . reliance would ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class"). Here, for instance, ███████████████████ ████████████████████████████████████████████████. *See* Ex. 64 at 58:9-60:4, 63:1-65:23; Ex. 67 at 72:9-73:5, 73:13-76:5, 77:25-78:21, 80:1-81:2; Ex. 65 at 72:5-75:10, 124:24-128:15, 129:14-134:18; Ex. 68 at 83:17-84:2, 126:17-23, 129:23-130:24. Without a presumption of reliance, Plaintiffs will be unable to prove the elements of even their own individual cases.

## II. Plaintiffs Cannot Use the *Basic* Presumption Because the Challenged Statements Had No Impact on Seagate's Stock Price.

The ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████. *See* Ex. 66 at 80:12-

81:13.  However, the critical inference underlying Dr. Cain's theory—"that the back-end price drop equals front-end inflation"—fails for each alleged corrective disclosure.  *See Goldman*, 594 U.S. at 123.  "A finding of 'back-end' price impact requires proof that the information disclosed on [a corrective disclosure date] was (i) corrective of one or more prior false statements or omissions, (ii) new (unknown to the market prior to [the corrective disclosure date]), and (iii) 'value relevant' (*i.e.*, caused at least some of the stock price decline)."  *Fibrogen*, 2024 WL 1064665, at *12.  For the following reasons, there is no evidence that the challenged statements had any price impact.

**A.      The March 8, 2022 Disclosures Do Not Establish Price Impact.**

The Complaint alleges that "on March 8, 2022, following the collapse of the Company's illicit monopoly in response to intensifying legal scrutiny, Seagate was forced to lower its earnings guidance" for fiscal Q3 2022 (ending April 1, 2022).  ¶ 112.  The Complaint further alleges that Dr. Mosley "cautioned investors that Seagate was facing revenue pressure and was 'going to be at the lower end of [its financial guidance] ranges' for the upcoming quarter as a result of 'disruption in the Chinese market' for HDDs."  *Id.*  These disclosures do not establish price impact for three independent reasons.

*First*, there is a mismatch between the challenged statements and the March 8 disclosures.  The inference that "back-end price drop equals front-end inflation" "starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure."  *Goldman*, 594 U.S. at 123.  "[W]hen the earlier misrepresentation is generic (e.g., we have faith in our business model) and the later corrective disclosure is specific (e.g., our fourth quarter earnings did not meet expectations), then there is a mismatch between the contents of the misrepresentation and the corrective disclosure."  *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *12 (S.D. Cal. Mar. 20, 2023) (quoting *Goldman*, 594 U.S. at 123) (cleaned up).

Here, the Complaint challenges statements such as "we comply with all the rules and regulations[,]" Seagate disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting[,]" "I don't think" Huawei's revenue contribution to Seagate's Q2 2021 (ending January 1, 2021) guidance is "material[,]"

and Seagate's revenue performance in Q3 2021 (ending April 2, 2021) was driven in part by "[s]trong cloud data center demand and ongoing recovery in the enterprise markets[.]" *See* ¶¶ 183, 186, 192, 215, 228.  The Complaint then alleges that the disclosure of disappointing financial performance in Q3 2022 revealed that Seagate had lost an "illegal monopoly" and "significant source of Seagate's revenue" when it stopped shipping to Huawei months earlier. *See* ¶¶ 262, 263.  But the alleged misrepresentations about Seagate's regulatory compliance are generic, while the March 8 disclosures about its disappointing financial performance in one quarter are specific.  Further, the alleged misrepresentations about Seagate's revenue drivers largely pertain to quarters other than the quarter discussed on March 8.  Therefore, the March 8 disclosures do not show any price impact of the challenged statements.  *See In re Concho Res., Inc. Sec. Litig.*, 2025 WL 1040379, at *16 (S.D. Tex. Apr. 7, 2025) (holding on class certification that the mere disclosure of financial results in a particular quarter did not correct statements in earlier quarters about "the switch to manufacturing mode generally"); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *16 (N.D. Cal. Dec. 22, 2016) (ruling on class certification that "financial statements are not corrective of misrepresentations related to safety").

Further, the March 8 disclosures do not mention Huawei at all.  *See* Ex. 19. Acknowledging this weakness, Plaintiffs have argued that ███████████████████ ████████████.  *See* Ex. 66 at 85:21-86:6.  But no analysts—including the two cited by the Complaint—connected the March 8 disclosures to Huawei.  *See* Ex. 69 ¶¶ 111; ¶ 113 (citing Ex. 20; Ex. 21).  Moreover, the Complaint misattributes to Dr. Mosley the reference to China.  An analyst asked him if Seagate's results were caused by "disruption in the Chinese market," and Dr. Mosley instead pointed to "other things going on in the world."  *See* Ex. 19 at 3-4.  Discovery has confirmed the mismatch.  Seagate's internal documents show that Seagate's sales in China **outperformed** the quarter's forecasted $899 million in revenue with actual revenue of $911 million.  Ex. 24 at '588.

████████████████████████████████████████ ███████████████████████████████████.  *See* Ex. 64 at 66:12-69:3;

Ex. 65 at 62:18-67:12; Ex. 68 at 86:15-88:11.  Because there is a clear mismatch between the March 8 disclosures and the challenged statements, the March 8 disclosures cannot show any price impact.  *See Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at *19-20 (N.D. Tex. Aug. 21, 2023) (holding that plaintiffs could not prove price impact to the extent plaintiffs alleged defendants misled the market about their use of a proxy cost of carbon because the market drew no connection between defendants' earnings press releases and earlier statements about the use of a proxy cost of carbon).[2]

*Second*, the March 8 disclosures do not establish price impact because investors **knew** that Seagate had stopped selling to Huawei five months earlier.  The presumption of reliance is rebutted if investors "were privy to the truth . . . , and thus . . . the market price would not have been affected by the[] misrepresentations."  *See Basic*, 485 U.S. at 248.  Even Dr. Cain concedes that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.  *See* Ex. 66 at 27:2-25.  Thus, the March 8 stock price decline could not have been caused by information the market knew five months earlier.

Here, investors knew that Seagate continued selling to Huawei after September 2020 and stopped selling to Huawei by October 2021.  *See* Facts § B above.  Analysts also correctly estimated the approximate volume of those sales during that period.  *See id*.  Further, Seagate issued its guidance for fiscal Q3 2022 four months *after* it stopped selling to Huawei and therefore investors would have understood that the guidance no longer included expected future sales to Huawei.  Ex. 72 at 2.[3]  Because investors knew all these facts months before March 8,

[2] Although the Court previously concluded that the Complaint's allegations were "sufficient" at the motion to dismiss stage (ECF No. 113 at 20), now Plaintiffs "must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23[,]" which they cannot do for the reasons stated above.  *See Halliburton II*, 573 U.S. at 275.

[3] Plaintiffs have not alleged that any guidance issued by Seagate was fraudulent (*see* ECF No. 101), and Seagate's internal documents confirm that Huawei was removed from Seagate's financial plans right after Seagate stopped selling to Huawei and was replaced by other customers.  *See* Ex. 14  ("we should not have a plan that has [Huawei] in it"); Ex. 15 at '311 (Seagate "will be able to reallocate to other customers"); Ex. 16 at 11 ("Demand gap from [Huawei] expected to be closed by other China accounts."); Ex. 35 (Seagate has "brought in new

2022, the updated financial expectations announced on March 8 could not have revealed any new information about Seagate's compliance with the FDPR or the drivers of Seagate's revenue in prior quarters and therefore could not have impacted Seagate's stock price.  *See Fibrogen*, 2024 WL 1064665, at *13 (finding defendants successfully rebutted price impact upon showing that the allegedly corrective information "was already public knowledge"); *Qualcomm*, 2023 WL 2583306, at *13 (finding that defendants' evidence that the alleged truth "was public prior to the corrective disclosures makes price impact less likely").

*Third*, the stock price decline on March 8 was caused by non-fraud related factors. "[E]vidence supporting alternative explanations for the stock decline" tends to negate price impact.  *See In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *9 (S.D.N.Y. Mar. 29, 2024).  As Dr. Cain acknowledges, ████████████████████████████ ████████████████████████████████████████.  *See* Cain Report ¶ 102; Ex. 66 at 81:14-82:21, 109:22-111:20.

Here, Defendants disclosed on March 8 that Seagate's Q3 2022 revenue would be at the lower end of its guidance due to "disruptions that we see in Russia[,]" "freight logistics," "the price of oil," "credit risk everywhere[,]" and "the world waking back up was a little slow[.]"  Ex. 19 at 4, 5, 6, 11.  Analysts credited this explanation.  *See* Ex. 20 at 1-2; Ex. 22 at '800; Ex. 23 at '804; Ex. 69 ¶ 111.  Further, Seagate's competitors (who had stopped shipping to Huawei after the FDPR was amended) experienced similar revenue declines over the same period, which confirms that industry-wide factors (rather than cessation of sales to Huawei) were driving Seagate's revenue.  *See* Ex. 69 ¶¶ 112-113.  Because other value-relevant information explains the stock price decline on March 8, the decline does not show that the challenged statements had any price impact.  *See Kirkland*, 2024 WL 1342800, at *9 ("credit[ing] [defendants' expert's] analysis to the extent that it offers credible, but potential, alternative explanations for the price decline").

business to replace that lost revenue [from Huawei] recovering almost 100% of the lost revenue").

**B.     The July 21, 2022 Disclosures Do Not Establish Price Impact.**

The Complaint alleges that "[i]nvestors continued to learn the truth" about Seagate's reliance on sales of HDDs to Huawei "on July 21, 2022, when Seagate reported that its revenues declined by 12.8% year-over-year, driven by lagging HDD demand in Asia, missing the Company's entire revenue guidance range (and missing the midpoint of guidance by more than $150 million)." ¶ 117.  The Complaint further alleges that Seagate "guided down the coming quarter's revenue by 5% and reported that it was cutting HDD production because of customer 'inventory overages' in China." *Id.*  These disclosures do not establish price impact for three independent reasons.

*First*, there is another mismatch between the challenged statements and the July 21 disclosures.  As above, the challenged statements are far more generic than the specific financial results disclosed on July 21.  Further, the July 21 disclosures do not mention Huawei and no analysts—including the three cited by the Complaint—connected "China" to Huawei.  *See* Ex. 28; Ex. 29; ¶ 118 (citing Ex. 30; Ex. 33; Ex. 34); Ex. 69 ¶ 121.  Consistent with its public disclosures, Seagate's internal documents attribute the decline in China sales to "macro economy and COVID policy impact" and "[h]igh inventory across all customers."  Ex. 27 at 25; *see also* Ex. 64 at 38:11-39:13 (██████████████████████████████████████████████████████████████████████████████████████. Further, ███████████████████████████████████████████████████████████████████████████████████████████████ *See* Ex. 64 at 70:1-75:3; Ex. 65 at 69:2-72:4; Ex. 68 at 95:13-97:13.  Thus, price impact cannot be assumed based on the July 21 disclosures.  *See Concho*, 2025 WL 1040379, at *16; *Intuitive*, 2016 WL 7425926, at *16; *Ramirez*, 2023 WL 5415315, at *19-20.

*Second*, investors knew that Seagate had stopped selling to Huawei long before the July 21 disclosures.  Seagate initially issued its guidance for fiscal Q4 2022 (ending July 1, 2022) on April 27, 2022—nearly seven months after Seagate had stopped selling to Huawei.  *See* Ex. 26 at 1-2; Ex. 71 at 5.  Therefore, the financial results disclosed on July 21 could not have revealed the alleged fraud because investors would have assumed that this guidance no longer incorporated

sales to Huawei. *See Fibrogen*, 2024 WL 1064665, at *13; *Qualcomm*, 2023 WL 2583306, at *13.

*Third*, the stock price decline on July 21 was similarly caused by non-fraud related factors. On July 21, Defendants attributed Seagate's financial results to a "built-up in inventory levels across a broad spectrum of customers," "Asia-based cloud customers . . . dealing with the impacts of COVID restrictive measures," and "persistent non-HDD component shortages" all contributing to lowered guidance for the next quarter. *See* Ex. 29 at 4. Analysts also credited these explanations. Ex. 31 at '534; Ex. 30 at 1-2; Ex. 32 at 1-2; Ex. 69 ¶ 121. Further, Seagate's competitors experienced similar revenue declines over the same period, which confirms that industry-wide factors were driving Seagate's revenue. *See* Ex. 69 ¶¶ 122-123. Because these non-fraud disclosures explain the stock price decline on July 21, the decline does not show any price impact from the challenged statements. *See Kirkland*, 2024 WL 1342800, at *9.

**C.    The October 26, 2022 Disclosures Do Not Establish Price Impact.**

The Complaint alleges that on October 26, 2022, Seagate disclosed its receipt of the PCL. ¶ 122; ECF No. 104-15 at 3. The Complaint further alleges that the same day, Seagate disclosed "disappointing financial results for the first quarter of 2022," declining HDD sales due to declining demand in China, lowered production output and fiscal year 2023 capital expenditures, and a restructuring plan. ¶ 266. These disclosures do not establish price impact for three independent reasons.

*First*, investors **knew** the risk that Seagate may be charged with violating the FDPR more than a year before the October 26 disclosures. Specifically, investors had long known that Seagate was selling to Huawei without a license; Seagate's competitors had stopped selling; BIS was investigating Seagate; BIS could interpret the FDPR differently than Seagate; and the Senate Minority Staff had inquired and found a "likely violat[ion][.]" *See* Facts § B. The fact that none of the disclosures about the Senate Minority Staff inquiry resulted in a statistically significant stock price decline is strong evidence that Seagate's stock price had already incorporated the risk of BIS finding a violation. *See* Ex. 69 ¶¶ 63-71. Even analyst reports cited in the Complaint show that investors knew the risk. *See* ¶ 123; Ex. 47 at '123 (noting Senate Minority Staff

"report last October" and "[Western Digital] (and Toshiba) ceased shipments after [FDPR] went into effect"); Ex. 44 at 1 ("our suspicions that the company was over-shipping to China were confirmed").

A stock price decline due to the materialization of a **known** risk cannot show that the challenged statements impacted the stock price. *See* Ex. 69 ¶¶ 74-75; *Fibrogen*, 2024 WL 1064665, at *13; *Qualcomm*, 2023 WL 2583306, at *13; *see also Holwill v. AbbVie Inc.*, 2025 WL 1908156, at *20-23 (N.D. Ill. July 10, 2025) (granting summary judgment for defendants; plaintiffs could not "establish loss causation as a matter law" because regulator's intervention in qui tam action merely made the "probability" of "regulatory action" a "certainty" and was "not any correction of a prior misrepresentation" where the alleged kickbacks were already publicly known); *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 327-28 (S.D.N.Y. 2023) (granting summary judgment for defendants; "AG's amended complaint . . . fails to adduce new information showing a connection between anything Mylan said and new facts" where "the fact of an investigation into Mylan was public information"), *aff'd sub nom. Menorah Mivtachim Ins. Ltd. v. Sheehan*, 2024 WL 1613907 (2d Cir. Apr. 15, 2024), *cert. denied*, 145 S. Ct. 436 (2024).

*Second*, the financial results disclosed on October 26 do not establish any price impact because investors knew that Seagate had stopped selling to Huawei well before the October 26 disclosures. Seagate issued its guidance for Q1 2023 (ending September 30, 2022) on July 21, 2022—nearly ten months after Seagate had stopped selling to Huawei. Ex. 28 at 1; Ex. 71 at 5. Therefore, the financial results disclosed on October 26 could not have revealed the alleged fraud. *See Ramirez*, 2023 WL 5415315, at *19-20.[4]

*Third*, the stock price decline on October 26 was caused primarily by factors unrelated to Huawei. On that day, Defendants also disclosed the impacts of broad-based customer inventory

---

[4] To the extent that Plaintiffs allege that the financial results announced on October 26 were corrective independent of the PCL disclosure, the argument would also fail due to the mismatch between announcement of the financial results and the challenged statements. As with the financial results disclosed on March 8 and July 21, the financial results disclosed on October 26 were not caused by cessation of sales to Huawei. *See* Ex. 36 at 20 (Seagate internal document attributing China revenue miss to, among other things, "high inventory and cost control").

corrections, COVID lockdowns in China, a weakened economy, and consumer spending weakness amid inflationary pressures.  *See* Ex. 37 at 1-2; Ex. 38 at 4-5.  Analysts focused on these factors.  *See* Ex. 45 at '157; Ex. 44 at 2; Ex. 46 at 1; Ex. 69 ¶ 131.  Further, Seagate's competitors experienced similar revenue declines over the same period, which confirms that industry-wide factors were driving Seagate's revenue.  *See* Ex. 69 ¶¶ 132-133.  Because these non-fraud disclosures explain the stock price decline on October 26, the decline does not show any price impact from the challenged statements.  *See Kirkland*, 2024 WL 1342800, at *9.

### D.    The April 19, 2023 Disclosures Do Not Establish Price Impact.

Finally, the Complaint alleges that after trading hours on April 19, 2023, Seagate disclosed the BIS settlement, pursuant to which Seagate agreed to pay a civil penalty of $300 million.  ¶ 126.  This disclosure does not establish price impact for three independent reasons.

*First*, as explained above, investors long knew the risk that Seagate may have to pay a penalty for violating the FDPR.  *See* Facts § B; Argument § II.C above.  Therefore, a decline in Seagate's stock price due to the materialization of that known risk does not establish that the challenged statements impacted Seagate's stock price.  *See* Ex. 69 ¶¶ 86-87; *Fibrogen*, 2024 WL 1064665, at *13; *Qualcomm*, 2023 WL 2583306, at *13; *see also AbbVie*, 2025 WL 1908156, at *20-23; *Mylan*, 666 F. Supp. 3d at 327-328.

*Second*, investors' reaction to the BIS settlement was ***positive***.  Yet to prevail on their theory, Plaintiffs must "point to a ***negative*** disclosure about a company and an associated drop in its stock price[.]"  *See Goldman*, 594 U.S. at 123 (emphasis added).  Here, analysts reacted favorably to the settlement because Seagate negotiated a lower penalty than expected and the settlement eliminated any uncertainty about the result of BIS's investigation.  *See* Ex. 69 ¶¶ 81-85; Ex. 49 at '430 ("we see this resolution as a positive"); Ex. 63 at '562 ("We see the settlement as positive for shares"); Ex. 54 at 1 ("The $300M settlement (we est ~$250M) with BIS is a positive"); Ex. 58 at '287 ("The resolution with Commerce was about as positive an outcome as we could have envisioned"); Ex. 59 at '425 ("[w]e see this end result as nearly a best case scenario for [Seagate]"); Ex. 50 at '814 ("the dollar amount of this BIS settlement is significantly lower than what these guidelines might have suggested" and "this settlement both in terms of

magnitude and structure is better than feared"); Ex. 51 at '420 ("We view the news as positive, as our prior discussions with investor indicated an expectation of a $500M-$1B fine"); Ex. 60 at 1 ("much more favorable BIS settlement than expected ($300M paid incrementally vs expectations of $800M)").

Two of the three analyst reports cited by the Complaint (¶ 129) do not assess the penalty relative to expectations (Ex. 55 at '597; Ex. 56 at 2); the third confirms that the settlement was "favorable" and "good news" because "it clearly removes a key overhang that has weighed on [Seagate] in recent quarters" (Ex. 57 at 1, 5). Dr. Cain ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 66 at 127:4-18. Accordingly, announcement of the BIS settlement cannot show price impact because that announcement did not cause a decline in Seagate's stock price. *See Kirkland*, 2024 WL 1342800, at *9 (crediting evidence that plaintiffs misinterpreted how the market reacted to disclosures in finding no price impact).

*Third*, the stock price decline on April 20 was caused by non-fraud related factors. That day, Seagate disclosed that it "came in at the low-end of our guidance range" for fiscal Q3 2023 (ending March 31, 2023). Ex. 52 at 1. Seagate attributed these results to "economic uncertainties and an elongated inventory correction that impacted demand among a few large customers late in the quarter," "some pricing pressure," "focus[] on reducing the debt," and "protect[ing] our dividend." Ex. 53 at 3, 12, 14, 16. Analysts confirmed the importance of these disclosures to investors. *See* Ex. 61 at 1; Ex. 56 at 1; Ex. 62 at 1, 3; Ex. 69 ¶ 143.[5] Further, Seagate's competitors experienced similar revenue declines over the same period, which confirms that industry-wide factors were driving Seagate's revenue. *See* Ex. 69 ¶¶ 144-145.

---

[5] The Complaint appears to concede that these results are not related to the alleged fraud by omitting any reference to them. *See* ¶¶ 126-130. Nevertheless, to the extent that Plaintiffs attempt to claim that these results are corrective, the attempt would fail for substantially similar reasons as the prior three alleged corrective disclosures.

Because these non-fraud disclosures explain the stock price decline on April 20, the decline does not show any price impact from the challenged statements.  *See Kirkland*, 2024 WL 1342800, at *9.

### III.    Plaintiffs Cannot Rely on the *Affiliated Ute* Presumption Because this Case Involves Primarily Alleged Misstatements, Not Omissions.

Unable to use the *Basic* presumption, Plaintiffs incorrectly resort to the *Affiliated Ute* presumption to argue that reliance can be presumed on a classwide basis.  Mot. at 19-20.  In the Ninth Circuit, "the *Affiliated Ute* presumption is limited to cases that primarily allege omissions and present plaintiffs with the difficult task of proving a speculative negative."  *Volkswagen*, 2 F.4th at 1204.  The "mere fact of concealment cannot transform affirmative conduct into omissions."  *Id.* at 1205.

Here, the *Affiliated Ute* presumption does not apply because the Complaint does not "**primarily** allege omissions" and reliance is not "**impossible or impractical** to prove[.]"  *See Volkswagen*, 2 F.4th at 1204, 1206 (emphases added).  To the contrary, the Complaint challenges more than 30 affirmative statements as false or misleading.  *See* ECF No. 101.  Thus, the Complaint does not "primarily allege omissions[.]" *See Volkswagen*, 2 F.4th at 1204.  Further, investors knew to—and did—ask about Seagate's HDD sales to Huawei.  *E.g.*, ¶ 51; Facts § B above.  Therefore, it would not be "impossible or impractical" for Plaintiffs to prove that investors relied on Defendants' statements about that topic.  *See Volkswagen*, 2 F.4th at 1206-08 (rejecting *Affiliated Ute* where complaint challenged affirmative misrepresentations regarding "financial results" and "compliance with . . . regulatory standards" because the alleged omission that company was violating those standards and consequently overstating its results was "simply the inverse of the affirmative misrepresentations") (citation omitted); *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 667 (9th Cir. 2004) (rejecting *Affiliated Ute* in case alleging mixed claims of affirmative misstatements and omissions); *Crago v. Charles Schwab & Co.*, 2021 WL 4990234, at *3 (N.D. Cal. Oct. 27, 2021) (rejecting *Affiliated Ute* presumption in case where omissions were effectively the inverse of alleged misrepresentations).

Plaintiffs' cases are inapposite. *See* Mot. at 19-20. They rejected the application of *Affiliated Ute*, *see Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999), concerned deceptive conduct that was clearly distinct from the misstatements because the conduct occurred after the misstatements, *see In re Didi Global Inc. Securities Litigation*, 2025 WL 2345696, at *2 (S.D.N.Y. Aug. 13, 2025), or involved scenarios where investors could not have relied on affirmative misstatements because investors did not know to ask about the allegedly omitted facts, such as undisclosed *quid pro quo* payments between parties to an otherwise legitimate-appearing business relationship. *See W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 289 (D. Minn. 2018); *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 48 & n.3 (S.D.N.Y 2013); *In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *8 (S.D.N.Y. Aug. 21, 2008); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 298 (S.D.N.Y. 2003). Accordingly, the *Affiliated Ute* presumption does not apply.

### IV.     The Proposed Class Period Should Begin on October 22, 2020 Because the Court Dismissed All Earlier Challenged Statements.

Even if the Court were inclined to certify a class under the fraud-on-the-market or *Affiliated Ute* presumptions, Plaintiffs' Proposed Class Period would still be overbroad for all claims alleged. In a typical securities class action, "the class period begins on the date of the first misstatement, as it is the injection of misinformation into the marketplace that distorts the price of the stock." *In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 459 n.12 (S.D.N.Y. 2013) (rejecting plaintiffs' request for the class period to begin on February 20, 2006 because the first alleged misstatement occurred on February 24, 2006); *see also Luna v. Marvell Tech. Grp., Ltd.*, 2017 WL 4865559, at *7 (N.D. Cal. Oct. 27, 2017) (limiting the class period to a start date of February 19, 2015, the date of the first purported misleading statement); *Venkataraman v. Kandi Techs. Grp., Inc.*, 2024 WL 4345571, at *5 (S.D.N.Y. Sept. 30, 2024) (shortening the proposed class period because "[t]he proper date for the start of a class period is no earlier than the first alleged actionable false public statement"). Here, if the Court is inclined to certify a class, the class period should begin on the date of the first alleged misstatement for which the Court held

Plaintiffs had adequately pleaded a claim, *i.e.*, October 22, 2020.  ECF No. 104-7 at 5; Order at 14.

Plaintiffs, however, propose to begin the class period on September 14, 2020.  Mot. at 1. Yet the only occurrences alleged in the Complaint on that date were affirmative statements that the Court has dismissed.  *See* ¶¶ 51, 53, 83, 166-168, 212-213; Order at 10-11, 18-19, 21.  If Defendants did nothing to deceive investors on September 14, then no artificial inflation could have entered Seagate's stock price on that date.  Plaintiffs have argued that their scheme claim "does not depend exclusively upon the alleged misstatements" (ECF No. 127 at 2 n.1), but this argument does not support extending the class period to September 14 because Plaintiffs point to no evidence showing that the alleged scheme began on September 14.  And for the reasons explained above, no material facts were omitted.  *See* Facts § B.  The mere fact that Seagate continued selling to Huawei after September 14 (¶ 285) cannot by itself establish a scheme because Defendants openly and publicly acknowledged at that time that Seagate would continue to sell.  *See* Ex. 1 at 5; *In re Overstock Sec. Litig.*, 119 F.4th 787, 804-805 (10th Cir. 2024) (on a motion to dismiss, rejecting scheme claim where "Overstock's [dividend] plan was announced to the public" and thus "[d]efendants' disclosures prevented any false signal that would deceive investors from entering the market").  All other acts alleged in the Complaint to have "furthered Defendants' scheme" occurred *on or after* October 22, 2020.  *See* ¶ 284 (alleging Defendants' responses to analyst questions *on or after* October 22, 2020); ¶ 285 (alleging "financial performance and stock prices boosted by secret and illegal revenues" during quarters in which Seagate's financial performance was disclosed *on or after* October 22, 2020); ¶ 286 (alleging that "Defendants entered into two secret agreements . . . with Huawei," which were executed months *after* October 22, 2020).

Thus, if a class is certified, the start date should be on October 22, 2020, when the first challenged statements sustained by the Court were made.  *See, e.g.*, *Luna*, 2017 WL 4865559, at *7 (plaintiff's allegations that defendants' conduct prior to the first misstatement impacted future disclosures insufficient to extend class period because plaintiff "must make some showing, grounded in fact," that the allegedly wrongful conduct "[was] the result of an impropriety, or

[was] otherwise misleading"); *Kandi Techs.*, 2024 WL 4345571, at \*5 (shortening class period to date of first actionable statement because "[w]hat matters is when the [d]efendants' first alleged misstatements became public, and thereby could have begun affecting the price of Kandi stock"); *In re Miva, Inc., Sec. Litig.*, 2008 WL 681755, at \*2 (M.D. Fla. Mar. 12, 2008) (shortening class period to February 23, 2015 because "all statements prior to the February 23, 2005 conference call were not actionable").

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for class certification.

Dated:  February 10, 2026                              Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI,
Professional Corporation

By:  */s/ Caz Hashemi*
     Caz Hashemi, State Bar No. 210239
     Stephen B. Strain, State Bar No. 291572
     650 Page Mill Road
     Palo Alto, CA 94304
     Telephone: (650) 493-9300
     Facsimile: (650) 565-5100
     Email:     chashemi@wsgr.com
                sstrain@wsgr.com

     John I. Karin (*pro hac vice*)
     31 West 52nd Street
     Fifth Floor
     New York, NY 10019
     Telephone: (212) 999-5800
     Facsimile: (866) 974-7329
     Email:     jkarin@wsgr.com

     *Attorneys for Defendants*
     *Seagate Technology Holdings plc,*
     *William D. Mosley, and Gianluca Romano*