Lance V. Oliver (admitted *pro hac vice*)
William S. Norton (admitted *pro hac vice*)
Joshua C. Littlejohn (admitted *pro hac vice*)
Christopher F. Moriarty (admitted *pro hac vice*)
Andrew P. Arnold (admitted *pro hac vice*)
Gregg S. Levin (admitted *pro hac vice*)
Cameran M. Gilliam (admitted *pro hac vice*)
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
loliver@motleyrice.com
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com
aarnold@motleyrice.com
glevin@motleyrice.com
cgilliam@motleyrice.com

Salvatore J. Graziano (admitted *pro hac vice*)
Hannah Ross (admitted *pro hac vice*)
James A. Harrod (admitted *pro hac vice*)
Jorge G. Tenreiro (admitted *pro hac vice*)
Aasiya Farah Mirza Glover (admitted *pro hac vice*)
Sarah Schmidt (admitted *pro hac vice*)
**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
hannah@blbglaw.com
jim.harrod@blbglaw.com
jorge.tenreiro@blbglaw.com
aasiya.glover@blbglaw.com
sarah.schmidt@blbglaw.com

*Co-Lead Counsel for Co-Lead Plaintiffs
Universal-Investment-Gesellschaft mbH,
Universal-Investment-Luxembourg S.A., and
UI BVK Kapitalverwaltungsgesellschaft mbH,
and the Class*

*Co-Lead Counsel for Co-Lead Plaintiffs
Public Employees' Retirement System of
Mississippi and Arkansas Public Employees'
Retirement System, and the Class*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| *In re Seagate Technology Holdings plc Securities Litigation* | Case No. 3:23-cv-03431-RFL<br><br>CLASS ACTION<br><br>**LEAD PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND APPROVAL OF CLASS COUNSEL**<br><br>**JUDGE:** Rita F. Lin<br>**DATE:** April 21, 2026<br>**TIME:** 10:00 am<br>**DEPT.:** Courtroom 15 - 18th Floor |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

I.  PRELIMINARY STATEMENT ....................................................................................... 1

II.  ARGUMENT ..................................................................................................................... 2

    A.  Defendants Cannot Prove a Complete Lack of Price Impact ................................. 2

        1.  Defendants' Arguments that the Truth Was Known Are Unavailing ......... 3

            a.  Romano's September 14 Statement Is Evidence of Price Impact ....................................................................................... 3

            b.  *The Washington Times* Article Is Evidence of Price Impact .......... 5

            c.  Defendants' "Materialization of Known Risks" Arguments Fail ............................................................................................... 7

        2.  Defendants Ignore Extensive Evidence of Price Impact............................ 8

        3.  "Non-Fraud" Factors Do Not Show a Complete Lack of Price Impact.... 11

        4.  Defendants' Remaining Price Impact Arguments Should Be Rejected.... 12

    B.  Defendants' *Goldman* Arguments Do Not Rebut the Presumption of Reliance............................................................................................................... 13

    C.  The *Affiliated Ute* Presumption of Reliance Applies to Plaintiffs' Scheme Claim ...................................................................................................... 15

    D.  The Class Period Begins on September 14, 2020 ................................................. 15

III.  CONCLUSION................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Affiliated UTE Citizens of Utah v. United States*,
406 U.S. 128 (1972)..............................................................................................................15

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
623 F. Supp. 3d 470 (E.D. Pa. 2022) ....................................................................................9

*In re Apple Comput. Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ...................................................................................6, 12, 13

*Basic v. Levinson*,
485 U.S. 224 (1988)....................................................................................................1, 12, 13

*Berkley Ins. Co. v. Fed. Hous. Fin. Agency*,
2023 WL 4744155 (D.D.C. July 25, 2023)...........................................................................4

*In re BofI Hold., Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ...............................................................................................14

*Crews v. Rivian Auto., Inc.*,
2024 WL 3447988 (C.D. Cal. July 17, 2024)......................................................................15

*In re Facebook Inc. Sec. Litig.*,
87 F.4th 934 (9th Cir. 2023) ..................................................................................................7

*In re Fibrogen Sec. Litig.*,
2024 WL 1064665 (N.D. Cal. Oct. 3, 2024)..........................................................................3

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) ....................................................................................15

*Goldman Sachs Grp., Inc. v. Arkansas Teacher Ret. Sys.*,
594 U.S. 113 (2021)........................................................................................................ *passim*

*Hall v. Johnson & Johnson*,
2023 WL 9017023 (D.N.J. Dec. 29, 2023), *aff'd sub nom., San Diego Cnty. Emps. Ret. Assoc. v. Johnson &* Johnson, 2025 WL 2159093 (3rd Cir. July 30, 2025)...................7, 8

*Hatamian v. Advanced Micro Devices, Inc.*,
2016 WL 1042502 (N.D. Cal. Mar. 16, 2016)........................................................................3

*Homyk v. ChemoCentryx*,
2024 WL 1141699 (N.D. Cal. Mar. 6, 2024).............................................................2, 3, 8, 12

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023) ..................................................................11

*Jaeger v. Zillow Grp., Inc.*,
   2025 WL 2741642 (9th Cir. Sept. 26, 2025) .........................................................8, 12, 14, 15

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
   2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) .........................................................................3

*Leventhal v. Chegg, Inc.*,
   2024 WL 3447516 (N.D. Cal. July 17, 2024).........................................................................13

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ...............................................................................................5

*In re Mattel, Inc. Sec. Litig.*,
   2021 WL 4704578 (C.D. Cal. Oct. 6, 2021)..........................................................................3

*Metzler Inv. GMBH v. Corinthian Coll., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) .............................................................................................6

*Mineworkers' Pension Scheme v. First Solar, Inc.*,
   881 F.3d 750 (9th Cir. 2018) ..............................................................................................13

*In re Novatel Wireless Sec. Litig.*,
   2011 WL 5827198 (S.D. Cal. Nov. 17, 2011) .......................................................................4

*Omnicare, Inc. v. Laborers Dist. Council, Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)............................................................................................................10

*Pardi v. Tricida, Inc.*,
   2024 WL 4336627 (N.D. Cal. Sept. 27, 2024) ...........................................................2, 3, 4, 7

*Pearlstein v. BlackBerry Ltd.*,
   2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ..........................................................................4

*Pommer v. Medtest Corp.*,
   961 F.2d 620 (7th Cir. 1992) ..............................................................................................10

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
   335 F.R.D. 276 (N.D. Cal. 2020).......................................................................................6, 12

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2019 WL 3001084 (S.D.N.Y. July 10, 2019) ........................................................................8

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
   798 F. Supp. 3d 416 (S.D.N.Y. 2025)..................................................................................5, 8

*In re Snap Inc. Ses. Litig.*,
   334 F.R.D. 209 (C.D. Cal. 2019)........................................................................................13

*St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*,
   2022 WL 4598044 (M.D. Tenn. Sept. 30, 2022)..................................................................15

**OTHER AUTHORITIES**

17 CFR § 240.10b-5........................................................................................................2, 15

Fed. R. Civ. P. 23(a) ...........................................................................................................1

Fed. R. Civ. P. 23(b)(3)....................................................................................................1, 9

Note:  Unless otherwise indicated, all emphasis in quotations is added and internal quotes and citations are omitted, and all references to "Ex." are to the Exhibits attached to the accompanying Declaration of James A. Harrod In Further Support of Lead Plaintiffs' Motion for Class Certification ("Harrod Decl."). References to ¶___ are to the paragraphs of Lead Plaintiffs' Consolidated Amended Class Action Complaint, ECF No. 100.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    PRELIMINARY STATEMENT

Defendants do not dispute that this case satisfies Rule 23(a) and that a class action is the superior method to adjudicate it under Rule 23(b)(3). *See* ECF No. 156 ("Opp."). As to Rule 23(b)(3)'s predominance requirement, Defendants concede Seagate trades in an efficient market—such that class-wide reliance is presumed under *Basic v. Levinson*, 485 U.S. 224 (1988), Opp. at 8—and concede that damages can be calculated on a class-wide basis.

Defendants nevertheless narrowly oppose class certification, arguing that because the market knew all along the facts it needed to piece together the truth behind Defendants' fraud, their misstatements had *no* impact whatsoever on Seagate's stock price, rebutting the presumption of reliance. Specifically, Defendants contend that investors knew Defendants were still evaluating whether the FDPR allowed HDD sales to Huawei while their competitors immediately ceased such sales, and suspected Seagate could be under investigation. Defendants then conclude that this gave the market sufficient information to fully estimate the magnitude of HDD sales Seagate captured from its law-abiding rivals and price in the risk and magnitude of regulatory action. Opp. at 1-2. But Defendants' conclusions cannot be squared with the uncontested fact that each corrective disclosure in this case resulted in a highly-statistically significant negative decline (abnormal return). These declines confirm—contrary to Defendants' conclusions—that the market learned new, value-relevant information from each disclosure. The stock declines also negate Defendants' contention that the corrective disclosures were "materialization of *known* risks." *Id.* at 2, 16-17.

Moreover, Defendants' contentions rest on a distorted and incomplete reading of the record and cannot satisfy Defendants' heavy burden of showing a *complete lack* of price impact. Defendants misconstrue Romano's statement immediately following the promulgation of the FDPR—that Seagate was "still going through the final assessment"—as conclusively, unequivocally, and forever disclosing that Seagate would continue selling HDDs to Huawei. That is not what Romano said, and Defendants' tortured interpretation cannot defeat class certification. Indeed, the analyst reports Defendants rely on show Romano's statement simply fueled speculation about these issues—evidence that Defendants' misstatements impacted Seagate's stock price.

Defendants also ignore extensive additional evidence of price impact. This includes their own repeated assurances, after Romano's statements and in response to questions about Huawei, that Defendants "comply with all the rules and regulations"; the market's continued reliance on those statements; investors many "questions" about these issues; and ███████████████ ████████████████████████████████. And, in arguing that all the regulatory risks were fully "known," Defendants ignore they hid facts critical to assessing these risks, including having received ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ *All* the evidence—and a "good dose of common sense," *Goldman Sachs Grp., Inc. v. Arkansas Teacher Ret. Sys.*, 594 U.S. 113, 122 (2021)—demonstrates that Defendants' misrepresentations affected Seagate's stock price.

Defendants' additional arguments against class certification fare no better. None of their misrepresentations are like the generic statements in *Goldman*. They were made in direct response to specific questions about whether Seagate was selling to Huawei or contained specific (mis)information about what drove Seagate's revenues. Moreover, the corrective disclosures are tied to those specific misrepresentations and Defendants' claims that certain correctives do not "match" the misstatements because they do not mention Huawei or do not relate to fraudulent earnings guidance are unavailing, as the law requires no such mirror image.

Finally, Defendants ignore that *Affiliated Ute* applies a presumption of reliance as to Plaintiffs' claims that Defendants engaged in a fraudulent scheme under Rules 10b-5(a) and (c). Relatedly, the Class Period starts on September 14, 2020—the last day FDPR permitted shipments to Huawei—because evidence produced so far shows Defendants' scheme was by then underway.

## II.    ARGUMENT

### A.  Defendants Cannot Prove a Complete Lack of Price Impact

To rebut the presumption of reliance, Defendants bear the burden of showing by a preponderance of the evidence a complete lack of price impact. *Goldman*, 594 U.S. at 117, 126; *Pardi v. Tricida, Inc.*, 2024 WL 4336627, at *12 (N.D. Cal. Sept. 27, 2024); *Homyk v.*

*ChemoCentryx*, 2024 WL 1141699, at *4 (N.D. Cal. Mar. 6, 2024). In assessing price impact, courts may consider "all probative evidence—qualitative as well as quantitative," and apply "a good dose of common sense." *Homyk*, 2024 WL 1141699, at *4 (citing *Goldman*, 594 U.S. at 122). "The district court must . . . decide the price impact issue while resisting the temptation to draw what may be obvious inferences for the closely related issues that must be left for the merits." *Id.*

Defendants face an insurmountable burden given that each of the four alleged corrective disclosures was followed by a price decline that was statistically significant at a 99% confidence level, demonstrating the existence of new and value-relevant information on those dates. Ex. G at ¶68; ECF No. 156-67 at ¶¶104, 115, 125, 135, Ex. 1; Ex. H, at 48:2-49:13, 109:21-110:4, 123:22-124:12; *see In re Mattel, Inc. Sec. Litig.*, 2021 WL 4704578, at *5 (C.D. Cal. Oct. 6, 2021) ("statistically significant price adjustment following [each] corrective disclosure is evidence" of price impact); *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *7-8 (N.D. Cal. Mar. 16, 2016) (granting class certification where "expert reports show statistically significant price impacts").[1] Defendants' selective reading of the record cannot overcome this evidence.

### 1.    Defendants' Arguments that the Truth Was Known Are Unavailing

Defendants' principal contention is that there can be no price impact because "investors already knew the alleged omitted information," Opp. at 1, including "about Seagate's continued sales to Huawei and [that] the sales carried risk," *id.* at 4, and that Seagate had stopped selling to Huawei by October 2021, *id.* at 12; *see also id.* at 14-17.[2] These arguments fail.

### a.    Romano's September 14 Statement Is Evidence of Price Impact

Defendants first argue that ***any*** price impact associated with the corrective disclosures is negated because investors unequivocally knew that Seagate continued selling to Huawei after Romano's September 14, 2020 statement that he did not "see any particular restriction" on

---

[1] The existence of statistically significant residual returns distinguishes the cases upon which Defendants extensively rely, as those cases involved no such price movements. *E.g.*, Opp. at 2, 10, 12, 13, 15-19 (citing *In re Fibrogen Sec. Litig.*, 2024 WL 1064665 (N.D. Cal. Oct. 3, 2024)); *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024)).

[2] While courts may "make factual findings as to a truth on the market defense" at class certification solely to address price impact disputes, "the decision requires careful trekking—to say the least—as it relates to merits-only issues." *Pardi*, 2024 WL 4336627, at *8.

Seagate's ability to sell to Huawei "until now." Opp. at 9, 17. But Defendants omit a key portion of the statement, that Seagate was "still going through the final assessment" of the FDPR, and ignore that Seagate thereafter refused to answer any questions about sales to Huawei that would address the results of the assessment. ECF No. 100 at ¶¶166-169. Thus, Romano's statement, as the Court has already explained, simply "impl[ies] that, *at that point in time*, Seagate was still forming its opinion on the potential consequences of the rule." ECF No. 113 at 10. Defendants' contention that investors knew the whole truth based on that statement alone fails out of the gate.

Undaunted, Defendants and their expert selectively quote from a handful of cherry-picked analyst reports as supposed proof that the September 14 statement revealed the whole truth about Seagate's sales and about whether Seagate was complying with the law. *See, e.g.*, Opp. at 4-6. However, "the presence or absence of analyst commentary, while of interest, is *not* a scientifically accepted method of demonstrating price impact or its absence." *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *21 (S.D.N.Y. Jan. 26, 2021); *Pardi*, 2024 WL 4336627, at *11 n.7 ("[T]he Court does not find a dissection of subjective analyst reporting to be dispositive—or even particularly compelling—evidence regarding price impact").[3]

In any event, these reports *confirm* what the Court's commonsense reading of the September 14 statement suggests—that Romano's temporally delimited statements about compliance raised more questions and left the market in search of the truth about Seagate's compliance. Consistent with that interpretation, both experts identify multiple analyst reports

---

[3] Dr. Zurek's opinions about ███████████████ ██████████ are particularly unreliable and entitled to little weight. Dr. Zurek reached his "opinions" about ████████████████████████████████ ████████████████████████████████████████ *See* Ex. H, at 24:5-31:25; 169:12-172:9; 190:15-193:13; 219:25-223:6; 252:25-254:13; 270:2-272:23; 287:12-290:14; 293:4-13 (discussing ██████████████████████████); *see also* Ex. I; Ex. J; Ex. K; Ex. L; Ex. M (reports Zurek did not consult). But "[s]imply read[ing]" from analyst reports "relies on essentially no methodology at all," *Berkley Ins. Co. v. Fed. Hous. Fin. Agency*, 2023 WL 4744155, at *2 (D.D.C. July 25, 2023), and is particularly subjective and inappropriate as a basis to infer what the *entire* market "knew." *E.g.*, *In re Novatel Wireless Sec. Litig.*, 2011 WL 5827198, at *5 (S.D. Cal. Nov. 17, 2011) (expert opinion impermissible that "invades the authority of the trier of fact to determine for itself the plain meaning of the facts and documents").

showing that market participants did ***not*** know whether Seagate was still selling to Huawei, when it may have stopped, or the scope of the sales. *See, e.g.*, ¶183 (analyst noting investors had "a lot of questions" on these subjects); Ex. K (analyst noting in April 2021 it was "unclear if STX continuing to ship to Huawei"); Ex. O (analyst discussing BIS investigation and wondering if it was about "(Huawei?)"); Ex. P (analyst does not know of regulatory violation noting it was "unclear" how Seagate "was justifying the shipment"); Ex. Q (analyst guessing that large Seagate customer was Google); Ex. R (analyst noting prior "suspicions" about past sales to Huawei were not "confirmed" until the release of the BIS charging letter and wondering about the scope of the sales); Ex. S (analyst underestimating scope of sales to Huawei per quarter); Ex. T (analyst noting that "Huawei has **not** been reported as a 10%+ customer for Seagate" (emphasis in original)); Ex. J (analyst reporting that Seagate "is suspected" of selling drives subject to export controls to Huawei and that Seagate reiterated that "it will fully comply with rules and regulations"). The fact that analysts continued, throughout the Class Period, to attempt to resolve the question of Seagate's sales and compliance conclusively demonstrates the importance of this issue to the market and that the issue was uncertain, and ultimately does exactly the opposite of showing the complete absence of price impact—it provides additional evidence that Defendants' misrepresentation impacted Seagate's stock price.

### b. *The Washington Times* **Article Is Evidence of Price Impact**

Defendants next contend that "investors knew all material facts by no later than March 2021" when *The Washington Times* published an article noting the BIS "suspected" Seagate of making illegal sales to Huawei. Opp. at 4-5; Ex. GG. However, news of an investigation about some uncertain volume of sales does not disclose as a certainty that Seagate's sales occurred, let alone Seagate's awareness of its non-compliance, its deceptive conduct, or the magnitude of the problem. *See Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 798 F. Supp. 3d 416, 441 (S.D.N.Y. 2025) (articles that "at best include[d] speculation about Goldman's knowledge" were "not a truthful substitute for Goldman admitting it was aware" of fraudulent conduct); *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) ("The announcement of an investigation does not 'reveal' fraudulent practices to the market."); *Metzler Inv. GMBH v. Corinthian Coll., Inc.*, 540 F.3d 1049,

1063 (9th Cir. 2008) (newspaper article reporting on regulatory investigation too general and speculative to properly allege loss causation). Like the September 14 statement, *The Washington Times* article merely fueled speculation and raised more questions about Seagate's sales and compliance, further evidence that Defendants' later misrepresentations would have impacted Seagate's stock price. Exs. K, O, P, Q, R, S, T, and U (April 20, 2023 report asking "What is Normalized Demand for Seagate?").

Moreover, given the inconclusive nature of allegations and suspicions, the market continued to rely on Defendants' assurances that Seagate complied with the law when asked about Huawei—including continued misstatements and omissions of legal compliance made after Romano's statement and *The Washington Times* article. *See* Ex. G, at ¶¶19-25, 30-35 (detailing analyst reliance on Seagate statements); Ex. H, at 198:15-200:19; 201:17-203:7; 216:5-15; 247:9-248:17 (admitting that ███████████████████████████████████ ████████████████); *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989) ("The investing public justifiably places heavy reliance on the statements and opinions of corporate insiders."). These unqualified assurances came even as the scope of Defendants' illegal conduct widened after September 14. *See infra* at § II.A.2, Exs. O, P, R, S.

Finally, Defendants claim that *The Washington Times* article was followed by a statistically significant stock price drop (ECF No. 156-67 at ¶¶14, 57, Ex. 1 at 3) that dissipated all stock price inflation at that point and argue that, therefore, their misstatements had no additional impact on Seagate's price. Even if it were true that the article ***fully*** dissipated all the price impact at that point (it is not), it says nothing about whether ***subsequent*** misrepresentations ***also*** had an independent impact on the stock price. To the contrary, the fact that the stock price movement after *The Washington Times* article was statistically significant ***suggests*** that future misrepresentations about these issues also impacted Seagate's stock price. *See SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 287 (N.D. Cal. 2020) (certifying class where defense expert admitted that disclosures "were followed by statistically significant price declines").[4]

---

[4] Plaintiffs anticipate including this statistically significant price drop in their loss causation and damages arguments at the merits stage.

Moreover, Defendants' concession that *The Washington Times* article resulted in a statistically significant price drop proves too much, as it fatally undermines Defendants' claim that the October 26, 2021 Minority Report (which was followed by no statistically significant price movement) revealed additional truth to the market. *See* Opp. at 5, 15. Defendants' own theories imply that the minority report reiterated the same ***allegations and suspicions*** from the March 2021 *Washington Times* article—the lack of a price decline means it added nothing new to the mix.

### c.    Defendants' "Materialization of Known Risks" Arguments Fail

Defendants next argue that even if all the relevant facts were not known, the ***risks*** were known and priced into the stock, such that ***any*** subsequent stock price decline cannot at all be attributed to the concealment of *any* information related to that risk.

However, as Defendants' expert concedes ███████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████ Ex. H at 118:2-119:5; 138:2-14; 138:25-141:21; 147:4-22; *see also id.* at 87:4-12 (████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████). Accordingly, as the *Pardi* court explained, disclosure of theoretical risks does not disprove price impact or preclude class certification. 2024 WL 4336627, at *12 (citing *In re Facebook Inc. Sec. Litig.*, 87 F.4th 934, 948–49 (9th Cir. 2023)). Here, Defendants failed to disclose specific additional facts that had already materialized and that showed the extent of their misconduct, which would inform the possibility, severity, and consequences of any regulatory action or of ceasing sales to Huawei. *See infra* § II.A.2.

Other courts have accordingly rejected lack of price impact arguments at the class certification stage under similar circumstances. In *Hall v. Johnson & Johnson*, for example, the court certified the class because a corrective disclosure revealing that patients intended to bring asbestos-related claims against the company "signaled a new development to J&J investors" even though two articles previously discussed "J&J potentially facing claims relating to asbestos." 2023 WL 9017023, at *12 (D.N.J. Dec. 29, 2023), *aff'd sub nom.*, *San Diego Cnty. Emps. Ret. Assoc. v.*

*Johnson & Johnson*, 2025 WL 2159093 (3rd Cir. July 30, 2025); *see also Sjunde AP-Fonden*, 798 F. Supp. 3d at 442 (certifying class after noting that "rote acknowledgement that there are risks associated with a government investigation was not equivalent to Goldman acknowledging its awareness" of fraudulent conduct); *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *15 (S.D.N.Y. July 10, 2019) (certifying class reasoning disclosures about potential risks do not show the full scope of the risks "was fully known (or knowable) by the market").

Defendants do not grapple with the facts they failed to disclose and that would have informed the risks Defendants now claim the market knew. Thus, even if the Court finds that the market was aware of regulatory risks, the corrective disclosures revealed new, value-relevant information about those risks leading to statistically significant price declines—information that Defendants withheld from the market—demonstrating "how the market would have reacted had the defendant told the truth from the start." *Jaeger v. Zillow Grp., Inc.*, 2025 WL 2741642, at *1 (9th Cir. Sept. 26, 2025); *see also Homyk*, 2024 WL 1141699, at *4 (rejecting argument that corrective contained no "new information" when prior disclosures "omitted relevant implications" of adverse facts).

### 2.   Defendants Ignore Extensive Evidence of Price Impact

In addition to offering insufficient evidence to disprove the existence of price impact, Defendants' arguments entirely ignore extensive, additional evidence that demonstrates their misrepresentations impacted Seagate's stock price.

First, there is unrebutted evidence of statistically significant stock price movements— "front end" price impact—immediately after certain misstatements. Specifically, when Defendants announced earnings on April 22 and October 22, 2021, they misleadingly attributed Seagate's positive performance, including specifically its better-than-expected performance in HDD sales, to misleading factors such as long-term demand planning with customers and the strength of Seagate's HDD portfolio, without mentioning the Huawei sales. *See* ECF No. 100 at ¶¶231, 232, 237-241. Analysts credited these explanations and, following them, Seagate's stock increased by statistically significant amounts at the 99% confidence level. *See* Ex. G at ¶¶40-48; *see also* ECF No. 156-67 at ¶¶125, 135, Ex. 1 at 10, 13 (finding statistically significant price increases following

the October 26, 2022 and April 20, 2023 statements). This is unrebutted evidence that Defendants' misstatements about what drove their revenue impacted Seagate's stock price, which is all that is required to show that class-wide inquiries predominate under Rule 23(b)(3). Additional inquiries as to what portions of the price increases and declines were ***caused*** by the misrepresentations are loss causation questions for the merits. *See, e.g.*, *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 493-94 (E.D. Pa. 2022).

Second, while Defendants now claim they "believed Seagate was compliant with the FDPR," Opp. at 3, they ignore critical contrary information they never disclosed and that was implicated by their statements that they complied with the law and that certain legitimate business developments drove their revenue. This includes: (i) ███████████████████████████████████████████████████████████████, Ex. II at -551; (ii) ███████████████████████████████████████████████████████████████████████████████, Ex. JJ at -235; (iii) ███████████████████████████████████████████████████ Ex. KK at -588; (iv) ███████████████████████████████████████████████████ Ex. LL at -601, ███████████████████████████████████████████████████ Ex. MM at -026, ███████████████████████████████, Ex. NN at -562; and (v) ███████████████████████████████████████████████████████████████████████ Ex. OO at -329; *see also* Exs. V, W, X.

Defendants elide these critical omissions when they insist that all the critical facts needed to assess the risk of potential consequences from Seagate's misconduct were known. An "investor … has cause to complain" if an issuer speaks about the legality of its conduct "in the face of its lawyers' contrary advice." *Omnicare, Inc. v. Laborers Dist. Council, Constr. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015). Defendants' failure to grapple with this additional evidence

precludes them from showing the complete absence of price impact—and even Defendants' expert concedes that ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████. *E.g.*, Ex. H at 103:21-105:2; 167:2-168:6. "Even savvy investors may recover when a bald lie understates the gravity of a known risk." *Pommer v. Medtest Corp.*, 961 F.2d 620, 624 (7th Cir. 1992).

Third, relatedly, Defendants never disclosed additional material information embodied in the corrective disclosures, including, among other things:

- That Seagate *in fact* had continued to sell to Huawei without a license, Ex. Y;

- That Seagate also knew of the significant risk that it was violating export control laws due to notices provided by their vendors that use of those vendors' products made the Seagate HDDs subject to the FDPR, Exs. Y, Z;

- That Seagate deliberately managed sales to Huawei to avoid disclosing Huawei as a 10% customer, Ex. AA;

- That Seagate did not disclose that it used equipment covered by the ECCNs specified in the FDPR to manufacture its HDDs, which would have shown their sales were specifically prohibited, Ex. Y;

- ██████████████████████████████████████████████████████████████████, Ex. BB;

- The value of Seagate's sales to Huawei during the Class Period, Ex. Y;

- Seagate's partnership agreements with Huawei and that Seagate kept those hidden from the market, Ex. Y;

- The more than billion-dollar credit line Seagate extended to Huawei, Ex. Y;

- ████████████████████████████████████████, Exs. Y, CC; and

- █████████████████████████████████████████████████, Ex. DD.

Defendants concede that this information was not disclosed prior to the corrective disclosures, *e.g.*, Ex. H at 89:20-90:8; 114:13-115:1. Importantly, much of this information was critical to the BIS in determining the scope of the record-setting fine it imposed on Seagate, s*ee* Ex. Y, additional evidence that Defendants' misrepresentations impacted Seagate's stock price.

Defendants do not even attempt to dispute the value-relevant nature of this information. Nor could they, as the omitted facts would have been central to investors' assessments of the Company's potential to generate future cash flows and could inform investors' understanding of the scope of the regulatory risks, including the risk of substantial penalties, and their understanding

of the sustainability and extent of Seagate's HDD sales to Huawei. *See* Ex. G at ¶¶52-62. Analysts' focus on trying to discover and understand this information—both when it was misrepresented to them and later when the corrective disclosures revealed the truth—is additional evidence that Defendants' failure to disclose it impacted Seagate's stock price. *See id.* at ¶¶75-99. Thus, at least one court has rejected Dr. Zurek's supposed expert opinion that the "materialization of known risks" was evidence of no price impact in circumstances like those present here, where Defendants did not disclose critical facts relating to those risks. *See Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134, at \*15-16 (M.D. Tenn. Feb. 24, 2023) (price impact not rebutted where "the Court [wa]s not satisfied that the market was adequately apprised [by a prior disclosure] of the information that was later disclosed in the [corrective disclosure]").

Finally, consistent with the commonsense conclusion that this concealed information was value-critical to investors, long after *The Washington Times* March 2021 article but before the end of the Class Period, Seagate continued to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. EE (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮); Ex. FF (i▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

In sum, extensive unrebutted evidence shows that Defendants' misrepresentations about these matters impacted Seagate's stock price and that Seagate's stock price could be expected to decline when the truth was finally known—exactly as it did.

### 3. "Non-Fraud" Factors Do Not Show a Complete Lack of Price Impact

Defendants also point to purported non-fraud industry-wide factors like "disruptions that we see in Russia," "Asia-based cloud customers . . . dealing with the impacts of COVID," "a weakened economy," and "similar revenue declines" by Seagate's competitors, as the supposed true "cause[]" of the price declines in this case. Opp. 13, 15, 17, 18.

But even if that contention is credited, it does not follow that price declines following the corrective disclosures provide *no* evidence that the misrepresentations *also* impacted Seagate's stock price. The issue at class certification is not what factors *caused* the declines or disaggregating

what factors caused what portion of the loss—those are loss causation inquiries for the merits. The declines are simply *evidence* of price impact—they "indicate how the market would have reacted had the defendant told the truth from the start." *Zillow*, 2025 WL 2741642, at *1.

It is particularly unfruitful for Defendants to attempt to undermine this evidence by pointing to supposedly confounding factors without offering any empirical analysis showing the effect of their supposedly confounding factors on the stock, and without even attempting to disaggregate the supposedly confounding factors from the portions of the declines that *are* attributable to revelation of the fraud. Critically, Defendants ignore that the event studies—including their own event study—are designed to *control for industry-wide* events. Ex. G at ¶98. Thus, courts typically hold that "[c]laims that other factors also contributed in part to the price drop are insufficient to rebut the *Basic* presumption." *Apple*, 2022 WL 354785, at *10; *see also* *SEB*, 335 F.R.D. at 287-88; *Homyk*, 2024 WL 1141699, at *4.

### 4.    Defendants' Remaining Price Impact Arguments Should Be Rejected

Defendants contend that the corrective disclosures do not show price impact because the market supposedly knew when Seagate stopped selling to Huawei and would have thus assumed that guidance issued thereafter did not incorporate sales to Huawei and because Plaintiffs do not challenge that guidance as fraudulent, inviting the Court to then conclude that, therefore, "updated financial expectations … could not have revealed any new information" to the market. *E.g.*, Opp. at 12, 12 n.3, 14, 16. This convoluted argument does not help Defendants meet their burden.

As a threshold matter, there is no requirement that earnings' misses related to fraudulent guidance demonstrate price impact. *Cf. Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 754 (9th Cir. 2018). The stock price drop that follows corrective disclosures shows price impact "even if the market was unaware at the time that fraud had concealed the miss." *Id.*; *see also Leventhal v. Chegg, Inc.*, 2024 WL 3447516, at *3 (N.D. Cal. July 17, 2024) (necessary "link" can be established if company "issued revenue guidance providing a more accurate impression of its business"). Moreover, the evidence shows that Defendants concealed ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, *see, e.g.*, Ex. CC at -118 (▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇); Ex. DD at slide 2 ▇▇▇▇▇▇

██████████████████████████████████████████████████████████), and that Defendants'

scheme of ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

*E.g.*, Ex. PP at -488. This is all additional evidence of price impact. Defendants' attempt to rebut this by creating a strawman requirement that earnings misses must relate to fraudulent guidance that was alleged to show price impact and then arguing that these disclosures failed that invented test, is misguided. *See* Ex. G at ¶¶107-08.

Finally, Defendants miss the mark when they attempt to show a complete lack of price impact with testimony from Lead Plaintiffs' representatives that they were unaware whether Plaintiffs' outside investments managers—the only ones with trading authority—knew of Defendants misstatements, and that the representatives they "did not perceive a connection between the March 8 disclosures" and the fraud. Opp. at 9, 11, 14. *Basic* does not require individual plaintiffs to have relied upon the misrepresentation or known what the corrective revealed. *See Apple*, 2022 WL 354785, at *6; *In re Snap Inc. Ses. Litig.*, 334 F.R.D. 209, 228 (C.D. Cal. 2019) (rejecting argument that plaintiffs were not entitled to *Basic* presumption because they did not show reliance on statements).

**B. Defendants' *Goldman* Arguments Do Not Rebut the Presumption of Reliance**

In the alternative Defendants argue that, under *Goldman*, their statements were too generic and did not "match" the corrective disclosures. Opp. at 10, 11, 14. But Defendants' misstatements were particular and specific, and the corrective disclosures sufficiently "match" the misstatements.

First, Defendants' misstatements were far from generic—they were made in response to specific analyst questions or press reports about Huawei specifically. *See* Ex. G at ¶¶66-67 (collecting statements). For example, in response to an analyst's question whether Seagate was "***continuing to ship to Huawei***" and if so, whether Seagate was "seeing some benefits of that in [its] December quarter," Mosley stated "we continually monitor and remain in compliance with all the rules and regulations." ECF No. 100, at ¶170. Similarly, in response to reporting on the minority report on Seagate's sales to Huawei, Seagate stated "the company 'complies with all laws applicable to its business and operations, including export control regulations." *Id.*, at ¶188.

Defendants also answered "a lot of questions" about Huawei and the "restrictions in place" by assuring investors Defendants complied with the law. *Id.*, at ¶183.

Similarly, Defendants repeatedly attributed Seagate's financial performance to a host of specific business factors, including, "strong recovery from enterprise and OEM customers," "healthy growth from cloud," and the waning of COVID-19 pandemic headwinds. Defendants also touted results related to Seagate's "highest ever HDD shipments." *Id.*, at ¶¶228-29. Similarly, during Seagate's April 22, 2021 earnings call, Defendants made certain statements in direct response to analyst questions about "the drivers" of Seagate's financial performance. *Id.*, at ¶¶230-31. These "concrete" and specific representations far surpass the generic statements analyzed in *Goldman*, such as that "[i]ntegrity and honesty are at the heart of our business." 594 U.S. at 120.

Second, the corrective disclosures also sufficiently "match" Defendants' misstatements. A corrective disclosure "need not precisely mirror" alleged misrepresentations. *In re BofI Hold., Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020); *Zillow*, 2025 WL 2741642, at *1. Rather, "'[i]t is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading.'" *Zillow*, 2025 WL 2741642, at *2. Here, each corrective disclosure "revealed new information" about Seagate's reliance on Huawei sales by revealing that Seagate's revenues were declining, or about its export controls compliance, and all "suggested that its earlier statements may have obscured" what Seagate knew about its legal risk as well as its reliance on Huawei sales. *Id.* In these circumstances, Seagate's "statements are matched enough under *Goldman*." *Id.*; *see also Crews v. Rivian Auto., Inc.*, 2024 WL 3447988, at *14 (C.D. Cal. July 17, 2024) (finding match between misstatements describing "Rivian's path to profitability" and disclosure of base price increases); Ex. G, at ¶¶68-69.

Nor does Defendants' argument that there is a "clear mismatch" for the first two alleged corrective disclosures because they "do not mention Huawei" while the challenged statements which are "all about Huawei," Opp. at 11, 14, carry the day. Price impact exists "[e]ven if a later disclosure does not refer directly to an alleged misrepresentation," as "it may reveal true facts concealed by such misrepresentation." *Zillow*, 2025 WL 2741642, at *1.

**C.  The *Affiliated Ute* Presumption of Reliance Applies to Plaintiffs' Scheme Claim**

Defendants' argument that Plaintiffs cannot invoke the *Affiliated UTE Citizens of Utah v. United States*, 406 U.S. 128 (1972) presumption of reliance because investors asked "about Seagate's HDD sales to Huawei," Opp. 19-20, ignores that this Court upheld Plaintiffs' scheme claim based on omissions. ECF No. 113 at 19. Defendants' misrepresentations in response to these statements were misleading by omission. *See St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2022 WL 4598044, at *8-9 (M.D. Tenn. Sept. 30, 2022) (applying *Affiliated Ute* to "affirmative misrepresentations" made misleading by "failure to disclose").

**D.  The Class Period Begins on September 14, 2020**

Defendants argue that the Class Period begins on October 22, 2020, the date of the first sustained misstatement. Opp. at 20-21. Plaintiffs agree as to their claims of fraudulent misstatements under Rule 10b-5(b), which are based on misrepresentations beginning on that day.

But Plaintiffs' Rule 10b-5(a) and (c) scheme liability claims are "***not*** contingent upon the defendant making a specific misrepresentation or public statement" but on the totality of Defendants' deceptive and manipulative conduct. *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1196-97 (D. Or. 2015). Here (i) ███████████████████████████████████████████████████████████████, Ex. HH at -958; (ii) █████████████████████████████████████████████████████████████, *id.*, Ex. V; (iii) on September 14, 2020, in response to a specific question about the application of the FDPR to Huawei, Defendants stated they had no reason for concern ████████████████████████████████████████████████████, *id.*, Ex. N, Ex. II at -551; and (iv) Defendants continued their sales after September 14, 2020—the last date the FDPR permitted shipments to Huawei under its savings clause. Ex. MM at -026. The Class Period for these claims thus begins on September 14, 2020.

**III.    CONCLUSION**

For the above reasons, Plaintiffs respectfully request that the Court grant their Motion.

DATED: March 24, 2026

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**

By:___s/ *James A. Harrod*_____
Salvatore J. Graziano (admitted *pro hac vice*)
Hannah Ross (admitted *pro hac vice*)
James A. Harrod (admitted *pro hac vice*)
Jorge G. Tenreiro (admitted *pro hac vice*)
Aasiya Farah Mirza Glover (admitted *pro hac vice*)
Sarah Schmidt (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
hannah@blbglaw.com
jim.harrod@blbglaw.com
jorge.tenreiro@blbglaw.com
aasiya.glover@blbglaw.com
sarah.schmidt@blbglaw.com

-and-

Jonathan D. Uslaner (Bar No. 256898)
2121 Avenue of the Stars, Suite 2575
Los Angeles, California 90067
Telephone: (310) 819-3470
jonathanu@blbglaw.com

*Co-Lead Counsel for Co-Lead Plaintiffs Public*
*Employees' Retirement System of Mississippi and*
*Arkansas Public Employees' Retirement System,*
*and the Class*

**MOTLEY RICE LLC**
Lance V. Oliver (admitted *pro hac vice*)
William S. Norton (admitted *pro hac vice*)
Joshua C. Littlejohn (admitted *pro hac vice*)
Christopher F. Moriarty (admitted *pro hac vice*)
Andrew P. Arnold (admitted *pro hac vice*)
Cameran M. Gilliam (admitted *pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
loliver@motleyrice.com

bnorton@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com
aarnold@motleyrice.com
glevin@motleyrice.com
cgilliam@motleyrice.com

*Co-Lead Counsel for Co-Lead Plaintiffs Universal-Investment-Gesellschaft mbH, Universal-Investment-Luxembourg S.A., and UI BVK Kapitalverwaltungsgesellschaft mbH, and the Class*

**DAVIDSON BOWIE, PLLC**
John L. Davidson (*pro hac vice*)
1062 Highland Colony Parkway 200 Concourse, Suite 275 Ridgeland, MS 39157
Telephone: (601) 932-0028
jdavidson@dbslawfirm.net

*Additional Counsel for Co-Lead Plaintiffs Public Employees' Retirement System of Mississippi*