# Exhibit G

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE SEAGATE TECHNOLOGY HOLDINGS PLC SECURITIES LITIGATION | Case No. 3:23-cv-03431-RFL |

EXPERT REPLY REPORT OF MATTHEW D. CAIN, PH.D.

March 24, 2026

**Table of Contents**

I.      **Introduction**................................................................................................1

II.     **Summary of Opinions**................................................................................2

III.    **Background on the Fraud-on-the-Market Theory and Stock Prices**...........................5

IV.     **Evidence That the Market Continued to Rely Upon the Alleged Compliance and Revenue Driver Misrepresentations After March 17, 2021 and October 26, 2021**......6

    A.    Evidence that the Market Continued to Rely Upon the Alleged Compliance Misrepresentations After March 17, 2021............................................6

    B.    Evidence that the Market Continued to Rely Upon the Alleged Revenue Driver Misrepresentations After October 26, 2021................................................14

V.      **Economic Evidence that the Alleged Misrepresentations Impacted Seagate's Common Stock Prices**................................................................17

    A.    Evidence that the Alleged Misrepresentations Had Front-End Price Impact................................................................................17

    B.    Fundamental Principles of Finance and Economics Demonstrate the Price Impact of the Alleged Misrepresentations................................21

        i.      Price Impact from the Alleged Compliance Misrepresentations.............. 23

        ii.     Price Impact from the Alleged Revenue Driver Misrepresentations ................................................. 25

    C.    The Alleged Misrepresentations are Economically Connected to the Relevant Truth Revealed by the Alleged Corrective Disclosures ........................28

    D.    Analyst Commentary Following the Alleged Misrepresentations Provides Further Evidence of Front-End Price Impact and/or Price Maintenance ................................................................34

        i.      Analyst Commentary on the Alleged Compliance Misrepresentations ................................................. 34

        ii.     Analyst Commentary on the Alleged Revenue Driver Misrepresentations ................................................. 39

    E.    Analyst Commentary Regarding the Alleged Revelations of the Relevant Truth Provides Further Evidence of Back-End Price Impact ................43

    F.    The Zurek Report Provides Evidence of Price Impact Based on the March 17, 2021 *Washington Times* Article ........................................55

VI.     **The Zurek Report Does Not Interact with Plaintiffs' Theory of Liability**................56

VII.    **Conclusion** ................................................................................59

## I.    Introduction

1.    On December 16, 2025, I submitted an expert report in this matter (my "Opening Report"), in which I concluded that the market for Seagate's Common Stock was efficient throughout the Class Period, September 14, 2020 to April 19, 2023, inclusive.[1] I also concluded that damages in this matter can be calculated on a class-wide basis subject to a standard, common methodology for Plaintiffs' pending claims.[2]

2.    Following the submission of my Opening Report, Plaintiffs' Counsel provided me with the February 10, 2026 Expert Report of Paul Zurek, Ph.D. (the "Zurek Report") and Defendants' Memorandum of Law in Opposition to Lead Plaintiffs' Motion for Class Certification ("Defendants' Opp. Brief" or "Opp. Brief"). I have been asked to review, evaluate, and respond to the Zurek Report and certain arguments made in Defendants' Opp. Brief.

3.    My qualifications and rate of compensation for work in this matter were identified in my Opening Report, and I do not repeat them here. I have attached an updated version of my curriculum vitae as Appendix A.

4.    In formulating my opinions set forth in this Expert Reply Report, I have relied upon the analyses already described in my Opening Report, as well as my knowledge, experience, and formal training in economics, finance, and statistics, in addition to the allegations and facts set forth in this matter. All of the materials I have considered in forming my opinions are identified in Appendix B to this Reply Report, in addition to those previously identified in Appendix B to my Opening Report.

5.    I reserve the right to amend this report to reflect new information that becomes

---

[1] *See* Opening Report, ¶ 3. I continue to hold the opinions expressed in my Opening Report and reiterate them herein. Capitalized terms in this report have the same meaning as in my Opening Report.

[2] *Id*.

available to me in light of the discovery process or future rulings from the Court.

## II.    Summary of Opinions

6.    Nothing in the Zurek Report or Defendants' Opp. Brief disturbs the opinions expressed in my Opening Report.

7.    The Zurek Report and Defendants' Opp. Brief do not dispute the conclusion I reached in my Opening Report that Seagate Common Stock traded in an efficient market throughout the entirety of the Class Period. In my Opening Report, I tested the efficiency of the market for Seagate Common Stock by evaluating the standard *Cammer* and *Krogman* factors.[3] Dr. Zurek does not dispute my analyses of or my conclusions regarding *any* of these factors. Indeed, some of Dr. Zurek's opinions in the Zurek Report rely implicitly on the market for Seagate Common Stock being efficient.

8.    Dr. Zurek does not offer any criticism of the event study regression specified in my Opening Report, nor does he conduct his own event study regression of Seagate Common Stock returns to investigate efficiency. While Dr. Zurek performs a robustness check by substituting the S&P 500 market index used in my model with the CRSP value-weighted index, which confirmed the validity of my event study, Dr. Zurek does not dispute that I performed a valid event study regression that controls for market and industry effects. [4] Dr. Zurek adopts an event study model consistent with my assumptions which accurately measures the abnormal returns exhibited by Seagate Common Stock during the Class Period and on the alleged corrective disclosure dates.[5]

9.    Dr. Zurek does not dispute that the general damages framework and methodology (*i.e.*, the out-of-pocket methodology) that I detail in my Opening Report is standard, reasonable, and relied upon in virtually all securities class action matters alleging fraud claims under §§ 10(b)

---

[3] Opening Report, Section V.
[4] Zurek Report ¶¶ 46-48.
[5] *Id*.

and 20(a) of the Exchange Act.[6] Nor does he articulate any alternative approach that would be more suitable in this matter.

10.    Dr. Zurek claims, however, that (i) the Alleged Compliance Misrepresentations had no price impact during the Class Period,[7] (ii) the Alleged Revenue Driver Misrepresentations had no price impact during the Class Period,[8] (iii) the stock price declines following the two alleged corrective disclosures on October 26, 2022 and April 19, 2023 do not provide evidence of price impact of the Alleged Compliance Misrepresentations,[9] and (iv) the stock price declines following all four alleged corrective disclosures (March 8, 2022, July 21, 2022, October 26, 2022, and April 19, 2023, the "Corrective Disclosures") do not provide evidence of price impact.[10]

11.    Defendants' Opp. Brief also claims that there is a "mismatch" between the alleged misstatements and the alleged truth revealed by the alleged corrective disclosures on March 8, 2022 and July 21, 2022.[11] However, the Zurek Report offers no opinions or support for this claim.

12.    I have analyzed the Zurek report and Defendants' Opp. Brief, and I conclude they are flawed and unreliable. In this report I document reliable economic evidence consistent with price impact for both the Alleged Compliance Misrepresentations and the Alleged Revenue Driver Misrepresentations. I further illustrate that there is no mismatch between the alleged misrepresentations put forward by Plaintiffs and the subsequent revelations of the relevant truth provided by the alleged corrective disclosures.

13.    I document reliable economic evidence that the Alleged Compliance Misrepresentations and the Alleged Revenue Driver Misrepresentations impacted the prices of Seagate's Common Stock. This evidence includes the following:

---

[6] Opening Report, Section VI.
[7] Zurek Report ¶¶ 13-15, 49.
[8] Zurek Report ¶¶ 19-23, 88.
[9] Zurek Report ¶¶ 17-18.
[10] Zurek Report ¶ 25.
[11] Opp. Brief at 2, 10-15.

a.  I document evidence that the alleged misrepresentations had front-end price impact. For example, on April 22, 2021, when Seagate hosted its Q3 2021 earnings call, Defendants reported Seagate's "highest ever HDD shipments," and assured investors that the Company's strong revenues were driven by "strong cloud data center demands and ongoing recovery in the enterprise markets."[12] Then, when the Company reported its Q1 2022 earnings on October 22, 2021, Defendants attributed record mass capacity revenue, exceeding $2 billion for the first time, to "broad-based growth across each of the end markets." [13] Following these alleged misstatements, the price of Seagate Common Stock increased by statistically significant amounts. Contemporaneous analyst reports explicitly relied on and referenced Defendants' statements, crediting "broad-based demand" and "improving enterprise spending and healthy growth from cloud data center customers"[14] as the drivers of Seagate's outperformance — issues Plaintiffs allege were misrepresented.

b.  My analysis indicates no such "mismatch" between the alleged misstatements and alleged corrective disclosures, for both the Alleged Compliance Misrepresentations and the Revenue Driver Misrepresentations. The alleged misstatements in this case were specific, detailed, and economically connected to the alleged corrective disclosures. The economic connection between the alleged misrepresentations and omissions and the corrective information is further supported by: (i) fundamental principles of finance and economic analysis; and (ii) analyst discussions, and price target changes, which explicitly referenced the same economic information pertaining to the alleged misrepresentations and the resulting alleged corrective disclosures.

c.  The Alleged Compliance and Revenue Driver Misrepresentations were value relevant and by their nature had price impact. Moreover, on earnings calls, analysts asked questions related to both the Alleged Compliance and Revenue Driver Misrepresentations, which Defendants replied to with alleged misrepresentations, and numerous analysts referenced and relied on the Alleged Compliance and Revenue Driver Misrepresentations throughout the Class Period.

d.  I document reliable economic evidence of back-end price impact of the alleged misstatements. The alleged corrective disclosures were followed by statistically significant declines in the price of Seagate Common Stock. Moreover, analysts referenced and relied on the alleged revelations of the relevant truth contained within the alleged corrective disclosures.

e.  The Zurek Report also provides evidence of price impact, documenting that Seagate's Common Stock price declined by a statistically significant amount after the March 17, 2021 *Washington Times* article, from which "the market learned that the BIS was investigating Seagate and 'suspected [it] of improperly selling hard

---

[12] Q3 2021 Earnings Call Transcript, April 22, 2021, at 2. *See also* Complaint ¶ 228-229.

[13] Q1 2022 Earnings Call Transcript, October 22, 2021, at 2. *See also* Complaint ¶¶ 237-242.

[14] *See* **Section V.A** below. *See also* Complaint ¶ 56.

4

drives to Chinese tech giant Huawei Technologies.'"[15]

### III.    Background on the Fraud-on-the-Market Theory and Stock Prices

14.    In my Opening Report, I explained how the fraud-on-the-market theory relates directly to the price of a given security.[16] This theory posits that if a company's stock price reflects all public widely available information, then all purchasers and sellers of that company's stock implicitly rely on any misrepresentations or omissions because those statements or omissions have distorted the transaction price. I further explained how the fraud-on-the-market theory of reliance has been addressed by numerous courts over the years in relation to claims made under § 10(b) of the Exchange Act and was adopted by the U.S. Supreme Court in *Basic* and reaffirmed in its *Halliburton II* decision.

15.    I analyzed the *Cammer*, *Krogman*, and other relevant factors relating to Seagate Common Stock in my Opening Report, and I ultimately found that these factors support a conclusion of market efficiency.[17] Thus, it follows that purchasers of Seagate Common Stock implicitly relied on Defendants' alleged misrepresentations and/or omissions because the value of that information was impounded into the price of Seagate Common Stock. Dr. Zurek does not dispute my analyses of any of the 11 relevant factors or my conclusion that Seagate Common Stock traded in an efficient market during the entirety of the Class Period.

16.    As part of the analysis in my Opening Report, I performed an event study to analyze the stock price movements of the Seagate Common Stock throughout the Class Period. To perform the event study, I used regression analysis to measure the relationship between Seagate Common stock price returns and: (i) changes in market-wide factors that would be expected to impact all stocks; and (ii) changes in industry-wide factors that would be expected to impact stocks in Seagate's industry. By modeling how Seagate's stock price return typically moves relative to an

---

[15] Zurek Report ¶ 14.
[16] Opening Report, Section IV.
[17] Opening Report, Section V.

overall market index and an industry index, I can measure its "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

17.    Dr. Zurek offers no criticisms of my event study analysis. Nor does he dispute that it accurately measures the abnormal returns exhibited by Seagate Common Stock during the Class Period and on the alleged corrective disclosure dates. As shown in **Exhibit 1a**, the results of my event study show that there were statistically significant price increases in Seagate Common Stock, after controlling for market and industry effects, following multiple alleged misrepresentations. Further, as shown in **Exhibit 1b**, the results of my event study show that there were statistically significant price declines in Seagate Common Stock, after controlling for market and industry effects, following multiple alleged corrective disclosures. For all of the alleged Corrective Disclosures, I document abnormal declines upon the revelation of the relevant truth, which are each statistically significant at better than the 99% level.

## IV.    Evidence That the Market Continued to Rely Upon the Alleged Compliance and Revenue Driver Misrepresentations After March 17, 2021 and October 26, 2021

### A.    Evidence that the Market Continued to Rely Upon the Alleged Compliance Misrepresentations After March 17, 2021

18.    Defendants' Opp. Brief and Dr. Zurek claim that the Alleged Compliance Misrepresentations had no impact on Seagate's Common Stock prices.[18] First, they argue that from the start of the Class Period, the market was already aware that Seagate, unlike its competitors, continued selling HDDs to Huawei.[19] Second, they assert that no later than March 17, 2021, following a *Washington Times* article reporting on a BIS investigation, Seagate's Common Stock prices fully reflected the risk of FDPR non-compliance.[20] Defendants' Opp. Brief and Dr. Zurek

---

[18] Opp. Brief, at 9-19; Zurek Report, Section VIII.
[19] Opp. Brief, at 4, Zurek Report, Section VIII.
[20] Opp. Brief, at 4; Zurek Report ¶¶ 55-62.

further argue that the absence of statistically significant positive stock price reactions on the dates of the Alleged Compliance Misrepresentations following March 17, 2021, confirms "that the risk of Seagate's sales to Huawei had already been incorporated into Seagate's stock price."[21] For the reasons set forth below, these arguments lack support and are unpersuasive.

19.    After the March 17, 2021 *Washington Times* article, Defendants allegedly continued to make repeated, specific, affirmative representations that Seagate was in full compliance with the FDPR and that the Company's revenue performance reflected legitimate, broad-based demand. Even when alleged misrepresentations are not associated with statistically significant price increases, they may nonetheless have price impact by maintaining artificial inflation in the stock price. Analyst commentary following the March 17, 2021 *Washington Times* article is consistent with analysts continuing to rely on Defendants' Compliance Misrepresentations. For example:

> Wells Fargo Securities (March 18, 2021): "Late Wednesday (3/17) The Washington Times published an article reporting that The Commerce Department's Bureau of Industry and Security (agency tasked with monitoring compliance with export controls) is probing Seagate over a 'possible breach' of US sanctions imposed on China…"
>
> "**Seagate has previously noted, when asked about sanctions, has stated that it did 'not see any particular restriction for us [Seagate] in terms of being able to continue to keep the Huawei or any other customers in China**…So, we do not think we need to have a specific license.'"[22]
>
> Susquehanna (March 18, 2021): "According to The Washington Times, Seagate is suspected of selling hard drives to Huawei that contained microchips that are subject to export controls after the ban was tightened last summer." "In September, Seagate's CFO said, 'I do not see any particular restriction for us in terms of being able to keep … Huawei or any other customers in China … So, we do not think we need to have a specific license.'"

---

[21] Opp. Brief, at 4-6; Zurek Report ¶¶ 63-71.
[22] "STX: US Commerce Department Bureau of Industry & Security (BIS) Looking into Seagate's Sales to Huawei?" *Wells Fargo Securities,* March 18, 2021 at 1 (emphasis added).

> "**Seagate states that it will fully comply with rules and regulations and continue to review the situation.**"[23]

> Wedbush Securities (March 22, 2021): "Our belief is STX likely interpreted restrictions differently than its peers." "**We see limited financial ramifications should STX need to end shipments to the Chinese OEM.**"[24]

20.     This pattern of analyst reliance on Defendants' stated compliance with the FDPR continued well after March 17, 2021. Continued analyst inquiries and commentary regarding Seagate's compliance is itself significant. The fact that analysts were still actively asking about a "particular customer" with "restrictions in place for shipments" after March 2021, and that Bank of America analyst Wamsi Mohan noted "receiving a lot of questions" from investors on the subject, provides evidence that the market had not resolved the compliance question and continued to look to Defendants for guidance:

> Bank of America Global Technology Conference (June 8, 2021): Bank of America analyst Wamsi Mohan noted they had "**been receiving a lot of questions around a particular customer of yours where there are some restrictions in place for shipments.**" Defendant Romano responded "we always answer to these specific questions the same way because **that is the truth. We comply with all the rules and regulations. And based on that, we ship to all our customers following those rules and regulations**," further stating "But in general, **it's part of our job to ensure that we understand and then, we follow all their rules and regulations and all of that of trade.**"[25]

> Wall Street Journal (October 26, 2021): Following the publication of the Minority Staff Report, the *Wall Street Journal* reported that Defendants denied

---

[23] "Seagate: Revisiting our Thesis, Aimed at Answering a Few Questions," *Susquehanna*, March 18, 2021, at 2 (emphasis added).

[24] "Lifting Our Forecasts, but Struggling with Relative Valuation," *Wedbush Securities,* March 22, 2021, at 3 (emphasis added).

[25] BofA Securities Global Technology Conference Transcript, June 8, 2021, at 8 (emphasis added).

any wrongdoing and asserted that **Seagate "complies with all laws applicable to its business and operations, including export control regulations."**[26]

21.     Defendants also made continued Alleged Compliance Misrepresentations during the Company's October 26, 2022 earnings call and in financial filings.[27] In anticipation of analyst interest in the BIS Proposed Charging Letter, Seagate's Senior VP of Investor Relations, Shanye Hudson, led off the investor call by explicitly stating that:

> "Seagate also filed an 8-K today disclosing that on August 29, we received a proposed charging letter from the US Department of Commerce's Bureau of Industry and Security, or BIS, alleging violations of the US Export Administration Regulations. **We have responded to the letter and believe that we've complied with all relevant export control laws and regulations**. We've been cooperating with BIS, and we intend to continue engaging with them to seek a resolution. **During the Q&A portion of this call, we won't be commenting further on this matter and we'll provide additional updates as appropriate moving forward**."[28]

22.     Nevertheless, analyst Wamsi Mohan—the same analyst who had been "receiving a lot of questions" from investors about Seagate's compliance at least as far back as June 2021—pressed Defendants for further detail on their compliance position, stating:

> "**I know you guys said you really can't talk a lot about this export regulation area**. But could you just **give investors some sense on why you believe the shipments are not subject to export regulations**. Does it have to do with the IP for the products and where it resides or any color you can share about why you have confidence in your position. **Clearly, you articulated that you do. So it's – the why is, I guess, important from an investor standpoint**."[29]

---

[26] "Seagate Broke Export Curbs by Supplying Huawei, Senate Republicans Say," The Wall Street Journal, October 26, 2021, *available at* https://www.wsj.com/business/telecom/seagate-broke-export-curbs-by-supplying-huawei-senate-republicans-say-11635254101/ (emphasis added).

[27] *See e.g.*, Seagate Technology Holdings, Form 8-K, October 26, 2022 ("Seagate believes it has complied with all relevant export control laws and regulations. Seagate has committed to compliance through its global team of international trade compliance and legal professionals and by maintaining robust trade controls compliance policies and procedures.")

[28] Q1 2023 Earnings Call Transcript, October 26, 2022, at 3 (emphasis added).

[29] *Id.* at 9 (emphasis added).

23.    The fact that an analyst proceeded to ask follow-up compliance questions despite management's prior statement that no further comment would be provided is evidence that analysts continued to seek information regarding the Company's compliance status and viewed it as value-relevant. Defendant Mosley declined to provide any substantive response, restating the Alleged Compliance Misrepresentations:

> "[W]e don't really think it's appropriate for us to be commenting on it at all at this time. I mean, we'll cooperate transparently, and **we believe we have a really good compliance program in place with all the policies and procedures. So that's what builds our confidence**. But like I said, we'll communicate transparently. I just don't think it's appropriate for us to be commenting." [30]

24.    This exchange is consistent with evidence that market participants had not fully incorporated the compliance risk, as Dr. Zurek contends, but rather continued to actively seek guidance from Defendants on the very compliance questions that the Alleged Compliance Misrepresentations had left unresolved.

25.    Analysts' continued reliance on Defendants' Compliance Misrepresentations is further reflected in commentary during the Class Period. For example:

> Credit Suisse (October 26, 2022): "Alleged export violations: On 8/29 (just disclosed), Seagate received a proposed charging letter from the US Bureau of Industry and Security (BIS) alleging illegal shipments to Huawei between Aug 2020 and Sept 2021. **Seagate believes it complied with all export controls and 'has been cooperating with BIS and intends to continue to engage with BIS to seek a resolution of this matter.**'"[31]

> Morgan Stanley (October 26, 2022): "Today, STX reported they received a letter from the US Commerce Department's Bureau of Industry and Security (BIS) in August 2022, alleging STX violated the US Export Administration Regulations (EAR) by selling HDDs to a customer on the Entity List from August 2020-September 2021. While STX's 8-K did not identify this specific customer. **STX argues they did not engage in prohibited behavior 'because, among other**

---

[30] *Id.* at 9 (emphasis added).
[31] "F1Q23 Review; Inventory Correction Underway, Question On Duration With HAMR On The Horizon," *Credit Suisse*, October 26, 2022, at 1 (emphasis added).

**reasons, Seagate's HDDs are not subject to the EAR'** but did not take any questions on the charging letting [sic] on either the public earnings call or sell-side callback."[32]

Argus Research (October 27, 2022): "In October 2022, the U.S. Commerce Department alleged that Seagate had violated export controls by providing HDDs to Huawei, currently on the U.S. government's Entities List. **Seagate** is cooperating with the U.S. government and **has argued that its sales practices did not violate any laws or regulations.**"[33]

UBS (October 27, 2022): "STX received a proposed charging letter from the US DoC alleging violations of U.S export control regulations related to HDDs sold to customers on the BIS entity list, **though STX noted that it has been in full compliance with all relevant regulations** and is actively engaging with the BIS on a resolution."[34]

26.    Moreover, the BIS settlement announced on April 19, 2023 ("BIS Settlement"), in which Seagate admitted to committing the alleged conduct described in the Proposed Charging Letter, allegedly revealed the full scope of Seagate's violations and the consequences thereof. Regarding the nature and scope of the violations, the BIS Settlement revealed that:

    a.    Seagate had committed 429 separate violations of Section 764.2(a) of the Export Administration Regulations, selling over $1.1 billion in HDDs to Huawei without the required BIS license between August 17, 2020 and September 29, 2021;[35]

    b.    Seagate continued shipments to Huawei after receiving, in January 2021, an FDP rule notification from a key equipment supplier stating that its equipment was subject to the new export controls, and that a BIS license would be required for transactions involving listed Huawei entities;[36]

    c.    Seagate had internally designated Huawei as a "strategic" customer, had entered into a three-year Strategic Cooperation Agreement and a Long-Term Agreement with Huawei, and had authorized over $1 billion in temporary credit lines to facilitate Huawei purchases during the relevant period,[37] which, as shown in

---

[32] "Dec Should Be The Trough, But Risk Factors Are Elevated," *Morgan Stanley*, October 26, 2022, at 2 (emphasis added).

[33] "Analyst's Notes," *Argus Research*, October 27, 2022, at 3-4 (emphasis added).

[34] "Downgrade To Neutral: New Risks Offset An Otherwise Solid Recovery Story," *UBS*, October 27, 2022, at 1-2 (emphasis added).

[35] BIS Settlement, at 2.

[36] BIS Settlement, at 6-7.

[37] BIS Settlement, at 2, 5, 7.

**Exhibit 2**, contributed 13.42% of revenues in Q3 2021 during the Class Period;

d.  Seagate's conduct was *deliberate* rather than inadvertent, as evidenced by internal communications revealed in the Charging Letter, including: (i) a senior Seagate manager responding to news of a two-million-unit Huawei purchase order with "this is great!!!"; (ii) Seagate senior leadership acknowledging that it had reduced supply allocations to U.S. customers in order to redirect supply to support Huawei in China; and (iii) internal communications marked "critical" and "urgent" noting that Huawei was "close to line down situation" and that Seagate was aware it was Huawei's only remaining HDD supplier;[38]

e.  Two of the three companies capable of making HDDs had publicly ceased sales to Huawei following the August 2020 FDP rule, while Seagate continued sales, and the settlement further noted that Seagate did not voluntarily disclose the violations to BIS;[39]

f.  the full scope of Seagate's non-compliance was not available to the market through Seagate's own disclosures prior to the April 19, 2023 Settlement.[40]

27.    Regarding the consequences of those violations, the Settlement revealed that BIS had:

a.  Imposed a $300 million civil penalty, payable in quarterly installments of $15 million over five years;[41]

b.  Imposed ongoing compliance obligations, including three audits of Seagate's export controls compliance program and associated reporting requirements to BIS;[42]

c.  Imposed a five-year suspension of Seagate's export privileges, which, while suspended contingent on full and timely payment of the civil penalty and completion of the required audits, would be automatically activated if Seagate failed to meet any of these conditions — potentially revoking all of Seagate's existing BIS licenses.[43]

---

[38] BIS Settlement, at 7-8.

[39] BIS Settlement, at 3-4.

[40] *See* "A look behind Seagate's record-breaking export penalty," Export Solutions, April 26, 2023, *available at* https://www.exportsolutionsinc.com/resources/blog/a-look-behind-seagates-record-breaking-export-penalty/ ("BIS is also making it known that Seagate did not voluntarily disclose the activity, and that this contributed to the severity of the fine"). *See also* Complaint ¶ 130.

[41] BIS Settlement, at 9.

[42] BIS Settlement, at 11-12.

[43] BIS Settlement, at 12.

28. Further, analyst commentary following the BIS Settlement indicates that these specific consequences were not previously known or fully anticipated by the market.

Deutsche Bank (April 20, 2023): "STX announced reaching an agreement with US Department of Commerce (BIS) to pay ~$300m over the next five years (~$15m quarterly installments) for allegations tied to the sales of HDDs to a restricted customer. **While we view the company's settlement as not ideal, we recognize that it removes downside uncertainties related to the review.**"[44]

Susquehanna (April 20, 2023): "STX is scheduled to pay off ~$550M of debt in the Jun-Q, while there is also $108M of cancellation fees that STX is obligated to pay suppliers by December '23 (for terminating purchase commitments in CY22). STX is also required to pay $15M per quarter for the next five years ($300M total) after reaching a settlement with the U.S. Department of Commerce's Bureau of Industry and Security (BIS) for alleged sales to Huawei after they were placed on the banned entity list. **The BIS settlement will, in our view, have further adverse impact on STX's HDD EB shipments as STX will no longer be able to ship to Huawei (that in the past had driven a material uptick in demand in the upcycle).**"[45]

29. The evidence set forth above is inconsistent with Defendants' and Dr. Zurek's contention that the Alleged Compliance Misrepresentations had no price impact because the relevant truth was fully incorporated into Seagate's stock price by March 17, 2021. First, the continued analyst uncertainty and questioning regarding Seagate's FDPR compliance after March 2021 provides evidence that the market had not resolved the compliance question, and Defendants responded to inquiries with specific affirmative misrepresentations. Second, the full nature and extent of the consequences of the non-compliance were only fully revealed in the BIS Settlement on April 19, 2023. Third, analyst commentary following the BIS Settlement, reflecting surprise at both the scope of the violations and the magnitude of the consequences, confirms that the specific information concealed by the Alleged Compliance Misrepresentations was not fully publicly

---

[44] "F3Q Results: Recovery pushed as macro concerns weigh on demand," *Deutsche Bank*, April 20, 2023, at 2 (emphasis added).
[45] "Seagate: Thesis Playing Out; Recovery Timeline Extended/ Breaching Debt Covenants," *Susquehanna*, April 20, 2023, at 1 (emphasis added).

known or anticipated by the market prior to April 19, 2023. Taken together, this evidence supports the conclusion that Defendants' Alleged Compliance Misrepresentations had price impact on Seagate's Common Stock price during the Class Period, including beyond March 17, 2021.

### B. Evidence that the Market Continued to Rely Upon the Alleged Revenue Driver Misrepresentations After October 26, 2021

30.    Defendants' Opp. Brief claims that investors were aware of the approximate volume of Seagate's HDD sales to Huawei, citing analyst commentary that Huawei represented "less than 10% of sales" and that it had "not been reported as a 10%+ customer."[46] Dr. Zurek similarly contends that the Alleged Revenue Driver misstatements had "no impact on Seagate's stock price during the Proposed Class Period."[47] He highlights the Minority Staff Report issued by the Senate Committee Minority Staff on October 26, 2021, alleging that Seagate likely "knowingly violated the Foreign Direct Product Rule for more than one year" by continuing to sell HDDs to Huawei.[48] Dr. Zurek argues that because Seagate's Common Stock did not exhibit a statistically significant return following disclosure of the Minority Staff Report, it did not reveal information that was "both new and value-relevant."[49] As I explain below, the economic evidence indicates that the Alleged Revenue Driver Misrepresentations had price impact during the Class Period, including after October 26, 2021.

31.    First, the analyst reports cited in Defendants' Opp. Brief were published prior to Seagate's April 22, 2021 earnings report, the quarter in which Seagate's sales to Huawei exceeded 10% of Seagate's total revenue.[50] Therefore, they do not demonstrate that the market had

---

[46] Opp. Brief at 5-6 (emphasis omitted).
[47] Zurek Report ¶¶ 19, 26, Section IX.
[48] Zurek Report ¶ 68.
[49] *Id.* ¶ 69 (emphasis omitted).
[50] *See, e.g.,* Opp. Brief Ex. 3: "F1Q21 Preview; Moving Ahead with Large Capacity HDD," *Cross Research*, October 21, 2020. *And see* Opp. Brief Ex. 9 "STX: US Commerce Department Bureau of Industry & Security (BIS) Looking into Seagate's Sales to Huawei?" *Wells Fargo Securities*, March 18, 2021.

incorporated the true magnitude of Seagate's illegal HDD sales to Huawei, which represented as much as 13.42% of total revenue in Q3 2021 and 9.28% in Q1 2022—figures that were not disclosed until the end of the Class Period.

32.    Second, Dr. Zurek identifies no analyst commentary indicating that the market had incorporated the fact that sales to Huawei were enabling Seagate to meet or exceed analyst consensus revenue estimates that it would otherwise have missed. As **Exhibit 2** demonstrates, absent sales to Huawei, Seagate's revenue would have been below analyst revenue consensus estimates in each quarter from Q2 2021 through Q1 2022. Defendants' characterizations of demand as "broad-based" and driven by cloud and enterprise customers allegedly concealed this specific dynamic, that Huawei sales were the margin between hitting and missing analyst consensus across multiple consecutive quarters.

33.    Third, Dr. Zurek does not address the evidence that the Alleged Revenue Driver Misstatements had front-end price impact. In particular, and as described in more detail below in **Section V.A**, there is clear evidence that analysts attributed the Company's performance to broad-based demand for the Company's products rather than its sales to Huawei.

34.    Fourth, analyst reactions to subsequent corrective disclosures undermine Dr. Zurek's claim that the October 26, 2021 Minority Staff Report informed investors of the extent to which Huawei revenue was a significant driver of Company Revenue. Indeed, even months after the BIS settlement, analysts were still working to assess the financial implications of losing Huawei as a customer. For example:

> Wedbush Securities (July 22, 2022, lowering price target from $85 to $75): "**Seagate meaningfully missed expectations**, and guided below forward Street estimates to an even greater degree. With STX having been viewed as potentially somewhat insulated from economic disruption due to its significant exposure to the cloud (generally considered the healthiest end market), **we believe the**

15

**magnitude of STX's shortfall was not anticipated by the investment community**."[51]

Susquehanna (April 20, 2023, lowering price target from $35 to $32): "The BIS settlement will, in our view, have further adverse impact on STX's HDD EB shipments as **STX will no longer be able to ship to Huawei (that in the past had driven a material uptick in demand in the upcycle)**."[52]

Evercore ISI (April 20, 2023, lowering price target from $70 to $65): "Here, the HDD industry remains locked in a structural correction following COVID-era overshipments, **further exacerbated in Seagate's case by temporary Huawei-related share gains in CY20/21 (after peers ceased shipments).**"[53]

"What is Normalized Demand for Seagate?…Moreover, **Seagate between Aug. 17, 2020 and Sept. 29, 2021 witnessed a revenue/EB windfall associated with ongoing shipments to Huawei, where peers ceased shipments due to export restrictions** (see below on settlement regarding $1.1B+ in STX HDD sales to Huawei)."[54]

Morningstar (April 20, 2023, lowering price target from $62 to $55): "We lower our fair value estimate for Seagate Technology to $55 per share, from $62, after **it missed our fiscal third-quarter earnings expectations and provided poor forward-looking commentary**."[55]

35.    These reactions are inconsistent with the market having fully incorporated the revenue implications of Seagate's sales to Huawei as of October 26, 2021, as Dr. Zurek contends. To the contrary, subsequent analyst commentary continued to adjust to the newly revealed significance of Huawei revenues to Seagate's baseline financial performance—evidence that Dr. Zurek's no-price-impact opinion fails to account for and cannot reconcile with the analyst record as a whole.

---

[51] "HAMR Progress a Silver Lining in a Disappointing Report," *Wedbush Securities*, July 22, 2022, at 1 (emphasis added).
[52] "Seagate: Thesis Playing Out; Recovery Timeline Extended/Breaching Debt Covenants," *Susquehanna*, April 20, 2023, at 1 (emphasis added).
[53] "Still Searching for a Bottom as Nearline Inventory Correction Continues," *Evercore ISI*, April 20, 2023, at 1 (emphasis added).
[54] *Id.* at 4 (emphasis added).
[55] "Seagate Earnings: Poor Profits, Layoffs, and a Legal Settlement Combine for a Disappointing Quarter," *Morningstar*, April 20, 2023, at 1 (emphasis added).

**V.    Economic Evidence that the Alleged Misrepresentations Impacted Seagate's Common Stock Prices**

36.    I understand that Defendants bear the burden of establishing that the alleged misrepresentations had no impact on the price of Seagate's Common Stock. Defendants attempt to rebut the "fraud-on-the-market" presumption by claiming that the alleged misstatements and revelations did not impact the price of Seagate's Common Stock.[56] Nonetheless, as I explain below, reliable economic evidence indicates that the alleged misrepresentations did have price impact.

37.    Additionally, Defendants' Opp. Brief cites the *Goldman* decision and asserts a supposed mismatch between the alleged misrepresentations and the subsequent alleged corrective disclosures.[57] Defendants' Opp. Brief argues that such a mismatch indicates a lack of price impact and thus renders the calculation of damages unreliable. For the reasons explained below, I find no support for this claim. Furthermore, the Zurek Report provides no evidence of a mismatch.

38.    Moreover, I document reliable economic evidence indicating that the alleged misstatements were not generic, but rather specific claims about Seagate's alleged compliance with the FDPR and about Seagate's alleged failure to disclose that its financial performance was driven materially by its HDD sales to Huawei, which match the specific regulatory violations and downward earnings guidance revisions allegedly revealed in the corrective disclosures.

39.    Furthermore, fundamental principles of finance and economics, as well as commentary from research analysts indicate the presence of both front-end and back-end price impact of the alleged misstatements on the price of Seagate's Common Stock.

**A. Evidence that the Alleged Misrepresentations Had Front-End Price Impact**

40.    On April 22, 2021, after markets had closed, Seagate issued its Q3 2021 earnings and held an earnings call with investors and analysts. On this call, Defendants reported Seagate's

---

[56] Opp. Brief at 9-19.
[57] Opp. Brief at 2, 10-14.

"highest ever HDD shipments," including mass capacity HDD sales that beat the prior record by 21%, resulting in 8% sequential and 16% year-over-year revenue growth.[58] Defendants Mosley and Romano made comments characterizing demand as strong across cloud, enterprise, and mission-critical markets, while attributing the Company's record performance to broad-based recovery.[59] Despite Defendants' claims about the sources of demand, sales to Huawei accounted for more than 13% of Seagate's total revenue for the quarter (as shown in **Exhibit 2**), something Defendants did not acknowledge.

41.    Instead, on the call, Defendant Mosley stated that Seagate's revenue performance was driven by "strong cloud data center demand and ongoing recovery in the enterprise markets,"[60] as well as "higher enterprise mission critical sales and relatively stable desktop PC demand."[61] When Wells Fargo Securities analyst Aaron Rakers asked what was driving Seagate's improved revenue outlook over the prior three months, Defendant Mosley responded that Seagate's mass capacity business was "relatively insulated" from supply chain concerns affecting other segments, attributing growth largely to "the cloud and enterprise on-prem coming back."[62] When Barclays analyst Thomas O'Malley cited Seagate's "50-plus-percent" HDD market share and asked what had led the Company to that position, Defendant Mosley attributed it to long-term demand planning with customers and increasing market stability, stating the environment had become "a way more stable environment than it used to be."[63]

42.    Moreover, during the call, Defendant Romano attributed Seagate's revenue performance to "strong recovery from enterprise and OEM customers as well as healthy growth from cloud," "improving demand for mission-critical drives and stronger than anticipated demand

---

[58] Q3 2021 Earnings Call Transcript, April 22, 2021. *See also* Complaint ¶¶ 228-233.
[59] Q3 2021 Earnings Call Transcript, April 22, 2021. *See also* Complaint ¶¶ 228-233.
[60] Q3 2021 Earnings Call Transcript, April 22, 2021, at 4.
[61] *Id*.
[62] *Id.* at 11.
[63] *Id.* at 14.

18

for desktop PC," and a better alignment in supply and demand as the pandemic waned.[64] In its earnings press release filed the same day, Defendant Mosley attributed the Company's performance to "ongoing operational execution and record sales of our high capacity nearline drives," stating that results "underscore the strength of our HDD product portfolio and increasing demand for mass capacity storage."[65]

43.    Following the earnings call, the price of Seagate's Common Stock increased by 4.62% after controlling for market and industry effects, a return that was statistically significant at the 95% confidence level (See **Exhibit 1a**). The market's reaction provides evidence that the alleged misrepresentations made by Defendants had price impact.

44.    Additionally, following the Q3 2021 earnings call, analysts relied on and repeated Defendants' alleged misstatements characterizing (i) demand as broad-based and strong across cloud, enterprise, and mass capacity markets; (ii) growth as constrained by supply and operational factors rather than demand; and (iii) HDD inventory levels as well-balanced. This contradicts the Zurek Report opinion that the alleged misrepresentations had no price impact after March 17, 2021. For example:

> Evercore ISI (April 22, 2021): "a strong recovery in the Enterprise Market, and better than expected results in the company's legacy business (supported by strength in mission critical and stability in desktop PC demand). The company also highlighted expectations for demand strength to continue through the year, resulting in a CY21 revenue guide of at least +10% Y/Y (vs consensus of +8.5% Y/Y coming in) – implying revenues tracking flattish through CY end."[66]
>
> "Moreover, the company noted that it currently has excess capacity across all of its business segments – though they did acknowledge that shortages could affect

---

[64] *Id.* at 4-5, 8, 10.
[65] Seagate Technology Holdings, Form 8-K, April 22, 2021, at 1.
[66] "Demand Backdrop Sunny While Margin Trajectory Still Cloudy," *Evercore ISI*, April 22, 2021, at 1.

customers' ability to obtain other parts, which could push out some demand for them"[67]

Rosenblatt Securities (April 23, 2021, raising price target from $90 to $95): "Strong Cloud demand, recovering demand from Enterprise and stabilizing Legacy demand resulted in a solid beat-n-raise earnings report. We continue to appreciate the company's layering mass capacity product roadmap that gives customers options on increasing storage capacity…We continue recommending the STX shares and are increasing our 12-month target price to $95 based on 15x NTM non-GAAP EPS."[68]

Craig-Hallum (April 23, 2021): "We believe Seagate remains positioned well to capitalize on the ongoing high-capacity demand growth from cloud and enterprise customers, and with an improving margin outlook we expect the company to continue to drive solid earnings leverage into FY22. We are reiterating our Buy rating and $95 price target, based on 15x our FY22 EPS estimate of $6.34."[69]

45.    On October 22, 2021, during Seagate's Q1 2022 earnings call, the Company reported $3.1 billion in quarterly revenue, representing "robust growth of 35% year-over-year and 3% above a very strong June quarter."[70] Despite the fact that Huawei represented 9% of the total revenue for the quarter (as shown in **Exhibit 2**), Defendant Mosley attributed this performance instead to "broad-based growth across each of the end markets," with "[t]he cloud [as] the strongest contributor to the mass capacity markets" and "improving enterprise spending and healthy growth from cloud data center customers."[71] Defendants also announced that Seagate was "raising our fiscal [year] 2022 revenue growth outlook from the high-single-digit percentage range to the low-double-digit range."[72]

46.    In response to an analyst's request for "what's embedded" in Seagate's "assuming

---

[67] *Id.* at 3.
[68] "STX: Strong Cloud and Recovering Enterprise Demand Leads to Beat-n-Raise," *Rosenblatt Securities*, April 23, 2021, at 1.
[69] "Topline Strength And Margin Improvement To Continue. Reiterating Our BUY Rating And $95 Price Target," *Craig-Hallum*, April 23, 2021, at 1.
[70] Q1 2022 Earnings Call Transcript, October 22, 2021, at 2.
[71] *Id* at 2, 4.
[72] Q1 2022 Earnings Call Transcript, October 22, 2021, at 3-4, 6.

a down quarter sequentially in March and/or June," Defendant Mosley stated: "So, I think if you go back to last quarter, it would have been seasonality and it would have been more biased towards the legacy business. Obviously, the VIA markets are seasonal as well. And I would say, now, it's even more muted seasonality in some of the strength in the exabyte growth that we see in the cloud, particularly at the top end of the mass capacity markets. So, that kind of explains what's changed, I think, in the last three months."[73]

47. Following the earnings call, the price of Seagate's Common Stock increased by 6.36% after controlling for market and industry effects, a return that was statistically significant at the 99% confidence level (See **Exhibit 1a**). The market's reaction provides evidence that the alleged misrepresentations made by Defendants had price impact.

48. In summary, following these alleged misrepresentations, the prices of Seagate Common Stock increased by statistically significant amounts. Contemporaneous analyst reports explicitly relied on and referenced Defendants' statements, crediting Defendants' representations regarding "broad-based demand" and "improving enterprise spending and healthy growth from cloud data center customers" as the drivers of Seagate's outperformance—issues Plaintiffs allege were misrepresented. This evidence, coupled with my event study's findings of statistically significant increases in Seagate's Common Stock prices following these alleged misrepresentations, provides reliable economic evidence of front-end price impact.

## B. Fundamental Principles of Finance and Economics Demonstrate the Price Impact of the Alleged Misrepresentations

49. A core principle of finance and economics is that the value of a company's common stock reflects the market's expectations of the firm's future cash flows, discounted to present value. When new information alters investors' assessment of a company's ability to generate future

---

[73] *Id.* at 15-16.

21

revenues or profits, the firm's stock price must therefore adjust accordingly.[74] For instance, when investors learn that previously accepted information relating to a company's ability to generate future revenues or profits was false or misleading, the stock price will fall to reflect the corrected expectations of future cash flows.

50.    There is a direct economic connection between the information Defendants allegedly misrepresented regarding Seagate's FDPR compliance, the alleged true drivers of the Company's financial performance, and the Company's future cash flows. The revenue Seagate received from HDD sales comprised approximately 92% of the Company's total revenue during the Class Period, with both actual and expected HDD demand informing investors' expectations of future revenues.[75] Defendants' alleged misstatements concealed that illegal sales to Huawei were boosting the Company's total revenue by between 3% and 13% as shown in **Exhibit 2**, repeatedly allowing Seagate to meet or exceed its revenue guidance when it otherwise would have missed it entirely.[76]

51.    Fundamental principles of finance and economics therefore establish that Defendants' statements about alleged FDPR compliance and the alleged true drivers of Seagate's financial performance were value relevant and had price impact. It follows that the Company's stock prices would be expected to fall in response to the alleged revelations of the relevant truth, reflecting the effect of such revelations on expected future revenues and cashflows.

---

[74] *See, e.g.*, David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook*, The Role of the Financial Expert (3rd ed. 2001) ("the price of an efficiently traded stock is equal to the present value of the discounted future stream of free cash flow"); *See also* Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* (John Wiley & Sons, 1996), at 11 ("This [DCF] approach has its foundation in the present value rule, where the value of any asset is the present value of expected future cash flows on it.").
[75] Complaint ¶ 22.
[76] Complaint ¶¶ 59, 107. *See also* **Exhibit 2**.

### i.    Price Impact from the Alleged Compliance Misrepresentations

52.    Throughout the Class Period, Defendants repeatedly asserted that Seagate was in full compliance with all applicable U.S. export control regulations, including the FDPR.[77] Defendants emphasized the Company's compliance with such regulations when responding to repeated investor and analyst inquiries about whether Seagate's HDD manufacturing processes triggered the FDPR's licensing requirements and whether the Company continued to sell to Huawei.[78]

53.    Defendants allegedly misrepresented the status of Seagate's compliance with export control regulations in earnings calls, investor conferences, and SEC filings, issuing statements that assured investors that the Company "[was complying] with all laws applicable to its business and operations, including export control regulations."[79] Throughout the Class Period, Seagate allegedly misrepresented that it had "policies and procedures designed to ensure compliance" with all "applicable laws, rules and regulations"[80] statements that, as Seagate has since admitted, were false.[81]

54.    Furthermore, Defendants repeatedly acknowledged in investor communications that regulatory compliance was central to the Company's ability to continue serving its customer base. In investor communications, the Company identified and reported that export control laws "could have a material adverse effect" on its business, while allegedly simultaneously concealing

---

[77] Complaint ¶ 165.

[78] Complaint ¶¶ 166-168.

[79] *For example* "Seagate Broke Export Curbs by Supplying Huawei, Senate Republicans Say," The Wall Street Journal, October 26, 2021, available at https://www.wsj.com/business/telecom/seagate-broke-export-curbs-by-supplying-huawei-senate-republicans-say-11635254101/.

[80] *See* Seagate Technology Holdings, Form 10-K, August 10, 2020, at 25, referenced by Defendants throughout the Class Period, *see* Seagate Technology Holdings Form 10-Q, October 29, 2020, at 37 ("There have been no material changes to the description of the risk factors associated with our business previously disclosed in "Risk Factors" in Part I, Item 1A. in our Annual Report on Form 10-K for the fiscal year ended July 3, 2020").

[81]  BIS Settlement, at 9.

that it was already in violation of those laws.[82] In internal documents and commercial agreements, Seagate's senior management specifically directed and celebrated the Company's expanded relationship with Huawei, signing sweeping strategic agreements designating Huawei as a "strategic customer" and extending over $1 billion in credit to facilitate illegal HDD purchases.[83]

55.     Following the Company's representations concerning compliance, analysts credited Defendants' assurances that Seagate remained in full regulatory compliance and that no special license was required to continue shipping to Huawei, repeating Defendants' statements that Seagate "[did] not need a special license to ship product to Huawei."[84] Plaintiffs allege that, by misrepresenting the Company's compliance status, Defendants concealed from investors the significant risks that non-compliance entailed, including the risk of substantial regulatory penalties, mandatory compliance audits, reputational harm, and the potential imposition of a deferred denial order by BIS that could prohibit Seagate from participating in any transaction subject to the Export Administration Regulations.[85] Additionally, analysts cut their price targets and downgraded Seagate's stock in response to the revelations of the relevant truth, such as the disclosure of the BIS Proposed Charging Letter in October 2022 and the full government settlement in April 2023:

> Susquehanna (April 20, 2023, lowering price target from $35 to $32): "STX is also required to pay $15M per quarter for the next five years ($300M total) after reaching a settlement with the U.S. Department of Commerce's Bureau of Industry and Security (BIS) for alleged sales to Huawei after they were placed on the banned entity list. **The BIS settlement will, in our view, have further adverse impact on STX's HDD EB shipments as STX will no longer be able**

---

[82] *See* Seagate Technology Holdings, Form 10-K, August 6, 2021, at 17. *See also* Seagate Technology Holdings, Form 10-K, August 5, 2022, at 17.
[83] Seagate_000128375 at 2, Complaint ¶¶ 4, 59, 106, 153, 158.
[84] "Raise Price Target Ahead of FQ1 Results," *Fox Advisors*, October 19, 2020, at 1. *See also* "DB Tech Conference Takeaways," *Deutsche Bank*, September 14, 2020, at 1 ("STX does not believe it should be restricted in its shipments to Huawei or any other Chinese customer. The company does not expect to have to apply for a license to continue to ship to Huawei").
[85] Complaint ¶ 126, 260.

**to ship to Huawei** (that in the past had driven a material uptick in demand in the upcycle)."[86]

Morningstar (April 20, 2023, lowering price target from $62 to $55): "**We lower our fair value estimate for Seagate Technology to $55 per share, from $62**, after it missed our fiscal third-quarter earnings expectations and provided poor forward-looking commentary. … A new round of layoffs and a trade violation settlement further soured the print. Shares traded down after results, and we see them as slightly overvalued."[87]

Evercore ISI (April 20, 2023, lowering price target from $70 to $65): "Here, the HDD industry remains locked in a structural correction following COVID-era overshipments, **further exacerbated in Seagate's case by temporary Huawei-related share gains in CY20/21**"[88]

56.    Fundamental principles of finance and economics therefore establish that Seagate's representations regarding compliance were value relevant and had price impact. Because these representations informed investors' understanding of the regulatory risks facing the Company, including the risk of substantial financial penalties, mandatory compliance audits, reputational harm, and the potential denial of export privileges, they were central to investors' assessments of the Company's potential to generate future cash flows. Thus, it follows that, if such representations were in fact misrepresented, then the Company's stock price would be expected to fall when the relevant truth was revealed, as the Company would incur significant regulatory penalties and reputational harm, and would be limited in its ability to export HDD to certain customers.

### ii.    Price Impact from the Alleged Revenue Driver Misrepresentations

57.    Throughout the Class Period, Defendants repeatedly attributed Seagate's financial performance to a host of legitimate business factors, including "strong recovery from enterprise

---

[86] "Seagate: Thesis Playing Out; Recovery Timeline Extended/Breaching Debt Covenants," *Susquehanna*, April 20, 2023, at 1 (emphasis added).

[87] "Seagate Earnings: Poor Profits, Layoffs, and a Legal Settlement Combine for a Disappointing Quarter," *Morningstar*, April 20, 2023 at 1 (emphasis added).

[88] "Still Searching for a Bottom as Nearline Inventory Correction Continues," *Evercore ISI*, April 20, 2023, at 1 (emphasis added).

and OEM customers," "healthy growth from cloud," and the waning of COVID-19 pandemic headwinds.[89] Defendants emphasized these supposed revenue drivers when reporting quarterly results that met or exceeded guidance, touting results such as Seagate's "highest ever HDD shipments"[90] and revenue "topp[ing] the $3 billion mark for the first time in six years."[91]

58.    Rather than disclosing that illegal HDD sales had allowed Seagate to meet or exceed its revenue guidance over multiple quarters, as shown in **Exhibit 2**, Defendants attributed the Company's strong financial results to "broad-based demand across the mass capacity end markets,"[92] "strong recovery from enterprise and OEM customers,"[93] "healthy growth from cloud,"[94] and "stronger than expected growth in video and image applications."[95] These statements were allegedly false, as Seagate has since admitted that its illegal sales to Huawei boosted total Company revenue, with such illicit sales contributing up to 13% of the Company's quarterly revenue during the Class Period (as shown in **Exhibit 2**).[96]

59.    Moreover, as shown in **Exhibit 2**, but-for the revenues the Company generated by allegedly illegally selling HDD to Huawei, Seagate would have missed analysts' consensus revenue projections in each quarter between Q2 2021 and Q1 2022. Decades of research in finance and economics demonstrate the value-relevance of a company's performance relative to analyst expectations.[97]

---

[89] Q3 2021 Earnings Call Transcript, April 22, 2021, at 6, 11.
[90] *Id.* at 4.
[91] Q4 2021 Earnings Call Transcript, July 21, 2021, at 4.
[92] *Id.* at 3.
[93] Q3 2021 Earnings Call Transcript, April 22, 2021, at 6.
[94] *Id*.
[95] Q2 2021 Earnings Call Transcript, January 21, 2021, at 4.
[96] Complaint ¶¶ 58-59.
[97] *See* e.g., William H. Beaver, "The Information Content of Annual Earnings Announcements," *Journal of Accounting Research 6*, 1968, at 67-92; Ball, Ray, and Philip Brown. "An Empirical

60.    Furthermore, the Company itself identified its revenue drivers as critical to investors' assessments of Seagate's business prospects. Defendants specifically credited broad-based demand recovery and cloud and enterprise market strength for Seagate's outperformance relative to competitors in a series of quarterly earnings calls, while concealing that Seagate's revenue advantage over Western Digital and Toshiba was attributable to its HDD sales to Huawei.[98] In internal documents, senior management celebrated record-breaking HDD sales to Huawei, noting "$600M revenue in [calendar year 2020] just for HDD."[99]

61.    Following the Company's alleged misrepresentations concerning revenue drivers, analysts repeated and relied upon Defendants' alleged misstatements when considering the Company's prospects. For example, UBS analysts reported that Seagate's revenue beat was "driven by recovery in the enterprise market, healthy cloud demand [] and better than expected [VIA] demand," [100] while analysts from Deutsche Bank, Wells Fargo, and Goldman Sachs similarly attributed Seagate's revenue growth to recovery in the enterprise markets, stable demand from cloud customers, and robust demand from Seagate's VIA customers.[101] After Seagate's record-setting quarter in Q4 2021, Morgan Stanley reported that blockchain demand shock was "having a lasting impact on industry fundamentals."[102] As the truth regarding Seagate's alleged illegal Huawei monopoly began to emerge, analysts expressed surprise at the effect on Seagate's revenue, with Wedbush noting that "the magnitude of STX's shortfall was not anticipated by the

---

Evaluation of Accounting Income Numbers." *Journal of Accounting Research 6*, 1968, at 159–178; William H. Beaver, "Financial Reporting: An Accounting Revolution" (1998), at 38; William H. Beaver, Maureen F. McNichols, and Zach Z. Wang. "Increased market response to earnings announcements in the 21st century: An empirical investigation." *Journal of Accounting and Economics 69*, 2020, at 101–244.

[98] Complaint ¶¶ 54-56, 59, 108.

[99] Complaint ¶ 157.

[100] "Good Visibility for Now But Potential Peak Likely Closer; Maintain Neutral," *UBS*, January 21, 2021, at 1.

[101] Complaint ¶ 56.

[102] "Structural Pricing Reset Lifts EPS," *Morgan Stanley*, July 21, 2021, at 1.

investment community." [103] Following the April 2023 settlement, Susquehanna explicitly acknowledged that Huawei "in the past had driven a material uptick in demand in the upcycle."[104]

62.    Fundamental principles of finance and economics therefore establish that the revenue driver representations were value relevant and had price impact. Because these representations directly determined investors' understanding of the sustainability and breadth of Seagate's HDD revenue, which accounted for approximately 92% of the Company's total revenues, they were central to investors' assessments of the Company's potential to generate future cash flows.[105] Thus, it follows that, if the Company misrepresented the true sources of its revenue drivers, then the Company's stock price would be expected to fall when the relevant truth was revealed, as the market adjusted for an expected decline in revenue absent the alleged illegal and unsustainable Huawei revenue stream.

## C. The Alleged Misrepresentations are Economically Connected to the Relevant Truth Revealed by the Alleged Corrective Disclosures

63.    Defendants' Opp. Brief asserts there is a "mismatch" between the alleged misrepresentations and the corrective disclosures in this case.[106] However, the Zurek Report offers no evidence, opinions, or support for this claim. As I explain in this section, the mismatch claim made by Defendants lacks foundation and is unpersuasive.

64.    As an initial matter, I understand the *Goldman* case Defendants point to involved a mismatch between generic misstatements and highly specific corrective disclosures. Examples of the generic challenged statements in the *Goldman* case include:

---

[103] "HAMR Progress a Silver Lining in a Disappointing Report," *Wedbush Securities*, July 22, 2022, at 1.
[104] "Seagate: Thesis Playing Out; Recovery Timeline Extended/ Breaching Debt Covenants," *Susquehanna*, April 20, 2023, at 1.
[105] Complaint ¶¶ 5, 22, 57.
[106] Opp. Brief at 2, 10-14.

- "Our clients' interests always come first. Our experience shows that if we serve our clients well, our own success will follow."

- "Integrity and honesty are at the heart of our business."

- "Conflicts of interest are increasing and a failure to appropriately identify and deal with conflicts of interest could adversely affect our businesses."

- "Our reputation is one of our most important assets."

65.     The alleged misstatements and corrective disclosures in this matter are directly linked in subject matter, addressing the same specific topics of FDPR compliance and the drivers of Seagate's HDD revenue.

66.     The nature of the alleged misrepresentations further underscores their direct connection to the corrective disclosures. Here, many of the alleged misrepresentations were made in direct response to targeted analyst questions about FDPR compliance and the sources of Seagate's financial outperformance, topics that analysts and investors repeatedly identified as central to their assessment of the Company's value throughout the Class Period. Specifically, the alleged misrepresentations included:

- On September 14, 2020, at the Deutsche Bank Technology Conference, an analyst asked Defendant Romano how the FDPR's "restrictions will impact Seagate." Defendant Romano responded "I don't see any particular restriction for us in terms of being able to continue to ship to Huawei or any other customers in China. So we don't think we need to have a specific license."[107]

  Later during the conference, another analyst asked whether Seagate was "impacted by several Chinese companies being put on the Entity List" to which Defendant Romano responded, "I would say the majority of our customers are in China. We have a very high market share in China in general. … We don't have any limitation right now in term[s] of what we can ship to those customers." [108]

- On October 22, 2020, during Seagate's Q1 2021 earnings call, an analyst asked Defendants "to confirm that can you talk about whether you are continuing to ship to Huawei and what is included in your December quarter guidance. It looks like your competitor may have stopped shipping maybe back in the middle of September."

---

[107] Deutsche Bank 2020 Technology Virtual Conference Transcript, September 15, 2020, at 2.
[108] *Id.* at 7.

Defendant Mosley responded "We continually monitor and remain in compliance with all the rules and regulations around. I think relative to some of the legacy markets, I think we're just watching too much inventory out there. So I don't think it's material."[109]

- On January 21, 2021, during the Q2 2021 earnings call, an analyst asked "given the current restrictions on the shipment to Huawei, does that change the way you think about the total addressable market for this calendar year for nearline drives [a core segment of Seagate's HDD business]?" Defendant Romano responded "So like I said last time, we don't comment on any specific customers. I think that the market demand globally will not change on how it's ultimately serviced, so if that answers your question."[110]

- On June 8, 2021, at the Bank of America Global Technology Conference, an analyst noted they had "been receiving a lot of questions around a particular customer of yours where there are some restrictions in place for shipments." Defendant Romano responded "we always answer to these specific questions the same way because that is the truth. We comply with all the rules and regulations. And based on that, we ship to all our customers following those rules and regulations[,]" further stating "But in general, it's part of our job to ensure that we understand and then, we follow all their rules and regulations and all of that of trade."[111]

- On April 22, 2021, during the Q3 2021 earnings call, Defendant Mosley attributed Seagate's "highest ever HDD shipments … and record mass capacity revenue" to "strong cloud data center demand and ongoing recovery in the enterprise markets" while Defendant Romano credited "strong recovery from enterprise and OEM customers as well as healthy growth from cloud." On that same call, an analyst cited Seagate's improved revenue outlook and asked, "what's been the drivers of that change over the course of the last three months or so?" Defendant Mosley responded "So, we look at this year as not having as profound an impact as we did in 2020 and that's where we get the 10% [revenue growth] and it's largely on the strength of mass capacity, some of the VIA markets and things like that will be contributing as well but it's largely the cloud and enterprise on-prem coming back."[112]

67.    As can be seen from the examples above, the alleged misstatements in this matter were not simply boilerplate, generic claims about regulatory compliance or the drivers of company revenue, but rather pertained specifically to Seagate's compliance with the FDPR, and to the specific sources of the Company's HDD revenue during specific financial periods, and were made

---

[109] Q1 2021 Earnings Call Transcript, October 22, 2020, at 15.
[110] Q2 2021 Earnings Call, January 21, 2021, at 12.
[111] BofA Securities Global Technology Conference Transcript, June 8, 2021, at 8.
[112] Q3 2021 Earnings Call Transcript, April 22, 2021, at 4, 6, 11.

in direct response to analyst questions about these precise topics. Defendants' specific representations that Seagate "complies with all the rules and regulations," that its HDD production processes did not implicate export restrictions, and that its revenue outperformance was driven by broad-based legitimate demand, were directly contradicted by corrective disclosures revealing that Seagate had violated the FDPR and that its revenues had been materially inflated by illegal Huawei sales.

68.    The alleged corrective disclosures address the specific subject matter of the alleged misrepresentations—FDPR compliance and the true drivers of Seagate's HDD revenue:

- **March 8, 2022 (event study: 11.14% abnormal decline with 99% statistical significance)**: Defendant Mosley cautioned investors at an investor conference that Seagate was facing revenue pressure and was "going to be at the lower end of [its financial guidance] ranges" for the upcoming quarter as a result of "disruption in" "… VIA in China" for HDDs.[113] Morgan Stanley reported that "China markets are driving incremental weakness" in HDD sales[114], while UBS noted "weakness seen in China."[115] Defendant Mosley attributed the shortfall to a variety of "transitory" business factors including "freight logistics,"[116] with analysts such as Bank of America characterizing the headwinds as "transitory" and maintaining their Buy rating.[117]

- **July 21, 2022 (event study: 6.10% abnormal decline with 99% statistical significance)**: Seagate reported revenues declining 12.8% year-over-year, missing the Company's entire revenue guidance range by more than $150 million, and guided the coming quarter's revenue down by 5%, reporting it was cutting HDD production because of customer "inventory overages" in China.[118] Deutsche Bank noted that even accounting for anticipated macroeconomic headwinds, Seagate's "revenue cut is larger than we had expected"[119] while Wedbush observed that "the magnitude of STX's

---

[113] Morgan Stanley Technology, Media and Telecom Conference Transcript, March 8, 2022, at 2.
[114] "Fireside Chat Highlights Near Term Pressures," *Morgan Stanley*, March 8, 2022, at 1.
[115] "Adjust Model Post Updated Guidance," *UBS*, March 8, 2022, at 1.
[116] Morgan Stanley Technology, Media and Telecom Conference Transcript, March 8, 2022, at 2, 9. *See also* Complaint ¶¶ 112-116.
[117] "Lowering estimates on near-term revenue and margin headwinds," *Bank of America*, March 9, 2022, at 1.
[118] Q4 2022 Earnings Call Transcript, July 21, 2022, at 9. *See also* Complaint ¶¶ 117-120.
[119] "A miss-and-miss, but will inventory adjustments be done in one quarter?" *Deutsche Bank*, July 21, 2022, at 1.

31

shortfall was not anticipated by the investment community."[120] Defendants attributed the decline to "impacts from COVID lockdowns in Asia, non-HDD component shortages, and global inflationary pressures."[121]

- **October 26, 2022 (7.76% abnormal decline with 99% statistical significance)**: Seagate disclosed in a Form 8-K that it had received a Proposed Charging Letter from BIS two months earlier alleging violations of U.S. export restrictions.[122] UBS cut its price target by over 35% and downgraded the stock to Neutral, noting that Western Digital and Toshiba "ceased shipments after the new Foreign Direct Product Rule went into effect and STX significantly outperformed WDC in subsequent Qs"[123] while Barclays reported the charging letter validated market "suspicions that the company was over-shipping to China."[124] Defendants issued statements asserting that Seagate "did not engage in prohibited conduct" and "complied with all relevant export control laws and regulations."[125]

- **April 19, 2023 (8.99% abnormal decline with 99% statistical significance)**: Seagate and BIS announced a settlement in which Seagate admitted to illegally selling over $1.1 billion in HDDs to Huawei in violation of the FDPR, and that BIS had imposed a $300 million civil penalty, the largest standalone penalty in agency history.[126] Susquehanna noted the settlement would "have further adverse impact on STX's HDD EB shipments as STX will no longer be able to ship to Huawei (that in the past had driven a material uptick in demand in the upcycle)"[127] while Evercore questioned "What is Normalized Demand for Seagate" noting that Seagate had "witnessed a revenue/EB windfall associated with ongoing shipments to Huawei, where peers ceased shipments due to export restrictions."[128]

69.     The evidence thus suggests that, contrary to Defendants' assertions, there is no mismatch between the genericness of the alleged misstatements and the specificity of the

---

[120] "HAMR Progress a Silver Lining in a Disappointing Report," *Wedbush Securities*, July 22, 2022, at 1.

[121] Q4 2022 Earnings Call Transcript, July 21, 2022, at 3.

[122] Seagate Technology Holdings, Form 8-K, October 26, 2022.

[123] "Downgrade To Neutral: New Risks Offset An Otherwise Solid Recovery Story," *UBS*, October 27, 2022, at 1, 3.

[124] "Another Cut Exposes More Questions than Answers," *Barclays*, October 26, 2022, at 1.

[125] Seagate Technology Holdings, Form 8-K, October 26, 2022.

[126] Seagate Technology Holdings, Form 8-K, April 19, 2023. *See also* "BIS Imposes $300 Million Penalty Against Seagate Technology LLC Related To Shipments To Huawei," *BIS*, April 19, 2023, *available at* https://www.bis.gov/node/20250/. *See also* Complaint ¶¶126-129.

[127] "Seagate: Thesis Playing Out; Recovery Timeline Extended/Breaching Debt Covenants," *Susquehanna*, April 20, 2023, at 1.

[128] "Still Searching for a Bottom as Nearline Inventory Correction Continues," *Evercore ISI*, April 20, 2023, at 4.

corrective disclosures. Moreover, there is a direct economic connection between the alleged misstatements and corrective disclosures.

70.    Furthermore, Defendants' Opp. Brief argues that the first two alleged corrective disclosures on March 8, 2022 and July 21, 2022 cannot show evidence of price impact because there is a "clear mismatch" between those two disclosures, which "do not mention Huawei" and the challenged statements, which are "all about Huawei."[129] However, I understand that a mirror image is not required between the language of alleged misstatements and the language contained in corrective disclosures. In this case, Plaintiffs allege that it was the cessation of Huawei sales that Defendants had previously attributed to broad-based legitimate demand that caused the Company to report lower-than-expected revenue for the respective quarters.[130]

71.    The Alleged Revenue Driver Misrepresentations are thus directly implicated by both corrective disclosures in question: On March 8, 2022, Defendant Mosley cautioned investors at an investor conference that Seagate was facing revenue pressure and was "going to be at the lower end of [its financial guidance] ranges" for the upcoming quarter as a result of "disruption in" "… VIA in China,"[131] and on July 21, 2022, Seagate reported revenues declining 12.8% year-over-year, missing the Company's entire revenue guidance range by more than $150 million, and guided the coming quarter's revenue down by 5%, reporting it was cutting HDD production because of customer "inventory overages" in China.[132] Plaintiffs allege that both revenue shortfalls were directly caused by the permanent loss of illegal Huawei sales that had previously been contributing as much as 13% of Seagate's quarterly revenues, (See **Exhibit 2**) sales that Defendants had allegedly attributed to broad-based legitimate demand rather than a single illegal and unsustainable

---

[129] Opp. Brief at 2, 11-12, 14.

[130] *See* e.g., Complaint ¶¶ 115, 118, 248, 252.

[131]  Morgan Stanley Technology, Media and Telecom Conference Transcript, March 8, 2022, at 2.

[132] Q4 2022 Earnings Call Transcript, July 21, 2022, at 9.

33

customer relationship.[133]

72. Therefore, despite Defendants' assertions that there was a mismatch between the genericness of the misstatements and the specificity of the disclosures, or that there was a mismatch in subject matter between the two, I present clear evidence that the alleged misstatements and corrective disclosures were economically connected.

### D. Analyst Commentary Following the Alleged Misrepresentations Provides Further Evidence of Front-End Price Impact and/or Price Maintenance

73. As noted above, many of the alleged misrepresentations were specific statements made by Defendants at investor conferences and in reply to questions from analysts on earnings calls. The fact that Defendants made these statements in response to analyst inquiries provides evidence that analysts viewed the alleged misrepresentations as value relevant, and provides clear front-end evidence of price impact and/or evidence that the Seagate's stock price was maintained at artificially inflated levels.

74. Moreover, analysts referenced and relied upon the economic information at issue within the alleged misrepresentations. This reliance provides additional economic evidence of the front-end price impact and/or price maintenance of the alleged misrepresentations.

#### i. Analyst Commentary on the Alleged Compliance Misrepresentations

75. Multiple analysts relied upon and discussed Defendants' statements about Seagate's FDPR compliance and its ability to continue shipping HDDs to Huawei when assessing the Company throughout the Class Period. Furthermore, analysts connected those claims to the Company's ability to maintain its HDD revenue base and generate revenues and profits, as well as to their valuations of the Company.

76. Analysts referenced and relied upon Defendants' statements about Seagate's export

---

[133] Complaint ¶¶ 260-265.

compliance and reported on the Company's ability to continue serving Huawei as a customer beginning in August 2020, when the FDPR was first enacted, and continuing throughout the Class Period. Such references included Defendants' repeated assurances that Seagate did not require a special license to ship to Huawei and that the Company's HDD production processes did not violate the FDPR's restrictions. Analysts' consistent focus on the Alleged Compliance Misrepresentations provides evidence of their economic importance to Seagate's value. For example:

> Deutsche Bank (September 14, 2020): "From its analysis so far, **STX does not believe it should be restricted in its shipments to Huawei** or any other Chinese customer. The company does not expect to have to apply for a license to continue to ship to Huawei." [134]

> Fox Advisors (October 19, 2020, raising price target from $56 to $60): "Finally, we imagine questions around the Huawei supply chain, still admittedly a "wild card" in our minds, since **the company most recently noted it does not need a special license to ship product to Huawei following the 8/17 announcement** by the U.S. Department of Commerce that it was expanding existing restrictions on Huawei for "critical component" sales based on U.S. developed technologies." [135]

> Evercore ISI (October 22, 2020): "Mgmt. declined to explicitly state if the company is still shipping to Huawei, stating that **it remains in compliance with all rules and regulations**" [136]

77.    Even after the *Washington Times* article published on March 17, 2021, which Dr. Zurek asserts removed all uncertainty regarding the Alleged Compliance Misrepresentations, analysts continued to reference and rely upon the Alleged Compliance Misrepresentations, which continued to be made by Defendants during the Class Period. This contradicts the Zurek Report

---

[134] "DB Tech Conference Takeaways," *Deutsche Bank,* September 14, 2020, at 1 (emphasis added).

[135] "Raise Price Target Ahead of FQ1 Results," *Fox Advisors,* October 19, 2020, at 1 (emphasis added).

[136] "Gross Margin Improvement Still Elusive in December Q Guide," *Evercore ISI,* October 22, 2020, at 3 (emphasis added).

opinion that the Alleged Compliance Misrepresentations had no price impact after March 17, 2021.

For example:

> Susquehanna (March 18, 2021): "According to The Washington Times, Seagate is suspected of selling hard drives to Huawei that contained microchips that are subject to export controls after the ban was tightened last summer. … In September, Seagate's CFO said, 'I do not see any particular restriction for us in terms of being able to keep … Huawei or any other customers in China … So, we do not think we need to have a specific license.' **Seagate states that it will fully comply with rules and regulations and continue to review the situation.**"[137]

> Wells Fargo Securities (March 18, 2021): "Late Wednesday (3/17) The Washington Times published an article reporting that The Commerce Department's Bureau of Industry and Security (agency tasked with monitoring compliance with export controls) is probing Seagate over a "possible breach" of US sanctions imposed on China. … **Seagate has previously noted, when asked about sanctions, has stated that it did 'not see any particular restriction for us [Seagate] in terms of being able to continue to keep the Huawei or any other customers in China**…So, we do not think we need to have a specific license.' During the company's F2Q21 (Dec '20) earnings call in late-January, in response to a question on sales to Huawei, Seagate's CEO noted that '…we don't comment on any specific customers. I think that the market demand globally will not change on how its ultimately serviced.' … **We have not spoken to Seagate on this news, and thus we are not in a position to assess any fundamental impact (if any) at this time**"[138]

> Wells Fargo Securities (May 11, 2021): "**Seagate has only noted that it doesn't comment on any specific customers. In September 2020, in response to a question regarding restrictions placed on sales of HDDs to Huawei, Seagate noted that 'I [Seagate's CFO] don't see any particular restriction for us in term of being able to continue to ship to Huawei'**"[139]

> Bank of America Global Technology Conference (June 8, 2021): Bank of America analyst Wamsi Mohan noted they had "**been receiving a lot of questions around a particular customer of yours where there are some**

---

[137] "Seagate: Revisiting our Thesis, Aimed at Answering a Few Questions," *Susquehanna*, March 18, 2021, at 2 (emphasis added).

[138] "STX: US Commerce Department Bureau of Industry & Security (BIS) Looking into Seagate's Sales to Huawei?" *Wells Fargo Securities,* March 18, 2021, at 1 (emphasis added).

[139] "US Commerce Fact-Finding Inquiry into Sales of HDDs to Huawei—Focus on Seagate (See Letter Link Below)," *Wells Fargo Securities,* May 11, 2021, at 1 (emphasis added).

**restrictions in place for shipments.**" Defendant Romano responded "we always answer to these specific questions the same way because **that is the truth. We comply with all the rules and regulations. And based on that, we ship to all our customers following those rules and regulations**," further stating "But in general, **it's part of our job to ensure that we understand and then, we follow all their rules and regulations and all of that of trade.**"[140]

Wells Fargo Securities (October 22, 2021): "Although STX will not comment on specific customers, when asked about the disclosure of an ~11% customer in the F2021 10-K STX pointed to this as being a cloud customer (we would est. Google). **The company provided no comments on shipments to Huawei; only reiterating that it is shipping according to applicable regulatory requirements.**" [141]

78.     Continuing even after the third alleged corrective disclosure, Defendants reiterated the Alleged Compliance Misrepresentations, such as in their Form-8K released on October 26, 2022,[142] and analysts and market participants continued to rely upon these assertions. For example:

Wall Street Journal (October 26, 2021): "A Seagate spokesman said the company '**complies with all laws applicable to its business and operations, including export control regulations.**'"[143]

Credit Suisse (October 26, 2022): "Alleged export violations: On 8/29 (just disclosed), Seagate received a proposed charging letter from the US Bureau of Industry and Security (BIS) alleging illegal shipments to Huawei between Aug 2020 and Sept 2021. **Seagate believes it complied with all export controls and**

---

[140] BofA Securities Global Technology Conference Transcript, June 8, 2021, at 8 (emphasis added).

[141] "STX: Nearline Momentum Continues; Confidence in Sustainable 30%+ GM% w/ Increased F2022 Rev. Outlook (Low SD% Growth)," *Wells Fargo Securities*, October 22, 2021, at 1 (emphasis added).

[142] Seagate Technology Holdings, Form 8-K, October 26, 2022 ("Seagate has responded to the PCL, setting forth Seagate's position that it did not engage in prohibited conduct as alleged by BIS, because, among other reasons, Seagate's HDDs are not subject to the EAR. …
Seagate believes it has complied with all relevant export control laws and regulations. Seagate has committed to compliance through its global team of international trade compliance and legal professionals and by maintaining robust trade controls compliance policies and procedures.")

[143] "Seagate Broke Export Curbs by Supplying Huawei, Senate Republicans Say," The Wall Street Journal, October 26, 2021, *available at* https://www.wsj.com/business/telecom/seagate-broke-export-curbs-by-supplying-huawei-senate-republicans-say-11635254101/ (emphasis added).

**'has been cooperating with BIS and intends to continue to engage with BIS to seek a resolution of this matter.'"**[144]

Morgan Stanley (October 26, 2022): "Today, STX reported they received a letter from the US Commerce Department's Bureau of Industry and Security (BIS) in August 2022, alleging STX violated the US Export Administration Regulations (EAR) by selling HDDs to a customer on the Entity List from August 2020-September 2021. While STX's 8-K did not identify this specific customer. **STX argues they did not engage in prohibited behavior 'because, among other reasons, Seagate's HDDs are not subject to the EAR'** but did not take any questions on the charging letting [sic] on either the public earnings call or sell-side callback … the presence of the charging letter introduces a new stock overhang, and **1) could result in a sizable fine** (potentially as high as hundreds of millions of dollars depending on the size of the transactions) if STX formally charged, **and/or 2) could potentially impact STX's ability to ship to other vendors in China moving forward.** For reference, **China makes up roughly 1/3 of STX's revenue.**"[145]

Argus Research (October 27, 2022): "In October 2022, the U.S. Commerce Department alleged that Seagate had violated export controls by providing HDDs to Huawei, currently on the U.S. government's Entities List. Seagate is cooperating with the U.S. government and **has argued that its sales practices did not violate any laws or regulations.**"[146]

UBS (October 27, 2022): "The **new US Dept of Commerce charge** that STX shipped in 2H:20/1H:21 to customers on the Entity List (reportedly Huawei) simply **creates too much potential risk and offsets what is otherwise a fundamental set-up that is pretty good**, and somewhat similar to MU. While it is hard to handicap the outcome of such an inquiry … STX received a proposed charging letter from the US DoC alleging violations of U.S export control regulations related to HDDs sold to customers on the BIS entity list, **though STX noted that it has been in full compliance with all relevant regulations and is actively engaging with the BIS on a resolution**."[147]

79.     As documented above, analysts referenced and relied upon the Alleged Compliance

Misrepresentations when developing their assessments of the Company. Such reference provides

---

[144] "F1Q23 Review; Inventory Correction Underway, Question On Duration With HAMR On The Horizon," *Credit Suisse*, October 26, 2022, at 1 (emphasis added).

[145] "Dec Should Be The Trough, But Risk Factors Are Elevated," *Morgan Stanley*, October 26, 2022, at 2 (emphasis added).

[146] "Analyst's Notes," *Argus Research*, October 27, 2022, at 5 (emphasis added).

[147] "Downgrade To Neutral: New Risks Offset An Otherwise Solid Recovery Story," *UBS*, October 27, 2022, at 1-2 (emphasis added).

reliable economic evidence that the alleged misrepresentations had front-end price impact and/or maintained the price of Seagate's Common Stock at artificially inflated levels. Moreover, as I document in **Section V.E** below, analysts referenced and relied upon the relevant truth related to the alleged misrepresentations when updating their assessments of Seagate following the alleged corrective disclosure events, and they correspondingly lowered their expectations for the Company's revenues and price targets for Seagate Common Stock. This further demonstrates the price impact of and/or price maintenance caused by the Alleged Compliance Misrepresentations, and supports the economic connection between the alleged misrepresentations and the relevant truth.

### ii.    Analyst Commentary on the Alleged Revenue Driver Misrepresentations

80.    Multiple analysts relied upon and discussed Defendants' statements about the drivers of Seagate's HDD revenue in their assessment of the Company throughout the Class Period. Furthermore, analysts connected those characterizations to the Company's ability to sustain and grow its HDD revenue base, generate revenues and profits, and support the Company's stock price, attributing the Company's financial performance to factors such as "cloud demand and recovering enterprise spending"[148] and "demand in mission critical enterprise and desktop markets"[149] rather than sales to Huawei. This consistent focus indicates that analysts viewed the Alleged Revenue Driver Misrepresentations as economically important.

81.    During the Q3 2021 earnings call on April 22, 2021, Defendants reported Seagate's "highest ever HDD shipments" including mass capacity HDD sales that beat the prior record by 21%.[150] Defendants attributed this record performance to "strong cloud data center demand and ongoing recovery in the enterprise markets" and "strong recovery from enterprise and OEM

---

[148] "F3Q results: Solid and should get better through CY21," *Deutsche Bank*, April 22, 2021, at 1
[149] "Converging Trends Drive Double-Digit Growth," *Morgan Stanley*, April 23, 2021, at 1
[150] Q3 2021 Earnings Call Transcript, April 22, 2021, at 4-5.

customers as well as healthy growth from cloud"[151] while making no reference to Huawei sales, which accounted for 13.42% of revenue that quarter, as shown in **Exhibit 2**, and allowed Seagate to meet guidance it would otherwise have missed entirely. Following this, analyst commentary attributed Seagate's revenue beat to Defendant's misrepresentations. For example:

> Deutsche Bank (April 22, 2021, raising price target from $70 to $80): "STX reported a strong print with F3Q results and F4Q guidance coming in above DBe/Street expectations. F3Q results benefitted from a strong nearline market environment, driven by cloud demand and recovering enterprise spending, and STX expects its nearline business to improve sequentially throughout CY21. STX now expects to grow its CY21 revenue by at least 10% in CY21, modestly above DBe/Street estimates."[152]

> Barclays (April 23, 2021, raising price target from $65 to $70): "Non-HDD led the March beat and the company only guided June only slightly ahead. The company is maintaining >50% share in Nearline drives and is well positioned as Enterprise and Cloud markets remain strong. The company guided to 10% or greater growth for CY21 with less seasonality for the remainder of the year."[153]

> Morgan Stanley (April 23, 2021, raising price target from $90 to $98): "Seagate reported March quarter revenue 3% and EPS 9% above our model, with the upside coming from improving demand in mission critical enterprise and desktop markets. Gross margin, an important driver of stock performance, improved 60bps Q/Q and was 30bps better than consensus and is expected to expand at similar levels in the coming quarters."[154]

> Wedbush Securities (April 23, 2021, raising price target from $62 to $70): "Seagate reported better than expected results driven by: 1) a return to growth in near-line drive consumption, and to a lesser extent, 2) a rebound in mission critical shipments, and 3) atypical seasonal strength in PC related markets."[155]

82.   After the first alleged corrective disclosure on March 8, 2022, analysts continued

---

[151] *Id.*

[152] "F3Q results: Solid and should get better through CY21," *Deutsche Bank*, April 22, 2021, at 1.

[153] "Cloud and Enterprise Driving Top-Line but Long Road Yet for Margins," *Barclays*, April 23, 2021, at 1.

[154] "Converging Trends Drive Double-Digit Growth," *Morgan Stanley*, April 23, 2021, at 1.

[155] "3FQ21 Review – Good Quarter; Good Guide; Expensive Valuation," *Wedbush Securities*, April 23, 2021, at 1.

to reference and rely upon the Alleged Revenue Driver Misrepresentations, which continued to be made by Defendants during the Class Period. This contradicts the Zurek Report opinion that the Alleged Revenue Driver Misrepresentations had no price impact after October 26, 2021. For example:

> Morgan Stanley (March 8, 2022): "Weaker China demand was recently highlighted by TSR, which expressed a cautious view on Chinese data center nearline demand in 2022 (more here), and this also aligns with STX commentary during F2Q earnings that some China data center build out is being pushed due to component shortages and/or budgets being shifted into COVID measures (more here). While the expected downside doesn't change our longer-term view, we believe this could reinvigorate the bear thesis that STX is still more levered to cyclical vs. secular growth, at least in the near-term. STX believes this disruption is largely isolated to F3Q and won't impact full year guidance for FY22 (12-14% revenue growth) or CY22 (3-6% revenue growth) at this point."[156]

> Rosenblatt Securities (March 8, 2022): "We see today's market reaction, down ~7%, to Seagate CEO Dave Mosley revising March quarter guidance to the lower end of previous guidance as overdone. FY22 and CY22 revenue guidance is maintained. Tactical issues related to a slower return following Chinese New Year's along with other worldwide disruption, has management prudently cautious. We see fundamental market demand for mass capacity HDD as robust."[157]

> Bank of America (March 9, 2022): "At a recent competitor conference management guided F3Q22 revenue/EPS to the lower end of previous guidance (previous revenue guidance was $2.75bn-$3.05bn, and EPS guidance $1.80-$2.20). This is primarily because revenue in some end markets, primarily in VIA (Video and Image Applications), has trended lower than expected coming out of Chinese New Year. STX has also seen lower than expected spend in smart city applications. Demand from Cloud is trending as expected. Based on its current view of demand, management maintained its revenue growth outlook for F22 (12-14% y/y), as well as C22 (3-6% y/y). We take our revenue/EPS ests for F3Q to the low end of the ranges, and model F22 revenue growth of 12% y/y and C22 revenue growth of 3% y/y. We view the headwinds as transitory and reiterate Buy on LT strong demand in Mass capacity/Nearline, improving visibility

---

[156] "Fireside Chat Highlights Near-Term Pressures," *Morgan Stanley*, March 8, 2022, at 1.
[157] "STX: Slight March Quarter Guidance Revision Due to Tactical Issues," *Rosenblatt Securities*, March 8, 2022, at 1.

afforded by long-term agreements (LTA), better HDD supply/demand which should support pricing and drive OM and GM improvements, common platform which reduces cost and time to market for new offerings, and strong capital return."[158]

83.    Furthermore, analyst commentary following the *Washington Times* article published on March 17, 2021, provides evidence that analysts were unaware of the extent to which revenue from Huawei was contributing to the Company's ability to meet or exceed revenue guidance and expectations. For example:

> Wedbush Securities (March 22, 2021): "Commerce Department investigation of shipments to Huawei. Per the Washington Times, Commerce is investigating STX's continued shipments of HDDs to Huawei as having circumvented US export restrictions. …. **We see limited financial ramifications should STX need to end shipments to the Chinese OEM**."[159]

> Argus Research (March 22, 2021, raising price target from $75 to $86): "According to multiple sources, Seagate is being investigated by the U.S. Commerce Department over product sales to Huawei that potentially breached sanctions imposed on the Chinese technology company. Overall sanctions were tightened in August 2020, after being implemented in May. **Despite the sanctions, various entities have been able to maintain limited commerce with Huawei. Seagate has not commented, and we will continue to monitor this situation**."[160]

84.    As documented above, analysts referenced and relied upon the Alleged Revenue Driver Misrepresentations when developing their assessments of the Company. Such reference provides reliable economic evidence that the alleged misrepresentations had front-end price impact and/or maintained the price of Seagate Common Stock at artificially inflated levels. Moreover, as I document in Section **V.E** below, analysts referenced and relied upon the relevant truth related to the alleged misrepresentations when updating their assessments of Seagate following the alleged

---

[158] "Lowering estimates on near-term revenue and margin headwinds," *Bank of America*, March 9, 2022, at 1.

[159] "Lifting Our Forecasts, but Struggling with Relative Valuation," *Wedbush Securities,* March 22, 2021, at 3 (emphasis added).

[160] "Analyst's Notes," *Argus Research*, March 22, 2021, at 4 (emphasis added).

42

corrective disclosure events, and they correspondingly lowered their expectations for the Company's revenues and price targets for Seagate Common Stock. This provides further evidence of the price impact of and/or the price maintenance caused by the Alleged Revenue Driver Misrepresentations, and supports the economic connection between the alleged misrepresentations and the relevant truth.

### E.  Analyst Commentary Regarding the Alleged Revelations of the Relevant Truth Provides Further Evidence of Back-End Price Impact

85.    Following the alleged corrective disclosures for both the Alleged Compliance and Revenue Driver Misrepresentations, analysts referenced the economic information at issue within both categories of the alleged misrepresentations. Such references provide evidence of the back-end price impact of both the Alleged Compliance Misrepresentations and the Alleged Revenue Driver Misrepresentations.

86.    Plaintiffs allege that the relevant truth behind the Alleged Compliance and Revenue Driver Misrepresentations came to light over a series of corrective disclosures, as described further below.[161] Analyst commentary following the alleged corrective disclosures supports the economic connection between the Alleged Compliance and Revenue Driver Misrepresentations and the alleged corrective disclosures, and provides further support of price impact. Moreover, despite Dr. Zurek's assertions about a lack of price impact regarding the Alleged Compliance Misrepresentations following March 17, 2021,[162] the evidence shows that Dr. Zurek ignores (i) Defendants' continued misstatements reasserting FDPR compliance well after that date and (ii) analyst commentary demonstrating the economic connection between the alleged misrepresentations and alleged corrective disclosures following each of the corrective disclosures. Furthermore, despite Dr. Zurek's assertions about a lack of price impact regarding the Alleged

---

[161] Complaint ¶¶ 111-130.
[162] *See e.g.*, Zurek Report ¶¶ 55, 58, 60.

Revenue Driver Misrepresentations following October 26, 2021, the evidence shows that Dr. Zurek ignores (i) Defendants' continued misstatements attributing Seagate's financial performance solely to legitimate, legal revenue drivers well after that date, and (ii) analyst commentary demonstrating the economic connection between the alleged misrepresentations and alleged corrective disclosures following each of the corrective disclosures.

87.    Plaintiffs allege that the relevant truth was first revealed on March 8, 2022 at the Morgan Stanley Technology, Media and Telecom Conference. [163] During the conference, Defendant Mosley disclosed that Seagate was "going to be at the lower end of [its financial guidance] ranges" for the upcoming quarter as a result of "disruption in" "…VIA in China[.]"[164] Defendant Mosley attributed the shortfall to a variety of "transitory" business factors including "freight logistics," while continuing to attribute Seagate's prior outperformance to legitimate demand dynamics.[165] Additionally, Defendant Mosley allegedly failed to disclose that the revenue weakness reflected the loss of illegal Huawei sales that had been materially driving the Company's financial performance.[166] In addition, Defendant Mosley continued to make alleged affirmative compliance assurances, citing the Company's adherence to export restrictions on Russia as evidence of Seagate's regulatory compliance culture.[167]

88.    Following this revelation, analysts attributed the revenue weakness to declining Chinese demand, while continuing to credit Defendants' characterizations of the headwinds as

---

[163] Complaint ¶¶ 7, 112-115, 262.
[164] Morgan Stanley Technology, Media and Telecom Conference, March 8, 2022, at 2. *See also* Complaint ¶¶ 7, 112-115, 262.
[165] Morgan Stanley Technology, Media and Telecom Conference, March 8, 2022, at 2, 9.
[166] Complaint ¶¶ 7, 115, 270.
[167] *Id* ¶ 115. *See also* Morgan Stanley Technology, Media and Telecom Conference, March 8, 2022, at 3.

44

"transitory."[168] Such reference within analyst commentary is consistent with Plaintiffs' allegation that the true source of revenue weakness, the permanent loss of Huawei sales, remained concealed:

89.    Following this, analysts commented on the Company's revenue disappointment:

Morgan Stanley (March 8, 2022): "The Video and Image Application (VIA) and China markets are driving incremental weakness and a more back-end loaded March quarter. While full year outlook remains unchanged and Seagate characterized the shortfall as 'transitory', lower near-term visibility suggests potential risk to the June quarter as well. [T]he expected downside doesn't change our longer-term view"[169]

…"Weaker China demand was recently highlighted by TSR, which expressed a cautious view on Chinese data center nearline demand in 2022, and this also aligns with STX commentary during F2Q earnings that some China data center build out is being pushed due to component shortages and/or budgets being shifted into COVID measures. While the expected downside doesn't change our longer-term view, we believe this could reinvigorate the bear thesis that STX is still more levered to cyclical vs. secular growth, at least in the near-term. STX believes this disruption is largely isolated to F3Q"[170]

UBS (March 8, 2022, lowering price target from $120 to $110): "Despite cloud remaining strong, STX highlighted the VIA (video and image applications) end market as weaker than expected over the past month with weakness seen in China."[171]

90.    Then, on July 21, 2022, the relevant truth was allegedly further revealed when Seagate reported declining year-over-year revenues of 12.8%, missing the Company's entire revenue guidance range by more than $150 million.[172] The Company lowered its guidance for the coming quarter's revenue accordingly, adjusting projections downward by 5% and reporting that

---

[168] *See e.g.,* "Fireside Chat Highlights Near-Term Pressures," *Morgan Stanley,* March 8, 2022, at 1 ("While full year outlook remains unchanged and Seagate characterized the shortfall as 'transitory'…"); "Lowering estimates on near-term revenue and margin headwinds," *Bank of America*, March 9, 2022, at 1 ("We view the headwinds as transitory and reiterate Buy…").
[169] "Fireside Chat Highlights Near-Term Pressures," *Morgan Stanley,* March 8, 2022, at 1.
[170] *Id*.
[171] "Adjust Model Post Updated Guidance," *UBS,* March 8, 2022, at 1.
[172] Complaint ¶ 7, 117-121.

it was cutting HDD production because of customer "inventory overages" in China.[173] Plaintiffs allege this disclosure further revealed the consequences of the Alleged Revenue Driver Misrepresentations and the Alleged Compliance Misrepresentations, as the revenue decline reflected the continuing impact of the loss of illegal Huawei sales that Defendants had previously attributed to broad-based legitimate demand.[174] Defendants again continued to attribute the decline solely to legitimate factors, citing "impacts from COVID lockdowns in Asia, non-HDD component shortages, and global inflationary pressures" rather than disclosing the permanent loss of Huawei HDD sales as a material revenue driver.[175]

91.    Analysts expressed surprise in response to the disclosure and responded by lowering price targets for the Company. Deutsche Bank analysts noted that the magnitude of the shortfall was greater than anticipated, even given expected macroeconomic headwinds. For example:

> Rosenblatt Securities (July 21, 2022, lowering price target from $100 to $95): "Management noted impacts from COVID lockdowns in Asia, non-HDD component shortages and global inflationary pressures as major headwinds in the June quarter. These impacts led mass capacity revenue to be flat q/q at $1.9B. Management noted that VIA sales improved during the quarter, but remain impacted by COVID lockdowns and expect demand to resume once restrictions ease in Asia."[176]

> Deutsche Bank (July 21, 2022, lowering price target from $82 to $75): "[T]he magnitude of the F1Q revenue cut is larger than we had expected driven by inventory adjustments across most segments. While management appears confident that inventory adjustments should be completed by the end of F1Q and is expecting FY23 revenue to be flat or up y/y, we are more skeptical about the

---

[173] Complaint ¶ 117.
[174]  Q4 2022 Earnings Call Transcript, July 21, 2022, at 7. *See also* Complaint ¶¶ 107, 117.
[175] Q4 2022 Earnings Call Transcript, July 21, 2022, at 3. *See also* Complaint ¶ 120.
[176] "STX: Correction in Place; Expectations for Sequential Growth to Resume," *Rosenblatt Securities*, July 21, 2022, at 1.

macro environment that could impact cloud and enterprise spending in 1H CY23."[177]

Wedbush Securities (July 22, 2022, lowering price target from $85 to $75): "Seagate meaningfully missed expectations, and guided below forward Street estimates to an even greater degree. With STX having been viewed as potentially somewhat insulated from economic disruption due to its significant exposure to the cloud (generally considered the healthiest end market), we believe the magnitude of STX's shortfall was not anticipated by the investment community."[178]

Morgan Stanley (July 22, 2022, lowering price target from $89 to $84): "Overall, June quarter results were worse than expected, with revenue of $2.6B and EPS of $1.59 coming in 7% and 19% below our expectations. While a slow recovery in China impacting VIA and continued legacy weakness were largely expected, management flagged that customer inventories began to spike towards the middle of June due to 1) non- HDD component shortages, which impacted the pace of data center build out, and 2) macro weakness in consumer market, with demand 'rapidly' deteriorating at the end of the quarter."[179]

UBS (July 22, 2022, lowering price target from $100 to $95): "STX is being hit by an inventory correction in its consumer end markets and demand in China is generally very poor due to COVID lockdowns that are only slowly relenting. … Exposure to waning end consumer demand translated into a sharp decline in STX's legacy business late in the quarter, as lockdowns and surging inflation impacted spending on PCs, notebooks and external drives. Consumer headwinds may linger in the near-term, with legacy still accounting for around ~20% of revenues, though we believe most of the likely downside has already been reflected in the CQ2 dip with CQ3 potentially representing the bottom."[180]

92.     The Complaint alleges that relevant truth was further revealed on October 26, 2022, when Seagate disclosed in a Form 8-K that it had received a Proposed Charging Letter from the BIS two months earlier alleging violations of U.S. export restrictions.[181] Plaintiffs allege this

---

[177] "A miss-and-miss, but will inventory adjustments be done in one quarter?" *Deutsche Bank*, July 21, 2022, at 1.

[178] "HAMR Progress a Silver Lining in a Disappointing Report," *Wedbush Securities*, July 22, 2022, at 1.

[179] "Will Demand Rebound in F2H23 After Near-Term Inventory Correction?" *Morgan Stanley*, July 22, 2022, at 1.

[180] "Trimming Estimates on Near-Term Inventory Digestion, But LT Growth Thesis Remains Intact," *UBS*, July 22, 2022, at 1.

[181] Complaint ¶¶ 122-125, 204-208.

disclosure was particularly significant in relation to the Alleged Compliance Misrepresentations, as it represented the first explicit regulatory confirmation that Seagate's repeated assurances of FDPR compliance had been false.[182] In the wake of this revelation, Defendants again issued misleading compliance assurances on the same day, stating that Seagate "did not engage in prohibited conduct" and was "committed to compliance through its global team of international trade compliance and legal professionals."[183] Following this disclosure, analysts significantly revised their assessments of Seagate's regulatory risk and compliance posture, with several cutting their price targets and downgrading the stock in response to the charging letter. For example:

> Barclays (October 26, 2022, lowering price target from $65 to $50): "On top of that, our suspicions that the company was over-shipping to China were confirmed with a potential BIS fine regarding Huawei **(we estimate the impact could be in the $100s of millions**) that is now an ongoing overhang and could wipe out an entire quarter of FCF in the coming quarters."[184]

> BNP Paribas (October 26, 2022, lowering price target from $70 to $55): "However, we'd like to see … clarity on the BIS letter before becoming more constructive … Perhaps the largest known unknown is the outcome of the proposed charging letter from the U.S. BIS that alleges STX violated export regulations to a customer on the Entity List between 8/2020 and 9/2021 (Huawei?). The timing of ruling and penalties, if any, remain unresolved."[185]

> Bank of America (October 26, 2022, lowering price target from $85 to $70): "STX reported receiving a proposed charging letter (PCL) from the U.S. Commerce Department's Bureau of Industry and Security (BIS) alleging violations of export regulations for providing hard drives to a customer on the BIS Entity List between Aug 2020 and Sep 2021. STX believes it has not engaged in prohibited conduct. **We see low risk to revenues (Shipments stopped in Sep 21) but hard to size any other impacts.**"[186]

---

[182] Complaint ¶¶ 122-125.

[183] Seagate Technology Holdings, Form 8-K, October 26, 2022. *See also* Complaint ¶ 204.

[184] "Another Cut Exposes More Questions than Answers," *Barclays*, October 26, 2022, at 1 (emphasis added).

[185] "Controlling The Controllables," *BNP Paribas*, October 26, 2022, at 1.

[186] "Is Dec qtr the bottom? PO to $70," *Bank of America*, October 26, 2022, at 1 (emphasis added).

Credit Suisse (Oct. 26, 2022, lowering price target from $65 to $60): "We see [the proposed charging letter] as an additional overhang until resolved. … Risks include potential penalties related to Huawei sales"[187]

Rosenblatt Securities (October 26, 2022, lowering price target from $80 to $60): "The company announced that on August 29th, it received a letter from the U.S Commerce Department saying that the company violated export control laws by providing hard disk drives to a customer on a trade entity. Seagate's management **commented that the company has responded to the letter and believe that the company has complied with all relevant export control laws and regulations**. No further comment was given from Seagate on the matter."[188]

Morgan Stanley (October 26, 2022, lowering price target from $57 to $54): "[T]he presence of the charging letter introduces a new stock overhang, and 1) could result in a sizable fine (potentially as high as hundreds of millions of dollars depending on the size of the transactions) if STX [is] formally charged, and/or 2) could potentially impact STX's ability to ship to other vendors in China moving forward. For reference, China makes up roughly 1/3 of STX's revenue."[189]

Wedbush Securities (October 26, 2022, lowering price target from $55 to $45): "We don't know whether STX will be found to have violated export restrictions and/or what penalty might be imposed; however, we would note any investigation and/or litigation will likely result in some expense for STX with the potential for future fines."[190]

UBS (October 27, 2022, lowering price target from $85 to $55, downgrading rating from Buy to Neutral): "We are cutting our PT from $85 to $55 and downgrading the stock to Neutral. The new US Dept of Commerce charge that STX shipped in 2H:20/1H:21 to customers on the Entity List (reportedly Huawei) simply creates too much potential risk and offsets what is otherwise a fundamental set-up that is pretty good, and somewhat similar to MU. While it is hard to handicap the outcome of such an inquiry, Reuters is reporting that STX could face penalties up to a multiple of 2x the value of the transactions. It is hard to know, but we believe that prior to ceasing shipments upon being placed on the EL, WDC was shipping in the range of ~$200MM/Q to Huawei. It seems

---

[187] "F1Q23 Review; Inventory Correction Underway, Question On Duration With HAMR On The Horizon," *Credit Suisse*, October 26, 2022, at 1.

[188] "STX: Inventory Correction in Full Swing; Management Lowering Production and Costs; Lowering PT," *Rosenblatt Securities*, October 26, 2022, at 2 (emphasis added).

[189] "Dec Should Be The Trough, But Risk Factors Are Elevated," *Morgan Stanley*, October 26, 2022, at 2.

[190] "The Correction in the Mirror May Be Larger Than It Appears," *Wedbush Securities*, October 26, 2022, at 4.

plausible based on STX's geographic exposure and high level commentary as to how this breaks out, that STX could have conservatively shipped ~$100-200MM/Q to Huawei. **There is a wide range of outcomes,** but if the maximum penalty were imposed this could be a number larger than STX's current stated ~$500MM of excess liquidity on its balance sheet stemming from cash on hand together with the revolver."[191]

93.     The relevant truth was allegedly fully revealed to the market on April 19, 2023, when Seagate and BIS announced a settlement in which Seagate admitted that the Company had illegally sold over $1.1 billion in HDDs to Huawei in violation of the FDPR, that senior management had repeatedly ramped up illegal sales despite receiving direct warnings that such sales were unlawful, and that BIS had imposed the largest standalone civil penalty in agency history of $300 million.[192] In addition to the fine, the settlement agreement also imposed additional restrictions on the Company, including audits of Seagate's export controls compliance program and a five-year suspension of Seagate's export privileges contingent on adherence to all other aspects of the agreement.[193] Any lapse of the suspension conditions could have resulted in the revoking of all of Seagate's existing BIS licenses.[194]

94.     Defendants' Opp. Brief argues that investors' reaction to the BIS settlement was positive, "because Seagate negotiated a lower penalty than expected and the settlement eliminated any uncertainty about the result of BIS's investigation."[195] The Opp. Brief also incorrectly claims that I conceded this disclosure did not cause a decline in Seagate's stock price.[196] However, I actually explained the following in testimony:

---

[191] "Downgrade To Neutral: New Risks Offset An Otherwise Solid Recovery Story," *UBS*, October 27, 2022, at 1 (emphasis added).
[192] BIS Settlement at 9. *See also* Complaint ¶¶ 126-128.
[193] BIS Settlement, at 11-12.
[194] BIS Settlement, at 12.
[195] Opp. Brief, at 17.
[196] Opp. Brief, at 18.

Q. All else equal, if investors had expected Seagate to pay a much larger penalty than $300 million, would the announcement of a $300 million penalty be expected to have a positive impact on Seagate's stock price?

A. It is possible that if every single investor expected, let's say, a $600 million penalty and there was an announcement of a $300 million penalty, then it's possible or at least conceivable that in that type of scenario the announcement of a $300 million penalty could lead to a positive increase in the stock price if that's the only information that was disclosed.[197]

95.    Moreover, far from the BIS penalty being "below expectations," evidence indicates that market participants reported a range of expectations for any potential fine resulting from the BIS investigation. As seen in analyst reactions to the disclosure of the BIS Charging Letter in October 2022 and in their analysis continuing until the charges were formalized in April 2023, there was considerable uncertainty as to the ultimate size of the eventual penalty (if any), with one analyst referring to the investigation as "unquantifiable." In fact, even after the penalty amount was announced, the total figure exceeded the prior expectations among some market participants. For example:

BNP Paribas (October 26, 2022, lowering price target from $70 to $55): "However, we'd like to see … clarity on the BIS letter before becoming more constructive. … **Perhaps the largest known unknown is the outcome of the proposed charging letter from the U.S. BIS that alleges STX violated export regulations** to a customer on the Entity List between 8/2020 and 9/2021 (Huawei?). **The timing of ruling and penalties, if any, remain unresolved.**"[198]

Morgan Stanley (October 26, 2022, lowering price target from $57 to $54): "[T]he presence of the charging letter introduces a new stock overhang, and 1**) could result in a sizable fine** (potentially as high as hundreds of millions of dollars depending on the size of the transactions) **if STX [is] formally charged**, and/or 2) could potentially impact STX's ability to ship to other vendors in China moving forward. For reference, China makes up roughly 1/3 of STX's revenue."[199]

---

[197] Cain Deposition. 127:4-20 (objection omitted).
[198] "Controlling The Controllables," *BNP Paribas*, October 26, 2022, at 1 (emphasis added).
[199] "Dec Should Be The Trough, But Risk Factors Are Elevated," *Morgan Stanley*, October 26, 2022, at 2 (emphasis added).

<u>Wedbush Securities (October 26, 2022, lowering price target from $55 to $45)</u>: "**We don't know whether STX will be found to have violated export restrictions and/or what penalty might be imposed**; however, we would note any investigation and/or litigation will likely result in some expense for STX with the potential for future fines."[200]

<u>Wells Fargo Securities (January 25, 2023)</u>: "Outcome from **ongoing BIS investigation (re: Huawei) remains unquantifiable risk**."[201]

<u>UBS (January 26, 2023)</u>: "In our eyes, HDD remains one of the few industries that we can reasonably argue for significant gross margin improvement over time but we remain scared by the **potential for a big fine related to the BIS actions as there is such a wide range of potential outcomes**."[202]

<u>Evercore ISI (April 15, 2023)</u>: "We also believe **any resolution with the BIS that results in an immaterial fine for Seagate's alleged EAR violations would be a huge positive for shares** (though no guarantee that we receive an update here this week)."[203]

<u>Cowen and Company (Apr. 20, 2023, lowering price target from $72 to $70)</u>: "The $300M settlement (**we est ~$250M**)"[204]

96.     Furthermore, as discussed above, the totality of information revealed by the April 2023 settlement extended well beyond the $300 million penalty. The BIS settlement disclosed that Seagate had admitted to 429 separate violations, that senior management had knowingly ramped up sales despite receiving warnings they were unlawful, that Seagate had lost Huawei as a 'strategic customer,'[205] eliminating a revenue stream that Plaintiffs allege contributed as much as 13.42% of Seagate's quarterly revenues, as shown in **Exhibit 2**, during the Class Period, and that

---

[200] "The Correction in the Mirror May Be Larger Than It Appears," *Wedbush Securities*, October 26, 2022, at 4 (emphasis added).

[201] "STX: Better than Expected – GM% Recovery, Increased HAMR Confidence, and Path Back to >$5/sh. EPS in Focus," *Wells Fargo Securities*, January 25, 2023, at 1 (emphasis added).

[202] "Recovery Is Here, But BIS Situation Still An Overhang," *UBS*, January 26, 2023, at 1 (emphasis added).

[203] "Weekly Muse-ings: Earnings Have Arrived Once Again (ASML, LRCX, TSMC and STX)," *Evercore ISI*, April 15, 2023, at 16 (emphasis added).

[204] "Focusing On What Can Be Controlled," *Cowen and Company*, April 20, 2023, at 1 (emphasis added).

[205] BIS Settlement ¶ 15 at 5, ¶ 26 at 8, ¶ 28 at 9.

Seagate had admitted to selling over $1.1 billion in HDDs to Huawei in violation of the FDPR.[206] Further, the settlement included non-monetary penalties that could serve to reduce the Company's potential export market, including audits and a suspended five-year suspension of the Company's export privileges. These ***negative*** disclosures are consistent with my event study results, which find a ***negative*** abnormal return in Seagate's Common Stock on April 20, 2023, statistically significant at the 99% level.

97.    Plaintiffs allege this final disclosure revealed the full scope of the Alleged Compliance Misrepresentations, confirming that Defendants' repeated assurances of FDPR compliance had been false throughout the entire Class Period, and that the Company had knowingly concealed multiple direct warnings that its sales were illegal, including the "FDP rule notification" letter from a key supplier.[207] Following this disclosure, analysts reassessed the full extent of Seagate's admitted misconduct and the implications for the Company's normalized revenue base and future prospects. For example:

> Susquehanna (April 20, 2023, lowering price target from $35 to $32): "STX is also required to pay $15M per quarter for the next five years ($300M total) after reaching a settlement with the U.S. Department of Commerce's Bureau of Industry and Security (BIS) for alleged sales to Huawei after they were placed on the banned entity list. The BIS settlement will, in our view, have further adverse impact on STX's HDD EB shipments as STX will no longer be able to ship to Huawei (that in the past had driven a material uptick in demand in the upcycle)."

> …"They also have $108M of cancellation fees that STX is obligated to pay suppliers by December '23 and $15M quarterly payments (for the next five years) after reaching a settlement with the U.S. Department of Commerce's Bureau of Industry and Security (BIS) for alleged sales to Huawei after they were placed on the banned entity list.These pulls on cash are leading STX to

---

[206] BIS Settlement at 9. *See also* Complaint ¶¶ 126-129.
[207] Complaint ¶¶ 126-128.

conduct sale-leasebacks on some of their manufacturing facilities in order to generate cash."[208]

Evercore ISI (April 20, 2023, lowering price target from $70 to $65): "What is Normalized Demand for Seagate? … Seagate between Aug. 17, 2020 and Sept. 29, 2021 witnessed a revenue/EB windfall associated with ongoing shipments to Huawei, where peers ceased shipments due to export restrictions (see below on settlement regarding $1.1B+ in STX HDD sales to Huawei)."[209]

Cowen and Company (Apr. 20, 2023, lowering price target from $72 to $70): "The $300M settlement (we est ~$250M)…"[210]

Deutsche Bank (Apr. 20, 2023, lowering price target from $60 to $55): "While we view the company's settlement as not ideal, we recognize that it removes downside uncertainties related to the review."[211]

Oppenheimer (Apr. 21, 2023): "Seagate shipped 7.4 million hard drives to Huawei on 429 occasions between August 2020 and September 2021 without obtaining an export license from the U.S. Department of Commerce's Bureau of Industry and Security. Those drives were worth around $1.104 billion back then. Seagate has agreed to pay the imposed $300 million fine in quarterly installments of $15 million over five years beginning October 2023. The $300 million penalty is more than double the estimated net profit."[212]

98.     Separately, Dr. Zurek suggests that the statistically significant declines in Seagate's Common Stock price following the alleged corrective disclosures may have been caused, at least in part, by industry-wide declines in revenue due to geopolitical and macroeconomic events rather than disclosures of the relevant truth.[213] This assertion is speculative and unfounded. While Dr. Zurek observes general factors purportedly affecting the computer hardware industry, he offers no empirical evidence connecting those industry-wide trends to the specific timing and magnitude of

---

[208] "Seagate: Thesis Playing Out; Recovery Timeline Extended/Breaching Debt Covenants," *Susquehanna*, April 20, 2023, at 1, 3.

[209] "Still Searching for a Bottom as Nearline Inventory Correction Continues," *Evercore ISI*, April 20, 2023, at 4.

[210] "Focusing On What Can Be Controlled," *Cowen and Company*, April 20, 2023, at 1.

[211] "F3Q Results: Recovery pushed as macro concerns weigh on demand," *Deutsche Bank*, April 20, 2023, at 2.

[212] "Daily Chip Clips," *Oppenheimer*, April 21, 2023, at 1.

[213] Zurek Report ¶¶ 112-113, 122-123, 132-133, 144-145.

Seagate's stock price movements.

99.    Furthermore, Dr. Zurek fails to explain why the event study methodology—a tool designed to control for market and industry changes—would not account for these purported industry changes. As explained in my Opening Report, by modeling how Seagate's stock price returns typically move relative to an overall market index and an industry index, my event study measures the "abnormal" stock return, which represents the component of the return that is not attributable to market-wide or industry-wide movements. Therefore, the identification of a large, statistically significant negative abnormal return for Seagate is consistent with price impact driven by idiosyncratic information rather than the general industry trends speculated by Dr. Zurek.

100.    In summary, following the alleged corrective disclosure events, analysts referenced and relied upon the relevant truth related to the Revenue Driver and Compliance Misrepresentations, and correspondingly lowered price targets for Seagate Common Stock. Furthermore, my event study identifies statistically significant abnormal declines in the price of Seagate's Common Stock following each of the alleged corrective disclosures after accounting for market- and industry-wide trends. Taken together, these findings further demonstrate the price impact of the Alleged Revenue Driver and Compliance Misrepresentations.

F. **The Zurek Report Provides Evidence of Price Impact Based on the March 17, 2021 *Washington Times* Article**

101.    The Zurek Report documents that on March 17, 2021 the *Washington Times* published an article, from which "the market learned that the BIS was investigating Seagate and 'suspected [it] of improperly selling hard drives to Chinese tech giant Huawei Technologies.'"[214] Dr. Zurek's event study calculates a decline in Seagate's Common Stock price on the next available trading day following this disclosure, statistically significant at the 95% level.[215] My event study

---

[214] Zurek Report ¶ 14.
[215] Zurek Report, Exhibit 1.

also documents a statistically significant decline at the 95% level. Moreover, the Zurek Report documents that multiple research analysts referenced and relied on the information disclosed in the Washington Times article.[216] Thus, the Zurek Report provides evidence of price impact from the alleged misrepresentations.

102.    However, the Zurek Report also notes that following this disclosure, analysts assessed "limited financial ramifications" if Seagate were forced to cease shipments to Huawei.[217] This view among analysts provides evidence that the market did not have access to the full relevant truth that was allegedly revealed in the subsequent corrective disclosures. My analyses in **Sections IV** and **V** further demonstrate that investors did not have access to the full relevant truth based on this March 17, 2021 disclosure. As a result, the March 17, 2021 disclosure, along with my analyses of the Alleged Compliance Misrepresentations, the Alleged Revenue Driver Misrepresentations, and the alleged corrective disclosures, demonstrate price impact in this matter.

## VI.    The Zurek Report Does Not Interact with Plaintiffs' Theory of Liability

103.    In the preceding sections, I provide reliable economic evidence that the alleged misrepresentations impacted Seagate's Common Stock price. While the Zurek Report purports to assess price impact of the alleged misrepresentations, from an economics perspective, it fails to interact with Plaintiffs' theory of liability. This flaw renders all of Dr. Zurek's analyses and opinions unreliable and ultimately irrelevant. Dr. Zurek explains that for purposes of his analysis, Counsel gave him the following instruction:

> "Plaintiffs' liability theory implies that Seagate should have disclosed during the Proposed Class Period, at the time the Alleged Misrepresentations were made, that (a) Seagate continued to sell HDDs to Huawei until September 2021 based on its interpretation of the FDPR, subjecting the Company to the risk that the U.S. Department of Commerce's Bureau of Industry and Security ('BIS') could disagree with the Company's interpretation and conclude that such sales did not comply with

---

[216] Zurek Report ¶ 59.
[217] *Id*.

FDPR requirements after the export restrictions on sales to Huawei became effective (the 'Alleged Truth Regarding Compliance'); and (b) Seagate's HDD sales to Huawei were among the factors that drove Seagate's reported revenue through its fiscal Q1 2022 (ending October 1, 2021), and Seagate's declining revenues in subsequent quarters were attributable in part to the cessation of sales to Huawei (the 'Alleged Truth Regarding Revenue Drivers,' and collectively, the 'Alleged Truth')."[218]

104.    In other words, ████████████████████████████████████████████

████████████████████████████████████████████████████████████[219]

However, ████████████████████████████████████████████████



████████████████████████████████████████████████[220]

105.    Plaintiffs' liability theory is not merely that Seagate subjected itself to the risk that the BIS could disagree with Seagate's interpretation of the FDPR. Because all of Dr. Zurek's analyses focus on a distorted understanding of Plaintiffs' allegations—per his instruction from Defense Counsel—his price impact assessments of the Alleged Compliance Misrepresentations are thus flawed, unreliable, and ultimately irrelevant from an economics perspective.

106.    Further, Dr. Zurek assumes that the Alleged Revenue Driver Misrepresentations pertain merely to Seagate's HDD sales to Huawei being "among the factors that drove Seagate's reported revenue through its fiscal Q1 2022." However, from an economics perspective, Dr. Zurek

---

[218] Zurek Report ¶ 9.
[219] *See* Zurek Deposition at 128:5-24 (████████████████████████████████████ ████████████████████████████████████ )
[220] Complaint ¶ 3, §VI.A. This is also consistent with internal management communications showing that Seagate personnel were likely obscuring references to Huawei in certain reports (*See* Seagate_000094774 at -74: "████████████████████████████ ████████████████████████████ ).

fails to evaluate the magnitude of the concealed revenue reliance. Plaintiffs allege that during the Class Period, Defendants engaged in a scheme and made false and misleading statements and/or omissions to mislead investors regarding the extent to which Seagate's revenue was attributable to, or reliant on, HDD sales to Huawei – including claiming that it was not "material" to the Company's guidance.[221] Plaintiffs allege, however, that Seagate was forced to lower its earnings guidance due to the cessation of sales to Huawei, which had been a driver of its revenue performance during the Class Period.[222] ███████████████████████████████

████████████████████████████████████████████[223] For example:

- ████████████████████████████████████[224]

- ████████████████████████████████████████
████████████████████████████████████████
████████████████████[225]

- ████████████████████████████████████████
████████████████████[226]

107.    Because all of Dr. Zurek's analyses focus on a distorted understanding of Plaintiffs' allegations—per his instruction from Defense Counsel—his price impact assessments of the Alleged Revenue Driver Misrepresentations are thus flawed, unreliable, and ultimately irrelevant from an economics perspective.

108.    Moreover, Dr. Zurek's opinions about the lack of price impact from the guidance

---

[221] Complaint ¶ 215-217.
[222] *Id.* ¶ 262.
[223] ████████████████████████████████████████████████
████████████████ *See e.g.,* Zurek Deposition at 36:25-37:11.
[224] *See e.g.,* Seagate_000128375 at 2.
[225] *See e.g.,* Seagate_000223210 at 3, 5, 9, 10, Seagate_000094127 at 25-26, Seagate_000046420 at -27.
[226] *See* Seagate_000009363 at STX002647912 ("████████████████████████████
████████████████████████████████).

reductions in the alleged corrective disclosures are premised upon his assertion that Plaintiffs "do not allege Seagate's [previously-issued] financial guidance … to have been false or misleading."[227] Even though he concedes these guidance reductions and earnings announcements contained within the alleged corrective disclosures caused statistically significant declines in Seagate's Common Stock price, he simply opines that they cannot support a finding of price impact because Plaintiffs did not allege the previously-issued guidance to be false or misleading.

109.    Dr. Zurek provides no citation, economic evidence, or legal authority for his claim that prior guidance must be alleged as a false or misleading statement in order for subsequent corrective disclosures to indicate price impact. I am not aware of any such authority. In essence, Dr. Zurek requires a mirror image between an alleged misrepresentation and a corrective disclosure. I understand that no such requirement exists in order for corrective disclosures to support a finding of price impact from alleged misrepresentations. As a result, as a matter of economics, the Zurek Report's price impact opinions are flawed, unreliable, and ultimately irrelevant.

## VII.    Conclusion

110.    In summary, Dr. Zurek's opinions and Defendants' Opp. Brief critiques of my Opening Report are flawed and unpersuasive. In this report I document reliable economic evidence consistent with price impact for both the Alleged Compliance Misrepresentations and the Alleged Revenue Driver Misrepresentations. I further illustrate that there is no mismatch between the alleged misrepresentations put forward by Plaintiffs and the subsequent revelations of the relevant truth provided by the alleged corrective disclosures.

---

[227] Zurek Report ¶¶ 106, 116, 126, 138.

I declare under the penalty of perjury that the foregoing is true and correct.

Matthew D. Cain

**Appendix A**

# Matthew D. Cain, Ph.D.                                    March 2026

E-mail: mdcain@outlook.com
Mobile: 574-485-8065

## Education

Ph.D., Finance, August 2007                    Purdue University, West Lafayette, IN
B.S., Finance, May 2001                        Grove City College, Grove City, PA

## Professional and Academic Experience

*Senior Fellow*, New York University School of Law, 2024-Present

*Senior Fellow*, Berkeley Center for Law and Business, 2019-2024

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

## Publications

What is Price Impact? How the *Goldman* Decisions are Reshaping Shareholder Class Actions (with Per Axelson), *Berkeley Business Law Journal* 22:2, 441-465 (2025).

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

**Presentations**
- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway

A-2

- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania; Napa
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**<u>Journal Referee</u>**: *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law

LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2026

LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2023

University of Notre Dame, Mendoza College of Business

FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management

MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008

MGMT 610: Financial Management I (MBA Core), Fall: 2007

**Expert Witness Experience**

- *Local 272 Labor-Management Pension Fund, et al. v. The Walt Disney Company, et al.*, Case No. 2:23-cv-03661-CBM (C.D. Ca.). Report March 2026.

- *Bucks County Employees Retirement System, et al. v. Norfolk Southern Corporation, et al.*, Case No. 1:23-cv-04175-SDG (N.D. Ga.). Report February 2026.

- *Michael Farzad and Gregory Perri, et al. v. Trasimene Capital FT, LP II, Trasimene Capital Management, LLC, William P. Foley, II, Richard N. Massey, Erika Meinhardt, Mark D. Linehan, C. Malcolm*, C.A. No. 2023-0193-JTL (Del. Chancery). Report February 2026.

- *City of Fort Lauderdale General Employees' Retirement System, et al. v. Holley Inc., et al.*, Case No. 1:23-cv-00148-GNS (W.D. Ky.). Report January 2026.

- *Securities and Exchange Commission v. Anthem Hayek Blanchard and Anthem Holdings Company*, Case No. 2:24-cv-02437-KHV-GEB (D. Kan.). Report January 2026.

- *In re SVB Financial Group Securities Litigation*, Case No. 3:23-cv-01097-NW (N.D. Ca.). Report January 2026. Rebuttal Report March 2026.

- *In re Seagate Technology Holdings plc Securities Litigation*, Case No. 3:23-cv-03431-RFL (N.D. Ca.). Report December 2025. Deposition January 2026.

- *United States of America v. Andrew Left*, CR No. 2:24-cr-00456-TJH (C.D. Ca.). Declaration December 2025. Declaration February 2026.

- *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund, et al. v. iRhythm Technologies, Inc., et al.*, Case No. 3:24-cv-706 (N.D. Ca.). Report November 2025. Deposition December 2025. Rebuttal Report February 2026.

- *In re Virtu Financial, Inc. Securities Litigation*, Case No. 1:23-cv-03770 (E.D. N.Y.). Report October 2025. Deposition December 2025.

A-4

- *In re SolarEdge Technologies, Inc. Securities Litigation*, Case No. 1:23-cv-09748 (S.D. N.Y.). Report October 2025. Deposition January 2026. Rebuttal Report February 2026.

- *Joe Fasano, et al. v. Dangdang Holding Company, Ltd., et al.*, Case No. 01-22-0003-8285 (AAA). Report September 2025. Rebuttal Report October 2025.

- *KAYNE MICHAEL MIDDLETON v. TELUS INTERNATIONAL (CDA) INC., et al.*, Case No. S-248620 (Supreme Court of British Columbia, Vancouver Registry). Report August 2025.

- *In re Doximity, Inc., Securities Litigation*, Case No. 5:24-cv-02281 (N.D. Ca.). Report August 2025. Rebuttal Report October 2025. Deposition November 2025.

- *In re The Estee Lauder Co., Inc. Securities Litigation*, Case No. 1:23-cv-10669 (S.D. N.Y.). Report July 2025. Deposition December 2025.

- *Genesee County Employees' Retirement System, et al., v. DocGo Inc., et al.*, Case No. 1:23-cv-09476 (S.D. N.Y.). Report July 2025.

- *YVONNE DOLBEC c. BANK OF MONTREAL, et al.*, Case No. 500-06-001335-245 (Province of Quebec, District of Montreal). Report May 2025.

- *In re National Instruments Corporation Securities Litigation*, Case No. 1:23-cv-10488 (S.D. N.Y.). Report May 2025. Deposition June 2025. Report July 2025. Rebuttal Report November 2025. Deposition November 2025.

- *MOUVEMENT D'ÉDUCATION ET DE DÉFENSE DES ACTIONNAIRES c. CAE INC., MARC PARENT, and SONYA BRANCO*, Case No. 500-06-001312-244, (Province of Quebec, District of Montreal). Report April 2025.

- *In re StoneCo Ltd. Securities Litigation*, Case No. 1:21-cv-09620 (S.D. N.Y.). Report April 2025. Declaration November 2025.

- *In re UiPath, Inc. Securities Litigation*, Case No. 1:23-cv-07908 (S.D. N.Y.). Report February 2025.

- *Ali Diabat, et al., v. Credit Suisse Group AG, et al.*, Case No. 1:23-cv-5874 (S.D. N.Y.). Report December 2024. Rebuttal Report January 2025.

- *San Antonio Fire and Police Pension Fund, et al., v. Dentsply Sirona Inc., et al.*, Case No. 1:22-cv-06339 (S.D. N.Y.). Report November 2024. Rebuttal Report February 2025. Report September 2025. Deposition October 2025.

- *Steven Leventhal, et al. v. Chegg, Inc., et al.*, Case No. 5:21-cv-09953 (N.D. Ca.). Declaration November 2024.

- *Miami Firefighters' Relief & Pension Fund v. Carl C. Icahn et al.*, Index No. 657447/2019 (N.Y. Sup. Ct.). Declaration September 2024. Rebuttal Report October 2024.

- *Securities and Exchange Commission v. American Renal Associates Holdings, Inc., et al.*, Case No. 22-cv-10651-NMG (D. Mass.). Report June 2024. Deposition September 2024.

A-5

- *Securities and Exchange Commission v. Kevin A. Van de Grift and Gil Friedman*, Case No. 1:23-cv-01491 (S.D. N.Y.). Report June 2024. Declaration November 2024.

- *El Paso Firemen & Policemen's Pension Fund, et al. v. InnovAge Holding Corp., et al.*, Case No. 21-cv-02770-WJM-SKC (D. Co.). Report May 2024. Rebuttal Report October 2024.

- *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM (D.D.C.). Report February 2024. Deposition April 2024. Rebuttal Report June 2024. Report July 2024. Hearing August 2024. Rebuttal Report October 2024.

- *In the Matter of Joshua Abrahams*, File No. 3-21214, (SEC Admin. Proc.). Rebuttal Report February 2024.

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.). Report February 2024.

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024. Deposition April 2024. Rebuttal Report December 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al.*, Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.). Report January 2024. Deposition March 2024. Rebuttal Report July 2024. Declaration September 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024. Report February 2025. Rebuttal Report August 2025. Deposition August 2025.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024. Rebuttal Report March 2024. Report July 2024. Deposition August 2024. Rebuttal Report September 2024. Declaration January 2026.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024. Rebuttal Report February 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023. Report December 2024. Deposition March 2025.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023. Rebuttal Report January 2024. Report September 2024. Rebuttal Report November 2024. Deposition January 2025.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

A-6

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022. Report March 2024.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021. Rebuttal Report March 2024. Report September 2024. Deposition November 2024. Rebuttal Report January 2025.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

A-8

**Appendix B**

## Documents Considered

**Case Documents:**

Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws dated September 12, 2024, Case No. 3:23-cv-03431-RFL.

Expert Report of Matthew D. Cain, Ph.D. dated December 16, 2025.

Defendants' Opposition to Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Approval of Class Counsel dated February 10, 2026.

Expert Report of Paul Zurek, Ph.D. dated February 10, 2026.

**Deposition Testimony:**

Deposition of Matthew D. Cain, Ph.D. dated January 30, 2026.

Deposition of Paul Zurek, Ph.D. dated March 18, 2026.

**Discovery Documents:**

Seagate_000046420

Seagate_000009363

Seagate_000094127

Seagate_000094774

Seagate_000128375

Seagate_000223210

**Academic Articles:**

Ball, R., & Brown, P. (1968). An empirical evaluation of accounting income numbers. *Journal of Accounting Research*, *6*, 159–178.

Beaver, W. H. (1968). The information content of annual earnings announcements. *Journal of Accounting Research*, *6*, 67–92.

Beaver, W. H. (1998). *Financial reporting: An accounting revolution* (3rd ed.).

Beaver, W. H., McNichols, M. F., & Wang, Z. Z. (2020). Increased market response to earnings announcements in the 21st century: An empirical investigation. *Journal of Accounting and Economics*, *69*, 101–244.

Damodaran, A. (1996). *Investment valuation: Tools and techniques for determining the value of any asset*. John Wiley & Sons.

Tabak, D. I., & Dunbar, F. C. (2001). Materiality and magnitude: Event studies in the courtroom (Ch. 19). In *Litigation services handbook: The role of the financial expert* (3rd ed.).

**Analyst Reports:**

"DB Tech Conference Takeaways," *Deutsche Bank*, September 14, 2020.

"Raise Price Target Ahead of FQ1 Results," *Fox Advisors*, October 19, 2020.

"F1Q21 Preview; Moving Ahead with Large Capacity HDD," *Cross Research*, October 21, 2020.

"Gross Margin Improvement Still Elusive in December Q Guide," *Evercore ISI,* October 22, 2020.

"Good Visibility for Now But Potential Peak Likely Closer; Maintain Neutral," *UBS*, January 21, 2021.

"Seagate: Revisiting our Thesis, Aimed at Answering a Few Questions," *Susquehanna*, March 18, 2021.

"STX: US Commerce Department Bureau of Industry & Security (BIS) Looking into Seagate's Sales to Huawei?" *Wells Fargo Securities*, March 18, 2021.

"Analyst's Notes," *Argus Research*, March 22, 2021.

"Lifting Our Forecasts, but Struggling with Relative Valuation," *Wedbush Securities,* March 22, 2021.

"F3Q results: Solid and should get better through CY21," *Deutsche Bank*, April 22, 2021.

"Demand Backdrop Sunny While Margin Trajectory Still Cloudy," *Evercore ISI*, April 22, 2021.

"Cloud and Enterprise Driving Top-Line but Long Road Yet for Margins," *Barclays*, April 23, 2021.

"Topline Strength And Margin Improvement To Continue. Reiterating Our BUY Rating And $95 Price Target," *Craig-Hallum*, April 23, 2021.

"Converging Trends Drive Double-Digit Growth," *Morgan Stanley*, April 23, 2021.

"STX: Strong Cloud and Recovering Enterprise Demand Leads to Beat-n-Raise," *Rosenblatt Securities*, April 23, 2021.

"3FQ21 Review – Good Quarter; Good Guide; Expensive Valuation," *Wedbush Securities*, April 23, 2021.

"US Commerce Fact-Finding Inquiry into Sales of HDDs to Huawei—Focus on Seagate (See Letter Link Below)," *Wells Fargo Securities,* May 11, 2021.

"Structural Pricing Reset Lifts EPS," *Morgan Stanley*, July 21, 2021.

"STX: Nearline Momentum Continues; Confidence in Sustainable 30%+ GM% w/ Increased F2022 Rev. Outlook (Low SD% Growth)," *Wells Fargo Securities*, October 22, 2021.

"Fireside Chat Highlights Near Term Pressures," *Morgan Stanley*, March 8, 2022.

"STX: Slight March Quarter Guidance Revision Due to Tactical Issues," *Rosenblatt Securities*, March 8, 2022.

"Adjust Model Post Updated Guidance," *UBS*, March 8, 2022.

"Lowering estimates on near-term revenue and margin headwinds," *Bank of America*, March 9, 2022.

"A miss-and-miss, but will inventory adjustments be done in one quarter?" *Deutsche Bank*, July 21, 2022.

"STX: Correction in Place; Expectations for Sequential Growth to Resume," *Rosenblatt Securities*, July 21, 2022.

"Will Demand Rebound in F2H23 After Near-Term Inventory Correction?" *Morgan Stanley*, July 22, 2022.

"Trimming Estimates on Near-Term Inventory Digestion, But LT Growth Thesis Remains Intact," *UBS*, July 22, 2022.

"HAMR Progress a Silver Lining in a Disappointing Report," *Wedbush Securities*, July 22, 2022.

"Is Dec qtr the bottom? PO to $70," *Bank of America*, October 26, 2022.

"Another Cut Exposes More Questions than Answers," *Barclays*, October 26, 2022.

"Controlling The Controllables," *BNP Paribas*, October 26, 2022.

"F1Q23 Review; Inventory Correction Underway, Question On Duration With HAMR On The Horizon," *Credit Suisse*, October 26, 2022.

"Dec Should Be The Trough, But Risk Factors Are Elevated," *Morgan Stanley*, October 26, 2022.

"STX: Inventory Correction in Full Swing; Management Lowering Production and Costs; Lowering PT," *Rosenblatt Securities*, October 26, 2022.

"The Correction in the Mirror May Be Larger Than It Appears," *Wedbush Securities*, October 26, 2022.

"Analyst's Notes," *Argus Research*, October 27, 2022.

"Downgrade To Neutral: New Risks Offset An Otherwise Solid Recovery Story," *UBS*, October 27, 2022.

"STX: Better than Expected – GM% Recovery, Increased HAMR Confidence, and Path Back to >$5/sh. EPS in Focus," *Wells Fargo Securities*, January 25, 2023.

"Recovery Is Here, But BIS Situation Still An Overhang," *UBS*, January 26, 2023.

"Weekly Muse-ings: Earnings Have Arrived Once Again (ASML, LRCX, TSMC and STX)," *Evercore ISI*, April 15, 2023.

"Focusing On What Can Be Controlled," *Cowen and Company*, April 20, 2023.

"F3Q Results: Recovery pushed as macro concerns weigh on demand," *Deutsche Bank*, April 20, 2023.

"Still Searching for a Bottom as Nearline Inventory Correction Continues," *Evercore ISI*, April 20, 2023.

"Seagate Earnings: Poor Profits, Layoffs, and a Legal Settlement Combine for a Disappointing Quarter," *Morningstar*, April 20, 2023.

"Seagate: Thesis Playing Out; Recovery Timeline Extended/Breaching Debt Covenants," *Susquehanna*, April 20, 2023.

"Daily Chip Clips," *Oppenheimer*, April 21, 2023.

**Earnings Calls and Conferences:**

Deutsche Bank 2020 Technology Virtual Conference, September 15, 2020.

Q1 2021 Earnings Call, October 22, 2020.

Q2 2021 Earnings Call, January 21, 2021.

Q3 2021 Earnings Call, April 22, 2021.

BofA Securities Global Technology Conference, June 8, 2021.

Q4 2021 Earnings Call, July 21, 2021.

Q1 2022 Earnings Call, October 22, 2021.

Morgan Stanley Technology, Media and Telecom Conference, March 8, 2022.

Q4 2022 Earnings Call, July 21, 2022.

Q1 2023 Earnings Call, October 26, 2022.

**Websites:**

https://www.bis.gov/node/20250/

https://www.exportsolutionsinc.com/resources/blog/a-look-behind-seagates-record-breaking-export-penalty/

https://www.wsj.com/business/telecom/seagate-broke-export-curbs-by-supplying-huawei-senate-republicans-say-11635254101/

SEC EDGAR

**Other:**

BIS Settlement dated April 19, 2023

All other data and documents cited or referred to within this report and Opening Report.

Case 3:23-cv-03431-RFL    Document 161-2    Filed 03/24/26    Page 76 of 78

**Event Study Results: Alleged Misstatements**

| Date | Market Impact Date | Raw Return | Abnormal Return | Abnormal Return ($) | p-Value | Significance Level |
|------|------|------|------|------|------|------|
| Apr 22, 2021 | Apr 23, 2021 | 6.03% | 4.62% | $3.89 | 0.0193 | ** |
| Oct 22, 2021 | Oct 22, 2021 | 6.07% | 6.36% | $5.23 | 0.0017 | *** |

Data Sources: Opening Report, Bloomberg, S&P Capital IQ, SEC EDGAR, Factiva, Complaint

Notes: Regression models described in notes below my Opening Report Exhibit 7. "*," "**," and "***" denote statistical significance at the 90%, 95%, and 99% confidence levels, respectively.

**Exhibit 1b**

### Event Study Results: Alleged Corrective Disclosures

| Date | Market Impact Date | Raw Return | Abnormal Return | Abnormal Return ($) | p-Value | Significance Level |
|---|---|---|---|---|---|---|
| Mar 08, 2022 | Mar 08, 2022 | -9.51% | -11.14% | -$11.15 | 0.0000 | *** |
| Jul 21, 2022 | Jul 22, 2022 | -8.11% | -6.10% | -$5.10 | 0.0000 | *** |
| Oct 26, 2022 | Oct 26, 2022 | -7.95% | -7.76% | -$4.50 | 0.0000 | *** |
| Apr 19, 2023 | Apr 20, 2023 | -9.20% | -8.99% | -$5.65 | 0.0000 | *** |

Data Sources: Opening Report, Bloomberg, S&P Capital IQ, SEC EDGAR, Factiva, Complaint

Notes: Regression models described in notes below my Opening Report Exhibit 7. "*," "**," and "***" denote statistical significance at the 90%, 95%, and 99% confidence levels, respectively.

**Exhibit 2**

**Seagate's Revenue Absent Illegal HDD Sales to Huawei**
**October 2020 – October 2021**

| Relevant Period | Announced Revenue Date | Realized Revenue (billions) | Average Analyst Revenue Estimate for Relevant Period (billions) | Revenue Derived from Illegal Sales to Huawei (billions) | Revenue Derived from Illegal Sales to Huawei (%) | Realized Revenue Absent Illegal Huawei Sales (billions) | Seagate Misses Analyst Expected Revenue Target | Seagate Misses Analyst Expected Revenue Target Absent Illegal Huawei Sales |
|---|---|---|---|---|---|---|---|---|
| 1Q 2021 | Oct 22, 2020 | $2.31 | $2.34 | $0.07 | 3.06% | $2.24 | Yes | *Yes* |
| 2Q 2021 | Jan 21, 2021 | $2.62 | $2.57 | $0.15 | 5.61% | $2.48 | No | *Yes* |
| 3Q 2021 | Apr 22, 2021 | $2.73 | $2.68 | $0.37 | 13.42% | $2.36 | No | *Yes* |
| 4Q 2021 | Jul 21, 2021 | $3.01 | $2.98 | $0.23 | 7.67% | $2.78 | No | *Yes* |
| 1Q 2022 | Oct 22, 2021 | $3.12 | $3.11 | $0.29 | 9.28% | $2.83 | No | *Yes* |

Data Sources: BIS Settlement, SEC Edgar, Bloomberg.